# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HAYMOUNT URGENT CARE PC, AND ROBERT A. CLINTON, JR., INDIGO INSTALLATIONS, INC. AND CHRISTOPHER A. TURRENTINE, individually, and on behalf of all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOFUND ADVANCE, LLC; FUNDING 123, LLC; MERCHANT CAPITAL LLC; ALPHA RECOVERY PARTNERS, LLC; YITZCHOK ("ISAAC") WOLF; JOSEF BREZEL; JOSEPH KROEN; AND YISROEL C. GETTER,<br><br>Defendants. | Civ. A. No. 1:22-cv-01245-JSR |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Haymount Urgent Care PC, Robert A. Clinton, Jr., MD., Indigo Installations, Inc. ("Indigo"), and Christopher A. Turrentine ("Turrentine") (collectively "Plaintiffs"), individually and on behalf of all those similarly situated, as and for their Complaint against GoFund Advance, LLC, ("GoFund"), Funding 123, LLC ("Funding 123"), Merchant Capital, LLC ("Merchant Capital"), Alpha Recovery Partners, LLC  ("Alpha Recovery"); Yitzchok (a/k/a Isaac) Wolf ("Wolf"), Joseph Kroen ("Kroen") and Yisroel C. Getter ("Getter") (collectively "Defendants"), state as a follows:

## NATURE OF THE ACTION

1.      This is a class action against several related merchant cash advance ("MCA") companies that are controlled and manipulated by Defendants Wolf, Brezel, Kroen and Getter, to carry out a fraudulent scheme to collect upon unlawful debts and otherwise fraudulently obtain

funds from Plaintiffs and hundreds of other similarly situated victims through the use of their sham

MCA agreements as further defined below ("MCA Agreements").

2.      Unfortunately, the type of conduct by Defendants here is a ballooning national

problem that has raised the attention of both state and federal regulators.

3.      In November 2018, Bloomberg News and renowned journalist Bethany McLean

(of Vanity Fair acclaim) published what would be the first in a series of groundbreaking news

articles exposing the abuses of the MCA industry, and its use of confessions of judgments to seize

out-of-state bank accounts.[1]

4.      The New York Legislature quickly took action, banning the use of out-of-state

confessions of judgment in September 2019.  In support, the Legislature cited Bloomberg News.

5.      More recently, on February 10, 2022, Bloomberg News exposed a new tactic being

abused by the predatory MCA industry, and in particular, Defendants here.  *See* Exs. 1-2.

6.      Specifically, Defendants operate out of New York but abuse an apparent loophole

under Connecticut procedural law to collect upon their unlawful debts.  In doing so, Defendants

freeze out-of-state bank accounts by simply serving legal papers (which have not been reviewed

or scrutinized by any court) on a bank that has a branch located in Connecticut.  As justification

for their bank freezes, Defendants represent and attest under oath that their small business victims

owe them a debt and that Defendants are unaware of any defenses to their claims.

7.      According to Bloomberg News, this Connecticut loophole was used more than 180

times just last year.  The result of this tactic is often catastrophic because Defendants can freeze

out-of-state bank accounts without any notice whatsoever.  Once frozen, Defendants can then

---

[1] *https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html* ; *https://www.bloomberg.com/confessions-of-judgment*

extort payment under duress due to their victims' need to save payroll or pay other necessary business expenses, such as insurance, taxes, rent and inventory.

8.      This tactic is especially harsh because even when the small business victim capitulates to Defendant's extortionate demands, it is often too late because the release of those bank accounts may take days to unfreeze due to the processing delays and procedural constraints of individual banks and their levy departments.

9.      In doing so, Defendants violated 42 U.S.C. § 1983 by violating their Fourteenth Amendment right to Due Process under the color of Connecticut state law.   Among these intentional violations of due process, Defendants, like here, knowingly and purposely issue Prejudgment Writs of Attachment to third-party banks without first filing a complaint in state court, and without serving notice upon Defendants.   Instead, Defendants require Plaintiffs to execute form contracts of adhesion waiving their rights to a hearing, while at the same time agreeing to the jurisdiction of three different states, Connecticut, New York, and Texas.   Thus, the first notice received by Plaintiffs is when their bank accounts become frozen.

10.     In addition to freezing bank accounts, Defendants also collect upon their unlawful debts by sending UCC Lien Notices to third parties, through Defendant Alpha Recovery, demanding the third party to pay Defendants and falsely representing that if the third party does not comply that it will result in the third-party "paying the obligation twice," and threatening the "time, expense and inconvenience which would inevitably accompany a formal legal proceeding." *See*, *e.g*., Ex. 3.

11.     In doing so, Defendants attempt to give the false impression that Alpha Recovery is an independent debt collector when, in fact, they are just an arm of the MCA companies.

12.      And Defendants are not even good at their sham.  On the cover letter, Alpha Recovery purports to have an address of 1247 49th Street, STE 197, Brooklyn, N.Y. and GoFund Advance purports to have an address of 5308 13th Ave. STE 324, Brooklyn, N.Y.

13.      But the UCC filing they attach only further reveals the fraud.  Under Section 3, the UCC lists the Secured Party's Name as "Go Fund," and the address listed is 1247 49th Street, STE 197, Brooklyn, NY—the very same address at Alpha Advance.

14.      But the sham gets better.  Just last month, Florence D. Zaboritsky, Esq. of Alpha Advance, filed a summons and complaint in Kings County, N.Y. representing to a New York court that GoFund Advance was a limited liability company organized under the laws of New York and that it had an address of 5308 13th Ave, STE 324, Brooklyn, N.Y.  *See* Ex. 4.

15.      That is quite curious.  On January 24, 2022, the same Go Fund Advance LLC filed an annual report in the State of Connecticut representing that it was a Connecticut LLC and that its principal place of business was located at 500 West Putnam Ave. in Greenwich, Connecticut. The same filing lists Defendant Kroen as previous member of the company.  *See* Ex. 5.

16.      Apparently neither of the locations represented by counsel is accurate.  Unless, of course, Defendants operate out of mailbox store.  Below is the 5308 13th Ave location:



17.     And below is the 1247 49th Street location:



18.     As it turns out, Bloomberg News was spot on.  Defendants do in fact operate a series of related predatory lending companies out of Brooklyn, N.Y., such as Merchant Capital, Matrix Advance, GoFund, and Bridge Funding Cap, as well as others identified herein, but fraudulently represent to governmental agencies that those companies operate out of Connecticut solely so that they can abuse the Connecticut loophole exposed by Bloomberg News.  *See* Ex. 2.

19.     To be sure, a simple search of the public docket from the State of Connecticut Superior Court confirms that Defendants have, in fact, filed numerous actions under these company names.  *See* Ex. 6.

20.     As further reported by Bloomberg News, Defendants purportedly act under the direction of a former drug trafficker who recently had his federal prison sentence commuted by President Trump without utilizing the safeguards and review process typically employed by U.S. Presidents.  *See* Ex. 1.  The individual defendants are purportedly all relatives of John Braun.

21.     Bloomberg News is not alone in alleging that Braun is part of an unlawful loansharking scheme.  The Federal Trade Commission and the New York State Attorney General

have each likewise accused Braun of loansharking, fraud, and other heinous collection tactics, including threats of physical violence. *See* Exs. 7-8.

22.     Plaintiffs here are representatives of Defendants' unlawful lending practices.

23.     Plaintiff Haymount is an urgent care center in North Carolina that desperately needed a cash infusion to help combat the recent Omicron surge.

24.     From August 25, 2021 through February 17, 2022, Defendants advanced a total of $3,080,000 and collected $4,601,407.  That is an effective interest rate exceeding 100%.  The maximum interest rate permitted under the criminal usury laws of New York is 25%.  That is four times the amount allowed under the criminal laws of this State.

25.     The interest rate is even far worse than 100% due to Defendants' typical scheme of only advancing a portion of the amount promised, and then lending the merchant back its money, at a criminally usurious interest rate.

26.     For example, in the last transactions involving Plaintiff Haymount, Defendant GoFund promised to advance $1,000,000 but only advanced $400,000, and only after Haymount had paid back nearly $800,000, did GoFund advance another $400,000.

27.     In addition to shorting Plaintiff Haymount on the amounts advance, Defendants also over collected on prior transactions in the hundreds of thousands of dollars.

28.     Apparently, Defendants' greed knows no bounds.  After collecting more than $1.6 million in criminally usurious interest from Plaintiffs, Defendants had the temerity to send a UCC Lien Notice to Plaintiff Haymount's largest claim administer—demanding another $488,928.23.

29.     Plaintiff Indigo is a contractor out of Texas and experienced similar treatment.

30.     Originally, Defendant GoFund promised to advance $40,000 in exchange for a payback of $63,960 at $2,200 per day.

31.     But that is not what happened.  Instead, Defendant GoFund deposited $14,000 on February 2, 2022, and only after Plaintiff Indigo had already paid back $24,200 within 11 business days, did GoFund deposit another $14,000 on February 18, 2022.

32.     The total payback?  A whopping $127,920.  That is correct.  GoFund advanced a total of $28,000 and duped Plaintiff Indigo into executing two separate agreements requiring it to payback $127,920—at $2,200 per day.

33.     And when Plaintiff Indigo finally realized it had been tricked by blocking further debits, Defendants responded by utilizing the Connecticut loophole exposed by Bloomberg News to freeze Plaintiff Indigo's bank account located in McKinney, Texas.

34.     Defendants similarly sent a UCC Lien letter to one of Plaintiff Indigo's customers, demanding immediate payment of $31,360.  *See* Ex. 9.

35.     Immediately upon freezing Plaintiff Indigo's bank account, Defendants attempted to extort more money from Plaintiff Indigo.

36.     On March 3, 2022, Defendants, through the same attorney identified by Bloomberg News, sent Plaintiff Indigo a bank release based on purported settlement that had been reached with Defendants.  *See* Ex. 10.

37.     No settlement had been reached.  Instead, it was an extortion attempt to obtain $7,702 through the threat of financial duress in violation of the Hobbs Act, 18 U.S.C § 1951.

38.     Like others similarly situated, Defendants ultimately extorted a settlement under duress by conditioning the release of their unlawful restraint on the PNC Bank account and UCC Lien Notices on additional payment and a release of the very claims at issue.

39.     Plaintiffs now bring this action on behalf of Plaintiffs and those similarly situated, to permanently enjoin Defendants from their myriad unlawful practices.

## THE PARTIES

40.     Plaintiff Haymount Urgent Care, P.C., is a North Carolina professional corporation organized under the laws of the state of North Carolina, with its principal place of business located in North Carolina.

41.     Plaintiff Robert A. Clinton Jr., MD is an individual and citizen of North Carolina.

42.     Plaintiff Indigo Installations, Inc. is a corporation duly organized under the laws of Texas, with its principal place of business located in McKinney, Texas.

43.     Plaintiff Christopher A. Turrentine in an individual and citizen of Texas.

44.     Defendant GoFund Advance, LLC is a limited liability company organized under the laws of Connecticut with its principal place of business located somewhere in Brooklyn, N.Y.

45.     Defendant Funding 123, LLC is a limited liability company organized under the laws of Connecticut with its principal place of business located somewhere in Brooklyn, N.Y.

46.     Defendant Merchant Capital, LLC is a limited liability company organized under the laws of Connecticut with its principal place of business located somewhere in Brooklyn, N.Y.

47.     Defendant Alpha Recovery Partners, LLC is a limited liability company organized under the laws of New York with its principal place of business somewhere in Brooklyn, N.Y.

48.     Defendant Isaac Wolf is an individual and citizen of Brooklyn, New York.

49.     Defendant Yisroel C. Getter is an individual and citizen of Brooklyn, New York.

50.     Defendant Josef Brezel is an individual and citizen of Brooklyn, New York.

51.     Defendant Joseph Kroen is an individual and citizen of Brooklyn, New York.

## JURISDICTION

52.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

53.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

54.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68 ("RICO").

55.     The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

56.     This Court has original jurisdiction based upon 28 U.S.C. § 1332(a) because no Plaintiff is a citizen of the same state as Defendant and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

57.     This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

58.     Venue is proper because each Defendant regularly conducts business within this judicial district.

## COMMON FACTUAL ALLEGATIONS

### A. The Predatory MCA Industry.

59.     The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[2] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

60.     As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[3] The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.*  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated." *Id.*

### B. The Sham.

61.     Many states, like New York, have laws prohibiting the predatory interest rates. In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables."  MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts.  The form of the contract thus allows MCAs to represent to

---

[2] https://www.sec.gov/litigation/admin/2008/34-58574.pdf
[3] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences.

### C.    The Bloomberg Awakening.

62.    For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all changed on November 20, 2018 when Bloomberg News and renowned journalist Bethany McLean published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[4]

63.    As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

64.    Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story."  As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[6]

65.    Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.[7]

---

[4] *https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html*
[6] https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=60
[7] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping

66.     On July 31, 2020, the Securities and Exchange Commission shut down an MCA company. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."[8] The FBI thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.[9]

67.     On June 10, 2020, the Federal Trade Commission filed a complaint against John Braun and his various companies alleging various fraudulent and deceptive practices in connection with MCAs.  *See* Ex. 6.[10]

68.     On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone.[11] Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them."  *Id.*

69.     On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[12]

70.     On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on

---

[8] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm
[9] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html
[10] https://www.ftc.gov/system/files/documents/cases/192_3252_rcg_advances_-_complaint.pdf
[11] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small
[12] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf.

future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."[13]

71.    On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[14]

72.    As Gretchen Morgenson of NBC News recently reported, however, the financial greed of predatory lenders, like Defendants, has only accelerated in the wake of Covid-19.[15]

**D.    The Sea Change in Law.**

73.    Prior to the Bloomberg Awakening, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA companies.  Courts primarily denied those attempts on the procedural basis that a plenary action must be filed instead of merely seeking to vacate by motion.  One court went so far as to sanction the attorney for even bringing the motion.  *See, e.g., Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty Jun. 25, 2018) (citing *Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct. Erie Co. Oct. 6, 2017)).

74.    The tide has since turned in the wake of the Bloomberg articles.  Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings. *See McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty Nov. 19,

---

[13] https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/
[14] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/
[15] https://www.nbcnews.com/business/economy/feds-crack-down-lenders-targeting-small-businesses-high-interest-loans-n1236167, Aug. 11, 2020.

2019). Notably, Judge Nowak reversed his own prior decision in *Yellowstone Capital, LLC v. Jevin*, *supra*, where he previously held that the very same Yellowstone agreement was not a loan as a matter of law. This time, upon further reflection, Judge Nowak not only upheld the claims of usury, but also upheld the RICO claims.  Numerous courts have followed suit.  *See, e.g., Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims); *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122 N.Y.S.3d 309 (2d Dep't. 2020);; *American Resources Corp. v. C6 Capital, LLC*, 2020 N.Y. Misc. LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); *Funding Metrics LLC v. NRO Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); *Funding Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019), *rev'd on other grounds*.

75.     Numerous federal courts have also joined the revolution. *See Fleetwood Servs., LLC v. Ram Capital Funding LLC*, 2021 U.S. Dist. LEXIS 94381 (S.D.N.Y. 2021) (upholding RICO claims under MCA agreement); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp*., 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same); *Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims).

76.     So has New York's highest court.  Most notably, a member of New York's highest court, just recently advised in *dicta* that MCA transactions, like here, more closely resemble loans subject to New York's usury laws rather than bona fide sales of receivables:

> Although the GTR and CMS agreements are described as 'factoring' agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and

> CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, NE3d, 2021 NY Slip Op 05616 [2021]). Nevertheless, for the purpose of these certified questions, we are asked to assume the judgments rendered on those agreements are valid.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021).

**E.   The MCA Agreements are Substantively And Procedurally Unconscionable.**

77.    The MCA Agreements are unconscionable contracts of adhesion that are not negotiated at arms-length.

78.    Instead, the MCA Agreements contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that each of the transactions, including those involving the Plaintiffs, are really loans.

79.    Among these one-sided terms, the MCA Agreements include: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing

from other sources, (11) the maintenance of business interruption insurance, (12) an assignment

of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit

card processing payments to the MCA company, (14) a power-of-attorney to settle all obligations

due to the MCA Company and (15) a power of attorney authorizing the MCA company to "file

any claims or taken any action or institute any proceeding…"

80.     The MCA Agreements are also unconscionable because they contain numerous

knowingly false statements. Among these knowingly false statements are that: (1) the transaction

is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the

fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is

labor intensive and is not an automated process, requiring the MCA company to charge an

exorbitant ACH Program Fee or Origination Fee.

81.     The MCA Agreements are also unconscionable because they are designed to fail.

Among other things, the MCA Agreements are designed to result in a default in the event that the

merchant's business suffers any downturn in sales by preventing the merchant from obtaining other

financing and requiring the merchant to continuously represent and warrant that there has been no

material adverse changes, financial or otherwise, in such condition, operation or ownership of

Merchant.

82.     The MCA Agreements also contain numerous improper penalties that violate

New York's strong public policy.  Among these improper penalties, the MCA Agreements (1)

entitle the MCA company to attorneys' fees, (2) accelerate the entire debt upon an Event of

Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just

one fixed daily payment.

83.     The Daily Payments under each of the MCA Agreements described below were

fixed and absolute and each of the agreements' reconciliation provisions were a sham.

84.     Defendants did not maintain reconciliation departments and did not have any one trained or otherwise dedicated to performing any reconciliation of a merchant's accounts.  Indeed, the MCA Agreements did not contain any functioning contact information whereby Plaintiffs could even request a reconciliation within the terms of that provision.

85.     The terms of the reconciliation provisions further reveal the sham.

**N.     The Enterprise Intentionally Disguised the True Nature of the Transaction.**

86.     Despite the documented form, the Transaction is, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a)     The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)     The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)     The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)     The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

## FACTS SPECIFIC TO PLAINTIFFS

### A.     Haymount Urgent Care, P.C.

87.     Haymount provides medical services to the citizens of Fayetteville North Carolina and strives to keep the community healthy by offering not only urgent care services but also primary care to its community.

### B.     The Impact of COVID-19

88.     Haymount offers special care to the community's veterans and is a VA-approved urgent care practice and certified to provide VA disability consultations.

89.     Haymount employs over 100 employees and sees over 300 per day. The average payroll is in excess of $250,000 per month.

90.     Haymount offers to pay up to 50% of its employee's health insurance, and provides $100,000 in life insurance (due to the risk of Covid-19).  It also provides a matching 401k program and health benefits to its employees who are frontline workers.

-18-

91.   As a direct result of the COVID-19 pandemic, Haymount's funds were greatly reduced due to the facilities choice to take precautionary expensive measures to protects its patients and its employees.   The main expense is the cost to provide testing to patients – setup a full PCR lab, hire additional scientists and staff, pay for reagants and supplies.

92.   With the surge in the pandemic due to various strains (Delta last summer/fall and Omicron recently), its testing numbers dramatically went up to 2,500 patients per day requiring Haymount to look for funds.

93.   Haymount took on the added expenses to pay for personal protection equipment, cleaning supplies, overtime, as well as other necessary expenses to protect its patients and employees.

94.   In addition to increased expenses, there was an increased need for medical care from individuals who could not afford it.

95.   As a direct result, all of the Haymount's revenues were greatly reduced.

96.   Haymount's revenues had been operating at approximately $60,000 per month. Expenses and revenues fluctuate with the pandemic surges.  Expenses are paid two to three months prior to collecting payments on claims.  With the added expense of these loans, profitability is severely diminished.

97.   The issues related to aging receivables stem from a lack of collectability for patients with Medicare, TriCare for Life and slow payment of HRSA (CARES ACT payments for the uninsured) and private insurance companies.

98.   Prior to COVID-19, the margins of Haymount Urgent Care were very thin.

99.   As a direct result of COVID-19, cash flow has been problematic due to slow payment from HRSA for uninsured and zero payments from Medicare.

100.  In addition to slowed payments, Haymount has incurred additional expenses as a result of purchasing equipment to protect against COVID-19.

101.  As a direct result of these factors, Haymount was actively looking for long-term financing of approximately ($12,000,000) over as long of a period as possible so that it could stay afloat to help treat the community suffering during the deadly pandemic, whilst also ensuring the safety of its patients and staff.

102.  Enter the MCAs.

**C.      The First Usurious Loan (GoFund)**

103.   Plaintiffs entered into their First MCA Agreement with Merchant Capital on August 25, 2021 ("First MCA").

104.   The First MCA provided Plaintiffs an advance of $200,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $275,000.00 (the "Purchased Amount") was repaid.

105.   The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $7,299 (a "Daily Payment"), and the amount would be repaid in just 52 days which, on its face, translates to an annual interest rate of more than 263% per annum or more than 10 times the maximum 25% rate permitted under New York Penal Law.

106.   The fixed daily payment was disguised as a good-faith estimate equal to 45% of Haymount's daily revenues. The estimated daily payment did not remotely reflect 45% of Haymount's daily revenues. Rather, the estimated daily amount was dictated by Defendants based on the length of the payment term of the loan.

107.    Merchant Capital entered into the sham First MCA agreement with Plaintiffs wherein the Plaintiffs were forced to pay an unconscionable interest rate of 263%. Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

108.    Even worse, Merchant Capital did not advance Plaintiff the full Purchased Amount. Instead, Merchant Capital deducted an "ACH Origination Fee" of 10% of the purchase price for origination and related expenses.

109.    Merchant Capital also deducted an "Underwriting Fee" of 12% of the purchase price for underwriting and related expenses.

110.    Merchant Capital also deducted an NSF Fee, Wire Fee, Risk Assessment Fee, UCC Fee, and a Management Fee.

111.    While the ACH Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Merchant Capital performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the ACH Origination Fee, Underwriting Fee, and other fees were merely additional disguised interest.

112.    As a direct result of these sham fees, Haymount received a total of $160,000, despite having a face amount of $200,000.

113.    Given the inability to sustain the unconscionable payments to Merchant Capital, Plaintiffs were forced to enter into another MCA in order to pay this First MCA.

**D.      GoFund: The Second Usurious loan.**

114.    Plaintiffs entered into their second MCA Agreement with GoFund on August 26, 2021 ("Second MCA").

115.    The Second MCA provided Plaintiffs an advance of $250,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $349,750.00 (the "Purchased Amount") was repaid.

116.    The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $8,000 (a "Daily Payment"), and the amount would be repaid in just 60 days which, on its face, translates to an annual interest rate of more than 242% per annum or more than 9 times the maximum 25% rate permitted under New York Penal Law.

117.    The fixed daily payment was disguised as a good-faith estimate equal to 25% of Haymount's daily revenues. The estimated daily payment did not remotely reflect 25% of Haymount's daily revenues. Rather, the estimated daily amount was dictated by Defendants based on the length of the payment term of the loan.

118.    GoFund entered into the sham Second MCA agreement with Plaintiffs wherein the Plaintiffs were forced to pay an unconscionable interest rate of 242%. Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

119.    Even worse, GoFund did not advance Plaintiff the full Purchased Amount.

120.    Instead, GoFund deducted an "ACH Origination Fee" of 10% of the purchase price to cover cost of origination and ACH Setup.

121.    GoFund also deducted an Underwriting Fee of 12% of the purchase price for underwriting and related expenses.

122.    GoFund also deducted an NSF Fee, Wire Fee, Risk Assessment Fee, UCC Fee, and a Management Fee.

123.    While the ACH Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, GoFund performed little or no due

diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the ACH Origination Fee, Underwriting Fee, and other fees were merely additional disguised interest.

124.     As a direct result of these sham fees, Haymount received a total of $200,000, despite having a face amount of $250,000

125.     Given the inability to sustain the unconscionable payments to GoFund, Plaintiffs were forced to enter into another MCA in order to pay the Second MCA.

**E.      GoFund: The Third Usurious loan.**

126.     Just one month later, on September 27, 2021, Plaintiffs entered into a Third MCA with GoFund ("Third MCA").

127.     The Third MCA provided Plaintiffs an advance of $150,000 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $224,850 (the "Purchased Amount") was repaid.

128.     The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $7,500 (a "Daily Payment"), and the amount would be repaid in just 28 days which, on its face, translates to an annual interest rate of more than 650% per annum or more than 26 times the maximum 25% rate permitted under New York Penal Law.

129.     The fixed daily payment was disguised as a good-faith estimate equal to 25% of Haymount's daily revenues. The estimated daily payment did not remotely reflect 25% of Haymount's daily revenues.  Rather, the estimated daily amount was dictated by Defendants based on the length of the payment term of the loan.

130.    GoFund entered into the sham Third MCA agreement with Plaintiffs wherein the Plaintiffs were forced to pay an unconscionable interest rate of 650%. Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

131.    Even worse, GoFund did not advance Plaintiff the full Purchased Amount. Instead, GoFund deducted an "ACH Origination Fee" of 10% of the purchase price to cover cost of origination and ACH Setup.

132.    GoFund also deducted an Underwriting Fee of 12% of the purchase price for underwriting and related expenses.

133.    GoFund also deducted an NSF Fee, Wire Fee, Risk Assessment Fee, UCC Fee, and a Management Fee.

134.    While the ACH Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, GoFund performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the ACH Origination Fee, Underwriting Fee, and other fees were merely additional disguised interest.

135.    As a direct result of these sham fees, Haymount received a total of $120,000, despite having a face amount of $150,000

136.    Given the inability to sustain the unconscionable interest rate of the Third MCA, the Plaintiffs were in dire need of additional funding.

**F.    GoFund: The Fourth Usurious loan.**

137.    On December 16, 2021, Plaintiffs entered into the Fourth MCA with GoFund Advance ("Fourth MCA").

138.   The Fourth MCA provided Plaintiffs an advance of $1,000,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $1,350,000.00 (the "Purchased Amount") was repaid.

139.   The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $35,000 (a "Daily Payment"), and the amount would be repaid in just 39 days which, on its face, translates to an annual interest rate of more than 319% per annum or more than 13 times the maximum 25% rate permitted under New York Penal Law.

140.   The fixed daily payment was disguised as a good-faith estimate equal to 45% of Haymount's daily revenues.  The estimated daily payment did not remotely reflect 45% of Haymount's daily revenues.  Rather, the estimated daily amount was dictated by Defendants based on the length of the payment term of the loan.

141.   Notably, simple math demonstrates the sham.  If 25% of Haymount's receivables equaled $7,500 (as alleged and represented in the Third MCA), then 45% should equal less than $15,000.  Instead, Defendant's knowingly and intentionally falsely inflated the fixed daily payment amount based on the size of the loan amount ($1,000,000), as opposed to any spike in receivables.

142.   GoFund entered into the sham Fourth MCA agreement with the Plaintiffs wherein the Plaintiffs were forced to pay an unconscionable interest rate of 319%. Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

143.   GoFund did not advance Plaintiff the full Purchased Amount. Instead, GoFund deducted an "ACH Origination Fee" 10% of the purchase price to cover cost of Original and ACH Setup.

144.    GoFund also deducted an Underwriting Fee of 12% of the purchase price for underwriting and related expenses.

145.    GoFund also deducted an NSF Fee, Wire Fee, Risk Assessment Fee, UCC Fee, and a Management Fee.

146.    While the ACH Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, GoFund performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the ACH Origination Fee, Underwriting Fee, and other fees were merely additional disguised interest.

147.    As a direct result of these sham fees, Haymount received a total of $900,000, despite having a face amount of $1,000,000

148.    As further evidence that the transaction was a loan based on the time value of the money advanced (as opposed to the value of the receipts purchased), an addendum to the Fourth MCA stated: "Merchant will only have to pay back $1,150,000.00 of the payback amount if paid within 2 weeks of funding and $1,210,000.00 if paid within 4 weeks of funding.

149.    GoFund has not only charged Plaintiffs improper fees but GoFund has withdrawn daily payments in excess of the amount that was authorized by the Plaintiff to be withdrawn from Plaintiff's bank account. GoFund has improperly taken thousands of dollars in unauthorized overpayments from the Plaintiff.

150.    GoFund has extracted unauthorized overpayments from the Plaintiff's bank account, above and beyond the Daily Payment being made by the Plaintiff without any notice or prior authorization, and well after Plaintiff had paid the loan in full.

151.    In total, Plaintiff has overpaid in excess of $50,000 to GoFund in unauthorized overpayments related to the Fourth MCA, by way of the Defendant's unlawful debiting from the Plaintiff's bank account.

**G.     Funding 123: The Fifth Usurious loan.**

152.    On December 27, 2021, Plaintiffs entered into a Fifth MCA with Funding 123 ("Fifth MCA").

153.    The Fifth MCA provided Plaintiffs an advance of $2,000,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $2,998,000.00 (the "Purchased Amount") was repaid.

154.    The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $80,000 (a "Daily Payment"), and the amount would be repaid in just 45 days which, on its face, translates to an annual interest rate of more than 405% per annum or more than 16 times the maximum 25% rate permitted under New York Penal Law.  Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

155.    Once again, the fixed daily payment was disguised as a good-faith estimate equal to 45% of Haymount's daily revenues.  The estimated daily payment did not remotely reflect 45% of Haymount's daily revenues.  Rather, the estimated daily amount was dictated by Defendants based on the length of the payment term of the loan.

156.    Once again, Defendants did not advance Plaintiff the full Purchased Amount.  Instead, Funding 123 deducted $100,000 in fees.

157.    Funding 123 did not advance Plaintiff the full Purchased Amount. Instead, Funding 123 deducted an "ACH Origination Fee" 10% of the purchase price to cover cost of origination and ACH Setup.

158.     Funding 123 deducted an Underwriting Fee of 12% of the purchase price for underwriting and related expenses.

159.     Funding 123 also deducted an NSF Fee, Wire Fee, Risk Assessment Fee, UCC Fee, and a Management Fee.

160.     While the ACH Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Funding 123 performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the ACH Origination Fee, Underwriting Fee, and other fees were merely additional disguised interest.

161.     As a direct result of these sham fees, Haymount received a total of $900,000, despite having a face amount of $1,000,000.

162.     On its face, the Fifth MCA was structured as two disbursements wherein the second disbursement would not be triggered unless further confirmed by the borrowing Plaintiffs. When Haymount Urgent Care informed Funding 123 that it did not want the second part of the loan, Funding 123 ignored Haymount's request and began threatening the ultimate destruction of Haymount's business.

163.     Even more disturbing, Funding 123 has withdrawn daily payments in excess of the amount that was authorized by the Plaintiff to be withdrawn from Plaintiff's bank account. Funding 123 has improperly taken thousands of dollars in unauthorized overpayments from the Plaintiff.

164.     Funding 123 has extracted unauthorized overpayments from the Plaintiff's bank account, above and beyond the Daily Payment being made by the Plaintiff without any notice or prior authorization.

165.    In total, Plaintiff has overpaid $170,000 to Funding 123 in unauthorized overpayments related to the Fifth MCA, by way of the Defendant's unlawful debiting from the Plaintiff's bank account.

**H.    GoFund: The Sixth Usurious loan.**

166.    On January 20, 2022, Plaintiffs entered into the Sixth MCA with GoFund ("Sixth MCA").

167.    The Sixth MCA provided Plaintiffs an advance of $1,000,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $1,499,000.00 (the "Purchased Amount") was repaid.

168.    The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $60,000 (a "Daily Payment"), and the amount would be repaid in just 29 days which, on its face, translates to an annual interest rate of more than 612% per annum or more than 24 times the maximum 25% rate permitted under New York Penal Law.  Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

169.    Once again, the fixed daily payment was disguised as a good-faith estimate equal to 45% of Haymount's daily revenues.  The estimated daily payment did not remotely reflect 45% of Haymount's daily revenues.  Rather, the estimated daily amount was dictated by Defendants based on the length of the payment term of the loan.

170.    No math is even needed to see the sham on this one.  Just one month earlier, GoFundrepresented that 45% of Haymount's receivables equaled $30,000 (as alleged and represented in the Fourth MCA).  Now it represents 45% is equal to $60,000. Revenues did not double in one month. Instead, Defendant's knowingly and intentionally falsely inflated the fixed

daily payment amount based on the size of the loan amount ($1,000,000), as opposed to any spike in receivables.

171.    GoFund entered into the sham Sixth MCA agreement with the Plaintiffs wherein the Plaintiffs were forced to pay an unconscionable interest rate of at least 612%.

172.    The interest rate is even worse than that because GoFund did not even advance Plaintiff the full Purchased Amount. Instead, GoFund deducted $100,000 as purported fees in connection with making the loan.

173.    But it gets worse.  GoFund did not even advance the full amount required on the face of the MCA Agreement.  Although the face of the agreement provides for an advance of $1,000,000, GoFund only advanced $400,000 (after deducting $100,000 in fees).

174.    Only after Haymount repaid over $785,000 in a span of just over two weeks, GoFund deposited another $400,000 after deducting another $100,000 in fees.

175.    In other words, GoFund used Haymount's own money for the second portion of the advance, and then charged Haymount a staggering $385,000 for the privilege of borrowing Haymount's own money.

176.    GoFund deducted an "ACH Origination Fee" 10% of the purchase price to cover cost of origination and ACH Setup.

177.     GoFund also deducted an Underwriting Fee of 12% of the purchase price for underwriting and related expenses.

178.     GoFund also deducted a NSF Fee, Wire Fee, Risk Assessment Fee, UCC Fee, and a Management Fee.

179.    While the ACH Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, GoFund performed little or no due

diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the ACH Origination Fee, Underwriting Fee, and other fees were merely additional disguised interest.

180.    GoFund has not only charged Plaintiff the above improper fees but GoFund has also withdrawn daily payments in excess of the amount that was authorized. GoFund has improperly taken thousands of dollars in unauthorized overpayments from the Plaintiff.

181.    GoFund has extracted unauthorized overpayments from the Plaintiff's bank account, above and beyond the Daily Payment being made by the Plaintiff without any notice or prior authorization, and well after Plaintiff had paid the loan in full.

182.     GoFund continues to attempt to fraudulently withdraw from Plaintiff's bank account.

183.    Throughout February 2022, Go Fund intentionally attacked every one of the Plaintiff's bank accounts by fraudulently debiting $60,000.

184.      Specifically, GoFund attacked the Plaintiff's Bank of America bank account on February 9, 2022, February 10, 2022, February 16, 2022, February 18, 2022, and February 23, 2022 by fraudulently attempting to debit $60,000.

185.    As a direct result, Bank of America placed a fraud alert on Plaintiff's bank accounts and put a stop on all ACH transactions. However, this did not stop GoFund from continuing to commit wire fraud

186.    On February 16, 2022, February 18," 2022 and February 23, 2022, GoFund attempted to bypass its block from debiting from Plaintiff's account by fraudulently debiting $60,000 from the Plaintiff's bank account under the name "GoFund b" as opposed to "GoFund.

###### I.      Fraudulent Unauthorized Overpayments Scheme.

187.    The First MCA, Second MCA, Third MCA, Fourth MCA, Fifth MCA, and Sixth MCA are individually a MCA Agreement and collectively the MCA Agreements.

188.    The Defendants have improperly provided usurious loans by way of the MCA Agreements, and have also significantly overcharged the Plaintiff as outlined in each instance above.

189.    Defendants have engaged in predatory and fraudulent conduct that allowed them to fraudulently extract even more monies from Plaintiff.

190.    Among other things, Defendants charged Plaintiff hundreds of thousands of dollars in so-called "ACH origination fees" and "Underwriting Fees" to cover the costs of due diligence that they never performed and "ACH fees" to cover ACH operations they claimed were "labor intensive" but, in actuality, were fully automated and cost a mere fraction of the fees charged to Plaintiff.

191.    Even worse, Defendants failed to properly account for Plaintiff's payments, falsely reported Plaintiff's account balances and forced Plaintiff to pay thousands of dollars in overpayments or excess collections under the MCA Agreements. Defendants have demonstrated a pattern of withdrawing unauthorized overpayments from the Plaintiff's bank accounts and committing wire fraud.

### FACTS SPECIFIC TO INDIGO

192.    Indigo is a restaurant equipment installer out of Texas.  It is owned and operated by Christopher A. Turrentine.

193.    Like just about every small business owner, Plaintiff Turrentine was bombarded with phone calls and emails offering his company short-term financing.

194.    Regrettably, he answered one of those calls with Defendants on the other end.

195.    Defendants, through GoFund, promised to advance Indigo $40,000 in exchange for a payback of $63,960 at $2,200 per day.

196.    At the time, Indigo was about to begin a new project and could use the extra cash.

197.    But just the opposite happened.

198.    Instead of getting financing, Defendants devised a scheme where the tricked Indigo to pay Defendants tens of thousands of dollars to borrow Plaintiff's own money.

199.    Rather than advance the full $40,000 as initially promised, GoFund backtracked on the day of funding, explaining that the $40,000 would be released in tranches.

200.    In doing so, GoFund provided Indigo with a loan package that consisted of two agreements.  One was dated February 1, 2022, and the second was dated February 18, 2022.

201.    On its face, the First GoFund MCA agreement provided $20,000 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $63,960 (the "Purchased Amount") was repaid.

202.    The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $2,200 (a "Daily Payment"), and the amount would be repaid in just 29 days which, on its face, translates to an annual interest rate of more than 612% per annum or more than 24 times the maximum 25% rate permitted under New York Penal Law.  Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

203.    Like Haymount, the fixed daily payment was disguised as a good-faith estimate equal to 45% of Indigo's daily revenues.  The estimated daily payment did not remotely reflect 45% of Indigo's daily revenues.  Rather, the estimated daily amount was dictated by Defendants based on the length of the payment term of the loan.

204. The Second GoFund MCA Agreement with Indigo was identical to the first with the exception that it was dated February 18, 2022.

205. One day later, on February 2, 2022, Defendant GoFund deposited $14,000 into Indigo's bank account.

206. Between February 3 and February 17, GoFund debited $2,200 per business day for a total of $24,200.

207. On February 18, 2022, GoFund then lent Plaintiff Indigo its own money back by depositing $14,000.

208. It continued, however, to debit $2,200 each business day.

209. On February 22, 2022, stopped payment on the ACH withdrawals after GoFund refused to advance the remaining $12,000 Indigo had been promised.

210. In response, Defendants utilized the Connecticut loophole exposed by Bloomberg News to freeze Plaintiff Indigo's bank account located in McKinney, Texas.

211. Defendants similarly sent a UCC Lien letter to one of Plaintiff Indigo's customers, demanding immediate payment of $33,360.  *See* Ex. 9.

212. Immediately upon freezing Plaintiff Indigo's bank account, Defendants attempted to extort more money from Plaintiff Indigo.

213. On March 3, 2022, Defendants, through the same attorney identified by Bloomberg News, sent Plaintiff Indigo a bank release based on purported settlement that had been reached with Defendants.  *See* Ex. 10.

214. No settlement had been reached.  Instead, it was an extortion attempt to obtain $7,702 through the threat of financial duress in violation of the Hobbs Act, 18 U.S.C § 1951.

215.    Nevertheless, on March 8, 2022, Plaintiff Indigo ultimately was forced to capitulate to the demands of Defendants due to the extreme financial duress of the bank freeze, and thus, Defendants successfully extorted more money from Defendant Indigo, and extorted a release of their very extortionate conduct at the same time.

## CLASS ALLEGATIONS

216.    Plaintiffs and the putative Classes repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

217.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

218.    Plaintiffs bring this action individually and on behalf of classes of similarly situated persons defined as follows:

> All persons in the United States who, on or after February 11, 2018, paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

219.    Plaintiff Indigo brings this action individually and on behalf of classes of similarly situated persons defined as follows:

> All persons in the United States who, on or after February 11, 2018, had their bank account frozen as a result of a writ of attachment issued by Defendants under the color of Connecticut law.

> All persons in the United States who, on or after February 11, 2018, had their bank account frozen as a result of a writ of attachment issued by Defendants under the color of Connecticut law, and who subsequently entered into a settlement agreement with Defendants.

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this

matter have been finally adjudicated on the merits or otherwise released or waived; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

220.     **Numerosity**:  The exact number of members of the Classes is unknown and is not available to Plaintiffs at this time, but individual joinder in this case is impracticable. Based on publicly available documents, each of the Classes likely numbers in the hundreds.

221.     **Commonality and Predominance**:  There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class but are not limited to the following:

a)  Whether the MCA Agreements are loans;

b)  Whether the MCA Agreements are usurious;

c)  Whether the MCA Agreements are void;

d)  Whether Plaintiffs and the Classes may recover any moneys or property paid to the Enterprise pursuant to the MCA agreements;

e)  Whether Defendants violated the Due Process Clause by issuing writs of attachment on third-party banks without filing a complaint or serving Defendants;

f)  Whether Defendants extorted settlements under duress through their unlawful conduct; and

g)  Whether Defendants' conduct was willful or knowing.

222.     **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs and members of the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Classes.

223.    **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes

224.    **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

225.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.     The Unlawful Activity.**

226.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

227.     In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

228.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

229.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

230.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

231.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

232.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

233.     Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

234.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Persons.**

235.     Wolf, Kroen, Brezel and Getter are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is an individual capable of holding a legal interest in property.  They are the owners of GoFund, Funding 123, and Merchant Capital which, collectively, have less than ten (10) employees.

**C.      The Enterprise.**

236.     Defendants GoFund, Funding 123, Merchant Capital, Alpha Recovery Partners, Wolf, Brezel, Kroen and Getter constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

237.     The Enterprise is associated in fact through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

238.     Since at least 2020 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

-39-

239.     The Enterprise consists of at least the following entities: Bridge Funding Cap, United Fund USA, Fundura Capital, Lifetime Funding, Go Fund, Matrix Advance, Alpha Recovery Partners, and Merchant Capital.

240.     The debt, including such debt evidenced by the agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

241.     Since at least 2020 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

242.     The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

C.     **The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

243.     The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

i.     **The Enterprise Principals:  Wolf, Brezel, Getter and Kroen**

244.     Wolf, Brezel, Getter and Kroen are principals of the Enterprise ("the Principals"). Together they are responsible for the day-to-day operations of the Enterprise and have final say on

all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

245.    In their capacity principals, Wolf, Brezel, Getter and Kroen are responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Plaintiffs.

246.    Wolf, Brezel, Getter and Kroen have taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

247.    Wolf, Brezel, Getter and Kroen have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Enterprise members.

### ii.    The Enterprise MCA Companies:  GoFund, Funding 123, and Merchant Capital.

248.    GoFund, Funding 123, and Merchant Capital maintain officers, books, records, and bank accounts independent of the other Enterprise members ("the Enterprise MCA Companies").

249.     The Principals have operated the Enterprise MCA Companies as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, the Enterprise MCA Companies have: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

250.     In this case, the Enterprise MCA Companies, through Defendants: (i) solicited borrowers; (ii) pooled funds from Investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; and (v) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Plaintiffs.

**vi.     The Enterprise Collection Arm:  Alpha Recovery Partners.**

251.     Alpha Recovery maintains officers, books, records, and bank accounts independent of the other Enterprise members.

252.     The Principals  have operated Alpha Recovery as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, Alpha Recover has: (i)  set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; (ii) obtained judgments to further collect upon the unlawful debt, and has issued UCC Lien Notices to collect upon the unlawful debt.

253.    In this case, Alpha Recovery: (i) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Plaintiffs; (ii) filed a UCC Financing Statement on February 15, 2022; and (iii) sent a UCC Lien Notice to United Healthcare Services, Inc. on February 15, 2022 to collect upon the unlawful debt herein.

**E.    Interstate Commerce**

254.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

255.    Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

256.    In the present case, all communications between the members of the Enterprise, the Enterprise MCA Companies and Alpha Recovery were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the agreements, fund the advances under each of the agreements and collect the payments via interstate electronic ACH debits.

257.    In addition, at the direction of Defendants, each of the agreements was executed in states outside of New York, and original copies of the Agreements were sent from North Carolina to the Enterprise, through Defendants, at their offices in New York via electronic mail.

F.      **Injury and Causation.**

258.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

259.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments. Plaintiffs were forced to make daily payments pursuant to the MCA Agreements that amounted to unconscionable interest rates.

260.    Under controlling New York law, the MCA Agreements are void ab initio.  *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 2021 WL 4777289 (N.Y. Oct. 14, 2021).

261.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

262.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

263.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

264.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of the Enterprise to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

265.    By and through each of the Enterprise Member's business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendant and the Enterprise Members concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements,

Defendant knew the nature of the Enterprise and Defendant knew that the Enterprise extended beyond each Enterprise Member's individual role. Moreover, through the same connections and coordination, Defendant knew that the other Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

266.    Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the agreements.

267.    Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

268.    The participation and agreement of Defendant and each Enterprise Member was necessary to allow the commission of this scheme.

269.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

270.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments, lost customers, loss of goodwill, and lost profits. Plaintiffs

were forced to make daily payments pursuant to the MCA agreements that amounted to unconscionable interest rates.

271.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

272.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## THIRD CAUSE OF ACTION
### (Declaratory Relief)

273.    Plaintiffs repeat and hereby incorporate each of the above allegation.

274.    A declaratory judgment is required by this Court to determine the rights and obligations of the parties with respect to the MCA Agreements are void as a matter of law.

275.    A declaratory judgment declaring that the Defendants have no right to enforce any security rights and that Defendants are barred from enforcing unconscionable and illegal interest rates on sham loans.

276.    Under controlling New York law, the MCA Agreements are void ab initio.  *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 2021 LEXIS 2206, 2021 Slip Op. 05616, 2021 WL 4777289 (N.Y. Oct. 14, 2021).

277.    A declaratory judgment is also required by this Court to determine the rights and obligations of the parties with respect to the settlement agreement that Defendants and Plaintiffs Indigo and Turrentine entered into on March 8, 2022.

278.    The settlement agreement is void because Defendants and their counsel obtained the settlement by knowingly and intentionally circumventing Plaintiff Indigo's and Turrentine's New York counsel.

279.    On March 4, 2022, counsel for Plaintiffs Indigo and Turrentine sent Defendant GoFund's counsel, Jared Alfin, an email informing him that he did not "release the bank accounts and dismiss your action, we will be seeking a TRO our pending SDNY class action on Monday." Ex. 11.

280.    Twice, on the same day counsel for Plaintiffs Indigo and Turrentine also asked Mr. Alfin for a copy of the complaint (as required by Conn. Gen. Stat. § 52-278(f)), which was referenced in the settlement agreement he drafted and caused to be delivered to Plaintiffs Indigo and Turrentine.  *See id.*

281.    On March 7, 2022, counsel for Plaintiffs Indigo and Turrentine also asked Mr. Alfin to provide a copy of the affidavit required by Conn. Gen. Stat. § 52-278(f).  *See id.*

282.    On March 8, 2022, counsel for Plaintiffs Indigo and Turrentine again asked Mr. Alfin to provide the requested information.

283.    As it turns out, while Defendants' counsel was ignoring the above repeated requests by Plaintiffs' counsel, Mr. Alfin was simultaneously drafting a settlement agreement with Plaintiffs Indigo and Turrentine without advising Plaintiffs' counsel.

284.    Notably, in the settlement agreement drafted by Mr. Alfin, it purports to represent that all parties "have had the ability to adequately consult with their respective legal counsel in regards to this commercial Agreement and its meaning."

285.    In consideration for entering into the settlement agreement, Defendants required Plaintiffs Indigo and Turrentine to pay $4,000 directly to Mr. Alfin's law firm out of the funds being held by PNC Bank.

286.    Defendants also required Plaintiffs Indigo and Turrentine to retract their complaints to the United States Attorney's Office by forcing them to admit in the settlement agreement that

"INDIGO further acknowledges and agrees that all of its statements to GFA, PNC Bank, any state or federal law enforcement authority and/or its attorney's concerning the validity of the Contract and GFA's rights to take legal action against INDIGO for breaching the Agreement were not accurate and based upon a misapprehension of facts."

287.    It further required INDIGO to release Defendants—and their attorneys from any and all claims or liability.

288.    The settlement agreement is void and unenforceable because, among other reasons, it was obtained under the threat of financial duress in violation of the Hobbs Act, and Defendants' violation of 42 U.S.C. § 1983.  But for the unlawful conduct and threats of financial duress, Plaintiffs Indigo and Turrentine would not have entered into the settlement agreement.  Rather, Plaintiffs Indigo and Turrentine were forced into the settlement as a direct result of Defendants' unlawful conduct.

289.    Plaintiffs Indigo and Turrentine therefore seek a declaration that the March 8, 2022 settlement agreement is void and unenforceable.

## FOURTH CAUSE OF ACTION
### (Fraud)

290.    Plaintiffs repeat and re-allege each of the above allegations.

291.    Each of the MCA agreements contained an appendix setting forth sham fees chargeable to Plaintiffs.

292.    The Defendants improperly deducted an "ACH Origination Fee" 10% of the purchase price to cover cost of origination and ACH Setup. This fee was fraudulent as it was simply a ploy to extract additional funds from the Plaintiffs and did not actually comprise of related expenses pertaining to origination. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

293.     The Defendants also deducted an Underwriting Fee of 12% of the purchase price for underwriting and related expense. This fee was fraudulent as this was simply a sham to extract more funds from the Plaintiffs. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

294.     Defendants also deducted an NSF Fee, Wire Fee, Risk Assessment Fee, UCC Fee, and a Management Fee which were similarly a fraudulent ploy to extract funds from the Plaintiffs by using a sham misnomer characterization of fees.

295.     The MCA agreements represented that these fees were for services or costs purportedly provided by or incurred by the Enterprise MCA Companies in connection with their respective agreements, but, in reality, these services or costs were never provided or incurred or were otherwise provided or incurred for amounts far below those stated in the MCA agreements and the so-called "fees" were nothing more than additional profits reaped by the Enterprise MCA Companies under the MCA agreements.

296.     For example, each of the MCA agreements provided for an "Underwriting Fee" in order "to cover Underwriting and related expenses."  However, the Enterprise MCA Companies performed little or no due diligence and conducted very little underwriting when entertaining into the MCA agreements.

297.     Initially, the Enterprise MCA Companies would require little more than the completion of an online application and three months bank statements and would approve advances to Plaintiffs in a matter of hours.

298.     The Enterprise MCA Companies would thereafter "refinance" their initial agreements just weeks and sometimes days after entering into the original agreements without

requiring any additional documentation or information from Plaintiffs and yet, the Enterprise MCA Companies would charge the same or even a greater "Origination Fee."

299.    In each MCA agreement, the Enterprise MCA Companies told Plaintiffs they would deduct an "ACH Program Fee" because managing Plaintiff's Daily Payments was "labor intensive and . . . not an automated process," but, in fact, the process is entirely automated and inexpensive.

300.    The Enterprise MCA Companies knew that their representations concerning the nature and purpose of the ACH Origination Fee, Underwriting Fee and other fees were false and misleading at the time they entered into the MCA Agreements.

301.    These false representations were made in order to induce Plaintiffs into believing that the fees charged to Plaintiffs and deducted from the Purchased Amount of the MCA Agreements were legitimate fees charged to offset the costs of services provided by the Enterprise MCA Companies under the MCA Agreements.

302.    Plaintiffs reasonably relied upon these representations in entering into the MCA Agreements and, ultimately paying, the fees through either the Daily Payments or "refinancing" their payment obligations with additional advances by the Enterprise MCA Companies.

303.    Defendants further engaged in predatory and fraudulent conduct that allowed them to fraudulently extract even more monies from Plaintiff by taking unauthorized overpayments from the Plaintiff's bank accounts.

304.    In addition to the hundreds of thousands of dollars in so called "ACH Origination fees" and "Underwriting Fees" to cover the costs of due diligence that they never performed and "ACH fees" to cover ACH operations they claimed were "labor intensive" but, in actuality, were fully automated and cost a mere fraction of the fees charged to Plaintiff, Defendants extracted unauthorized payments from the Plaintiffs.

305.     Even worse, Defendants failed to properly account for Plaintiff's payments, falsely reported Plaintiff's account balances and forced Plaintiff to pay thousands of dollars in overpayments or excess collections under the MCA Agreements.

306.     Defendants have intentionally committed wire fraud by extracting unauthorized debits from the Plaintiff's bank accounts. Defendants go as far as changing their name once their unauthorized debits are flagged as fraud by Plaintiff's bank in a further attempt to extract unauthorized debits from the Plaintiff's bank accounts.

307.     Defendants have demonstrated a fraudulent scheme of withdrawing unauthorized overpayments from the Plaintiff's bank accounts and committing persistent wire fraud. By reason of the foregoing, Plaintiffs are entitled to a judgment against each of Defendants in the amount of fees charged to Plaintiffs by each Enterprise MCA Company.

### FIFTH CAUSE OF ACTION
**(In the alternative, Breach of Contract)**

308.     Plaintiffs repeat and re-allege each of the above allegations.

309.     Under each of the MCA agreements, Defendants promised to advance certain amounts as identified in each of the MCA agreements.

310.     Defendants did not advance the amounts as promised.

311.     Under each of the MCA agreements, Defendants were entitled to debit through ACH withdrawals certain amounts as identified in each of the MCA agreements.

312.     As described in detail above, Defendants debited more than they were entitled to debit under each of the MCA agreements.

313.     As a direct and proximate result of Defendants' breach of each of the MCA agreements, Plaintiffs have been damaged in the amounts described in detail above.

314.    In the event that the Court finds that each of the MCA agreements are valid and enforceable and not void *ab initio* as a matter of law, then Plaintiffs are entitled to direct and consequential damages caused by Defendants' breach of each of the MCA agreements.

### SIXTH CAUSE OF ACTION
#### (42 U.S.C. § 1983)

315.    Plaintiffs repeat and re-allege each of the above allegations.

316.    In response to New York's prohibition against using its confession of judgment statute and related judgment collection procedures against out-of-state residents, Defendants knowingly and purposely devised a scheme to deprive out-of-state residents from their constitutional right to due process under the Fourteenth Amendment of the United States Constitution by abusing the state laws of Connecticut.

317.    In particular, Defendants, who are located in and reside in Brooklyn, New York, devised a scheme where they would fraudulently register a series of related companies as Connecticut limited liability companies with a Connecticut address in order to avail themselves of Connecticut's prejudgment attachment statute.

318.    The statute, Conn. Gen. Stat. § 52-278(f), is unconstitutional as used by Defendants.

319.    In their form, contracts of adhesion, Defendants require merchants, such as here, to consent to the jurisdiction of three different states, Connecticut, New York, and Texas—even though neither Connecticut nor Texas has anything to do with the transaction or parties.

320.    In addition, Defendants include a form "Prejudgment Remedy Waiver," requiring merchants to waive "all rights to notice and prior court hearing or court order in connection with any and all prejudgment remedies…"

321.    Then, when the merchant fails to pay for any reason at all, even in the event of a good-faith dispute, such as here, Defendants employ the prejudgment attachment mechanism of §

52-278(f) by serving a Writ of Attachment on the merchant's bank account ***before the filing of a complaint and before serving the merchant.***

322.    In order to utilize its prejudgment attachment remedies, § 52-278(f) provides:  "(1) ***the complaint shall set forth a copy of the waiver***; (2) ***the plaintiff shall file an affidavit*** sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff; and (3) the ***plaintiff shall include in the process served on the defendant a notice satisfying the requirements of subsections (b) and (c) of section 52-278e***."

323.    These requirements are also plainly spelled out on the court's practice guide:

**II. PJR When Defendant In Commercial Transaction Has Waived Notice And Hearing (Section 52-278f of the Connecticut General Statutes) - Documents Required**

Note: These documents must be served on the Defendant. After service on the Defendant, these documents must be returned electronically to the Court in accordance with the E-Services Procedures and Technical Standards.

    A.  *A Notice of Ex Parte Prejudgment Remedy/Claim for Hearing to Dissolve or Modify* (form JD-CV 55) may be used to meet the requirement of notice in Section 52-278f of the Connecticut General Statutes.

    B.  Signed complaint that includes a copy of the waiver

    C.  Affidavit by the plaintiff or another person who know the facts personally containing a statement of facts that show probable cause that a judgment in the amount of the prejudgment remedy being asked for, or in an amount greater than the amount of the prejudgment remedy being asked for after considering any known defenses, counterclaims or set-offs, will be rendered in the matter for the plaintiff.

324.    Instead of complying with the letter and spirit of the protections afforded by § 52-278(f), Defendants instead, like here, fire first and ask questions later.

325.    Specifically, Defendants ***do not*** (1) draft and serve a complaint providing notice to the merchant of its claims; (2) rely upon an affidavit setting forth the facts sufficient to show

probably cause; or (3) provide notice to the merchants satisfying subsections (b) and (c) of section 52-278e."

326.   Rather than comply with the dictates of § 52-278(f), Defendants first freeze the merchant's bank accounts by serving writs of attachment on the bank only, and then immediately demand a settlement under duress and the threat of financial ruin.

327.   By abusing § 52-278(f), Defendants knowingly and intentionally deprive their merchants of their constitutional due process rights by freezing bank accounts and not even knowing how the bank account was frozen or where to go to seek protection.

328.   For example, here, Defendants froze Plaintiff Indigo's Texas bank account by serving a writ of attachment on a Connecticut branch of PNC Bank on or about February 24, 2022.

329.   No notice was provided by Defendants before, during or after PNC Bank froze the account.   Instead, Plaintiff Indigo had to obtain the legal documents from PNC Bank itself.   The papers served on PNC Bank did not include a copy of a complaint identifying the grounds for the claims asserted by Defendants.   In fact, to this day, Defendants have not provided a copy of the complaint or the supporting affidavit required under § 52-278(f), despite numerous requests by Indigo's counsel.

330.   Plaintiffs did not voluntarily and intelligently waive their due process rights.   *See D.H. Overmyer Co., Inc. v. Frick Co.*, 405 U.S. 174, 31 L. Ed. 2d 124, 92 S. Ct. 775 (1972).

331.   Rather, Plaintiffs Indigo, Turrentine, and those similarly situated, (1) were not represented by legal counsel; (2) are unsophisticated business persons; (3) did not have any prior pending actions against them by Defendants; (4) did not have a fair balance of bargaining power; (5) did not negotiate the terms at arms-length; and (6) were knowingly and intentionally taken advantage of by Defendants due to their financial duress.

332.    Defendants knowingly and intentionally deprived Plaintiffs of their due process rights and had no good-faith basis to believe their actions were lawful under the color of state law. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3d Cir. 1994).

333.    As a direct and proximate cause of Defendants' knowing and intentional violation of 42 U.S.C. § 1983, Plaintiffs suffered damages by, among other things, not being able to pay necessary expenses such as insurance premiums, customer refunds due, materials and supplies.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order from the Court:

a)      Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class representatives, and appointing their attorneys as class counsel;

b)      Declaring that the Agreements entered into between Class Members and Defendants constitute a loan transaction, and thus, are void because each intended to charge and receive a criminally usurious interest rate in excess of 25%;

c)      Declaring that the settlement agreements entered into between Class Members and Defendants are void because they were obtained in violation of the Hobbs Act, 42 U.S.C. § 1983, and under threats of financial duress;

d)      Ordering Defendants to repay all principal and interest previously paid to Defendants in connection with the criminally usurious loans, including prejudgment interest;

e)      Granting an injunction against Defendants permanently enjoining them from enforcing any of their rights under the criminally usurious loans;

f)      Awarding the Plaintiffs and Class Members direct and consequential damages;

g)      Awarding Plaintiffs and the Class Members treble damages;

h)      Awarding Plaintiffs and the Class Members their attorney's fees and costs incurred in this action; and

i)      Granting such other and further relief as this Court deems just and proper.

DATED:      New York, New York
            March 10, 2022

                              **WHITE AND WILLIAMS LLP**


                    By: _____
                        Shane R. Heskin
                        7 Times Square, Suite 2900
                        New York, NY  10036
                        (212) 244-9500 or (215) 864-6329
                        heskins@whiteandwilliams.com

-56-