UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAYMOUNT URGENT CARE PC, AND ROBERT
A. CLINTON, JR., INDIGO INSTALLATIONS,
INC., AND CHRISTOPHER A. TURRENTINE,
individually, and on behalf of all those similarly
situated,

Civ. A. No. 1:22-cv-01245- JSR

                Plaintiffs,

    v.

GOFUND ADVANCE, LLC, FUNDING 123, LLC,
MERCHANT CAPITAL LLC , ALPHA
RECOVERY PARTNERS, LLC, YITZCHOK
("ISAAC") WOLF, JOSEF BREZEL, JOSEPH
KROEN, AND YISROEL C. GETTER
                Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINING
## ORDER AND PRELIMINARY INJUNCTION

WHITE AND WILLIAMS LLP
7 Times Square, Suite 2900
New York, New York 10036-6524
(215) 864-6329
Attorneys for the Plaintiffs

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
    37 N.Y.3d 320 (2021) ...............................................................................16, 17, 18

*American Resources Corp. v. C6 Capital, LLC*,
    2020 NY Slip Op 34198(U), 2020 N.Y. Misc. LEXIS 10725 (N.Y. Kings
    Cty., Dec. 16, 2020) ........................................................................................12

*American Resources Corp. v. C6 Capital, LLC*,
    2020 NY Slip Op 34198(U), (N.Y. Kings Cty., Dec. 16, 2020).............................15

*CapCall, LLC v. Foster (In re Shoot the Moon, LLC)*,
    2021 Bankr. LEXIS 2482 (Bank. D. Mo. Sept. 10, 2021).....................................19

*Davis v. Richmond Cap. Gr.*,
    194 A.D.3d 516 (1st Dept. 2021).....................................................................18, 19

*Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*,
    374 F. Supp. 3d 361 (E.D. Pa. 2019) ..................................................................16

*Fleetwood Servs., LLC v. Ram Capital Funding LLC*,
    2021 U.S. Dist. LEXIS 94381 (S.D.N.Y. 2021) ...................................................18

*Funding Metrics, LLC v. NRO Boston, LLC*,
    2019 N.Y. Misc. LEXIS 4878 (Westch. Cty. Aug. 18, 2019) ..........................17, 18

*Gateway Intl. 360, LLC v Richmond Capital Group, LLC*,
    2021 NY Slip Op 30219(U) (N.Y. Sup. Ct. 2021) ................................................14

*Harris v Seward Park Hous. Corp.*,
    79 AD3d 425, 913 N.Y.S.2d 161 (1st Dept 2010)................................................15

*John B. Hull Inc. v. Waterbury Prods Inc.*,
    588 F.2d 24 (2d Cir. 1978)................................................................................12

*LG Funding, LLC v United Senior Props. of Olathe, LLC*,
    181 A.D.3d 664 (2d Dep't. 2020) .......................................................................19

*McNider Mar., LLC v Yellowstone Cap., LLC*,
    2019 N.Y. Misc. LEXIS 6165 (Erie Cty, Nov. 19, 2019) .....................................18

*N.A.A.C.P., Inc. v. Town of East Haven*,
    70 F. 3d 219 (2d Cir. 1995)...............................................................................11

*NRO Boston LLC v. CapCall LLC*,
　2020 N.Y. Misc. LEXIS 4064 (Sup. Ct. Westch. Cty. July 8, 2020) ....................................18

*NRO Boston LLC v. Yellowstone Cap. LLC*,
　2021 N.Y. Misc. LEXIS 1892 (Rockl. Cty, April 9, 2021)....................................................18

*NRO Boston v. Funding Metrics*,
　2018 U.S. Dist. LEXIS 239152 (E.D.Pa. May 23, 2018) .................................................17, 18

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*,
　2021 N.Y. LEXIS 2577 (2021) (Wilson, J., dissenting)..........................................................19

*Prof'l Merch. Advance Capital, LLC v. Care Servs., LLC*,
　2013 WL 12109397 (S.D.N.Y., Oct. 2, 2013) .......................................................................12

*Quackenbos v. Sayer*,
　62 N.Y. 344 (1875) ................................................................................................................17

*United States v. Tucker*,
　16-cr-91 (PKC) .....................................................................................................................16

## STATUTES

18 U.S.C.
　§ 1962(c) ................................................................................................................................16
　§ 1962(d) ...............................................................................................................................14

18 U.S.C. § 1962....................................................................................................14. 16, 17, 18

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 65 .......................................................................................1, 11

Federal Rules of Civil Procedure Rule 65(b)............................................................................11

Plaintiffs Haymount Urgent Care PC ("Haymount"), Robert A. Clinton, Jr., MD ("Dr. Clinton") hereby submit the within Memorandum of Law in support of their Order to Show Cause ("OSC") for a temporary restraining order ("TRO") and a preliminary injunction ("Preliminary Injunction") pursuant to Federal Rule of Civil Procedure 65 against Defendant GoFund Advance, LLC ("GoFund") in order to prevent immediate and irreparable harm to Plaintiffs.

## PRELIMINARY STATEMENT

Plaintiffs Haymount and Dr. Clinton are an urgent care facility and its individual owner from North Carolina. Defendants are predatory lenders out of Brooklyn who have preyed upon a healthcare facility that has been overwhelmed by the COVID-19 pandemic.  Due to the past surge from the Omicron variant in December and January, Plaintiff needed a cashflow injection to pay for reagents, medical staff, and other related expenses.  Defendants took advantage of Plaintiffs by purporting to provide a short-term cashflow bridge when all Defendants did was lend Plaintiffs their own money at criminally usurious interest rates.  In total, from August 30, 2021 to January 20, 2022, Defendants advanced $3,080,000.00, and Plaintiffs repaid $4,601,407.00.

Apparently, lending Plaintiffs their own money at criminally usurious rates was not enough.  In early February, Defendants began debiting Plaintiff's account by ***$95,000 per day***:

| Date | Description | Amount |
|------|-------------|--------|
| 02/08/22 | BUSINESS TO BUSINESS ACH GO FUND HAYMOUNT U Feb 8 832999 HAYMOUNT URGENT CARE 4 | $60,000.00 |
| 02/08/22 | BUSINESS TO BUSINESS ACH GO FUND HAYMOUNT U Feb 8 823712 HAYMOUNT URGENT CARE 2 | $35,000.00 |
| 02/07/22 | BUSINESS TO BUSINESS ACH GO FUND HAYMOUNT U Feb 7 832999 HAYMOUNT URGENT CARE 4 | $60,000.00 |
| 02/07/22 | BUSINESS TO BUSINESS ACH GO FUND HAYMOUNT U Feb 7 823712 HAYMOUNT URGENT CARE 2 | $35,000.00 |

As a direct result of Defendants' overcollection, Plaintiffs placed a stop payment on Defendants' ACH debits, and filed this class action lawsuit.

Unfortunately, Plaintiffs are not alone. As Bloomberg News recently reported, Defendants run a loansharking scheme out of Brooklyn at the purported direction of John Braun, a convicted drug trafficker who had his federal prison sentence commuted by former President Trump.  In its complaint against Braun, the New York Attorney General has accused Braun of collection tactics so heinous that Plaintiffs will not repeat them here. The Attorney General's complaint is attached as Ex. 8 to the Amended Complaint and speaks for itself.  Defendants here are purported relatives or so-called henchmen of Braun who Bloomberg News alleges carry out his directives.  Whether Braun directs them or not will be sorted out through discovery.  What matters now is only that Defendants themselves have engaged in criminal loansharking and wire fraud warranting the immediate injunctive relief requested.

To decide this motion, the Court need not wade into the merits of the usury claims that go to the heart of this action (and which are echoed by this State's Attorney General through numerous supporting victim affidavits). Rather, the Court can resolve this motion by simply reviewing the face of the contract at issue, and the bank statements alone. With respect to Haymount and Dr. Clinton, on the face of the agreement (specifically the Sixth MCA as defined below), Defendant GoFund was required to advance $1,000,000.  It did not.  Instead, it advanced $400,000, and only after Plaintiff paid back nearly $800,000, did GoFund advance another $400,000. In other words, GoFund lent Plaintiffs their own money, and now demand criminally usurious interest for the privilege of lending Plaintiffs their own money.  The Court need not look any further than the Bank of America and Wells Fargo bank statements and the MCA Agreement itself.

But it gets even worse.  Far worse.  After Plaintiffs placed a block on the Bank of America bank account and filed this class action lawsuit, Defendants then committed wire fraud by making unauthorized debits to Haymount's Bank of America account.  And when Haymount attempted to

block those too, Defendants continued their brazen wire and bank fraud by simply changing the

name on the ACH authorizations by adding the letter "b" after the word "GoFund."  To be precise,

Haymount placed a block on ACH debits from "GoFund" so Defendants changed the ACH Debit

Authorization to appear as "GoFund b":[1]

| 02/16/2022 | GO FUND DES:b150222012 ID:HAYMOUNT URGENT INDN:HAYMOUNT URGENT CARE CO... | C | -60,000.00 |
|---|---|---|---|

Processing
**ACH HOLD GO FUND b ON 02/16**

**−$60,000.00**
$45,885.78

Now comes the part that brings us to this motion.  On the day before it continued to debit

$60,000 per day from Haymount (having already collected at least $1,020,000 on an original

advance of $400,000), Defendants had their counsel file and send a UCC Lien letter to its claim

administrator, United Healthcare Services, Inc., demanding that United Healthcare pay Defendants

$488,928.23.  As a direct result of this letter, United Healthcare shut down Haymount's entire

HSRA Optum Pay billing system, and blocked its access to the billing system, which accounts for

over 75% of Haymount's revenues.[2]  In just the past month, Haymount billed over $22 million for

HSRA through United Healthcare.  Thus, due to Defendants' actions, Haymount is on the brink of

collapse if an order is not entered enjoining Defendants from taking any action to collect on these

disputed amounts, and directing Defendants to immediately withdraw and retract any and all UCC

Lien Letters Defendants have issued to any third party.

---

[1] *See* Clinton Affid., ¶58, 59.
[2] United Healthcare is an insurance program that manages Optum Pay, which is the Health Resources and Services Administration ("HSRA"), which is the government COVID testing and treatment reimbursement program under the CARES Act.

-3-

All elements necessary for the temporary injunctive relief are easily met with regards to Haymount and Dr. Clinton: (1) Plaintiffs have established the likelihood of success, at a minimum, on the breach of contract claim alone.  Defendants were required to advance $1,000,0000 on the face of the contract, yet only advanced $400,000; (2) the equities favor Plaintiffs because Defendants have received more than $200,000 more than the amount advanced on the last contract alone (and more than $1.6 million overall); and (3) Plaintiffs will suffer irreparable harm if injunctive relief is not granted because it cannot continue to operate without access to its claim administrator, United Healthcare, which comprises more than 75% of its revenues.

For all of these reasons and those below, Plaintiffs respectfully ask the Court to enter an order: (i) restraining and enjoining Defendants from continuing to debit unauthorized monetary amounts from the Plaintiffs' bank accounts; (ii) restraining and enjoining the Defendants from freezing Plaintiffs' bank accounts and health insurance accounts, assets and receivables; and (iii) directing Defendants to withdraw and retract any and all UCC Lien Letters sent to third parties.

## FACTS

As of February 25, 2022, the Defendants have effectively made Haymount completely inoperable. Defendants have sent out improper UCC lien notices to various third parties that has effectively shut down its ability to receive its receivables.

## HAYMOUNT HAS BEEN IRREPARABLY HARMED

Defendants specifically reached out to United Healthcare directing it to pay Defendants $488,928.23, which resulted in United Healthcare deactivating all of Haymount's accounts.  As a direct result of Defendants' actions, Haymount is unable to collect any funds from United Healthcare or other health insurance providers for patients they have treated. This has effectively made Plaintiffs inoperable and left Plaintiffs unable to continue operations. Defendants improperly

-4-

issued UCC lien notices to United Healthcare, which has halted any remittance from HSRA to the Plaintiffs for services they performed

By way of background, Haymount provides medical services to the citizens of Fayetteville North Carolina and strives to keep the community healthy by offering not only urgent care services but also primary care to its community. Haymount offers special care to the community's veterans and is a VA-approved urgent care practice and certified to provide VA disability consultations. Haymount employs over 100 employees and sees over 300 per day. The average payroll is in excess of $250,000 per month. Haymount offers to pay up to 50% of its employee's health insurance, and provides $100,000 in life insurance (due to the risk of Covid-19). It also provides a matching 401k program and health benefits to its employees who are frontline workers.

As a direct result of the COVID-19 pandemic, Haymount's funds were greatly reduced due to the facilities choice to take precautionary expensive measures to protect its patients and its employees. The main expense is the cost to provide testing to patients – setup a full PCR lab, hire additional scientists and staff, pay for reagants and supplies.  Dr. Clinton and the frontline medical professionals and staff at Haymount Urgent Care ("Haymount") have risked their lives to treat countless of patients suffering from COVID-19 and other medical conditions. Haymount is a facility that has dedicated itself to helping people heal, even where a global pandemic has put its own existence at such risk. Unfortunately, the Plaintiffs have fallen victim to the Defendants and only justice can remediate and prevent further irreparable harm to Plaintiffs.

With the surge in the pandemic due to various strains (Delta last summer/fall and Omicron recently), its testing numbers dramatically went up to 2,500 patients per day requiring Haymount to look for funds to cover increased expenses. Haymount took on the added expenses to pay for

personal protection equipment, cleaning supplies, overtime, as well as other necessary expenses to protect its patients and employees.

In addition to increased expenses, there was an increased need for medical care from individuals who could not afford it. As a direct result, all of the Haymount's revenues were greatly reduced.  Haymount's revenues had been operating at approximately $60,000 per month. Expenses and revenues fluctuate with the pandemic surges. Expenses are paid two to three months prior to collecting payments on claims. With the added expense of these loans, profitability is severely diminished. The issues related to aging receivables stem from a lack of collectability for patients with Medicare, TriCare for Life and slow payment of HRSA (CARES ACT payments for the uninsured) and private insurance companies.

Prior to COVID-19, the margins of Haymount were thin. As a direct result of COVID-19, cash flow has been problematic due to slow payment from HRSA for uninsured and zero payments from Medicare. In addition to slowed payments, Haymount has incurred additional expenses as a result of purchasing equipment to protect against COVID-19.

As a direct result of these factors, Haymount was actively looking for long-term financing of approximately ($12,000,000) over as long of a period as possible so that it could stay afloat to help treat the community suffering during the deadly pandemic, whilst also ensuring the safety of its patients and staff.  Enter the MCAs.

Merchant Capital, GoFund, and Funding 123 are predatory lenders that took advantage of Haymount's desperation by charging outrageous interest rates well above the 25% maximum interest rate permitted by New York law. In an attempt to extort immediate payment from Plaintiffs, Defendants have restrained its United Healthcare account in an effort to prevent

Plaintiffs' operations. Defendants have already frozen the Plaintiffs' health insurance receivable accounts and may seek to freeze Plaintiffs' additional health insurance and bank accounts.

These restraints will result and have resulted in negative balances across all of Plaintiffs' accounts in the many millions of dollars. In addition, the restraints seek to cause Plaintiffs to miss payroll obligations, which will result in fines and penalties. The unlawful restraint has also caused Plaintiff to be significantly impaired in treating patients. It has also stopped Plaintiffs from purchasing desperately needed medical supplies, COVID-19 treatments, as well as other protective equipment and medical supplies. Defendants have been advised of these dire consequences, yet they refuse to heed filing any restraints, forcing this order to show cause to restrain the Defendants from continuing to harm Haymount.

There were six unlawful sham MCA Agreements entered into by Defendants with Plaintiffs. The First MCA, Second MCA, Third MCA, Fourth MCA, Fifth MCA, and Sixth MCA as defined in the Complaint are individually a MCA Agreement and collectively the MCA Agreements. Plaintiffs have outlined each of the sham MCA Agreements that constitute usurious loans provided by the Defendants in their Complaint filed on February 14, 2022. For sake of efficiency, Plaintiffs hereby incorporate those factual allegations hereto.

Defendants with each of the MCA Agreements have charged Plaintiffs unconscionable fees by underfunding each of the usurious loans and then subsequently taking unauthorized overpayments through their scheme of committing wire fraud. In each instance, Defendants charged Plaintiffs an "ACH Origination Fee" and an "Underwriting Fee." While the ACH Origination Fee and Underwriting Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Defendants performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. In reality, the ACH Origination Fee,

Underwriting Fee, and other fees were merely additional disguised interest. Once each of the usurious loans were underfunded by the Defendants, the Defendants continued to over debit the Plaintiffs' accounts and take overpayments well above the authorized ACH debit amount.

**GoFund Advance: The Sixth Usurious loan.**

Most recently, on January 20, 2022, Plaintiffs entered into the Sixth MCA with GoFund ("Sixth MCA"). The Sixth MCA required Defendant GoFund to advance of $1,000,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $1,499,000.00 (the "Purchased Amount") was repaid. The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $60,000 ("Daily Payment"), and the amount would be repaid in just 29 days which, on its face, translates to an annual interest rate of more than 612% per annum or more than 24 times the maximum 25% rate permitted under New York Penal Law. Plaintiffs were forced to make daily payments that accounted for this unconscionable interest rate.

The fixed daily payment was disguised as a good-faith estimate equal to 45% of Haymount's daily revenues. The estimated daily payment did not remotely reflect 45% of Haymount's daily revenues. Rather, the estimated daily amount was dictated by Defendants based on the length of the payment loan term. No math is needed to see the sham. Just one month earlier, GoFund represented that 45% of Haymount's receivables equaled $30,000 (as alleged and represented in the Third MCA). Now it supposedly represents $60,000. Revenues did not double in one month. Instead, Defendants falsely inflated the fixed daily payment amount based on the size of the loan amount ($1,000,000), as opposed to any spike in receivables.

GoFund entered into the sham Sixth MCA agreement with the Plaintiffs wherein the Plaintiffs were forced to pay an unconscionable interest rate of at least 612%. The interest rate is

-8-

even worse than that because GoFund did not even advance Plaintiff the full Purchased Amount. Instead, GoFund deducted $100,000 as purported fees in connection with making the loan.

But it gets worse. GoFund did not even advance the full amount required on the face of the MCA Agreement. Although the face of the agreement provides for an advance of $1,000,000, GoFund only advanced $400,000 (after deducting $100,000 in fees). Only after Haymount repaid over $785,000 in a span of just over two weeks, GoFund deposited another $400,000 after deducting another $100,000 in fees.

In other words, GoFund used Haymount's own money for the second portion of the advance, and then charged Haymount a staggering $385,000 for the privilege of borrowing Haymount's own money. GoFund has not only charged Plaintiff the above improper fees but GoFund has withdrawn daily payments in excess of the amount that was authorized. GoFund has improperly taken thousands of dollars in overpayments from Haymount above and beyond the Daily Payment being made by the Plaintiff without any notice or prior authorization, and well after Plaintiff had paid the loan in full. Despite this lawsuit, GoFund continues to attempt to fraudulently withdraw from Haymount's bank account.

Throughout February 2022, GoFund intentionally attacked Haymount's bank accounts by debiting $60,000 per day on February 9, 2022, February 10, 2022, February 16, 2022, February 18, 2022, and February 23, 2022, despite Plaintiffs attempts to block those payments after this class action was filed.

As a direct result, Bank of America placed a fraud alert on Haymount's bank accounts and put a stop on all ACH transactions. However, this did not stop GoFund from continuing to commit wire fraud. On February 16, 2022, February 18, 2022 and February 23, 2022, GoFund attempted

to bypass its block from debiting from Haymount's account by fraudulently debiting $60,000 from the Plaintiff's bank account under the name "GoFund b" as opposed to "GoFund."

Even worse, Defendants failed to properly account for Plaintiff's payments, falsely reported Plaintiff's account balances and forced Plaintiff to pay thousands of dollars in overpayments or excess collections under the MCA Agreements. Defendants have demonstrated a pattern of withdrawing unauthorized overpayments from the Plaintiff's bank accounts and committing wire fraud. While these accusations may be alarming, this is not the first time, MCA companies like Defendants have been accused of fraud. The New York Attorney General's Office ("NY AG"), the Federal Trade Commission (the "FTC"), have each filed separate actions against John Braun ("Braun") alleging the unlawful loansharking scheme. The Individual Defendants in this action are purportedly all relatives of Braun as outlined in the Amended Complaint. The Federal Trade Commission and the New York State Attorney General have each likewise accused Braun of loansharking, fraud, and other heinous collection tactics, including threats of physical violence.  *See* Amended Complaint, Exs. 7-8.

**Defendants Stole $170,000 from Plaintiffs through Funding 123.**

On December 27, 2021, Haymount entered into a Fifth MCA with Defendants through Funding 123 ("Fifth MCA"). The Fifth MCA provided Haymount $2,000,000 advance ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $2,998,000.00 (the "Purchased Amount") was repaid.

The Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $80,000 (a "Daily Payment"), and the amount would be repaid in just 45 days which, on its face, translates to an annual interest rate of more than 405% per annum or more than 16 times the

maximum 25% rate permitted under New York Penal Law. Haymount was forced to make daily payments that accounted for this unconscionable interest rate.

Once again, the fixed daily payment was disguised as a good-faith estimate equal to 45% of Haymount's daily revenues. The estimated daily payment did not remotely reflect 45% of Haymount's daily revenues. Rather, the estimated daily amount was dictated by Defendants based on the length of the payment term of the loan. Once again, Defendants did not advance Haymount the full Purchased Amount. Instead, Funding 123 deducted $100,000 in fees.

On its face, the Fifth MCA was structured as two disbursements wherein the second disbursement would not be triggered unless further confirmed by the borrowing Plaintiffs. When Haymount informed Funding 123 that it did not want the second part of the loan, Funding 123 ignored Haymount's request and began threatening the destruction of Haymount's business.

Despite declining the second advance, Funding 123 has improperly taken $170,000 in unauthorized overpayments related to the Fifth MCA and refuses to return the money.

## STANDARD OF REVIEW

The standard for granting a temporary restraining order and a preliminary injunction are identical under the Fed. R. Civ. P . 65. "A party must demonstrate '(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." *N.A.A.C.P., Inc. v. Town of East Haven*, 70 F. 3d 219, 223 (2d Cir. 1995). Plaintiffs meet all three prongs of this test:

> Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, a 'court may issue' a TRO without notice only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's

> attorney certifies in writing any efforts made to give notice and the
> reasons why it should not be required.

*Prof'l Merch. Advance Capital, LLC v. Care Servs., LLC,* 2013 WL 12109397 (S.D.N.Y., Oct. 2, 2013).  A party must establish that irreparable injury is imminent. *Id*. "To establish irreparable injury the injury alleged must be one requiring a remedy of more than mere money damages." *Id*. at *7. Plaintiffs have not only suffered irreparable injury as a result of Defendants' conduct but will continue to do so.

## LEGAL ARGUMENT

### I.     A TRO MUST BE GRANTED IN ORDER TO PREVENT IMMEDIATE AND IRREPARABLE HARM TO THE PLAINTIFFS

The Defendants' conduct has resulted and will continue to result in immediate irreparable harm to the Plaintiffs that cannot be remediated by money damages. The Defendants' fraudulent actions have caused tremendous harm that is irreversible, and which money cannot fix. Courts have extensively recognized that a threat to the continued existence of a business constitutes irreparable injury. *See John B. Hull Inc. v. Waterbury Prods Inc*., 588 F.2d 24, 28-29 (2d Cir. 1978); *American Resources Corp. v. C6 Capital, LLC,* 2020 NY Slip Op 34198(U), 2020 N.Y. Misc. LEXIS 10725 *9 (N.Y. Kings Cty., Dec. 16, 2020) ("Consequently, the plaintiffs have demonstrated a likelihood of success on the merits the loan was usurious. Moreover, the plaintiffs have presented irreparable harm that would result if the injunction is not granted.").

As of February 25, 2022, Defendants have frozen Haymount's HSRA and insurance accounts and are seeking to freeze over $22 million of assets of Haymount. Defendants' actions have effectively rendered Haymount inoperable. A TRO must be granted on this ground alone; Defendants must be restrained from continuing to freeze Haymount's accounts and from interfering with its business and ability to operate to treat countless patients.

-12-

Moreover, the Defendants' fraudulent conduct of debiting unauthorized payments from Haymount's bank accounts, when it has been hanging on by a string, threatens to leave Haymount bankrupt with the inability to bounce back even if a future judgment of money damages is provided. Haymount will not only fail as a business but will also fail to be able to provide medical care to countless patients who so desperately require it every day. A TRO must be issued to prevent Defendants from continuing to fraudulently debit from Haymount's bank accounts, leaving it with no recourse and the inability to pay its third-party vendors and to make payroll.

The facts of this case demonstrate the exact scenario that a TRO seeks to prevent by maintaining the *status quo* during the pendency of a lawsuit and preventing immediate irreparable harm towards a party. Not only has immediate irreparable harm been caused to Haymount, which if Defendants are not restrained will lead to Haymount's ultimate destruction, but harm has also been caused to the general public. Haymount has been victimized by Defendants' criminal usurious conduct and irreparable harm will continue unless a TRO and a Preliminary Injunction is entered preventing Defendants from forcing Haymount into bankruptcy by their unauthorized freezing of Plaintiff's accounts, interference with health insurance payments, and unlawful debiting of its bank accounts.

Defendants' actions have prevented Haymount from operating the urgent care facility that provides medical care to countless individuals of the general public. The exceptional factual circumstances of this case warrants granting a TRO and distinguishes this matter from other requests where a party is seeking solely money damages in a breach of contract action.

Haymount cannot make payroll and pay for ongoing medical expenses to provide medical care to its patients since the Defendants froze Haymount's accounts, interfering with its health insurance companies' receivables, and the debiting from Haymount's bank accounts. Haymount

cannot cut corners in providing requisite medical care to its patients that it will later need to bill insurance companies for. In addition, Haymount cannot afford to have unauthorized debits and funds being stolen from its bank account daily by Defendants. Defendants have continued to extract unauthorized payments given their access to Haymount's bank accounts, which have made Haymount effectively inoperable. As a result of Defendants' unauthorized payments, Haymount is unable to make payroll and pay third party vendors. Both items are not only crucial to operating the business but crucial to providing medical care to its patients.

## II.   THE CLAIMS AGAINST DEFENDANTS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS GIVEN DEFENDANTS' CONDUCT

Plaintiffs Haymount and Clinton filed a class action Amended Complaint asserting six causes of action against the Defendants: (1) RICO: 18 U.S.C. § 1962; (2) Conspiracy under 18 U.S.C. § 1962(d); (3) Declaratory Relief; (4) Fraud; and (5) Breach of Contract. The underlying MCA Agreements stem from criminally usurious loans (First MCA, Second MCA, Third MCA, Fourth MCA, Fifth MCA, and Sixth MCA). There is a strong likelihood of success on the merits for each of the five causes of action in the Complaint, and therefore a TRO and Preliminary Injunction is mandated to maintain the *status quo* and to prevent the continued irreparable harm towards the Plaintiffs. Defendants' actions and lack thereof in accordance with the Fifth and Sixth MCA have already caused irreparable harm to the Plaintiffs and continue to threaten ultimate destruction that is irreversible.

### A.   Plaintiffs have demonstrated a likelihood of success for the breach of contract.

The likelihood of success on Haymount's breach of contract claim is simple, straightforward, and overwhelming. "The elements of a breach of contract claim are 'the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages.'" *Gateway Intl. 360, LLC v Richmond Capital Group, LLC*, 2021 NY Slip Op 30219(U),

*12-13 (N.Y. Sup. Ct. 2021) (citing *Harris v Seward Park Hous. Corp.,* 79 AD3d 425, 426, 913 N.Y.S.2d 161 (1st Dept 2010); *see also American Resources Corp. v. C6 Capital, LLC*, 2020 NY Slip Op 34198(U), (N.Y. Kings Cty., Dec. 16, 2020) (granting the request for a TRO against Defendants where there is a likelihood of success that the MCA agreement was a usurious loan and irreparable harm would result).

      All three elements for a breach of contract are met in this case.  First, as described above, with regards to the Sixth MCA, that GoFund was required to advance $1,000,000 on the face of the contract, yet only advanced $400,000 (after deducting $100,000 in fees). The amount was to be repaid through daily ACH withdrawal debits in the amount of $60,000. Only after Haymount repaid over $785,000 in a span of just over two weeks, did GoFund deposit another $400,000 after deducting another $100,000 in fees. Go Fund used Haymount's own money for the second portion of the advance and then charged Haymount a staggering $385,000 to borrow its own money. On top of that, GoFund intentionally attacked Plaintiff's bank accounts by debiting $60,000 per day despite the blocks to these payments after this class action was filed. Similarly, with regards to the Fifth MCA, Funding 123 did not advance the full amount under the Fifth MCA. To make matters worse, Funding 123 extracted over $170,000 in unauthorized overpayments.

      In fact, Defendants did not advance the amounts as promised under any of the MCA Agreements as outlined in the well-plead Amended Complaint. Under each of the MCA agreements, the Defendants were entitled to debit through ACH withdrawals certain amounts as identified in each of the MCA Agreements. However, Defendants debited more than they were entitled to under each MCA Agreement. As a direct and proximate result of Defendants' breach of the MCA Agreements, Plaintiffs have been damaged.

**B.**      **Plaintiffs have demonstrated a likelihood of success on the collection of an unlawful debt and usury.**

Plaintiffs are likely to succeed on their collection of an unlawful debt under RICO and violation of New York's usury laws.  In *Fleetwood*, the United States District Court for the Eastern District of Pennsylvania sustained a RICO claim involving a disguised usurious loan, concluding that wire fraud was sufficient to support a RICO claim:

> As recounted above, the Amended Complaint alleges (1) a scheme to defraud borrowers and their guarantors by luring them into credit arrangements with illegal interest rates, despite Defendants' knowledge of the illegality of those rates, (2) the use of the wires (i.e., January, 2017, emails and ACH debits between Defendants and Fleetwood Services furthering the false impression of the enforceability of the unenforceable agreements) to further the scheme, and (3) Defendants engaged in this scheme with the intent to defraud (which may be averred generally).

*Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F. Supp. 3d 361, 376 (E.D. Pa. 2019). Here, the facts overwhelmingly establish multiple counts of wire fraud by over debiting the bank accounts by at least $170,000, as well as fraud in the executing of the Sixth MCA Agreement with GoFund by depositing a fraction of the amounts promised, and then attempting to debit under false pretenses and fake names.  GoFund further committed wire and mail fraud by sending UCC Notices falsely representing that Haymount was in breach and direct payments to made directly to Defendants.  Like in *Fleetwood*, Plaintiffs likewise communicated with Defendants by email and the loans were repaid through ACH debits.  Defendants also engaged in this scheme with the intent to defraud.

A RICO violation under 18 U.S.C. § 1962(c) can also be established through the collection of unlawful debt, a theory of liability which requires no demonstration of pattern.  *See, e.g.*, *United States v. Tucker*, 16-cr-91 (PKC) (criminal RICO verdict resulting from evading state usury law).

The New York Court of Appeals' 2021 decision in *Adar Bays* is instructive.  That case brought to the fore three important threads of New York's usury jurisprudence:

1. <u>Substance over form:</u> Under New York law, "[w]hen determining whether a transaction is a loan, substance—not form—controls." *Adar Bays*, *LLC v. GeneSYS ID, Inc*., 37 N.Y.3d 320, 334 (2021).

2. <u>Intent is a question of fact:</u> "Usurious intent is an essential element of usury and where usury does not appear on the face of the note, usury is a **question of fact**." *Id.* at 336 (internal citations omitted, emphasis added).

3. <u>Tradition of disguising usurious loans:</u>  "Indeed, a common tool of lenders in the 1800s to avoid enforcement of usury law penalties—civil or criminal—was to disguise the loan as a "sale of choses in action" exempted from the law (id.). We noted then that "[t]he shifts and devices of usurers to evade the statutes against usury, have taken every shape and form that the wit of man could devise, but none have been allowed to prevail."  *Id.* at 342 (2021), *quoting Quackenbos v. Sayer*,  62 N.Y. 344 (1875).

The combined effect of these observations is this:  a court errs in disregarding allegations that the transaction is intended as a usurious loan merely because the face of the agreement is clear. If the agreement contains provisions that show on the face of the agreement that the agreement functions as an absolutely repayable loan, then plaintiff may carry its burden on that issue as a matter of law.  *See, e.g., Funding Metrics, LLC v. NRO Boston, LLC,* 2019 N.Y. Misc. LEXIS 4878 (Westch. Cty. Aug. 18, 2019) (holding MCA agreements were loans as a matter of law); *NRO Boston v. Funding Metrics,* 2018 U.S. Dist. LEXIS 239152 (E.D.Pa. May 23, 2018) (upholding RICO claims).

When the shoe is on the other foot, however, an agreement that facially does not have the features of loan does not foreclose plaintiff from bringing sufficient, plausible allegations of usury. As *Adar Bays* noted, there is a tradition of such loans being disguised as legitimate transactions. *Adar Bays*, *LLC*, 37 N.Y.3d at 342.  And as *Adar Bays* further noted, the intent question is factual. *Id.* at 336.  If plaintiff has pled sufficient facts to raise a factual question as to the defendants' intent, the face of the written agreement will not preclude inquiry.  In such cases, it can still be pled that the agreement is a sham and intended to disguise a loan agreement.

-17-

That the rate of interest depends on some contingency does not preclude a finding that an agreement is a usurious loan.  *Adar Bays* also made clear that an agreement to pay interest that may or may not be usurious "depending upon a reasonable contingency" gives rise to a question of fact regarding the parties' intent. *Adar Bays*, *LLC*, 37 N.Y.3d at 338.  Loans may have contingent repayment: the "contingent nature" of a provision will not "remove the loan from the scrutiny of the usury law." *Id.*

Multiple courts have sustained claims that an agreement labeled MCA in fact functions as a usurious loan.  In the Southern District of New York, RICO claims based on collection of unlawful debt from an MCA agreement were upheld in *Fleetwood Servs., LLC  v. Ram Capital Funding LLC,* 2021 U.S. Dist. LEXIS 94381 (S.D.N.Y. 2021), which noted that the complaint alleged the defendants in that case had "preyed upon thousands of small businesses throughout the United States by offering funding under so-called 'merchant cash advances' that 'are in fact fraudulent, usurious loans with interest rates in the triple and even quadruple digits, far above the maximum rate permissible for a loan under New York law.'" *Id* at *8.  The MCA label did not forestall the Court's conclusion that the agreement was truly a loan.

Other cases have looked beyond the MCA label to sustain claims that MCA agreements may be disguised usurious loans.  *See NRO Boston v. Funding Metrics,* 2018 U.S. Dist. LEXIS 239152 (E.D.Pa. May 23, 2018) (same); *Davis v. Richmond Cap. Gr.,*194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Cap. LLC,* 2021 N.Y. Misc. LEXIS 1892 (Rockl. Cty, April 9, 2021) (sustaining RICO claims); *NRO Boston LLC v. CapCall LLC*, 2020 N.Y. Misc. LEXIS 4064, *6-7 (Sup. Ct. Westch. Cty. July 8, 2020) (same); *McNider Mar., LLC v Yellowstone Cap., LLC,* 2019 N.Y. Misc. LEXIS 6165 (Erie Cty, Nov. 19, 2019) (same); *Funding Metrics, LLC v. NRO Boston, LLC,* 2019 N.Y. Misc. LEXIS 4878 (Westch. Cty. Aug. 18, 2019) (holding MCA

agreements were loans as a matter of law); *LG Funding, LLC v United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 665 (2d Dep't. 2020).

In *Davis v. Richmond Capital Group,* the New York Supreme Court Appellate Division, First Department, looked to these factors in concluding the transaction under review was a loan:

> Plaintiffs also allege sufficiently that the subject agreements were loans subject to usury laws, to wit, the discretionary nature of the reconciliation provisions, the allegations that defendants refused to permit reconciliation, the selection of daily payment rates that did not appear to represent a good faith estimate of receivables, provisions making rejection of an automated debit on two or three occasions without prior notice an event of default entitling defendants to immediate repayment of the full uncollected purchased amount, and provisions authorizing defendants to collect on the personal guaranty in the event of plaintiff business's inability to pay or bankruptcy

*Davis,*194 A.D.3d at 517.  The Court should also look at whether the transaction is what it purports to be.  The missing hallmarks of a true sale raises red flags.  As observed by a member of New York's highest court:

> Although the GTR and CMS agreements are described as "factoring" agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns

*See Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *25 n. 14 (2021) (Wilson, J., dissenting); *see also CapCall, LLC v. Foster (In re Shoot the Moon, LLC)*, 2021 Bankr. LEXIS 2482, *27 (Bank. D. Mo. Sept. 10, 2021) ("CapCall's panoply of rights, remedies, and potential control is highly unusual in the context of an asset sale. Such an overall arrangement is consistent with a debtor-creditor relationship, not a seller-buyer relationship.").

Although the Court can decide this motion solely on the merits of the breach of contract claim, the Court may also sustain the motion based on the usury claims as well.

### III.     THE BALANCE OF EQUITIES WARRANTS ISSUANCE OF THE TRO.

The balancing of equities in this case clearly tips in Plaintiffs' favor because Defendants have already taken over $1.6 million of Plaintiffs' desperately needed money, and the relief requested will only place a hold on Defendants' further profits, which are the result of Defendants lending Plaintiffs their own money at criminally usurious interest rates.

In contrast, Plaintiffs will continue to suffer irreparable harm if the TRO is not granted. Plaintiffs are medical professionals who risk their lives every day to combat and help the general public. Plaintiffs have done everything in their power to help not only victims of COVID-19 but also victims who are in need of urgent medical care. Dr. Clinton risks his life every day to help his patients, and Haymount risks its financial prosperity by accepting and running government programs, which serve patients with limited insurance coverage.

Unfortunately, as described by Bloomberg News, Plaintiffs have become victims of the injustices perpetrated by unethical MCA companies such as Defendants. Justice is needed to prevent further irreparable harm to the Plaintiffs. Defendants have frozen Haymount's insurance accounts (preventing its largest payor from reimbursing it), continue to take unauthorized debits from Haymount's bank accounts, and continue to threaten to freeze Haymount's bank accounts, which has effectively made Plaintiffs inoperable. Defendants' actions are leading to the destruction of Plaintiffs' business.

## IV.    CONCLUSION

The TRO must be granted in this case in order to prevent irreparable harm to the Plaintiffs. The TRO will maintain the status quo during the pendency of this action and prevent ultimate devastation to the Plaintiffs.

DATED:        New York, New York
              March 10, 2022

                                        **WHITE AND WILLIAMS LLP**


                              By:   _____
                                        Shane R. Heskin
                                        Agatha C. Mingos
                                        7 Times Square, Suite 2900
                                        New York, NY  10036
                                        (212) 244-9500 or (215) 864-6329
                                        heskins@whiteandwilliams.com
                                        mingosa@whiteandwilliams.com

-21-