# EXHIBIT A

# REVENUE PURCHASE AGREEMENT

# REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement") dated 08/25/2021 between Merchant Capital ("**MC**") the Merchant(s) listed below (**Merchant**") and the Individual(s) listed below ("Guarantor")

## MERCHANT INFORMATION

Merchant's Legal Name: **HAYMOUNT URGENT CARE, P.C.**

D/B/A: **HAYMOUNT URGENT CARE, P.C.**   State of Incorporation / Organization: **NC**

Type of Entity:

Physical Address: **420 OWEN DR.**

City: **FAYETTEVILLE**   State: **NC**   Zip: **28304**   Business Phone:

Guarantor(s) Name: **ROBERT A. CLINTON, JR.**   Cellphone Number:   Email Address:

Mailing Address: **222 GLENWOOD AVE. APT 304**   City: **RALEIGH**   State: **NC**   Zip: **27603**

Purchase Price: $ **200000.00**   Purchased Percent **45** %   Purchased Amount: $ **275000.00**

Payment Frequency: **DAILY**   Remittance $ **7299.00**

## PURCHASE AND SALE OF FUTURE RECEIVABLES

In consideration of payment by MC to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to MC (making MC the absolute owner) the Purchased Percentage of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to MC.

Merchant is selling a portion of a future revenue stream to MC at a discount, and is not borrowing money from MC, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by MC. The Remittance is a good faith estimate of MC's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. MC is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and MC assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give MC a reasonable and fair opportunity to receive the benefit of its bargain. MC acknowledges that it may never receive the Purchased Amount in the event that the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

MC will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, MC (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as MC receives payment in full of the Purchased Amount. Merchant hereby authorizes MC to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of MC) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide MC with all required access codes and monthly bank statements regarding the Account so that MC may monitor the Account. MC payment of the Purchase Price shall be deemed the acceptance and performance by MC of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by MC remains in the Account and will be held responsible for any fees incurred by MC resulting from a rejected ACH attempt or an Event of Default. MC is not responsible for any overdrafts or rejected transactions that may result from MC's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between MC and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.

FOR THE MERCHANT (#1) By: **ROBERT A. CLINTON, JR.**   _____
(Print Name and Title)   (Signature)

FOR THE MERCHANT (#2) By: _____   _____
(Print Name and Title)   (Signature)

BY OWNER (#1) By: **ROBERT A. CLINTON, JR.**   _____
(Print Name and Title)   (Signature)

BY OWNER (#2) By: _____   _____
(Print Name and Title)   (Signature)

## MERCHANT AGREEMENT TERMS AND CONDITIONS

**1       TERMS OF ENROLLMENT IN PROGRAM**

1.1     **Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to MC with a Bank acceptable to MC to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to MC with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide MC and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes MC and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to MC for the receipts as specified herein and to pay such amounts to MC. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by MC or not. This additional authorization is not a waiver of MC's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which MC did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of MC.

1.2     **Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by MC as per the terms of this Agreement.

1.3     **Future Purchase of Increments.** Subject to the terms of this Agreement, MC offers to purchase additional Receipts in the "Increments" stated in on Page 1 of this Agreement, if any. MC reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion.

1.4     **Reconciliation**. As long as an Event of Default, or breach of this Agreement, has not occurred, once per calendar month Merchant may request a retroactive reconciliation of the total Remittance Amount(for the purposes of this Agreement "total Remittance Amount" shall be defined as all payments made by Merchant to MC after MC remitted the Purchase Price to Merchant). All requests hereunder must be in writing to admin@merchantcapitalpro.com within five (5) business days of the close of the calendar month. Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report if applicable, for the requested month. MC retains the right the request additional documentation such as bank login or DecisionLogic access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and MC shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by MC within five (5) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by MC shall equal the Specific Percentage of the Future Receipts that Merchant Collected from the date of this Agreement up to and including the date of the Reconciliation request. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with MC's right and ability to debit Merchant's Account while the Request is pending or to unilaterally modify the initial Remittance amount, in any method other than the ones listed in this Agreement.

1.5     **Adjustments to the Remittance.** As long an Event of Default, or breach of this Agreement, has not occurred and should the Merchant experience a decrease in its' Future Receipts, Merchant may give notice to MC to request a decrease in the Remittance. All requests hereunder must be in writing to admin@merchantcapitalpro.com and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable reports for the requested period. MC retains the right the request additional documentation such as bank login or DecisionLogic access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and MC shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks or by other means that can more accurately estimate the Merchant's Future Receipts. Merchant shall provide MC with viewing access to their bank account as well as all information reasonably requested by MC to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

1.6     **Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined and limited) authorize MC and its agents to investigate their financial responsibility and history, and will provide to MC any authorizations, bank or financial statements, tax returns, etc., as MC deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. MC is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

1.7     **Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide MC with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide MC with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from MC.

1.8     **Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by MC for monies owed to MC from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by MC.

1.9     **No Liability.** In no event will MC be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of MC's attorney's fees and expenses resulting therefrom.

1.10    **Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, MC, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

1.11    **Sale of Receipts.** Merchant and MC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from MC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. MC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to MC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that MC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and MC shall promptly refund to Merchant any interest received by MC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that MC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

1.12    **Power of Attorney.** Merchant irrevocably appoints MC as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to MC from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to MC; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which MC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

1.13    **Protections Against Default.** The following Protections 1 through 8 may be invoked by MC immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the MC electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to MC; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of MC, and (ii) the written agreement of any MC or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to MC; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide MC with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from MC, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of

Default contained in Section 3.1 herein. These protections are in addition to any other remedies available to MC at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.
**Protection 2.** MC may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).
**Protection 3.** Merchant hereby authorizes MC to execute in the name of the Merchant a Confession of Judgment in favor of MC in the amount of Purchased Amount stated in the Agreement. Upon an Event of Default, MC may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.
**Protection 4.** MC may enforce its security interest in the Collateral.
**Protection 5.** The entire Purchased Amount and all fee (including reasonable attorney's fees) shall become immediately payable to MC from Merchant.
**Protection 6.** MC may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if MC recovers a Judgment against Merchant, Merchant shall be liable for all of MC's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. **Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to MC. Upon breach of any provision in this Agreement, MC may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. MC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to MC.

1.14    **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes MC to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that MC obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against MC or any of its affiliates relating to any (i)investigation undertaken by or on behalf of MC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.15    **Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by MC, including this Agreement and any other MC documents (collectively, "Confidential Information") are proprietary and confidential information of MC. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of MC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles MC to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

1.16    **Publicity**. Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes MC to use its, his or her name in listings of clients and in advertising and marketing materials.

1.17    **D/B/A's.** Merchant hereby acknowledges and agrees that MC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between MC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2    REPRESENTATIONS, WARRANTIES AND COVENANTS**
Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

2.1    **Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to MC, and future statements which will be furnished hereafter at the discretion of MC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise MC of any material adverse change in their financial condition, operation or ownership. MC may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to MC within five business days after request from MC. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

2.2    **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3    **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4    **Use of Funds.**  Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

2.5    **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without MC's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6    **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and MC, nor shall Merchant change any of its places of business without prior written consent by MC.

2.7    **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

2.8    **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from MC to Merchant, execute, acknowledge and deliver to MC and/or to any other person, firm or corporation specified by MC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9    **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10    **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of MC.

2.11    **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12    **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13    **Good Faith.** Merchant and Guarantors hereby affirm that Merchant is receiving the Purchase Price and selling MC the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.

**3    EVENTS OF DEFAULT AND REMEDIES**
3.1    **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:
(a)    Merchant or Guarantor shall violate any term or covenant in this Agreement;
(b)    Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;
(c)    the sending of notice of termination by Merchant or verbally notifying MC of its intent to breach this Agreement;
(d)    the Merchant fails to give MC 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, and the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;
(f)    Merchant shall transfer or sell all or substantially all of its assets;
(g)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;
(h)    Merchant shall use multiple depository accounts without the prior written consent of MC
(i)    Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.
(j)    Merchant shall change its depositing account without the prior written consent of MC; or
(k)    Merchant shall close its depositing account used for ACH debits without the prior written consent of MC
(l)    Merchant's bank returns a code other than NSF cutting MC from its collections
(m)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with MC.

3.2 **Limited Personal Guaranty** In the Event of a Default, MC will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to MC for all of MC's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3 **Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4. hereof, MC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of MC in connection with this Agreement may be exercised at any time by MC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4 **Costs.** Merchant shall pay to MC all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of MC's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.5 **Required Notifications.** Merchant is required to give MC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give MC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## 4 MISCELLANEOUS

4.1 **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by MC.

4.2 **Assignment.** MC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3 **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to MC shall become effective only upon receipt by MC. Notices to Merchant shall become effective three days after mailing.

4.4 **Waiver Remedies.** No failure on the part of MC to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5 **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted in any court sitting in New York, Texas or Connecticut, and shall be the sole and exclusive venues for any lawsuit, action or proceeding (the "Acceptable Forums"). The parties agree that the said sole and exclusive Acceptable Forums are convenient and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, each of the parties to this Agreement irrevocably waives any right to oppose any motion or application made by any other party to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by MC by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

4.6 **Survival of Representation**, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7 **Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8 **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9 **Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and MC and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10 **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND  ONLY AFTER EXTENSIVE CONSIDERATION  OF  THE  RAMIFICATIONS  OF  THIS WAIVER WITH THEIR ATTORNEYS.

4.11 **CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE  PARTY WHO  INITIATES  OR  PARTICIPATES  AS  A  MEMBER  OF  THE  CLASS  WILL  NOT  SUBMIT  A   CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12 **Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

4.13 **Prejudgment Remedy Waiver**. EACH AND EVERY MERCHANT, ENDORSER, GUARANTOR AND SURETY OF THIS AGREEMENT, AND EACH OTHER PERSON OR ENTITY WHO MAY BECOME LIABLE FOR ALL OR ANY PART OF THIS OBLIGATION, HEREBY ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTIONS 52-278a TO 52-278m, INCLUSIVE, OR BY OTHER APPLICABLE LAW EACH AND EVERY MERCHANT, ENDORSER AND GUARANTOR OF THIS AGREEMENT HEREBY WAIVE (A) ALL RIGHTS TO NOTICE AND PRIOR COURT HEARING OR COURT ORDER IN CONNECTION WITH ANY AND ALL PREJUDGMENT REMEDIES TO WHICH FCG HEREOF MAY BECOME ENTITLED BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENTAND (B) ALL RIGHTS TO REQUEST THAT FCG HEREOF POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT SAID MERCHANTS, ENDORSER OR GUARANTOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY THE HOLDER HEREOF BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENT.

## SECURITY AGREEMENT AND GUARANTY

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PEFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Merchant's Legal Name: **HAYMOUNT URGENT CARE, P.C.**

D/B/A: **HAYMOUNT URGENT CARE, P.C.**   Federal ID#: _____

Physical Address: **420 OWEN DR.**   City: **FAYETTEVILLE**  State: **NC**   Zip: **28304**

**Additional Guarantor(s).**

_____

_____

### SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grants to MC a security interest in and lien upon all of their present and future: (a) accounts (the "Accounts Collateral"), chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to MC under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Collateral "). Merchant agrees to provide other security to MC upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover MC's entitlements under this Agreement, MC is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Collateral. These security interests and liens will secure all of MC's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, MC or an affiliate of MC. MC is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by MC without notice or demand of any kind by making an immediate withdrawal or freezing the Collateral. MC shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, MC has control over and may direct the disposition of the Collateral, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Collateral.

With respect to such security interests and liens, MC will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from MC written consent prior to granting a security interest of any kind in the Collateral to a third party. Merchant and Guarantor (s) agree(s) that this is a contract of recoupment and MC is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Collateral. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by MC. Merchant and Guarantor(s) agree(s) to execute and deliver to MC such instruments and documents MC may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. MC is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to MC under any other agreement between Merchant or Guarantor(s) and MC (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as MC deems necessary to perfect or maintain MC's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes MC to file any financing statements deemed necessary by MC to perfect or maintain MC's security interest. Merchant and Guarantor(s) shall be liable for, and MC may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by MC in protecting, preserving and enforcing MC's security interest and rights.

**Negative Pledge**. Merchant and Guarantor(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease**. MC shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, MC may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that MC may enter into an agreement with Merchant's landlord giving MC the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies**. Upon any Event of Default, MC may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to MC, whether by acceleration or otherwise.

**GUARANTY OF PERFORMANCE**

As an additional inducement for MC to enter into this Agreement, the undersigned Guarantor(s) hereby provides MC with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to MC in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

Guarantor Waivers. In the event of a breach of the above, MC may seek recovery from Guarantors for all of MC's losses and damages by enforcement of MC's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral MC may hold pursuant to this Agreement or any other guaranty.

MC does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of:

(i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) MC's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to MC. In addition, MC may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to MC; (ii) release Merchant from its obligations to MC; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to MC under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that MC must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

Guarantor Acknowledgement. Guarantor acknowledges that: (i) He/She is bound by the Prejudgment Remedy Waiver and Class Action Waiver provisions in the Merchant Agreement Terms and Conditions, as well as all other terms and conditions therein, which are incorporated herein by reference; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**FOR THE MERCHANT (#1)** By: ROBERT A. CLINTON, JR.
(Print Name and Title)                                    (Signature)

SSN#_____            Driver's License Number_____

**FOR THE MERCHANT (#2)** By: _____
(Print Name and Title)                                    (Signature)

SSN#_____            Driver's License Number_____

**BY OWNER (#1)** By: ROBERT A. CLINTON, JR.
(Print Name and Title)                                    (Signature)

SSN#_____            Driver's License Number_____

**BY OWNER (#2)** By: _____
(Print Name and Title)                                    (Signature)

SSN#_____            Driver's License Number_____

**FOR THE GUARANTOR(S)** By: _____
(Print Name and Title)                                    (Signature)

SSN#_____            Driver's License Number_____

**FOR THE GUARANTOR(S)** By: _____
(Print Name and Title)                                    (Signature)

SSN#_____            Driver's License Number_____

**APPENDIX A - THE FEE STRUCTURE:**

A. Underwriting Fee    Minimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses.

B. Origination Fee    Minimum of $500.00 or up to 10% of the purchase price to cover cost of Origination and ACHSetup

C. NSF Fee (Standard)    $35.00 (each)

D. Rejected ACH / Blocked ACH / Default Fee $5,000.00 When Merchant BLOCKS Account from our Debit ACH, or when Merchant directs the bank to reject our Debit ACH, which places them in default (per contract). When Merchant changes bank Account cutting us off from our collections.

E. Bank Change Fee  $50.00     When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

F. Wire Fee - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

G. Unauthorized Account Fee: $5,000.00 (if a merchant blocks MC'S ACH debit of the Account, bounces more than 2 debits of the Account, or simultaneously uses multiple bank accounts or credit- card processors to process its receipts).

H. Default Fee: $5,000.00 or up to 10% of the funded amount (if a merchant changes bank accounts or switches to another credit-card processor without MC's consent, or commits another default pursuant to the Agreement) or bounces more than 2 debits of the Account.

I. Stacking Fee: If the Merchant takes any further financing from any other finance /factoring company a fee of 10% of the purchased amount will be added to the Merchants current balance.

J. Risk Assessment Fee: $249.00

K. UCC Fee:    $195.00

L. Management Fee: $299 monthly funding fee for duration of agreement terms or until balance paid.

M. Attorney's Fee: $10,000.When merchant breaches any term of this Agreement and MC is required to retain counsel to enforce, defend or collect any term of this Agreement.

**FOR THE MERCHANT (#1)** By: ROBERT A. CLINTON, JR.           _[signature]_
                              (Print Name and Title)                                    (Signature)

**FOR THE MERCHANT (#2)** By:_____      _____
                              (Print Name and Title)                                    (Signature)

AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS

Merchant: HAYMOUNT URGENT CARE, P.C.            Tax ID:_____
              (Merchant's Legal Name)

Merchant Agreement: Merchant Agreement between MC, and Merchant, dated as of: _____08/25/2021_____

Designated Checking Account:

Bank Name: BANK OF AMERICA       Routing:_____       Accoun
Bank Name: WELLS FARGO           Routing:_____       Accoun
Bank Name:_____        Routing:_____       Account:_____
Bank Name:_____        Routing:_____       Account:_____
Bank Name:_____        Routing:_____       Account:_____
Bank Name:_____        Routing:_____       Account:_____
Bank Name:_____        Routing:_____       Account:_____
Bank Name:_____        Routing:_____       Account:_____

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes MC, to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes MC to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**
to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes Merchant Capital to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

In the amount of: $ 7299.00        (Or) Percentage of each Banking Deposit: 45 %
On the Following Days: MONDAY - FRIDAY .

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that MC may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Merchant also authorizes MC to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** MC is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). Merchant agrees to be bound by the ACH Rules as set forth by NACHA. This Authorization Agreement is to remain in full force and effect until MC has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford MC a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Merchant: HAYMOUNT URGENT CARE, P.C.                    Date: 08/25/2021
(Merchant's Legal Name)                                  (Month) (Day) (Year)

Title:_____
X_____
  (Signature)
Print Name: ROBERT A. CLINTON, JR.

8                                                                    Initials: RC

Doc ID: 8863e7500eb91e71134e86a907c694983911344f

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from Merchant Capital. We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

Merchant Capital, will require viewing access s to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

Merchant Capital will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower case letters.

Name of Bank: __Wells Fargo__

Bank portal website: __www.wellsfargo.com__

Username: Password:

Security Question / Answer 1:

Security Question / Answer 2:

Security Question / Answer 3:

Any other information necessary to access your account:

_____                                      08 / 26 / 2021
Merchant / Owner Signature                                      Dated

9                                                          Initials: RC

Doc ID: 8863e7500eb91e71134e86a907c694983911344f



# Audit Trail

| | |
|---|---|
| **TITLE** | HAYMOUNT URGENT CARE FUNDING DOCS |
| **FILE NAME** | HAYMOUNT URGENT C...ct - other CT.pdf |
| **DOCUMENT ID** | 8863e7500eb91e71134e86a907c694983911344f |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

**SENT**  
08 / 26 / 2021  
16:19:31 UTC  
Sent for signature to ROBERT A. CLINTON, JR. (drrobertclinton@gmail.com) from admin@merchantcapitalpro.com  
IP: 24.190.223.121

**VIEWED**  
08 / 27 / 2021  
02:00:59 UTC  
Viewed by ROBERT A. CLINTON, JR. (drrobertclinton@gmail.com)  
IP: 107.194.34.78

**SIGNED**  
08 / 27 / 2021  
02:02:40 UTC  
Signed by ROBERT A. CLINTON, JR. (drrobertclinton@gmail.com)  
IP: 107.194.34.78

**COMPLETED**  
08 / 27 / 2021  
02:02:40 UTC  
The document has been completed.

Powered by HELLOSIGN