# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAYMOUNT URGENT CARE PC, AND ROBERT A. CLINTON, JR., INDIGO INSTALLATIONS, INC., AND CHRISTOPHER A. TURRENTINE, individually, and on behalf of all those similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC , ALPHA RECOVERY PARTNERS, LLC, YITZCHOK WOLF, YOSEF BREZEL, JOSEPH KROEN, and YISROEL C. GETTER,<br><br>               Defendants. | Civ. A. No.:  1:22-cv-01245-JSR |

<br>

## MEMORANDUM OF LAW IN OPPOSITION TO PARTIAL MOTION TO DISMISS

<br><br>

**WHITE AND WILLIAMS LLP**
Shane R. Heskin
7 Times Square
New York, NY  10036
Tel:  (212) 244-9500 or (215) 864-6329

*Attorneys for Plaintiffs and Putative Class Plaintiffs*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT ........................................................................................1

FACTS ...........................................................................................................................2

    I.    OVERVIEW OF AN MCA AGREEMENT....................................................2

    II.   THE TRANSACTIONS HERE....................................................................5

ARGUMENT ..................................................................................................................9

    I.    PLAINTIFFS HAVE STATED A VALID RICO CLAIM ............................9

        A.    Plaintiffs have alleged a RICO claim for collection of unlawful debt.......................9

           1.    RICO is not limited to "mobsters" and organized crime ...........................9

           2.    Plaintiffs have pled that Defendants' agreements are usurious loans...................10

        B.    Plaintiffs have pled a pattern of racketeering activity. ...............................16

           1.    Plaintiffs have adequately pled the open-ended continuity requirement ..............17

           2.    Plaintiffs have sufficiently pled wire fraud........................................18

        C.    Go Fund, Funding 123, Merchant Capital and Alpha are liable under RICO as co-conspirators, not culpable parties....................................................19

    II.   PLAINTIFFS HAVE STATED A VALID CLAIM FOR RICO CONSPIRACY ........19

    III.  PLAINTIFFS ARE ENTITLED TO A DECLARATORY JUDGMENT THAT THE PURCHASE AGREEMENTS ARE VOID AB INITIO. ...............................19

    IV.  THE PURPORTED INDIGO SETTLEMENT WAS COERCED AND IS VOID.......20

    V.   PLAINTIFFS STATE A VALID FRAUD CLAIM. ....................................21

    VI.  INDIGO HAS STATED A VALID CLAIM FOR VIOLATION OF SECTION 1983. ...........................................................................................24

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*805 Third Ave. Co. v. M.W. Realty Associates*,
58 N.Y.2d 447, 448 N.E.2d 445, 461 N.Y.S.2d 778 (1983)...................................................20

*989 Sixth Ave. Assoc. v. Stolow*,
176 A.D.2d 556, 575 N.Y.S.2d 24 (1st Dep't 1991) ............................................................21

*Aardwoolf Corp. v. Nelson Capital Corp.*,
861 F.2d 46 (2d Cir. 1988)....................................................................................................4

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
37 N.Y.3d 320 (2021) .........................................................................................3, 11, 15, 16

*Benton v. Sun Industries*,
277 A.D. 46 (1st Dep't 1950) ...............................................................................................16

*Blumenthal v. Tener*,
227 A.D.2d 183, 642 N.Y.S.2d 26 (1st Dep't 1996) ...........................................................21

*Bouffard v. Befese, LLC*,
111 A.D.3d 866 (2d Dep't 2013) ....................................................................................3, 15

*Bridge v. Phoenix Bond & Idemn. Co.*,
553 U.S. 639 (2008)..............................................................................................................9

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
98 F.3d 13 (2d Cir. 1996).....................................................................................................24

*Brooke v. Schlesinger*,
898 F. Supp. 1076 (S.D.N.Y. 1995)....................................................................................23

*Browne v Vredenburgh*,
43 N.Y. 195 (1870) ..............................................................................................................15

*Bullock v. Becker*,
52 Misc. 2d 698 (N.Y. Sup. Ct. 1965) .................................................................................16

*Call v. Ellenville Nat'l Bank*,
5 A.D.3d 521, 774 N.Y.S.2d 76 (2d Dep't 2004) ................................................................20

*Callow v. Comm'r*,
135 T.C. 26 (U.S. Tax Ct. 2010)............................................................................................3

*CapCall, LLC v. Foster (In re Shoot the Moon, LLC)*,
    2021 Bankr. LEXIS 2482, 70 Bankr. Ct. Dec. 187, 2021 WL 4144933 (Bankr.
    Mont. Sept. 10, 2021) ....................................................................................................11, 20

*Champion Auto Sales, LLC v. Pearl Beta Funding, LLC*,
    69 N.Y.S.3d 798 (1st Dep't 2018) .........................................................................................10

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*,
    187 F.3d 229 (2d Cir. 1999)...................................................................................................17

*Colonial Funding Network, Inc. v. Epazz, Inc.*,
    252 F.Supp. 3d 274 (S.D.N.Y. 2017)....................................................................................10

*Cont. Transp. Servs., Inc. v. New Era Lending LLC*,
    2018 U.S. Dist. LEXIS 241286 (S.D.N.Y. Oct. 6, 2018) .................................................10, 18

*Contrast Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
    837 F. Supp. 2d 162 (S.D.N.Y. 2011)...................................................................................24

*Davis v. Richmond Cap. Gr.*,
    194 A.D.3d 516 (1st Dep't 2021) ..........................................................................................10

*Doe v. Brown Univ.*,
    166 F. Supp. 3d 177 (D.R.I. 2016)........................................................................................19

*Doe v. W. New Eng. Univ.*,
    No. 15-cv-30192, 2016 U.S. Dist. LEXIS 181656 (D. Mass. Aug. 31, 2016) .......................19

*Durante Bros. & Sons v. Flushing Nat. Bank*,
    755 F.2d 239 (2d Cir. 1985).....................................................................................................9

*Eagle One Roofing Contrs., Inc. v. Acquafredda*,
    2018 U.S. Dist. LEXIS 59969 (E.D.N.Y. Mar. 31, 2018)......................................................23

*Elmer v. Commissioner*,
    65 F.2d 568 (2d Cir. 1933)........................................................................................................4

*Endico Potatoes v. CIT Group/Factoring*,
    67 F.3d 1063 (2d Cir. 1995)....................................................................................2, 3, 12, 15

*Felder v. Casey*,
    487 U.S. 131 (1988)...............................................................................................................24

*Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*,
    374 F.Supp.3d 361 (E.D. Pa. 2019) ..................................................................................10, 18

*Fleetwood Servs., LLC v. Ram Capital Funding LLC*,
    2021 U.S. Dist. LEXIS 94381 (S.D.N.Y. 2021).....................................................................10

*Funding Metrics, LLC v. NRO Boston, LLC*,
  2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Ct. Aug. 18, 2019) ...............................................11

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
  492 U.S. 229 (1989) ...................................................................................................9, 17

*Hammelburger v. Foursome Inn Corp.*,
  431 N.E.2d 278 (N.Y. 1981) ...........................................................................................20

*In re Evergreen Valley Resort*,
  23 B.R. 659 (D. Me. 1982) ...............................................................................................3

*In re Hurricane Elkhorn Coal Corp. II*,
  19 B.R. 609 (W.D. Ky. 1982) ............................................................................................3

*In re O.P.M. Leasing, Inc.*,
  30 B.R. 642 (S.D.N.Y. 1983)...........................................................................................13

*In re Rosner*,
  48 B.R. 538 (E.D. Bank. Ct. 1985) ...................................................................................16

*JMW Auto Sales, Ltd. v. FT Dev. Inc. (In re Moye)*,
  2010 Bankr. LEXIS 4378 (S.D. Tex. 2010) ........................................................................3

*Jones v. Halstead Mgmt. Co., LLC*,
  81 F. Supp. 3d 324 (S.D.N.Y. 2015).................................................................................6

*LCS Grp.,LLC v. Shire LLC*,
  2019 U.S. Dist. LEXIS 43255 (S.D.N.Y. Mar. 8, 2019) .....................................................23

*LG Funding LLC v. United Senior Properties of Olathe LLC*,
  122 N.Y.S.3d 309 (2d Dep't 2020)..................................................................................10

*Madden v. Midland Funding, LLC*,
  237 F. Supp. 3d 130 (S.D.N.Y. 2017)...............................................................................20

*Martinez v. California*,
  444 U.S. 277 (1980).......................................................................................................25

*McNider Mar., LLC v Yellowstone Cap., LLC*,
  2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct. Nov. 19, 2019) .............................................10

*Miller v. Discount Factors, Inc.*,
  135 N.E. 2d 33 (N.Y. 1956)............................................................................................14

*Nassau Trust Co. v. Midland Manor Home for Adults*,
  57 A.D.2d 609 (2d Dep't 1977) ......................................................................................16

*Needham & Co., LLC v. Access Staffing, LLC,*
    2016 U.S. Dist. LEXIS 111925 (S.D.N.Y. 2016) ............................................................22, 23

*NetBank, FSB v. Kipperman (In Re Commer. Money Ctr. Inc.),*
    350 B.R. 465 (9th Cir. 2006) ....................................................................................3

*Niesgi v. Team I,*
    76 N.Y.2d 363 (1990) ............................................................................................21

*NRO Boston LLC v. CapCall LLC,*
    2020 N.Y. Misc. LEXIS 4064 (N.Y. Sup. Ct. July 8, 2020) ..................................10

*NRO Boston LLC v. Yellowstone Cap. LLC,*
    2021 N.Y. Misc. LEXIS 1892 (N.Y. Sup. Ct. Apr. 9, 2021)..................................10

*NRO Boston v. Funding Metrics,*
    2018 U.S. Dist. LEXIS 239152 (E.D.Pa. May 23, 2018) .......................................10

*People v. JAG NY, LLC,*
    18 A.D.3d 950 (2005) ............................................................................................16

*Polaroid Corp. v. Feely,*
    889 F. Supp. 21 (D. Mass. 1995) ..........................................................................20

*Quackenbos v. Sayer,*
    62 N.Y. 344 (1875) ................................................................................................3

*Rahanian v. Ahdout,*
    258 A.D.2d 156, 694 N.Y.S.2d. 44 (1st Dep't 1999) .............................................13

*Related Companies, L.P. v. Ruthling,*
    2017 WL 6507759 (S.D.N.Y. Dec. 18, 2017) (Rakoff, J.) .................................12, 16

*Romeo v. Tsunis Hotel Partners,*
    218 A.D.2d 646, 630 N.Y.S.2d 366 (2d Dep't 1995) ............................................21

*Rubenstein v. Small,*
    273 A.D. 102 (1st Dep't 1947) ..............................................................................13

*Samuels v. Mackell,*
    401 U.S. 66 (1971)................................................................................................19

*Scott v. Lloyd,*
    34 U.S. 418, 9 L.Ed. 178 (1835)..........................................................................1, 3

*Sedima, S.P.R.L. v. Imrex Co.,*
    741 F.2d 482 (2d Cir. 1984)..................................................................................9

*Sedima, S.P.R. v. Imrex Co.*,
    473 U.S. 479 (1985)....................................................................................................1, 10

*Sigman v. Claar Bros., Inc.*,
    184 F. Supp. 193 (S.D.N.Y. 1960) ..........................................................................15

*Silverboys, LLC v Skordas*,
    2019 N.Y. Misc. LEXIS 546 (N.Y. Sup. Ct. Feb. 11, 2019) ...................................23

*TIFD III-E, Inc. v. United States*,
    459 F.3d 220 (2d Cir. 2006).......................................................................................2

*West Pico Furniture Co. v. Pacific Fin. Loans*,
    469 P.2d 665 (Cal. 1970) ............................................................................................3

*Wynn v. AC Rochester*,
    273 F.3d 153 (2d Cir. 2001).....................................................................................22

## PRELIMINARY STATEMENT

As explained by Chief Justice John Marshall nearly 200 years ago:

> The ingenuity of lenders has devised many contrivances, by which under forms sanctioned by law, the statute may evaded. . . Yet, it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the statute would become a dead letter.  Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction.

*Scott v. Lloyd*, 34 U.S. 418, 9 L.Ed. 178 (1835).

Greed and dishonesty continue to motivate lenders today to devise such "contrivances" and disguise usurious loans as something they are not.  It is this greed and dishonesty – the most basic human wrongs that legal systems of all natures have been set up to curb – for which the present class action seeks redress.  Plaintiffs seek redress for the injuries they suffered as a result of their dalliances with Defendants GoFund Advance, LLC, ("GFA"), Funding 123, LLC ("Funding 123"), and Merchant Capital, LLC, three merchant cash advance ("MCA") companies operating within a single RICO Enterprise formed for the purpose of issuing and collecting upon unlawful debt – usurious loans with interest rates many multiples of New York's criminal usury cap.  Make no mistake: although the face of the agreement described each transaction as a receivables purchase, the historical negotiation and performance of the parties show that the transactions were, in substance, loans.  Text messages show that the short payback terms were a critical piece to be bargained for in each negotiation.

To evade RICO liability, Defendants argue that RICO claims are limited to "mobsters" and organized crime.  That argument has been squarely rejected by the United States Supreme Court decades ago in *Sedima, S.P.R. v. Imrex Co.*, 473 U.S. 479 (1985).  Indeed, the largest RICO verdict in its history was handed down—in this very court—against former race car driver Scott Tucker and his lawyer Timothy Muir.  Like here, the enterprise used a series of associated-in-fact

corporations and shams to evade state usury laws.[1]  Here, Defendants have made it easy to establish

the Enterprise.  On this motion, Defendants submit an affidavit admitting that Defendants are

associated-in-fact through a common enterprise.  *See* ECF #69. Among other things, the affidavit

admits that Defendant Brezel is an authorized representative of all three MCA companies.  He

even attaches a copy of the form agreements used by each MCA company—which are identical in

form.  The articles of incorporation attached to the Amended Complaint also establish that each

uses the same sham Connecticut "office" and collection scheme. And then, of course, there is the

Bloomberg investigation, which ties them all to a second story office building in Brooklyn, where

they all operate at the direction of John Braun—a convicted drug dealer accused of loansharking

by the New York Attorney General and the Federal Trade Commission for the exact same MCA

scheme and atrocities experienced by Plaintiffs here.  The motion should be denied.

## FACTS

### I.    OVERVIEW OF AN MCA AGREEMENT

A merchant cash advance is a form of non-traditional financing by which an MCA

company purports on paper to purchase a merchant's future receipts at a discounted price.  The

merchant then repays the MCA company through predetermined daily payments until the full face

value of the purchased receipts has been repaid.  The MCA industry, virtually unregulated, found

opportunity in the credit-tightening in the wake of the 2008 recession.

Traditional factoring involves the transfer of risk; a loan is advanced money repayable

absolutely.[2]  In distinguishing a sale from a loan, New York law looks to the conduct and intent of

---

[1] *See* Heskin Decl., dated April 13, 2022, Ex. 1 (Tucker Indictment); *see also id.*, Ex. 2 (Hallinan Indictment).

[2] *Compare Endico Potatoes v. CIT Group/Factoring*, 67 F.3d 1063 (2d Cir. 1995) ("The root of all of these factors is the transfer of risk.") *with TIFD III-E, Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006) (citing *Estate of Mixon v. United States*, 464 F.2d 394, 405 (5th Cir. 1972) ("If there is

the parties, not its paper form.[3]  An MCA agreement purports on its face to be a sale of a merchant's

future receivables.  This device – intended to evade state usury laws – is not novel.  As early as

the time of Lord Mansfield, it was recognized that "the most usual form of usury was a pretended

sale of goods."  *Quackenbos v. Sayer*, 62 N.Y. 344, 346 (1875).[4]

    In a true sale, the seller retains no benefits of ownership with respect to the subject assets

transferred, the risk of loss with the subject assets is wholly transferred to the buyer, and the seller

maintains no control over the assets.[5]  In a true sale, "the benefits and burdens of ownership" pass

from the seller to the buyer.[6]  As explained by the Second Circuit in drawing this distinction:

---

a definite obligation to repay the advance, the transaction [will] take on some indicia of a loan."); Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 Am. Bankr. L.J. 181, 186-94 (1991).

[3] *West Pico Furniture Co. v. Pacific Fin. Loans*, 469 P.2d 665, 671-72 (Cal. 1970) ("[A]ll of the negotiations, circumstances and conduct of the parties surrounding and connected with their contracts may be material in determining whether the form thereof covered an intent to violate the usury law"); *Endico Potatoes*, 67 F.3d at 1068 (looking to "the substance of the relationship" and "not simply the label attached to the transaction"); *Adar Bays, LLC v. GeneSYS ID, Inc*., 37 N.Y.3d 320, 334 (2021) ("When determining whether a transaction is a loan, substance—not form—controls."); *Bouffard v. Befese*, *LLC*, 111 A.D.3d 866, 869 (2d Dep't 2013) ("[T]he law looks not to a transaction's form, but its substance, or real character).

[4] *See also Adar Bays*, *LLC v. GeneSYS ID, Inc*., 37 N.Y.3d 320, 342 (2021) (a common tool of lenders in the 1800s to avoid enforcement of usury law penalties—civil or criminal—was to disguise the loan as a sale). *See also Scott v. Lloyd*, 34 U.S. 418, 9 L.Ed. 178 (1835) ("The ingenuity of lenders has devised many contrivances, by which under forms sanctioned by law, the statute may evaded. . . .Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction.").

[5] *See NetBank, FSB v. Kipperman (In Re Commer. Money Ctr. Inc.)*, 350 B.R. 465 (9th Cir. 2006) (finding transaction to be a loan rather than a sale where seller/assignor retained right to surplus proceeds); *In re Evergreen Valley Resort*, 23 B.R. 659, 661 (D. Me. 1982) (recognizing that a loan "is indicated if the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt" rather than retaining such surplus as the benefits of ownership); *In re Hurricane Elkhorn Coal Corp. II*, 19 B.R. 609, 614 (W.D. Ky. 1982) (finding transaction was a loan because debtor retained right to use proceeds in excess of amount advanced).

[6] *See JMW Auto Sales, Ltd. v. FT Dev. Inc. (In re Moye)*, 2010 Bankr. LEXIS 4378 (S.D. Tex. 2010) (holding agreement "did not evidence a consummated transfer of the benefits and burdens

> Such transactions are somewhat ambiguous and admit of definition as loans or sales on slight differences. If a merchant discounts his customer's note at a bank, endorsing it, but getting immediate credit for its discount value, it would be a most unnatural thing to consider it a loan from the bank. He remains liable if the customer defaults, but the collection is in the bank's hands, and the transaction is closed in the absence of a default. If, on the other hand, a merchant pledges his accounts to a 'finance' company and collects them himself, paying the loan out of his collections, it is clearly a loan, and has always been so considered.

*Elmer v. Commissioner*, 65 F.2d 568 (2d Cir. 1933); *see also Aardwoolf Corp. v. Nelson Capital Corp.*, 861 F.2d 46, 47 (2d Cir. 1988) ("At the outset, we lay to rest any question there may be as to the nature of the so-called 'discount.' It was, as the parties concede, the taking of interest in advance, a practice as old as the proverbial hills.") (citing *Evans v. National Bank*, 251 U.S. 108, 113 (1919)).

Mechanically, the MCA agreement contains the following features:

- The Factor Rate: Typically between 1.3 and 1.49, this ratio of the Purchased Amount to the Purchase Price is the amount charged for the time value of the money being lent. (Example: for a $100,000 advance with a 1.49 factor rate, $149,000 would be repaid – a $100,000 "Purchase Price" and a $149,000 "Purchased Amount")

- Daily Payment Amount: Under a legitimate MCA agreement, a good-faith estimate of the percentage of purchased receivables, calculated from historical receivables. (Example: If the average monthly receivables equal $100,000, then the merchant's average daily receivables is $4,545 ($100,000 divided by 22) If the MCA company was purchasing 10% of the merchant's receivables, then the good-faith estimated payment should be $454 ($4,545 x .10)

- The Interest Rate: The interest rate on an MCA can be calculated from the face of the agreement by dividing the Purchased Amount by the Daily Payment to find the term. Using the amount of interest charged and the repayment term, an annualized interest rate can be calculated.

- Reconciliation Provision: In order to give the appearance of risk, almost all MCA agreements contain a so-called "reconciliation" provision. In theory, if the amount collected through the Daily Payments exceeds the percentage of receivables allegedly purchased, the MCA company is required to provide a refund of any

---

of ownership" so as to constitute a true sale); *Callow v. Comm'r,* 135 T.C. 26, 33-34 (U.S. Tax Ct. 2010) ("[T]he key to deciding whether the transaction was a sale or other disposition is to determine whether the benefits and burdens of ownership have passed" from seller to buyer.).

excess amounts collected.  In theory, if the business generated no receipts and the MCA company collected $10,000 through the Daily Payments, the MCA company ought to refund the entire $10,000 because 10% of zero is zero.  The superficial effect of this reconciliation provision allows the MCA company to claim that, unlike a loan, it is assuming the risk of nonpayment.  It also allows it to assert that the repayment term is indefinite so there can be no violation of the usury laws.

- The Personal Guarantee and Confession of Judgment:  In a legitimate factoring agreement, a purchaser does not have recourse against the seller if the account debtor does not pay.  Rather, that is a risk assumed by the purchaser.  But MCA agreements contain a personal guarantee, wherein the individual owner guarantees certain performance under the MCA agreement.  In addition, the vast majority of MCA agreements (including those here) require a merchant to execute a confession of judgment, permitting the MCA company to obtain a judgment against both the small business and its individual owner in the event of a default.

## II.    THE TRANSACTIONS HERE

The Amended Class Action Complaint details transactions that the Defendant MCA Companies entered into with two businesses: Haymount Urgent Care PC (an urgent care center in North Carolina) and Indigo Installations, Inc. (a contractor in Texas).  (ECF 22, ¶¶ 23, 29).

Haymount: Facing increased costs due to the pandemic, Haymount sought out funding in the 2021 and entered into a series of six transactions with Defendants:  This chart summarizes the terms of the transactions, as set forth in the complaint:[7]

| Contract | Purchase Price | Purchased Amount | Purchased percentage | Daily payment | Term | Interest rate |
|---|---|---|---|---|---|---|
| 8/25/21 | $200,000 | $275,000 | 45% | $7,299 | 52 days | 263% |
| 8/26/21 | $250,000 | $349,750 | 25% | $8,000 | 60 days | 242% |
| 9/27/21 | $150,000 | $224,850 | 25% | $7,500 | 28 days | 650% |
| 12/16/21 | $1,000,000 | $1,350,000 | 45% | $35,000 | 39 days | 319% |
| 12/27/21 | $2,000,000 | $2,998,000 | 45% | $80,000 | 45 days | 405% |
| 1/20/22 | $1,000,000 | $1,499,990 | 45% | $60,000 | 29 days | 612% |

From the chart above, it is apparent from the numbers that the daily payments in these transactions could not be good-faith estimates of the purchased percentage of receivables, insofar

---

[7] One transaction is with Defendant Merchant Capital, one with Defendant 123 Funding, and the remainder with GoFund.

as 45% of the Haymount's revenues could not be $35,000, then $80,000, then $60,000 all within the course of a month. While these numbers do not correlate to a percentage of purchased receivables, they do correlate to the size of the loan and the term.

Text messages reveal more.[8] On December 27, Haymount agreed to a $2,000,000 funding with 123 Funding, with the second $1,000,000 tranche to be delivered after ten days of successful payments.[9] The text messages detail how the deal actually played out from inception through pay back, and show that the Haymount remained absolutely liable for the amount, paying $80,000 a day for the use of less than a million dollars (as Haymount never received the second tranche). When a payment was rejected for insufficient funds, 123 Funding *did not* acquiesce, but demanded a separate payment which was made from the guarantor's personal account:



---

8 "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. . . . Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Jones v. Halstead Mgmt. Co., LLC*, 81 F. Supp. 3d 324, 331 (S.D.N.Y. 2015). These text messages form the basis of the Paragraphs 162-65 of the Complaint.

9 *See* Affidavit of Robert Clinton, dated Mar. 17, 2022, Ex. A, ECF #62.



Moreover, Funding 123 over-collected upon the loan, taking double payment for a day early in the process, and continuing to attempt to take payments even once payment on the first million was complete and the second million tranche had not been sent.



Most importantly, the text messages make clear that the loan terms were not in fact a receivables purchase:  the parties were expressly negotiating a fixed daily payment, e.g.:

I want to do more business with you. 60K a day for 2m is a lot better than 80k for 1m. Let's do that. But you have to make these two payments today. 9:53 AM

At other points, Funding 123 proposes "500k 35k" – i.e., a $35,000 daily payment for a loan of $500,000.  These are fixed payment amounts being negotiated, with no reference to receivables, and they translate to a fixed term loan.

Indigo:  Defendants, through GoFund, promised to advance $40,000 for a $63,960 payback, at a rate of $2,200 a day.  [ECF 22, ¶ 195].  Instead, on the day of funding, Defendants pulled a bait and switch and said that the $40,000 would be released in two tranches of $20,000. Defendants presented Indigo with two agreements for $20,000 each.  [ECF 22, ¶ 199].  But the terms of each agreement stated that the $20,000 payment was for the negotiated $63,960, thus doubling the payment that had been negotiated.  [ECF 22, ¶ 201].  As with Haymount, the $2,200 daily payment had no relation to the 45% of receivables that it purported to estimate, but instead, was dictated by Defendants based on the desired repayment period.  [ECF 22, ¶ 203].

By employing the two-tranche system, Defendants in effect loaned Indigo its own money. GoFund deposited $14,000 on February 2, 2022.  After ten debits of $2,200 (totaling $24,200) GoFund deposited $14,000.  [ECF 22, ¶¶ 205-09].  On February 22, Indigo stopped payment on the daily withdrawals because GoFund refused to advance the remaining $12,000 originally promised.  [ECF 22, ¶ 209].  In response, Defendants used the Connecticut loophole exposed by Bloomberg News to freeze Indigo's Texas Bank Account. [ECF 22, ¶210].  Defendants then used the financial duress from the bank hold to extort a release while intentionally circumventing Indigo's New York counsel, who had indicated that he was in the process of seeking a TRO.  [ECF 22, ¶¶ 278-79] and who had requested (but was not provided with) a copy of the complaint and affidavit required by Conn. Gen. Stat. § 52-278(f).  [ECF 22, ¶¶ 280-81].

**ARGUMENT**

**I.     PLAINTIFFS HAVE STATED A VALID RICO CLAIM**

The individual defendants are all alleged to be relatives and/or associates of John Braun, a convicted drug dealer who has been accused by the Federal Trade Commission and the New York State Attorney General of engaging in loansharking, fraud, and other heinous collection tactics, including threats of physical violence.  Am. Compl., ¶¶ 20-21, Exs. 7-8.  The allegations here plainly demonstrate that the apple did not fall far from the tree and Defendants' attempts to distance themselves from such allegations are unavailing.

**A.     Plaintiffs have alleged a RICO claim for collection of unlawful debt.**

**1.     RICO is not limited to "mobsters" and organized crime.**

RICO is not limited to the acts of "mobsters," or members of "organized crime," as Defendants contend. The Supreme Court has refused "to read an organized crime limitation into RICO," *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 244 (1989), and has repeatedly rejected the view, implied by Defendants, that RICO provides a private right of action "only against defendants who had been convicted on criminal charges, and only where there had occurred a 'racketeering injury.'" *Durante Bros. & Sons v. Flushing Nat. Bank*, 755 F.2d 239, 248 (2d Cir. 1985).  Rather, the act is to be construed broadly to cover those activities Congress felt were actionable, no matter who engages in them.  *See Bridge v. Phoenix Bond & Idemn. Co.*, 553 U.S. 639, 660 (2008) ("We have repeatedly refused to adopt narrow constructions of RICO in order to conform to a preconceived notion of what congress intended to proscribe.").

Defendants' reliance upon *Durante*, *Colonial* and *New Era* for a contrary result is entirely misplaced.  First, the Second Circuit's discussion in *Durante* relied on *Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482 (2d Cir. 1984).  *See Durante Bros. & Sons v. Flushing Nat. Bank*, 755 F.2d.

239, 245-48 (2d Cir. 1985).  The Supreme Court reversed the holding in *Sedima* and adopted the broader application of RICO discussed above.  *Sedima*, 473 U.S. at 481.

Second, the RICO claims in *Colonial Funding Network, Inc. v. Epazz, Inc.*, 252 F.Supp. 3d 274 (S.D.N.Y. 2017) and *Cont. Transp. Servs., Inc. v. New Era Lending LLC*, 2018 U.S. Dist. LEXIS 241286 (S.D.N.Y. Oct. 6, 2018) were dismissed, in large part, because the complaints failed to allege sufficient facts establishing the underlying transaction were loans.[10]  That is not the case here.  Am. Compl. ¶¶ 73-76.  Nor did those courts consider the recent teachings in *Adar Bays* and *Plymouth*.  *See also Fleetwood Servs., LLC v. Ram Capital Funding LLC*, 2021 U.S. Dist. LEXIS 94381 (S.D.N.Y. 2021) (sustaining RICO claim); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D.Pa. May 23, 2018) (same); *Davis v. Richmond Cap. Gr.*,194 A.D.3d 516 (1st Dep't 2021); *NRO Boston LLC v. Yellowstone Cap. LLC*, 2021 N.Y. Misc. LEXIS 1892 (N.Y. Sup. Ct. Apr. 9, 2021) (same); *NRO Boston LLC v. CapCall LLC*, 2020 N.Y. Misc. LEXIS 4064, *6-7 (N.Y. Sup. Ct. July 8, 2020) (same); *McNider Mar., LLC v Yellowstone Cap., LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct. Nov. 19, 2019) (same).

### 2.      Plaintiffs have pled that Defendants' agreements are usurious loans.

Defendants oversimplify the trends in New York case law and cite only those favorable to them.  As this Court recognized, New York courts are respectfully inconsistent.[11]  *Compare*, *e.g*., *Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dep't 2021) and *LG Funding LLC v. United Senior Properties of Olathe LLC*, 122 N.Y.S.3d 309 (2d Dep't 2020) *with Champion Auto Sales, LLC v. Pearl Beta Funding, LLC*, 69 N.Y.S.3d 798 (1st Dep't 2018).

---

[10] *See* Heskin Decl., Ex. 3 (attaching copy of underlying *New Era* complaint).
[11] The Amended Class Action Complaint itself explains the historical shift by the lower courts: there was a sea change in the prevailing understanding of the MCA industry's predatory nature due to the investigative journalism of Bloomberg News.  [ECF 22, ¶¶ 73-76].

This Court's role is not to take a side in the split but to predict what New York's highest court would do.  The strongest indicia of how the high court would rule comes from two 2021 decisions:  the opinion in *Adar Bays*, providing extensive guidance on New York usury law, and *dicta* by Justice Wilson in *Plymouth Venture Partners, II*, which lays out the factors considered when distinguishing a true sale from a loan.

In *Adar Bays*, the New York Court of Appeals' extensive discussion of usury brought to the fore three important threads of New York's jurisprudence:

1. Substance over form: Under New York law, "[w]hen determining whether a transaction is a loan, substance—not form—controls." *Adar Bays*, *LLC v. GeneSYS ID, Inc*., 37 N.Y.3d 320, 334 (2021).

2. Intent is a question of fact: "Usurious intent is an essential element of usury and where usury does not appear on the face of the note, usury is a **question of fact**." *Id.* at 336 (internal citations omitted, emphasis added).

3. Tradition of disguising usurious loans:  "Indeed, a common tool of lenders in the 1800s to avoid enforcement of usury law penalties—civil or criminal—was to disguise the loan as a "sale of choses in action" exempted from the law (id.). We noted then that "[t]he shifts and devices of usurers to evade the statutes against usury, have taken every shape and form that the wit of man could devise, but none have been allowed to prevail." *Id.* at 342 (2021) (quoting *Quackenbos v. Sayer*, 62 N.Y. 344 (1875)).

The combined effect of these observations is this:  a court errs in disregarding allegations that the transaction is intended as a usurious loan merely because the face of the agreement says it is not.  *See, e.g., CapCall, LLC v. Foster (In re Shoot the Moon, LLC)*, 2021 Bankr. LEXIS 2482, 70 Bankr. Ct. Dec. 187, 2021 WL 4144933 (Bankr. Mont. Sept. 10, 2021) (finding MCA to be a loan after conducting evidentiary hearing). If the agreement contains provisions showing on the face of the agreement that it functions as a loan, then plaintiff may carry its burden as a matter of law.  *See, e.g.*, *Funding Metrics, LLC v. NRO Boston, LLC*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Ct. Aug. 18, 2019) (holding MCA agreements were loans as a matter of law).

-11-

A second indicia of how the high court will view MCAs comes from *Plymouth Venture Partners, II*, which explicitly notes in *dicta* that the features of the MCAs before it "appear less like factoring agreements and more like high-interest loans that might trigger usury concerns":

> Although the GTR and CMS agreements are described as "factoring" agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns.

*See Plymouth Venture*, 2021 N.Y. LEXIS 2577, *25 n. 14 (Wilson, J., dissenting).

The factors laid out in *Adar Bays* and *Plymouth Venture Partners* are the same factors that New York courts have always considered. *See Endico Potatoes*, 67 F.3d at 1069 (2d Cir. 1995) ("The root of all of these factors is the transfer of risk.").

First, consider the factors that are apparent from the face of the agreements themselves. It is a longstanding point that a true receivables purchase entitles the buyer to only the purchased receivables, not to repayment from independent funds. *Compare Plymouth Venture Partners, II, L.P.*, 2021 N.Y. LEXIS 2577 at *25 n. 14 ("GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet"). Here, the Agreements require a fixed daily payment from an account that is not limited to the purchased portion of the receivables, as well as granting a security interest in other property and a guaranty from the business's principal. Indeed, the text messages here show Defendants demanded payment from whatever sources available—even from personal funds.

It is also apparent from the face of the agreement that Haymount and Indigo retained beneficial ownership of the supposedly purchased receivables. In a true sale, "title and risk of loss

pass to the buyer-retailer and the buyer is entitled to retain all proceeds of a subsequent sale." *Rahanian v. Ahdout*, 258 A.D.2d 156, 694 N.Y.S.2d. 44, (1st Dep't 1999); *see also In re O.P.M. Leasing*, *Inc.*, 30 B.R. 642, 648 (S.D.N.Y. 1983) (holding transaction was a loan because assignor retained the right to use the balance of lease payments). Here, Haymount and Indigo collected the receipts and were free to use the balance of their accounts for business purposes.

The face of the agreement also shows that these transactions were repayable absolutely, and therefore loans. "For a true loan it is essential to provide for repayment absolutely and at all events or that the principal in some way be secured as distinguished from being put in hazard." *Rubenstein v. Small*, 273 A.D. 102, 104 (1st Dep't 1947). Here, the agreements were secured by UCC filings, a personal guaranty, a confession of judgment, and a prejudgment attachment device.

As a counter to this position, the centerpiece of Defendant's argument is that the agreements here *cannot* be absolutely repayable because of the existence of the reconciliation clause. But the complaint alleges that the reconciliation provision is a sham. There are two ways in which the functionality of a reconciliation provision can fail: 1) if access to the reconciliation procedure rests in the discretion of the lender or 2) if the daily payment does not correlate to the percentage of receivables it purportedly represents. Here, defendants argue that the reconciliation does not fail in the former way. But it is clear from the face of the agreement that reconciliation will fail in these agreements because the percentage of receivables does not accurately approximate the percentage. As noted in the complaint, within a period of months Haymount made daily payments that ranged from $7,299 a day to $80,000 a day that purported to reflect a good-faith estimate of 45% of Haymount's receivables.

Even if Defendants were correct that reconciliation is mandatory under the Agreement language (and Plaintiffs do not so concede), reconciliation can only provide effective relief from

the fixed payments if the purchased percentage is accurate to begin with.  If the nature of the sham reconciliation provision is that the daily payment is intentionally low, it functions as a bar to reconciliation even if the terms of the reconciliation provision make reconciliation procedure accessible, payments will not decrease if they were not initially keyed to the percentage of receivables stated in the contract.  If the daily payment is untethered from the supposed purchased amount, then declining receipts will not make reconciliation work even if the reconciliation is pursued.  If the daily payment is already low to the percentage of the receipts it nominally represents, it is not reduced by the reconciliation.  Here, it is clear from the face of the agreements themselves that the daily payment percentage could not have been keyed to receivables, and without that correlation reconciliation cannot work as designed.  The so-called reconciliation is clearly a sham, even looking only at the face of the contracts.

The reconciliation provision is also illusory for a third reason.  Under the last three transactions, the agreements purport to cumulatively purchase 135% of Haymount's receivables in the span of just one month. And even if considered individually, no business could survive if it were actually selling 45% of its receivables unless it had margins of 55% and zero expenses, which is obviously not the case with an urgent care facility in the midst of a pandemic.

Moreover, Defendants rely on case law that ignores major strands of New York usury jurisprudence. In *Miller v. Discount Factors, Inc.*, 135 N.E. 2d 33 (N.Y. 1956), the New York Court of Appeals held that the discounting of note with no *prior* legal inception is a loan, while the discounting of note with a *present* legal inception is a valid factoring arrangement, noting: "Subsequent cases have upheld this distinction between notes discounted when a loan is made, in which case the discounted notes are the consideration for the loan, and the purchase of existing notes at a discount, holding the former void and upholding the validity of the latter." *Id.* at 280;

-14-

*see also Sigman v. Claar Bros., Inc.*, 184 F. Supp. 193 (S.D.N.Y. 1960).

Similarly, Defendants ignore the case law (including *Adar Bays*) noting that some degree of contingency in repayment does not immunize a transaction from being a usurious loan. Loans may have contingent repayment: the "contingent nature" of a provision will not "remove the loan from the scrutiny of the usury law." *Adar Bays*, *LLC*, 37 N.Y.3d at 338. The test is not whether the agreement might result in *non-usurious* interest. The test is whether the agreement might result in *usurious interest. See Browne v Vredenburgh*, 43 N.Y. 195, 198 (1870) ("When a lender stipulates for a contingent benefit beyond the legal rate of interest, and has the right to demand the repayment of the principal sum with the legal rate of interest thereon, the contract is in violation of the statute prohibiting usury, and void."). Here, there is no question of whether a contingency might render a transaction usurious: it is usurious if performed exactly as intended through the so-called good-faith estimate of the daily payments. None of the cases relied upon by Defendants cites *Browne*, *Miller*, *Adar Bays,* or *Plymouth Venture.* Defendants' cases are not true harbingers of how the high court will rule; they are fundamentally flawed and overlook controlling law.

Nor should the Court limit itself to the face of the contracts alone. It is a longstanding point of New York law that courts look beyond the face of a transaction to the parties' intent and the agreement's purpose. *See Adar Bays*, *LLC*, 37 N.Y.3d at 334 ("When determining whether a transaction is a loan, substance—not form—controls."); *Bouffard v. Befese, LLC*, 111 A.D.3d 866, 869 (2d Dep't 2013) ("In determining whether a transaction is usurious, the law looks not to its form, but its substance, or real character" and being a "hard money lender" to those "unable to obtain conventional financing" is nothing more than "plainly usurious" lending). So too, the Second Circuit. *See Endico Potatoes,* 67 F.3d at 1068 (substance, not label, controls).

-15-

Looking beyond the face of the contracts provides irrefutable proof these are term loans: Plaintiffs' complaint relies upon a lengthy text message thread regarding Funding 123's transaction with Haymount and subsequent offers of more funding.  The actual practice of the parties was to negotiate fixed terms for the repayment. Reviewing the parties' actual text messages, the transaction is clearly a loan.  Or at the very least, Plaintiffs have made a plausible showing under the *Iqbal* standard that a trier of fact should resolve whether the parties intended to make a usurious loan.  *See Adar Bays*, 37 N.Y.3d at 334; *Benton v. Sun Industries*, 277 A.D. 46 (1st Dep't 1950) ("There should be a trial, in any event, to elicit facts on the basis of which the court might conclude that it should look behind the mere form in which the transaction has been cast…"); *Nassau Trust Co. v. Midland Manor Home for Adults*, 57 A.D.2d 609 (2d Dep't 1977); *In re Rosner*, 48 B.R. 538 (E.D. Bank. Ct. 1985) (citing *Hall v. Eagle Insurance Co.* 136 N.Y.S. 774 (1st Dep't 1912), *aff'd*, 211 N.Y. 507, 105 N.E. 1085 (1914)); *Bullock v. Becker*, 52 Misc. 2d 698 (N.Y. Sup. Ct. 1965)*; People v. JAG NY, LLC*, 18 A.D.3d 950 (2005).

## B.  Plaintiffs have pled a pattern of racketeering activity.

As an alternative theory to collection of an unlawful debt, Plaintiffs may prove their RICO claim by demonstrating a "pattern of racketeering activity."  The specific racketeering activity invoked is "wire fraud."  *See* Am. Comp. ¶ 185, 191, 252, 267, 306-307.  As Defendants note (Def. Mem. 14), a plaintiff alleging a pattern of racketeering must establish: (i) at least two predicate acts of racketeering; (2) that these predicate acts are related to each other; and (3) that these predicate acts amount to or pose a threat of continuing criminal activity.  *See Related Companies, L.P. v. Ruthling*, 2017 WL 6507759, at *18 (S.D.N.Y. Dec. 18, 2017) (Rakoff, J.).

Here, Defendants allege that Plaintiffs have failed to meet this standard because the Amended Complaint does not: (i) allege a continuity of racketeering activity or (ii) specify the alleged wire fraud with particularity. (Def. Mem, pp. 14-17).  Defendants are wrong.

### 1.    Plaintiffs have adequately pled the open-ended continuity requirement.

To satisfy the open-ended continuity element, "plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999). "[W]here the enterprise primarily conducts a legitimate business . . . there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Id*.

Here, it is alleged that, "[s]ince at least 2020 and continuing through the present," Defendants engaged wire fraud to "collect[] upon fraudulent fees through electronic wires."  Am. Compl., ¶ 241.  More specifically, Plaintiffs allege that the Enterprise uses ACH withdrawals to collect upon fees that were charged for ACH servicing, origination, underwriting and other costs that were never incurred by the Enterprise or in amounts that grossly mispresented the actual costs allegedly being passed on to its victims.  Am. Compl. ¶¶ 107-111, 120-124, 131-135, 143-147, 157-161, 291-307.  It further alleges Defendants repeatedly failed to properly account for payments and, thereafter, extracted unauthorized debits from Plaintiffs' accounts by changing the names under which the ACH withdrawals are conducted in order to avoid being blocked once their unauthorized debits were flagged as fraudulent by Plaintiffs' bank.  Am. Compl., ¶¶ 306-07.  And it alleges this conduct was and continues to be a common business practice of Defendants because the fees and required use of ACH withdrawals are standard provisions in their agreements with all customers. Am. Compl., ¶¶ 86, 245, 249, 252.   Thus, far from being isolated and sporadic incidents, the predicate acts of wire fraud alleged are Defendants' "regular way of operating that business," such that the complaint amply satisfies the continuity requirement of RICO. *Cofacredit*, 187 F.3d at 242; *see also H.J. Inc*., 492 U.S. at 243-44 (noting the continuity requirement is

likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise.").[12]

### 2.    Plaintiffs have sufficiently pled wire fraud.

The allegations of wire fraud are twofold: (i) the use of email to transmit agreements the that mispresented the nature of the fees that they were charging; and (ii) the use of ACH withdrawals to extract unrecorded overpayments.  The misrepresentations concerning their fees and the ACH withdrawals are critical to the Enterprise's carrying out of the scheme.  These allegations are sufficient to state a wire fraud claim at the pleading stage:

> As recounted above, the Amended Complaint alleges (1) a scheme to defraud borrowers and their guarantors by luring them into credit arrangements with illegal interest rates, despite Defendants' knowledge of the illegality of those rates, (2) the use of the wires (i.e., January, 2017, emails and ACH debits between Defendants and Fleetwood Services furthering the false impression of the enforceability of the unenforceable agreements) to further the scheme, and (3) Defendants engaged in this scheme with the intent to defraud (which may be averred generally).

*Fleetwood*, 374 F. Supp. 3d at 376 (E.D. Pa. 2019).

---

[12] Defendants' reliance upon *New Era* for their lack of continuity argument is again misplaced and factually distinguishable.  While *New Era* discusses continuity, the RICO claims were dismissed, in part, because the plaintiff failed to allege a connection between the multiple RICO defendants, not because the scheme of any individual defendant lacked continuity.  *New Era*, 2018 U.S. Dist. LEXIS 241286 at *13-14.  Plaintiffs' allegations do not suffer this deficiency.  Among other things, the corporate defendants: (i) were all organized in Connecticut; (ii) share the same principal address of 500 West Putman Ave., Suite 400 Greenwich, CT and the same agent, Hassett & George P.C., and (iii) their state corporate filings were each acknowledged and certified by the same person - Defendant Yisroel Getter.  *See* Connecticut Secretary of State Annual Reports attached as Exhibit E to the Amended Complaint.  Equally, and perhaps more importantly, the form of agreements used by the Corporate Defendants to carry out the fraudulent scheme are identical, right down to the typos found in Section 4.1 (misplaced "etc." at beginning of section), Section 4.7 (omitted "an" from "with attorney of their own choosing") and Section 4.10 ("theenforcement" all one word). *Compare*, Exhibits A through H of Brzel Aff, ECF #69.

**C.      Go Fund, Funding 123, Merchant Capital and Alpha are liable under RICO as co-conspirators, not culpable parties.**

The Amended Complaint seeks to hold the individual Defendants Wolf, Brezel, Kroen and Getter liable as "culpable parties" under RICO.  Am. Compl. ¶¶ 235-53.  The corporate Defendants Go Fund, Funding 123, Merchant Capital and Alpha are not alleged to be culpable parties. Plaintiffs allege that the corporate Defendants are co-conspirators.  Am. Compl., ¶¶ 263-272. Defendants do not attack the sufficient of the conspiracy claims except to argue the claims should be dismissed because the underlying agreements are not usurious loans.  They are wrong.

## II.      PLAINTIFFS HAVE STATED A VALID CLAIM FOR RICO CONSPIRACY

Defendants argue that the RICO conspiracy count fails because there is no underlying RICO violation.  Plaintiffs incorporate their RICO arguments above.

## III.      PLAINTIFFS ARE ENTITLED TO A DECLARATORY JUDGMENT THAT THE PURCHASE AGREEMENTS ARE VOID AB INITIO.

It is well settled that a claim for declaratory relief under 28 U.S.C. § 2201 may stand as a separately pleaded count when other substantive claims exist between the parties:

> Brown argues that Doe's claim for declaratory judgment should be dismissed because '[a]ll of Plaintiff's substantive claims are subject to dismissal' and '[t]he Federal Declaratory Judgment Act is procedural only and does not create an independent cause of action.' Brown is correct that the Declaratory Judgment Act does not create its own substantive cause of action; however, because the Court denies Brown's motion with respect to a number of Doe's claims, he continues to state a claim for declaratory relief.

*Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 197 (D.R.I. 2016)*; see also Doe v. W. New Eng. Univ.*, No. 15-cv-30192, 2016 U.S. Dist. LEXIS 181656, at *75-76 (D. Mass. Aug. 31, 2016) ("Accordingly, the court recommends that Defendants' motion to dismiss Plaintiff's request for declaratory relief (Count XIII) be denied."); *Samuels v. Mackell*, 401 U.S. 66, 70 (1971) ("Although [a] declaratory judgment . . . [i]s a statutory remedy rather than a traditional form of equitable relief, . . . a suit for declaratory judgment [i]s nevertheless 'essentially an equitable cause

-19-

of action'. . . ") (quoting *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943));

*Polaroid Corp. v. Feely*, 889 F. Supp. 21, 26 (D. Mass. 1995) ("[T]he First Circuit has stated that

mailing a letter charging infringement …creates an actual controversy and thus gives rise to a

cause of action under the Declaratory Judgment Act.").

      In addition to the RICO claims forming the basis of other substantive claims, Plaintiffs may

also assert an affirmative claim for usury.  *See Hammelburger v. Foursome Inn Corp.*, 431 N.E.2d

278, 283 (N.Y. 1981) ("The criminal usurer … remains subject also to civil liability for his criminal

act…to the debtor from whom the usurer could have collected neither principal nor interest for the

principal and interest.").  Notably, the ability to assert a civil cause of action against a usurer was

essential to the holding in *Hammelburger* because the right of the victim to recover civilly from

the guilty party justified the ultimate holding that a usury defense may not be asserted against an

innocent third party. To the extent that lower courts have overlooked *Hammelburger*, this Court is

well suited to set straighten a flawed line of cases that has been improvidently followed.  *See*

*Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 147 (S.D.N.Y. 2017) (correcting flawed

line of cases holding that criminal usury cap does not apply to default interest); *see also CapCall,*

*LLC*, 2021 WL 4144933 at *17 (upholding declaratory relief claim).

## IV.      THE PURPORTED INDIGO SETTLEMENT WAS COERCED AND IS VOID.

      As reported by Bloomberg News, Defendants continue to abuse the Connecticut

prejudgment attachment statute to extort settlements under duress.  Here, as they have done to

hundreds of other victims, Defendants froze Plaintiff Indigo's bank accounts and refused to release

those funds unless Indigo capitulated to their extortionate demands.  Whether the settlement

agreement was coerced under duress is therefore an issue of fact.[13]

---

[13] *See 805 Third Ave. Co. v. M.W. Realty Associates*, 58 N.Y.2d 447, 451, 448 N.E.2d 445, 447,
461 N.Y.S.2d 778, 780 (1983) ("Thus, if all we had before us was plaintiff's complaint we would

But there is more.  Here, Defendants also obtained the settlement in violation of Rule 4.2(b) of the Rules of Professional Conduct:  "[A] lawyer may cause a client to communicate with a represented person …, and may counsel the client with respect to those communications, ***provided the lawyer gives reasonable advance notice to the represented person's counsel that such communications will be taking place***." (emphasis added); *see also, Niesgi v. Team I*, 76 N.Y.2d 363, 370 (1990) (the "no contact" rule "safeguards against clients making improvident settlements, ill-advised disclosures and unwarranted concessions."). *See* Am. Compl., ¶¶ 278-88.

## V.      PLAINTIFFS STATE A VALID FRAUD CLAIM.

The Fourth Count [ECF 22] challenges fees that purported to be for certain "costs" and "expenses" in connection with the agreements.  Plaintiffs later learned that although the fees were

---

reverse and deny defendant's motion to dismiss, for accepting the allegations of the complaint as true, as we must, it alleges a cause of action upon which plaintiff may recover."); *see also Call v. Ellenville Nat'l Bank*, 5 A.D.3d 521, 525-26, 774 N.Y.S.2d 76, 79-80 (2d Dep't 2004) ("[T]he fact that Mrs. Call had no direct liability for the $74,000 debt, there are triable issues of fact whether her transfer of assets and execution of the promissory note were the product of duress, undue influence, or overreaching by the defendant bank."); *Blumenthal v. Tener*, 227 A.D.2d 183, 183-84, 642 N.Y.S.2d 26, 26 (1st Dep't 1996) ("The option agreement, promissory note and confession of judgment at the heart of this litigation are asserted to have been executed under economic duress. Where one party establishes it entered into an agreement by means of a wrongful threat precluding the exercise of free will, the agreement is voidable on the grounds of duress. It is clear that the documents at issue were given by plaintiffs, as co-venturers of defendants, in the midst of a real estate development project, when the defendants opted not to go forward with the project, leaving plaintiffs in a precarious position. Supreme Court properly determined that, on this record, there exists a genuine issue of fact as to whether these documents were executed under economic duress and are voidable as such."); *Romeo v. Tsunis Hotel Partners*, 218 A.D.2d 646, 647, 630 N.Y.S.2d 366, 367 (2d Dep't 1995) ("The appellants' papers submitted in opposition to the motion sufficiently raised triable issues of fact with respect to whether the appellants entered into the underlying contract secured by the subject mortgage on which they subsequently defaulted as a result of economic duress." (citing *805 Third Ave. Co. v M.W. Realty Assocs.,* 58 NY2d 447, 451; *Austin Instrument v Loral Corp.,* 29 NY2d 124, 130; *Sosnoff v Carter,* 165 AD2d 486, 491)); *989 Sixth Ave. Assoc. v. Stolow*, 176 A.D.2d 556, 557, 575 N.Y.S.2d 24, 25 (1st Dep't 1991) ("The parties' affidavits are in conflict, and questions are raised as to whether defendant was compelled to guarantee the corporate obligations by a wrongful threat that precluded the exercise of his free will, whether defendant acceded to the plaintiff's demands under the press of financial circumstances created by plaintiff's coercive acts and whether the circumstances permitted no alternative other than capitulation to plaintiff's demands.").

charged, the costs and expenses that they purported to reflect were not actually incurred: Defendants fraudulently billed the associated fees. Each contract includes a 10% "ACH origination fee" and a 12% "Underwriting Fee." [ECF 22, ¶¶ 108-111]. As Appendix A describes:

A. **Underwriting Fee**: Minimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses.

B. **ACH Origination Fee**: Minimum of $500.00 or up to 10% of the purchase price to cover cost of Origination and ACH Setup

Although the Underwriting fee purports to be "for underwriting and related expenses," the defendant companies do not perform traditional underwriting. Similarly, the ACH Origination Fee purports to be "to cover cost of Origination and ACH Setup, but this too is a misrepresentation: ACH withdrawals are automated and not labor intensive. These fees, as described, indicate that the defendants are passing on "expenses" and "costs" they themselves have incurred through entering into each contract. But here, no such "expenses" or "costs" exist, because the services they report to reflect are either not performed (like the underwriting) or do not actually take human labor to perform (like initiating automated ACH withdrawals). Additionally, as set forth in the Amended Complaint, the NSF Fee, Wire Fee, Risk Assessment Fee, UCC Fee, and Management Fee contained in the contracts were all similarly without basis in the costs and expenses they purported to reflect, and were simply sham methods of extracting additional cash.

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001), *citing Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (N.Y. 1996).

False billing fact patterns sound in fraud. In *Needham & Co., LLC v. Access Staffing, LLC*, 2016 U.S. Dist. LEXIS 111925 (S.D.N.Y. 2016), defendants submitted eight years of false invoices for services not rendered. So too here: the agreements here charged for "costs" and

"expenses" that defendants knew did not exist.  In both cases the defendants knew their own cost and labor requirements, the plaintiffs could not know that internal detail, and the plaintiffs accepted the defendants' representation and paid the quoted fee.  The deception worked on the Needham & Co. plaintiff sounded in fraud, and the result should be the same here. As the Needham & Co. court explained, "[p]aying the invoices is amply sufficient to show actual reliance upon them." *Needham & Co., LLC v. Access Staffing, LLC*, 2016 U.S. Dist. LEXIS 111925, *49 (S.D.N.Y. Aug. 12, 2016); *see also Eagle One Roofing Contrs., Inc. v. Acquafredda*, 2018 U.S. Dist. LEXIS 59969, *48 (E.D.N.Y. Mar. 31, 2018) (sustaining fraud claims for false invoices for work not actually done); *Silverboys, LLC v Skordas*, 2019 N.Y. Misc. LEXIS 546, *6 (N.Y. Sup. Ct. Feb. 11, 2019) (fraud sustained where defendant billed for equipment that was never received).

Here, the representations regarding the Underwriting Fee, the ACH Origination Fee, and the other fees charged were embedded into the form documents themselves.  The inclusion of these fees is not a simple case of checking the wrong box.  This system was built to routinely charge an Underwriting Fee by the very people who set up the system to do minimal underwriting.  This system was built to routinely charge an ACH Origination Fee by the very people who understood the automated nature of the ACH withdrawal system.  "Allegations of affirmative misrepresentation in connection with the invoicing fraud give rise to a strong inference of fraudulent intent."  *Brooke v. Schlesinger*, 898 F. Supp. 1076, 1087 (S.D.N.Y. 1995).

Defendants argue that this case is within the ambit of a breach of contract claim, as the misrepresentation is contained within the contract, citing the settled law that the "misrepresentation" element of a fraud claim cannot simply be an assurance that a contracting party intends to perform, followed by the party's non-performance.  "A fraud-based cause of action is duplicative of a breach of contract claim when the only fraud alleged is that the defendant was

not sincere when it promised to perform under the contract." *LCS Grp.,LLC v. Shire LLC*, 2019 U.S. Dist. LEXIS 43255, *15-16 (S.D.N.Y. Mar. 8, 2019) (quoting *Manas v. VMS Assocs., LLC*, 53 A.D.3d 451, 863 N.Y.S.2d 4, 7 (1st Dep't 2008)).  An unfulfilled promise of performance alone is simply breach of contract.  *See, e.g., Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).  But this is not an unfilled promise of performance.  Here, the misrepresentation is as to the existence of fictitious costs and expenses that were ancillary to the central promises within the contract.  *Contrast Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc*., 837 F. Supp. 2d 162, 198 (S.D.N.Y. 2011) (a misrepresentation of facts that is collateral to the contract involves a separate breach of duty).[14]

## VI.    INDIGO HAS STATED A VALID CLAIM FOR VIOLATION OF SECTION 1983.

Defendants do not cite a single case in support of their contention that the 1983 claim should be dismissed.  Nor do Defendants even attempt to address the merits of Plaintiffs' due process violations, which form the basis of the 1983 claim.  Instead, Defendants ask this Court to dismiss the claim because Plaintiffs have a remedy through state court.  But that is not how our system of federalism works.  State statutes cannot preempt federal statutes, nor can they usurp constitutional rights. Rather, the Supreme Court has repeatedly held that "a state law that immunizes government conduct otherwise subject to suit under § 1983 is preempted, even where the federal civil rights litigation takes place in state court, because the application of the state immunity law would thwart the congressional remedy..." *Felder v. Casey*, 487 U.S. 131, 139

---

[14] The wire fraud allegations underlying the RICO count likewise do not sound in breach of contract.  What is fraudulent about the ACH transfers is that no valid contract existed under New York law, as the agreements were disguised usurious loans.  The misrepresentation is that there is a valid contract; it cannot sound in breach because the contract is void ab initio.  This misrepresentation affected <u>every</u> wire transfer associated with each transaction.  GoFund also made numerous attempts to make withdrawals not justified by the contracts after the loan was paid in full, which are separate instances of wire fraud.  [ECF 22, ¶¶ 183-86].

(1988); *Martinez v. California*, 444 U.S. 277, 284, fn. 8 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983...cannot be immunized by state law"].).

Defendants also confuse Plaintiffs' allegations.  Plaintiffs assert that the Connecticut statute is unconstitutional *as applied by Defendants*.  Thus, it is the conduct of Defendants in abusing and violating the state statute that gives rise to the 1983 claim, not necessarily the statute itself.  In an abundance of caution, however, Plaintiffs have provided a copy of the Amended Complaint to the Attorney Generals of both Connecticut and New York.[15]

## CONCLUSION

The Amended Class Action Complaint sets forth a cognizable RICO claim under both an unlawful debt theory and a pattern of racketeering activity (wire fraud) theory.  Defendants have profited from a scheme that has squeezed countless small businesses like Plaintiffs here using disguised illegal loans.  They have conducted this scheme across the country, soliciting small businesses over electronic communications to accept and enter into these loans, and collecting upon them through ACH transfers, all the while representing to these small businesses that the transactions were legitimate receivable sales rather than illegal, unenforceable usurious loans.  To add further injury, Defendants fraudulently charged fees for services never rendered on these contracts, charging for "costs" and "expenses" for underwriting work that was not performed and ACH withdrawals that were automated.  Defendants' motion to dismiss should be denied.

Dated: April 13, 2022
        New York, New York

WHITE AND WILLIAMS LLC

Shane R. Heskin, Esq.
7 Times Square, Suite 2900
New York, New York 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com

---

[15] *See* Heskin Decl., Exs. 4-6.

*Attorneys for Plaintiffs and Putative Class Plaintiffs*

28759009v.1