UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAYMOUNT URGENT CARE PC, AND ROBERT A. CLINTON, JR., INDIGO INSTALLATIONS, INC., AND CHRISTOPHER A. TURRENTINE, individually, and on behalf of all those similarly situated,<br><br>                  Plaintiffs,<br><br>    v.<br><br>GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC , ALPHA RECOVERY PARTNERS, LLC, YITZCHOK WOLF, YOSEF BREZEL, JOSEPH KROEN, and YISROEL C. GETTER,<br><br>                  Defendants. | Civ. A. No.:  1:22-cv-01245-JSR |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW ON THE APPLICATION OF NORTH CAROLINA AND TEXAS LAW**

                                      **WHITE AND WILLIAMS LLP**
                                      Shane R. Heskin
                                      7 Times Square
                                      New York, NY  10036
                                      Tel:  (212) 244-9500 or (215) 864-6329

                                      *Attorneys for Plaintiffs and Putative Class Plaintiffs*

-i-

## **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ...........................................................................................................1

I. NORTH CAROLINA LAW. ........................................................................................................3

    A. The Collection of an Unlawful Debt. ....................................................................3

    B. Wire Fraud ............................................................................................................4

II. Texas law ..............................................................................................................................4

    A. The Collection of an Unlawful Debt. ....................................................................4

    B. Wire Fraud. .........................................................................................................10

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*,
    297 S.W.3d 768 (Tex. 2009) ................................................................................................10

*Bank v. Wysong*,
    177 N.C. 380, 99 S.E. 199 ......................................................................................................3

*Callow v. Comm'r*,
    135 T.C. 26 (U.S. Tax Ct. 2010) ..........................................................................................10

*Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*,
    67 F.3d 1063 (2d Cir. 1995) ................................................................................................7, 8

*Express Working Capital, LLC v. Starving Students, Inc.*,
    26 F. Supp. 3d 660 (N.D. Tex. 2014) ..............................................................................4, 5, 7

*Express Working Capital, LLC v. Starving Students, Inc.*,
    28 F.Supp.3d at 660 ..................................................................................................................7

*Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*,
    374 F. Supp. 3d 361 (E.D. Pa. 2019) .......................................................................................2

*Forbis v. Neal*,
    649 S.E.2d 382 (N.C. 2007) ....................................................................................................4

*Gonzales County Sav. & Loan Ass'n v. Freeman*,
    534 S.W.2d 903 (Tex. 1976) ...................................................................................................4

*Grossman v. Butcher*,
    1992 Ohio App. LEXIS 3653 (Ct. App. 10th Dist. June 30, 1992) .........................................8

*In re Evergreen Valley Resort, Inc.*,
    23 B.R. 659 (Bankr. Me. 1982) ...............................................................................................9

*In re Joseph Kanner Hat Co.*,
    482 F.2d 937 (2d Cir. 1973) ....................................................................................................8

*JMW Auto Sales, Ltd. v. FT Dev. Inc. (In re Moye)*,
    2010 Bankr. LEXIS 4378 (S.D. Tex. 2010) ..........................................................................10

*Kerr v. Commer. Credit Group, Inc.*,
    456 B.R. 597 (N.D. Ga. 2011) ...............................................................................................10

*Koch v Boxicon*,
    2016 Tex. App. LEXIS 3274 (Tex. App. March 30 2016).................................................4, 10

*Korrody v. Miller*,
    126 S.W.3d 224 (Tex. App. 2003)..........................................................................................4, 5

*Lange v. Inova Capital Funding, LLC*,
    441 B.R. 325 (8th Cir. 2011) .....................................................................................................9

*Maersk, Inc. v. Neewra, Inc.*,
    687 F. Supp. 2d 300 (S.D.N.Y. 2009).......................................................................................1

*Maersk, Inc. v. Sahni*,
    450 F. App'x 3 (2d Cir. 2011) ...................................................................................................1

*MF Global Holdings, Ltd. v. PricewaterhouseCoopers LLP*,
    199 F. Supp. 3d 818 (S.D.N.Y. 2016)...............................................................................7, 8, 9

*Ray v. Texas State Bd. of Pub. Accountancy*,
    4 S.W.3d 429 (Tex. Ct. App. 1999)..........................................................................................6

*Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*,
    336 F.3d 410 (5th Cir. 2003) ..................................................................................................6, 7

*Ripple v. Mortgage & Acceptance Corp.*,
    137 S.E. 156 (N.C. 1927)...........................................................................................................3

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000)......................................................................................................1

*USA Certified Merchants, LLC v. Koebel*,
    262 F. Supp. 2d 319 (S.D.N.Y. 2003).......................................................................................1

*Williams v. Bell*,
    402 S.W.3d 28 (Tex. App. 2013)..............................................................................................4

*Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Development Co.*,
    626 F.2d 401 (5th Cir. 1980) .....................................................................................................5

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
    530 F. Supp. 2d 486 (S.D.N.Y. 2007).......................................................................................1

**STATUTES**

Code
    § 303.009(c) ...............................................................................................................................4
    § 306.103(b)................................................................................................................................4

N.C. Gen. Stat. § 24-8.......................................................................................................................3

Tex. Fin. Code,
§ 301.002(a)(10) ...........................................................................................................7
§ 306.001(1) .................................................................................................................7

**OTHER AUTHORITIES**

6 Corbin on Contracts § 1501 (1951) ..................................................................................5

Texas Const., Art. XVI § 11 .................................................................................................4

## PRELIMINARY STATEMENT

Plaintiffs assert RICO claims based on (i) the collection of unlawful debt; and (ii) a pattern of wire fraud. The elements of mail and wire fraud are: "(1) the use of interstate mail or wires in furtherance of (2) a scheme to defraud (3) with money or property as the object." *Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 332 (S.D.N.Y. 2009) (citing *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)), *aff'd sub nom. Maersk, Inc. v. Sahni*, 450 F. App'x 3 (2d Cir. 2011). Under Second Circuit precedent, the "'predicate mail or wire communications need not themselves contain fraudulent communications,' but they must be material to a scheme that has a fraudulent and deceptive purpose." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 497 (S.D.N.Y. 2007) (quoting *USA Certified Merchants, LLC v. Koebel*, 262 F. Supp. 2d 319, 332 (S.D.N.Y. 2003)), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).

The Complaint alleges that Defendants used ACH withdrawals, wire transfers, and US Mail to carry out a common scheme to defraud with money as the object by:

- ➢ Fraudulently inducing merchants to pay Defendants money by misrepresenting the amount of money it intended to advance. Compl. ¶¶ 161;[1] 173; 195-199; 148; 173; 195-199. Notably, this is the same common scheme that the New York Attorney General alleges to be fraudulent; Compl., Ex. 8, ¶¶ 12, 100, 119 ("Short-changing merchants on their cash advances and overcharging them on fees deducted from advances.") ("Falsely representing to merchants that they will provide cash advances at certain amounts, then changing those amounts after obtaining merchant's signatures on Respondents' agreements…");

- ➢ Fraudulently charging sham fees for origination, ACH and underwriting costs by misrepresenting that the fees were necessary costs incurred by Defendants when they were merely a disguise to exact more money from Plaintiffs; *Compare* Compl. ¶¶ 291-304 with *id.*, Ex. 8, ¶ 148 ("Misrepresenting the basis of the fees they deduct from merchant cash advances.").

---

[1] Although the complaint mistakenly alleges that the advance was set up as two advances on its face, the actual agreement submitted by Defendant Funding 123 shows that it was all supposed to be advanced in one lump sum. *See* ECF #69-5. The text messages submitted by Plaintiff with Funding 123 also demonstrate that Plaintiff was defrauded by being shorted the amount promised on the contract. *See* ECF #74-1.

- ➢ Fraudulently inducing merchants to pay Defendants money by misrepresenting that the agreements are not loans. *See Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F. Supp. 3d 361, 376 (E.D. Pa. 2019) (applying Texas law) ("As recounted above, the Amended Complaint alleges (1) a scheme to defraud borrowers and their guarantors by luring them into credit arrangements with illegal interest rates, despite Defendants' knowledge of the illegality of those rates, (2) the use of the wires (i.e., January, 2017, emails and ACH debits between Defendants and Fleetwood Services furthering the false impression of the enforceability of the unenforceable agreements) to further the scheme, and (3) Defendants engaged in this scheme with the intent to defraud (which may be averred generally). As a result, the Court will deny Defendants' motion to dismiss on this ground.");

- ➢ Fraudulently using ACH debits to steal money; *Compare* Compl., ¶¶ 165, 184-91 with *Id.,* Ex. 8, ¶ 12 ("Respondents regularly defraud the merchants to whom they loan money.  They issue loans in smaller amounts than promised and withdraw more money from merchants' bank accounts than the merchants agree to pay.")

As alleged in the Complaint, Defendants employ the very same fraudulent scheme that the New York Attorney General has alleged against John Braun and his entities.  As demonstrated by the Bloomberg News investigation, Defendants are associates of Braun who are continuing to carry on the same unlawful and fraudulent scheme.  Indeed, the Bloomberg News investigation has recently been cited by the New York Attorney General:  "Since being released from prison, Braun has reportedly reentered the merchant cash advance business, supervising a new company based in Brooklyn."[2] This fraudulent scheme is also unlawful under Texas and North Carolina law.

The text messages upon which the Complaint is based indisputably prove fraudulent inducement from inception.  For example, the Funding 123 loan on its face was $2,000,000.  But it only funded $900,000 and when Plaintiffs complained about the bait-and-switch, the text messages prove that Funding 123 never had the intent to fund the full amount:[3]

> How much more do you need? I can maybe get another funder to do it

---

[2] Ex. A, Brief by NY AG, dated May 3, 2022, at pg. 9, n.4 (citing same Bloomberg News Article).
[3] ECF# 74-1, pg. 3.

## I. NORTH CAROLINA LAW.

### A. The Collection of an Unlawful Debt.

North Carolina has no instructive authority on the interpretation of MCA agreements. But it does apply the same principle that a court must look beyond the form of the contract. *See, e.g.*, *Ripple v. Mortgage & Acceptance Corp.*, 137 S.E. 156 (N.C. 1927) ("From time to time, however, our courts are called upon to determine whether or not the law has been successfully evaded by those who are not content to lend money in North Carolina at the legal rate of interest. Attempts to evade the law have not been generally successful. Our courts do not hesitate to look beneath the forms of transactions alleged to be usurious in order to determine whether or not such transactions are in truth and in reality usurious. In *Bank v. Wysong*, 177 N.C. 380, 99 S.E. 199, Justice Walker, speaking of a transaction alleged to be usurious, says: 'This kind of usurious agreement has been cast in various forms, but the courts have invariably stripped it of its flimsy disguises, and decided according to its substance, and its tendency and effect, when the purpose and intent of the lender is unmistakable. This is the correct rule.' Where a transaction is in reality a loan of money, whatever may be its form, and the lender charges for the use of his money a sum in excess of interest at the legal rate, by whatever name the charge may be called, the transaction will be held to be usurious. The law considers the substance and not the mere form or outward appearance of the transaction in order to determine what it in reality is. If this were not so, the usury laws of the State would easily be evaded by lenders of money who would exact from borrowers with impunity compensation for money loaned in excess of interest at the legal rate.").

North Carolina law, however, does not cap the amount of interest that can be charged on loans in excess of $300,000. *See* N.C. Gen. Stat. § 24-8.

### B. Wire Fraud

The elements of fraud under North Carolina law are "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 649 S.E.2d 382 (N.C. 2007).

## II. TEXAS LAW

### A. The Collection of an Unlawful Debt.

Texas Finance Code § 303.009(c) prohibits loans charging an interest rate in excess of 28%. The public policy prohibiting usury is embodied in the Texas Constitution itself. *See* Texas Const., Art. XVI § 11. This policy is further cemented in Texas statutes and precedent. *See Williams v. Bell,* 402 S.W.3d 28, 36 (Tex. App. 2013) ("Contracts for usurious interest are contrary to public policy and prohibited by the Texas Constitution and Texas Finance Code.").

Like New York law, **bona fide** account purchase transactions are exempt from the usury laws. Texas Finance Code § 306.103(b) provides that "the parties' characterization of **an account purchase transaction** as a purchase is conclusive that the account purchase transaction is not a transaction for the use, forbearance or detention of money." (emphasis added).

Nevertheless, Texas courts have likewise rejected the argument that the label put on a transaction is dispositive. *See Koch v Boxicon*, 2016 Tex. App. LEXIS 3274 at *18-9 (Tex. App. March 30 2016) (rejecting the contention that Texas Finance Code § 306.103(b) automatically applied to a transaction merely because the agreement stated it was an "Agreement to Purchase/Sell a Portion of Future Business Income, and instead conducting a fact-intensive inquiry); *Korrody v. Miller*, 126 S.W.3d 224, 226 (Tex. App. 2003) (conducting detailed factual analysis of whether transaction constituted an "account purchase transaction"); *Express Working Capital, LLC v. Starving Students, Inc.*, 26 F. Supp. 3d 660, 666 (N.D. Tex. 2014); *Gonzales County Sav. & Loan*

*Ass'n v. Freeman*, 534 S.W.2d 903, 906 (Tex. 1976) ("It has often been said that courts will look beyond the form of the [transaction] to its substances in determining the existence or nonexistence of usury . . . Labels put on a particular charge are not controlling."); *Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Development Co.*, 626 F.2d 401, 413 (5th Cir. 1980) (applying Texas law) ("A bargain for a loan can easily be disguised in other forms to which the usury laws appear not to be applicable. As in the case of all other illegal bargains, the court will penetrate the disguise if it can and make the provisions of the usury statute effective . . . parole testimony in all relevant circumstances are admissible in evidence.") (citing 6 Corbin on Contracts § 1501 (1951)).

Rather, to "determine whether a transaction is a loan or a sale, courts ascertain the intention of the parties as disclosed by the contract, attending circumstances, or both." *Express Working Capital,* 26 F. Supp. 3d at 666 (N.D.Tex. 2014) (citing *Korrody*, 126 S.W.3d at 226). Here, the Complaint alleges that the parties negotiated a loan over based on fixed payment terms and the text messages between the parties overwhelmingly establish this intent:[4]

> I want to do more business with you. 60K a day for 2m is a lot better than 80k for 1m. Let's do that. But you have to make these two payments today.

> It was never to be $80k for 1MM.

> 1M flex I'll do 60k
> 500k I'll do 45k

> Let's start working on wiping everyone out and work on a solid deal term loan

---

[4] ECF# 74-1, at pg. 30, 35-36, 39.

> 500k 35k
>
> Better than all your deals man

>> 1M 35k?

> Lol
>
> Ready to fund you
>
> Next deal we do a solid one

>> My partner doesn't feel comfortable with all positions to do that low. Like I said next deal I'm coming in first and giving you a killer deal
>>
>> Let's do this one for now
>>
>> I'll make it 43k
>>
>> Let's call it a day
>>
>> I'll do 400k 35k
>>
>> Want that?

In addition to considering the extrinsic evidence of intent above, Texas courts consider: "(i) [w]hether the debtor retains control over the allegedly purchased assets and an ownership interest in the asset: (ii) whether debtor can repay the debt through independent funds; and (iii) whether the debtor remains liable for any deficiency if the assets assigned prove insufficient to satisfy the debt."[5] *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 414 (5th

---

[5] Texas also recognizes that Generally Accepted Accounting Principles ("GAAP") "have become well-established and universally accepted over time." *Ray v. Texas State Bd. of Pub. Accountancy*, 4 S.W.3d 429, 432 (Tex. Ct. App. 1999). GAAP uses similar, but somewhat distinct criteria to determine whether a transaction can be accounted as a sale: "First, the transferred financial assets must have been put beyond the reach of the transferor and its creditors. Second, the transferee must have the right to pledge or exchange the asset free of conditions. Third, the transferor must not

Cir. 2003) (citing *Endico Potatoes, Inc*, 67 F.3d at 1068). The determination of whether an agreement is an account purchase transaction under the statute requires a fact-intensive inquiry. It would thus be improper to make that determination on a motion to dismiss.

When applying this test, there is no question that Plaintiffs have alleged sufficient facts to show that the agreements here are in substance disguised loan transactions, not an account purchase transaction. The Texas Finance Code defines an "account purchase transaction" as "an agreement under which a person engaged in a commercial enterprise sells accounts, instruments, documents, or chattel paper . . . at a discount." Tex. Fin. Code, § 306.001(1). It defines a "loan" as "an advance of money that is made to or on behalf of an obligor, the principal amount of which the obligor has an obligation to pay the creditor." Tex. Fin. Code, § 301.002(a)(10). Here, the Complaint contains substantial allegations establishing that the agreements are not account purchase transactions. These allegations meet every factor of the *Reaves* test.

First, the agreements are not true sales because Plaintiffs retained control over the allegedly sold receivables. Notwithstanding that Defendants purported to purchase "all" of Plaintiffs' future receipts until the Purchased Amount was repaid in full, as long as Plaintiffs made the Daily Payments, it could use the proceeds of the future Receipts without restraint. Plaintiffs' retention of the right to use the allegedly purchased Receipts is entirely inconsistent with the absolute transfer of ownership required for a transaction to be a sale.

In this regard, this case differs significantly from *Express Working Capital, LLC v. Starving Students, Inc.,* 28 F.Supp.3d at 660. First, in *Express*, the merchant sold a *percentage* (not all) of its future credit card receivables to Express Working Capital, LLC at a discount. The agreement

---

maintain effective control over the asset." *MF Global Holdings, Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 824 (S.D.N.Y. 2016). None of these factors is met here.

provided that the merchant's credit card processor would automatically transmit the purchased percentage of the merchant's future credit receipts to Express Working Capital. In other words, unlike here, the merchant never possessed the allegedly purchased future asset and never had control over or the right to use the allegedly purchased asset. Under these circumstances (not present here), the court found the transaction constituted a valid account purchase transaction. Here, the text messages upon which the Complaint is based shows that Plaintiffs retained control of the alleged receipts purchased and merely had to wire payments from any source:[6]

> Can you transfer from another account so it clears

Second, the agreements are not sales of receivables because obligations thereunder could be repaid with independent funds. A quintessential element of a true sale of receivables is that the purchaser is repaid through the collection of the purchased receivables. *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir. 1995). Thus, in a *bona fide* factoring arrangement, the factor is repaid through the account debtor's payment of the purchased receivable to a lockbox or some other account controlled by the factor. *See Grossman v. Butcher,* 1992 Ohio App. LEXIS 3653 at 7 (Ct. App. 10th Dist. June 30, 1992) ("[G]enerally speaking, an agreement to factor contains some variation of the following terms . . . an agreement that the invoice will notify the customer of the sale of the account to the factor, and the customer will be required to pay the factor directly."). However, where the advanced funds could be repaid with independent funds, courts have found the transaction was a loan and not a true sale. *See, e.g., In re Joseph Kanner Hat Co.*, 482 F.2d 937, 940 (2d Cir. 1973) (finding an agreement to be a loan where the "bank office testified that any payment received under the assignment would applied to reduce the

---

[6] *Id.* pg. 13.

amount of the loan"); *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 662 (Bankr. Me. 1982) (finding agreement to be a loan where the seller "acknowledges its rights to the assignment would be extinguished were Evergreen to pay the debt in full from some other source").

That is not the case here. Rather, the text messages demonstrate that Defendants accepted payment from personal funds and did not require repayment from actual receivables:[7]

> I need a wire today — 2:21 PM
> Of course. I know. — 2:21 PM
> Updates? — 3:00 PM
> I will tell you when it goes. — 3:01 PM
> Will it be today? — 3:07 PM
> Sending from personal account — 3:10 PM
> Ok but when? — 3:11 PM

Third, the transactions are not sales because Plaintiffs remained liable for repayment of the Purchased Amount even if Plaintiffs' receivables proved insufficient:[8]

> I need a wire for 160k
> For yesterday and today's payment.

The risk of loss associated with the purportedly sold receivables, both in form and practice, remained with Plaintiffs, which is entirely inconsistent with a *purchase of receivables* arrangement. In a true factoring arrangement, the factor purchases the receivables and assumes the risk that factor client will pay the receivable. *See Lange v. Inova Capital Funding, LLC*, 441 B.R. 325, 230 (8th Cir. 2011) (finding the purchase of receivables constituted a loan rather than a

---

[7] *Id.*. at pg. 10.
[8] *Id.*, at 14.

sale because the agreement "shift[ed] all risk" onto the seller); *Major's Furniture Mart, Inc.*, 602 F.2d 538, 546 (3d Cir. 1979) ("It is apparent to us on the record none of the risks present in a true sale is present here."); *Kerr v. Commer. Credit Group, Inc.*, 456 B.R. 597, 607 (N.D. Ga. 2011) ("[B]uyer's recourse against Debtor effectively transfers the risk of non-collection on Debtor. The Court therefore construes the transaction as a loan, not a sale.").

Fourth, when, as here, a seller retains the right to use even a portion of the allegedly purchased assets, Texas courts have found the transaction did not constitute a true sale. *See JMW Auto Sales, Ltd. v. FT Dev. Inc. (In re Moye),* 2010 Bankr. LEXIS 4378 (S.D. Tex. 2010) (agreement "did not evidence a consummated transfer of the benefits and burdens of ownership" so as to constitute a true sale under Texas law); *Callow v. Comm'r,* 135 T.C. 26, 33-34 (U.S. Tax Ct. 2010) ("[T]he key to deciding whether the transaction was a sale or other disposition is to determine whether the benefits and burdens of ownership have passed" from seller to buyer.). The Loan Documents in this case demonstrate a disguised loan and not an account purchase agreement. *See, e.g.*, *Koch v Boxicon*, 2016 Tex. App. LEXIS 3274 at *18-9 (Tex. App. March 30 2016) (holding that a contract that purported to be an account purchase transaction, but which in fact imposed an absolute obligation to repay the principal and established a fixed payment schedule was in fact a disguised usurious loan); Exhibit B (denying MCA summary judgment motion.).

### B.  Wire Fraud.

The elements of common law fraud are "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Aquaplex, Inc. v. Rancho La Valencia, Inc*., 297 S.W.3d 768, 774 (Tex. 2009).

Dated: May 27, 2022
       New York, New York

**WHITE AND WILLIAMS LLC**

*/s/ Shane R. Heskin*
_____
Shane R. Heskin, Esq.
7 Times Square, Suite 2900
New York, New York 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs and Putative Class Plaintiffs*

-11-

28947063v.1