UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAYMOUNT URGENT CARE PC; ROBERT
A. CLINTON, JR.; INDIGO
INSTALLATIONS, INC.; and
CHRISTOPHER A. TURRENTINE; et
al.,

      Plaintiffs,

      -v-

GOFUND ADVANCE, LLC; FUNDING
123, LLC; MERCHANT CAPITAL LLC;
ALPHA RECOVERY PARTNERS, LLC;
YITZCHOK ("ISAAC") WOLF; JOSEF
BREZEL; JOSEPH KROEN; AND
YISROEL C. GETTER,

      Defendants.

22-cv-1245 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

    This is a putative class action alleging that defendants make allegedly fraudulent and usurious loans and then engage in abusive collection tactics. The defendants are companies and individuals engaged in the "merchant cash advance" ("MCA") industry. MCA agreements are financial products, often marketed to small businesses through high-pressure sales operations resembling "boiler rooms," that purport to purchase at a discount a portion of a business's future receivables. The plaintiffs here are two small businesses (a North Carolina urgent care facility and a Texas construction contractor) and their principals that entered into MCA agreements with defendants that they have since come to regret. Plaintiffs' amended complaint, ECF 22 ("Complaint" or

"FAC"), brings claims sounding in RICO, racketeering conspiracy, breach of contract, § 1983, and fraud.

Now before the Court is defendants' motion to dismiss all claims other than the breach of contract claims. ECF 68 ("Mot."). The Court has carefully considered the parties' briefing and the presentations of counsel at oral argument. As explained further below, defendants' motion to dismiss is granted in part and denied in part.

Specifically, the motion is granted in part with respect to the declaratory judgment claim, which is dismissed against all defendants except GoFund Advance, against whom only the aspect of the claim concerning the validity of the Indigo settlement may proceed. The motion is also granted in part with respect to the fraud claim, which is dismissed against all defendants other than GoFund Advance, against whom only the aspect of the claim concerning allegedly fraudulent electronic bank transfers may proceed. The motion is otherwise denied. With this motion resolved, the Court also lifts the stay of these proceedings previously imposed, and the parties are directed to follow the procedures set forth in the conclusion of this Opinion to develop a new case management plan that will move this litigation expeditiously toward trial.

I.   **Background**

    A. **Factual Background**[1]

        1.   MCA Agreement Terms

---

[1] The factual allegations here are taken from the Complaint and the documents referenced therein and integral thereto.

The MCA transactions here at issue relate to purported purchases of a portion of the plaintiff merchants' receivables in exchange for up-front payments. The MCA agreements specify a purchase price to be paid by the MCA company to the merchant, an amount of receivables purchased, the percentage of the merchant's total receivables that the purchase purportedly represents, and a daily "remittance" amount. See, e.g., ECF 69-2 at 3.[2] The merchant is obligated to pay that daily remittance amount through an ACH bank transfer unless the amount is adjusted. Id. The owner of the merchant company is also required to sign the agreement in his personal capacity as a "guarantor." Id.

The first page of the agreement includes the following statements under the heading "Purchase and sale of future receivables:"

> Merchant is selling a portion of a future revenue stream to GFA at a discount, not borrowing money from GFA, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by GFA. The Remittance is a good faith estimate of Purchased Percentage multiplied by revenues of Merchant. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. GFA is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and GFA assumes these risks based on Merchant's

---

[2] In analyzing the MCA transactions at issue here, this Opinion references the terms from a GoFund Advance agreement, ECF 69-2, since that is the most common agreement form in the case. This agreement is cognizable on a motion to dismiss because it is incorporated by reference in and integral to the Complaint. Neither party has identified material differences in the agreement terms among the companies, so for the purpose of this motion, the Court treats these terms as applying to all transactions presently at issue. For convenience, the Court will use "GFA" to refer collectively to defendants GoFund Advance, Merchant Capital, and Funding 123, the three purported "purchasers" of the merchants' receivables.

> representations, warranties and covenants.... Merchant and
> Guarantor are only guaranteeing their performance of the terms
> of this Revenue Purchase Agreement, and are not guaranteeing the
> payment of the Purchased Amount. The initial Remittance shall be
> as described above. The Remittance is subject to adjustment as
> set forth [herein].

ECF 69-2 at 3. The MCA agreement also includes a "reconciliation"

provision that purports to result in adjustment of the daily remittance

amount. This provision states, in relevant part:

> As long as an Event of Default, or breach of this Agreement, has
> not occurred, once per calendar month Merchant may request a
> retroactive reconciliation of the total Remittance Amount (for
> the purposes of this Agreement "total Remittance Amount" shall
> be defined as all payments made by Merchant to GFA after GFA
> remitted the Purchase Price to Merchant). All requests hereunder
> must be in writing to eric@gofundadvance.com within five (5)
> business days of the close of the calendar month. Said request
> must include copies of all of Merchant's bank account statements,
> credit card processing statements, and accounts receivable report
> if applicable, for the requested month. GFA retains the right to
> request additional documentation such as bank login ... to view
> Merchant's accounts, refusal to provide access shall be a breach
> of this Agreement and GFA shall have no obligation to reconcile.
> Such reconciliation, if applicable, shall be performed by GFA
> within five (5) Business Days following its receipt of Merchant's
> request for reconciliation by either crediting or debiting the
> difference back to, or from, Merchants Bank Account so that the
> total amount debited by GFA shall equal the Specific Percentage
> of the Future Receipts that Merchant Collected from the date of
> this Agreement up to and including the date of the Reconciliation
> request.

ECF 69-2 at 4 (§ 1.4).

The MCA agreement also provides GFA with various "Protections

Against Default," should various listed events occur, including

collection of the "full uncollected Purchased Amount plus all fees ...

immediately," enforcement of the "Limited Personal Guaranty of

Performance against the Garantor(s)," and "execut[ion] [by GFA] in the

name of the Merchant [of] a Confession of Judgment in favor of GFA in

the amount of Purchased Amount stated in the Agreement." ECF 69-2 at 5 (§ 1.13). For okaintiffs Haymount and Indigo, the personal guaranty was executed by their principals, also plaintiffs here. See, e.g., ECF 69-2 at 9. The MCA agreements state that "[s]aid Guarantors will be jointly and severally liable to GFA for all of GFA's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement." ECF 69-2 at 6 (§ 3.2). As for the "confession of judgment" protection, the MCA agreement states in part:

> Each and every merchant, endorser guarantor and surety of this agreement, and each other person or entity who may become liable for all or any part of this obligation, hereby acknowledge that the transaction of which this agreement is a part is a commercial transaction, and to the extent allowed under Connecticut General Statutes sections 52-278a to 52-278m, inclusive, or by other applicable law each and every merchant, endorser and guarantor of this agreement hereby waive (a) all rights to notice and prior court hearing or court order in connection with any and all prejudgment remedies to which FCG hereof may become entitled by virtue of any default or provision of this agreement or security agreement securing this agreement and (b) all rights to request that FCG hereof post a bond....

ECF 69-2 at 7 (§ 4.13). Finally, the MCA agreement also includes a security agreement, permitting UCC lien notices to be sent to the merchant's banks and counterparties, freezing its accounts. ECF 69-2 at 8.

The MCA agreements also contain a fee structure document. It lists various large fees, including "Underwriting Fee: Minimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses," and "ACH Origination Fee: Minimum of $500.00 or up to 10% of the purchase price to cover cost of Origination and ACH Setup." Id at 10.

2.  <u>Haymount Urgent Care</u>

Haymount is an urgent care and primary care facility located in Fayetteville N.C. at which more than 100 employees provide medical care to approximately 300 people per day. FAC ¶¶ 87-88. Plaintiff Dr. Robert Clinton Jr. is Haymount's owner. <u>See</u> ECF 69-2 at 9. Haymount's financial position allegedly came under strain as a result of the COVID-19 pandemic, both because of additional costs (<u>e.g.</u>, setting up a PCR lab, hiring additional staff, and purchasing supplies and personal protective equipment) and because of slow payments for care provided to uninsured and Medicare-insured patients. FAC ¶¶ 91-100. Haymount was therefore seeking additional financing to help it sustain operations with limited cash flows. FAC ¶ 101.

Haymount entered into the six MCA agreements with defendants GoFund Advance, Merchant Capital, and Funding123 summarized below:

| Contract Date | MCA Entity | Purchase Price | Amount of Purchased Receivables | Stated Percentage of Revenue | Stated Daily Remittance | Implied Interest Rate[3] |
|---|---|---|---|---|---|---|
| 8/25/21 | Merchant Capital | $200,000 | $275,000 | 45% | $7,299 | 263% |
| 8/26/21 | GoFund Advance | $250,000 | $349,750 | 25% | $8,000 | 242% |
| 9/27/21 | GoFund Advance | $150,000 | $224,850 | 25% | $7,500 | 650% |
| 12/16/21 | GoFund Advance | $1,000,000 | $1,350,000 | 45% | $35,000 | 319% |
| 12/27/21 | Funding123 | $2,000,000 | $2,998,000 | 45% | $80,000 | 405% |
| 1/20/22 | GoFund Advance | $1,000,000 | $1,499,990 | 45% | $60,000 | 612% |

---

[3] As explained, the MCA agreements expressly state that there is no interest rate associated with the contemplated financial transactions. However, the Complaint alleges that there are implied interest rates, based on the total amount borrowed, the total amount to be repaid, and the number of days over which repayment is expected.

See FCA ¶¶ 103-186.

Haymount alleges that these figures represent the terms of short-term commercial loans, rather than purchases of receivables for reasons that are discussed below at length. Haymount points out that these agreements reflect widely varying estimates of the company's daily revenue. For instance, the MCA agreement dated December 16, 2021 estimated that 45% of the company's daily revenues was $35,000, whereas the MCA agreement dated December 27, 2021 estimated that 45% of daily revenues was $80,000. See FAC ¶¶ 139-140, 155. There is no basis, Haymount argues, for the defendants to have concluded that its revenues more than doubled in 11 days, thus supporting the inference that these figures are not good faith reflections of revenues purportedly purchased.[4]

Moreover, Haymount alleges that it would repeatedly not receive its full advance, with defendants disbursing only part of the amount and then waiting until that had been more than paid back before dispensing the rest. This is the basis of the breach of contract claim, which is not at issue in the instant motion. See FAC ¶¶ 308-314.

Alpha Recovery Partners allegedly serves as the collection arm of the RICO enterprise, setting up and operating the ACH withdrawals and, upon default, issuing UCC liens and attachment orders pursuant

---

[4] Haymount also points to text messages that suggest negotiations over fixed loan terms rather than purchases of receivables. See Opp. 6. However, plaintiffs have identified no adequate rationale for the Court considering these documents, which are neither referenced in nor integral to the Complaint.

to a Connecticut pre-judgment relief statute. In Haymount's case, Alpha froze bank accounts and medical insurance reimbursement accounts, effectively debilitating Haymount's business.

       3. <u>Indigo</u>

Indigo, through its principal, plaintiff Christopher Turrentine, entered an MCA agreement in which it would be advanced $40,000 for a $63,960 payback at a rate of $2,200 per day, purporting to be for 45% of revenues. FAC ¶¶ 195, 203. Like Haymount, Indigo alleges that the advance was not paid in full, and that the balance -- minus the allegedly fraudulent fees -- was only paid after Indigo's total repayment was more than the value of the first advance. FAC ¶¶ 205-207.

Alpha Recovery Partners used the Connecticut pre-judgment relief procedure to freeze Indigo's Texas bank account by serving a writ of attachment on a Connecticut branch of PNC Bank on or about February 24, 2022. FAC ¶ 328. Defendants allegedly provided Indigo and Turrentine no notice of this attachment, either before or after the writ was issued. Moreover, the defendants allegedly failed to serve on Indigo or PNC a copy of any underlying Connecticut civil action, a sworn affidavit as required by statute, or a statutorily required notice. FAC ¶ 329. Indigo agreed to a settlement with defendants where it paid $4,000 to settle outstanding claims and, as part of that settlement, to release claims against defendants. <u>See</u> ECF 69-9 ¶ 11.

B. **Procedural Background**

The putative class action Complaint pleads six counts: (i) RICO, based on collection of an unlawful debt or, in the alternative, based on a pattern of wire fraud; (ii) racketeering conspiracy, based on an alleged conspiracy to commit the substantive RICO scheme alleged in Count I; (iii) declaratory judgment, seeking a declaration that the MCA agreements are void _ab initio_ as usurious loans, and that the settlement with Indigo is void; (iv) common law fraud, related to the imposition of excessive fees; (v) breach of contract, related to the timing of payments from GFA to the merchants; and (vi) section 1983, related to allegedly abusive use of the Connecticut pre-judgment relief statute.

On March 21, 2022, the Court granted Haymount's motion for a preliminary injunction against GoFund Advance, prohibiting defendants from freezing Haymount's bank and medical insurance reimbursement accounts. ECF 66. Defendants now move for dismissal of all claims other than the claim for breach of contract.

II. **Discussion**

Defendants seek dismissal of the RICO, section 1983, declaratory judgment, and fraud claims. Most of these claims are also multifaceted, in that they contain two unrelated theories of liability under a single claim. The Court addresses the arguments against each claim in turn.

A. **RICO**

The Complaint's core claim is that defendants are liable under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1961 <u>et seq.</u>, for illegally operating an enterprise that
loans money to small businesses at criminally usurious interest rates
and then uses various improper tactics to collect on those loans. The
catch, however, is that RICO's application to an enterprise engaged
in the collection of an unlawful debt requires that the transactions
at issue be <u>loans</u>, since the outstanding balance on a financing
transaction that is not a loan cannot, by definition, constitute an
unlawful debt. The plaintiffs therefore plead, apparently in the
alternative, that RICO liability also lies on the basis of a pattern
of wire fraud, and they argue that both the MCA agreements' excessive
fees and defendants' deceptive ACH transfer practices might constitute
wire fraud. Finally, the Complaint pleads a racketeering conspiracy
claim.

For the reasons explained further below, the Court finds that the
Complaint states claims for substantive and conspiratorial RICO
violations, both predicated on the collection of unlawful debts and
on a pattern of wire fraud involving allegedly manipulative use of ACH
withdrawals.

1.  <u>Collection of an Unlawful Debt</u>

The Complaint's principal theory of RICO liability is that the
defendants are operating an enterprise dedicated to making and
collecting on usurious loans. The potentially dispositive issue raised
by the instant motion is whether the MCA agreements amount to loans
under applicable state law, because it is undisputed that the implied

interest rates of these agreements far exceed the cap in applicable New York usury law.

The RICO statute declares that it is "unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through ... collection of unlawful debt." 18 U.S.C. § 1962(c). As relevant here, the statute defines an "unlawful debt" as a "debt (A) ... which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with ... the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

Since RICO's "definition of 'unlawful debt' invokes state as well as federal laws related to usury to provide substance to the concept of 'unlawful[ness],'" the first question is what state's law applies to the transactions at issue. United States v. Moseley, 980 F.3d 9, 18 (2d Cir. 2020). The MCA agreements at issue expressly choose that New York law will govern their terms. See, e.g., ECF 69-2 at 6 (§ 4.5). And there is no apparent reason why those choice of law provisions would be held unenforceable under either the laws of New York, of North Carolina (Haymount's domicile), or of Texas (Indigo's domicile), particularly since New York's usury laws are the strictest among these three states. See generally ECF 82, 83. Therefore, as the Second

11

Circuit explained in Moseley, for the purposes of RICO liability, New York law governs the issues of whether the contracts amount to loans, and, if they are loans, whether they are unlawful debt under RICO. 980 F.3d at 20.

Here, therefore, liability for an "unlawful debt" RICO violation requires proof of five elements: "[1] that a debt existed, [2] that it was unenforceable under New York's usury laws, [3] that it was incurred in connection with the business of lending money at more than twice the legal rate, [4] that the defendant aided collection of the debt in some manner, and [5] that the defendant acted knowingly, willfully and unlawfully." United States v. Biasucci, 786 F.2d 504, 513 (2d Cir. 1986). The instant motion challenges only the second element. The motion's core argument is that the debts arising from the MCA agreements are not unenforceable under New York's usury laws because the MCA agreements are genuine purchases of receivables, not loans. Defendants effectively concede, at least for now, that if the transactions amount to loans, then the implied interest rates are well above 50%, which is the twice the rate of criminal usury under New York law (25%), N.Y. Penal L. § 190.40. However, even when a transaction is unmistakably a loan, the lender is entitled to a presumption that the loan is lawful, so the borrower must establish by "clear evidence" that a transaction is a usurious loan. Giventer v. Arnow, 37 N.Y.2d 305, 309 (1975).

Under New York law, "[u]sury laws apply only to loans or forbearances, not investments. If the transaction is not a loan, there

can be no usury, however unconscionable the contract may be." Seidel v. 18 E. 17th St. Owners, Inc., 79 N.Y.2d 735, 744 (1992). New York courts uniformly hold that "[w]hen determining whether a transaction is a loan, substance -- not form -- controls." Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 334 (2021).

In assessing the substance of financial transactions, the Court of Appeals has focused on how the contract at issue allocates risk between the parties. As the Second Circuit has explained, when determining whether a transaction was a true sale of receivables, "[t]he root of [the analysis] is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1069 (2d Cir. 1995). However, where economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a bona fide purchase of receivables and the transaction is, in substance, a loan. Id. See also Adar Bays, 37 N.Y.3d at 334 ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders."). In addition to an economic analysis of the transaction, the New York Court of Appeals has also considered

13

objective indicia of the parties' intent to "distinguish between intent to borrow and intent to engage in a joint transaction or exchange money for some other reason." Adar Bays, 37 N.Y.3d at 334. "Usurious intent is an essential element of usury and where usury does not appear on the face of the note, usury is a question of fact" Id. at 336.

The New York Court of Appeals has not yet addressed how to apply these general principals to MCA agreements, so this Court's task is necessarily to predict how the Court of Appeals would treat an MCA agreement. While there have been several Appellate Division decisions and numerous trial court cases on the issue, the outcomes are strongly fact-bound and vary considerably. The Court's review of the caselaw suggests that, contrary to defendants' suggestion, the Appellate Divisions have yet to settle on any specific framework for classifying MCA agreements.

Defendants suggest that the Court should treat as dispositive a set of three factors that the Second Department and various trial courts have repeatedly applied: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." LG Funding, LLC v. United Senior Properties of Olathe, LLC, 181 A.D.3d 664 (2d Dep't 2020). To that end, defendants argue that the MCA agreements at issue here cannot be loans because they contain a reconciliation provision that can be read as mandatory, lack a stated term, and do not treat the merchant's bankruptcy filing as an event of default. See Mot. 14.

But the Court concludes that, while these three factors may be relevant to the analysis, they are far from dispositive. To start, other Departments have analyzed MCA contracts without applying these factors. See, e.g., Davis v. Richmond Capital Group LLC, 194 A.D.3d 516, 517 (1st Dep't 2021). But even the Second Department has not reduced the question of whether a particular MCA contract is a loan to a mechanical application of these three factors, as the defendants urge the Court to do. For instance, in LG Funding, the Second Department considered the three factors as part of an overall analysis of the transaction, but its holding that the MCA contract at issue was a loan subject the usury laws depended on the conclusion that "[t]he agreement also contains provisions suggesting that [the merchant's] obligation to repay was absolute and not contingent on its actual accounts receivable." 181 A.D.3d at 666. Indeed, the LG Funding decision's holding is ultimately about whether the transaction represented a real transfer of risk, concluding that the contract's "provisions suggest that the [MCA lender] did not assume the risk that [the merchant] would have less-than-expected or no revenues," so the economic substance of the transaction was a loan, not a purchase of receivables. Id. Other judges in this District have similarly considered the three Second Department factors but ultimately determined that the essential question was whether the purported MCA purchaser actually bears the risk of a revenue shortfall or if the agreement is structured to ensure an "absolute payment obligation." Womack v. Cap. Stack, LLC, 2019 WL 4142740, at *5-*7 (S.D.N.Y. Aug.

30, 2019) (collecting cases); see also, e.g., Fleetwood Servs., LLC
v. Ram Cap. Funding, LLC, 2022 WL 1997207, at *9 (S.D.N.Y. June 6,
2022) ("The three factors provide only a guide to analysis. They do
not dictate the conclusion.").

Starting with the Second Department's three factors, defendants
contend that applying these factors to the face of the MCA agreements
at issue weigh against finding them to be loans: none of the agreements
have definite terms,[5] none names the merchant's bankruptcy as a default
event, and all purport to have mandatory reconciliation provisions.
See ECF 69-2 at 6. However, the actual operation of the contracts
muddies this picture. Although the reconciliation provision is styled
as a mechanism requiring defendants to adjust the remittance amount
upon the merchant's application, the actual structure of the provision
makes it often impossible to use and leaves the lender with substantial
discretion to prevent adjustment. To begin with, the merchant may only
seek reconciliation once per calendar month, and then only during the
last five business days of a month. See ECF 69-2 at 4 (§ 1.4).
Therefore, the contract only permits the merchant to seek
reconciliation about 20% of the time. This limitation is particularly
significant because some of the MCA agreements here at issue had

---

[5] While none of the MCA agreements have definite terms spelled
out in the texts of those contracts, the expected duration of the
repayment period is readily calculable, since the merchant's total
repayment amount due is known, as is the daily remittance amount.
While that remittance is subject to reconciliation, and thus to
extension of the loan term, "the contingent nature of [potential future
payments] [do not] remove the loan from the scrutiny of the usury
law." Adar Bays, 37 N.Y.3d at 338.

implied repayment periods of less than one month, see Opp. 5, reflecting the high daily remittance amounts, and thus a corresponding likelihood that the merchant's need for reconciliation might be urgent. If a mid-month decline in revenues would lead a merchant to have insufficient cash to fund its high daily remittance, its inability to even apply for reconciliation could lead its account to return an insufficient funds message to the lender, which would trigger a default under the contract and entitle the lender to immediately seek the whole uncollected amount due from the merchant's principal, via the personal guaranty. See ECF 69-2 at 5-6 (§§ 1.13, 3.1). Moreover, while the reconciliation provision purports to be "mandatory," its structure nonetheless vests substantial discretion in GFA to deny reconciliation: the reconciliation provision expressly permits the lender "to request additional documentation such as bank login," and notes that "refusal to provide access shall be a breach" such that the lender "shall have no obligation to reconcile." ECF 69-2 at 4 (§ 1.4). It is readily apparent how the lender could use this contractual right to obtain from the merchant further documentation as a procedural pretext for denying reconciliation.

In any event, drawing back from the aforementioned three factors, which are neither exclusive nor dispositive, the MCA agreements at issue here have many features that weigh in favor of finding the transactions to be loans, rather than bona fide purchases of receivables, because they operate to prevent GFA from taking on the risk of shortfalls in the merchants' receivables. See Endico Potatoes,

17

Inc., 67 F.3d at 1069. And New York courts have found that many of
these features weigh in favor of finding MCA transactions to constitute
loans subject to the usury laws. For instance, the daily remittance
amounts described in the MCA agreements and alleged to have been
negotiated are fixed dollar amounts, and the Complaint adequately
alleges that these amounts appear not to be good faith estimates of
the merchant's receivables. See Davis, 194 A.D.3d at 517. Nor does any
MCA agreement identify particular revenues or accounts that were
supposedly purchased, so there is no transfer of "risk of nonpayment
by any specific customer." Plymouth Venture Partners, II, L.P. v. GTR
Source, LLC, 37 N.Y.3d 591, 609 n. 2 (2021) (Wilson, J. dissenting).
Moreover, the MCA agreements leave merchants with the responsibility
to collect revenues from all their accounts, and merchants may possess
and use those revenues so long as the daily remittances are made. All
these features of the MCA agreements are more consistent with an
"intent to borrow" a fixed sum through a loan rather than an intent
to purchase specified receivables of an independent business. Adar
Bays, 37 N.Y.3d at 334.

    The repayment and remedy terms of the MCA agreements also operate
in a manner more akin to a standard, high interest-rate loan than to
a genuine transfer of the risks associated with specified receivables.
For instance, they provide that a merchant defaults on the MCA
agreement if its bank rejects the automated debit for one of those
remittances without the merchant having provided prior notice. This
default then entitles the lender to immediate repayment of the full

amount of the transaction outstanding. <u>See Davis</u>, 194 A.D.3d at 517. And should a merchant default and the lender be unable to recover the outstanding balance from the merchant's bank accounts, the MCA agreements entitle the lender to obtain full repayment from the merchant's principal, via the personal guaranty. <u>See id.</u> Finally, GFA's risks of nonpayment are further mitigated by the MCA agreements' provisions permitting GFA to use the Connecticut confession of judgment process, including the incorporation of a waiver permitting the lender to issue a writ of attachment on the merchant's accounts and assets without a judicial hearing. <u>See</u> <u>LG Funding</u>, 181 A.D. 3d at 666. Together, "[t]hese provisions suggest that the plaintiff did not assume the risk that [merchants] would have less-than-expected or no revenues." <u>Id.</u>

Considering all of these factors, as well as the factual questions raised concerning the defendants' alleged usurious intent, the Court concludes that the Complaint has adequately pled that the MCA agreements at issue here function as loans. Because the transactions should be treated as loans, at least at this juncture, and because defendants do not dispute that the implied interest rates on these transactions far exceed 50% per annum (twice the New York State criminal usury rate), the Court holds that the Complaint has adequately pled that the debts created by the MCA agreements that the defendants issue are unenforceable, "unlawful debts" under the RICO statute. Since this was the only element of the RICO claim that defendants challenged on this motion, the Court's conclusion that the transactions

amount to loans is sufficient to deny the prong of the motion concerning the RICO claim for collection of unlawful debts.

    2.  <u>Pattern of Wire Fraud</u>

In the alternative, the Complaint pleads a RICO claim predicated on a patter of racketeering activity, to wit, wire fraud. Plaintiffs allege that two types of activities described in the Complaint amount to wire fraud: (i) the use of email to transmit agreements that misrepresent the nature of the fees they were charging, and (ii) the use of ACH withdrawals, including through use of misleading names, to extract unrecorded payments or payments after merchants blocked access to their accounts. <u>See</u> Opp. 18. For the reasons explained below, the Court concludes that only the second allegation adequately pleads a pattern of wire fraud sufficient to support a RICO claim.

Pleading a RICO claim based on a pattern of racketeering activity requires alleging "(1) at least two predicate acts of racketeering occurring within a ten-year period; (2) that these predicate acts are related to each other; and (3) that these predicate acts amount to or pose a threat of continuing criminal activity." <u>Related Companies, L.P. v. Ruthling</u>, 2017 WL 6507759, at *18 (S.D.N.Y. Dec. 18, 2017). Defendants contend the wire fraud allegations are not pled with particularity and that there is no adequate continuity of the alleged fraud.

Plaintiffs' first theory of wire fraud is that defendants charge exorbitant fees for "underwriting" and "ACH setup" that far exceed any actually incurred expenses. However, the MCA agreements disclose the

amounts of these fees. See ECF 69-2 at 9. While they are plainly exorbitant and do not reflect real costs, they are disclosed. Plaintiffs provide no authority that charging excessive but disclosed fees pursuant to a contract amounts to wire fraud. To the extent that plaintiffs allege that no services were actually performed in exchange for these fees, or that the work performed materially differed from the descriptions in the fee schedule, plaintiffs' complaints sound in breach of contract, not fraud.[6] Accordingly, this theory is not a viable basis for a RICO claim.

However, the Complaint also alleges that GoFund Advance made ACH withdrawals from Haymount's account (after Haymount attempted to block further withdrawals) by using misleading names to evade the blocks. See FAC ¶¶ 180-186. As discussed further in Section II.D infra, this allegation just barely clears the Rule 9(b) barrier for pleading fraud claims with particularity.

That still leaves the issue of continuity. The several "attacks" on Haymount's bank account are isolated and close in time, so there is no closed-end continuity. See DeFalco v. Bernas, 244 F.3d 286, 321 (2d Cir. 2001) (the Second Circuit has not recently upheld closed end continuity where acts occurred over a period of less than two years). Moreover, the tactic of using deceptive party names to evade blocks

---

[6] The same is true regarding the allegations that certain remittances were not properly credited to Haymount's accounts. This may be a breach of contract, but the Complaint does not sufficiently allege that this constitutes a fraud, let alone a pattern of fraud.

on ACH withdrawals is only alleged in relation to Haymount, not Indigo. See FAC ¶¶ 306-307.

However, the Complaint has, just barely, alleged that open-ended continuity applies to the second variant of the wire fraud theory. "A party may establish open-ended continuity by alleging predicate acts occurring over a short period of time so long as there is a threat that such conduct will recur in the future. The threat that such illegal conduct will recur in the future exists when: (1) a specific threat of repetition exists, (2) the predicates are a regular way of conducting an ongoing legitimate business, or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." Rakoff & Goldstein, RICO: Civil and Criminal Law and Strategy § 1.04[2] (2021). Here, ACH withdrawals are a regular means of collecting on the MCA agreements. Taking the Complaint's allegations as a whole, specifically including the repeated attempts to debit Haymount's Bank of America account on at least five days spread over several weeks, see FAC ¶¶ 183-184, and considering these allegations in the light most favorable to the plaintiffs, it is plausible to infer that the alleged RICO enterprise regularly conducted business using these tactics. Accordingly, the Court concludes that the Complaint alleges facts that can support a finding of open-ended continuity, and thus, pleads a claim for a RICO violation predicated on a pattern of wire fraud activity.

3.  Racketeering Conspiracy

Defendants' only argument against the claim that they engaged in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) is derivative of their objections to the substantive RICO claim. Specifically, defendants cite First Cap. Asset Mgmt., Inc. v. Satinwood, Inc. for the proposition that a RICO conspiracy claim is properly dismissed where a complaint fails to state a substantive RICO claim. 385 F.3d 159, 182 (2d Cir. 2004). However, since the Court has concluded that the substantive RICO claim is adequately pled, there is no reason at this juncture to dismiss the racketeering conspiracy claim.

For these reasons, the Court concludes that the motion to dismiss is denied with respect to the RICO and racketeering conspiracy claims.[7]

B. Section 1983

Plaintiffs allege that defendants have violated their constitutional right to due process while acting under color of Connecticut state law, all in violation of 42 U.S.C. § 1983. The complaint alleges that defendants had their attorneys issue writs of attachment on the plaintiffs' bank and medical insurance reimbursement accounts, but that defendants failed to adhere to the statutory requirements for use of this as a form of prejudgment remedy without

---

[7] However, as explained above, the plaintiffs are precluded from proceeding on the aspect of the wire fraud prong of the substantive RICO claim concerning the allegedly excessive fees that were, nevertheless, disclosed, and this limitation applies to the conspiracy claim as well.

any court order or procedure. This, plaintiffs claim, violates procedural due process, even considering the creditor-friendly provisions of the Connecticut prejudgment attachment statute.

Defendants move to dismiss this claim, contending that the MCA agreements contained valid waivers permitting their attorneys to issue writs, without any court process, and thereby freeze the merchants' accounts. Defendants argue, therefore, that plaintiffs have waived any due process objections they now make to their use of this procedure. Defendants further contend that if there were procedural deficiencies or other issues with their use of the pre-judgment remedy, then plaintiffs should have raised those issues in Connecticut court, not made them the basis of a federal constitutional claim. However, taking the plaintiffs' allegations as true, the Court concludes that the complaint states a claim under section 1983.[8]

---

[8] Although they are private parties, defendants do not challenge that the Complaint adequately alleges that they acted "under color of state law" and with a sufficient nexus to state action in their allegedly unlawful use of the prejudgment attachment statute. In any event, the Supreme Court has repeatedly explained that section 1983 liability may lie for either abusive use of a prejudgment attachment statute or knowing or reckless use of an unconstitutional prejudgment remedy where the alleged deprivation was caused by the exercise of a power created by the state and the party charged with the deprivation is a person who "he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). See also, e.g., Connecticut v. Doehr, 501 U.S. 1 (1991); North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601 (1975). Attorneys employing a confession of judgment statute to attach private property without notice or hearing may be treated as state actors, because they "enlist[] the compulsive powers of the state to seize property by executing on a judgment without pre-deprivation notice or hearing [and so they] act[] under color of law." Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1267 (3d

Connecticut's prejudgment attachment statute provides, in relevant part:

> In an action upon a commercial transaction, ... wherein the defendant has waived his right to a notice and hearing..., the attorney for the plaintiff shall issue the writ for a prejudgment remedy without securing a court order provided that (1) the complaint shall set forth a copy of the waiver; (2) the plaintiff shall file an affidavit sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a [net] judgment in the amount of [or greater than] the prejudgment remedy sought, ... will be rendered in the matter in favor of the plaintiff; and (3) the plaintiff shall include in the process served on the defendant a notice satisfying the requirements of [another provision].

Conn. Gen. Stat. Ann. § 52-278f. According to the Complaint, the Connecticut judiciary also publishes a practice guide explaining in more details the three procedural requirements for issuing a writ pursuant to a waiver. See FAC § 323. As the defendants contend, the MCA agreements contain boilerplate language designed to operate as a waiver of judicial process, see, e.g., ECF 69-3 at 7, § 4.13, and so defendants appear eligible to use this prejudgment remedy provision without notice and hearing. Plaintiffs respond that, to the extent the relevant provisions of the MCA agreements would operate as a waiver of due process requirements, their purported waiver was neither knowing nor intentional, since the provisions were buried in a dense, adhesive contract. See FAC ¶¶ 9, 319, 330-331. But the Court need not address,

---

Cir. 1994). Here, the writs of attachment purported to be issued in aid of a pending lawsuit, and so the banks froze the plaintiffs' accounts because the writs purported to "use the state's power of legal compulsion to deprive another of property." Id.

at this juncture, whether the waiver was valid, because the Complaint adequately alleges that the defendants failed to follow any of the procedural requirements set forth in section 52-278f.

Specifically, the Complaint alleges that defendants did not draft -- or at least did not serve on plaintiffs or their bank -- a complaint, a supporting factual affidavit, or the statutorily required notice. FAC ¶ 325. Instead, defendants allegedly have a practice of serving writs directly on a financial institution, and even those papers served on the banks do not include either a complaint or an sworn affidavit. ¶¶ 328-329. Rather than an orderly processed linked to a meritorious lawsuit, as the statute envisions, plaintiffs allege that defendants "first freeze the merchant's bank accounts by serving writs of attachment on the bank only, and then immediately demand a settlement under duress and the threat of financial ruin." FAC ¶ 326. The inference that defendants have abused Connecticut's prejudgment remedy is also supported by the allegation that, at least in the case of a writ served on plaintiff Indigo's bank, defendants have never "provided a copy of the complaint or the supporting affidavit ... despite numerous requests by Indigo's counsel." FAC ¶ 329.

Treating the Complaint's allegations as true, as required on a motion to dismiss, the Court concludes that neither defendants' substantive nor their procedural argument is availing. Substantively, the allegations that defendants routinely fail to follow § 52-278f's procedural requirements undercut defendants' position that their conduct comports with due process. It is a constitutionally delicate

matter for a state to permit a private party's attorney to issue writs of attachment purportedly in aid of pending litigation but without any judicial supervision and without proper notice or hearing. See, e.g., Doehr, 501 U.S. at 9-10. Section 52-278f's procedural safeguards, which defendants are alleged to have flagrantly ignored, are therefore crucial to a private entity's lawful use of the statute, assuming arguendo that the statute is constitutional if properly employed. The mere fact that the plaintiffs waived their rights to a pre-deprivation hearing does not inoculate defendants from section 1983 liability where they employ the prejudgment attachment statute maliciously, that is, where they pursue a purportedly "lawful end by ... intentionally unlawful means." Pinsky v. Duncan, 79 F.3d 306, 313 (2d Cir. 1996). The Complaint has therefore adequately alleged that defendants employ attorneys who act under the color of state law to deprive the plaintiffs of property without due process of law.

Defendants' procedural objection -- that the plaintiffs should have raised these complaints in Connecticut state court "where the underlying litigation was filed" -- is also unavailing. Although Connecticut law provides a procedure by which a properly obtained prejudgment remedy may be modified or vacated, see Conn. Gen. Stat. Ann. § 52-278k, the Complaint alleges that defendants issue their writs without ever commencing actions in state court. FAC ¶ 9. Indeed, defendants have not identified that they ever "filed" any "underlying litigation[s]" in Connecticut in which the plaintiffs could have raised the issues of which they complain. But, in any event, it is well

established that litigants challenging an allegedly unconstitutional prejudgment remedy may seek relief in a federal court under section 1983, even if there is a pending state court action associated with the prejudgment remedy. See, e.g., Pinsky, 79 F.3d at 308.

The Court therefore concludes that none of defendants' arguments justifies dismissing the section 1983 claim.

### C. **Declaratory Judgment**

The Complaint pleads a single declaratory judgment count that nonetheless seeks two distinct declarations. First, plaintiffs ask the Court to declare that the MCA agreements were void ab initio, because they function as criminally usurious loans. However, as explained below, New York law prohibits corporations from seeking affirmative relief in this manner, so this aspect of the claim is precluded. Second, Indigo and Turrentine seek a declaration invalidating the settlement agreement they consummated with GoFund Advance is void because it was obtained under economic duress and by circumventing plaintiff's counsel. None of defendants' arguments justify dismissal of this aspect of the claim.

In sum, the declaratory judgment claim is dismissed against all defendants except GoFund Advance, which is the only one of the defendants that is party to the Indigo settlement.

### 1. MCA Agreements

The New York usury statute prohibits corporations from interposing a defense of usury to an action to collect a debt except insofar as the rate of interest exceeds the criminal usury rate of 25%

per annum, set out in Penal Code § 190.40. N.Y. Gen. Oblig. L. § 5-521. Where the interest rate exceeds the criminal usury rate, a corporation may interpose an affirmative defense of usury and, if successful, obtain a declaration that invalidates the debt instrument ab initio. See Adar Bays, 37 N.Y.3d at 333. However, New York courts have uniformly construed this statute as limited to the affirmative defense, and they have prohibited corporations from bringing affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an agreement. See, e.g., Paycation Travel, Inc. v. Glob. Merch. Cash, Inc., 192 A.D.3d 1040, 1041 (2d Dep't 2021); LG Funding, 181 A.D.3d at 666-67; Intima-Eighteen, Inc. v. A.H. Schreiber Co., 172 A.D.2d 456, 457 (1st Dep't 1991). Plaintiffs present no countervailing case law suggesting that they can seek affirmative relief under the New York usury statute.

Therefore, the Court dismisses the declaratory judgment count insofar as it seeks a declaration that the MCA agreements are void ab initio.

### 2. Indigo Settlement

As explained above, Indigo alleges that its accounts and assets were the subject of UCC lien notices sent by defendants seeking to collect on the outstanding MCA agreements. FCA ¶¶ 278-288. During negotiations over those liens, defendants allegedly induced and, while this case was pending, allegedly got Indigo to sign a settlement agreement in which it paid $4,000 to settle claims of $33,000 and thereby had the liens withdrawn. ¶¶ 278-288; ECF 69-9. Plaintiffs seek

a declaratory judgment that the settlement is void because it was obtained under economic duress and by circumventing Indigo's counsel. Defendants move for dismissal of this claim, arguing that the Indigo principal stated that he consulted with a different lawyer and that there was no wrongful threat.

Parties seeking to void a settlement agreement releasing claims face a steep climb. "It is well established under New York law that a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties." Berman v. Parco, 986 F.Supp. 195, 208 (S.D.N.Y. 1997).[9] A release of claims in a settlement agreement is therefore "binding on the parties absent a showing of fraud, duress, undue influence, or some other valid legal defense." Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc., 168 F. Supp. 2d 109, 113 (S.D.N.Y. 2001) (Lynch, J.).

---

[9] The Indigo settlement agreement does not specify which state's law governs its terms, and neither party addressed this issue. See generally ECF 69-9. But the Court need not decide the choice of law issue at this juncture. The potentially relevant grounds for voiding the settlement -- undue influence and duress -- are similar under both New York law (which might apply because the settled claims arose from an MCA agreement that specified New York law, see ECF 69-8 at 6 (¶ 4.5)) and Connecticut law (which might be relevant because the settlement could be read to settle litigation supposedly pending in Stamford, Connecticut), see ECF 69-9 at 2. See also Doherty v. Sullivan, 618 A.2d 56, 59 (Conn. App. 1992) ("Our law has long been clear that a 'compromise agreement ... if free from fraud, mistake or undue influence ... is conclusive between the parties.'") (quoting Azzolina v. Sons of Italy, 179 A. 201, 204 (1935))). The Court therefore assumes without deciding that the Indigo settlement agreement is governed by New York law.

With regard to the issue of whether defendants circumvented Indigo's counsel in obtaining its agreement to the settlement, defendants argue that a representative was told that Turrentine consulted with an attorney other than his counsel in this litigation.[10] Even if this assertion were cognizable on a motion to dismiss, it still might not justify dismissal, because the complaint and its supporting materials clearly allege that the defendants' counsel sought to negotiate and consummate the settlement directly with Indigo, knowing that Indigo was represented and despite efforts by Indigo's counsel to intervene.[11] The principal evidence on the issue of circumvention is an email chain attached to the Complaint that indicates that defendants' counsel (not the attorney of record in this litigation) was advising defendants with respect to the settlement agreement and caused a representative of his clients to contact Indigo with a proposed settlement and release document. See ECF 22-11. Plaintiffs allege that this conduct violated Rule 4.2(b) of the New York Rules of Professional Conduct, which states in part:

> [A] lawyer may cause a client to communicate with a represented person unless the represented person is not legally competent, and may counsel the client with respect to those communications,

---

[10] In response, defendants submitted an affidavit attaching a text message exchange between a GoFund Advance representative and Turrentine. See ECF 77-1. But defendants have offered no authority for why these communications, which are neither integral to the complaint nor incorporated by reference, are cognizable on a motion to dismiss.

[11] Indeed, the text messages submitted by defendants, see n. 10 supra, read in the light most favorable to the plaintiffs, support the inference that the defendants knew that Indigo's counsel in this litigation sought to advise his client on the proposed settlement, which was plainly devised to torpedo the instant lawsuit.

provided the lawyer gives reasonable advance notice to the represented person's counsel that such communications will be taking place.

22 CRR-NY 1200.0 (Rule 4.2(b)). In this posture, there is no evidence that any advance notice to counsel was ever provided. And plaintiffs assert, without any dispute from defendants, that the New York Rules apply to this conduct. Accordingly, the Complaint adequately alleges that the settlement was obtained in circumvention of the N.Y. rules of professional conduct. Defendants never suggest the settlement would be valid if obtained by an attorney's conduct that violated applicable rules of professional conduct; presumably this conduct might amount to undue influence, though plaintiffs never explain why. But since defendants never raise these legal issues, the Court need not reach the questions of whether the New York Rules apply or whether a settlement obtained in violation of Rule 4.2(b) may be voidable.

Indeed, even if defendants had raised these legal issues regarding circumvention of counsel, the Court would not need to decide now whether they could independently justify voiding the settlement, because the second allegation -- that the settlement was obtained under economic duress -- is effectively unchallenged at this stage. Under New York law, "[a] release agreement may be voided on the ground of economic duress where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of his free will." Davis & Assocs., Inc., 168 F. Supp. 2d at 114. Parties seeking to establish duress from one-sided economic advantage must carry a "heavy burden." Id. However, the alleged threats at issue

32

here -- unlawful use of a prejudgment remedy to induce financial paralysis as a means of collecting on a criminally usurious debt -- would almost certainly be wrongful if proven.[12] Defendants have little to say on this issue. Their only response is to conclusively assert that Indigo was not deprived of its free will because, according to the non-cognizable text messages, Turrentine appeared to have had time to consult with an unspecified company attorney before signing the settlement. Mot. 20. But even if there were a procedural basis to consider this fact-dependent contention, it would be irrelevant: the possibility that Turrentine had time to consult a lawyer before signing says nothing about whether the defendants induced consent to the release through wrongful economic duress by allegedly holding Indigo's bank account ransom with unlawfully issued UCC lien notices.

Since there is no merit to any of defendants' attacks on the aspect of the declaratory judgment claim concerning the Indigo settlement, that prong of the motion is denied. Since GoFund Advance is Indigo and Turrentine's only counterparty in the settlement, this aspect of the claim is irrelevant to the other defendants.[13] Therefore,

---

[12] Indeed, the settlement's reference to a lawsuit supposedly pending in Connecticut state court might justify voiding the settlement for fraud, should it turn out that no such lawsuit ever existed. See ECF 69-9 at 2.

[13] The Court notes, however, that the settlement purports to extend its release to apply to claims against any individuals or "affiliated businesses" associated with GoFund Advance. See ECF 69-9 at 3. Obviously, if the Court declares against GoFund that the settlement is void, none of the other defendants will be heard to

since New York law does not permit the affirmative relief sought by the aspect of the declaratory judgment claim concerning the validity of the MCA agreements themselves, the declaratory judgment claim is dismissed against all defendants other than GoFund Advance.

### D. **Fraud**

The Complaint also pleads a fraud claim under state law. In New York, "[t]he elements of a cause of action for fraud [are] a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559 (2009). The Complaint's fraud count suggests several theories for how defendants committed fraud, two of which require analysis.[14]

The first theory is based on the allegation that defendants charged excessive fees purportedly for origination and servicing of the MCA agreements. Specifically, plaintiffs allege that defendants falsely represented that the fees were charged to offset actual fees and costs incurred by the MCA companies, when in fact the companies undertook no meaningful activities for which the fees were charged (e.g., an "underwriting" fee amounting to 12% of the MCA loan amount) or the actual costs involved were much lower than the fees charged

---

argue that they have standing to revive the release as third-party beneficiaries.

[14] To the extent that any other theories of fraud lurk in count four of the Complaint, the Court finds that they fail to state a claim.

(e.g., for ACH setup, which is very fast and cheap but led to a fee of 10% of the MCA loan amount). FAC ¶¶ 292-302.

This theory fails to state a claim for fraud. The allegedly excessive fees arise under a contract, which plainly discloses the existence and amounts of the fees. See FAC ¶ 291. Plaintiffs make no meaningful showing that liability for fraud lies where a business charged excessive fees that are prominently disclosed in the contract. The only authority they cite involves submission and payment of false invoices, a case that is not analogous and does not establish the existence of an actionable misrepresentation here. See Needham & Co., LLC v. Access Staffing, LLC, 2016 WL 4399288, at *2 (S.D.N.Y. Aug. 12, 2016).

While plaintiffs sufficiently allege that the fees far exceed the costs for which they purport to relate, there is no allegation that the actions for which the fees were charged did not occur. For instance, while ACH setup does not cost tens of thousands of dollars, the rate was disclosed in the contract, and plaintiffs do not allege that defendants failed to set up ACH payments. And even if that allegation had been made, it would sound in breach of contract, not fraud. Under New York law, "[t]o maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."

<u>Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.</u>, 98 F.3d 13, 20 (2d Cir. 1996). Plaintiffs make none of these showings.[15]

The second theory is that defendants committed fraud by extracting unauthorized debits from their bank accounts using misleading names calculated to evade stop payment orders entered by plaintiffs' banks to prevent further ACH withdrawals. FAC ¶¶ 306-307, 180-186. Specifically, the Complaint alleges that "On February 16, 2022, February 18, 2022 and February 23, 2022, GoFund attempted to bypass its block from debiting from Plaintiff's account by fraudulently debiting $60,000 from the Plaintiff's bank account under the name 'GoFund b' as opposed to 'GoFund.'" FAC ¶ 186. The Court concludes that this suffices to state a claim for fraud against defendant GoFund Advance. However, since any fraud claim must be pled with specificity, <u>see</u> Fed. R. Civ. P. 9(b), and the Complaint's allegations on this point relate to no defendant other than GoFund Advance, the fraud count fails to state a claim as to any of the other defendants.

Since there is no other viable fraud claim pled, the Court will dismiss the fraud count against all defendants other than GoFund Advance.

---

[15] The same conclusion applies to the complaint's suggestion that defendants "failed to properly account for [Haymount's] payments," and various other alleged failures to properly service the MCA agreement. FAC ¶ 305.

III.   **Conclusion**

For the reasons explained above, defendants' motion to dismiss the First Amended Complaint is granted in part and denied in part. The motion is denied with respect to the substantive and conspiratorial RICO claims, although the plaintiffs may not proceed with the aspect of the wire fraud prong of the substantive RICO claim predicated on allegedly excessive fees that were disclosed in the MCA agreements. The motion is denied with respect to the section 1983 claim, which survives in its entirety. The declaratory judgment claim has two parts, one of which -- seeking a declaration that the MCA agreements are void ab initio -- is dismissed. The aspect of the declaratory judgment claim concerning the validity of the Indigo settlement survives, but only as against GoFund Advance. Finally, the fraud claim is dismissed against all defendants other than GoFund Advance, and then only the aspect of the claim concerning allegedly fraudulent ACH withdrawals may proceed.

Following argument on the instant motion, the Court stayed discovery and all further proceedings in this case, which was then less than three months from being ready for trial. That stay is now dissolved. The parties are directed to complete a new case management plan, using the template available on the Court's website and inserting a ready-for-trial date three months from the date of this order. The parties shall email this proposed case management plan to Chambers and then initiate a joint phone conference with the Court's law clerk within one week of the entry of this order.

SO ORDERED.

New York, NY
June 27, 2022

_____
JED S. RAKOFF, U.S.D.J.