**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAYMOUNT URGENT CARE PC, ROBERT A. CLINTON, JR., INDIGO INSTALLATIONS, INC., AND CHRISTOPHER A. TURRENTINE, *individually and on behalf of all those similarly situated*,<br><br>               Plaintiffs,<br><br>   v.<br><br>GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISAAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, AND YISROEL C. GETTER,<br><br>               Defendants. | Case No. 1:22-cv-01245-JSR |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**WHITE AND WILLIAMS LLP**
Shane R. Heskin
Alex D. Corey
7 Times Square
New York, New York  10036
Tel:  (212) 244-9500
heskins@whiteandwilliams.com
coreya@whiteandwilliams.com

**WEITZ & LUXENBERG, P.C.**
James J. Bilsborrow
700 Broadway
New York, New York 10003
Tel: (212) 558-5500
jbilsborrow@weitzlux.com

**BENESCH FRIEDLANDER COPLAN & ARONOFF LLP**
David S. Almeida
71 South Wacker Drive, Suite 1600
Chicago, Illinois  60606
Tel:  (312) 212-4949
dalmeida@beneschlaw.com

*Attorneys for Plaintiffs & Putative Class Members*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF RELEVANT FACTS ...............................................................4

I.    Defendants' Predatory Lending Organization and the Scheme to Defraud............4

    A.    The Individual and Corporate Defendants are Associated in a RICO Enterprise Provable Using Common Evidence .................................4

    B.    The Predatory Lending Enterprise Uses a Form MCA Agreement .............5

    C.    The MCA Agreements Are Procedurally and Substantively Unconscionable.................................................................................7

    D.    Defendants Collect Upon Their Unlawful Debt Using a Common Scheme ...............................................................................11

II.    Representative Plaintiffs & MCA Transactions ................................................12

    A.    Haymount Urgent Care PC & Dr. Robert Clinton, Jr ...............................12

    B.    Indigo Installations, Inc. & Christopher Turrentine.................................13

III.    Relevant Procedural Background ........................................................................15

IV.    The Claims & Proposed Classes .........................................................................16

STANDARD.................................................................................................17

ARGUMENT .................................................................................................19

I.    USURY AND RICO ACTIONS ARE WELL-SUITED FOR CLASS TREATMENT .................................................................................19

II.    THE CLASSES SATISFY ALL RULE 23(a) & (b)(3) REQUIREMENTS ........20

    A.    The Legal and Factual Requirements to Prove RICO Liability and Damages in this Case Are Determinable on a Class-wide Basis .............20

    B.    The Proposed Classes Satisfy Rule 23(a)'s Requirements .......................23

        1.    The Proposed Classes Satisfy the Numerosity Requirement .........23

        2.    There are Questions of Law and Fact Common to the Class.........24

        3.    Plaintiffs' Claims are Typical of Those of the Class Members .................................................................................25

        4.    Plaintiffs and Proposed Class Counsel Will Ably Represent Class Members' Interests.................................................26

    C.    The Proposed Classes Satisfy Rule 23(b)(3) Requirements .....................28

        1.    Common Questions of Law & Fact Unquestionably Predominate .................................................................................28

i

    2. Resolving Virtually Identical Usury Claims Based on the
     Same Form Agreement on a Classwide Basis is a Superior
     Method of Adjudication ................................................................33

  D. A Separate Rule 23(b)(2) Class Should Also Be Certified .......................35

III. THE CLASSES ARE APPROPRIATELY DEFINED & MEMBERSHIP
  CAN BE READILY DETERMINED BASED ON DEFENDANTS'
  RECORDS ............................................................................................................36

IV. THE CLASS ACTION WAIVER IS UNENFORCEABLE BECAUSE
  THE MCA AGREEMENTS ARE USURIOUS LOANS VOID AB
  INITIO ................................................................................................................37

CONCLUSION.............................................................................................................................41

29487740v.1

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Allegra v. Luxottica Retail N. Am.*,
 17-CV-5216 (E.D.N.Y. Dec. 13, 2021) ................................................................23

*American Timber & Trading Co. v. First Nat'l Bank of Oregon*,
 690 F.2d 781 (9th Cir. 1982) .........................................................................2, 20

*Baisch v. Gallina*,
 346 F.3d 366 (2d Cir. 2003).................................................................................31

*Bernadino v. Barnes & Noble Booksellers, Inc.*,
 No. 17-CV-04570 (LAK), 2017 WL 7309893 (S.D.N.Y. Nov. 20, 2017)...........39

*Bistro Exec., Inc. v. Reward Network, Inc.*,
 No. CV 04-4640 ...................................................................................................20

*Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*,
 105 A.D.3d 178 (1st Dep't 2013) ...................................................................31, 38

*Brown v. Kelly*,
 609 F.3d 467 (2d Cir. 2010)..................................................................................28

*Buffington v. Prog. Advanced Ins. Co.*,
 20-CV-07408 (S.D.N.Y. Aug. 23, 2022) ..............................................................36

*Chen-Oster v. Goldman, Sachs & Co.*,
 449 F. Supp. 3d 216 (S.D.N.Y. 2020)........................................................38, 39, 40

*Chester-Oster v. Goldman, Sachs & Co.*,
 325 F.R.D. 55 (S.D.N.Y. Mar. 30, 2018)..............................................................34

*Consol. Rail Corp. v. Town of Hyde Park*,
 47 F.3d 473 (2d Cir. 1995)....................................................................................23

*Estate of Gardner*,
 316 F.R.D. ..............................................................................................................34

*Fleetwood Serv., LLC, v. Ram Cap. Funding, LLC*,
 20-cv-05120-LJL, DE 105, Opinion & Order (S.D.N.Y. Aug. 17, 2022) .............20

*Fleetwood Serv., LLC, v. Ram Capital Funding*,
 20-cv-5120 (LJL), 2022 WL 3536128...............................................................21, 22

iii

*Gatton v. T-Mobile USA, Inc.*,
    152 Cal. App. 4th 571 (Cal. App. 2007) ................................................................39

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981) ................................................................................................17

*Haley v. Teachers Ins. & Annuity Assn of Am.*,
    17-CV-855 (S.D.N.Y. Nov. 25, 2020) ...................................................................24

*Hetchkop v. Woodlawn at Grassmere, Inc.*,
    116 F.3d 28 (2d Cir. 1997) ....................................................................................38

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) ....................................................................................25

*Hirschfeld v. Stone*,
    193 F.R.D. 175 (S.D.N.Y. 2000) ..........................................................................27

*II, L.P. v. American Stevedoring, Inc.*,
    961 N.Y.S.2d 86 (N.Y. App. Div. 2013) ..............................................................31

*In re Amla Litig.*,
    282 F. Supp. 3d at 758 ..........................................................................................26

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    17 Civ. 1580, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ..........................18, 19

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ....................................................................................26

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ..................................................................................18

*In re Petrobras Secs.*,
    862 F.3d 250 (2d Cir. 2017) ............................................................................34, 35

*In re Signet Jewelers Ltd.*,
    No. 16 Civ. 6728 (S.D.N.Y. July 10, 2019) .........................................................36

*Kelen v. World Fin. Network Nat'l Bank*,
    295 F.R.D. 87 (S.D.N.Y. 2013) ............................................................................27

*Lemire v. Wolpoff & Abramson. LLP*,
    256 F.R.D. 321 (D. Conn. 2009) ...........................................................................25

iv

*Madden v. Midland Funding, LLC*,
   237 F. Supp. 3d 130 (S.D.N.Y. 2017)..........................................................................26, 29, 37

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997)...........................................................................................18

*Moore v. Comrnfed Sav. Bank*,
   908 F.2d 834 (11th Cir. 1990) ........................................................................................20

*Moss v. First Premier Bank*,
   2:13-cv-05438, 2020 WL 160253 (E.D.N.Y. Sept. 2, 2020)...........................................38

*Purdie v. Ace Cash Express, Inc.*,
   3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547 (N.D. Tex. Dec. 11, 2003) .........................30

*Ragone v. Atl. Video at Manhattan Ctr.*,
   595 F.3d 115 (2d Cir. 2010)...........................................................................................39

*Roper v. Consurve, Inc.*,
   578 F.2d 1106 (5th Cir. 1978) ........................................................................................19

*Saizhang Guan v. Uber Techs., Inc.*,
   236 F. Supp. 3d 711 (E.D.N.Y. 2017) .............................................................................38

*Seijas v. Republic of Arg.*,
   606 F.3d 53 (2d Cir. 2010).............................................................................................33

*Sukhnandan v. Royal Health Care of Long Island LLC*,
   12cv4216, 2014 WL 3778173 (S.D.N.Y. July 31, 2014) .....................................................17

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015)...................................................................................... *passim*

*Szetela v. Discover Bank*,
   118 Cal. Rptr. 2d 862 (Ct. App. 2002) ...........................................................................40

*Trs. of Plumbers & Pipefitters Nat. Pens. Fund v. Transworld Mech., Inc.*,
   886 F. Supp. 1134 (S.D.N.Y. 1995).................................................................................21

*United States v. Moseley*,
   980 F.3d 9 (2d Cir. 2020)...............................................................................................20

*Upshaw v. Ga. Catalog Sales, Inc.*,
   206 F.R.D. 694 (M.D. Ga. 2002) ....................................................................................30

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) ...................................................................................25, 34

*Williams v. Big Picture Loans, LLC,*
   339 F.R.D. 46 (E.D. Va. 2021) .................................................................19, 30

## STATUTES

18 U.S.C. § 1962 ..................................................................................... *passim*

42 U.S.C. § 1983 .............................................................................2, 17, 31, 32

FDCPA ...........................................................................................................29

N.Y. Penal L. § 190.40 ...................................................................................21

§ 349, New York Judiciary Law § 487 ...........................................................29

UCC .......................................................................................................3, 4, 13, 15

## OTHER AUTHORITIES

FED.R.CIV.P. 23 ....................................................................................... *passim*

vi

## PRELIMINARY STATEMENT

America's small businesses serve a critical role in our nation's economy, employing nearly half of all private-sector workers and creating nearly two-thirds of new jobs. Yet a small business credit gap has developed wherein access to capital—particularly for historically underrepresented entrepreneurs, including people of color, rural borrowers, women and veterans—is a significant problem. While traditional lending has not returned to pre-2008 recession levels (and, given the COVID-19 pandemic, likely will not for some time, if ever), a new market of alternative lenders has surfaced purporting to offer alternative financing opportunities in the form of merchant cash advances ("MCAs"). This new market is essentially unregulated, leaving often desperate small business borrowers vulnerable to predatory practices from unscrupulous lenders.

MCA companies provide capital in exchange for an absolute obligation to repay the money in predetermined, fixed intervals over a short period of time or—in other words—a loan. Small business owners who take out MCAs sign standardized, non-negotiable contracts of adhesion designed to obscure the true nature of the transactions, including the usurious interest rates, outrageous fees and numerous other onerous provisions, including prejudgment attachments and class action waivers. These predatory products place an incredible stress on small businesses, ruining their finances and forcing many of them to close their doors and lay off their employees, often costing them their businesses, their healthcare and their livelihoods.

This action seeks to foreclose the ongoing use of particularly egregious—and illegal—MCAs by a group of entities and individuals that have preyed on and imperiled small businesses and individuals for years by claiming to purchase their future receivables in exchange for upfront, lump-sum payments under completely one-sided MCA agreements that obscure the fact that the transactions are usurious loans with interest rates often exceeding 500%. Plaintiffs—and more than

1

a thousand of other similarly situated entities and individuals—have been victimized by the same fraudulent scheme orchestrated by Defendants Yitzchok Wolf, Josef Brezel, Joseph Kroen and Yisroel Getter (the "Individual Defendants") who own, operate and control Defendants GoFund Advance, LLC ("GFA"), Funding 123, LLC, Merchant Capital LLC and Alpha Recovery Partners LLC (the "Corporate Defendants," and with the Individual Defendants, the "Defendants") to collect upon unlawful debts and otherwise fraudulently obtain funds from Plaintiffs and the putative class members through sham, boilerplate MCA agreements, not to mention incredibly aggressive and inappropriate collection measures. For those struggling to repay their debt, there is little recourse to modify the loan due to a reconciliation provision this Court has observed is "impossible to use and leaves the lender with substantial discretion to prevent adjustment."

This case is manifestly appropriate for class certification. Plaintiffs seek to certify three classes, a nationwide RICO class and two sub-classes asserting claims under 42 U.S.C. § 1983 on behalf of those persons that had their bank accounts frozen as a result of an abuse of a writ of pre-judgment attachment and those who entered into a coerced settlement agreement as a result. First, according to Defendants' own records, more than a thousand companies (and a greater number of guarantors) comprise the proposed classes, making joinder of all members wholly impracticable. Second, numerous questions of law and fact are common to the proposed classes and unquestionably predominate over any individual issues. Indeed, the dominating question in this litigation is whether Defendants' Form MCA agreements constitute usurious loans in violation of New York law. Numerous courts have found that such a predominating common issue suffices for purposes of class certification. Third, the claims and defenses of the class representatives are typical of those of the class members. Plaintiffs signed form documents that were substantially

similar in all material respects to those executed by *all* companies and guarantors victimized by Defendants' scheme. <u>Fourth</u>, representative Plaintiffs and their counsel will ably protect and represent the interests of the classes. Plaintiffs' interests are aligned with other class members in that they all took usurious loans from Defendants (or guaranteed such loans) and have the incentive to pursue their representative claims vigorously. <u>Finally</u>, class certification provides a superior method for adjudicating this case. Although some of the transactions at issue amounted to thousands or tens of thousands of dollars in illegal principal and interest, Plaintiffs and putative class members are struggling small businesses throughout the country for which it would be impractical to bring individual actions against these well-funded Defendants, particularly so when Defendants will not hesitate to freeze their bank accounts, send UCC lien letters to their clients and otherwise make it impossible to run their businesses. Faced with the choice between litigating their meritorious claims against extremely litigious MCA companies desperate to protect their "cash cow," most victims of Defendants' predatory lending scheme understandably will not initiate litigation despite the strength of their claims. Class treatment is also superior because, without it, repetitive litigation is certain to occur as Defendants are aggressively pursuing collection efforts against various borrowers and guarantors across the country.

In addition to the satisfaction of all Rule 23 requirements, class certification is warranted for the fundamental reason that Defendants' predatory, opportunistic and usurious lending practices should be reviewed by a court for legality. Defendants brazenly masquerade as legitimate businesses (and their owners), but predatory lending at rates far exceeding the allowable statutory amounts is an evil with no countervailing societal benefit. Whether or not their MCA program constitutes illegal loans is a merits question for another day but, for the reasons set forth herein,

3

that question should be answered on a class-wide basis for all the companies and individuals whose businesses and lives have been forever upended by Defendants' scheme.

<u>**STATEMENT OF RELEVANT FACTS**</u>[1]

I.    **Defendants' Predatory Lending Organization and the Scheme to Defraud.**

    A.    **The Individual and Corporate Defendants are Associated in a RICO Enterprise Provable Using Common Evidence.**

Defendants GFA, Funding 123 and Merchant Capital LLC are MCA companies whose sole purpose is to document and to fund usurious transactions with small businesses through standardized MCA agreements. Each of these companies is a subsidiary of Hartford Receivables, LLC ("Hartford"), an entity owned by Defendant Yisroel Getter and controlled by Defendant Yitzchok Wolf. [*See* Declaration of Shane Heskin ("Heskin Decl."), Ex. 11, Brezel Tr. at 33:1-35:24.] Defendant Josef Brezel controls a separate entity, GSS Equity, LLC, through which he funds MCA agreements executed by GFA, Merchant Capital and an entity called Eleven Capital. And, defendant Joseph Kroen owns the entities Matrix Advance, LLC and Fundura Capital, LLC and funds agreements through Hartford. [*See id.* at 16:1-18:24 & 37:1-24.][2]

Defendant Alpha Recovery is a d/b/a of GSS. [*See id.*, Ex. 18, Gold Tr. at 22:16-24:19.] Alpha is the collection arm of Defendants' Enterprise, and among other things, sends UCC lien notices—including to Plaintiffs—at the direction of the Individual Defendants. [*See* Heskin Decl.,

---

[1]    Discovery ends on September 28, 2022. [DE 100, ¶ D.6.] Defendants' document production is incomplete and ongoing. [Heskin Decl., ¶ 76] Accordingly, the factual background presented herein is necessarily based on the discovery taken to date. That said, the evidence adduced thus far (as summarized herein and in the Heskin Declaration) establishes that all of the Rule 23(a) and (b) requirements are satisfied.

[2]    As Bloomberg News recently reported, the Individual Defendants run a loansharking scheme out of Brooklyn at the purported direction of John Braun, a convicted drug trafficker who had his federal prison sentence commuted by former President Trump. [DE 28-1 & 28-2]. The Individual Defendants are Braun's relatives. [*See* Brezel Tr. at 112:12-15.]

4

¶¶ 57-59.] In order to do so, Alpha uses pre-signed form letters of an attorney who does not review the letters before they go out under her name. [*See* Gold Tr. at 10:15-11:10, 13:19-17:2 & 50:15-54:20.] Rather, the Enterprise pays the attorney $2,500 per month merely for the use of her signature. [*See id.*]

Defendants operate out of Brooklyn and share office space, accounting systems, ACH processors, office staff, attorneys, investors and collection arms. [*See id.*, Wolf Tr. at 34:8-36:8-20.] The Individual Defendants all take advice and direction from John Braun. [*See id.* at 26:21-27:24, 36:4-7, 60:10-17.] Defendants, as well as Braun, all utilize the same attorney for collecting upon their unlawful debts. [*See* Heskin Decl., Alfin Tr. at 45:15-46:2 (admitting that Braun is an agent of Defendants and all work together).] Plaintiffs can establish through common proof that Defendants are a RICO Enterprise that is associated in-fact through a closely held relationship with each member playing a defined role.

**B.    The Predatory Lending Enterprise Uses a Form MCA Agreement.**

To perpetrate their predatory lending scheme, Defendants utilize standard Form MCA Agreements that have virtually identical material terms and provisions. [*See* DE 22, Am. Compl., ¶¶ 77-86 (listing the substantive terms common to all known MCA agreements).] This Court thoroughly analyzed the Form MCA Agreement in the Order, concluding that the agreement operates like "a standard, high-interest loan," imposing an implied interest rate that is usurious and illegal under New York law. [*See* DE 86, Order at 3 n.2 & 16-20 (analyzing the MCA transactions based on a GFA Agreement "since that is the most common form agreement in the case").][3]

---

[3]    Plaintiffs provide several exemplar agreements memorializing the MCA transactions at issue. [*See* Heskin Decl., Exs. 9-10.] Notably, not a single MCA Form Agreement is actually signed by any Defendant, corporate or individual. [*See id.*] Despite the fact that Defendants

5

The evidence adduced to date demonstrates that substantially similar agreements were executed with all members of the RICO class during the class period, February 11, 2018 through present. [Heskin Decl., ¶¶ 32-35.] Defendants have produced hundreds of MCA agreements that are substantially similar in all material respects; the only differences among the agreements are the amount advanced, the amount to be repaid and the number of days or weeks borrowers have to repay. [*See* Declaration of James Bilsborrow ("Bilsborrow Decl."), ¶ 19 & Ex. A thereto.][4]

Defendants' corporate designee testified the Form MCA Agreement was *not* negotiated in any fashion but rather was presented to each merchant borrower in a "take it or leave it" fashion. [Heskin Decl., Brezel Tr. at 52:18-57:9.] Notably, borrower requests for revisions were "rare" and Defendants' allowance of a change was "even rarer." [*Id.*] Defendants' corporate designee could not identify a single material term that varied across the Form MCA Agreements. [*Id.*][5]

On August 31, 2022, Plaintiffs served the expert report of Charles S. Lunden, CPA, which demonstrates that the simple interest rate is readily calculable from the face of the agreements. [*See* Preliminary Expert Report on Damages prepared by Charles S. Lunden (the "Lunden Report"), Heskin Decl., Ex. 30, at 2.] The Lunden Report shows that the intended interest rate can be computed for any of the Form MCA Agreements using a simple formula and three data points available from the face of each agreement. [*Id.* ("Using the methodology in this report, any data

---

publicly filed a GFA agreement, [DE 69-2], their counsel have inexplicably designated all Form MCA Agreements produced thus far as "Confidential." [*See* Heskin Decl., Ex. 10.]

[4]    On August 2, 2022, this Court ordered Defendants to produce all MCA Agreements dating back to February 11, 2018. As of the date of this filing, defense counsel has not provided all agreements nor have they certified that all agreements have been produced. [Heskin Decl., ¶ 76.]

[5]    While the form agreement uses terms such as "sale" and "purchase," the transactions have *none* of the hallmarks of a sale and *all* of the hallmarks of loans that charge usurious interest rates in excess of New York's criminal usury statutory cap of 50%. [DE 86 at 19-20.]

entry person can compute the interest rate for each of the MCAs in the class period using the formula embedded in the Excel spreadsheet attached as Exhibit A.").] Mr. Lunden's formula divides the difference between the total repayment amount and the total monies advanced by the original principal and then uses the fixed time set for repayment to calculate an effective simple interest rate. [*See id.*] With this formula, the interest rate for any of Defendants' purported purchases of indeterminate "future receivables" can easily be computed. [*See also* DE 86 at 12 (noting "Defendants effectively concede . . that if the transactions amount to loans, then the implied interest rates are well above 50%").] Plaintiffs have examined the MCA Agreements produced thus far using Mr. Lunden's formula, ***and every agreement imposes an implied interest rate far above 25%, with many exceeding 500%***. [*See* Bilsborrow Decl., ¶ 19 & Ex. A.][6]

C.    **The MCA Agreements Are Procedurally and Substantively Unconscionable.**

The Form MCA Agreements have virtually identical terms and provisions. [*See* DE 22, Am. Compl., ¶¶ 77-86 (listing the substantive terms common to all known MCA agreements).] There are numerous other provisions that further demonstrate the abject unconscionability of Defendants' MCA Agreements. First, not a single MCA Agreement actually identifies the entity funding the loan. [*See* Heskin Decl., Exs. 9-10.] Second, not a single MCA Agreement is actually signed by Defendants; that is, while Defendants are quick to point out that Representative Plaintiffs auto-signed the various agreements, they have not bound themselves to any of the terms,

---

[6]    Although his Report was prepared prior to Defendants' review and (still ongoing) production of the MCA Agreements, Mr. Lunden computed the effective simple interest rate for five exemplar MCA transactions, each of which greatly exceeded legal limits: Kenrock Enterprises LLC, 999.7%; Window Select Wisconsin LLC, 554.8%; AA, MBAA Investments LLC Mat 633 LLC, 1,3323.3%; Floortechs LLC, 1,033.3% and Ohana Enterprises, 89.1%. [*See* Lunden Report at 2 & Ex. A thereto.]

provisions or requirements of their illegal transactions. [*See id.*] Third, not a single MCA Agreement identifies a physical address or phone number for the MCA company purportedly funding the transaction. [*See id.*] In addition to their obligations being completely illusory, Defendants' failure to sign the agreements or to provide an actual address is significant because § 4.3 requires that all notices "shall be delivered by certified mail, return receipt requested" and that notices to the MCA "shall become effective only upon receipt" by the MCA, yet notices to the Merchant "shall become effective three days after mailing." [*See id.*.] It is impossible for the Merchant to provide notice, yet notice is deemed effective on the Merchant upon mere mailing. This one-sided notice provision is significant because the evidence shows that 20% of these notices are never delivered to the Merchant. [*See* Heskin Decl., Ex. 16, Marshal Ostrowski Tr. at 91:1-23]

Defendants' failure to identify the true lender and to provide a physical address or phone number is also procedurally unconscionable for the very reasons exemplified by the representative Plaintiffs and those already challenged by the Federal Trade Commission and the New York Attorney General. [Heskin Decl., ¶ 24, & DE 28-7 & 28-8.] Both regulatory bodies have sought to stop the procedurally unconscionable practices that Defendants engage in here. Among these unconscionable practices is the failure to conspicuously disclose the fees charged *anywhere in the agreement*. While Defendants disclose a range of fees in an Addendum buried at the end of the Form MCA Agreement, the actual amount of fees to be charge is never disclosed in writing prior to funding. The failure to document the amount of these fees is intentional and designed to gain leverage in the parties' already abusive relationship. Couple that with the failure to disclose the true lender, a physical address or a phone number, and merchants are left with nothing more than a lone email address buried in a single provision in small print. [*See, e.g.*., Ex. 9 § 1.4.] Thus, when

a Merchant, like Indigo, is shell-shocked by the fees charged and/or the amount shorted, they are unable to actually speak to a live person to inquire about the fees charged.

The failure to disclose the true lender behind the transactions also permits Defendants to play a shell game with their borrowers by pretending to provide better payment terms through different entities—like with Haymount. [Heskin Decl., Ex. 11, Brezel Tr. at 18:16-28:1, 74:7-14, 160:5-163:13 & 178:12-18.] As demonstrated by the text messages here, Defendants played Haymount off each other by negotiating terms under Funding 123, but then called under a different name, GFA, to offer what appears to be better terms—when, in fact, they were one and the same lender. [Heskin Decl., Ex. 20.]

The outrageous payment terms dictated by Defendants also demonstrate the sheer desperation of Merchants and unfair bargaining power. Defendants themselves allege the terms for Indigo alone were $28,000 paying back $63,960 over 29 days. [Heskin Decl., Ex. 9 at HAY-0000346.] Even worse, Defendants shorted Indigo and told it for the first time on the funding call that the advances would be split. [Turrentine Decl., ¶¶ 13-16.] But Defendants did not disclose the fees or how the advances would be disbursed, and they only disbursed the second tranche after Inidigo had repaid the first, and only after Indigo complained about not getting the second tranche. [*Id*.] The same thing happened with Haymount—as this Court already held. [Heskin Decl., Ex. 6 at GOFUND_000010891-904].  And as discovery has revealed, these patently unreasonable terms and tactics were all orchestrated by John Braun. [*See id.*, ¶¶ 23-31.]

Defendants also include an "anti-stacking" clause that prevents the Merchant from taking out any other type of financing with any company other than Defendants. [*Id.*, Ex. 9, § 3.1(i).] But Defendants use so many fake DBAs that Merchants would not even know if they are related to

9

Defendants. [Brezel Tr. at 18:16-28:1, 74:7-14, 160:5-163:13 & 178:12-18.] Moreover, Defendants knowingly stack themselves *and* other MCAs to the point where Defendants are knowingly taking more per month than the merchant has in receivables. For example, in Haymount, Defendants' own underwriting revealed that Haymount had existing IRS tax liens. [*Id.*, Ex. 13 at GOFUND_000019975-979]. Defendants also knew that average monthly receivables were $2.1 million. [*Id.*] The daily payments for just the two agreements from GFA and Funding 123 took $35,000 and $80,000 per day. [*Id.*, Ex. 9.] That means that just those two agreements alone were taking $2,530,000 per month ($115,000 x 22). But, Defendants also knew that Haymount had "2.5M" per month in other advances. [*Id*, Ex. 13 at GOFUND_000019975-979.]

        In addition to the many, many ways that these agreements are substantively and procedurally unconscionable, Defendants try to insulate all of this activity from judicial review by including a purported class action waiver:

> 4.11 **CLASS ACTION WAIVER.** The parties hereto waive any right to assert any claims against the other party as a representative or member in any class or representative action, **except where such waiver is prohibited by law as against public policy**. To the extent either party is permitted by law or court of law to proceed with a class or representative action against the other, the parties hereby agree that: (1) the prevailing party shall not be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action (not withstanding any other provision in this agreement); and (2) the party who initiates or participates as a member of the class will not submit a claim or otherwise participate in any recovery secured through the class or representative action.

[Heskin Decl., Ex. 9, § 4.11 (emphasis added).] Given that Defendants solicit and enter into thousands of MCA agreements, a purported waiver of these borrowers' right to bring a lawsuit in a representative capacity virtually ensures that each borrower is unable to individually challenge the MCA agreements which often—by design—leave the borrowers in a worse financial position.

                                        10

Rather than negotiate at arms-length, Defendants preyed upon Plaintiffs' desperate financial conditions by imposing grossly one-sided terms in their uniform contracts of adhesion. This desperation is borne out by the substantively unconscionable and criminally usurious terms imposed by each agreement; Plaintiffs had no choice but to accept the terms unilaterally dictated by Defendants due to their desperate financial condition and lack of bargaining power. Simply put, Plaintiffs lacked any meaningful choice or ability to negotiate the terms of the MCA agreements. [Heskin Decl., Ex. 11, Brezel Tr. at 52:18-57:9).][7] Finally, Defendants, of course, do not disclose the way in which they actually fund these loans in that they will "short-fund" the anticipated funding amount (typically by half) until the borrower repays the first installment and then lend the borrower's money back to them for subsequent installments of the same loan. [*Id.*, Ex. 6 at GOFUND_000010891-904.][8]

### D.    Defendants Collect Upon Their Unlawful Debt Using a Common Scheme.

Defendants' Form MCA Agreements all contain a prejudgment attachment waiver under Conn. Gen. St. § 52-278. [*See id.*, Ex. 9 § 4.13.] In order to collect upon their unlawful debt, Defendants use Hassett & George, PPLC, a Connecticut law firm, to freeze the out-of-state bank accounts of their victims and then extort a settlement under duress. [*Id.* Ex. 17, Alfin Tr. at 127:15-129:7.] Jared Alfin, a Partner at Hassett & George testified that this extortion tactic is successful

---

[7]    Defendants' contention that "there was no disparity in bargaining power here because Plaintiffs could (and did) easily have sought funds from other sources" is belied by the fact that all MCA contracts—regardless of lender—contain putative class action waivers so there was no meaningful choice. [*See* DE 69, Exs. 1-8; Clinton Decl., ¶ 26.] Notably, Defendants disguised the true lender by using various names under the contracts, but each contained the same class action waiver. [*See* Heskin Decl., Ex. 10.]

[8]    Nor do they mention how the first-time merchants find out the actual fees charged is when the funds hit their account. [Heskin Decl. ¶¶ 38-41.]

11

85-90% of the time. [*Id.* at 51:9-53:23.] Defendants, through their common attorney, hand-serve a bank branch in Connecticut and then wait anywhere from several days to several weeks to serve their victims. [Heskin Decl., ¶¶ 47-49.] Defendants improperly serve the Connecticut Secretary of State for individuals and businesses that do not do business in Connecticut. [*Id.*] The result is that victims' bank accounts are frozen without receiving notice or service, and the only way to obtain a release of those frozen accounts is to capitulate to the extortionate demands of Defendants. [*Id.*]

## II.    Representative Plaintiffs & MCA Transactions.

### A.    Haymount Urgent Care PC & Dr. Robert Clinton, Jr.

Dr. Robert A. Clinton, Jr. is a physician and the owner of Haymount Urgent Care PC ("Haymount"), which is a VA-approved urgent care practice located in Fayetteville, North Carolina. [*See* Declaration of Robert A. Clinton, Jr. ("Clinton Decl."), ¶ 3.] As a result of the pandemic, Haymount's cash flow was greatly reduced as it was forced to take expensive precautionary measures to protect its patients and employees. [*Id.*, ¶¶ 8-11.] Under this cloud of economic duress, Haymount entered into a series of MCA Agreements with Defendants. [*Id.*, ¶¶ 16-17.] As with each of the Form MCA Agreements produced to date, each of Haymount's agreements contained substantially the same material terms referenced above. [*See id.*, Exs. 1-6.]

The amounts of money that Defendants were willing to loan Haymount were *not* based on what its future receivables were estimated to be *nor* the creditworthiness of the third parties who were to pay those receivables. For instance, the December 16, 2021 MCA Agreement with GFA "estimated" that 45% of Haymount's daily revenue was $35,000 but a MCA Agreement entered into on December 27, 2021 with Funding 123 estimated that 45% of its daily revenues was $80,000. [*See id.*, Ex. 4.] All in, and in order to pay off this debt spiral, Haymount entered into six MCA Agreements with Defendants, with each subsequent MCA Agreement necessary to pay off

12

the prior, usurious loan. [*See id.*, ¶ 17.] The Lunden Report computed the effective simple interest rate in these six MCA Agreements as follows: 248.8%, 228.2%, 416.1%, 226.9%, 332.9%, and 449.3%. [*See* Lunden Report, Ex. A.] When Haymount refused to pay Defendants' exorbitant fees and usurious interest to borrow its own money, Defendants unleashed their collection arm, Alpha Recovery to freeze all health insurance payments by sending UCC lien letters. [*See* Clinton Decl, ¶ 30.] In total, from August 30, 2021 to January 20, 2022, Defendants advanced Haymount no more than $3,080,000 and Haymount ultimately repaid at least $4,601,407. [*Id.*, ¶¶ 28.]

### B.    Indigo Installations, Inc. & Christopher Turrentine.

Plaintiff Indigo Installations, Inc. ("Indigo"), based in McKinney, Texas, is a restaurant equipment installation company owned and operated by Christopher Turrentine. [*See* Declaration of Christopher A. Turrentine ("Turrentine Decl."), ¶ 3.] In early 2022, Indigo was beginning a new project, and responded to a cold call from a purported third-party contractor used by Defendants—Sara Beityakov (who uses aliases Jenny Taylor and Kate Green). [*Id.* ¶¶ 7-8.] Through Beityakov, Defendants promised Indigo a $40,000 loan but on the eve of funding informed Indigo it would only receive half of the "Purchased Amount" up front with the other amounts to be released in tranches (releasing one additional tranche after it had already paid back the first). [*Id.* ¶¶ 8-16.]

In order to paper over the illegal transaction, Defendants provided Indigo with a loan package that consisted of two agreements, both of which were with GFA, one dated February 1, 2022 and the other dated February 18, 2022. [Heskin Decl, Ex. 9.] As with Haymount, the fixed Daily Payment of $2,200 was disguised as a good-faith estimate equal to 45% of Indigo's daily revenues. [*Id.*] That amount did not remotely reflect 45% of Indigo's daily revenues; rather, the estimated Daily Payment was unilaterally dictated by Defendants based on the length of the loan.

13

[*Id.*] As with all other transactions evaluated, the effective simple interest rate on Indigo's loans was in excess of the legal limit. [*See* Lunden Report, Ex. A (noting that the interest rate for the Indigo transaction was greater than 500%).]

In total, GFA actually "advanced" only $28,000 but demanded that Indigo pay back $63,960 in the span of just 29 days. [Turrentine Decl., ¶ 26] After GFA refused to advance the remaining $12,000, Indigo—on February 22, 2022—stopped payment on the ACH withdrawals. [*Id.* ¶ 17.] In response, Defendants, through Alpha Recovery, on or about February 24, 2022, unleashed Hassett & George to issue a writ for a pre-judgment attachment and to serve it on a Connecticut branch of PNC Bank, despite the fact that Indigo's PNC account was in McKinney, Texas. [*Id.* ¶¶ 18-20.] At no point prior to engaging in "settlement talks" was Indigo or Turrentine provided notice of the pre-judgment attachment or a copy of the underlying Connecticut civil action, a sworn affidavit or the statutorily required notice. [*Id.* ¶¶ 28.] Rather, a marshal served PNC Bank on February 28, 2022, and then waited until March 8, 2022 to improperly serve Indigo and Mr. Turrentine through the Connecticut Secretary of State. [Heskin Decl., Ex. 16, Ostrowsky Tr. at 77:1-79:24.] Notably, in the interim, Defendants had already secured a settlement under duress. [Turrentine Decl., ¶ 22.]

This situation—Defendants acting under color of state law to deprive the Frozen Account and Coerced Settlement class members of their civil rights—was sadly not unique to Indigo as Defendants' own attorney admitted that he does not file a complaint 85-90% of the time because merchants all settle by the time he is required to file anything with the court, including this one. [*See* Heskin Decl., Ex. 17, Alfin Tr. at 51:9-53:23.] Even worse, the marshal received a notice of non-receipt on May 3, 2022, and admitted that the return rate of non-service is about 20%. [Heskin

Decl., Ex. 16, Ostrowski Tr. at 91:1-23.] Delivery by certified mail was not actually received by Indigo until May 28, 2022, nearly two months after the original return date to court. [*Id.*] The marshal testified that she does not even have to serve papers on the merchants until 12 days before the return date, which is typically 4-6 weeks after service on the banks. [*Id.*, at 67:4-68:14.] In other words, the bank account gets frozen on day one, and service is not required on merchant for up to a month or more, which provides Defendants time to "negotiate" a settlement.[9]

Immediately upon freezing Indigo's bank account, Defendants attempted to extort more money from Indigo and Turrentine. [Turrentine Decl., ¶¶ 19-20.] On March 3, 2022, Defendants sent Indigo a bank release based on a purported settlement that had been reached with Defendants. [*Id.*, Ex. 4] But no settlement had been reached; rather, it was an extortion attempt to obtain $7,702 through the threat of financial duress. [*Id.*] On March 8, 2022, Indigo was forced to capitulate to Defendants' demands due to the extreme financial duress of the illegal bank freeze. [*Id.*, ¶¶ 22.]

## III.    Relevant Procedural Background.

Plaintiffs Haymount and Clinton initiated this lawsuit action on February 14, 2022, alleging causes of action against Defendants for (i) RICO violations pursuant to 18 U.S.C. § 1962; (ii) RICO conspiracy pursuant to 18 U.S.C. § 1962(d) and (iii) declaratory relief. [DE 1.] On March 10, 2022, Plaintiffs amended their complaint to include new representative parties and additional Defendants, additional factual allegations and new Fourth, Fifth and Sixth Causes of Action for fraud, breach of contract and due process violations, respectively. [*See generally* DE 28.]

---

[9]    In addition to freezing Indigo's bank account, Defendants unleashed its collection arm, Alpha Recovery, by sending UCC lien notices to Indigo's customers and payment processors. [*See* Turrentine Decl. ¶ 21.] These UCC Lien Notices was sent to Indigo's customers. [*Id.*] Defendants' tactic of UCC lien notices extort settlements under duress is commonly done. [*See* Heskin Decl., Ex. 19 at GOFUND_000021543-545 (noting "leverage is pending" after sending UCC).]

15

On March 31, 2022, Defendants moved to dismiss the Amended Complaint. [DE 68.] On June 27, 2022, this Court issued its Opinion and Order denying most of Defendants' motion to dismiss. [DE 86.][10] Significantly, this Court ruled that "the motion is denied with respect to the substantive and conspiratorial RICO claims." [*Id*. at 37.] In so doing, this Court expressly considered—and firmly rejected—Defendants' arguments that the RICO unlawful debt claim should be dismissed because the MCA Agreements are not loans. [*Id*. at 10-20 (recognizing that "the implied interest rates of these agreements far exceed the cap in applicable New York usury law" and noting that many of the factors advanced by Defendants weigh in favor of Plaintiffs).] The Court further noted that the MCA Agreements' reconciliation provisions "makes it often impossible to use and leaves the lender with substantial discretion to prevent adjustment." [*Id*. at 15-16 ("[W]hether the purported MCA purchaser actually bears the risk of a revenue shortfall or if the agreement is structured to ensure an 'absolute payment obligation.'" (citations omitted).] After extensive analysis, this Court held that "the Complaint has adequately pled that the MCA agreements []functions as loans," and that Plaintiffs have "pled that the debts created by the MCA agreements at issue are unenforceable, 'unlawful debts' under the RICO statute." [*Id*. at 19.]

## IV.    The Claims & Proposed Classes.

Plaintiffs assert counts I and II individually and on behalf of the "RICO Class" of similarly situated persons defined as:

> All persons in the United States who, on or after February 11, 2018, paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five

---

[10]    This Court granted the motion to dismiss with respect to (i) Plaintiffs' claim for declaratory judgment that the MCA agreements are void *ab initio*; (ii) the fraud claim, except with respect to GFA concerning fraudulent ACH withdrawals and (iii) the declaratory judgment claim concerning the validity of the Indigo settlement for Defendants other than GFA. [*See id*. at 37.]

percent.

[DE 28, Am. Compl., ¶ 218.] Plaintiffs Indigo and Turrentine bring Count VI individually and on

behalf of classes of similarly situated persons defined as:

> **The Frozen Account Class.** All persons in the United States who, on or after February 11, 2018, had their bank account frozen as a result of a writ of attachment issued by Defendants under the color of Connecticut law.

> **The Coerced Settlement Class.** All persons in the United States who, on or after February 11, 2018, had their bank account frozen as a result of a writ of attachment issued by Defendants under the color of Connecticut law, and who subsequently entered into a settlement agreement with Defendants.

[*Id.*, ¶ 219.] Thus, further to this Court's Order, the remaining individual and class claims are:

| **COUNT** | **Plaintiff(s)** | **Defendant(s)** | **Class or Individual** |
|---|---|---|---|
| 1. RICO (Unlawful debt) (Mail fraud) | ALL | Individual Defendants | Class, on behalf of the RICO Class |
| 2. RICO (Conspiracy) | ALL | Corporate Defendants | Class, on behalf of the RICO Class |
| 3. Declaratory Judgment | INDIGO TURRENTINE | GoFund Advance | Individual |
| 4. Fraud | CLINTON HAYMOUNT | GoFund Advance | Individual |
| 5. Breach of Contract (in the alternative) | ALL | All Defendants | Individual |
| 6. 42 U.S.C. § 1983 | INDIGO TURRENTINE | All Defendants | Class, on behalf of the Frozen Account & Coerced Settlement sub-classes |

## STANDARD

"Class actions serve an important function in our system of civil justice" because they

afford a single forum to litigate the same or similar claims, and provide an indispensable

17

mechanism to conserve judicial resources. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981); *see also Sukhnandan v. Royal Health Care of Long Island LLC*, 12cv4216, 2014 WL 3778173, at \*23 (S.D.N.Y. July 31, 2014) ("Moreover, class actions are an invaluable safeguard for public rights.") (citation omitted). In order to maintain a suit as a class action, a plaintiff must demonstrate, by a preponderance of the evidence, that (i) the class is so numerous that joinder of all members is impracticable; (ii) there are questions of law or fact common to the class; (iii) the claims or defenses of the representative parties are typical of the claims or defenses of the class and (iv) the representative parties will fairly and adequately protect the interests of the class. *See* FED.R.CIV.P. 23(a); *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80-81 (2d Cir. 2015) (affirming certification of debtor classes in case involving sham affidavits and fictitious service).

Federal Rule 23(b) provides additional requirements for a district court to consider prior to certification of a class.  Rule 23(b)(2) allows plaintiffs to seek injunctive and equitable relief where the misconduct to be enjoined applies to all class members and such relief will benefit the class overall. *See* FED.R.CIV.P. 23(b)(2); *see also Sykes*, 780 F.3d at 97. Plaintiffs seeking monetary damages must satisfy Rule 23(b)(3) by demonstrating that questions of law or fact common to the members of the proposed class "predominate over any questions affecting only individual members" and that a class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006); *see also Sykes*, 780 F.3d at 80-81.

Consistent with its "general preference [] for granting rather than denying class certification," the Second Circuit instructs that any doubt as to the propriety of certification should be resolved in favor of certifying the class because denial will almost certainly terminate the action

18

and be detrimental to the class members. *See, e.g., Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d

Cir. 1997). Thus, "[i]f there is to be an error made, let it be in favor and not against the maintenance

of the class action, for it is always subject to modification should later developments during the

course of the trial so require." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 17 Civ. 1580,

2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020).

## ARGUMENT

## I.    USURY AND RICO ACTIONS ARE WELL-SUITED FOR CLASS TREATMENT.

To begin, courts have consistently endorsed the use of the class action mechanism to

resolve claims predicated on RICO and/or various states' usury laws. For example, in *Gibbs v.

Stinson*, plaintiffs filed a class action lawsuit challenging defendants' unlawful lending operation

which involved loans made through tribal entities at exorbitant interest rates. [*See* Heskin Decl.,

Ex. 31 (3:18cv676, at *1 (E.D. Va. Oct. 14, 2021))]. As here, plaintiffs in *Gibbs* sought declaratory

and injunctive relief, damages and attorney's fees and costs based on violation of RICO. *Id.* at *4.

The Court found the Rule 23(a) and (b)(3) requirements met because, among other reasons, "the

class claims encompass the same essential factual and legal issues. The central issue before the

Court is whether Defendants are liable as decision-makers, founders, owners or indirect

beneficiaries of the tribal lending scheme perpetuated by [Defendants]. This alone, as the

qualitatively overarching issue of this case, satisfies the predominance requirement and outweighs

any issues particular to individual class members." *See id.* at *30. The Court held that that

plaintiffs' RICO claims could (and should) be resolved on a class-wide basis because plaintiffs

"predicate their RICO injury not only on the payment of usurious interest, but also on paying the

principal on debts rendered void under Virginia law." *Id.* at *34 (stating that "[w]hether that theory

succeeds on the merits raises a legal question common to the entire class, which, by definition,

includes only those borrowers who made payments on their loans"); *see also Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 61-62 (E.D. Va. 2021) (stating that "[c]ourts, when faced with class certification in RICO claims, often find that common issues predominate"); *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir. 1978) (stating that "[t]his is a classic case for Rule 23(b)(3) class action. The claims of a large number of individuals can be adjudicated at one time, with less expense than would be incurred in any form of litigation."); *Bistro Exec., Inc. v. Reward Network, Inc.*, No. CV 04-4640 CBM, 2006 WL 6849825 (C.D. Cal. Oct. 11, 2005).[11]

## II.    THE CLASSES SATISFY *ALL* RULE 23(a) & (b)(3) REQUIREMENTS.

### A.    The Legal and Factual Requirements to Prove RICO Liability and Damages in this Case Are Determinable on a Class-wide Basis.

As noted by this Court in its Order, Plaintiffs' principal theory of RICO liability is that the "[D]efendants are operating an enterprise dedicated to making and collecting on usurious loans." [DE 86, Order at 10.] The RICO statute declares that it is "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt." [*Id.* at 12 (citing 18 U.S.C. § 1962(c)); *see also Fleetwood Serv., LLC, v. Ram Cap. Funding, LLC,* 20-cv-05120-LJL, DE 105, Opinion & Order (S.D.N.Y. Aug. 17, 2022), at *8.] "Unlawful debt" is defined to include, among other things, a debt "which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State

---

[11]    The ability to resolve similar, if not identical claims, all predicated on the same or similar form agreements is precisely why courts throughout the country have frequently certified classes alleging usury. *See also Moore v. Comrnfed Sav. Bank*, 908 F.2d 834 (11th Cir. 1990) (rejecting argument that usury claims must be brought on an individual basis); *American Timber & Trading Co. v. First Nat'l Bank of Oregon*, 690 F.2d 781 (9th Cir. 1982) (certifying usury class action).

20

or Federal law, where the usurious rate is at least twice the enforceable rate." [DE 86, Order at 12 (citing 18 U.S.C. § 1962(6).][12] Thus, liability for an "unlawful debt" RICO violation requires, under New York law, proof that (i) a debt existed; (ii) said debt was unenforceable; (iii) the debt was incurred in connection with the business of lending money at more than twice the legal rate of 25%; (iv) the defendant aided collection of the debt in some manner and (v) the defendant acted knowingly, willfully and unlawfully. [*Id.* at 12 (citation omitted).]

Here, Plaintiffs will present common evidence that Defendants' Enterprise utilized form MCA Agreements—with substantially similar terms—that lent money at rates exceeding New York's usury laws. [*See* Heskin, Decl., ¶¶ 32-35 & 63-66.]  Not only were Plaintiffs provided MCA Agreements with implied interest rates well over 100%, but Plaintiffs' expert, Mr. Lunden has demonstrated that the effective simple interest rate can readily be calculated using information on the face of each MCA Agreement. [Lunden Report & Ex. A.] Plaintiffs have examined many of the MCA Agreements produced thus far and there is no agreement with an effective simple interest rate below 100%. [*See* Bilsborrow Decl., ¶ 19 & Ex. A.] In short, if the transactions amount to loans, then common proof will establish the interest rates are well above 50%, which is twice the rate of criminal usury under New York law. [*See* DE 86 at 12 (citing N.Y. Penal L. § 190.40).]

Once it is established that the interest rate exceeds 50%, determination of damages is equally as straightforward and determined by deducting the amounts actually received by each merchant from the amounts actually paid by each merchant. [Lunden Report at 3 (citation omitted).] The question of the damages once liability is established turns on a separate section of

---

[12]    As noted by this Court in its Order, New York law "governs the issues of whether the contracts amount to loans, and, if they are loans, whether they are unlawful debt under RICO." [DE 86, Order at 11-12 (*citing United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020).]

the RICO statute which provides that "[a]ny person injured in his business or property by reason of a violation of § 1962 of this chapter . . . shall recover threefold the damages he sustains." *Fleetwood Serv., LLC, v. Ram Capital Funding,* 20-cv-5120 (LJL), 2022 WL 3536128, at *15 (citing 18 U.S.C. § 1964(c) & discussing Second Circuit precedent, *Commercial Union Assurance Co., plc v. Milken*, "and the cases on which that decision rests . . . ."); *see also Trs. of Plumbers & Pipefitters Nat. Pens. Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1146 (S.D.N.Y. 1995) ("[T]he purpose of a civil RICO award is to return the plaintiff to the same financial position [they] would have enjoyed absent the illegal conduct.").

By way of illustrative example, in *Fleetwood Services, LLC v. Ram Capital Funding, LLC,* a virtually identical usury case, Judge Liman awarded damages of $75,117, which was determined by subtracting $44,500 (the amount received by the debtor) from $119,617 (the amount the debtor paid to lender). *See* 20-cv-05120-LJL, DE 105, at *10 & *12 (stating that "[a]s a result of the collection of an unlawful debt, [plaintiff/borrower] was worse off by $75,117" & "[t]his is the amount by which it is injured by reason of a violation of RICO, and this is the amount that will be trebled as required by the statute"). In so doing, Judge Chin noted that:

> The federal RICO statute already imposes a penalty on the collector of an unlawful debt in the form of trebling the damages incurred by the borrower. Fleetwood here had the option to proceed under either a usury statute or a RICO statute. It elected to proceed under the RICO statute. ***RICO provides a cause of action separate and apart from those available under New York [] law, incorporating those laws only to the extent that they define what sort of 'unlawful debt' cannot be collected.***

*Fleetwood Services, LLC,* 20-cv-05120-LJL, DE 105, at *13 (emphasis added) (granting motion for entry of judgment on borrower's RICO claim in the amount of $175,351, reflecting the amount

paid by debtor ($119,617) reduced by the amount received from lender ($44,500), trebled ($225,351) and then reduced by any amounts received by borrower in settlement ($50,000).

Finally, in order to prove usurious intent, Plaintiffs will rely primarily on the face of the Form MCA Agreements and the various one-sided terms that are common throughout as these provisions appear in all of MCA Agreements, rendering the questions of unconscionability subject to class-wide proof. [*See* Heskin Decl., ¶¶ 32-35, 63-66 & Exs. 9-10.][13]

### B.    The Proposed Classes Satisfy Rule 23(a)'s Requirements.

#### 1.    *The Proposed Classes Satisfy the Numerosity Requirement.*

Rule 23(a)(1) provides that a class may be certified only if it "is so numerous that joinder of all members is impracticable," which does not mean impossible but only that joining all class members would be difficult or inconvenient. *See Allegra v. Luxottica Retail N. Am.*, 17-CV-5216, at *22 (E.D.N.Y. Dec. 13, 2021) (stating that a precise enumeration or identification of class members is not required) (internal quotations marks & citations omitted). In the Second Circuit, numerosity is usually presumed for classes larger than forty members. *See, e.g.*, *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Here, the numerosity requirement is satisfied for the RICO class as the evidence adduced to date demonstrates that hundreds of persons or entities have paid money during the class period to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate

---

[13]    Plaintiffs can also establish that the estimated daily payment is a sham because Defendants admit it is not tied to the actual estimated receivables and is intentionally underestimated to render the reconciliation provision illusory. [Heskin Decl., Ex. 4, Wolf Tr. at 97:15-100:13.]

exceeding fifty percent. [Bilsborrow Decl., ¶ 19 & Ex. A.][14] With respect to the Frozen Account and the Coerced Settlement classes, numerosity is likewise established because approximately 100 people on or after February 11, 2018, "had their bank account frozen as a result of a writ of attachment issued by Defendants under the color of Connecticut law." [Alfin Tr. 51:9-53:23.] Similarly, the number of those persons who "subsequently entered into a settlement agreement with Defendants" is at least 80 individuals. [*Id.*]

### 2.    *There are Questions of Law and Fact Common to the Class.*

Rule 23(a)'s commonality prerequisite is satisfied if there is a common issue that "drive[s] the resolution of the litigation" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Sykes*, 780 F.3d at 84 (citation omitted). Because Plaintiffs' class claims are based on standardized conduct by Defendants, common questions of both fact and law are pervasive in this action.

The minimal requirements of Rule 23(a)(2) are satisfied here. Plaintiffs' claims involve common legal issues all stemming from the same factual predicate, including, but not limited to: (i) whether Defendants' Form MCA Agreements constitute loans or the purchase of future (undefined or segregated) receivables; (ii) whether, if loans, the interest rate exceeds 50%; (iii) whether the form MCA Agreements are void *ab initio*; (iv) whether Plaintiffs and the Classes may recover any monies paid to the Enterprise; (v) whether Defendants extorted settlements under duress and (vi) whether Defendants' conduct was willful or knowing. [*See* DE 28, ¶ 221.]  These are just some of the key legal and factual issues in the case, and they are common to all class

---

[14]    As noted above, this Court ordered Defendants to produce all MCA Agreements dating back to February of 2018. While Defendants are continuing to make "rolling productions," they have not certified that they have produced all MCA agreements. [*See* Heskin Decl., ¶ 76.]

24

members. *See, e.g., Haley v. Teachers Ins. & Annuity Assn of Am.*, 17-CV-855, at *13 (S.D.N.Y. Nov. 25, 2020) (common question of law is the legality of defendants' policy and procedure).

Obviously, whether Defendants' Form MCA Agreements reflect usurious loans or "legitimate" factoring transactions is a dominating issue, the determination of which will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Sykes*, 780 F.3d at 84. That is, whether Defendants' Form MCA Agreements create an absolute repayment obligation (thereby making the agreement a loan) is a common issue which can and should be decided based on the agreements signed by all class members and/or from common proof in terms of Defendants' treatment of their "advances" as absolutely repayable obligations. *See Sykes*, 780 F.3d at 84; *Gibbs*, 3:18cv676, at *31 (finding commonality satisfied in usury class action) [Heskin Decl., Ex. 31]. Simply put, "[i]f Plaintiffs establish as to one class member that the various participants here constitute a RICO enterprise, the same evidence will establish the same conclusion as to every other class member." *Gibbs v. Stinson*, 3:18cv676, at *24 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (issue qualifies as common if "it is capable of classwide resolution").

### 3.    *Plaintiffs' Claims are Typical of Those of the Class Members.*

Rule 23(a)(3) requires that the claims of the named plaintiff be typical of the claims of the class members. That requirement is satisfied if the representative plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other members and is based on the same legal theory. *See Sykes*, 780 F.3d at 80 (noting that in certain contexts "[t]he commonality and typicality requirements [] tend to merge [as b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class

members will be fairly and adequately protected in their absence") (cleaned up & citation omitted). In other words, typicality exists when the "defendants committed the same wrongful acts in the same manner against all members of the class." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) (quotations omitted). Although typicality requires the "same wrongful acts," it does not require identical damages to each class member. Thus, "a difference in damages arising from a disparity in injuries among the plaintiff class does not preclude typicality." *Lemire v. Wolpoff & Abramson. LLP*, 256 F.R.D. 321, 327 (D. Conn. 2009).

The representative plaintiffs are a North Carolina urgent care facility (Haymount) and its owner (Clinton) and a Texas restaurant installation company and its owner (Turrentine), who all signed the same form MCA Agreement used during the class period and paid (or contracted to pay) interest to the Corporate Defendants in excess of the maximum amounts allowed by New York law. [*See* Clinton Decl. ¶¶ 3-31, 17-; Turrentine Decl. ¶¶ 3-18.] Here, the violations suffered by Plaintiffs are typical of those of the RICO Class members they seek to represent as their claims arise from the same course of illegal conduct, namely, Defendants' attempt to collect on unlawful usurious loans, that gives rise to the claims of all other Nationwide Class members, and are based upon the same legal theories as those of the Class. Similarly, the representative claims of Indigo and Turrentine are typical of those of the Frozen Account and Coerced Settlement class because the class members' claims will rise and fall on the representative Plaintiffs' claims.

### 4. *Plaintiffs and Proposed Class Counsel Will Ably Represent Class Members' Interests.*

Rule 23(a)(4)'s requirement for fair and adequate class representation is satisfied here because the representative Plaintiffs' claims and interests are not antagonistic to those of any class member and their counsel are qualified and experienced attorneys capable of prosecuting this class

26

litigation. *See, e.g.*, *In re Amla Litig.*, 282 F. Supp. 3d at 758 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).

First, Plaintiffs have no conflict with any other Class member, and will fairly and adequately protect the interests of the Class. Plaintiffs are adequate representatives because they were subjected to the same unlawful conduct as the Class members. *See, e.g., Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 158 (S.D.N.Y. 2017) ("So long as [Plaintiff's] and the class members' injuries arose out of the same violative conduct, she may properly represent [the class.]"). Because Plaintiffs: (i) have suffered injury which is to be remedied by class relief; (ii) intend to pursue claims that will secure relief for the class and (iii) seek equitable and injunctive relief which will benefit the entire class, they are adequate class representatives. *See Hirschfeld v. Stone*, 193 F.R.D. 175, 183 (S.D.N.Y. 2000).

There is no conflict —actual or theoretical— between the representative Plaintiffs and the interests of the other class members as they share virtually the same problem in that they took (or guaranteed) usurious loans from Defendants which they have already repaid or which they must now repay. [*See* Clinton Decl. ¶¶ 32-34; Turrentine Decl. 22-33] Moreover, Plaintiffs Clinton and Turrentine have been extensively involved in this case, including, but not limited to, the initial investigation, preparation of the various complaints, the discovery process (and both are scheduled to be deposed shortly). [*See* Clinton Decl, ¶¶ 31-33; Turrentine Decl., ¶¶ 22-33.] There being no doubt about their good-faith commitment to this litigation, they are presumed adequate. *See, e.g.*, *Kelen v. World Fin. Network Nat'l Bank*, 295 F.R.D. 87, 93 (S.D.N.Y. 2013).

Second, Plaintiffs' counsel are well qualified to handle this case as a class action. Plaintiffs are represented by very experienced attorneys with the law firms White and Williams LLP, Benesch,

Friedlander, Coplan and Aronoff LLP and Weitz & Luxenberg, P.C. Proposed class counsel are highly qualified, experienced and able to devote the time and resources necessary to represent the classes in this case. [Heskin Dec., ¶¶ 3-23; Almeida Dec., ¶¶ 2-10; Bilsborrow Dec., ¶¶ 2-13.] Attorneys Heskin, Almeida and Bilsborrow have committed and will continue to commit significant resources to representing Plaintiffs and the Classes, and are committed to ensuring that all putative class members' rights are protected. In short, proposed class counsel will ably and competently represent the classes. *See* FED.R.CIV.P. 23(g)(1)(A)-(B).

### C.    The Proposed Classes Satisfy Rule 23(b)(3) Requirements.

Rule 23(b)(3) imposes two requirements for a damages class in that plaintiffs must establish that: (i) questions of law or fact common to the class members predominate over any questions affecting only individual class members and (ii) proceeding as a class action is a superior form of adjudication as compared to other available methods. *See Sykes*, 780 F.3d at 81 (citing FED.R.CIV.P. 23(b)(3)). Both predominance and superiority requirements are satisfied here.

### 1.    *Common Questions of Law & Fact Unquestionably Predominate.*

The Second Circuit instructs that the predominance inquiry demanded by Rule 23(b)(3) "anticipates the existence of individual issues" and that a class may only be certified if "questions of law or fact common to class members predominate over any questions affecting only individual members." *Sykes*, 780 F.3d at 81. Notably, Rule 23(b)(3) does *not* require that there be an absence of any individual issues, and the mere fact that class members' damages may differ does *not* preclude class certification when common issues concerning liability predominate. *See, e.g.*, *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (finding that the predominance requirement of Rule 23(b)(3) is satisfied when "the issues in the class action that are subject to generalized proof,

and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof").

> ### a.      The Qualitatively Overarching Issue of Whether the Form MCA Agreements are Loans Is Capable of Producing a Single Answer.

Rule 23(b)(3)'s predominance test is qualitative rather than quantitative, and if the qualitatively overarching issue in the litigation is common, a class may be certified notwithstanding the need to resolve actual or theorized individualized issues. *See, e.g.*, *Sykes*, 780 F.3d at 87. Plaintiffs satisfy the predominance requirement because a common nucleus of facts and legal issues dominates this litigation. The common questions that predominate are whether Defendants' form MCA Agreements with the RICO Class members are—in fact—loans and—if so—whether they violate New York's usury law. [*See* DE 86, Order at 1.]

As the Second Circuit stated in *Sykes*, the predominance inquiry is satisfied if:

> ***Every potential class member's claim arises out of defendants' uniform, widespread practice*** of filing automatically-generated, form affidavits of merit based on 'personal knowledge' and, in many instances, affidavits of service, to obtain default judgments against debtors in state court. Whether this practice violates the FDCPA, New York GBL § 349, New York Judiciary Law § 487, ***and/or constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and (d) does not depend on individualized considerations*** .... The Court recognizes that should defendants be found liable on some or all of these claims, individual issues may exist as to causation and damages as well as to whether a class member's claim accrued within the applicable statute of limitations. ***This, however, does not preclude a finding of predominance under Rule 23(b)(3)*** .

29

*Sykes*, 780 F.3d at 81 (citation omitted & emphasis added) (further stating that "[a]ll that is required at class certification is that "the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability").[15]

Thus, the determination as to whether the Form MCA Agreements are loans—and therefore unenforceable debt instruments under New York law—or are factoring agreements unquestionably predominates over any individual issue Defendants could foment in opposition. *See also Madden*, 237 F. Supp. 3d 130, 161 (S.D.N.Y. 2017) ("Defendants have thus not identified any issues requiring individualized inquiry, and Plaintiff has established that common issues predominate over individual ones."); *Gibbs v. Stinson*, 3:18cv676, at *34-35 ("This alone, as the qualitatively overarching issue of this case, satisfies the predominance requirement and outweighs any issues particular to individual class members.").[16]

---

[15]    These common issues are analogous to those in *Sykes* in which the Second Circuit affirmed the district court's grant of certification of RICO and other claims based on plaintiffs' allegations that defendants operated a debt-collection scheme whereby they would acquire charged-off debt, file lawsuits and then fail to serve the debtors in order to obtain default judgments under false pretenses. *See Sykes*, 780 F.3d at 75-80 (finding superiority met because a class action "is, without question, more efficient than requiring thousands of [falsely accused] debtors to sue individually").

[16]    Numerous other courts have found the predominance requirement satisfied in similar class cases alleging usury, albeit in unpublished opinions. *See, e.g.*, *Upshaw v. Ga. Catalog Sales, Inc.*, 206 F.R.D. 694, 700-01 (M.D. Ga. 2002) (finding predominance met in a payday lending case where plaintiffs' claims were based on statute usury laws and RICO, defendants' conduct was substantially the same with respect to all members of the class and defendants' primary defense applied to the class as a whole); *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 47 (E.D. Va. 2021); *Purdie v. Ace Cash Express, Inc.*, 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547, at *5, *13-14 (N.D. Tex. Dec. 11, 2003); *Rewards Network*, at **6-8, 10-11 (finding predominance satisfied because "none of the variations impacts the core legal issue: whether [defendant]'s standard Merchant Agreement documentation meets the four-prong test for usury").

### b. *Plaintiffs' Class Claims*

Although the predominance inquiry is satisfied by the overarching issue of whether the form MCA Agreements constitute loans, other common issues predominate with respect to Plaintiffs' class claims. For their substantive RICO class claim (Count I), brought on behalf of the RICO Class, Plaintiffs will have to establish that (i) a debt existed; (ii) said debt was unenforceable under New York law; (iii) the debt was incurred in connection with the business of lending money at more than twice the legal rate of 25%; (iv) the defendant aided collection of the debt in some manner and (v) the defendant acted knowingly, willfully and unlawfully. [DE 86, Order at 12 (citation omitted).]

Plaintiffs will be able to establish the existence of debts by Defendants' own records, namely, the numerous form MCA Agreements entered into between Corporate Defendants and the RICO class members from February 11, 2018 through the present. [*See* Heskin Decl, ¶¶ 32-35]. Moreover, Plaintiffs will be able to prove that those debts were unenforceable under New York law by way of simple calculation based on the information contained on the face of the form MCA Agreements. [*See* Lunden Report at 4-5, Ex. A.] Common proof likewise exists that Defendants attempted to collect on the illegal debts in various common, unlawful ways. [Heskin Decl., ¶¶ 55-59.] Finally, since usury "can be gleaned from the face of [the form MCA Agreements], intent will be implied and usury will be found as a matter of law." *See, e.g.*, *Blue Wolf Cap.* Fund *II, L.P. v. American Stevedoring, Inc.*, 961 N.Y.S.2d 86, 89 (N.Y. App. Div. 2013).[17]

---

[17]    The requirements for Count II (RICO conspiracy § 1962(d)) are less demanding than those for substantive violations. *See, e.g., Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or

Plaintiffs Indigo and Turrentine assert Count VI for violations of 42 U.S.C. § 1983 on behalf of the Frozen Account and the Coerced Settlement Classes. [*See* DE 28, ¶¶ 219, 316-333.] In denying the motion to dismiss the § 1983 claim, this Court noted that those Plaintiffs have plausibly alleged that Defendants did not comply with the procedural requirements set forth in the Connecticut pre-judgment attachment statute as Plaintiffs contend that Defendants did not draft nor serve a complaint, a supporting factual affidavit or the statutorily required notice. [*See* DE 86 at 26, citing DE 28, ¶¶ 325-329.] Rather than comply with the legislatively mandated process, Defendants "first freeze the merchant's bank accounts by serving writs of attachment on the bank only, and then immediately demand a settlement under duress and the threat of financial ruin." [DE 86, Order at 26, citing DE 28, ¶ 326; *see also* Heskin Decl., ¶¶ 47-59.]

The common issues that predominate for purposes of this § 1983 class claim are: (i) the inclusion in Defendants' form MCA Agreements of waivers of judicial process ostensibly permitting Defendants—through their agents—to obtain pre-judgment writs of attachment without notice and/or commencing an underlying lawsuit; (ii) whether Defendants, through their agents, actually filed complaints and/or served the Frozen Account or Coerced Settlement class members with necessary process and (iii) the entry into settlements by these class members as a result of the Defendants' practice of improperly and illegally freezing assets in order to extract additional monies through coerced settlements. For each of Plaintiffs' claims asserted on a representative basis, common factual and legal questions unquestionably predominate thereby satisfying Rule 23(b)(3)'s predominance requirement.

---

facilitating the criminal endeavor. In the civil context, a plaintiff must allege that the defendant knew about and agreed to facilitate the scheme.").

### 2. *Resolving Virtually Identical Usury Claims Based on the Same Form Agreement on a Classwide Basis is a Superior Method of Adjudication.*

Rule 23(b)(3) also requires plaintiffs to demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) lists four factors—individual control of litigation, prior actions involving the parties, the desirability of the forum and manageability—which courts consider in making these determinations. *See Sykes*, 780 F.3d at 82 (citing FED.R.CIV.P. 23(b)(3)(A)-(D)). Adjudicating the RICO class members' claims and the Frozen Account and Coerced Settlement class members' § 1983 claims on a class basis is the superior way to resolve these issues in this case. A class-wide adjudication is unquestionably more efficient than hundreds of individual actions and avoids the necessity of addressing, individually, the legality or lack thereof of Defendants' Form MCA Agreements as well as their use of the Connecticut pre-judgment attachment statute to extort settlements from understandably distraught class members.[18]

First, given the onerous nature of the Form MCA Agreements, the harassing and unrelenting collection efforts by Defendants, not to mention the fact that many unsuspecting merchants are completely unaware that these agreements are—in actuality—illegal loans and not purchases of future receivables, it is extremely unlikely that individual class members would know

---

[18]    As detailed in two scathing articles published in Bloomberg Businessweek in February of 2022, investigative reporters determined that GFA was one of several MCA companies—each owned or controlled by Jon Braun, who was serving a 10 year sentence for drug charges and was recently pardoned by former President Trump—that "have used a legal procedure called prejudgment attachment" to file over 100 cases in a Connecticut court. *See* Zeke Faux, *The Loan Shark Trump Freed From Prison is Lending Money Again*, BLOOMBERG BUSINESSWEEK (Feb. 10, 2022) [Dtk. No. 28-1] Zachary Mider & Zeke Faux, *Sign This Agreement and Your Bank Account Might Be Frozen*, BLOOMBERG BUSINESSWEEK (Feb. 10, 2022) (noting that Jared Alfin, a lawyer at Hassett & George, P.C., has used the Connecticut pre-judgment statute and pursued over 180 small-business owners on behalf of MCA companies including GFA) [Dtk. No. 28-2.]

to investigate much less to retain an attorney and to file a lawsuit to bring their own claims. [*See* Turrentine Decl., ¶¶ 26-29; Clinton Decl., ¶¶ 20-26.] And, even if they were aware, they likely would not be able to take the time and to devote the resources necessary to vindicate their rights. *See, e.g.*, *Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010); *Labbate-D'Alauro v. GC Servs Ltd. P'ship*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996) (finding superiority given "the improbability that large numbers of class members would possess the initiative to litigate individually").

Moreover, Defendants have intentionally deterred businesses and their owners from pursuing litigation using, among other things, the Connecticut pre-judgment attachment statute, which makes a class action superior to any other form of recourse. And, while many individual cases are pending regarding the legality of factoring agreements (such as the ones at issue here), Plaintiffs are not aware of any other active class cases on the same issues here, let alone any that have progressed through discovery as here. [*See* Heskin Decl., ¶ 77.]

Third, concentrating litigation on behalf of all class members in this forum will prevent inconsistent adjudications and will promote fair and efficient use of the judicial system. *See* FED.R.CIV.P. 23(b)(3)(C). Among other considerations, numerous class members are located in the New York City area, the form MCA Agreements were effectuated under New York law and this Court is familiar with the facts, the claims and has overseen the discovery process.[19]

---

[19]   It would be "nonsensical to disaggregate the claims into hundreds or thousands of individual proceedings." *Chester-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 84 (S.D.N.Y. Mar. 30, 2018) ("Doing so would only waste 'time, effort, and expense' and increase the likelihood of conflicting outcomes for Plaintiffs.") (citation omitted). And, resolving the common issues regarding the lawfulness of the form MCA Agreements will save the parties and the Court system substantial resources going forward.

34

Finally, this case is certainly manageable as a class action. While "the Second Circuit has cautioned that failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored," that admonition is not pertinent here as the case is distinctly manageable as a class action. *See, e.g.*, *In re Petrobras Secs.*, 862 F.3d 250, 268 (2d Cir. 2017). The class members and the specifics of the financial harms inflicted on them are readily ascertainable and can be uniformly identified via Defendants' records. [cite] Ultimately, "[i]n this case, because class-wide adjudication of Plaintiffs' claims would serve to efficiently resolve 'the claims or liabilities of many individuals in a single action, as well as eliminate the possibility of 'repetitious litigation and possibly inconsistent adjudications,' a class action is the superior method of litigation." *Estate of Gardner*, 316 F.R.D. at 76–77 (citation omitted).

### D.    A Separate Rule 23(b)(2) Class Should Also Be Certified.

A Rule 23(b)(2) class should be certified where the defendant has acted on grounds that apply generally to the class and are of an ongoing nature such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. *See* FED.R.CIV.P. 23(b)(2); *see also Dukes,*564 U.S. at 360 (holding that certification of a class for injunctive relief is appropriate where "a single injunction ... would provide relief to each member of the class").

The injuries to Plaintiffs and the RICO class members as a direct result of Defendants' illegal actions (collecting on unlawful debts), include, but are not limited to, "thousands of dollars in improperly collected criminally usurious payments." [DE 28, ¶ 258.] It truly would be a pyrrhic victory if Plaintiffs were to prevail on their claims on behalf of the RICO class but Defendants were still able to employ their abusive, threatening and harassing collection measures in order to extract illegal loan payments. As evidenced by the discovery produced to date, Defendants

35

brazenly continue to execute MCA Agreements with merchants even after this Court ruled that those agreements may constitute usurious, illegal loans. [*See* Heskin Decl., Ex. 10 at GOFUND_000000355-365 and GOFUND_000000818-828 (MCAs issued by the Enterprise dated July 2022).] As such, an injunction would benefit the RICO class members as a whole, and would address Defendants' ongoing, illegal activities. Thus, the prerequisites for entry of an injunction under Rule 23(b)(2) are satisfied. *See also Sykes II*, 285 F.R.D. at 294 (certifying separate classes under both Rule 23(b)(2) and 23(b)(3)). Additionally, Rule 23(b)(2) is satisfied with respect to the Frozen Account and Coerced Settlement class because a declaration that those attachments are ineffectual and any resulting settlements void would certainly benefit those classes as a whole.

## III.   THE CLASSES ARE APPROPRIATELY DEFINED & MEMBERSHIP CAN BE READILY DETERMINED BASED ON DEFENDANTS' RECORDS.

The Second Circuit instructs that class membership must be identifiable by objective measures. *See In re Petrobras Sec. Litig.*, 862 F.3d 250, 257 (2d Cir. 2017) ("[A] class is ascertainable if it is defined using objective criteria that establish membership with definite boundaries."). Here, inclusion in the RICO class can be determined by objective criteria, namely, Defendants' documents and records, particularly their form MCA Agreements as well as transaction records indicating (i) amounts loaned to Plaintiffs and (ii) monies paid to Defendants by Plaintiffs and the putative class members. [*See* DE 28, ¶ 218; Heskin Decl., Ex. 9-10.] And, as Mr. Lunden's expert report establishes, determination of whether a particular MCA transaction yields an interest rate in excess of 50% is readily determinable using a simple formula using the information on the first page of each of Defendants' Form MCA Agreements. [*See* Lunden Report at 4-5.] Similarly, membership in the Frozen Account and the Coerced Settlement Subclasses can be identified by records evidencing that a pre-judgment writ of attachment was utilized by Jared

36

Alfin to freeze a bank account and that a settlement agreement was entered into as a result. [Aflin Tr. at 127:15-129:7.] Each of the classes is limited to a specific time period, from February 11, 2018 through the present. [*See* DE 28, ¶¶ 218 & 219.] Therefore, since membership in the various classes is based on objective criteria, this Court would *not* be called on to make any determination about the merits of any particular class members' claim in deciding whether that person or entity is a class member. The ascertainability requirement is therefore satisfied. *See In re Signet Jewelers Ltd.*, No. 16 Civ. 6728, at *17 (S.D.N.Y. July 10, 2019) ("Ascertaining the members of the Class will be easily administrable by reference to investor records."); *Buffington v. Prog. Advanced Ins. Co.*, 20-CV-07408, at *1 (S.D.N.Y. Aug. 23, 2022) (ascertainability requirement satisfied because "Plaintiff posits that he can identify putative class members via data stored in Defendant's management software").

## IV.    THE CLASS ACTION WAIVER IS UNENFORCEABLE BECAUSE THE MCA AGREEMENTS ARE USURIOUS LOANS VOID *AB INITIO*.

Each of the form MCA Agreements contains a class action waiver. [Heskin Decl., Ex. 9 § 4.11.][20] As set forth below (and as detailed in Plaintiffs' Opposition to Defendants' Motion to Strike Class Allegations), the putative class action waiver is unenforceable because (i) the MCA Agreements constitute usurious loans and thus are void *ab initio* and (ii) the terms of the agreements are the epitome of substantively unconscionable and were procured in reprehensible fashion. The MCA Agreements, including the putative waiver, are unenforceable.

---

[20]    Defendants previously moved to strike Plaintiffs' class action allegations because of this waiver. [DE 104.] Plaintiffs' brief in opposition sets forth why Defendants' argument should be rejected. [DE 107.] For purposes of efficiency, Plaintiffs will not restate those arguments in detail here, but rather incorporate those arguments and detail the evidence that demonstrates that the Form MCA Agreements are procedurally and substantively unconscionable.

37

The interest charged by Defendants — ranging from 89 to 1,333% — is unconscionable, oppressive, illegal and violates New York's strong public policy against usury. [*See* Lunden Report, at 5; Bilsborrow Decl., Ex. A.] As this Court is aware, the New York Court of Appeals, in *Adar Bays, LLC v GeneSYS ID, Inc.*, recently affirmed that criminally usurious loans are void *ab initio*. Prior to doing so, the New York Court of Appeals conducted an exacting review of New York's strong public policy against all forms of usury, *including in the context of loans involving corporations. See* 37 N.Y.3d 320, 327-333 (2021) (discussing New York's usury laws and the legislature's repeated affirmation of the policies underlying those laws, including "the protection of persons in weak bargaining positions from being taken advantage of by those in much stronger bargaining positions.") (citation omitted); *see also Madden*, 237 F. Supp. 3d 130, 149 (S.D.N.Y. 2017) (observing that New York's usury prohibition is not a creature of recent statute, but rather one that reflects a deep-rooted tradition of the common weal").

With that backdrop, it is no wonder that usurious contracts are void *ab initio* and that New York law prohibits the enforcement of provisions contained therein, including class waivers:

> Plaintiff is correct that when a contract violates New York's civil usury statute, that contract is 'void ab initio.' ***When a court deems a transaction to be usurious, it must declare the transaction and its supporting documents void, enjoin prosecution on them and order that all documents and collateral be canceled and surrendered.*** The New York Court of Appeals has explained that when a loan is void for usury, the underlying transaction and supporting documents have no legal force or binding effect. ***And where the main objective of an agreement is illegal—here, providing a loan at an unlawful interest rate—courts will not sever and enforce incidental legal clauses***. Accordingly, when a contract is void ab initio, that invalidity extends even to procedural matters in the contract like a forum selection clause.
>
> ***Thus, under New York law, the class action waiver is invalid along with the rest of the contract.***

38

*Moss v. First Premier Bank*, 2:13-cv-05438, 2020 WL 160253, at *9 (E.D.N.Y. Sept. 2, 2020)

(cleaned up & emphasis added); *see also Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*,

105 A.D.3d 178, 182 (1st Dep't 2013) (finding the loan "void because it was criminally usurious

as a matter of law, and accordingly the collateral agreement is unenforceable.").

As this Court has determined that Plaintiffs have adequately pled that the MCA agreement

"function as loans" and "that the debts created by the[m] are unenforceable, 'unlawful debts'"

under the RICO statute, these form agreements (containing the purported class action waiver) are

unenforceable and void *ab initio*. *See Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 32

(2d Cir. 1997) ("A contract that is void *ab initio* is a 'nullity.'") (citations omitted).

The Class Action Waiver is unenforceable for the additional reason that Form MCA

Agreements are substantively and procedurally unconscionable. Under New York law, a contract

is unconscionable when it is "so grossly unreasonable . . . in the light of the mores and business

practices of the time and place as to be unenforceable according to its literal terms." *Saizhang*

*Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 730 (E.D.N.Y. 2017) (internal quotation

omitted).[21] Further underscoring the predominating common issues, Defendants' Form MCA

Agreements have virtually identical terms and provisions. Plaintiffs have identified at least fifteen

substantively unfair and one-sided provisions common to all of the MCA agreements at issue. [*See*

DE 28, ¶ 79.] As detailed above, the indicia of substantive unconscionability with respect to

---

[21]    Federal courts interpreting New York law have weighed procedural and substantive
unconscionability on a sliding scale; "the more questionable the meaningfulness of choice, the less
imbalance in a contract's terms should be tolerated and vice versa." *Chen-Oster v. Goldman, Sachs
& Co.*, 449 F. Supp. 3d 216, 247 (S.D.N.Y. 2020). The same courts have noted the doctrine is
"flexible" and "intended to be sensitive to the realities and nuances of the bargaining process." *Id.*
(citing *Bernadino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK), 2017 WL
7309893, at *11 (S.D.N.Y. Nov. 20, 2017)).

Defendants' Form MCA Agreements are numerous including the facts that the agreements are not signed by Defendants, do not identify a mailing address or the actual lending entity, nor do they disclose the actual amount of fees to be charged. [*See* Heskin Decl., Exs. 9-10.] These agreements are so one-sided, unfair (not to mention illusory in terms of Defendants' "obligations") that this Court should find the agreements, including the putative class action waiver, unenforceable. *See Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121-22 (2d Cir. 2010) (contract is substantively unconscionable if "so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms").

Not only is the Form Agreement *as a whole* substantively unconscionable and unenforceable for lack of mutuality, the Class Action Waiver provision is, itself, unconscionable as it states that even if a court invalidates the waiver and allows the case to go forward as a class action, a representative plaintiff "may not recover fees or costs nor may it participate in the very class action that it initiated." [*See* Form Agm't § 4.10; *see also Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 580 (Cal. App. 2007) (recognizing that since the drafters of adhesion contracts rarely utilize the class action tool to sue customers, such provisions generally lack mutuality).]

The class waiver provision in the Form MCA Agreement fails the "basic test for unconscionability," in that the parties were *not* on equal footing and the clause (indeed, the form agreement in totality) is so unilaterally one-sided that it is unconscionable under the circumstances existing when the parties made the contract. *See Szetela v. Discover Bank,* 118 Cal. Rptr. 2d 862, 867 (Ct. App. 2002) ("Although styled as a mutual prohibition on representative or class actions, it is difficult to envision the circumstances under which the provision might negatively impact

40

Discover [since] credit card companies typically do not sue their subscribers in class action lawsuits.").

Finally, procedural unconscionability concerns assent and turns on the facts surrounding the bargaining process. *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 247 (S.D.N.Y. 2020) ("The determination of whether a contract or any clause of the contract is unconscionable is a matter for the court to decide against the background of the contract's commercial setting, purpose and effect."). Here, Defendants took advantage of Plaintiffs' financial conditions to coerce hundreds of merchant borrowers into signing a contract of adhesion without discussing the material terms—*e.g.*, the true nature of the transaction, the interest and fees charged and the purported class waiver, among other things. There is no evidence to suggest that Defendants entertained *any* negotiations on *any* terms as all MCA Agreements were substantively identical and simple math shows that the "good faith estimates" Defendants relied upon in setting the fixed payments during negotiations were arbitrary and onerous. [Heskin Decl., Ex. 11, Tr. 52:18-57:9.] This desperation is borne out by the substantively unconscionable and criminally usurious terms imposed by each agreement; Plaintiffs had no choice but to accept the terms unilaterally dictated by Defendants due to their desperate financial condition and lack of bargaining power. Simply put, Plaintiffs lacked any meaningful choice or ability to negotiate the terms of the MCA agreements.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Honorable Court certify this matter as a class action under Rule 23 as well as grant all such other relief deemed equitable and just.

Dated:  September 12, 2022

**WHITE AND WILLIAMS LLP**

BY:    /s/ *Shane R. Heskin*
        Shane R. Heskin
        Alex D. Corey
        Market Street | One Liberty Place,
        Suite 1800
        Philadelphia, PA 19103-7395
        Tel: (215) 864-7000
        heskins@whiteandwilliams.com
        coreyd@whiteandwilliams.com

**WEITZ & LUXENBERG, P.C.**

BY:/s/ James J. Bilsborrow
        James J. Bilsborrow
        700 Broadway
        New York, New York 10003
        Tel: (212) 558-5000
        jbilsborrow@weitzlux.com

**BENESCH, FRIEDLANDER
COPLAN & ARONOFF LLP**

BY:/s/ David S. Almeida
        David S. Almeida
        71 S. Wacker Drive, Suite 1500
        Chicago, IL 60606
        Tel: (312) 212-4949
        dalmeida@beneschlaw.com

*Attorneys for Plaintiffs & the Classes*

42

29487740v.1