## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAYMOUNT URGENT CARE PC, ROBERT A. CLINTON, JR., INDIGO INSTALLATIONS, INC., AND CHRISTOPHER A. TURRENTINE, *individually and on behalf of all those similarly situated*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISAAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, AND YISROEL C. GETTER,<br><br>                    Defendants. | Case No. 1:22-cv-01245-JSR |

## <u>DECLARATION OF ROBERT A. CLINTON, JR.</u>

I, Robert A. Clinton, Jr., declare as follows:

1.      I am over the age of 18 years old, of sound mind, have never been convicted of a felony and am fully competent to make this declaration.  I have personal knowledge of the matters set forth in this declaration and, if called upon, could testify competently to them.

2.      I am a named plaintiff in the class action lawsuit *captioned Haymount Urgent Care PC, et al. v. Gofund Advance, LLC et al.,* currently pending before the United States District Court of the Southern District of New York and assigned Case No. 1:22-cv-01245-JSR (the "Lawsuit").

3.      I am a physician and the owner of Plaintiff Haymount Urgent Care PC ("Haymount"), which is a VA-approved urgent care practice located in Fayetteville, North Carolina.

4.      I am self-employed with as President and sole owner.

5.      Haymount provides medical services to the community of Fayetteville, North Carolina, and strives to keep its residents healthy by offering not only urgent care services but also primary care services.

6.      At the peak of the Pandemic, Haymount employed approximately 175 employees, and saw up to 2,000 patients per day.

7.      Haymount currently employs around 15 employees, and sees about 100 patients per day.

8.      As a direct result of the COVID-19 pandemic, Haymount's fund were drastically reduced as the facility had to take expensive precautionary measures to protect patients and employees.

9.      The additional expenses created by the pandemic included, but were not limited to, costs to provide testing to patients, purchasing personal protection equipment, cleaning supplies and additional cleaning and preventative materials.

10.      In addition to increased expenses, the Pandemic resulted in an increased need for medical care from individuals, many of whom could not afford it.

11.      As a result, Haymount's costs increased substantially during the Pandemic.

12.      Prior to COVID-19, the margins of Haymount were incredibly thin, and the Pandemic substantially increased the financial stresses on the Company and me personally.

13.      As a direct result of COVID-19, cash flow has been problematic due to slow payment from Health Resources and Services Administration ("HRSA"), among other factors.

14.      Before seeking financing from merchant cash advance ("MCA") companies, Haymount tried to obtain bank financing through Wells Fargo, Bank of America, and First Citizens

but could not obtain it quick enough to cover the increased expenses needed to endure the increased costs of the Pandemic.

15.     In addition to the need for quick cash, Haymount had an existing IRS tax lien.

16.     In the absence of traditional financing, Haymount was forced to turn to alternative financing in the form of MCAs.

17.     Starting in or about August 2021, I, on behalf of Haymount, entered into various loan transactions with various MCA companies, specifically:

        a.      with Merchant Capital LLC on August 25, 2021;

        b.      with GoFund Advance LLC on August 26, 2021;

        c.      with GoFund Advance LLC on September 27, 2021;

        d.      with GoFund Advance LLC on December 16, 2021;

        e.      with Funding 123, LLC on December 27, 2021; and

        f.      with GoFund Advance LLC on January 20, 2022.

18.     A true and correct copy of these agreements is annexed hereto as Exhibits 1-6.

19.     During this time period, I would receive numerous phone calls a day from various brokers and MCA companies offering Haymount financing.

20.     In order to obtain the above financing, I simply had to provide access to my bank accounts.  The bank account information I provided identified numerous other MCA agreements that I had already taken out with other MCA companies, and Defendants knew of these various other MCAs at the time of funding.

21.     In obtaining the MCA financing from Defendants, I was provided form agreements to sign.  I understood that the contracts were forms that were typically used by MCA companies. I did not attempt to negotiate any of the form provisions contained in the form agreements and did not believe that I had the ability to request changes in the form.

22.     The only terms that I believed could be negotiated were the amount of the loan, the amount of interest and fees to be paid, and the length of repayment.  These terms were typically expressed in terms of the amount to be received, the amount to be repaid, and the number of daily payments.  In addition, I understood that the payments had to be made on a daily or weekly basis and that Haymount was not allowed to miss a payment or request a reduction in payment.  To be sure, from time-to-time, Haymount had insufficient funds to cover the payments so Defendants demanded that I make payment from other accounts or other independent sources.  These demands were abusive.  At one point, I had even informed Defendants that I had contracted Covid-19, and was at home sick.  Defendants' response was effectively: sorry to hear that, now pay me.  At all relevant times, I considered the transactions with Defendants to be absolute repayable loans.  A true and correct copy of text messages with Defendants illustrating these communications is annexed as Exhibit 7.

23.     Due to the incredibly aggressive daily repayment schedules, high interest rates and fees assessed, Haymount began to experience basically a debt spiral, wherein we would have to take out another MCA in order to pay off the existing one.

24.     The terms of each MCA loan were non-negotiable in that an amount of money was advanced to Haymount and had to paid back (via daily installments) in a very short period of time.

25.     I was not aware that the loan agreements that I entered into with the MCA companies prohibited Haymount from obtaining financing from other sources.

26.     I was not aware that the MCA agreements that I entered into on behalf of Haymount with various MCA companies, including Defendants, included a class action waiver clause, a jury trial waiver clause and a prejudgment attachment waiver, among other things.  Nor do I reasonably understand what those things are.

27.     In or around February 2022, I noticed that Defendants were taking more than they were allowed to take under the contracts.  In addition, Defendants had repeatedly shorted me on the amount of funding promised, and effectively required Haymount to pay Defendants to borrow Haymount's own money.  When I complained, Defendants would routinely promise to make it up on the next deal, promising more money and longer payment terms.

28.     After shorting me for the last time, I placed a block payment on the Wells Fargo account where Defendants were debiting.  In total, from August 30, 2021, to January 20, 2022, Defendants advanced no more than $3,080,000 to Haymount, while Haymount repaid at least $4,601,407.

29.     Defendants then attempted to debit from Haymount's Bank of America account. After I placed a stop payment on that account as well, I noticed that debits continued to be attempted under the reference GoFund b.  As a result, I had to call each bank and place a stop on ACH debits containing the word GoFund.  Eventually, it worked.

30.     Defendants also had their collection agent, Alpha Recovery, send UCC lien letters to Haymount health insurance partners in order to freeze all health insurance payments.

31.     I am the guarantor who participated in, and was damaged by, Defendants' MCA loans during the class period.

32.     Since the initiation of this action, I have closely monitored the case.

33.     I have revised the various draft complaints, actively participated in the discovery process (including searching our files for responsive information and agreeing to sit for a deposition scheduled on September 14, 2022), and done everything I can to assist our lawyers and the putative class members.

34.     If the Court elects to certify a class and appoint me as a class representative, I am ready, willing and able to discharge my obligations as a class representative in this action. I declare under penalty and perjury that the foregoing is true and correct.

Executed on September 12, 2022.

                                            ____/s/ Robert A. Clinton, Jr.
                                            ROBERT A. CLINTON, JR.