## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAYMOUNT URGENT CARE PC and ROBERT A. CLINTON, JR., *individually and on behalf of all those similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISAAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, AND YISROEL C. GETTER, <br><br> Defendants. | Case No. 1:22-cv-01245-JSR |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**WHITE AND WILLIAMS LLP**
Shane R. Heskin
Alex D. Corey
7 Times Square
New York, New York  10036
Tel:  (212) 244-9500
heskins@whiteandwilliams.com
coreya@whiteandwilliams.com

**WEITZ & LUXENBERG, P.C.**
James J. Bilsborrow
700 Broadway
New York, New York 10003
Tel: (212) 558-5500
jbilsborrow@weitzlux.com

**BENESCH FRIEDLANDER COPLAN & ARONOFF LLP**
David S. Almeida
71 South Wacker Drive, Suite 1600
Chicago, Illinois  60606
Tel:  (312) 212-4949
dalmeida@beneschlaw.com

*Attorneys for Plaintiffs & Putative Class Members*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF RELEVANT FACTS .................................................................................5

I.    Defendants' Predatory Lending Organization and the Common Scheme to Defraud. ..................................................................................................................5

    A.    The RICO Enterprise is Provable Using Common Evidence. ................................5

    B.    The Enterprise Uses a Patsy to Perpetrate its Pattern of Fraud............................6

    C.    The Predatory Lending Enterprise Uses a Form MCA Agreement. .......................7

    D.    The MCA Agreements Are Procedurally and Substantively Unconscionable.........................................................................................9

    E.    Defendants Collect Upon Their Unlawful Debts Using a Common Scheme. ......................................................................................................13

II.    Representative Plaintiffs Haymount Urgent Care PC & Robert Clinton, Jr......................14

III.    The Intended Interest Rate for Each MCA Transaction is Readily Calculable. ................14

IV.    Class-Wide Damages Are Readily Calculable. .................................................................16

V.    Relevant Procedural Background. ......................................................................................16

VI.    The Claims & Proposed Class. ...........................................................................................17

ARGUMENT ...............................................................................................................................19

I.    USURY AND RICO ACTIONS ARE WELL-SUITED FOR CLASS TREATMENT. ...................................................................................................................19

II.    THE CLASSES SATISFY ALL RULE 23(a) & (b)(3) REQUIREMENTS. ...................20

    A.    The Legal and Factual Requirements to Prove RICO Liability and Damages in this Case Are Determinable on a Class-wide Basis...........................20

    B.    The Proposed Class Satisfies Rule 23(a)'s Requirements. ...................................23

        1.    The RICO Class Satisfies the Numerosity Requirement. ..........................23

        2.    There are Questions of Law and Fact Common to the Class.....................24

        3.    Plaintiffs' Claims are Typical of Those of the Class Members. ...............25

        4.    Plaintiffs and Proposed Class Counsel Will Ably Represent Class Members' Interests...................................................................................26

    C.    The Proposed Classes Satisfy Rule 23(b)(3) Requirements. ...............................28

i

1. The Unitary Predominating Issue of Whether the Form MCA Agreements are Loans Is Capable of Producing a Single Answer. ...........28

2. Resolving Virtually Identical Usury Claims Based on the Same Form Agreement on a Classwide Basis is a Superior Method of Adjudication.............................................................................................31

D. A Separate Rule 23(b)(2) Class Should Also Be Certified.................................34

III. THE CLASS IS APPROPRIATELY DEFINED & MEMBERSHIP CAN BE READILY DETERMINED BASED ON DEFENDANTS' RECORDS. ........................35

IV. THE CLASS ACTION WAIVER IS UNENFORCEABLE BECAUSE THE MCA AGREEMENTS ARE USURIOUS LOANS VOID AB INITIO. ........................36

V. THE FORM MCA AGREEMENTS ARE SUBSTANTIVELY UNCONSCIONABLE AND PROCURED IN A REPREHENSIBLE FASHION...........38

CONCLUSION.....................................................................................................................40

# TABLE OF AUTHORITIES

**CASES**                                                               **PAGE(S)**

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
   37 N.Y.3d 320 (2021) .......................................................................................15, 37

*Allegra v. Luxottica Retail N. Am.*,
   17-CV-5216 (E.D.N.Y. Dec. 13, 2021) ...........................................................................23

*American Timber & Trading Co. v. First Nat'l Bank of Oregon*,
   690 F.2d 781 (9th Cir. 1982) ..................................................................................3, 20

*Baisch v. Gallina*,
   346 F.3d 366 (2d Cir. 2003).............................................................................................31

*Band Realty Co. v North Brewster, Inc.*,
   37 N.Y.2d 460, 335 N.E.2d 316, 373 N.Y.S.2d 97 (1975)......................................15

*Bernadino v. Barnes & Noble Booksellers, Inc.*,
   No. 17-CV-04570 (LAK), 2017 WL 7309893 (S.D.N.Y. Nov. 20, 2017)..............................38

*Bistro Exec., Inc. v. Reward Network, Inc.*,
   No. CV 04-4640, 2006 WL 6849825 (C.D. Cal. Oct. 11, 2005)...........................................20

*Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*,
   105 A.D.3d 178 (1st Dep't 2013) ................................................................................31, 38

*Blue Wolf Capital Fund II, L.P. v. American Stevedoring Inc.*,
   961 N.Y.S.2d 86 (1st Dep't 2013) ..............................................................................15, 31

*Board of Trustees of the Aftra Retirement Fund v. JPMorgan Chase Bank, N.A.*,
   269 F.R.D. 340 (S.D.N.Y. 2010) ...............................................................................32, 33

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010)..............................................................................................29

*Buffington v. Prog. Advanced Ins. Co.*,
   20-CV-07408 (S.D.N.Y. Aug. 23, 2022) ...............................................................................36

*Chen-Oster v. Goldman, Sachs & Co.*,
   449 F. Supp. 3d 216 (S.D.N.Y. 2020)..........................................................................38, 40

iii

*Chester-Oster v. Goldman, Sachs & Co.*,
   325 F.R.D. 55 (S.D.N.Y. Mar. 30, 2018) ..............................................................33

*Consol. Rail Corp. v. Town of Hyde Park*,
   47 F.3d 473 (2d Cir. 1995) ....................................................................................24

*Estate of Gardner*,
   316 F.R.D. ..............................................................................................................34

*Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*,
   20-cv-5120 (LJL), 2022 WL 3536128 (S.D.N.Y. Aug. 17, 2022) .......16, 21, 22, 23

*Freitas v. Geddes Sav. & Loan*,
   63 N.Y.2d 254 (1984) ............................................................................................15

*Gatton v. T-Mobile USA, Inc.*,
   152 Cal. App. 4th 571 (Cal. App. 2007) ...............................................................39

*Gibbs v. Stinson*, 3:18cv676,
   564 U.S. 338 (2011) ........................................................................................25, 34

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) .................................................................................................18

*Haley v. Teachers Ins. & Annuity Assn of Am.*,
   17-CV-855 (S.D.N.Y. Nov. 25, 2020) ...................................................................25

*Hetchkop v. Woodlawn at Grassmere, Inc.*,
   116 F.3d 28 (2d Cir. 1997) ....................................................................................38

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004) ....................................................................................26

*Hirschfeld v. Stone*,
   193 F.R.D. 175 (S.D.N.Y. 2000) ...........................................................................27

*In re Amla Litig.*,
   282 F. Supp. 3d at 758 ...........................................................................................27

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   17 Civ. 1580, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ...........................19, 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009) ....................................................................................27

iv

*In re NASDAQ Market-Makers Antitrust Litigation*,
  172 F.R.D 119 (S.D.N.Y. 1997) ............................................................................33

*In re Nassau Cnty. Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006)..................................................................................19

*In re Petrobras Secs.*,
  862 F.3d 250 (2d Cir. 2017)..............................................................................34, 35

*In re Signet Jewelers Ltd.*,
  No. 16 Civ. 6728 (S.D.N.Y. July 10, 2019).........................................................36

*Kelen v. World Fin. Network Nat'l Bank*,
  295 F.R.D. 87 (S.D.N.Y. 2013) ............................................................................27

*Labbate-D'Alauro v.* GC *Servs Ltd. P'ship*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996) ...................32

*Lemire v. Wolpoff & Abramson. LLP*,
  256 F.R.D. 321 (D. Conn. 2009)..........................................................................26

*Madden v. Midland Funding, LLC*,
  237 F. Supp. 3d 130 (S.D.N.Y. 2017)......................................................27, 30, 37

*Marisol A. v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997)..................................................................................19

*Moore v. Comrnfed Sav. Bank*,
  908 F.2d 834 (11th Cir. 1990) ..............................................................................20

*Moss v. First Premier Bank*,
  2:13-cv-05438, 2020 WL 160253 (E.D.N.Y. Sept. 2, 2020)................................38

*Purdie v. Ace Cash Express, Inc.*,
  3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547 (N.D. Tex. Dec. 11, 2003) ........30

*Ragone v. Atl. Video at Manhattan Ctr.*,
  595 F.3d 115 (2d Cir. 2010)..................................................................................39

*Roper v. Consurve, Inc.*,
  578 F.2d 1106 (5th Cir. 1978) ..............................................................................20

*Saizhang Guan v. Uber Techs., Inc.*,
  236 F. Supp. 3d 711 (E.D.N.Y. 2017) ..................................................................38

v

*Seijas v. Republic of Arg.*,
606 F.3d 53 (2d Cir. 2010)............................................................................32

*Sukhnandan v. Royal Health Care of Long Island LLC*,
12cv4216, 2014 WL 3778173 (S.D.N.Y. July 31, 2014) ......................................18

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015)....................................................................... *passim*

*Szetela v. Discover Bank*,
118 Cal. Rptr. 2d 862 (Ct. App. 2002) ...........................................................40

*Trs. of Plumbers & Pipefitters Nat. Pens. Fund v. Transworld Mech., Inc.*,
886 F. Supp. 1134 (S.D.N.Y. 1995)..................................................................22

*United States v. Moseley*,
980 F.3d 9 (2d Cir. 2020)..............................................................................21

*Upshaw v. Ga. Catalog Sales, Inc.*,
206 F.R.D. 694 (M.D. Ga. 2002) ....................................................................30

*Williams v. Big Picture Loans, LLC*,
339 F.R.D. 46 (E.D. Va. 2021) ...............................................................20, 30

## S<span>TATUTES</span>

18 U.S.C. § 1962 ............................................................................... *passim*

FDCPA..........................................................................................................29

N.Y. Penal L. § 190.40 ..................................................................................22

New York Judiciary Law § 487 § 349 ............................................................29

UCC ...............................................................................................4, 6, 14

## O<span>THER</span> A<span>UTHORITIES</span>

F<span>ED</span>.R.C<span>IV</span>.P. 23 ................................................................................... *passim*

## PRELIMINARY STATEMENT

America's small businesses serve a critical role in our nation's economy, employing nearly half of all private-sector workers and creating nearly two-thirds of new jobs. Yet a small business credit gap has developed wherein access to capital—particularly for historically underrepresented entrepreneurs, including people of color, rural borrowers, women and veterans—is a significant problem. While traditional lending has not returned to pre-2008 recession levels (and, given the COVID-19 pandemic, likely will not for some time, if ever), a new market of alternative lenders has surfaced purporting to offer alternative financing opportunities in the form of merchant cash advances ("MCAs"). This new market is essentially unregulated, leaving often desperate small business borrowers vulnerable to predatory practices from unscrupulous lenders.

MCA companies provide capital in exchange for an absolute obligation to repay the money in predetermined, fixed intervals over a short period of time or—in other words—a loan. Small business owners who take out MCAs sign standardized, non-negotiable contracts of adhesion designed to obscure the true nature of the transactions, including the usurious interest rates, outrageous fees and numerous other onerous provisions, including prejudgment attachments and class action waivers. These predatory products place an incredible stress on small businesses, ruining their finances and forcing many of them to close their doors and to lay off their employees, often costing them their businesses, their healthcare and their livelihoods.

This action seeks to scrutinize the ongoing use of particularly egregious MCAs by a group of entities and individuals that have preyed on and imperiled small businesses and individuals for years by falsely claiming to purchase their future receivables in exchange for upfront, lump-sum

1

payments under completely one-sided MCA agreements that obscure the fact that the transactions are usurious loans with interest rates often exceeding 500%.

Plaintiffs Haymount Urgent Care PC, a VA-approved urgent care practice in Fayetteville, North Carolina ("Haymount"), and its owner Robert A. Clinton, Jr. (collectively, "Plaintiffs")— and hundreds, if not thousands, of similarly situated entities and individuals—have been victimized by the same fraudulent scheme orchestrated by the Enterprise, comprised of Yitzchok Wolf, Josef Brezel, and Joseph Kroen (the "Culpable Persons"), while setting up a then-twenty-three year old, high school dropout, Yisroel Getter, to be the patsy when the scheme is inevitably exposed ("Individual Defendants"). Although disguising their ownership on paper through Getter, the Culpable Persons own, operate and control GoFund Advance, LLC ("GFA"), Funding 123, LLC, Merchant Capital LLC and Alpha Recovery Partners LLC to collect upon unlawful debts and otherwise fraudulently obtain funds from Plaintiffs and the putative class members through boilerplate MCA agreements, not to mention illicit collection measures, including the filing of a knowingly false affidavit with this Court at the express direction of Wolf.

Defendants perpetrate their predatory lending scheme through virtually identical, form MCA Agreements which are, simply put, the epitome of unconscionability. The evidence adduced to date shows that not a single MCA Agreement identifies the actual entity funding the loan, nor is a single agreement signed by the putative funder. Moreover, not a single agreement identifies a physical address or phone number for the MCA company ostensibly funding the transaction, which is significant because the agreements specify that the merchants must send any required notice via registered mail, which "shall become effective only upon receipt" by the MCA company. The failure to disclose the true lender also permits Defendants to play a shell game with borrowers by

2

pretending to provide better payment terms through different entities—as happened with Haymount. The outrageous payment terms dictated also demonstrate the sheer desperation of merchants and the unfair bargaining power inherent in these transactions. And, for those struggling under the immense weight of these transactions, there is little recourse to attempt to modify the loan using a reconciliation provision, which this Court has observed is "impossible to use and leaves the lender with substantial discretion to prevent adjustment."

The form MCA Agreements also allow Defendants to extort unconscionable and baseless fees from their victims by blindsiding them with the amount of fees on the day of funding. Rather than disclosing the precise fees being charged upfront in writing, Defendants bury a range of fees on the last page of their agreement in fine print; for instance, the range of fees in just one agreement with Haymount ranges from $1,000 to $440,000. As a result, victims only learn the amount of fees being charged on the day of funding or when the amount deposited in their account is significantly less than expected. Understandably desperate to obtain the money they were promised, their victims have no choice but to capitulate. And when challenged, as in this case, Defendants brazenly file knowingly false and/or forged affidavits with courts.

This case is manifestly appropriate for class certification. To begin, Plaintiffs seek to certify a single class of similarly situated persons defined as "[a]ll persons in the United States who, on or after February 11, 2018, paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent." First, according to Defendants' own records, hundreds, and perhaps thousands, of companies (and a greater number of guarantors) comprise the proposed Class, making joinder of all members wholly impracticable. Second, numerous questions of law and fact are common to the proposed class and unquestionably

3

predominate over any individual issues. Indeed, the dominating question in this litigation is whether Defendants' form MCA agreement is intended to operate as a usurious loan in violation of New York law. Numerous courts have rightfully found that such a unitary, predominating common issue suffices for purposes of class certification. Third, the claims and defenses of the proposed class representatives are typical of those of the class members. Plaintiffs each signed form documents that were substantially similar in all material respects to those executed by *all* companies and guarantors victimized by Defendants' scheme. Fourth, representative Plaintiffs and their counsel will ably protect and represent the interests of the class. Plaintiffs' interests are aligned with other class members in that they all took usurious loans from Defendants (or guaranteed such loans), have actively participated in the litigation and have the incentive to pursue their representative claims vigorously. Finally, class certification provides a superior method for adjudicating the virtually identical claims possessed by Plaintiffs and those similarly situated. Although some transactions amount to thousands or tens of thousands of dollars in illegal interest, Plaintiffs and putative class members are struggling small businesses throughout the country for which it would be impractical to bring individual actions against these well-funded Defendants, particularly so when Defendants will not hesitate to freeze bank accounts (through forgeries), send UCC lien letters to their clients and otherwise make it impossible to run their businesses. Faced with the choice between litigating their claims against extremely litigious MCA companies desperate to protect their "cash cow," most victims of Defendants' predatory lending scheme understandably will not initiate litigation despite the strength of their claims. Class treatment is also superior because, without it, repetitive litigation is certain to occur as Defendants are aggressively pursuing collection efforts against borrowers and guarantors across the country.

4

Finally, in addition to satisfying all Rule 23 requirements, class certification is warranted for the fundamental reason that Defendants' predatory, opportunistic and usurious lending practices should be reviewed by a single court for legality. Defendants brazenly masquerade as legitimate businesses, but predatory lending at rates far exceeding the allowable statutory amounts is an evil with no countervailing societal benefit. Whether or not Defendants' MCA program constitutes illegal loans is a merits question for another day but—for the reasons set forth herein— that question should be answered on a class-wide basis for all the companies and individuals whose businesses and lives have been forever upended by Defendants' avaricious scheme.

## STATEMENT OF RELEVANT FACTS[1]

**I.    Defendants' Predatory Lending Organization and the Common Scheme to Defraud.**

**A.    The RICO Enterprise is Provable Using Common Evidence.**

Defendants GFA, Funding 123 and Merchant Capital are mere shell companies whose sole purpose is to provide a front for the Enterprise's loansharking business. Each of these companies is a purported subsidiary of Hartford Receivables, LLC ("Hartford"), which on paper is owned by a scapegoat, Getter. Defendants all admit that, despite its paper form, Hartford is controlled by Wolf. [*See* Declaration of Shane Heskin ("Heskin Decl."), Ex. 11, Brezel Tr. at 33:1-35:24.] Brezel controls a separate entity, GSS Equity, LLC ("GSS"), through which he funds MCA agreements executed by GFA, Merchant Capital and a d/b/a called Eleven Capital. [*Id.* at 40:1-11.]  Kroen

---

[1]    Discovery ends on September 28, 2022. [DE 100, ¶ D.6.] Defendants' document production is ongoing. [Heskin Decl., ¶ 76] Thus, the factual background presented herein is necessarily based on the discovery taken to date. That said, the evidence adduced thus far (as summarized herein and in the Heskin Decl.) establishes that all of the Rule 23(a) and (b) requirements are satisfied.

owns the entities Matrix Advance, LLC and Fundura Capital, LLC and funds agreements through purported d/b/a's of Hartford. [*See id.* at 16:1-18:24 & 37:1-24.]

Alpha Recovery is a d/b/a of GSS. [*See id.*, Ex. 18, Gold Tr. at 22:16-24:19.] Alpha is the collection arm of the Enterprise and, among other things, sends UCC lien notices—including to Plaintiffs—at the direction of the Culpable Persons. [Heskin Decl., ¶¶ 57-59.] In order to do so, Alpha uses pre-signed form letters of an attorney who does not review the letters before they go out under her name. [*See* Gold Tr. at 10:15-11:10, 13:19-17:2 & 50:15-54:20.] The Enterprise pays the attorney $2,500/month merely for the use of her signature. [*Id.*]

The Enterprise operates out of Brooklyn and shares office space, accounting systems, ACH processors, office staff, attorneys, investors and collection arms. [*See* Heskin Decl., Ex. 4, Wolf Tr. at 34:8-36:20.] The Individual Defendants all take direction from Johnathan Braun. [*See id.* at 26:21-27:24, 36:4-7, 60:10-17.] Defendants, as well as Braun, all utilize the same attorney for collecting upon their unlawful debts. [*See* Heskin Decl., Ex. 17, Alfin Tr. at 45:15-46:2 (admitting that Braun is an agent of Defendants and all work together).][2] Plaintiffs can establish through common proof that Defendants are a RICO Enterprise that is associated in-fact through a closely held relationship with each member playing a defined role.  [*See* Heskin Decl., Ex. 26.]

**B.**     **The Enterprise Uses a Patsy to Perpetrate its Pattern of Fraud.**

Wolf and Brezel are cousins of Braun. Kroen and Braun are longtime friends. In or around June 2022, Braun handpicked Getter to join the Enterprise. [*See* Heskin Decl., Ex. 34, Getter Tr.

---

[2]     As Bloomberg News recently reported, the Individual Defendants run a loansharking scheme out of Brooklyn at the direction of Braun, a convicted drug trafficker who had his federal prison sentence commuted by former President Trump. [DE 28-1 & 28-2.] The Individual Defendants are Braun's relatives or longtime friends. [*See* Brezel Tr. at 112:12-15.]

at 36:13-38:2; Ex. 35, Kroen Tr. at 27:17-24.] Getter takes instruction from Wolf and Braun. [*Id.*, Getter Tr. at 29:18-23 & 36:13-38:2.] Getter testified that Jared Alfin, the Enterprise's attorney, filed numerous Affidavits of Debts that contained his forged signature to collect upon the Enterprise's unlawful debts. [*Id.* at 154:17-171:10.] Getter never read any of the MCA Agreements at issue prior to this litigation and stated that he had no personal knowledge of many of the affidavits that contained his forged signature. [*Id.* at 33:8-15, 154:17-171:10.] Getter admitted that he had no personal knowledge of the alleged events of defaults contained in the forged affidavits. [*Id.* at 143:5-147:26.] Getter also admitted that he never authorized Alfin to file the forged affidavits. [*Id.* at 130:16-132:21 & 160:25-161:5.] Getter stated that he never authorized Alfin to file Certificates of Incorporation for Funding 123, GoFund, and Merchant Capital, which name his company Hartford Receivables as sole owner. [*Id.* at 130:16-132:21.] Rather, Getter testified that Kroen orchestrated the entire scheme. [*Id.* at 167:2-10.] Getter testified that Harford Receivables has no employees at all, let alone any who work out of Connecticut. [*Id.* at 136:5-13.][3]

## C.    The Predatory Lending Enterprise Uses a Form MCA Agreement.

To perpetrate their predatory lending scheme, the Enterprise utilizes standard form MCA Agreements that have virtually identical material terms and provisions. [*See* Heskin Decl., Exs. 9-10.]  In its recent Order denying, in part, Defendants' motion to dismiss, this Court thoroughly

---

[3]      Getter also admitted that Wolf instructed him to file a knowingly false affidavit with this Court. Specifically, Wolf instructed Getter to sign docket entry 58 in this case, falsely representing to this Court that the fees negotiated with Haymount were $400,000 in order to deceive this Court into concluding that Defendants did not over-debit Haymount's account. [*Id.* at 42:17-50:3, 93:22-98:21.] Thus, although the evidence establishes that the fees charged were "only" $300,000, Wolf instructed Getter to lie to this Court. [*Id.* at 93:22-98:21.] To this day, Defendants have not corrected the record or retracted the knowingly false affidavit submitted to this Court.

analyzed the form MCA Agreement concluding that the agreement operates like "a standard, high-interest loan" imposing an implied interest rate that is usurious and illegal under New York law. [*See* DE 86, Order at 3 n.2 & 16-20 (analyzing the MCA transactions based on a GFA Agreement "since that is the most common form agreement in the case").]

The evidence adduced to date demonstrates that substantially similar agreements were executed with all members of the class during the class period, February 11, 2018 through present. [Heskin Decl., ¶¶ 32-35.] To date,[4] Defendants have produced hundreds of MCA agreements that are substantially similar in all material respects; the only differences among the agreements are the amount advanced, the amount to be repaid and the number of days or weeks borrowers have to repay. [*See* James Bilsborrow Decl. ("Bilsborrow Decl."), ¶ 19 & Ex. A.][5]

Defendants' corporate designee testified the form MCA Agreement was *not* negotiated in any fashion but rather was presented to each merchant borrower in a "take it or leave it" fashion. [Heskin Decl., Ex. 11, Brezel Tr. at 52:18-57:9.] Notably, borrower requests for revisions were "rare" and Defendants' allowance of a change was "even rarer." [*Id.*] Defendants' corporate designee could not identify a single material term that varied across the MCA Agreements. [*Id.*][6]

---

[4]     On August 2, 2022, this Court ordered Defendants to produce all MCA Agreements dating back to February 11, 2018. As of the date of this filing, defense counsel has not provided all agreements nor have they certified that all agreements have been produced. [Heskin Decl., ¶ 76.]

[5]     The form MCA Agreements used prior to 2021 do not contain the Connecticut Prejudgment Attachment Waiver but they are intended to operate similarly in all material respects. [*See, e.g.*, Heskin Decl., Ex. 10 at GOFUND_000025118-26.]

[6]     While the form agreement uses terms such as "sale" and "purchase," the transactions have *none* of the hallmarks of a sale and *all* of the hallmarks of loans (most notably, no transfer of risk) that charge interest rates in excess of New York's criminal usury cap of 25%. [DE 86 at 19-20.]

**D.      The MCA Agreements Are Procedurally and Substantively Unconscionable.**

The Form MCA Agreements have virtually identical terms and provisions. [*See* Heskin Decl., Exs. 9-10; *see also* DE 28, Am. Compl., ¶¶ 77-86 (listing the substantive terms common to all known MCA agreements).] There are numerous other provisions that further demonstrate the abject unconscionability of Defendants' MCA Agreements. First, not a single MCA Agreement identifies the entity funding the loan. [*See* Heskin Decl., Exs. 9-10.] Second, not a single MCA Agreement is actually signed by Defendants; that is, while they are quick to point out that Plaintiff Clinton auto-signed the various MCA agreements on behalf of Haymount (and as guarantor), Defendants have *not* bound themselves to any of the terms, provisions or requirements of their illegal transactions. [*See id.*][7] Third, not a single MCA Agreement identifies a physical address or phone number for the MCA company purportedly funding the transaction. [*See id.*] In addition to their obligations being illusory, Defendants' failure to sign the agreements or to provide an actual address is significant because § 4.3 requires that all notices "shall be delivered by certified mail, return receipt requested" and that notices to the MCA "shall become effective only upon receipt" by the MCA, yet notices to the Merchant, including service of process, "shall become effective three days after mailing." [*See id.*.] It is impossible for the Merchant to provide notice, yet notice is deemed effective on the Merchant upon mere mailing. This one-sided notice provision is significant because the evidence shows that at least 20% of the prejudgment attachment notice are never delivered to the merchant. [*See* Heskin Decl., Ex. 16, Marshal Ostrowski Tr. at 91:1-23]

---

[7]      Plaintiffs provide several exemplar agreements memorializing the MCA transactions at issue. [*See* Heskin Decl., Exs. 9-10.] Notably, not a single form MCA Agreement is actually signed by any Defendant, corporate or individual. [*See id.*]

9

Defendants' failure to identify the true lender and to provide a physical address or phone number is also procedurally unconscionable for the very reasons exemplified by Plaintiffs and those already challenged by the FTC and NYAG. [*See* Heskin Decl., ¶ 24, & DE 28-7 & 28-8.] Both regulatory bodies have sought to stop the procedurally unconscionable practices that Defendants engage in here. Among these unconscionable practices is the failure to conspicuously disclose the specific fees charged. [*Id.*, Ex. 12.] Defendants, of course, do not disclose the way in which they actually fund these loans because they will "short-fund" the anticipated funding amount (typically by half) until the borrower repays the first installment and then lend the borrower's money back to them for subsequent installments of the same loan. [*Id.*, Ex. 6 at GOFUND_000010891-904.] Nor do they mention how the first-time merchants find out the actual fees charged is when the funds hit their account. [Heskin Decl. ¶¶ 38-41.][8]

Even worse, Defendants all use fake names so their victims never know the actual name of who to contact. [*See id.*, Ex. 34, Getter Tr. at 118:17-119:6.] On top of using fake names and various d/b/a's, Defendants also use so-called burner phones to disguise the number of the caller. [*Id.* at 31:6-32:18, 57:16-58:11.] Thus, when a merchant is blind-sided by the fees charged and/or the amount shorted, the only contact they have is (i) a fake cell phone number (ii) associated with

---

[8]     Or, as the Attorney General put it in her Verified Petition against numerous other MCA companies and a cast of individual defendants including Braun, "Respondents regularly defraud the merchants to whom they loan money. They issue loans in smaller amounts than promised and withdraw more money from merchants' bank accounts than the merchants agree to pay. They advertise merchant cash advances with no upfront fees, only to require merchants to pay upfront fees in their agreements. They then charge merchants these fees – which do not relate to any expense or labor of Respondents but are simply more profit for them – in amounts even higher than disclosed." [DE 28-8 (NYAG Compl.) ¶12 &  ¶¶99-103 (detailing unconscionable tactics); DE 28-7 (FTC Compl.), ¶ 20 *compare with* Heskin Decl. Ex. 12 (undisclosed fees).]

a fake name (iii) for a fake lender; and (iv) a fake email address that the purported owner does not even know about. [*Id.* at 111:11-112:6.] To put it mildly, Defendants' scheme is calculated chaos; So much so that Defendants themselves do not know how to identify which contract is associated with which company. [*Id.* at 31:6-14, 97:23-98:4.]

The failure to disclose the true lender behind the transactions also permits the Enterprise to play a shell game with borrowers by pretending to provide better payment terms through different entities—as with Haymount. [Heskin Decl., Ex. 11, Brezel Tr. at 18:16-28:1, 74:7-14, 160:5-163:13 & 178:12-18.] As demonstrated by text messages with Clinton, Defendants played Haymount off each other by negotiating terms under Funding 123 but then called under a different name, GFA, to offer what appeared to be better terms—when, in fact, they were one and the same lender. [Heskin Decl., Ex. 20.][9]

The outrageous financial terms dictated by the Enterprise also evidence the sheer desperation of merchants and the abjectly unfair bargaining power inherent in these transactions. [*See* Heskin Decl., Ex. 6 at GOFUND_000010891-904.] To further trap their victims, the Enterprise includes an "anti-stacking" clause in the agreements prohibiting the merchant from taking out financing with any other company. [*Id.*, Ex. 9, § 3.1(i).] But Defendants use so many fake d/b/a's that merchants would not even know if they are related to Defendants. [*See* Brezel Tr. at 18:16-28:1, 74:7-14, 160:5-163:13 & 178:12-18.] Moreover, Defendants intentionally stack themselves *and* other MCAs to the point where Defendants are knowingly taking more per month

---

[9]    Incidentally, while Haymount thought he was texting with a person named "Rob," he was texting a female named Sarah Beityakov, who works for Alt Source Capital, a d/b/a of Bridge Funding Cap, which in turn, is owned by Wolf. [*See, e.g.*, Getter Tr. at 23:23-24:6.] In other words, the circle all comes back to Wolf and his Enterprise.

11

than the merchant has in receivables. For example, in Haymount, Defendants' own underwriting revealed that Haymount had existing IRS tax liens. [*Id.*, Ex. 13 at GOFUND_000019975-979]. Defendants also knew that average monthly receivables was no more than $2.1 million. [*Id.*] The daily payments for just the two agreements from GFA and Funding 123 took $35,000 and $80,000 per day. [*Id.*, Ex. 9.] That means that for just those two agreements alone Defendants were taking $2,530,000 per month ($115,000 x 22). But Defendants also knew that Haymount had over $950,000 per month in other advances. [*Id*, Ex. 13 at GOFUND_000019975-979.] Defendants clearly understood that Haymount was encumbering daily withdrawals under the MCA Agreements that were far beyond its daily receivables.

In addition to the many, many ways that these agreements are substantively and procedurally unconscionable, Defendants try to insulate all of their actions from judicial review by including a purported class action waiver:

> 4.11 **CLASS ACTION WAIVER.** The parties hereto waive any right to assert any claims against the other party as a representative or member in any class or representative action, **except where such waiver is prohibited by law as against public policy**. To the extent either party is permitted by law or court of law to proceed with a class or representative action against the other, the parties hereby agree that: (1) the prevailing party shall not be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action . . . and (2) the party who initiates or participates as a member of the class will not submit a claim or otherwise participate in any recovery secured through the class or representative action.

[Heskin Decl., Ex. 9, § 4.11 (emphasis added).] Given that Defendants solicit and enter into thousands of MCA agreements, a purported waiver of these borrowers' right to bring a lawsuit in

a representative capacity virtually ensures that each borrower is unable to individually challenge the MCA agreements which often—by design—leave borrowers in a worse financial position.

   **E.     Defendants Collect Upon Their Unlawful Debts Using a Common Scheme.**

   In order to collect on their unlawful, usurious loans, Defendants subject merchants to a torrent of harassment, insults, abuse and threats. [*See* Heskin Decl., Ex. 8.]  When verbal threats do not suffice, Defendants employ certain artifices buried in their form MCA agreements including a prejudgment attachment waiver under Conn. Gen. St. § 52-278. [*See id.*, Ex. 9 § 4.13.] Defendants use Hassett & George, PPLC, a Connecticut law firm, to freeze the out-of-state bank accounts of their victims and then extort a settlement under duress. [*Id.*, Ex. 17, Alfin Tr. at 127:15-129:7.] Jared Alfin, a Partner at Hassett & George testified that this extortion tactic is successful 85-90% of the time. [*Id.* at 51:9-53:23.] Indeed, Kroen admitted that Alfin is the "most effective" way to get a merchant to settle because he freezes their bank account. [*Id.*, Ex. 35, Kroen Tr. at 72:10-73:4.] Defendants, through their common attorney, hand-serve a bank branch in Connecticut and then wait anywhere from several days to several weeks to serve their victims. [Heskin Decl., ¶¶ 47-49.] Defendants improperly serve the Connecticut Secretary of State for individuals and businesses that do not do business in Connecticut. [*Id.*] The result is that victims' bank accounts are frozen without receiving notice or service and the only way to obtain a release of those frozen accounts is to capitulate to the extortionate demands of the Enterprise. [*Id.*]  Incredibly, Alfin's collection mill uses forged and knowingly false affidavits of the Individual Defendants who have never even read their own agreements, let alone reviewed their affidavits before signing them. [*See* Heskin Decl., Ex. 34, Getter Tr., at 143:5-171:10, and Ex. 35, Kroen Tr., at 124:12-129:9 ].

## II.      Representative Plaintiffs Haymount Urgent Care PC & Robert Clinton, Jr.

Dr. Robert A. Clinton, Jr. is a physician and the owner of Haymount Urgent Care PC, which is a VA-approved urgent care practice in Fayetteville, North Carolina. [*See* Declaration of Robert A. Clinton, Jr. ("Clinton Decl."), ¶ 3.] As a result of the pandemic, Haymount's cash flow was greatly reduced as it was forced to take expensive precautionary measures to protect its patients and employees. [*Id.*, ¶¶ 8-11.] Under this cloud of economic duress, Haymount entered into a series of MCA Agreements with Defendants. [*Id.*, ¶¶ 16-17.]

The amounts of money that Defendants were willing to loan Haymount were *not* based on what its future receivables were estimated to be *nor* the creditworthiness of the third parties who were to pay those receivables. For instance, the December 16, 2021 MCA Agreement with GFA "estimated" that 45% of Haymount's daily revenue was $35,000 but a MCA Agreement entered into on December 27, 2021 with Funding 123 estimated that 45% of its daily revenues was $80,000. [*See id.*, Ex. 4.] All in, and in order to pay off this debt spiral, Haymount entered into six MCA Agreements with Defendants, with each subsequent agreement necessary to pay off the prior usurious loan. [*See id.*, ¶ 17.] The simple interest rate for these six transactions are at least: 248.8%, 228.2%, 416.1%, 226.9%, 332.9%, and 449.3%. [Lunden Report, Ex. A.] When Haymount refused to pay these exorbitant fees and usurious interest, Defendants unleashed their collection arm, Alpha Recovery to freeze all health insurance payments by sending UCC lien letters. [Clinton Decl, ¶ 30.] In total, from August 30, 2021 to January 20, 2022, Defendants advanced Haymount no more than $3,080,000 and Haymount ultimately repaid at least $4,601,407. [*Id.*, ¶ 28.]

## III.      The Intended Interest Rate for Each MCA Transaction is Readily Calculable.

The applicable interest rate is a simple mathematical equation that has been endorsed by

14

New York's highest court. *See Blue Wolf Capital Fund II, L.P. v. American Stevedoring Inc.*, 961 N.Y.S.2d 86 (1st Dep't 2013) (citing *Band Realty Co. v North Brewster, Inc.*, 37 N.Y.2d 460, 462, 335 N.E.2d 316, 373 N.Y.S.2d 97 (1975)). Although the Court may manually calculate the applicable interest rate on its own, Plaintiffs' expert, Charles Lunden, has created a variable template that automatically calculates the interest rate by simply entering the relevant data points such as the amount advanced, the amount to be repaid and the number of days or weeks. [*See* Heskin Decl., Ex. 30, at 2 (the "Lunden Report").] These relevant data points are readily ascertainable by not only the face of the agreement but also the internal funding sheets of the Enterprise, which expressly identifies the intended terms of the loans. [*See* Heskin Decl., Ex. 15.]

As held by New York's highest court in *Adar Bays, LLC v. GeneSYS ID, Inc*., 37 N.Y.3d 320 (2021), it is the intent of the parties at the time of contracting that determines usurious intent, and if the underwriting at the time proves that the parties intended to extract a usurious rate of return, then the agreement is criminally usurious. Here, the face of the agreements and internal documents prove that Defendants intended to exact usurious interest at the time of contracting. *See Freitas v. Geddes Sav. & Loan*, 63 N.Y.2d 254 (1984) ("It has been properly observed: '[I]f the note or bond shows a rate of interest higher than the statutory lawful rate, it would be immaterial whether the lender actually intended to violate the law. His intent would be conclusively presumed.'"). Plaintiffs have examined the MCA Agreements produced thus far using this simple mathmatical formula, ***and every agreement imposes an implied interest rate far above 25%, with many exceeding 500%***. [*See* Bilsborrow Decl., ¶ 19 & Ex. A.] In other words, usurious intent is not even a close call; it will be easily established, and as this Court noted in its prior decision, Defendants did not even attempt to contest the calculation. [DE 86 at 19.]

15

## IV.    Class-Wide Damages Are Readily Calculable.

Once usurious intent is established through simple mathematical calculations and other common evidence of usurious intent (such as the Enterprise's extortionate collection tactics and demands for absolute repayment), the damages are readily calculated on a class-wide basis. It is an even easier equation; it is simply the amount paid minus the amount received. *See Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 20-cv-5120 (LJL), 2022 WL 3536128 (S.D.N.Y. Aug. 17, 2022). These amounts are ascertainable from Defendants' own produced records and can be incorporated into Plaintiffs' expert report to calculate classwide damages. [Heskin Decl., Ex. 33.]

## V.    Relevant Procedural Background.

Plaintiffs Haymount and Clinton initiated this lawsuit action on February 14, 2022, alleging causes of action against Defendants for (i) RICO violations pursuant to 18 U.S.C. § 1962; (ii) RICO conspiracy pursuant to 18 U.S.C. § 1962(d) and (iii) declaratory relief. [DE 1.] On March 10, 2022, Plaintiffs amended their complaint to include new representative parties and additional Defendants, additional factual allegations and new Fourth, Fifth and Sixth Causes of Action for fraud, breach of contract and due process violations, respectively. [*See generally* DE 28.]

On March 31, 2022, Defendants moved to dismiss the Amended Complaint. [DE 68.] On June 27, 2022, this Court issued its Opinion and Order denying most of Defendants' motion to dismiss. [DE 86.][10]  Significantly, this Court ruled that "the motion is denied with respect to the

---

[10]    This Court granted the motion to dismiss with respect to (i) Plaintiffs' claim for declaratory judgment that the MCA agreements are void *ab initio*; (ii) the fraud claim, except with respect to GFA concerning fraudulent ACH withdrawals and (iii) the declaratory judgment claim concerning the validity of the settlement between former plaintiff Indigo and Defendants other than GFA. [*See id.* at 37.] As Indigo's and Turrentine's claims have been dismissed without prejudice, [DE 132], the declaratory judgment and 1983 claims are withdrawn.

substantive and conspiratorial RICO claims." [*Id*. at 37.] In so doing, this Court expressly considered—and firmly rejected—Defendants' arguments that the RICO unlawful debt claim should be dismissed because the MCA Agreements are not loans. [*Id*. at 10-20 (recognizing that "the implied interest rates of these agreements far exceed the cap in applicable New York usury law" and noting that many of the factors advanced by Defendants weigh in favor of Plaintiffs).] The Court further noted that the reconciliation provisions "makes it often impossible to use and leaves the lender with substantial discretion to prevent adjustment." [*Id*. at 15-16 ("[W]hether the purported MCA purchaser actually bears the risk of a revenue shortfall or if the agreement is structured to ensure an 'absolute payment obligation.'" (citations omitted).] After extensive analysis, this Court held that "the Complaint has adequately pled that the MCA agreements []functions as loans," and that Plaintiffs have "pled that the debts created by the MCA agreements at issue are unenforceable, 'unlawful debts' under the RICO statute." [*Id*. at 19.]

## VI.   The Claims & Proposed Class.

Plaintiffs assert counts I and II individually and on behalf of the "RICO Class" of similarly situated persons defined as "[a]ll persons in the United States who, on or after February 11, 2018, paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent." [DE 28, Am. Compl., ¶ 218.] Thus, further to this Court's orders, the remaining individual and class claims are:

| COUNT | Plaintiff(s) | Defendant(s) | Class or Individual |
|---|---|---|---|
| 1. RICO (Unlawful debt) (Mail fraud) | CLINTON HAYMOUNT | Individual Defendants | Class, on behalf of the RICO Class |
| 2. RICO (Conspiracy) | CLINTON HAYMOUNT | Corporate Defendants | Class, on behalf of the RICO Class |
| 4. Fraud | CLINTON HAYMOUNT | GoFund Advance | Individual |

17

| 5. Breach of Contract (in the alternative) | CLINTON HAYMOUNT | All Defendants | Individual |

## STANDARD

"Class actions serve an important function in our system of civil justice" because they afford a single forum to litigate the same or similar claims, and provide an indispensable mechanism to conserve judicial resources. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981); *Sukhnandan v. Royal Health Care of Long Island LLC*, 12cv4216, 2014 WL 3778173, at *23 (S.D.N.Y. July 31, 2014) ("Moreover, class actions are an invaluable safeguard for public rights.") (citation omitted). To maintain a suit as a class action, a plaintiff must demonstrate, by a preponderance of the evidence, that (i) the class is so numerous that joinder of all members is impracticable; (ii) there are questions of law or fact common to the class; (iii) the claims or defenses of the representative parties are typical of the claims or defenses of the class and (iv) the representative parties will fairly and adequately protect the interests of the class. *See* FED.R.CIV.P. 23(a); *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80-81 (2d Cir. 2015) (affirming certification of debtor classes involving sham affidavits and fictitious service).

Federal Rule 23(b) provides additional requirements for a district court to consider prior to certification of a class. Rule 23(b)(2) allows plaintiffs to seek injunctive and equitable relief where the misconduct to be enjoined applies to all class members and such relief will benefit the class overall. *See* FED.R.CIV.P. 23(b)(2); *see also Sykes*, 780 F.3d at 97. Plaintiffs seeking monetary damages must satisfy Rule 23(b)(3) by demonstrating that questions of law or fact common to the members of the proposed class "predominate over any questions affecting only individual members" and that a class resolution is "superior to other available methods for fairly and

18

efficiently adjudicating the controversy." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006); *see also Sykes*, 780 F.3d at 80-81.

Consistent with its "general preference [] for granting rather than denying class certification," the Second Circuit instructs that any doubt as to the propriety of certification should be resolved in favor of certifying the class because denial will almost certainly terminate the action and be detrimental to the class members. *See, e.g., Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). Thus, "[i]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 17 Civ. 1580, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020).

## ARGUMENT

## I.   USURY AND RICO ACTIONS ARE WELL-SUITED FOR CLASS TREATMENT.

To begin, courts have consistently endorsed the use of the class action mechanism to resolve claims predicated on RICO and/or various states' usury laws. For example, in *Gibbs v. Stinson*, plaintiffs filed a class action lawsuit challenging defendants' unlawful lending operation which involved loans made through tribal entities at exorbitant interest rates. [*See* Heskin Decl., Ex. 31 (3:18cv676, at *1 (E.D. Va. Oct. 14, 2021))]. As here, plaintiffs in *Gibbs* sought declaratory and injunctive relief, damages and attorney's fees and costs based on violation of RICO. *Id.* at *4. The Court found the Rule 23(a) and (b)(3) requirements met because, among other reasons, "the class claims encompass the same essential factual and legal issues. The central issue before the Court is whether Defendants are liable as decision-makers, founders, owners or indirect beneficiaries of the tribal lending scheme perpetuated by [Defendants]. This alone, as the

19

qualitatively overarching issue of this case, satisfies the predominance requirement and outweighs any issues particular to individual class members." *See id.* at *30. The Court held that that plaintiffs' RICO claims could (and should) be resolved on a class-wide basis because plaintiffs "predicate their RICO injury not only on the payment of usurious interest, but also on paying the principal on debts rendered void under Virginia law." *Id.* at *34 ("[w]hether that theory succeeds on the merits raises a legal question common to the entire class, which, by definition, includes only those borrowers who made payments on their loans"); *see also Williams v. Big Picture Loans, LLC,* 339 F.R.D. 46, 61-62 (E.D. Va. 2021) ("[c]ourts, when faced with class certification in RICO claims, often find that common issues predominate"); *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir. 1978) ("[t]his is a classic case for Rule 23(b)(3) class action. The claims of a large number of individuals can be adjudicated at one time, with less expense than would be incurred in any form of litigation."); *Bistro Exec., Inc. v. Reward Network, Inc.*, No. CV 04-4640 CBM, 2006 WL 6849825 (C.D. Cal. Oct. 11, 2005).[11]

## II.    THE CLASSES SATISFY *ALL* RULE 23(a) & (b)(3) REQUIREMENTS.

### A.    The Legal and Factual Requirements to Prove RICO Liability and Damages in this Case Are Determinable on a Class-wide Basis.

As noted by this Court in its Order, Plaintiffs' principal theory of RICO liability is that "[D]efendants are operating an enterprise dedicated to making and collecting on usurious loans."

---

[11]    The ability to resolve similar, if not identical claims, all predicated on the same or similar form agreements is precisely why courts throughout the country have frequently certified classes alleging usury. *See also Moore v. Comrnfed Sav. Bank*, 908 F.2d 834 (11th Cir. 1990) (rejecting argument that usury claims must be brought on an individual basis); *American Timber & Trading Co. v. First Nat'l Bank of Oregon*, 690 F.2d 781 (9th Cir. 1982) (certifying usury class action).

[DE 86, Order at 10.] The RICO statute declares that it is "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt." [*Id.* at 12 (citing 18 U.S.C. § 1962(c)); *see also Fleetwood Serv., LLC,* 2022 WL 3536128, at \*8.] "Unlawful debt" is defined to include, among other things, a debt "which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." [DE 86, Order at 12 (citing 18 U.S.C. § 1962(6).][12] Thus, liability for an "unlawful debt" RICO violation requires, under New York law, proof that (i) a debt existed; (ii) said debt was unenforceable; (iii) the debt was incurred in connection with the business of lending money at more than twice the legal rate of 25%; (iv) the defendant aided collection of the debt in some manner and (v) the defendant acted knowingly, willfully and unlawfully. [*Id.* (citation omitted).]

Here, Plaintiffs will present common evidence that Defendants' Enterprise utilized form MCA Agreements—with substantially similar terms—that lent money at rates exceeding New York's usury laws. [*See* Heskin, Decl., ¶¶ 32-35 & 63-66.] Not only were Plaintiffs provided MCA Agreements for transactions with intended interest rates well over 100%, but the intended simple interest for the other class members can readily be calculated using the same information on the face of each MCA Agreement. Plaintiffs have examined the MCA Agreements produced thus far and there is no agreement with an effective simple interest rate below 50%. [*See* Bilsborrow Decl.,

---

[12]    As noted by this Court in its Order, New York law "governs the issues of whether the contracts amount to loans, and, if they are loans, whether they are unlawful debt under RICO." [DE 86, Order at 11-12 (citing *United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020).]

¶ 19 & Ex. A.] In short, if the transactions amount to loans, then common proof will establish the interest rates are well above 50%, which is twice the rate of criminal usury under New York law. [*See* DE 86 at 12 (citing N.Y. Penal L. § 190.40).]

Once it is established that the interest rate exceeds 50%, determination of damages is equally as straightforward and determined by deducting the amounts actually received by each merchant from the amounts actually paid by each merchant. The question of the damages once liability is established turns on a separate section of the RICO statute which provides that "[a]ny person injured in his business or property by reason of a violation of § 1962 of this chapter . . . shall recover threefold the damages he sustains." *Fleetwood Serv., LLC,* 2022 WL 3536128, at *15 (citing 18 U.S.C. § 1964(c) & discussing Second Circuit precedent, *Commercial Union Assurance Co., plc v. Milken,* "and the cases on which that decision rests . . . ."); *see also Trs. of Plumbers & Pipefitters Nat. Pens. Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1146 (S.D.N.Y. 1995).

By way of illustrative example, in *Fleetwood Services, LLC,* a virtually identical usury case, Judge Liman awarded damages of $75,117, which was determined by subtracting $44,500 (the amount received by the debtor) from $119,617 (the amount the debtor paid to lender). *See* 20-cv-05120-LJL, DE 105, at *10 & *12 (stating that "[a]s a result of the collection of an unlawful debt, [plaintiff/borrower] was worse off by $75,117" & "[t]his is the amount by which it is injured by reason of a violation of RICO, and this is the amount that will be trebled as required by the statute"). In so doing, Judge Chin noted that:

> The federal RICO statute already imposes a penalty on the collector of an unlawful debt in the form of trebling the damages incurred by the borrower. Fleetwood here had the option to proceed under either a usury statute or a RICO statute. It elected to proceed under the RICO statute. ***RICO provides a cause of action separate and apart***

22

> *from those available under New York [] law, incorporating those laws only to the extent that they define what sort of 'unlawful debt' cannot be collected.*

*Id.* at *13 (emphasis added) (granting motion for entry of judgment on borrower's RICO claim in the amount of $175,351, reflecting the amount paid by debtor ($119,617) reduced by the amount received from lender ($44,500), trebled ($225,351) and then reduced by any amounts received by borrower in settlement ($50,000)). Finally, to prove usurious intent, Plaintiffs will rely primarily on the face of the form MCA Agreements and the various one-sided terms that are common throughout as these provisions appear in all of the Agreements, rendering the questions of unconscionability subject to class-wide proof. [*See* Heskin Decl., ¶¶ 32-35, 63-66 & Exs. 9-10.][13]

## B.    The Proposed Class Satisfies Rule 23(a)'s Requirements.

### 1.    *The RICO Class Satisfies the Numerosity Requirement.*

Rule 23(a)(1) provides that a class may be certified only if it "is so numerous that joinder of all members is impracticable," which does not mean impossible but only that joining all class members would be difficult or inconvenient. *See Allegra v. Luxottica Retail N. Am.*, 17-CV-5216, at *22 (E.D.N.Y. Dec. 13, 2021) (stating that a precise enumeration or identification of class members is not required) (internal quotations marks & citations omitted). In the Second Circuit, numerosity is usually presumed for classes larger than forty members. *See, e.g.*, *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, the numerosity requirement is satisfied for the class as the evidence adduced *to date* demonstrates that hundreds of persons or

---

[13]    Plaintiffs can also establish that the estimated daily payment is a sham because Defendants admit it is not tied to the actual estimated receivables and is intentionally underestimated to render the reconciliation provision illusory. [*See* Heskin Decl., Ex. 4, Wolf Tr. at 97:15-100:13.]

entities have paid money during the class period to a member of the Enterprise pursuant to an MCA Agreement with an interest rate exceeding fifty percent. [Bilsborrow Decl., ¶ 19 & Ex. A.][14]

### 2.      There are Questions of Law and Fact Common to the Class.

Rule 23(a)'s commonality prerequisite is satisfied if there is a common issue that "drive[s] the resolution of the litigation" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Sykes*, 780 F.3d at 84 (citation omitted). Because Plaintiffs' class claims are based on standardized conduct by Defendants, common questions of both fact and law are pervasive in this action.

The minimal requirements of Rule 23(a)(2) are satisfied here. Plaintiffs' claims involve common legal issues all stemming from the same factual predicate, including, but not limited to: (i) whether Defendants' form MCA Agreements constitute loans or the purchase of future (undefined or segregated) receivables; (ii) whether, if loans, the interest rate exceeds 50%; (iii) whether the form MCA Agreements are void *ab initio*; (iv) whether Plaintiffs and the Classes may recover any monies paid to the Enterprise; and (v) whether Defendants' conduct was willful or knowing. [*See* DE 28, ¶ 221.]  These are just some of the key legal and factual issues in the case, and they are common to all class members. *See, e.g., Haley v. Teachers Ins. & Annuity Assn of Am.*, 17-CV-855, at *13 (S.D.N.Y. Nov. 25, 2020) (common question of law is the legality of defendants' policy and procedure).

Obviously, whether Defendants' form MCA Agreements reflect usurious loans or

---

[14]      As noted above, this Court ordered Defendants to produce all MCA Agreements dating back to February of 2018. While Defendants are continuing to make "rolling productions," they have not certified that they have produced all MCA agreements. [*See* Heskin Decl., ¶ 78.]

"legitimate" factoring transactions is a dominating issue, the determination of which will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Sykes*, 780 F.3d at 84. That is, whether Defendants' form MCA Agreements create an absolute repayment obligation (thereby making the agreement a loan) is a common issue which can and should be decided based on the agreements signed by all class members and/or from common proof in terms of Defendants' treatment of their "advances" as absolutely repayable obligations. *See Sykes*, 780 F.3d at 84; *Gibbs*, 3:18cv676, at *31 (finding commonality satisfied in usury class action); Heskin Decl., Ex. 31. Simply put, "[i]f Plaintiffs establish as to one class member that the various participants here constitute a RICO enterprise, the same evidence will establish the same conclusion as to every other class member." *Gibbs v. Stinson*, 3:18cv676, at *24 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (issue qualifies as common if "it is capable of classwide resolution").

### 3.    *Plaintiffs' Claims are Typical of Those of the Class Members.*

Rule 23(a)(3) requires claims of the named plaintiff be typical of the claims of the class members. That requirement is satisfied if the representative plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other members and is based on the same legal theory. *See Sykes*, 780 F.3d at 80 (noting that in certain contexts "[t]he commonality and typicality requirements [] tend to merge [as b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence") (cleaned up & citation omitted). In other words, typicality exists when the "defendants committed the same wrongful acts in the same manner against all members of the class." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir.

2004) (quotations omitted). Although typicality requires the "same wrongful acts," it does not require identical damages to each class member. Thus, "a difference in damages arising from a disparity in injuries among the plaintiff class does not preclude typicality." *Lemire v. Wolpoff & Abramson. LLP*, 256 F.R.D. 321, 327 (D. Conn. 2009).

The representative plaintiffs are a North Carolina urgent care facility (Haymount) and its owner (Clinton), who signed the same form MCA Agreement used during the class period and paid (or contracted to pay) interest to the Corporate Defendants in excess of the maximum amounts allowed by New York law. [*See* Clinton Decl. ¶¶ 3-31.] Thus, the violations suffered by Plaintiffs are typical of those of the RICO Class members they seek to represent as their claims arise from the same course of illegal conduct, namely, Defendants collecting on unlawful interest based on usurious loans, that gives rise to the claims of all other RICO Class members, and are based upon the same legal theories as those of the class members.

### 4.    *Plaintiffs and Proposed Class Counsel Will Ably Represent Class Members' Interests.*

Rule 23(a)(4)'s requirement for fair and adequate class representation is satisfied here because the representative Plaintiffs' claims and interests are not antagonistic to those of any class member, Plaintiff Clinton has been actively involved in this litigation and their counsel are qualified and experienced attorneys capable of prosecuting this class litigation. *See, e.g.*, *In re Amla Litig.*, 282 F. Supp. 3d at 758 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).

First, Plaintiffs have no conflict with any other Class member, and will fairly and adequately protect the interests of the Class. Plaintiffs are adequate representatives because they

were subjected to the same unlawful conduct as the Class members. *See, e.g., Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 158 (S.D.N.Y. 2017) ("So long as [Plaintiff's] and the class members' injuries arose out of the same violative conduct, she may properly represent [the class.]"). Because Plaintiffs: (i) have suffered injury which is to be remedied by class relief; (ii) intend to pursue claims that will secure relief for the class and (iii) seek equitable and injunctive relief which will benefit the entire class, they are adequate class representatives. *See Hirschfeld v. Stone*, 193 F.R.D. 175, 183 (S.D.N.Y. 2000).

There is no conflict—actual or theoretical—between the representative Plaintiffs and the interests of the other RICO class members as they share virtually the same problem in that they took (or guaranteed) usurious loans from Defendants which they have already repaid or which they must now repay. [*See* Clinton Decl. ¶¶ 32-34.] Moreover, Plaintiff Clinton has been extensively involved in this case, including, but not limited to, the initial investigation, preparation of the various complaints, the discovery process including preparation of written discovery responses, searching for and producing to counsel potentially responsive documents and sitting for a six-hour deposition on September 13, 2022. [*See* Clinton Decl, ¶¶ 31-33.] There being no doubt about Clinton's good-faith commitment to this litigation, he is presumed adequate. *See, e.g.*, *Kelen v. World Fin. Network Nat'l Bank*, 295 F.R.D. 87, 93 (S.D.N.Y. 2013).

Second, Plaintiffs' counsel are well qualified to handle this case as a class action. Plaintiffs are represented by experienced attorneys with the law firms White and Williams LLP, Benesch, Friedlander, Coplan and Aronoff LLP and Weitz & Luxenberg, P.C. Proposed class counsel are highly qualified, experienced and able to devote the time and resources necessary to represent the classes in this case. [Heskin Dec., ¶¶ 3-23; Almeida Dec., ¶¶ 2-10; Bilsborrow Dec., ¶¶ 2-13.]

27

Attorneys Heskin, Almeida and Bilsborrow have committed and will continue to commit significant resources to representing Plaintiffs and the Classes, and are committed to ensuring that all putative class members' rights are protected. In short, proposed class counsel will ably and competently represent the classes. *See* FED.R.CIV.P. 23(g)(1)(A)-(B).

### C.     The Proposed Classes Satisfy Rule 23(b)(3) Requirements.

Rule 23(b)(3) imposes two requirements for a damages class in that plaintiffs must establish: (i) questions of law or fact common to the class members predominate over any questions affecting only individual class members and (ii) proceeding as a class action is a superior form of adjudication as compared to other available methods. *See Sykes*, 780 F.3d at 81 (citing FED.R.CIV.P. 23(b)(3)). Both predominance and superiority are satisfied here.

### 1.     *The Unitary Predominating Issue of Whether the Form MCA Agreements are Loans Is Capable of Producing a Single Answer.*

The Second Circuit instructs that the predominance inquiry demanded by Rule 23(b)(3) "anticipates the existence of individual issues" and that a class may only be certified if "questions of law or fact common to class members predominate over any questions affecting only individual members." *Sykes*, 780 F.3d at 81. Notably, Rule 23(b)(3) does *not* require that there be an absence of any individual issues and the mere fact that class members' damages may differ does *not* preclude class certification when common issues concerning liability predominate. *See, e.g.*, *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (finding that the predominance requirement of Rule 23(b)(3) is satisfied when "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof").

Rule 23(b)(3)'s predominance test is qualitative rather than quantitative, and if the qualitatively overarching issue in the litigation is common, a class may be certified notwithstanding the need to resolve actual or theorized individualized issues. *See, e.g.*, *Sykes*, 780 F.3d at 87. Plaintiffs satisfy the predominance requirement because a common nucleus of facts and legal issues dominates this litigation. The common questions that predominate are whether Defendants' form MCA Agreements with the RICO Class members are—in fact—loans and—if so—whether they violate New York's usury law. [*See* DE 86, Order at 1.]

As the Second Circuit stated in *Sykes*, the predominance inquiry is satisfied if:

> ***Every potential class member's claim arises out of defendants' uniform, widespread practice*** of filing automatically-generated, form affidavits of merit based on 'personal knowledge' and, in many instances, affidavits of service, to obtain default judgments against debtors in state court. Whether this practice violates the FDCPA, New York GBL § 349, New York Judiciary Law § 487, ***and/or constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and (d) does not depend on individualized considerations***.... The Court recognizes that should defendants be found liable on some or all of these claims, individual issues may exist as to causation and damages as well as to whether a class member's claim accrued within the applicable statute of limitations. ***This, however, does not preclude a finding of predominance under Rule 23(b)(3)***.

*Sykes*, 780 F.3d at 81 (citation omitted & emphasis added) (further stating that "[a]ll that is required at class certification is that "the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability").

Thus, the determination as to whether the form MCA Agreements are intended to operate as loans—and therefore unenforceable debt instruments under New York law—or are factoring agreements unquestionably predominates over any individual issue Defendants could foment in

29

opposition. *See also Madden*, 237 F. Supp. 3d 130, 161 (S.D.N.Y. 2017) ("Defendants have thus not identified any issues requiring individualized inquiry, and Plaintiff has established that common issues predominate over individual ones."); *Gibbs v. Stinson*, 3:18cv676, at *34-35 ("This alone, as the qualitatively overarching issue of this case, satisfies the predominance requirement and outweighs any issues particular to individual class members.").[15]

Although the predominance inquiry is satisfied by the overarching issue of whether the form MCA Agreements operate as loans, other common issues predominate with respect to Plaintiffs' class claims. For their substantive RICO class claim (Count I), Plaintiffs will have to establish that (i) a debt existed; (ii) said debt was unenforceable under New York law; (iii) the debt was incurred in connection with the business of lending money at more than twice the legal rate of 25%; (iv) the defendant aided collection of the debt in some manner and (v) the defendant acted knowingly, willfully and unlawfully. [DE 86, Order at 12 (citation omitted).]

Plaintiffs will be able to establish the existence of debts by Defendants' own records, namely, the numerous form MCA Agreements entered into between Corporate Defendants and the RICO class members from February 11, 2018, through the present. [*See* Heskin Decl, ¶¶ 32-35].

---

[15]    Numerous other courts have found the predominance requirement satisfied in similar class cases alleging usury, albeit in unpublished opinions. *See, e.g.*, *Upshaw v. Ga. Catalog Sales, Inc.*, 206 F.R.D. 694, 700-01 (M.D. Ga. 2002) (predominance met in a payday lending case where plaintiffs' claims were based on statute usury laws and RICO, defendants' conduct was substantially the same with respect to all members of the class and defendants' primary defense applied to the class as a whole); *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 47 (E.D. Va. 2021); *Purdie v. Ace Cash Express, Inc.*, 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547, at *5, *13-14 (N.D. Tex. Dec. 11, 2003); *Rewards Network*, at **6-8, 10-11 (predominance satisfied because "none of the variations impacts the core legal issue: whether [defendant]'s standard Merchant Agreement documentation meets the four-prong test for usury").

Moreover, Plaintiffs will be able to prove that those debts were unenforceable under New York law by way of simple calculation based on the information contained on the face of the form MCA Agreements. [*See* Lunden Report at 4-5, Ex. A.] Common proof likewise exists that Defendants attempted to collect on the illegal debts in various common, unlawful ways. [Heskin Decl., ¶¶ 55-59.] Since usury "can be gleaned from the face of [the MCA Agreements], intent will be implied and usury will be found as a matter of law." *Blue Wolf Cap. Fund II, L.P.*, 961 N.Y.S.2d at 89.[16]

### 2. *Resolving Virtually Identical Usury Claims Based on the Same Form Agreement on a Classwide Basis is a Superior Method of Adjudication.*

Rule 23(b)(3) also requires plaintiffs to demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) lists four factors—individual control of litigation, prior actions involving the parties, the desirability of the forum and manageability—which courts consider in making these determinations. *See Sykes*, 780 F.3d at 82 (citing FED.R.CIV.P. 23(b)(3)(A)-(D).[17] Here, class-wide adjudication is unquestionably more efficient than hundreds of individual actions and avoids the necessity of addressing,

---

[16]    The requirements for Count II (RICO conspiracy § 1962(d)) are less demanding than those for substantive violations. *See, e.g., Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. In the civil context, a plaintiff must allege that the defendant knew about and agreed to facilitate the scheme.").

[17]    These common issues are analogous to those in *Sykes* in which the Second Circuit affirmed the district court's grant of certification of RICO and other claims based on plaintiffs' allegations that defendants operated a debt-collection scheme whereby they would acquire charged-off debt, file lawsuits and then fail to serve the debtors in order to obtain default judgments under false pretenses. *See Sykes*, 780 F.3d at 75-80 (finding superiority met because a class action "is, without question, more efficient than requiring thousands of [falsely accused] debtors to sue individually").

individually, the legality or lack thereof of Defendants' form MCA Agreements as well as their use of various collection devices including use of Connecticut's pre-judgment attachment statute to freeze the (out of state) bank accounts of understandably distraught class members.

The first factor examines whether individual class members have a strong interest in individually controlling the litigation. *See, e.g.*, *Board of Trustees of the Aftra Retirement Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 355 (S.D.N.Y. 2010).  Here, given the onerous nature of the form MCA Agreements, the harassing and unrelenting collection efforts by Defendants, not to mention the fact that many unsuspecting merchants are completely unaware that these agreements are—in actuality—illegal loans and not purchases of indeterminate future receivables, it is extremely unlikely that individual class members would know to investigate much less to retain an attorney and to file a lawsuit to bring their own claims. [*See* Clinton Decl., ¶¶ 20-26.] And, even if they were aware, they likely would not be able to take the time and to devote the resources necessary to vindicate their rights. *See, e.g*., *Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir. 2010); *Labbate-D'Alauro v.* GC *Servs Ltd. P'ship*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996) (finding superiority given "the improbability that large numbers of class members would possess the initiative to litigate individually").[18]

The second factor examines whether there are prior actions involving the parties, and the answer to that issue is no. Moreover, Defendants have intentionally deterred businesses and their

---

[18]     The mere the fact that Plaintiff's claim may be significant in its own right is "no bar to a class when the advantages of unitary adjudication exist to determine the defendant's liability." *Board of Trustees of the Aftra Retirement Fund*, 269 F.R.D. at 355; *see also In re NASDAQ Market-Makers Antitrust Litigation*, 172 F.R.D 119 (S.D.N.Y. 1997) (finding that investors with substantial claims should be included in class).

owners from pursuing litigation using, among other things, the Connecticut pre-judgment attachment statute, which makes a class action superior to any other form of potential recourse. And, while many individual cases are pending regarding the legality of factoring agreements (such as the ones at issue here), Plaintiffs are not aware of any other active class cases on the same issues here that have progressed through discovery. [*See* Heskin Decl., ¶ 79.]

Third, concentrating litigation on behalf of all class members in this forum will prevent inconsistent adjudications and will promote fair and efficient use of the judicial system. *See* FED.R.CIV.P. 23(b)(3)(C). Among other considerations, numerous class members are located in New York City, the form MCA Agreements were effectuated under New York law and this Court is familiar with the facts, the claims and has overseen the discovery process. It would be "nonsensical to disaggregate the claims into hundreds or thousands of individual proceedings." *Chester-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 84 (S.D.N.Y. Mar. 30, 2018) ("Doing so would only waste 'time, effort, and expense' and increase the likelihood of conflicting outcomes for Plaintiffs.") (citation omitted). And, resolving these issues regarding the lawfulness of the MCA agreements will save the parties and the Court system substantial resources going forward.

Finally, this case is certainly manageable as a class action. While "the Second Circuit has cautioned that failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored," that admonition is not pertinent here as the case is distinctly manageable as a class action. *See, e.g.*, *In re Petrobras Secs.*, 862 F.3d 250, 268 (2d Cir. 2017). Class members and the specific financial harms inflicted on them are readily ascertainable and can be uniformly identified by Defendants' own records. [Heskin Decl., Ex. 33.] Ultimately, "[i]n this case, because class-wide adjudication of Plaintiffs' claims would serve to efficiently resolve 'the

33

claims or liabilities of many individuals in a single action, as well as eliminate the possibility of 'repetitious litigation and possibly inconsistent adjudications,' a class action is the superior method of litigation." *Estate of Gardner*, 316 F.R.D. at 76–77 (citation omitted).

**D.     A Separate Rule 23(b)(2) Class Should Also Be Certified.**

A Rule 23(b)(2) class should be certified where the defendant has acted on grounds that apply generally to the class and are of an ongoing nature such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a hole. *See* Fed.R.Civ.P. 23(b)(2); *see also Dukes,* 564 U.S. at 360 (holding that certification of a class for injunctive relief is appropriate where "a single injunction ... would provide relief to each member of the class").

The injuries to Plaintiffs and the RICO class members as a direct result of Defendants' illegal actions, include, but are not limited to, collecting "thousands of dollars in improperly collected criminally usurious payments." [DE 28, ¶ 258.] It truly would be a pyrrhic victory if Plaintiffs were to prevail on their claims on behalf of the RICO class but Defendants were still able to employ their abusive, threatening and harassing collection measures in order to extract illegal loan payments. As evidenced by the discovery produced to date, Defendants brazenly continue to execute MCA Agreements with merchants even *after* this Court ruled that those agreements may constitute usurious, illegal loans. [Heskin Decl., Ex. 10 (including Enterprise MCAs dated June 2022 or later).]  An injunction would benefit the RICO class members as a whole, and would address Defendants' ongoing, illegal activities and the prerequisites for entry of an injunction under Rule 23(b)(2) are satisfied. *See also Sykes II*, 285 F.R.D. at 294 (certifying separate classes under both Rule 23(b)(2) and 23(b)(3)).

34

### III.   THE CLASS IS APPROPRIATELY DEFINED & MEMBERSHIP CAN BE READILY DETERMINED BASED ON DEFENDANTS' RECORDS.

The Second Circuit instructs that class membership must be identifiable by objective measures. *See In re Petrobras Sec. Litig.*, 862 F.3d 250, 257 (2d Cir. 2017) ("[A] class is ascertainable if it is defined using objective criteria that establish membership with definite boundaries."). Here, inclusion in the RICO class can be determined by objective criteria, namely, Defendants' documents and records, particularly their form MCA Agreements as well as transaction records indicating (i) amounts loaned to Plaintiffs and (ii) monies paid to Defendants by Plaintiffs and the putative class members. [*See* DE 28, ¶ 218; Heskin Decl., Ex. 9-10.] And, as Mr. Lunden's expert report establishes, determination of whether a particular MCA transaction yields an intended interest rate in excess of 50% is readily determinable using a simple formula using the information on the first page of each of Defendants' Form MCA Agreements. [*See* Lunden Report at 4-5.] The class is limited to a specific time period, from February 11, 2018 through the present. [*See* DE 28, ¶¶ 218 & 219.] Therefore, since membership in the RICO class is based on objective criteria, this Court would *not* be called on to make any determination about the merits of any particular class members' claim in deciding whether that person or entity is a class member. The ascertainability requirement is therefore satisfied. *See, e.g.*, *In re Signet Jewelers Ltd.*, No. 16 Civ. 6728, at *17 (S.D.N.Y. July 10, 2019) ("Ascertaining the members of the Class will be easily administrable by reference to investor records."); *Buffington v. Prog. Advanced Ins. Co.*, 20-CV-07408, at *1 (S.D.N.Y. Aug. 23, 2022) (ascertainability requirement satisfied; "Plaintiff posits that he can identify putative class members via data stored in Defendant's management software").

**IV.    THE CLASS ACTION WAIVER IS UNENFORCEABLE BECAUSE THE MCA AGREEMENTS ARE USURIOUS LOANS VOID *AB INITIO.***

Each of the form MCA Agreements contains a class action waiver. [Heskin Decl., Ex. 9 §

4.11.] As set forth below (and as detailed in Plaintiffs' Opposition to Defendants' Motion to Strike

Class Allegations), the putative class action waiver is unenforceable because (i) the MCA

Agreements constitute usurious loans and thus are void *ab initio* and (ii) the terms of the

agreements are the epitome of substantively unconscionable and were procured in reprehensible

fashion. The MCA Agreements, including the putative waiver, are unenforceable.[19]

The interest charged by Defendants—ranging from 89 to 1,333%—is unconscionable,

oppressive, illegal and violates New York's strong public policy against usury. [*See* Lunden

Report, at 5; Bilsborrow Decl., Ex. A.] As this Court is aware, the New York Court of Appeals, in

*Adar Bays, LLC v GeneSYS ID, Inc.*, recently affirmed that criminally usurious loans are void *ab*

*initio*. Prior to doing so, the New York Court of Appeals conducted an exacting review of New

York's strong public policy against all forms of usury, *including in the context of loans involving*

*corporations*. *See* 37 N.Y.3d 320, 327-333 (2021) (discussing New York's usury laws and the

legislature's repeated affirmation of the policies underlying those laws, including "the protection

of persons in weak bargaining positions from being taken advantage of by those in much stronger

bargaining positions.") (citation omitted); *see also Madden*, 237 F. Supp. 3d 130, 149 (S.D.N.Y.

---

[19]    Defendants previously moved to strike Plaintiffs' class allegations because of this waiver. [DE 104.] Plaintiffs' brief in opposition sets forth the legal reasons why Defendants' argument should be rejected. [*See generally* DE 107.] For purposes of efficiency, Plaintiffs will not restate those arguments in detail here but rather incorporate those arguments and detail the factual evidence that demonstrates that the form MCA Agreements are procedurally and substantively unconscionable.

2017) (observing that New York's usury prohibition is not a creature of recent statute, but rather one that reflects a deep-rooted tradition of the common weal").

With that backdrop, it is no wonder that usurious contracts are void *ab initio* and that New York law prohibits the enforcement of all provisions therein, including class waivers:

> Plaintiff is correct that when a contract violates New York's civil usury statute, that contract is 'void ab initio.' ***When a court deems a transaction to be usurious, it must declare the transaction and its supporting documents void, enjoin prosecution on them and order that all documents and collateral be canceled and surrendered.*** The New York Court of Appeals has explained that when a loan is void for usury, the underlying transaction and supporting documents have no legal force or binding effect. ***And where the main objective of an agreement is illegal—here, providing a loan at an unlawful interest rate—courts will not sever and enforce incidental legal clauses***. Accordingly, when a contract is void ab initio, that invalidity extends even to procedural matters in the contract like a forum selection clause.
>
> ***Thus, under New York law, the class action waiver is invalid along with the rest of the contract.***

*Moss v. First Premier Bank*, 2:13-cv-05438, 2020 WL 160253, at *9 (E.D.N.Y. Sept. 2, 2020) (cleaned up & emphasis added); *see also Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 182 (1st Dep't 2013) (finding the loan "void because it was criminally usurious as a matter of law, and accordingly the collateral agreement is unenforceable.").

As this Court has determined that Plaintiffs have adequately pled that the MCA agreement "function as loans" and "that the debts created by the[m] are unenforceable, 'unlawful debts'" under the RICO statute, these form agreements (containing the purported class action waiver) are unenforceable and void *ab initio*. *See also Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 32 (2d Cir. 1997) ("A contract that is void *ab initio* is a 'nullity.'") (citations omitted).

37

## V.      THE FORM MCA AGREEMENTS ARE SUBSTANTIVELY UNCONSCIONABLE AND PROCURED IN A REPREHENSIBLE FASHION.

The Class Action Waiver is unenforceable for the additional reason that form MCA Agreements are substantively and procedurally unconscionable. Under New York law, a contract is unconscionable when it is "so grossly unreasonable . . . in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 730 (E.D.N.Y. 2017) (quotation omitted).[20]

Further underscoring the predominating common issues, Defendants' form MCA Agreements have virtually identical terms and provisions. Plaintiffs have identified at least fifteen substantively unfair and one-sided provisions common to all of the MCA agreements at issue. [*See* DE 28, ¶ 79.] As detailed above, the indicia of substantive unconscionability with respect to the form MCA Agreements are numerous including the facts that the agreements are not signed by Defendants, do not identify a mailing address or the actual lending entity nor do they disclose the actual amount of fees to be charged. [*See* Heskin Decl., Exs. 9-10.] These agreements are so egregiously one-sided, unfair—not to mention illusory in terms of Defendants' "obligations"— that this Court should find the agreements, including the putative class action waiver, unenforceable. [*See* DE 28-8 (NYAG Petition) ¶¶ 99-103; *see also Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121-22 (2d Cir. 2010) (contract is substantively unconscionable if

---

[20]      Federal courts interpreting New York law have weighed procedural and substantive unconscionability on a sliding scale; "the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 247 (S.D.N.Y. 2020). The same courts have noted the doctrine is "flexible" and "intended to be sensitive to the realities and nuances of the bargaining process." *Id.* (citing *Bernadino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK), 2017 WL 7309893, at *11 (S.D.N.Y. Nov. 20, 2017)).

"so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms").

Not only is the agreement *as a whole* substantively unconscionable, the Class Action Waiver provision is, itself, unconscionable as it states that even if a court invalidates the waiver and allows the case to go forward as a class action, a representative plaintiff "may not recover fees or costs nor may it participate in the very class action that it initiated." [*See* Heskin Decl., Ex. 9, § 4.10]; *see also Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 580 (Cal. App. 2007) (recognizing that since the drafters of adhesion contracts rarely utilize the class action tool to sue customers, such provisions generally lack mutuality). The class waiver provision in the form MCA Agreement fails the "basic test for unconscionability," in that the parties were *not* on equal footing and the clause (indeed, the form agreement in totality) is so unilaterally one-sided that it is unconscionable under the circumstances existing when the parties made the contract. *See Szetela v. Discover Bank,* 118 Cal. Rptr. 2d 862, 867 (Ct. App. 2002) ("Although styled as a mutual prohibition on representative or class actions, it is difficult to envision the circumstances under which the provision might negatively impact Discover [since] credit card companies typically do not sue their subscribers in class action lawsuits.").

Finally, procedural unconscionability concerns assent and turns on the facts surrounding the bargaining process. *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 247 (S.D.N.Y. 2020) ("The determination of whether a contract or any clause of the contract is unconscionable is a matter for the court to decide against the background of the contract's commercial setting, purpose and effect."). Here, Defendants took advantage of merchants' desperate financial condition to coerce hundreds of borrowers into signing a contract of adhesion

without disclosing the material terms—*e.g.*, the true nature of the transaction, the interest and fees charged and the purported class waiver, among other things.  [*See* Heskin Decl., Ex. 12 (Enterprise hiding true fees from merchants).]  There is no evidence to suggest that Defendants entertained *any* negotiations on *any* terms as all MCA Agreements were substantively identical and simple math shows that the "good faith estimates" Defendants relied upon in setting the fixed payments during negotiations were arbitrary and onerous. [*Id.*, Ex. 11, Brezel Tr. at 52:18-57:9.]  This desperation is borne out by the substantively unconscionable and criminally usurious terms imposed by each agreement; Plaintiffs had no choice but to accept the terms unilaterally dictated by Defendants due to their desperate financial condition and complete lack of bargaining power. Simply put, Plaintiffs lacked any meaningful choice or ability to negotiate the terms of the MCA agreements. Thus, in addition to the fact that the form MCA Agreements reflect illegal, usurious transactions and are therefore void *ab initio*, the Agreements—including the putative class action waiver—are procedurally and substantive unconscionable.

## CONCLUSION

Plaintiffs respectfully request that this Honorable Court certify this matter as a class action under Rule 23 as well as grant all such other relief deemed equitable and just.

Dated:  September 23, 2022

**WHITE AND WILLIAMS LLP**

BY:   /s/ *Shane R. Heskin*
       Shane R. Heskin
       Alex D. Corey
       Market Street | One Liberty Place,
       Suite 1800
       Philadelphia, PA 19103-7395
       Tel: (215) 864-7000
       heskins@whiteandwilliams.com
       coreyd@whiteandwilliams.com

**WEITZ & LUXENBERG, P.C.**

BY:/s/ James J. Bilsborrow
        James J. Bilsborrow
        700 Broadway
        New York, New York 10003
        Tel: (212) 558-5000
        jbilsborrow@weitzlux.com

**BENESCH, FRIEDLANDER**
**COPLAN & ARONOFF LLP**

BY:/s/ David S. Almeida
        David S. Almeida
        71 S. Wacker Drive, Suite 1500
        Chicago, IL 60606
        Tel: (312) 212-4949
        dalmeida@beneschlaw.com

*Attorneys for Plaintiffs & the Classes*