## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAYMOUNT URGENT CARE PC, ROBERT A. CLINTON, JR., *individually and on behalf of all those similarly situated*,<br><br>        Plaintiffs,<br><br>    v.<br><br>GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISAAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, AND YISROEL C. GETTER,<br><br>        Defendants. | Case No. 1:22-cv-01245-JSR<br><br><br>**DECLARATION OF SHANE R. HESKIN, ESQ.** |

Shane R. Heskin, Esq., an attorney duly licensed to practice law before the courts of the State of New York, affirms and declares the truth of the following under penalty of perjury:

1.    I am a Partner of White and Williams LLP, attorneys for Plaintiffs Haymount Urgent Care PC ("Haymount"), Robert A. Clinton, Jr. ("Dr. Clinton"), as well as those similarly situated (collectively, "Plaintiffs").

2.    I am fully familiar with the facts and circumstances of this action and all prior pleadings and proceedings heretofore had herein.  I make this declaration in support of Plaintiffs' motion for class certification.

*Class Counsel Qualifications*

3.    This putative class action lawsuit involves complex legal and factual issues that require specialized skill and experience with the merchant cash advance ("MCA") industry and the legal complexities of a RICO action.

4.    By way of background, I graduated from Albany Law School in 1999.  I have been with White and Williams LLP for seventeen years and an equity partner for fourteen years.  I have more than twenty years of complex, commercial litigation experience and have tried numerous

jury cases for both the defense and plaintiff. I also have extensive appellate experience and have appeared before numerous appellate courts.

5. I was admitted to practice in the State of New York on April 10, 2000, and admitted to the U.S. District Court for the Southern District of New York on July 25, 2000. I am admitted in several other district and appellate courts throughout the country.

7. In the past twenty years, I have handled some of the largest, most complex insurance coverage matters all over the country. Among these various coverage actions, I was recently lead trial counsel in a multi-billion insurance coverage case against Duke Energy in North Carolina concerning its many decades of coal ash disposal. I am also currently lead trial counsel in yet another insurance coverage action against Duke Energy in Indiana involving similar coal ash disposal practices.

8. In addition to my complex, insurance coverage experience, I have specialized knowledge of the MCA industry.

9. As alleged in this action and those brought by various regulatory agencies, the MCA industry is a predatory lending industry that preys upon struggling small businesses. The MCA industry predominately uses the New York Court System due to New York's unique judgment collection laws. As a consequence, MCA litigation is concentrated in New York.

10. Over the past six years, I have represented well over one hundred small businesses that have been victimized by the MCA industry, including the filing of numerous RICO actions that have been followed by subsequent government action.

11. One notable action involved a RICO action I brought on behalf of Radiant Images, Inc. and Gianna Wolfe against various predatory MCA lenders titled *Radiant Images, Inc. et al. v. Broadway Advance Funding, LLC et al.*, 1:18-cv-01492-LAK (Southern District of New York).

12.     Among the allegations set forth in the *Radiant* complaint was that Defendants utilized an associate named Gino Gioe ("Gino"), a former felon, to enter the premises of the *Radiant* plaintiffs to intimidate them into making payment:





13.     On August 26, 2022, the United States Attorney for the Eastern District of Pennsylvania filed a Criminal Information against Gino, which portends of much broader criminal RICO charges against an Enterprise led by "Person No. 1." Paragraphs 3-4 of the Overt Acts describe the same conduct as contained in my initial complaint above.

14.     Most notable to the claims in this action, the United States calls the MCA agreements "Loans" and the crimes charged are for the use of extortionate means to collect upon

an extension of credit under 18 U.S.C. § 894(a).  A true and correct copy of the Criminal Information is attached hereto as **Exhibit 1**.

15.     In addition to exposing criminal activity within the MCA industry, I have been cited as an authority on the MCA industry in numerous national publications, including NBC News, Bloomberg News, Yahoo Finance, the Philadelphia Inquirer, and the New York Post.[1]

16.     Most recently, one of my clients was featured in an article by ALM discussing the impact of the Court's decision in this case, as well as the trend by federal and state courts to look beyond the sham form of MCA agreements.  *See* Michael A. Mora, *'I'm Ruined': Litigation Trend Takes Aim at Merchant Cash Advance Industry*, THE PALM BEACH DAILY BUSINESS REVIEW (Sept. 9, 2022), a true and correct copy of which is attached hereto as **Exhibit 2**.

17.     Based on my experience in the industry, I have also been asked to testify on behalf of public interest groups before state and federal legislative bodies, including before the United States Congress on June 26, 2019.[2]

18.     I have also advised numerous state, federal and local law enforcement agencies on predatory MCA practices.

19.     In 2020, at the onset of the COVID-19 pandemic, I participated in a Town Hall panel sponsored by New York Congresswoman Maxine Waters, consisting of New York Attorney General Letitia James and then FTC Chair Rohit Chopra, to advise small businesses on how to protect themselves against MCA companies.

---

[1]     https://www.bloomberg.com/graphics/2018-confessions-of-judgment-millionaire-marshal/; https://finance.yahoo.com/news/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html; https://nypost.com/2018/11/27/doi-looks-into-city-marshal-for-expanding-reach-beyond-nyc/

[2]     https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=9

20.      I also recently appeared before the New York Court of Appeals concerning certified questions posed by the Second Circuit regarding the remedies available to a victim of unlawful collection practices by an MCA company.  *See Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 37 N.Y.3d 591, 594, 183 N.E.3d 1185, 1186, 163 N.Y.S.3d 467, 468, (2021).

21.      I am also lead counsel on numerous state and federal court decisions relating to the construction and interpretation of MCAs, as well as their application to the RICO statute.  *See, e.g.*, *Hi Bar Capital LLC v. Parkway Dental Serv., LLC,* Index No. 533245/2022 (N.Y. Sup. Ct. Kings, Aug. 25, 2022) (granting motion for reconsideration, noting "Federal courts have engaged in a more thorough and exacting scrutiny of merchant agreements, including at the agreements in a holistic and comprehensive manner and the conclusions they have reached are compelling."); *Fleetwood Services, LLC v. Ram Capital Funding, LLC*, No. 20-cv-5120 (LJL), 2022 WL 1997207 (S.D.N.Y. June 6, 2022); *Lateral Recovery LLC v. Queen Funding, LLC*, 21 Civ. 9607 (LGS), 2022 U.S. Dist. LEXIS 129032 (S.D.N.Y. July 20, 2022) (following this Court's decision and *Fleetwood*); *McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty Nov. 19, 2019) (upholding RICO claims and breaking from prior precedent); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims); *Funding Metrics LLC v. NRO Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019) (finding MCA loan as a matter of law); *Funding Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019) (same); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp*., 374 F.Supp.3d 361 (E.D. Pa. 2019) (upholding RICO claims); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same).

22.    The New York Attorney General, Letita James, recently cited the above referenced decision from *Lateral Recovery LLC v. Queen Funding, LLC*, 21 Civ. 9607 (LGS), 2022 U.S. Dist. LEXIS 129032 (S.D.N.Y. July 20, 2022)(which cites this Court's decision to deny Defendants' motion to dismiss and relies on Judge Liman's ruling in *Fleetwood*) in a September 12, 2022 letter to New York Supreme Court Justice Andrew Borrok as "Supplemental Authority" in New York's criminal RICO action against MCA company Richmond Capital Group, *People v. Richmond Capital Group, LLC*, No. 451368/2020.  The NY AG filed a similar letter on June 28, 2022, citing this Court's decision to deny Defendants' motion to dismiss as "Supplemental Authority" as well. True and correct copies of these letters is attached hereto as **Exhibit 3**.

23.    In sum, I am well qualified to handle this exact type of action, particularly because I am assisted by additional attorneys with significant experience in class actions and RICO claims, including David S. Almeida of Benesch Friedlander Coplan & Aronoff LLP and James J. Bilsborrow of Weitz & Luxenberg, P.C.

***Relevant Documents Supporting Plaintiffs' Class Certification Motion***

**i.    The Enterprise Takes Advice and Direction From Convicted Criminal John Braun.**

24.    The first two exhibits to the Amended Complaint detail the purported continued involvement of John Braun in the MCA industry through the Defendants in this Action.  *See* Dkt. No. 28, Exs. 1-2 (i) Zeke Faux, *The Loan Shark Trump Freed From Prison is Lending Money Again*, BLOOMBERG BUSINESSWEEK (Feb. 10, 2022); and (ii) Zachary Mider & Zeke Faux, *Sign This Agreement and Your Bank Account Might Be Frozen*, BLOOMBERG BUSINESSWEEK (Feb. 10, 2022) (noting that Jared Alfin, a lawyer at Hassett & George, P.C., has used the Connecticut pre-judgment statute and pursued over 180 small-business owners on behalf of MCA companies including GoFund Advance).  In addition, the Amended Complaint

cites the complaints by the FTC and New York Attorney General detailing the fraudulent and deceptive loansharking tactics that Braun has inflicted on victims throughout the United States. *See id.*, Exs., 7-8.

25.    These articles detail John Braun's ("Braun") personal criminal actions he engaged as a member of the MCA industry.  In 2020, Braun was serving a 10-year sentence for drug charges and facing a lawsuit from the New York attorney general for usury, fraud, and harassment relating to his lending, but was ultimately granted clemency from Former President Donald Trump on January 20, 2021.  The articles identify Braun as being associated with Defendants GoFund Advance, LLC and Matrix Advance, a d/b/a for Defendant Merchant Capital LLC.

26.    Bloomberg News nailed it.  Attached hereto as **Exhibit 4** is a true and correct copy of the transcript of the deposition of Yitzchok "Isaac" Wolf ("Wolf"), taken on September 6, 2022.

27.    Wolf testified that Braun directs and communicates with Defendants and the Enterprise through the email address "uw@altcapitalsource.com", i.e., purportedly as the underwriting department at Alt Capital Funding.  *Id*. Tr. 60:8-10.

28.    Evidence exchanged during discovery and documents produced by Defendants demonstrates that Braun continues to influence the affairs of the Enterprise using the "uw@altcapitalsource.com" email account.  True and correct copies of said evidence produced by Defendants is attached hereto as **Exhibit 5**, which includes: (i) January 20, 2022 email chain where Braun directs Defendant Wolf when to release funding, produced by Defendants at GOFUND_000020920-925; (ii) December 7, 2021 email chain where Mr. Braun directs the debiting of a merchant account, produced by Defendants at GOFUND_000027078-095; (iii) December 8, 2021 email chain where Braun instructs the Enterprise how to handle a merchant behind on payments, produced by Defendants at GOFUND_000027820-832; (iv) November 3,

2021 email from Braun directing Enterprise to "close this deal debits are shut, tomorrow is last payment", produced by Defendants at GOFUND_000030923-929; (v) November 12, 2021 email chain in which Braun directs the Enterprise handling a struggling merchant account to "Fix today or we're done," produced by Defendants at GOFUND_000031027-042; (vi) December 2, 2021 email from Braun directing Enterprise with respect to a merchant's account "we need to be paid current," produced by Defendants at GOFUND_000042448-469; (vii) November 15, 2021 email chain where Braun directs the Enterprise with respect to a merchant's account to "fix this shit" and asking "where the fuck is the $," produced by Defendants at GOFUND_000028779-790; (viii) October 6, 2021 email from Braun directing the Enterprise to refinance an indebted merchant, produced by Defendants at GOFUND_000031565-578; (ix) April 5, 2019 email from John Braun (JohnBraun@consultant.com) to members of the Enterprise instructing the release of remittances, produced by Defendants at GOFUND_000023594.

29.     Braun also advised the Enterprise on how to handle Plaintiffs Haymount's MCA transactions.  True and correct evidence of this conduct is attached hereto as **Exhibit 6**, which includes: (i) August through September 2021 email chain where Braun directs when to wire funds to Plaintiffs Haymount and Dr. Clinton, produced by Defendants at GOFUND_000018955-971; (ii) November 1, 2021 email from Braun to the Enterprise suggesting they "fund again" after Haymount was over debited, produced by Defendants at GOFUND_000019462-484; (iii) November 1, 2021 email from Braun to the Enterprise authorizing a new MCA deal with Haymount, produced by Defendants at GOFUND_000018998-018; (xii) January 21, 2022 email from Braun to the Enterprise explaining that Haymount must make more payments before Defendants will "release second increment" of MCA proceeds, produced by Defendants at GOFUND_000010891-904; (iv) January 21, 2021 email exchange between Braun and Defendant

Joseph Kroen ("Kroen") in which Kroen explained to Braun that Haymount had paid more than its share under the Promissory Note, to which Braun responded "he hasn't cleared that much, and the calculation is his calculation not ours," produced by Defendants at GOFUND_000011232-245; (v) January 5, 2022 email from Braun to the Enterprise directing how to handle all of Haymount's various accounts, produced by Defendants at GOFUND_000011394-398; (vi) January 10-11, 2022 email chain in which Braun directs the Enterprise to obtain payments from Haymount, produced by Defendants at GOFUND_0000111483-492; (viii) February 17, 2022 email from Braun to the Enterprise instructing on how to respond to an email from myself concerning Haymount, in which Braun writes: "there is a default past due balance.  The balance remaining with out any legal or default penalties taking everything into consideration is nearing 500K, if you have a proposal we are open to hearing it," produced by Defendants at GOFUND_000009909-991.

30.     Additional evidence has been uncovered that John Braun operated a business called "Royal Consulting Services" that worked as a consultant for Defendants, as reflected by a November 5, 2019 letter with Royal Consulting Services letterhead and a signature block for "Jacob Braun" and listing his email as "UW@HighFiveFunding.com", attached hereto as **Exhibit 7**, and produced by Defendants at GOFOUND_000025191-202.

31.     Documents produced by Defendants indicate that John Braun uses the "uw@highfivefunding.com" when communicating with merchants represented by attorneys, such as a November 15, 2019 email from John Braun to Jack Miller, a litigation clerk at the Law Office of Edward W. Miller, in which Braun writing: "WE ARE UNWILLING TO RELEASE YOU. YOU'RE A LIAR AND THIEF, AND DEFRAUD [sic] US FINANCIAL AS WELL AS COMMITTED FORGERY.  WE ARE NTO ALLOWING YOU TO DICTATE WHEN TO PAY

US AND DO WHATEVER YOU'D LIKE…", attached hereto as **Exhibit 8**, and produced by Defendants at GOFUND_000024777-783.

### ii.    The Form MCA Agreements Used by the Enterprise Are Substantively Identical And The Scope Of The Enterprise Is Far Broader Than Previously Known

32.    Attached hereto as **Exhibit 9** are copies of the operative MCA Agreements entered into between Plaintiffs and Defendants, which include: (i) the August 25, 2021 MCA Agreement between Haymount and Defendant Merchant Capital LLC ("Merchant Capital"); (ii) the August 26, 2021 MCA Agreement between Haymount and Defendant GoFund Advance, LLC ("GoFund") [*see also* Doc. No. 69-2]; (iii) the September 27, 2021 MCA Agreement between Haymount and GoFund; (iv) the December 16, 2021 MCA Agreement between Haymount and GoFund; (v) the December 27, 2021 MCA Agreement between Haymount and Defendant Funding 123, LLC ("Funding 123").

33.    Discovery and the exchange of documents produced by Defendants have revealed that Defendants issued these substantially identical, usurious and unconscionable MCA agreements to hundreds or thousands of merchants, often using numerous DBAs to confuse merchants as to when they are negotiating with Defendants, while still issuing substantially identical MCA agreements.

34.    Evidence of this conduct by Defendants is attached hereto as **Exhibit 10**, which includes **MCAs issued by named Defendants** (i) a March 21, 2022 MCA agreement issued by Funding 123, produced by Defendants at GOFUND_000000366-377; (ii) a December 12, 2021 MCA agreement issued by Funding 123 using a different tradename design, produced by Defendants at GOFUND_000000422-431; (iii) a December 22, 2021 MCA agreement issued by GoFund, produced by Defendants at GOFUND_000005144-154; (iv) a July 7, 2021 MCA agreement issued by Merchant Capital, produced by Defendants at GOFUND_000021405-414;

**MCAs issued by companies Defendants d/b/a or Defendants' former companies** (v) a November 5, 2019 MCA agreement issued by <u>Second Chance Funding</u>, produced by Defendants at GOFUND_000022241-255; (vi) March 14, 2019 and March 21, 2019 MCA agreements issued by <u>Business Funding Source</u>, and a produced by Defendants at GOFUND_000022352-361, and GOFUND_000022821-830, respectively; (vii) June 22, 2022 and July 5, 2022 MCA agreements issued by <u>Eleven Capital</u>, produced by Defendants at GOFUND_000000355-365 and GOFUND_000000818-828, respectively; (viii) an October 14, 2019 MCA agreement issued by <u>Map Cap</u>, produced by Defendants at GOFUND_000025118-126; (ix) a July 1, 2021 MCA agreement issued by <u>Fundura Capital Group</u>, produced by Defendants at GOFUND_000005222-232; (x) an October 20, 2021 MCA agreement issued by <u>Matrix Advance</u>, produced by Defendants at GOFUND_000005383-402; (xi) August 23, 2021 and September 16, 2019 MCA agreements issued by <u>Bridge Funding Cap LLC</u>, produced by Defendants at GOFUND_000021359-370 and GOFUND_000023901-911, respectively; (xii) a November 25, 2020 MCA agreement issued by <u>Simpli Fund</u>, produced by Defendants at GOFUND_000021480-488; (xiii) a April 1, 2022 MCA agreement issued by <u>Viking Capital</u>, produced by Defendants at GOFUND_000029452-462;

**MCA companies identified in discovery that may have affiliations with Defendants and may be members of the Enterprise** (xiv) a November 9, 2018 email from Defendant Brezel purportedly as an employee of <u>Second Chance Funding</u>, produced by Defendants at GOFUND_000023795; (xv) an MCA agreement issued by <u>Key Cap Fund</u>, produced by Defendants at GOFUND_000021559-568; (xvi) a January 3, 2021 "Revenue Purchase Agreement" issued by <u>United Fund USA</u>, produced by Defendants at GOFUND_000021634-643; (xvii) a February 5, 2021 "Revenue Purchase Agreement" issued by <u>Forward Fund</u>, produced by

Defendants at GOFUND_000021689-21697; and (xviii) a December 4, 2019 MCA agreement issued by <u>DayToday Funding</u>, produced by Defendants at GOFUND_000024794-803.

35.    From these samples, key immutable features of these MCA Agreements stand out, including, but not limited to: (i) broad language defining the purchase of revenues to include any and all payments to merchant; (ii) setting extremely high fixed daily or weekly payments, that when applied to the Purchase Amount, results in a readily calculable fixed term; (iii) broad definitions of Events of Default; (iv) a security agreement in the merchant's assets and a personal guaranty of merchant's obligations by merchant's principals, which is often invokable even if merchant declares bankruptcy; (v) reconciliation provisions that limit when the merchant can make the request and provide broad grounds for Defendants to refuse reconciliation; and (vi) several key purported waivers of merchant's rights, such as right to jury trial, class action waiver, and prejudgment remedy waiver.

36.    Attached hereto as **Exhibit 11** is a true and correct copy of the transcript of the deposition of Defendants, via FRCP Rule 30(b)(6) witness Defendant Josef Brezel, taken on September 2, 2022.

37.    Defendants' testimony confirmed they utilize numerous DBAs which had the effect of making merchants unaware of when they were negotiating with entities related or controlled by Defendants.  Ex. 11 (Brezel Tr.) 18:16-28:1, 74:7-14, 160:5-163:13, and 178:12-18.

38.    Defendant Getter, the present purported owner of GoFund, [3] confirmed in testimony that even he cannot keep all the DBAs the Enterprise uses completely straight.  When asked if he knew the difference between the various entities using the business name GoFund, he responded

---

[3] The term "purported" is used because Getter's testimony indicated that Kroen and other Defendants, through the Enterprise's attorney Jared Alfin, Esq., transferred through forgery and perjury ownership of GoFund, Funding 123, and Merchant Capital to a shell company owned by Getter, Hartford Receivables, in early 2022 without Getter's knowledge or full understanding.  *Id*. Tr. 128:25-142:19, 165:6-18.

"I am not sure exactly, but I know there's some entities with New York and DBA GoFund, some in Connecticut. I'm not sure of all the details." *See* Ex. 34 attached hereto, introduced formally below, at Tr. 31:6-10. Getter also testified as to the Enterprise's "standards" for staring a new DBA, stating "DBA is something you can decide to open up tomorrow morning a DBA of any name, but it doesn't mean anything." *Id*. 53:6-9.

39.     The Enterprise has been so successful in masking itself behind DBAs that even Getter, who again is the purported owner of Funding 123, GoFund, and Merchant Capital, cannot even answer the question whether Funding 123 is a separate entity from GoFund because he's "not entirely sure [of] all the corporate structures. I know there's some Funding 123 of DBA. Quite frankly when I see those names, I don't know which one sometimes it is, which one we're talking about." *Id.* Tr. 97:23-98:4.

### iii.    Defendants Fraudulently Debit Merchants With Undisclosed Bank Fees

38.     This Court previously dismissed Plaintiffs' fraud claims to the extent that the fees were disclosed on the face of the MCA Agreement. The Court, however, upheld Plaintiffs' RICO claims based on a pattern of wire fraud.

39.     In each of the MCA Agreements, Defendants include an "Appendix A – The Fee Structure," which purports to list out all fees the borrowing merchant will incur, including, but not limited to, (i) an "Underwriting Fee" defined as "Minimum of $500 or up to 12% of the purchase price for underwriting and related expenses"; and (ii) an "ACH Origination Fee" defined as "Minimum of $500.00 or up to 10% of the purchase price to cover costs of Origination and ACH Setup." *See*, *e.g.*, [Doc. No. 69-2] at 10 (Appendix A).

40.     Evidence exchanged during discovery and documents produced by Defendants indicates that Defendants and the Enterprise regularly assessed merchants hidden and undisclosed

fees that were not identified in the MCA Agreement or in any other writing.  True and correct copies of said evidence is attached as **Exhibit 12**, which includes: (i) November 5, 2021 internal term sheet for an MCA agreement assessing a "30%" banking fee, produced by Defendants at GOFUND_000026357-358, whereas the MCA agreement for this deal only disclosed a 22% bank fee, *see* GOFUND_000026382; (ii) October 13, 2021 internal term sheet for an MCA agreement assessing a "25%" banking fee, produced by Defendants at GOFUND_000028502-514;[4] (iii) May 20, 2022 internal term sheet for MCA agreement assessing a "35%" banking fee, produced by Defendants at GOFUND_000029225-227, whereas the MCA agreement for this deal only disclosed a 32% bank fee, *see* GOFUND_000008606; (iv) November 1, 2021 internal term sheet for MCA agreement assessing a "25%" banking fee, produced by Defendants at GOFUND_000029803-807, whereas the MCA agreement for this deal only disclosed a 22% fee, *see* GOFUND_000017067.

iv.    **Defendants Knowingly And Improperly Purchase Receivables Subject To Tax Liens**

41.    Evidence exchanged during discovery and documents produced by Defendants indicates that Defendants and the Enterprise enter into MCA agreements with merchants knowing that the merchant's receivables are already subject to a tax lien.  True and correct copies of this evidence is attached hereto as **Exhibit 13**, which includes: (i) June 17, 2021 internal term sheet for an MCA agreement which identifies the merchant's "Business tax liens:  255k, 421k & 278k filed 2018; 135k, 546k, 190k & 1.8M in 2017," produced by Defendants at GOFUND_000027422-452; (ii) May 3, 2021 internal term sheet for an MCA agreement which identifies that "Merchant has a fed tax lien for 26k filed 2018," produced by Defendants at GOFUND_000028791-798; (iii)

---

[4] Defendants have not produced an MCA agreement for this particular deal, but records show that the contract was likely issued by Fundura, whose MCA agreements from 2021 disclose merely at 22% bank fee.  *See* Ex. 10 at GOFUND_000005222-232.

November 17, 2021 internal term sheet for an MCA agreement which identifies that "Merchants have a tax lien for 55k filed 12/17/19," produced by Defendants at GOFUND_000029808-821; (iv) January 25, 2022 internal term sheet for an MCA agreement which identifies "Merchant federal tax lien 191k, 117k filed 2019, 254k, 226k filed 2018, 783k 2017," produced by Defendants at GOFUND_000034968-970; and (v) January 20, 2022 internal term sheet for an MCA Agreement between Defendants and Haymount identifying "Merchant tax liens: 95k filed 2017; 26k, 36k & 568k filed 2018; 45k filed 2020," produced at GOFUND_000019975-979.

   v.  **Defendants Knowingly Purport to Purchase Receivables That Have Been Purportedly Sold to Others**

   42.    Evidence exchanged during discovery and documents produced by Defendants indicates that Defendants and the Enterprise routinely enter into MCA agreements with merchants, purporting to purchase the merchant's receivables, while knowing that the merchant's receivables were already purportedly sold to other lenders. True and correct copies of said evidence is attached hereto as **Exhibit 14**, which includes: (i) December 11, 2022 internal term sheet for an MCA agreement that identifies merchant as subject to other funding agreements with "empire capital" and "ROYAL OAK," produced by Defendants at GOFUND_000030326-327; (ii) October 13, 2021 internal term sheet for MCA agreement that identifies merchant was already making daily payments pursuant to other funding agreements, produced by Defendants at GOFUND_000029822-823; (iii) May 3, 2021 internal term sheet for MCA agreement that identifies merchant has "9 advances [i.e., MCA agreements] debiting $4,708 daily," produced by Defendants at GOFUND_000028791-798; (iv) October 15, 2021 internal term sheet for MCA agreement that identifies merchant has "4 advance debits for $961 daily & 1 debit for $666 weekly," produced by Defendants at GOFUND_000025878-891; (v) March 11, 2021 internal term sheet for MCA agreement that identifies merchants "currently have 10 advances debiting

$9,312 daily," produced by Defendants at GOFUND_000027405-421; (vi) November 1, 2021 internal term sheet for MCA agreement that identifies merchants "have 3 advance debits for $13,759 daily" with other MCA companies, produced by Defendants at GOFUND_000031994-2009; (vii) November 12, 2021 internal term sheet for MCA agreement that identifies merchants "currently have 8 advance debits for $37,082 daily & 3 advances debiting $29,437 weekly," produced by Defendants at GOFUND_000030975-987; (viii) June 22, 2021 internal term sheet for MCA agreement that identifies merchants "currently have 2 advance debits $1,500 daily," produced by Defendants at GOFUND_000032260-264; (ix) August 19, 2021 internal term sheet for MCA agreement that identifies merchants "have 4 debits for $41,363 daily," the Enterprise further discusses that this merchant "NEEDS 500K TODAY FOR PAYROLL" to which Kroen responds "LET HIM JUST GIVE US HIS BUSINESS AND WE'LL GIVE HIM 500K A YEAR FOR IT", to which Braun responds by agreeing to refinance, produced by Defendants at GOFUND_000031565-578; (x) May 26, 2021 internal term sheet for MCA agreement that identifies merchants "have 8 advances debiting $14,016 daily," produced by Defendants at GOFUND_000027473-74; (xi) January 27, 2022 internal term sheet for MCA agreement that identifies merchants "have 3 advance debits for $1,902 daily & 5 debits for $10,475 weekly," produced by Defendants at GOFUND_000028169-170; (xii) September 2, 2021 internal term sheet for MCA agreement that identifies merchants "have three advances debiting $12,399 daily," produced by Defendants at GOFUND_000028245-248; (xiii) June 21, 2021 internal term sheet for MCA agreement that identifies merchants "have 2 advance debits for $38,399 daily," produced by Defendants at GOFUND_000028407-410; (xiv) May 23, 2022 email from Defendants' underwriting department identifying that merchants entering into an MCA agreement "have 2 advance debits for $761" from one MCA company, and "2 advance debits for $1,139 daily" for

another MCA company, produced by Defendants at GOFUND_000056521-523; (xv) July 17, 2019 email chain in which distressed merchant asks for relief from multiple MCA agreements entered into between Defendants and other MCA companies, and Defendants thereafter coordinate with other MCA creditors of merchant to re-allocate their collective debits, produced by Defendants at GOFUND_000053840-847.

vi.    **Defendants Perform Underwriting For Finite Term MCA Agreements**

43.    Defendants represent in their MCA agreements and to merchants that these MCA agreements have indefinite terms, as indicated by the MCA agreements' preamble which states, as an example, "there is no interest rate or payment schedule and no time period for which the Purchase Amount must be collected by [GoFund]" and "[GoFund] will debit the Remittance business day from only one depositing bank account . . . until such time as [GoFund] receives payment in full of the Purchased Amount." *See* [Doc. No. 69-2] at 1.

44.    Evidence exchanged during discovery and documents produced by Defendants indicates that Defendants dispense of the fiction that these MCA agreements have indefinite terms when performing underwriting.  For the purposes of Underwriting, Defendants treat the MCA agreements as having finite terms based on the number of fixed daily or weekly payments necessary to reach the Purchased Amount.

45.    True and correct copies of this evidence is attached hereto as **Exhibit 15**, which includes: (i) January 20, 2022 internal term sheet for MCA agreement indicating there will be 25 separate payments, produced by Defendants at GOFUND_000020244-245; (ii) October 6, 2021 internal term sheet for MCA agreement indicating there will be 31 separate payments, produced by Defendants at GOFUND_000025617-618; (iii) October 13, 2021 internal term sheet for MCA agreement indicating there will be 30 separate payments, produced by Defendants at

GOFUND_000025860-62; (iv) October 15, 2021 internal term sheet for MCA agreement indicating there will be 75 separate payments, produced by Defendants at GOFUND_000025913-914; (v) June 28, 2021 internal term sheet for MCA agreement indicating there will be 31 separate payments, produced by Defendants at GOFUND_000026017-019; (vi) May 26, 2017 internal term sheet for MCA agreement indicating that there will be 30 separate payments, produced by Defendants at GOFUND_000026165-166; (vi) November 5, 2021 internal term sheet for MCA agreement indicating there will be 30 separate payments, produced by Defendants at GOFUND_000026357-358; (vii) November 12, 2021 internal term sheet for MCA Agreement indicating there will be 43 separate payments, produced by Defendants at GOFUND_000026516-519; (viii) February 9, 2021 internal term sheet for MCA agreement indicating there will be 34 separate payments, produced by Defendants at GOFUND_000026874-875; (ix) June 14, 2021 internal term sheet for MCA agreement indicating there will be 51 separate payments, produced by Defendants at GOFUND_000026919-920; (x) May 26, 2021 internal term sheet for MCA agreement indicating there will be 30 separate payments, produced by Defendants at GOFUND_000027473-474; (xi) July 27, 2021 internal term sheet for MCA agreement indicating there will be 26 separate payments, produced by Defendants at GOFUND_000027567-570; (xii) November 25, 2022 internal term sheet for MCA agreement indicating there will be 26 separate payments, produced by Defendants at GOFUND_000029057-58; (xiii) April 13, 2022 internal term sheet for MCA agreement indicating there will be 18 separate payments, produced by Defendants at GOFUND_000029399-404; (xiv) December 20, 2022 internal term sheet for MCA agreement indicating there will be 13 separate payments, produced by Defendants at GOFUND_000030734-735; (xv) July 12, 2021 internal term sheet for MCA agreement indicating there will be 31 separate payments, produced by Defendants at GOFUND_000031062-63; (xvi)

-18-

June 17, 2021 internal term sheet for MCA agreement indicating there will be 30 separate payments, produced by Defendants at GOFUND_000032114-119; (xvii) November 19, 2020 internal term sheet for MCA agreement indicating there will be 27 separate payments, produced by Defendants at GOFUND_000032411-112; (xviii) January 14, 2020 internal term sheet for MCA agreement indicating there will be 103 separate payments, produced by Defendants at GOFUND_000024715-716; (xix) January 24, 2022 internal term sheet for MCA agreement indicating there will be 113 separate payments, produced by Defendants at GOFUND_000024877-878; (xx) December 1, 2021 internal term sheet for MCA agreement indicating there will be 25 separate payments, produced by Defendants at GOFUND_000025503-505; (xxi) January 7-8, 2019 email chain involving Brezel and other Enterprise members discussing refinancing a merchant's MCA agreement to include a time period of "74 days," produced by Defendants at GOFUND_000022571-574; (xxii) December 20, 2018 email from Barry Gold, a "direct lender" of Kingsman Capital to Defendant Brezel asking for a MCA agreement to be drafted with "35 daily payments," produced by Defendants at GOFUND_000022877-878; (xxiii) January 9, 2019 email from Defendant Brezel to Enterprise member Second Chance (an MCA company) asking for a contract with a finite term, produced by Defendants at GOFUND_000023141; (xxiv) October 4, 2019 email from John Braun ("uw@highfivefunding") to members of the Enterprise asking for an MCA agreement to be drafted with a fixed term, produced by Defendants at GOFUND_000023295-297; (xxv) February 7, 2019 email from Defendant Brezel asking Second Chance Funding to create an MCA agreement on a fixed term, produced by Defendants at GOFUND_000023350; (xxvi) November 9, 2018 email from Defendant Brezel asking Second Chance Funding to create an MCA agreement with a "40 days" repayment period, produced by Defendants at GOFUND_000023795.

vii.    **Defendants Violate Due Process Through Use Of A Connecticut Marshall And The Law Firm Hassett & George, P.C.**

47.    Attached hereto as **Exhibit 16** is a true and correct copy of the transcript of the deposition of Marshal Elizabeth Ostrowski, taken on September 1, 2022.

48.    During her deposition, Marshal Ostrowski explained how she routinely performs service for Defendants and their attorneys, Hasset & George, P.C., on out-of-state debtors through service on the Connecticut Secretary of State. *Id*. Tr. 27:17-28:2. Marshal Ostrowski testified that she is directed to serve these out-of-state debtors by Jared Aflin, Esq., as Commissioner of the Connecticut Superior Court. *Id*. Tr. 30:10-31:17. Approximately one third of Marshal Ostrowski's $400,000 gross revenue she annually earns as a process server comes from work given to her by Jared Alfin, Esq. and the law firm he works for, Hassett & George, P.C. *Id.* Tr. 41:2-9.

49.    Marshal Ostrowski testified that when she receives a writ of attachment from Hassett & George, P.C., she generally immediately hand delivers these writs of attachment on local branches of national banks which are used by out-of-state debtors for their in-state banking needs. *Id*. Tr. 67:4-68:14. Ms. Ostrowski testified that she then typically waits several days or weeks thereafter to attempt service on the out-of-state debtor. *Id*.

50.    Marshal Ostrowski testified that since 2020, she's effected service in the above-described manner approximately 715 times. Tr. 109:1-110:10. Marshal Ostrowski testified that approximately 20 percent of her services are returned unopened. Tr. 91:1-23.

51.    Attached hereto as **Exhibit 17** is a true and correct copy of the transcript of the deposition of the law firm Hassett & George, P.C., via FRCP Rule 30(b)(6) witness Jared Alfin, Esq., partner of Hasset & George, P.C. and general outside counsel for Defendants GoFund Advance, LLC, Funding 123 LLC, and Merchant Capital LLC. *See id.* at 30:14-31:24.

52.     Hassett & George P.C. testified that they have served approximately 100 writs of attachment for Defendants GoFund Advance, LLC, Funding 123, LLC, and Merchant Capital LLC since 2020.  Tr. 51:9-53:23.  Approximately 90 to 85 percent of these writs of attachment never get returned to court.  *Id*.

53.     Hassett & George P.C. testified that they receive copies of services returned by Marshal Ostrowski indicating that she attempted service on out-of-state individual debtors via service on the Connecticut Secretary of State, and confirmed that the firm has not researched whether this is proper service.  *Id.* Tr. 163:13-167:3-5.

54.     Hassett & George P.C. testified that it had knowledge of certain Bloomberg articles and government filings alleging that Defendants did not actually maintain a place of business in Connecticut, but the firm did nothing to investigate this allegation.  *Id.* Tr. 65:2-16 and 79:21-80:2.  No one from Hassett & George P.C. has ever visited or attempted to visit Defendants' purported Connecticut address, the address Hassett & George P.C. lists for Defendants in their papers and filings used to obtain judgments on behalf of Defendants.  *Id*. Tr. 71:18-72:21.  Rather, Mr. Alfin had one meeting with Defendants at their Brooklyn, New York place of business.  *Id*. Tr. 42:7-43:1.  Hassett & George P.C. could not recall a single instance where any representative from Defendants had signed an affidavit outside of New York.  *Id*. Tr. 71:18-72:21.

viii.     **Defendants And Their Agents Use Bank Freezes And UCC Liens To Obtain Settlements Under Duress**

55.     As mentioned above, Hassett & George P.C. testified that approximately 90 to 85 percent of these writs of attachment never get filed with the court.  Ex. 17 Tr. 51:9-53:23.

56.     Hassett & George P.C. testified that the reason for why so many writs of attachment are not filed with a court is that either Jared Alfin or the Defendants themselves would negotiate a

settlement with the merchant while its bank account was frozen but before the writ of attachment was filed, and while the merchant was unrepresented by counsel.  Tr. 127:15-129:7.

57.    Attached hereto as **Exhibit 18** is a true and correct copy of the transcript of the deposition of Alpha Recovery Partners, LLC, via FRCP Rule 30(b)(6) witness Dan Gold, taken on September 7, 2022.

58.    Defendant Alpha Recovery testified that its role in the Enterprise is to send out UCC Lien Restraints through pre-signed attorney letters.  Gold Tr. 13:19-17:2, 50:15-54:20.  Alpha Recovery further testified that it also performs this function under the d/b/a of GSS.  *Id*. Tr. 22:16-24:19.

59.    Evidence exchanged during discovery and documents produced by Defendants indicates that Defendants employ other means of coercing distressed merchants into settlements under duress.  Evidence of such conduct is attached hereto as **Exhibit 19**, which includes: (i) an August 24, 2021 email from Jason Peterson of Bridge Funding Cap LLC (an MCA company) to Wolf and Alpha Recovery reporting that a merchant "claims he is having a hard time paying because you froze his vendors.  He is trying to find out how much the restrains are help [sic] for so we can try to get those funds turned over to you and then he can pay the rest" while in the midst of negotiations with the merchant's attorney, produced by Defendants at GOFUND_000021600-619; (ii) April 20, 2021 email from Defendant Alpha Recovery to the Enterprise stating: "working on settlement here.  We still haven't frozen anything so leverage is pending," produced by Defendants at GOFUND_000021543-545; (iii) a March 16, 2022 internal Alpha Recovery email listing out UCCs issued on various merchants, including AMEX accounts, produced by Defendants at GOFUND_000000001-4; (iv) February 15, 2022 email from Dan Gold of Alpha Recovery to Enterprise members, including Wolf, listing out over a dozen UCC notices Defendants

were sending to freeze Haymount's accounts, produced by Defendants at GOFUND_000020642-646; October 20, 2021, through November 11, 2021 email chain between Enterprise members regarding filing UCC liens on purportedly defaulted merchant, Alpha Recovery instructs the Enterprise to "TAKE IT ALL," produced by Defendants at GOFUND_000021496-499.

ix.    **Defendants Refer To Themselves As Lenders Internally And Externally**

60.    Defendants attempt to disclaim that they are hard-money lenders by relying on boilerplate language in their MCA agreements, which provides, for example, that "Merchant is selling a portion of a future revenue stream to [GoFund] at a discount, not borrowing money from [GoFund], therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by [GoFund]." *See* [Doc. No. 69-2] at 1.

61.    However, victims of Defendants and the Enterprise I have been in contact with the for the purposes of establishing the class have provided me with numerous instances of receiving texts or emails from Defendants and/or the Enterprise where they represent themselves as "direct lenders." True and correct copies of these text messages are attached hereto as **Exhibit 20**.

62.    Moreover, evidence exchanged during discovery and documents produced by Defendants further confirms that Defendants and the Enterprise or their agents regularly refer to themselves as lenders. Evidence of such representations is attached hereto as **Exhibit 21**, which includes: (i) June 3, 2019 email from Jack Snyder of Merk Funding to Wolf and other Enterprise members with a signature line that reads "Direct Lender," produced by Defendants at GOFUND_000053651; (ii) December 20, 2021 email chain between Enterprise members and Defendant Joseph "Yossi" Brezel ("Brezel") in which Enterprise member Kingsman Capital self identifies as a "Direct Lender," produced by Defendants at GOFUND_000022877-878; (iii) March 17, 2020, to May 20, 2020 email chain between Enterprise members and upset merchant who felt

defrauded in which the MCA agreements are described as "loans" in the email body and subject line, produced by Defendants at GOFUND_000024863-873; (iv) January 10, 2022 email from Enterprise member Ashley Huaser of Alt Capital Source (an MCA company) in which she identifies herself as "I'm a direct lender, and received your file from a few brokers," produced by Plaintiffs at HAY-0001559; (v) April 9, 2019 email from Wolf to members of the Enterprise listing terms of an MCA agreement and that "Lender on the contract GEL", GEL is a d/b/a for Defendant Merchant Capital, produced by Defendants at GOFUND_000053614.

x.    **Defendants Issue MCA Agreements That Are Facially Unconscionable**

63.    While recognizing that unconscionability is a fact-intensive legal question, discovery to date has identified certain MCA agreements Defendants have entered into with unsuspecting merchants that, by their absurdly onerous terms on their face, are usurious, unconscionable and intentionally doomed to fail.  Evidence of such MCA agreements is attached hereto as **Exhibit 22**, which includes: (i) a January 20, 2022 internal term sheet for an MCA Agreement with Haymount with a funding of $1,000,000 and a pay-back amount of $1,500,000 in 25 days, while acknowledging Haymount had "current advances debiting over 2.5M/month" and had a most recent monthly receivables valued at $1,082,420, produced by Defendants at GOFUND_000019975-979; (ii) a December 1, 2021 internal term sheet for an MCA with a $500,000 advance amount that was to be repaid as $1,499,900.00 to Defendants within 25 days, produced by Defendants at GOFUND_000025503-505; (iii) March 11, 2021 email from Wolf to other members of the Enterprising setting forth a potential MCA agreement with a merchant Defendants know, as written by Wolf, "is only surviving because he keeps getting funding… would pass…unless you want to take the risk since it's only 19 day contract," yet Defendants

ultimate approve the transaction on March 25, 2021, produced by Defendants at GOFUND_000027405-421.

64.     Brezel testified that Defendants very rarely ever modify the terms of an MCA agreement, and when pressed for an example, Defendants could only recall one instance in which they agreed to a merchant's request to include a Heter Iska provision.  Tr. 52:18-57:9.

65.     What is more, public filings indicate that other merchants who have entered into contracts with the Enterprise, through one of its DBAs Fundura Capital Group[5], have accused the Enterprise of making unlawful and unauthorized withdrawals from their bank accounts unconnected to any remittance.  *See Fundura Capital Group v. Bat, Inc DBA Cost Processing et al.*, Index No. 613192/2021 (Sup. Ct. Nassau Cnty. 2021) [Doc. No 103 (Answer with Counterclaims) at ¶¶ 63-72, attached hereto as **Exhibit 23**.

66.     The above allegation against Fundura Capital Group making unauthorized withdrawals is not an isolated incident.   While Defendants' productions to date have had remarkably little correspondence between Defendants and their merchant clients, the few such communications produced included instances of merchants accusing Defendants of making unauthorized withdrawals.  Evidence of such conduct is attached hereto as **Exhibit 24** and includes (i) text messages from merchant to the Enterprise in which the merchant alleges MCA company withdrew 25% more money than was loaned, produced by Defendants at GOFUND_000062739-000062751; (ii) an October 26, 2021 email from Plaintiff Clinton to Merchant Capital asking for $31,558 paid over the contract amount be reimburse, produced by Defendants at GOFUND_000065734-36; and (iii) a January 12, 2022 email from Braun to the Enterprise

---

[5] *See* Exhibit 10 at GOFUND_000005222-232.

acknowledging that Haymount was debited 3 times in one day, produced by Defendants at GOFUND_000065769-783.

67.    Defendants internal underwriting criteria also reflects the unconscionability of the Enterprises MCA agreements.  For instance, on October 14, 2020, Defendant Kroen emailed a potential partner for the Enterprise "Fundura Capital Guidelines" for MCA contracts, which allOW upwards of 6 simultaneous positions on a given merchant account, require a mere $15,000 in monthly revenue and a 500 FICO score for approval, and clearly lists a finite max term of "6" (presumably months), reflecting the absolute repayment of their contracts, attached hereto as **Exhibit 25** at produced by Defendants at GOFUND_000057622.

xi.    **Defendants Conduct Demonstrates The Existence Of A RICO Enterprise**

67.    Statutory law defines a RICO enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  The RICO statute further provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Id*. § 1962(c).  Plaintiffs pleaded that Defendants conduct such an Enterprise through their pattern of collecting usurious debt pursuant to their MCA agreements. *See* Dkt. No. 28 at ¶¶ 236-242.

68.    Evidence exchanged during discovery and documents from Defendants' production have confirmed that Defendants operate a RICO enterprise through a pattern of racketeering and collection of unlawful debt using interstate commerce.  Evidence of the Enterprise's operational conduct is attached hereto as **Exhibit 26**, which includes: (i) February 7, 2022 email from

Enterprise member and MCA company United Fund USA to Alpha Recovery asking for a "RUSH" filing of UCC lien as a collection tactic for a merchant purportedly in default, produced by Defendants at GOFUND_000021620; (ii) January 9-11, 2019 email chain between Enterprise members and a merchant based in Texas where merchant accuses: "this transaction was extremely misleading and false in substance," produced by Defendants at GOFUND_000023527-549; (iii) undated email from Ashley Hauser of Alt Capital Source (an MCA company) disclosing that she is "texting Haymount from a new number that I'm from legal dept at funding 123 lol," indicating deception of merchants, produced by Defendants at GOFUND_000009505; (iv) February 15, 2022 email from Rene Aryeh of Business Fund Corp. (an MCA company) to Defendant Alpha Recovery asking it to send out UCC restrains on Haymount, based in North Carolina, for purported default as a collection tactic, produced by Defendants at GOFUND_000000010; (v) May 2, 2022 email chain showing MCA company Business Fund Corp. contacting Defendant Alpha Recovery at the request of Defendant Wolf for the purpose of helping "defend you guys in the Haymount deal," produced by Defendants at GOFUND_000000336-37; (vi) June 3, 2019 email from Barry Gold of MCA company Merk Funding, a "Direct Lender", to Defendant Wolf informing Wolf that he's obtained executed contracts and Confessions of Judgment for a merchant, produced by Defendants at GOFUND_000053941-42; (vii) August 30, 2021, through October 22, 2021 email chain between Enterprise members, including Braun, and Defendant Wolf, discussing collection efforts through UCC liens with respect to Haymount, produced by Defendants at GOFUND_000018955-971; (viii) December 28, 2021, through January 7, 2021 email chain between members of the Enterprise, including Braun and Defendants Brezel and Wolf, discussing the level of funds in Haymount's various bank accounts and directing wiring, produced by Defendants at GOFUND_000011288-293; (ix) December 28, 2021 email chain between members of the

Enterprise, including Wolf, Braun, and Brezel, discussing the debiting of Haymount's bank accounts, located in North Carolina, produced by Defendants at GOFUND_000010374-376.

xii.    **Miscellaneous Documents Relied Upon In The Motion For Class Certification**

69.    Attached hereto as **Exhibit 27** is a true and correct copy of Defendant Funding 123, LLC's Responses to Plaintiffs' First Set of Requests for Admission, dated August 24, 2022.

70.    Attached hereto as **Exhibit 28** is a true and correct copy of Defendant GoFund Advance LLC's Response to Plaintiffs' First Set of Requests for Admission, dated August 24, 2022.

71.    Attached hereto as **Exhibit 29** is a true and correct copy of Defendant Merchant Capital LLC's Response to Plaintiffs' First Set of Requests for Admission, dated August 24, 2022.

72.    Attached hereto as **Exhibit 30** is a true and correct copy of the Preliminary Expert Report on Damages, prepared by Charles S. Lunden, dated August 31, 2022.

73.    Attached hereto as **Exhibit 31** are true and correct copies of unpublished relevant case law, including *Gibbs v. Stinson*, 3:18-cv-676 (E.D. Va. Oct. 14, 2021); *Williams v. Big Picture Loans, LLC*, Civil Action 3:17-CV-461 (E.D. Va. July 20, 2021); *Clark Advanceme, Inc.*, No. CV-0803540 VBF (FFMx) (C.D. Cal. Dec. 13, 2010); *Fleetwood Serv., LLC v. Ram Cap. Funding, LLC*, 20-cv-05120-LJL, DE 105 (S.D.N.Y. Aug. 17, 2022); and *Hi Bar Capital LLC d/b/a Kingdom Kapital v. Parkway Services, LLC et al.*, Index No. 533245/2022 (Sup. Ct. Kings Co. Aug. 25, 2022).

74.    Attached hereto as **Exhibit 32** is a true and correct copy of the Declaration of Robert A. Clinton, Jr., dated September 12, 2022.

75.     Attached hereto as **Exhibit 33** are true and correct copies of merchants' payment histories with Defendants pursuant to MCA agreements issued by Defendants, including payment histories of Plaintiffs and other potential class members.

76.     Attached hereto as **Exhibit 34** is a true and correct copy of the rough transcript of the deposition of Defendant Yisroel Getter, taken on September 21, 2022.

77.     Attached hereto as **Exhibit 35** is a true and correct copy of the transcript of the deposition of Defendant Joseph Kroen, taken on September 13, 2022.

78.     Attached hereto as **Exhibit 36** are revenue calculations prepared by Defendant Brezel reflecting revenue derived from Haymount deals.

79.     The above is based on Defendants' incomplete production to date.  Defendants have also refused to certify that they produced all of their MCA agreements.

80.     Finally, I am not aware of any other active class cases on the same issues here, let alone any that have progressed through discovery.

Dated: September 23, 2022

**WHITE AND WILLIAMS LLP**

By: _____
Shane R. Heskin
7 Times Square, STE 29
New York, NY 10036
(215) 864-6329
heskins@whiteandwilliams.com

-29-
