**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAYMOUNT URGENT CARE PC, and ROBERT A. CLINTON, JR., individually, and on behalf of all those similarly situated, | |
| Plaintiffs. | Case No. 1:22-cv-01245-JSR |
| v. | |
| GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISAAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, and YISROEL C. GETTER, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................................. iii

STATEMENT OF FACTS ................................................................................................... 3

I.      The Funders' MCA products ................................................................................... 3

II.     Plaintiffs' relationship with the Funders was nothing like the generalized allegations
        of predatory lending.................................................................................................. 7

LEGAL STANDARD .......................................................................................................... 9

ARGUMENT ....................................................................................................................... 10

I.      Plaintiffs have not pursued, and have thus waived, class certification on the RICO
        wire fraud claims...................................................................................................... 10

II.     Usury and RICO actions are ill-suited for class treatment ...................................... 10

III.    Neither Haymount nor Clinton meets the requirements of Rule 23(a)..................... 13

        A.      The facts and law at issue here are not common for all class members .............. 13

        B.      Plaintiffs' claims are not typical......................................................................... 17

        C.      Plaintiffs are inadequate representatives............................................................. 20

        D.      White & Williams is inadequate class counsel .................................................... 23

        E.      The class definition is impermissibly broad ........................................................ 25

IV.     Haymount and Clinton do not meet the requirements of Rule 23(b).......................... 26

        A.      No common issues predominate over individual issues ....................................... 26

        B.      Individual issues predominate over the question of whether the MCA
                agreements constitute loans ................................................................................ 27

        C.      Certification is inappropriate because Plaintiffs cannot prove Defendants'
                alleged scienter on a class-wide basis ................................................................. 28

                1.      Usury-Based RICO claims require a showing of awareness of illegality.... 29

                2.      Scienter cannot be proved here on a class-wide basis ................................. 30

        D.      Damages are not calculable on a class-wide basis................................................ 31

V.      Class action is not a superior mechanism for pursuing this action ................................... 32

VI.   Plaintiffs' attempts to avoid the class waiver are themselves evidence that a class cannot be certified ........................................................................................................... 34

     A.   If the class action waiver is void, then conflicts of law prevent certification ....... 35

     B.   Defendants neither consented nor waived choice of law arguments ................... 37

VII.  Haymount and Clinton fail to meet the requirements for a Rule 23(b)(2) class .............. 39

CONCLUSION ..................................................................................................................... 40

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Timber & Trading Co. v. First Nat'l Bank of Oregon*,
690 F.2d 781 (9th Cir. 1982) ................................................................................. 12

*Am. Water Restoration, Inc. v. AKF Inc.*,
157 N.Y.S.3d 919 (N.Y. Sup. Ct. 2022) ........................................................... 16, 31

*Amara v. CIGNA Corp.*,
775 F.3d 510 (2d Cir. 2014) .................................................................................. 10

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000) ............................................................................... 17, 20

*Bistro Exec., Inc. v. Rewards Network, Inc.*,
No. 04-cv-4640, 2006 WL 6849825 (C.D. Cal. July 19, 2006) .............................. 12

*Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*,
105 A.D.3d 178 (1st Dep't 2013) ...................................................................... 28, 35

*Brecher v. Republic of Argentina*,
806 F.3d 22 (2d Cir. 2015) .................................................................................... 25

*Bridge v. Phx. Bond & Indem. Co.*,
553 U.S. 639 (2008) ............................................................................................... 27

*Bryan v. United States*,
524 U.S. 184 (1998) ............................................................................................... 29

*Cavalry LLC v. EBF Holdings*, LLC,
No. 3081/2021, 2021 WL 5868324 (Sup. Ct. Oct. 5, 2021) .................................. 33

*Dauphin v. Chestnut Ridge Transp.*,
No. 06-cv-2730, 2009 WL 2596636 (S.D.N.Y. Aug. 20, 2009) .............................. 23

*de Lacour v. Colgate-Palmolive Co.*,
338 F.R.D. 324 (S.D.N.Y. 2021) ...................................................................... 13, 21

*Delorme v. Autos, Inc.*,
No. 11-cv-039, 2012 WL 1606636 (D.N.D. May 8, 2012) ............................... 11, 13

*Ebin v. Kangadis Food inc.*,
297 F.R.D. 561 (S.D.N.Y. 2014) ........................................................................... 20

*Elonis v. United States*,
575 U.S. 723 (2015) ............................................................................................... 29

*Endres v. Wells Fargo Bank*,
No. C 06-7019, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008) .................................................. 11

*Express Working Cap., LLC v. Starving Students, Inc.*,
28 F. Supp. 3d 660 (N.D. Tex. 2014) ..................................................................................... 36

*Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*,
No. 20-cv-5120, 2022 WL 3536128 (S.D.N.Y. Aug. 17, 2022) ............................................ 28

*Freeland v. AT & T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) ............................................................................................ 40

*Garcia De Leon v. New York Univ.*,
No. 21-cv-05005, 2022 WL 2237452 (S.D.N.Y. June 22, 2022) ........................................... 23

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990) ................................................................................................... 23

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ................................................................................................................ 10

*Georgine v. Amchem Prods., Inc.*,
*83 F.3d 610 (3d Cir. 1996)* .................................................................................................... 32

*Gibbs v. Stinson*,
No. 18-cv-676, 2021 WL 4812451 (E.D. Va. Oct. 14, 2021) ................................................ 12

*Glover v. Udren*,
No. 08-cv-990, 2013 WL 6237990 (W.D. Pa. Dec. 3, 2013),
*aff'd*, 629 F. App'x 331 (3d Cir. 2015) .................................................................................. 11

*Gordon v. Sonar Cap. Mgmt. LLC*,
92 F. Supp. 3d 193 (S.D.N.Y. 2015)............................................................................ 9, 10, 21

*Graybeal v. Am. Sav. & Loan Ass'n*,
59 F.R.D. 7 (D.D.C. 1973) ..................................................................................................... 11

*Huang v. Shanghai City Corp.*,
No. 19-cv-7702, 2022 WL 1468450 (S.D.N.Y. May 10, 2022) ............................................. 10

*Hughes v. The Ester C Co.*,
317 F.R.D. 333 (E.D.N.Y. 2016) ........................................................................................... 39

*In re Brinker Data Incident Litig.*,
No. 18-cv-686, 2020 WL 691848 (M.D. Fla. Jan. 27, 2020)................................................. 38

*In re Digital Music Antitrust Litig.*,
321 F.R.D. 64 (S.D.N.Y. 2017) ............................................................................................. 37

*In re Monster Worldwide, Inc. Sec. Litig.*,
  251 F.R.D. 132 (S.D.N.Y. 2008) .................................................................................. 22

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  338 F.R.D. 527 (S.D.N.Y., 2021) ................................................................................. 26

*In re Petrobras Secs.*,
  862 F.3d 250 (2d Cir. 2017) ................................................................................... 9, 26

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Pracs. Litig.*,
  No. 05 C 2623, 2007 WL 4287511 (N.D. Ill. Dec. 4, 2007) ........................................ 26

*Jim Ball Pontiac-Buick-GMC, Inc. v. DHL Exp. (USA), Inc.*,
  No. 08-cv-761C, 2011 WL 815209 (W.D.N.Y. Mar. 2, 2011) ....................................... 18

*Johnson v. Nextel Commc'ns Inc.*,
  780 F.3d 128 (2d Cir. 2015) ......................................................................................... 36

*Kennard Law P.C. v. High Speed Capital LLC*,
  199 A.D.3d 1406 (4th Dept 2021) ........................................................................... 16, 31

*Koos v. First Nat'l Bank of Peoria*,
  496 F.2d 1162 (7th Cir. 1974) ..................................................................................... 11

*Kulig v. Midland Funding, LLC*,
  No. 13-cv-4715, 2014 WL 6769741 (S.D.N.Y. Nov. 20, 2014) ................................... 23

*Lewis Tree Servs., Inc. v. Lucent Techs., Inc.*,
  211 F.R.D. 228 (S.D.N.Y. 2002) ................................................................................. 37

*McDonnell v. AMC Entm't Holdings Inc.*,
  No. 20-cv-5378, 2022 WL 3274166 (S.D.N.Y. Aug. 11, 2022) ................................... 39

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) ................................................................................... 27, 32

*Moore v. Comfed Sav. Bank*,
  908 F.2d 834 (11th Cir. 1990) ..................................................................................... 12

*Moore v. Margiotta*,
  581 F. Supp. 649 (E.D.N.Y. 1984) ............................................................................... 25

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) ............................................................................... 11, 13

*Morrison v. Ocean State Jobbers, Inc.*,
  290 F.R.D. 347 (D. Conn. 2013) ................................................................................. 22

v

*Moss v. First Premier Bank*,
   No. 213-cv-05438, 2020 WL 5231320 (E.D.N.Y. Sept. 2, 2020) ............................................. 35

*Motorola Credit Corp. v. Uzan*,
   322 F.3d 130 (2d Cir. 2003) ............................................................................................. 26

*Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Assurance Co., Inc.*,
   No. 15-cv-7063, 2019 WL 3409882 (S.D.N.Y. July 27, 2019). ........................................ 34

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ............................................................................................... 9

*Parker v. George Thompson Ford, Inc.*,
   83 F.R.D. 378 (N.D. Ga. 1979) ........................................................................................ 11

*Pirs Cap., LLC v. D&M Truck, Tire & Trailer Repair Inc.*,
   129 N.Y.S.3d 734 (Sup. Ct. 2020) ................................................................................... 20

*Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*,
   277 F.R.D. 97 (S.D.N.Y. 2011) ........................................................................................ 10

*Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014) ................................................................................ 38

*Reliability Inc. v. Doki*,
   No. 20-cv-7109, 2021 WL 3408589 (S.D.N.Y. Aug. 4, 2021) ........................................... 1

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) ......................................................................................... 9, 27

*Robinson v. Metro-N. Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001) ............................................................................................. 39

*Roper v. Consurve, Inc.*,
   578 F.2d 1106 (5th Cir. 1978) ......................................................................................... 12

*Russell v. Forster & Garbus, LLP*,
   No. 17-cv-4274, 2020 WL 1244804 (E.D.N.Y. Mar. 16, 2020) ................................. 21, 22

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
   806 F.3d 71 (2d Cir. 2015) .............................................................................................. 11

*SpecFin Mgmt. LLC v. Elhadidy*,
   201 A.D.3d 31 (4th Dep't 2021) ..................................................................................... 19

*Staples v. United States*,
   511 U.S. 600 (1994) ........................................................................................................ 30

*Star Funding, Inc. v. Vault Minerals, LLC*,
No. 15-CV-03026, 2017 WL 7791558 (S.D.N.Y. Aug. 10 2017) report and
recommendation adopted No. 15-CV-03026, 2018 WL 1581685 (S.D.N.Y. Mar. 28, 2018) ... 19

*Streamlined Consultants, Inc. v. EBF Holdings LLC*,
No. 21-cv-9528, 2022 WL 4368114 (S.D.N.Y. Sept. 20, 2022) ................................................. 29

*Tender Loving Care Homes v. Reliable Fast Cash, LLC*,
172 N.Y.S.3d 335 (N.Y. Sup. Ct. 2022) ................................................................. 16, 31, 32, 33

*Ubaldi v. SLM Corp*.,
No. 11-01320 EDL, 2014 WL 1266783 (N.D. Cal. Mar. 24, 2014) ........................................ 11

*United States v. Moseley*,
980 F.3d 9 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1442 (2021) ....................................... 30, 36

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ...................................................................................................... 9, 13, 17

*Wang v. Tesla, Inc*.,
338 F.R.D. 428 (E.D.N.Y. 2021) ............................................................................................ 26

*Williams v. Big Picture Loans, LLC*,
339 F.R.D. 46 (E.D. Va. 2021) ............................................................................................... 12

*Withus v. Saul*,
No. 18-cv-10923, 2021 WL 2012270 (S.D.N.Y. May 19, 2021) ............................................ 10

*Womack v. Cap. Stack, LLC*,
No. 18-cv-04192, 2019 WL 4142740 (S.D.N.Y. Aug. 30, 2019) ........................................ 4, 16

*Yellowstone Cap. LLC v. Cent. USA Wireless LLC*,
110 N.Y.S.3d 485 (Table), 2018 WL 3765121 (Sup. Ct. June 25, 2018) ................................ 33

**Other Authorities**

*Allowable Fees on Commercial Loans*, 50 STATE STATUTORY SURVEYS: FINANCIAL SERVICES:
LOAN FUNDING (2021) ......................................................................................................... 36

Fed. R. Civ. P. 23(a) ..................................................................................................................... 9

Fed. R. Civ. P. 23(a)(4) .............................................................................................................. 20

Fed. R. Civ. P. 23(b)(2) .............................................................................................................. 39

Fed. R. Evid. 404(b)(1) ................................................................................................................. 8

Hannah Norman, *Hospitals are charging hundreds per COVID test. Will insurance premiums rise to compensate?* FORTUNE, May 7, 2021, *available at* https://fortune.com/2021/05/07/covid-test-billed-charged-hundreds-insurance-higher-premiums-hospitals/ (last accessed Oct. 12, 2022) ................................................................... 16

N.C. Gen. Stat. Ann. § 24-1.1 ........................................................................................ 36

N.Y. Gen. Oblig. Law § 5-501(6)(b)............................................................................... 19

Tex. Bus. & Comm. Code § 9.109(e) ............................................................................. 36

Defendants GoFund Advance, LLC ("GFA"), Funding 123, LLC ("Funding 123"), Merchant Capital LLC ("Merchant Capital"), Alpha Recovery Partners, LLC (collectively, the "Funders"), Yitzchok Wolf, Yosef Brezel, and Joseph Kroen (with the Funders, "Defendants") respectfully submit this Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification.

## PRELIMINARY STATEMENT

Plaintiffs cannot meet their burden of satisfying the Rule 23 factors that govern class certification. Recognizing this, Plaintiffs devote their 40-page brief (and an improper 29-page argumentative affidavit) to irrelevant facts intended to malign Defendants.[1] But the issue before the Court is whether this case, on its actual record, meets the standard for class certification. As detailed below, it does not; Plaintiffs' motion fails for several independent reasons.

The *relevant* record is clear that the merchant cash advance ("MCA") agreements Defendants offered were highly bespoke arrangements based on the specific business realities of the counterparties. The substantive terms of those agreements—the amount of revenue purchased, the purchase price, and the terms of their remittance—were carefully determined based on those individual merchants' businesses, their historic revenues, documents about those revenues, and merchant representations about what the future held for their particular revenues; the rest of the MCA terms were generally applicable and so reasonably used a standard form agreement. But these substantive and individualized terms are key to determining whether the MCA agreements are factoring

---

[1] Despite dropping two-thirds of their proposed classes through the voluntary dismissal of former plaintiffs Turrentine and Indigo, Plaintiffs added a 29-page argumentative counsel affidavit that nearly doubled the length of the permitted 40-pages they requested. *See* Dkt. 138 (the "Heskin Declaration"). The Heskin Declaration includes, for example, allegations and photographs concerning allegedly unscrupulous individuals unconnected to this case, *id.* ¶¶ 11-14, and several pages devoted to collections procedures in Connecticut despite Plaintiffs dismissal of all claims related to such procedures. *Compare id.* ¶¶ 47-56 *with* Motion at 16 n.10. Plaintiffs have thus granted themselves a 69-page brief. The Court should strike or ignore at least those portions of the declaration that contain legal argument or facts outside the record. *See Reliability Inc. v. Doki*, No. 20-cv-7109, 2021 WL 3408589, at *5 n.4 (S.D.N.Y. Aug. 4, 2021) ("The Court does not appreciate Defendants' page-saving machinations, and did not rely on the Kendall Declaration's recitation of facts in resolving the instant motion.").

agreements or loans. Plaintiffs blithely allege that the revenues purchased were shams, but the record shows that for both remaining named Plaintiffs Haymount Urgent Care PC ("Haymount") and Robert Clinton ("Clinton"), and ex-named plaintiffs Indigo Installations, Inc. ("Indigo") and Christopher Turrentine ("Turrentine"), *i.e.,* the only putative class members subject to detailed individualized discovery, Defendants carefully calculated the receivables purchase agreements to reflect the business's projected revenues. In the case of Haymount, the parties expected his business would continue its meteoric rise based on his highly demanded COVID-19 testing; and for Indigo, Defendants calculated revenue based on past receivables to near mathematical exactitude.[2] Plaintiffs seek to avoid these sorts of individualized facts by invoking Rule 23, but these facts demonstrate why class treatment is improper, and why the Court should deny Plaintiffs' motion.

Defendants concede numerosity is satisfied. But Plaintiffs fail to satisfy *any* of Rule 23's other requirements. For commonality, whether these bespoke transactions constituted usurious loans does not lend itself to common answers. For typicality, Plaintiffs' claims are subject to individual defenses—including that Haymount was (i) using the MCA agreements to speculate on luxury watches and crypto-currency, and that (ii) Haymount's overall balance exceeded $2.5 million dollars, rendering New York's usury laws inapplicable. For adequacy, Plaintiffs have been uninvolved stewards of the litigation—as demonstrated by the fact that Plaintiffs initiated this lawsuit at the behest of Defendants' competitors (who selected Plaintiffs' counsel, White and Williams, and advanced them $10,000). Moreover, Plaintiffs' counsel is inadequate because the firm represents a parallel and overlapping class.

Just as fundamentally, individual issues—such as questions of Defendants' scienter and the

---

[2] Indeed, immediately after Indigo was forced to sit for a deposition and admit these facts, Class Counsel dismissed its claims from this putative class action. This record demonstrates why Defendants must be afforded an opportunity to subject all class members to an individualized adversarial process.

factors demonstrating that the agreements are not loans—predominate over any common questions. For example, as shown below, the nature of the transaction (loan v. factoring agreement) cannot be determined from a review of the common contract terms. And while Plaintiffs insist that damages are calculable using an excel spreadsheet their expert compiled, at deposition, that same expert *disclaimed* his own analysis because it did not consider the "economic realities" of the underlying transactions. In fact, Plaintiffs' expert testified that the proposed class definition was too broad because it included multiple categories of members who suffered no damages.

Yet the Court need not reach any of these questions. Instead, the relevant contracts each contain an express class action waiver. Plaintiffs' attempts to avoid that waiver only doom their motion further: If the contracts are void *ab initio*, no choice of law provision applies, and the Court must conduct a choice of law analysis for *each merchant*. This individualized inquiry renders class treatment improper. The Court should deny Plaintiffs' motion.

<u>**STATEMENT OF FACTS**</u>

### I. The Funders' MCA products

MCA agreements are unique financial products that make working capital available to small businesses who cannot obtain traditional bank financing. In an MCA agreement, the Funders purchase future receivables from a merchant at a discount, collecting a percentage of the merchant's receivables until the full purchased amount has been received. MCAs are attractive to merchants because they have no payment deadlines (unlike typical loans) and the Funders' collections are aligned with the merchant's fluctuating revenue. MCA agreements have for years been upheld as a way for businesses to sell their future receivables—which carry inherent uncertainty and risk—for a present value discount. For decades, these products were routinely held to be outside of the ambit of usury laws, as they were not loans or forbearances, but rather bona fide purchases of receivables. *See Womack v. Cap. Stack, LLC*, No. 18-cv-04192, 2019 WL 4142740, at *7 n.9

(S.D.N.Y. Aug. 30, 2019) ("At least twenty-eight other recent decisions by State and Federal courts in New York found that similar MCA transactions were not loans subject to New York's usury laws."). It has been the law for years that where "the buyer: 1) purchases a fixed amount of the seller's future sales proceeds; 2) the proceeds are deliverable from a percentage of the seller's daily sales proceeds; and 3) the agreement provides no liability if the seller ceases operations in the ordinary course of business," the agreement is not a loan, unless and until state legislatures revisit the issue. *Id.* The Funders in this lawsuit have taken care to ensure that their agreements are consistent with current law, *see, e.g.*, Ex. 1[3] [Wolf Tr. 245:1-17], and crafted each contract individually to account for the needs and revenues of each merchant. Ex. 2 [Brezel Tr. 86:10-87:20].

Haymount's MCA agreements are prime examples of such tailor-made contracts. The terms, including the purchase price, purchased percent, purchased amount, payment frequency, and remittance, were all calculated based on Haymount's receivables. In addition, the Funders considered Haymount's representation that its revenue would continue to experience explosive growth due to COVID-19 testing when determining the terms of and agreeing to fund its contract. *Id.* [Brezel Tr. 197:6-199:23]. In fact, Haymount's MCA agreement even included **a custom addendum** that allowed for the reduction of the amount of revenue purchased if certain economic conditions were met. Ex. 3. Indigo has withdrawn as a plaintiff, but the Funders tailored that agreement too: Indigo's revenues were estimated with almost exact precision, underscoring the fact that the transaction was a bona fide purchase of receivables, not a loan. Ex. 4 [Indigo Tr. 71:23-76:23; 83:9-85:21] (admitting that Indigo's average revenue for a month and a half was ███████, and that 45% of ███████ is ██████, which is "pretty close" to the $63,960 that was purchased).

---

[3] The exhibit references herein are to the exhibits to the concurrently filed Freedman Declaration.

The Funders' MCA agreements also contain numerous common terms which demonstrate these transactions are not loans. For example, they each have a section on the first page entitled "PURCHASE AND SALE OF FUTURE RECEIVABLES," which states that the Funders will pay the merchant a purchase price for a specified percentage of all of the merchant's future receivables. *See, e.g.*, Dkts. 69-1–8. Each of these agreements provides: "Merchant is selling a portion of a future revenue stream to [Funder] at a discount, not borrowing money from [Funder], therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by [Funder]." *See, e.g.*, Dkt. 69-1 at 2. The MCA agreements at issue also have robust reconciliation and adjustment-to-remittance provisions that ensure merchants do not pay more than they have contractually agreed to pay—and that if they do, they retroactively receive refunds. Discovery has confirmed that Defendants perform reconciliations and adjustment to remittances. Ex. 1 [Wolf Tr. 260:22-262:1]; Ex. 2 [Brezel Tr. 59:19-63:10; 64:5-70:6]; Ex. 5 (showing Defendants adjusting remittances based on merchant requests).

Contrary to Plaintiffs' assertions, the MCA agreements include mandatory reconciliation provisions that protect Merchants by shifting the risk posed by revenue shortfalls to Defendants. As the Court noted in resolving Defendants' motion to dismiss, the existence of a mandatory reconciliation provision is an important factor in assessing whether the MCA agreement is really a loan, and the agreements at issue "purport to have mandatory reconciliation provisions." Dkt. 86 at 14-15 (discussing § 1.4 of the agreements).

Unfortunately, it appears Defendants' prior counsel failed to highlight that the MCA Agreements have *two* reconciliation provisions: § 1.4 (retroactive reconciliation) and § 1.5 (adjustment to future remittances). The Court analyzed only § 1.4, which is a supplementary procedure to retroactively correct any overcollection. It is for this reason that the provision is limited as

5

the Court described. The main method for reconciling the reality of merchant collections with the contractually estimated monthly payments is § 1.5, which provides that the merchant has the *right* to a payment adjustment at *any* time.

Specifically, § 1.5 provides that "should the Merchant experience a decrease in its' Future Receipts, Merchant may give notice to GFA to request a decrease in the Remittance" and that upon providing such notice and supporting documentation, "the Remittance *shall* be modified to more closely reflect the Merchant's actual receipts" for the next two weeks. Dkt. 69-2 § 1.5 (emphasis added). In addition, at the expiration of those two weeks, the Merchant is entitled to "request another adjustment pursuant to this paragraph." *Id.* This means that as long as the merchant provides Defendants with access to the pertinent records, Defendants do not have the right to decline the request (nor has any evidence suggested that Defendants have done so). The merchant can make a remittance adjustment request *at any time*, not "only during the last five business days of a month." *Compare* Dkt. 69-2 § 1.5 *with* Dkt. 86 at 14-15.

In other words, the fact that § 1.4 was effective only at month's end was a feature, not a bug, because any reconciliation during the month would be handled under § 1.5. The two provisions, read in concert, establish that a seller did have the ability to request an adjustment to remittance at any point if they had concerns about their ability to afford the daily remittance amount (under § 1.5), and that they also had the ability to request a retroactive adjustment if, when the months' books closed, monthly receivables were less than anticipated (under § 1.4). These companion provisions protect both the seller who finds themselves unable to pay during the period of the contract (§ 1.5) and the seller who, while able to technically afford the remittance amount, realizes at month's end that they earned less than anticipated (§ 1.4). The contract therefore provides the seller with layered reconciliation provisions, both of which are mandatory if the seller's

receivables decrease.[4] Thus Defendants, not merchants, bear the risk of less-than-expected or no receivables.[5]

## II. Plaintiffs' relationship with the Funders was nothing like the generalized allegations of predatory lending

Plaintiffs' motion (at 1-2) paints a picture of merchants as vulnerable victims living paycheck-to-paycheck, at risk of losing their business, healthcare, and livelihood as a result of Defendants' purportedly aggressive agreements. The evidence shows this to be false. When Haymount entered into these MCA agreements, Clinton was using Haymount's revenues to purchase an allegedly $135,000 Richard Mille watch, among other luxury watches, and $5,000 of cryptoassets each day—such that he ended up with about $500,000 worth of cryptoassets. *See* Ex. 6 [Haymount Tr. 165:21-167:24; 140:5-15; 195:20-198:2]. Plaintiffs' motion also creates the impression that Defendants take advantage of individuals and businesses who are unfamiliar with the MCA business. The evidence shows this to be false as well. Plaintiffs are repeat players in the MCA industry, having entered into over 40 MCA contracts since 2018. *Id.* at 61:6-20. Indeed, prior to being directed to sue by Defendants' competitors, Plaintiffs were pleased with the MCA agreements that are the subject of this lawsuit. Ex. 7.

In short, the record shows that Haymount's business was going gangbusters due to COVID-19, that Clinton was trying to extract as much capital as possible to buy watches and crypto-currency, and that he was willing to sell his future receivables at a substantial discount to obtain that

---

[4] In a related respect, Defendants respectfully submit that the Court appears to have misunderstood the contract's default provisions related to insufficient funds messages. The Court held that an inability to obtain a reconciliation under § 1.4 could lead to an insufficient funds message, "which would trigger a default." Dkt. 86 at 17. Putting aside that future reconciliations are to be handled under § 1.5, not § 1.4, the merchant can avoid any such default by merely notifying the purchaser that there are insufficient funds. Dkt. 69-2 § 3.1(d). Once notice is received, an insufficient funds notice *is not* a default; and no provision limits the number of such notifications. *See id.*

[5] While Defendants will be filing a dispositive motion on this issue, the importance of specific issues around the negotiation and interaction of each contract is salient to determining the nature of the transaction: loan v. factoring agreement.

immediate capital. Clinton's sworn declaration to the Court that COVID harmed his business is impossible to reconcile with his purchases of luxury watches and speculative cryptoassets. *See* Dkt. 142, Clinton Decl. ¶¶ 3, 8-11, 16-17.

The evidence also shows that Haymount knew exactly what it was doing when it executed the MCA agreements. Haymount negotiated the terms of his MCA agreements with Defendants and even negotiated a specific addendum, demonstrating the falsity of Plaintiffs' arguments that there were no negotiations and that all MCA agreements are identical adhesion contracts. Ex. 6 [Haymount Tr. 109:11-13; 153:5-22; 185:6-18] (Haymount testified that it discussed and negotiated its fees); Ex. 3. Haymount also had exposure to other MCA providers: in addition to the agreements at issue here, Haymount had entered into MCA agreements with Defendants' competitors who encouraged him to file this case, referred him to White and Williams, and then advanced that firm $10,000 to file this case, which they then added to Plaintiffs' MCA "bill." Ex. 6 [Haymount Tr. 27:1-15; 32:18-33:5; 233:11-34:5].

Instead of addressing the contracts and defendants at issue in this litigation, Plaintiffs (at 6-7) attempt to prove guilt by association—effectively stating that because the individual defendants are either related to, friendly with, or seek advice from, Jon Braun, they must be guilty of usury. Braun, however, is not a defendant in this litigation, is not an owner of any of the corporate entities, and is not authorized to interact with merchants. *See* Ex. 1 [Wolf Tr. 32:2-18]; Ex. 2, [Brezel Tr. 112:3-11]. Nor would his presence mean anything. Plaintiffs could not cite prior evidence of *Braun's* bad acts to prove *these Defendants* are culpable. *See* Fed. R. Evid. 404(b)(1). As with the irrelevant details of another funding entity proffered in the Heskin Declaration, Plaintiffs seek to smear Defendants and distract the Court from the lack of evidence supporting their claims.

## **LEGAL STANDARD**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation marks and citation omitted). Under Rule 23, before a court may certify a class, the plaintiff must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The plaintiffs must satisfy the district court, after a "rigorous analysis," that the prerequisites of Rule 23(a) have been satisfied. *Wal-Mart*, 564 U.S. at 351; *accord Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). "[I]ndividual questions of whether each class member sustained economic injury [can] present[] insurmountable obstacles to certification." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001). In the Second Circuit, moreover, the putative class must be sufficiently definite for the court to determine whether an individual is a member. *In re Petrobras Secs.*, 862 F.3d 250, 260 (2d Cir. 2017).

Plaintiffs must also satisfy at least one subsection of Rule 23(b). *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 198 (S.D.N.Y. 2015) (Rakoff, J.). Plaintiffs seek certification under two subsections of 23(b). First, under Rule 23(b)(2), which requires the Court to find that "the party opposing the class has acted . . . on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Second, under Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior . . ." Plaintiffs bear the burden of showing that Rule 23(a) and (b) have been met by a preponderance of the evidence. *Amara v. CIGNA Corp.*, 775 F.3d 510,

519 (2d Cir. 2014); *Gordon*, 92 F. Supp. 3d at 198. Failure to satisfy any Rule 23 element precludes certification. *Huang v. Shanghai City Corp.*, No. 19-cv-7702, 2022 WL 1468450, at *7 (S.D.N.Y. May 10, 2022).

The court must receive enough evidence to resolve all factual issues relevant to each Rule 23 requirement, even if there is "overlap between a Rule 23 requirement and a merits issue. . ." *Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 104 (S.D.N.Y. 2011) (Rakoff, J.). The decision must not be made on the complaint's allegations, and thus "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question . . . [because] actual, not presumed, conformance with Rule 23(a) [is] indispensable." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

## ARGUMENT

### I. Plaintiffs have not pursued, and have thus waived, class certification on the RICO wire fraud claims

Plaintiffs have not sought certification of the RICO class with regards to the wire fraud claim. Plaintiffs incorrectly assert (at 17) that the Court allowed Plaintiffs to proceed with its RICO claim on the predicate act of "mail fraud." But the Order permitted wire fraud only based on allegedly changed ACH records. Dkt. 86 at 22. Plaintiffs make no argument that the wire fraud claim is common, typical, or predominates, and thus waive certification of any such claim. *See Withus v. Saul*, No. 18-cv-10923, 2021 WL 2012270, at *8 n.12 (S.D.N.Y. May 19, 2021).

### II. Usury and RICO actions are ill-suited for class treatment

Plaintiffs assert (at 19) that RICO and usury claims are "well-suited" for class treatment and that "courts have consistently endorsed the use of the class action mechanism to resolve claims predicated on RICO and/or various states' usury laws." But the law belies these arguments. Courts regularly deny certification in RICO cases, where Rule 23 is not satisfied. *See, e.g.*, *Moore v.*

*PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) (affirming denial of certification of RICO and fraud classes because "plaintiffs will need to submit proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those misrepresentations"); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 74-75 (2d Cir. 2015) (affirming denial of RICO class certification because plaintiffs failed to prove causation could be established "with generalized proof").[6] The same is true with respect to proposed class actions based on allegations of usury. *Ubaldi v. SLM Corp.*, No. 11-01320 EDL, 2014 WL 1266783, at *1, *8, *13 (N.D. Cal. Mar. 24, 2014) (denying certification of proposed usury class on predominance, typicality and superiority grounds due, in part, to the "host of other issues" raised by "the difference between being charged usurious interest and having paid usurious interest"); *Delorme v. Autos, Inc.*, No. 11-cv-039, 2012 WL 1606636, at *5-6 (D.N.D. May 8, 2012) (denying certification of proposed usury class in part because "not all of the proposed class members were charged the same fees or interest rate").[7]

---

[6] *See, e.g.*, *Rainbow Bus. Sols. v. Merch. Servs., Inc.*, No. C 10-1993 CW, 2013 WL 6734086, at *8 (N.D. Cal. Dec. 20, 2013) ("[I]ndividual issues predominate with respect to Plaintiffs' alleged RICO and RICO conspiracy claims."), *aff'd*, 847 F.3d 1108 (9th Cir. 2017); *Agostino v. Quest Diagnostics Inc.*, No. 04-4362, 2010 WL 5392688, at *15-16 (D.N.J. Dec. 22, 2010) (denying certification because "membership of any particular individual in the [putative class] would require a determination on the merits of the RICO claim"); *Lester v. Percudani*, 217 F.R.D. 345, 353 (M.D. Pa. 2003) ("Although the fraudulent acts themselves may be common to the proposed class, issues of causation and proof of damages mandate the conclusion that individual issues will predominate. . ."); *Expanding Energy, Inc. v. Koch Indus., Inc.*, 132 F.R.D. 180, 183-84 (S.D. Tex. 1990) ("Plaintiffs have failed to satisfy the Court that common questions of fact predominate; that there is generalized proof of injury to the class; that each member of the proposed class was affected by Defendant's alleged conduct and that the class action is superior to other available methods.").

[7] *See also, e.g.*, *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1165 (7th Cir. 1974) (certification of usury claim denied on adequacy and numerosity grounds); *Glover v. Udren*, No. 08-cv-990, 2013 WL 6237990, at *15 (W.D. Pa. Dec. 3, 2013), *aff'd*, 629 F. App'x 331 (3d Cir. 2015) (denying certification of usury claim on typicality grounds); *Endres v. Wells Fargo Bank*, No. C 06-7019, 2008 WL 344204, at *12 (N.D. Cal. Feb. 6, 2008) (individual issues "predominate over common issues under plaintiffs' unconscionability/usury theory" because resolution of those claims requires "an individualized, customer-by-customer analysis" of "spending patterns, overdraft transaction details, credit card balances, interest rates, and payment practices"); *Parker v. George Thompson Ford, Inc.*, 83 F.R.D. 378, 382 (N.D. Ga. 1979) (certification inappropriate where claims "involve allegations of fraud and usury raising questions that relate primarily to individuals only"); *Graybeal v. Am. Sav. & Loan Ass'n*, 59 F.R.D. 7, 15 (D.D.C. 1973) (rejecting certification of usury and fraud claims because "individual questions" of choice of law and relating to calculating the relevant interest rate "predominate over questions common to the proposed class").

The cases Plaintiffs cited are not analogous. In both *Gibbs v. Stinson*, No. 18-cv-676, 2021 WL 4812451 (E.D. Va. Oct. 14, 2021), and *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46 (E.D. Va. 2021), the transactions at issue were undisputedly **loans**. The lenders were entities created under Native American tribal law, and the contracts provided that the loans were governed by tribal law, under which the loans were not usurious. The key issues of tribal immunity and the validity of the choice of tribal law clause were common to all claims.[8]

By contrast, Plaintiffs here contend that liability arises from Defendants' transactions with merchants that depend on individual representations made by those merchants. The contracts at issue on their face are sales of receivables, not loans, they do not impose any "absolute obligation to repay," and the reconciliation and adjustment to remittance provisions give the merchants an unfettered right to reduce the amounts payable and recover overpayments if receivables are lower than estimated. Dkt. 69-1 ¶¶ 1.4, 1.5; *see infra*. Plaintiffs' case is premised on the contention that the "form of the agreement is a sham" and that the adjustment provisions were not "functional or intended by the parties," even though Haymount never even requested an adjustment. Ex. 8 at Nos. 1-4. Accordingly, whether a particular class member requested an adjustment, whether the adjustment provisions functioned as written, and whether Defendants engaged in other purportedly "predatory practices" will turn on individualized analyses.[9] Where, as here, "the Court would need

---

[8] Plaintiffs also cite *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir. 1978), for its statement that "[t]his is a classic case for a Rule 23(b)(3) class action," but ignore the immediately following sentences, which explain that *Roper* is a "classic case" for class treatment because (and unlike here) the "claims are relatively small, said even by the plaintiffs to average less than $100 each," "the question of law is one that applies alike to all," and it "will not be necessary to hear evidence on each claim." *Id.* Plaintiffs also cite *Bistro Exec., Inc. v. Rewards Network, Inc.*, No. 04-cv-4640, 2006 WL 6849825 (C.D. Cal. July 19, 2006), *Am. Timber & Trading Co. v. First Nat'l Bank of Oregon*, 690 F.2d 781 (9th Cir. 1982), and *Moore v. Comfed Sav. Bank*, 908 F.2d 834 (11th Cir. 1990), but class certification was not even at issue in any of these decisions.

[9] Plaintiffs' allegations of supposed "predatory practices"—which are not supported by the record—likewise undermine commonality. Indeed, Plaintiffs themselves allege that the purported wrongdoing varies substantially from merchant to merchant. *Compare* Dkt. 28 ¶¶ 162, 182 (alleging Defendants threatened Haymount when he said he did not want the second disbursement of his funding arrangement) *with id.* ¶¶ 213-14 (alleging that Defendants extracted

to engage in an examination of each particular loan transaction" to determine what fees were charged and the character of the transaction, the Court should not certify a class. *Delorme*, 2021 WL 1606636, at *5.

There is no question that the Court would need to examine each particular loan transaction to determine, for example, the information provided by the merchant regarding expected revenues, how the percentage of receivables purchased compared to each merchant's actual receivables, what fees were charged, and how and when they were disclosed to the merchants. As is clear from the testimony of the formerly four, now two, named Plaintiffs, the answers to these questions are central to resolution of the RICO and usury issues, and will inevitably vary from agreement to agreement and merchant to merchant. On this independent basis, class treatment is not proper.

## III.   Neither Haymount nor Clinton meets the requirements of Rule 23(a)

### A.   The facts and law at issue here are not common for all class members

Common questions must be of "such a nature that [they are] capable of classwide resolution," such that determination of their "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Common questions must be able to "generate common answers apt to drive the resolution of the litigation." *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 336 (S.D.N.Y. 2021) (quoting *Wal-Mart*, 564 U.S. at 350). A plaintiff seeking class certification therefore must show the court is able to fairly and efficiently resolve the issue raised by the class "in one stroke." *Wal-Mart*, 564 U.S. at 350.

---

money from former plaintiff Indigo by using a false "bank release based on purported settlement"). Through these unsupported allegations, Plaintiffs suggest that class treatment is warranted because Defendants schemed to use a variety of unsavory tactics to defraud the merchants with whom they dealt. But "proof of a central, coordinated scheme" does not mean a class may be certified, unless "based on uniform misrepresentations made to all members of the class." *Moore*, 306 F.3d at 1253 (affirming denial of certification of putative RICO class).

The only common question Plaintiffs identify is whether the agreements constitute loans.[10] But that question cannot be resolved without assessing individualized issues. As an initial matter, the answer hinges on the parties' intent, which will require a review of each transaction. Dkt. 86 at 13-14 (noting the New York Court of Appeals has considered objective indicia of the parties' intent to distinguish between an intent to borrow or sell receivables). Plaintiffs also mischaracterize the contractual terms and attempt (at 21-22, 24) to gloss over the many, plainly individual questions at issue, such as whether the transactions with *each merchant* reflected actual purchases of receivables, the extent to which merchants negotiated the terms of the agreements, the bona fide nature of the transaction, and merchants' use of the various merchant-protective provisions such as § 1.4 and § 1.5.

In fact, this Court has already recognized that factors outside the four corners of the contract are highly relevant to determining whether these transactions were MCA agreements or loans. The Court reasoned that Plaintiffs' allegation that the daily remittance amounts are not "good faith estimates of the merchant's receivables" is a factor in determining the nature of these transactions. *Id*. at 18; *see also id.* at 7 (discussing allegation that the receivables purchased were not good faith estimates of the business's revenues). But determining whether the fixed payment amounts are "good faith estimates" will necessarily require an inquiry into (i) what the *actual* revenue was for each merchant, (ii) each merchant's *projected* revenue, (iii) what *documents and communications* were exchanged between Defendants and each merchant on those facts, (iv) whether the merchant *misrepresented* its expected revenue, (v) whether there was a special factor, *e.g.,* Haymount's COVID-19 business, that indicated revenue would increase dramatically, and (vi) what due

---

[10] Plaintiffs offer a number of other supposedly common questions, such as whether the implied interest rate exceeds 50%; whether the MCA agreements are *void ab initio*; whether Plaintiffs may recover any money; and whether the conduct was willful or knowing. These questions are relevant only if the Proposed Class can answer on a class-wide basis the primary question of whether these agreements are *bona fide* purchases of receivables. They cannot.

diligence Defendants performed. Such inquiries would call for mini-trials concerning estimated receivables for each of the hundreds of putative class members.

This is not theoretical. Discovery has demonstrated the importance of this inquiry to Defendants. Defendants engage in a review of multiple components of a merchant's business to determine projected receivables. Ex. 2 [Brezel Tr. 89:7-90:12]. Ex-Plaintiffs Indigo and Turrentine admitted that the daily remittance was almost exactly the actual daily revenue of Indigo. Ex. 4 [Indigo Tr. 71:23-76:23; 83:9-85:21] (testifying 45% of actual revenue was ███████, which was "pretty close" to the contractually estimated $64,000). That is, despite these two former Plaintiffs submitting sworn testimony that the fixed daily payment "did not remotely reflect 45% of . . . revenues," Dkt. 28 ¶ 203, the individualized and adversarial process of a deposition with document discovery forced those two plaintiffs to recant that testimony. This established that there *was* clear evidence that Defendants made a bona fide purchase of receivables from Indigo and Turrentine. It was likely the solicitation of these facts that resulted in class counsel's abrupt and voluntarily decision to withdraw Indigo and Turrentine from the action, taking two-thirds of the case with them. It would be hard to find a better example for why Defendants need an opportunity to obtain discovery against each putative class member individually and why class mechanisms are inappropriate in this case.

The facts surrounding Haymount's sales of receivables to Defendants further demonstrate the need for individualized determinations that are not suitable for common evaluation. Contrary to Clinton's statements to the Court, the COVID pandemic did not harm his business. Instead, it caused revenues to skyrocket, due to his ability to charge excessive fees for COVID tests. *Compare* Am. Compl. ¶¶ 88-101; Clinton Decl. (Dkt. 142) ¶¶ 8-13 *with* Ex. 9; Ex. 6 [Haymount Tr. 59:24-60:14] (describing his creation of Ex. 9 for use during his deposition). In fact, Haymount admitted

at deposition that he would charge over $1,000 for COVID tests that cost him $60 to perform. Ex. 6 [Haymount Tr. 60:15-23; 198:3-19].[11] Accordingly, while Haymount's 2020 revenue was only ███████, its 2021 revenue rose to ███████ (with a monthly high in November of ███████). Through August 2022, its revenues have remained high: it has generated ███████ through the end of August (or another ███████ on an annualized basis). Ex. 9. Haymount was thus seeking funding for future receivables that had increased from ███████ in September 2021, to ███████ in October 2021, and to ███████ in November 2021. *Id.* And Haymount informed Defendants that he expected that his revenues would continue to increase apace. *See* Ex. 2 [Brezel Tr. 197:6-199:23]; Ex. 6 [Haymount Tr. 69:10-70:12; 223:16-225:18] (describing Plaintiffs' own difficulties in estimating his revenue).[12] It was on this very specific, individualized basis that Defendants calculated Haymount's daily remittance (knowing that if their optimistic projections were unrealized, Haymount could seek a prospective adjustment or a retrospective reconciliation, as discussed above).

In addition, Defendants' reconciliation and adjustment-to-remittance provisions work together to provide merchants with *greater* protection for merchants than other MCA agreements that courts have upheld. *See Tender Loving Care Homes v. Reliable Fast Cash, LLC,* 172 N.Y.S.3d 335, 339-40 (N.Y. Sup. Ct. 2022); Ex. 10; *Am. Water Restoration, Inc. v. AKF Inc.*, 157 N.Y.S.3d 919, 4 (N.Y. Sup. Ct. 2022); Ex. 11; Ex. 12, *Kennard Law P.C. v. High Speed Capital LLC*, Index No. 805626/2020, NYSCEF 19 (N.Y. Sup. Ct. Dec. 11, 2020), *aff'd*, 199 A.D.3d 1406 (4th Dept 2021); Ex. 13; *Womack*, 2019 WL 4142740, at *5-8; Ex. 14. Given that lesser provisions have been

---

[11] Overbilling schemes such as this were widely reported as a way for providers to gouge insurance companies during the pandemic. *See* Hannah Norman, *Hospitals are charging hundreds per COVID test. Will insurance premiums rise to compensate?* FORTUNE, May 7, 2021, *available at* https://fortune.com/2021/05/07/covid-test-billed-charged-hundreds-insurance-higher-premiums-hospitals/ (last accessed Oct. 12, 2022).

[12] This difficulty in projecting Haymount's revenue also explains why Defendants purchased percentages added up to more than Defendants normally purchased.

held to be sufficiently robust, Plaintiffs here must demonstrate that these provisions are illusory or unusable. But Plaintiffs never attempted to use them and do not offer any evidence to meet their burden. Indeed, considering that White & Williams represents many of these merchants in connection with their MCA agreements, Plaintiffs presumably could have provided the Court with a record of denied reconciliations. Their conspicuous failure to do so speaks volumes. There is no evidence of a common scheme or practice to deny reconciliation. The opposite is true. These requests are granted when they are made. *See* Ex. 2 [Brezel Tr. 59:11-61:15] (noting that a reconciliation had occurred the week of his deposition); 64:20-66:18; 67:14-69:23; 122:14-24:12 126:3-27:5 (merchants do not always make formal adjustment or reconciliation requests, but Defendants regularly adjusted or delayed repayment when requested).

Instead of grappling with this record, Plaintiffs ask the Court to judge all of the MCA agreements *en masse*, thereby depriving Defendants of the ability to demonstrate a critical factor showing that these agreements are *bona fide* purchases of receivables. Given that a critical piece of the common question Plaintiffs identify requires individualized proof, there cannot be common answers across the Proposed Class. *See Wal-Mart*, 564 U.S. at 352 (unless some common "glue" holds the reasons for certain decisions together, it is "impossible to say that examination of all the class members' claims for relief will produce a common answer"). Said differently, the Court cannot decide the bona fides of each class member's sale of receivables in "one stroke." *Wal-Mart*, 564 U.S. at 350.

### B.   Plaintiffs' claims are not typical

Class certification is unwarranted where there is a "danger that absent class members will suffer if their representative is preoccupied with defenses unique to [him]." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citations omitted). There is no typicality where the named plaintiffs' circumstances are relatively unique, such that there will be

17

"unique defenses not applicable to other class members." *Jim Ball Pontiac-Buick-GMC, Inc. v. DHL Exp. (USA), Inc.*, No. 08-cv-761C, 2011 WL 815209, at *5 (W.D.N.Y. Mar. 2, 2011).

Plaintiffs are atypical. They claim (at 1-3) that America's small businesses are plagued by predatory lenders who take advantage of desperate merchants, but neither Haymount nor Clinton fit that description. Clinton is a sophisticated doctor who runs a successful urgent-care business with 6 facilities, 175 employees, and millions in revenue. Ex. 6 [Haymount Tr. 256:12-15; 291:12-17]. A repeat player in the industry, Haymount sought additional MCA agreements to capitalize on its rapidly increasing revenue due to the COVID-19 pandemic in the hopes of generating even more revenue. *See* Ex. 9; Ex. 6 [Haymount Tr. 62:13-21]. In other words, Defendants were making a high-risk investment in Haymount's business during a global pandemic, and knowingly took on the risk that Haymount's revenue could stop.

Plaintiffs knew they were selling receivables, as they had to other funders under similar circumstances. *See* Ex. 6 [Haymount Tr. 23:10-13; 24:19-25:9; 34:11-25; 59:3-14; 61:12-20]. Plaintiffs note (at 14) that from August 2021 to January 2022, Haymount entered into six MCA agreements with GoFund, in which he agreed to sell future receivables in exchange for more than $3 million in funding. Plaintiffs allege that Defendants blindsided them with baseless fees, but the evidence shows that merchants, including named Plaintiffs, were well aware of the fees charged and specifically negotiated them. *See* Ex. 6 [Haymount Tr. 153:5-22]; Heskin Decl. Ex. 20 (Dkt. 138-18) (active text thread between an agent of defendants and a merchant); Ex. 2 [Brezel Tr. 94:15-96:21]; Ex. 15 [Kroen Tr. 42:23-43:15].

In light of Plaintiffs' allegations, Haymount is also atypical given his negotiation of the terms of his MCA agreement and the bespoke changes made for him. Plaintiffs assert (at 5, 8) that Defendants offered MCA agreements to class members on a "take it or leave it" basis, that

18

negotiations regarding the terms of the contract were "rare," and agreements to modify the contract "rarer." But Haymount negotiated the terms of his deal, *see* Ex. 6 [Haymount Tr. 109:11-13; 153:5-22] (noting Haymount discussed and negotiated his fees), and Defendants modified the terms of Haymount's alleged "adhesion contract" by entering into an addendum at his request, Ex. 3.

      Haymount's claims are also not typical because the amount he claims he was loaned exceeds $2.5 million dollars (across several agreements), and thus arguably falls outside the bounds of New York's usury provisions. *See* N.Y. Gen. Obl. Law § 5-501(6)(b). That law provides that:

> No law regulating the maximum rate of interest which may be charged . . . shall apply to any loan . . . in the amount of two million five hundred thousand dollars or more. Loans . . . aggregating two million five hundred thousand dollars or more which are to be made or advanced to any one borrower in one or more installments pursuant to a written agreement by one or more lenders shall be deemed to be a single loan or forbearance for the total amount which the lender or lenders have agreed to advance or make pursuant to such agreement on the terms and conditions provided therein.

Haymount concedes Defendants provided him in the aggregate more than $3 million. Under § 5-501(6)(b), this is not a usurious loan. *See SpecFin Mgmt. LLC v. Elhadidy*, 201 A.D.3d 31, 42 (4th Dep't 2021) ("Even assuming . . . the fee structure . . . can be properly considered interest, 'the transaction is exempt, under General Obligations Law § 5–501(6)(b), from the operation of any law regulating the payment of interest' insofar as GTA agreed to provide advances aggregating $2,500,000."); *Star Funding, Inc. v. Vault Minerals, LLC*, No. 15-CV-03026, 2017 WL 7791558, at *5 (S.D.N.Y. Aug. 10 2017) report and recommendation adopted No. 15-CV-03026, 2018 WL 1581685 (S.D.N.Y. Mar. 28, 2018) (same). Plaintiffs' fact pattern is therefore atypical to the small funding deals the Proposed Class allegedly entered. Mot. at 1.

      In addition, neither Haymount nor Clinton ever sought a reconciliation or adjustment to remittance pursuant to §§ 1.4 and 1.5 of their MCA agreements. *See* Ex. 6 [Haymount Tr. 129:21-131:1; 132:22-35:10; 137:2-4; 137:14-18]. This demonstrates their inability to represent a class of

merchants who are alleging the reconciliation provisions are a sham. *See Pirs Cap., LLC v. D&M Truck, Tire & Trailer Repair Inc.*, 129 N.Y.S.3d 734, 739-40 (Sup. Ct. 2020) (finding plaintiff could not assert a reconciliation provision was a sham where plaintiff never sought to utilize those provisions). Indeed, the undisputed testimony is that those provisions were available and regularly utilized. *See* Ex. 2 [Brezel Tr. 59:11-61:15; 64:20-66:18; 67:14-69:23; 122:14-24:12 126:3-27:5]; Ex. 16 [Katz Tr. 77:4-80:21] (testifying that no request for reconciliation had been denied).

Haymount's use of the funds in violation of the terms of the agreement is likewise atypical of the class. The MCA agreements each contain a clause that the funds were being provided for use with business purposes—a clause which Haymount did not abide. Instead, Haymount distributed *millions* of dollars to Clinton and otherwise used the funds to purchase watches and cryptocurrency that he now conveniently claims were investments made on behalf of Haymount (despite the fact that he ran these transactions through a new company, RAC Investment Services, which bears his initials.). Ex. 6 [Haymount Tr. 139:22-140:15; 165:21-67:2; 171:12-20; 173:15-75:8; 197:14-20]. Haymount's breach of the contract and self-dealing subjects him to additional and unique defenses of prior breach, unclean hands, and fraudulent inducement.

C.  Plaintiffs are inadequate representatives

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This "entails an inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Baffa*, 222 F.3d at 60; *Ebin v. Kangadis Food inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. 2014). Inadequacy may be found if the named plaintiff has a conflict of interest with other class members, if there are unique defenses to his claims, if there is an unduly close or inappropriate relationship between the plaintiff and his counsel, or if the plaintiff lacks basic knowledge of the case and has "difficulty in recalling key facts

20

and responding to straightforward questions regarding th[e] action." *Gordon*, 92 F. Supp. 3d at 200. Adequacy cannot be found where a plaintiff is unaware of the "requirement that he finance his 'pro rata' share of costs." *Russell v. Forster & Garbus, LLP*, No. 17-cv-4274, 2020 WL 1244804, at *6 (E.D.N.Y. Mar. 16, 2020).

With respect to unique defenses, the "relevant inquiry is not whether a unique defense ultimately will succeed on the merits. Rather, courts consider whether any unique defenses will unacceptably detract from the focus of the litigation to the detriment of absent class members." *de Lacour*, 338 F.R.D. at 338 (quotations omitted); *see also Gordon*, 92 F. Supp. 3d at 205 (deeming a particular plaintiff inadequate because a unique issue was "paramount" for him, "the difference between a substantial recovery and no recovery at all"). A representative plaintiff with unique defenses undermines both adequacy and typicality.

Haymount and Clinton are inadequate representatives for the same reasons their claims are atypical: Haymount never requested an adjustment or reconciliation so it lacks standing to argue those provisions were ineffective; Haymount and Clinton were sophisticated and successful, so they cannot represent the small, down on their luck class members they assert (at 1) constitute the majority of the class; and Haymount engaged in substantial negotiations regarding the MCA agreements and the fees, while Plaintiffs' brief asserts (at 8) that the contracts are 'take it or leave it." To the extent the class intends on relying on these (unproven) facts, Plaintiffs aren't adequate to represent them.

Moreover, Haymount and Clinton are also inadequate because they have not been active stewards of the litigation. Haymount (a) was unaware of the identity of the expert hired on behalf of the class, Ex. 6 [Haymount Tr. 13:25-14:11]; (b) was unaware of who two of the three lead attorneys for the matter were, *id* at 14:12-15; (c) never spoke with ex-co-lead plaintiffs Turrentine

or Indigo about the case during the many months they were allegedly prosecuting the action, *id.* 19:4-9; (d) is unaware of any facts surrounding the Connecticut allegations in the case, *id.* 19:10-14, 47:4-12; (e) did not know the basis for his fraud claim, *id.* 45:24-46:8; (f) was neither aware that he was responsible for his pro-rata costs nor paying close attention to the costs incurred, *id.* 51:10-52:21; and (h) does not appear to have reviewed most papers before they were filed, based on Plaintiffs' privilege log. Ex. 17. Plaintiffs' remarkable ignorance of a claim they have been pursuing for less than a year demonstrates that they have not taken a serious interest in the case; their lawyer's decision to press the case is no substitute. *See In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 136 (S.D.N.Y. 2008) (refusing to certify class where the plaintiff was so uninformed as to the specifics of the case that the court refused to be "party to the sham"); *Russell*, 2020 WL 1244804, at *6; *see also Morrison v. Ocean State Jobbers, Inc.*, 290 F.R.D. 347, 355 (D. Conn. 2013).

Plaintiffs' problems as to adequacy do not stop there—they only brought this lawsuit under a champertous agreement with another MCA provider for a competitive advantage. *See* Ex. 6 [Haymount Tr. 24:16-28:13 (explaining how World Global Fund demanded that he sue GoFund); 29:22-33:14 (describing how World Global Fund connected Plaintiffs to White & Williams and paid for the suit to be brought prior to GoFund ever declaring Plaintiffs in default); 38:17-39:20 (describing that World Global Fund agreed to give Haymount better terms on his MCA agreements with them if he sued GoFund)]; Ex. 18; Ex. 19. This defense of champerty also undermines Haymount's adequacy to act for the class.

As a repeat player in the industry, Haymount has engaged in at least 40 similar agreements since 2018, Ex. 6 [Haymount Tr. 61:16-20], all of which he believes to be substantially the same, *id.* 75:13-76:3. His familiarity with MCA agreements comes with a cost, because he cannot recall

which negotiations happened with Defendants as compared to with other MCA funders, though he knows he always negotiates. *See id.* 82:20-83:10; 153:5-22. In addition, Plaintiffs admitted that the only reason they did not negotiate any terms other than the amount of funding or payback was because they did not "realize that this 12-page document had terms in it." *Id.* 124:19-25:5. And unlike the "small businesses" forced to seek expensive debt described in the Motion (at 1), Plaintiffs admitted they signed MCA agreements so they could continue to speculate on luxury watches and cryptoassets near the top of those markets. *Id.* 195:17-98:2. These individual facts will be the focus of much of the litigation, to the detriment of absent class members, and thus stand as a further bar to Plaintiffs serving as adequate representatives. "While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Dauphin v. Chestnut Ridge Transp.*, No. 06-cv-2730, 2009 WL 2596636, at *3 (S.D.N.Y. Aug. 20, 2009) (*citing Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ).

     D.  <u>White & Williams is inadequate class counsel</u>

If a proposed "class representative's understanding of the case is minimal, counsel's adequacy takes on even greater importance." *Kulig v. Midland Funding, LLC*, No. 13-cv-4715, 2014 WL 6769741, at *4 (S.D.N.Y. Nov. 20, 2014). "If the representative is manifestly unable to supervise class counsel, a court must have absolute confidence in counsel's competence and loyalty to the class." *Garcia De Leon v. New York Univ.*, No. 21-cv-05005, 2022 WL 2237452, at *15 (S.D.N.Y. June 22, 2022) (quoting *Kulig*). Here, the class representatives have a minimal understanding of the case and cannot supervise class counsel. Moreover, a White & Williams attorney is also a fact witness whose actions permeate the case: He has divided loyalties to the named

Plaintiffs, and is bringing a separate class action alleging the same claims against the same enterprise. Ex. 20.

As a threshold matter, White & Williams' involvement in the MCA industry is so extensive that Mr. Heskin devotes 15 paragraphs of his declaration to describing his work in unrelated MCA cases. Dkt. 138 ¶¶ 8-23. But White & Williams failed to disclose its involvement in negotiating settlements on behalf of merchants with funders, including Defendants and their counsel Mr. Alfin. *See e.g.*, Ex. 6 at 269:18-71:14; Ex. 21; Ex. 22. This point cannot be overstated: White & Williams negotiated the very settlements they now claim were shams due to lack of representation. And White & Williams is not merely representing the clients, but is seeking personal vindication. *See* Ex. 23 ("I am putting an end to this abuse of the CT court system.").

This personal desire to litigate this case is especially problematic where, as shown above, a third party directed Plaintiffs to sue using White & Williams and paid the firm $10,000 (which amount they added to Plaintiffs' MCA "bill"). Thus, it was Defendants' competitors, not Plaintiffs, who apparently selected White & Williams. *See supra*. White & Williams is inadequate because it is not clear that counsel is pursuing this class action on behalf of the class, rather than at the behest of a third party.

White & Williams is also inadequate because it is simultaneously pursuing a parallel RICO class action against Brezel (one of the Defendants here) and the exact same supposed enterprise, for the exact same alleged misconduct. Ex. 20 ¶¶ 94 (describing the enterprise as including Merchant Capital, GoFund, and Funding 123).[13]

---

[13] Plaintiffs in the *Avantgarde* action recently filed their Amended Complaint, having dropped GoFund as a defendant, but Josef Brezel remains a defendant in both actions. *See Avantgarde Senior Living v. GoFund LLC*, 22-cv-4313, Dkt. 41 (S.D.N.Y. Sept. 30, 2022).

Indeed, that action uses the *exact same* class definition as in this case. *See id.* ¶ 73. Inexplicably, however, White & Williams never informed the named Plaintiffs of this overlapping case and represented to the Court that they are "not aware of any other active class actions on the same issues here." Ex. 6 [Haymount Tr. 98:14-101:23]; Dkt. 138 ¶ 80. Thus, White & Williams has divided loyalties with respect to two classes pursuing a recovery from overlapping, and finite, sources of money. *See Moore v. Margiotta*, 581 F. Supp. 649, 651-53 (E.D.N.Y. 1984).

### E.   The class definition is impermissibly broad

The Court must also consider the "implied requirement of ascertainability," which requires the class to be "sufficiently definite so that it is administratively feasible for the court" to identify class members. *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015). Ascertainability is satisfied when the class is "defined by objective criteria" and when "identifying its members would not require a mini-hearing on the merits of each case." *Id.* at 24-25.

The proposed class here is overbroad and *would* require such a mini-hearing, because it includes many individuals who suffered no harm or have disposed of their claims. The proposed class is: "All persons in the United States who, on or after February 11, 2018, paid money to a member of the Enterprise pursuant to an MCA agreement with an effective interest rate exceeding twenty-five percent." Am. Compl. ¶ 218. Under this definition, to determine whether an individual was a member of the class, the Court would need to create and review an individual factual record to determine (a) whether usury laws applied; (b) whether the merchant was harmed; and (c) whether the merchant validly settled their claims. The proposed class includes, for example, individuals who are statutorily barred from pursuing a usury claim under New York law because, like Haymount, they received an amount over $2,500,000. It also includes individuals who received funds from Defendants but who never repaid the amount in full, such that they have suffered no harm (and in fact have benefited from the funds they received). *See* Ex. 24 [Lunden Tr. 214:2-

217:4] (Plaintiffs own expert admitting the class includes individuals who were not harmed). That "the class includes people who simply have not suffered any injury" creates a "separate and independent problem." *Wang v. Tesla, Inc.*, 338 F.R.D. 428, 443 (E.D.N.Y. 2021). This problem is particularly acute in a RICO class action because "a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (citations omitted). The class also includes individuals who have definitively settled their claims, like now-dismissed plaintiffs Indigo and Turrentine. The unduly broad class definition's untethered relationship to any harm suffered thus "dooms class certification." *In re Sears, Roebuck & Co. Tools Mktg. & Sales Pracs. Litig.*, No. 05 C 2623, 2007 WL 4287511, at *5 (N.D. Ill. Dec. 4, 2007).

### IV.   Haymount and Clinton do not meet the requirements of Rule 23(b)

A.   No common issues predominate over individual issues

Predominance is the most difficult factor for a Rule 23(b)(3) class to satisfy: it is "far more demanding" than commonality, and is not satisfied "simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 550 (S.D.N.Y., 2021). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623; *see also id.* at 624 (holding that the "overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard" given the "greater number" and "significance" of questions peculiar to the several categories of class members").

"Where individualized questions permeate the litigation, those fatal dissimilarities among putative class members 'make use of the class-action device inefficient or unfair." *Petrobras*, 862 F.3d at 270 (quotations omitted). The test is "whether the common, aggregation-enabling, issues in the case are *more prevalent or important* than the non-common, aggregation-defeating,

individual issues." *Id.* (remanding with instructions to determine whether class treatment was warranted). The courts also consider whether the damages calculations must be analyzed individually. *See Roach*, 778 F.3d at 405.[14]

Under this standard, Plaintiffs have not demonstrated that any common issues predominate. First, for the reasons described above, the question they present as common is in fact not common and cannot be determined from the four corners of the contract. Second, Plaintiffs have not demonstrated that they can show scienter on a class wide basis. Third, damages are not subject to common proof. Because each of these individual issues predominates over any common issues, Plaintiffs' motion must be denied.

B.   Individual issues predominate over the question of whether the MCA agreements constitute loans

Plaintiffs argue (at 28-31) that the Court can determine whether every MCA agreement is a factoring agreement or loan by merely reading the contract terms. But this argument is not supported by the law of this case or the facts developed in discovery.

The Court has not resolved whether one could determine if these MCA agreements were loans on their face. Instead, the Court held that one important factor is the degree to which the contract reflected the actual purchase of receivables. Dkt. 86 at 18, 7, 13-14. This issue cannot be proven generally, but rather requires detailed inquiry into the specific circumstances of each merchant, including their past and projected revenues. The deposition of ex-named plaintiffs Indigo and Turrentine, for example, shows that their daily remittance was almost *exactly* equal to the contractually specified 45% of average daily revenue over the period. Ex. 4 [Indigo Tr. 71:23-

---

[14] *See also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008) *abrogated in part on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008) ("Certifying, for example, the issue of defendants' scheme to defraud, would not materially advance the litigation because it would not dispose of larger issues such as reliance, injury, and damages.").

76:23; 83:13-85:21]. Similarly, and as discussed above, Haymount's remittance was calculated based on his COVID-related revenue boom. Clearly the inquiry into the specific facts and circumstances of each merchant's revenue will require a specific and detailed inquiry regarding each and every merchant and their business, historically and prospectively, at the time of funding.

With respect to the Court's conclusion that the text of § 1.4 was insufficient at the motion to dismiss stage to constitute a mandatory reconciliation provision, discovery has demonstrated that there are additional relevant facts to consider. Haymount never requested reconciliation, for example, but other merchants did. *See* Ex. 2 [Brezel Tr. 59:11-61:15; 64:20-66:18; 67:14-69:23; 122:14-24:12 126:3-27:5]. And those merchants used not only § 1.4 (which concerns retroactive reconciliations), which the Court analyzed at length, but also § 1.5 (which concerns prospective adjustments), and which the Court did not address. *See* Dkt. 86 at 16-17.

Plaintiffs attempt to elide these fact-specific inquires by citing *Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 182 (1st Dep't 2013), which is inapposite. The case concerned only a single *defendant* asserting the *affirmative defense* of usury. Similarly the *Fleetwood* case that Plaintiffs cite (at 22) is inapposite because it concerned a single plaintiff asserting a RICO violation. *See Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-cv-5120, 2022 WL 3536128 (S.D.N.Y. Aug. 17, 2022). These cases concern issues that arise only after the most important step—determining if each and every agreement constituted a loan.

### C. Certification is inappropriate because Plaintiffs cannot prove Defendants' alleged scienter on a class-wide basis

Plaintiffs cannot carry their burden to prove that Defendants acted with the requisite scienter at any relevant time, much less over a class period reaching back to February 11, 2018. Plaintiffs concede that prior to a series of articles published by Bloomberg—the first of which appeared in November 2018—"courts routinely rejected attempts by small business victims seeking to vacate

the many thousands of confessions of judgments filed by MCA companies." Dkt. 28 ¶ 73. Yet, in the intervening years, the law has anything but coalesced around the legality of these agreements—indeed, as late as last month, a court in this district refused to find a similar agreement a usurious loan. *Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21-cv-9528, 2022 WL 4368114, at *4-5 (S.D.N.Y. Sept. 20, 2022). Given the ever-changing state of the law regarding these agreements, Plaintiffs' attempts to imply scienter will require an individualized showing of what the balance of the law was as of the date of *each* agreement, as additional case law is constantly developing, but in inconsistent ways.

### 1. Usury-Based RICO claims require a showing of awareness of illegality

Under § 1962(c) and § 1962(d), to show a violation based on the collection of unlawful debt, Plaintiffs must prove that Defendants acted willfully—that is, "with knowledge that [their] conduct was unlawful[]," *Bryan v. United States*, 524 U.S. 184, 190-92 (1998). Plaintiffs thus must allege facts plausibly indicating that Defendants knew that the financings were unenforceable and usurious under the MCA agreements.[15]

The fact that RICO does not contain an express intent requirement does not eliminate the scienter requirement. As the Supreme Court has long held, the "'mere omission from a criminal enactment of any mention of criminal intent' should not be read as 'dispensing with it.'" *Elonis v. United States*, 575 U.S. 723, 734 (2015) (quoting *Morissette v. United States*, 342 U.S. 246, 250 (1952)). "[O]ffenses that require no *mens rea* generally are disfavored," and "some indication of

---

[15] "It is clear that civil RICO requires that the defendant's state of mind be the same as that required in a criminal prosecution." *Babst v. Morgan Keegan & Co*., 687 F. Supp. 255, 258 (E.D. La. 1988). "The substance of a RICO violation is set forth in § 1962(c) and is identical for civil and criminal cases. . . . Only the remedies differ[.]" *Chang v. Chen*, 80 F.3d 1293, 1297 n.1 (9th Cir. 1996), *overruled on other grounds by Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) (*en banc*).

congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime." *Staples v. United States,* 511 U.S. 600, 605-06 (1994).

Consistent with these principles, the Second Circuit has repeatedly indicated that RICO claims based on the collection of unlawful debt require proof that the defendant acted with specific knowledge of that unlawfulness. *See United States v. Grote*, 961 F.3d 105, 120-21 (2d Cir. 2020) (addressing whether a RICO violation can lie for collection of unlawful debt with no proof of the defendants' state of mind and expressing "serious doubts that such a rule appropriately 'separate[s] wrongful conduct from otherwise innocent conduct'" (quoting *Elonis*, 575 U.S. at 736)); *see also United States v. Moseley*, 980 F.3d 9, 19 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1442 (2021) (noting that for a RICO-usury conviction, it should be shown "that the [d]efendants were aware of the unlawful nature of the lending scheme" (quoting *Grote*, 961 F.3d at 117)).

That is, the question is whether Defendants "were aware of the unlawful nature of the lending scheme." *Grote*, 961 F.3d at 117. This asks whether they knew these agreements were loans and that the loans charged usurious interest—and, more to the point, whether that can be proven for every MCA agreement at all times throughout the class period with common proof. It cannot.

2. <u>Scienter cannot be proved here on a class-wide basis</u>

As a matter of law, Defendants could not have been "aware of the" supposed "unlawful nature" of the MCA agreements, based on the Court's own findings in this case. As the Court noted, "[t]he New York Court of Appeals has not yet addressed how to apply the[] general principals" applicable to the characterization of a transaction as a loan, "to MCA agreements, so *this Court's task is necessarily to predict* how the Court of Appeals would treat an MCA agreement." Dkt. 86 at 14 (emphasis added). The Court further noted, "the Appellate Divisions *have yet to settle on any specific framework* for classifying MCA agreements." *Id.* (emphasis added). Defendants, who are not lawyers, could not have acted with the requisite scienter *at any time* when they would have

30

had to "predict" a "strongly fact-bound" outcome that can "vary considerably" in the absence of "any specific framework."[16]

*A fortiori*, there is no way to prove, using common evidence, that Defendants were "aware of the unlawful nature" of MCA agreements executed in February 2018. And contrary to Plaintiffs' alleged "sea change in law" provoked by Bloomberg's reporting, Dkt. 28 ¶¶ 73-76, as recently as last month, New York courts have *continued* to uphold MCA agreements as purchases of future receivables. *See, e.g.*, *Streamlined Consultants, Inc.*, 2022 WL 4368114, at *4-5 (granting motion to dismiss based on the legality of a funding agreement substantially similar to those at issue here); Ex. 25 (MCA agreement in *Streamlined Consultants*, with substantially *less* robust reconciliation provision).[17]

### D. Damages are not calculable on a class-wide basis

Plaintiffs also assert (at 16) that they can prove damages on a class-wide basis in reliance on their expert report. What Plaintiffs omit is that their expert *disclaimed* his own report, because it analyzed only the general MCA agreement terms, and did not account for or analyze the actual funding amounts, remittances paid, any reconciliations, any agreements to waive payments for a period, or any other modification to the terms. *See* Ex. 24 [Lunden Tr. 68:7-71:17; 136:7-20; 142:3-149:24]. Nor is this analysis the simple "plug-and-chug" analysis that Plaintiffs pretend it to be. *See id.* at 117:15-122:13; 153:6-56:5. Instead, damages, like many other issues in the case, will

---

[16] The fact that current usury case law is insufficiently clear to provide the basis for criminal/RICO liability does not imply the absurd result that New York usury law is a dead letter. To be clear, New York courts can continue to apply civil usury law to MCA agreements and refuse to enforce MCA agreements found to be usurious, thereby defining a "framework" for the merchant cash advance agreements. Until then, however, MCA businesses cannot be charged with knowledge of the (possible, supposed, predicted) illegality of their actions.

[17] *See also Tender Loving Care Homes v. Reliable Fast Cash, LLC,* 172 N.Y.S.3d 335, 339-40 (N.Y. Sup. Ct. 2022); Ex. 10; *Am. Water Restoration, Inc. v. AKF Inc.*, 157 N.Y.S.3d 919, 4 (N.Y. Sup. Ct. 2022); Ex. 11; Ex. 12, *Kennard Law P.C. v. High Speed Capital LLC*, Index No. 805626/2020, NYSCEF 19 (N.Y. Sup. Ct. Dec. 11, 2020), *aff'd*, 199 A.D.3d 1406 (4th Dep't 2021)); Ex. 13; *Womack v. Cap. Stack, LLC*, 2019 WL 4142740, at *5-8 (S.D.N.Y. Aug. 30, 2019); Ex. 14.

need to be determined individually. *See McLaughlin*, 522 F.3d at 231 (noting that the issue of individual damages is "a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues").

### V.  Class action is not a superior mechanism for pursuing this action

Under Rule 23(b), Plaintiffs also bear the burden to show that class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Class treatment is not a superior method of resolving these potential claims for the following reasons:

*First*, this is not a case where class treatment is necessary, because it "aggregate[s] . . . relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem*, 521 U.S. at 617 (*quoting Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)). As the Court recently noted, "plaintiffs are all commercial entities that stand to recover substantial amounts on their individual claims should they prevail." Dkt. 145 at 16. These substantial amounts more than justify the cost of any suit, especially if these class members have valid RICO claims that can be trebled. *See* Ex. 6 [Haymount Tr. 94:11-18] (noting that he is paying his counsel hourly).

*Second*, as the Court is aware, the intersection of MCA financing and usury is a dynamic area of law. The recent decision in *Tender Loving Care Homes Inc. v. Reliable Fast Cash, LLC*, 172 N.Y.S.3d 335 (N.Y. Sup. Ct. June 22, 2022), is instructive. The court held that "after considering the three factors [*i.e.*, those identified by Defendants in this case], and after considering the context of the agreement in its entirety, the Court can conclude as a matter of law that *it is a valid agreement to purchase future accounts receivable, and not a disguised loan*." *Id*. at 340 (emphasis added). The terms of the MCA agreement in *Tender Loving* were *less* merchant-protective than the terms of the MCA agreements in this case. Like the MCA agreements in this case, for example, the one in *Tender Loving* provided that "once each calendar month, Seller may request, in writing,

that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage." Ex. 10 § 2. But the *Tender Loving* agreement did *not* provide any retroactive reconciliation procedure (as in Section 1.4 here), making it substantially *less* seller-protective. Yet the court held that it was legal.

Another recent case, decided in this District just weeks ago, provides even more support for Defendants and other MCA lenders. The court held:

> [T]he Court joins an ever-growing group of courts that have held that nearly identical agreements—and in one case, a fully identical agreement, *see Cavalry LLC v. EBF Holdings*, LLC, No. 3081/2021, 2021 WL 5868324, *2–15 (Sup. Ct. Oct. 5, 2021)—is not a usurious loan, *see Yellowstone Cap. LLC v. Cent. USA Wireless LLC*, 110 N.Y.S.3d 485 (Table), 2018 WL 3765121, at *1 (Sup. Ct. June 25, 2018) (finding a merchant agreement "which clearly reflect[s] the purchase of a certain percentage of a merchant's total future accounts, up to a certain amount, for a specified purchase price" is not a usurious loan and noting that "[i]n no less than thirty-eight (38) recent decisions, New York Courts have determined that the merchant agreements at issue . . . do not constitute loans").

*Streamlined Consultants Inc.*, 2022 WL 4368114, at *5. In short, there is a plain lack of judicial consensus that MCA agreements can be recharacterized as disguised usurious loans.[18] This continued lack of clear guidance cautions against the use of the class mechanism to destroy hundreds of merchant relationships and bring an end to Defendants' livelihood. In particular, it cautions against any finding that Defendants knowingly violated criminal law.

*Third*, the proposed use of the class mechanism is against the proposed class members' own interest. This is not a proposed opt-in class. Merchants who transact with Defendants realize

---

[18] In both recent cases, the court applied the three-factor analysis to determine whether the agreement was a sale or a loan and treated these three factors as dispositive. *Id.* ("determin[ing] that all three factors supplied by New York courts to determine if an agreement is a usurious loan counsel against such a finding"); *Tender Loving,* 172 N.Y.S.3d at 340 (alluding to the court's consideration of "the three factors"). Both decisions are in tension with this Court's earlier holding that "while these three factors may be relevant to the analysis, they are far from dispositive." Dkt. 86 at 15. The point is that there is a lack of agreement about whether MCA agreements constitute true sales versus loans—*or even what legal standard applies to that determination*.

their goal of a ready source for liquid capital that can provide them (when more traditional financial services providers would not) with prompt funding that would not follow them if their business went into bankruptcy. Indeed, at least until recently, Plaintiff Clinton valued his own relationship with Defendants. *See* Ex. 26 ("Thank you for always working with me and for being insightful. I appreciate all you have done for me over the years."). Indigo apparently sought MCA funds because of Turrentine's prior wire fraud convictions. Ex. 4 [Indigo Tr. 61:4-63:20; 86:11-91:14; 233:13-35:6]. MCA agreements are an essential way for merchants to get funds *fast*—sometimes on the same day—and it is far from clear that the proposed class would prefer to destroy this industry rather than have access to funding that may be needed to keep the doors open.[19]

*Fourth*, as more fully described below, the agreements signed by putative class members each contain a class action waiver. "Thus, if a class were certified, the parties and the Court would then have to determine which class members were properly part of this case . . . [a]nd, to the extent that the . . . class action waiver clauses are applicable and enforceable, the Court would be required to dismiss class members from the case. Such an undertaking is especially unnecessary where, as here, the potential recovery for the individual plaintiffs is large and the putative class members have an interest in litigating individually." *Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Assurance Co., Inc.*, No. 15-cv-7063, 2019 WL 3409882, at *4 (S.D.N.Y. July 27, 2019).

## VI.  Plaintiffs' attempts to avoid the class waiver are themselves evidence that a class

---

[19] Far from being what Plaintiffs' counsel—with his axe to grind—preposterously calls (at 5) an "evil with no countervailing societal benefit," MCAs provide funding to businesses that cannot get money elsewhere. Without these funding arrangements, these small businesses may not have made payroll or may have been forced to enter bankruptcy. Plaintiffs and their counsel have made no effort to disprove, because they could not, that MCAs play a unique role in allowing small businesses to continue as going concerns and thereby offer their products and services to the public.

**cannot be certified**

None of these issues need be addressed given the lack of a common answer, as discussed above, to the question of whether the MCA agreements are void. Since Plaintiffs have not shown "whether the MCA agreements' class action waiver provisions can be enforced against them" on a class basis, the class cannot be certified: each absent class member is still bound by a class action waiver unless and until their agreements are individually shown to be void *ab initio*. Because that issue is not amenable to common resolution, no class can be certified. Yet even were it possible to eliminate the class action waivers, the class would still be uncertifiable: without a binding choice of law provision, the class has fatal conflict of law problems.

A.  If the class action waiver is void, then conflicts of law prevent certification

Plaintiffs' arguments attempting to avoid the class action waiver are logically inconsistent with their assertion that the matter is amenable to class treatment. Plaintiffs ask the Court to find that every MCA agreement with Defendants is *void ab initio* as a usurious loan as a matter of law for purposes of summary judgment. *See* Dkt. 138 at 38. The Court agreed with Defendants' arguments in support of their motion to dismiss that New York law applies to the interpretation of the MCA agreements *because* they "contain effective New York choice of law provisions." Dkts. 82, 86. Yet if Plaintiffs are correct, and the MCA agreements are void *ab initio*, then New York law is clear that they "have no force or binding effect," including for purposes of choice of law. *Moss v. First Premier Bank*, No. 213-cv-05438, 2020 WL 5231320, at *4 (E.D.N.Y. Sept. 2, 2020) ("when a contract is void *ab initio*, that invalidity extends even to procedural matters in the contract"). Accordingly, if the Court determines that the MCA agreements are invalid under New York law, it must conduct a new choice-of-law analysis for each transaction. *See id.*; *see also Blue Wolf Cap. Fund II, L.P.*, 105 A.D.3d at 182 ("[T]he loan transaction is void because it was criminally usurious as a matter of law, and accordingly the collateral agreement is unenforceable.").

If the MCA agreements are all void *ab initio*, then the Court must engage in a center-of-gravity approach for each class member. Under this approach, courts "lay emphasis" upon the law of the place which has the "most significant contacts" with the disputed matter. *Moseley*, 980 F.3d at 23. Although this analysis is fact-dependent, the law of the *borrower's* jurisdiction often governs. *Id*. In this case, that would involve comparing the laws of 47 different jurisdictions. Freedman Decl. ¶ 3. Further, to the extent New York law might govern, this would depend, for each class member, on whether they knew where each Defendant was located. *Id*. at 24; Ex. 15 [Kroen Tr. 60:13-16]. It follows that either the laws of each borrower's state apply or else every class member must undergo a factual determination as to what they knew about Defendants' location. In either event, common questions do not predominate. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 141 (2d Cir. 2015) ("Courts must exercise care in conducting a choice-of-law analysis in a putative Rule 23(b)(3) class action [] in order to determine whether any conflicts in governing law will overwhelm the ability of the trier of fact meaningfully to advance the litigation through classwide proof.").

And each state in the country has a different usury regime. For example, in North Carolina, where Haymount is based, the usury statute is inapplicable to loans of greater than $25,000 in value. N.C. Gen. Stat. Ann. § 24-1.1. In other states, there are no usury laws, corporations are exempted, or there is a safe harbor for receivables purchase agreements like the MCA agreements. *See, e.g.*, Tex. Bus. & Comm. Code § 9.109(e); *Express Working Cap., LLC v. Starving Students, Inc.*, 28 F. Supp. 3d 660, 670 (N.D. Tex. 2014); *see also Allowable Fees on Commercial Loans*, 50 STATE STATUTORY SURVEYS: FINANCIAL SERVICES: LOAN FUNDING (2021) (available on Westlaw). These different legal regimes and the need for "[i]ndividualized choice of law analysis to each of plaintiff's claims" means that "the proliferation of disparate factual and legal issues is

compounded exponentially." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 99 (S.D.N.Y. 2017) (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996)). Where materially different laws of distinct jurisdictions are implicated, class certification is inappropriate. *See Lewis Tree Servs., Inc. v. Lucent Techs., Inc.*, 211 F.R.D. 228, 236 (S.D.N.Y. 2002) ("Courts have refused to certify nationwide class actions where the substantive law of multiple states must be applied."). Due to this pervasive and material variation in state law, Plaintiffs cannot show that the "proposed class would be manageable in a manner sufficient to satisfy Rule 23(b)(3)'s predominance and superiority requirements." *Id*.

Plaintiffs' effort to strike the class waiver presents the Court with two choices: (a) the contracts are not void *ab initio*—or it is impossible to so determine on a class-wide basis—and the class action waiver is enforceable; or (b) the contracts, including the class action waiver and choice-of-law provision, are void, necessitating individualized choice of law determinations preventing class certification. Either way, Plaintiffs' motion fails.

> B.  Defendants neither consented nor waived choice of law arguments

While Defendants did, for the purposes of the motion to dismiss, argue that New York law governs the applicable RICO claims, they did so solely on the basis that "the parties agreed to an effective choice of law provision specifying New York law." Dkt. 82 at 7. If the Court and Plaintiffs accept that the contracts are binding purchases of receivables—as was argued at the motion to dismiss—Defendants stand by this argument. If, however, the Court finds that Plaintiffs have shown that the contracts are void *ab initio*, then no choice of law provision controls, and Defendants' prior argument would be inapplicable. Because Defendants' argument that New York law controls rested *entirely* on the argument that there was an effective choice of law provision, it cannot be that, absent that choice of law provision, Defendants either consented to New York law or waived an argument that the law of another state (or other states) may govern.

Further, while Defendants did argue that New York law applied based on the choice of law provision, they also argued that under North Carolina and Texas law, Haymount's and Indigo's claims, respectively, were deficient. In such a circumstance, Defendants have adequately claimed other law could apply, barring any argument that they have consented to the application of New York law to the remainder of the case.

Likewise, the doctrine of waiver does not bar Defendants' arguments that choice of law issues abound *if* the Court voids the contracts. Defendants' argument throughout this litigation has been that the contracts are valid purchases of receivables. *See* Dkt. 76 at 3-6. On that basis, Defendants have maintained that there is an operative choice of law provision and an operative class action waiver. Plaintiffs now argue that the entire contract, including both of those provisions, is void *ab initio*, and if the Court accepts that argument in order to certify the class, then the *sole* rationale for Defendants' argument that New York law applies will have been firmly rejected by the Court. *See* Dkt. 82 at 4-7. Indeed, the choice of law question has been presented to the Court only once at an early stage of the litigation, and courts "do not generally hold the choice-of-law determination to have been waived until a late stage in litigation, such as at the point of making of summary judgment motions." *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 423 (S.D.N.Y. 2014) (holding that where a party has not been prejudiced by a new choice of law argument around the close of discovery, waiver is inapplicable).[20] "Thus, courts give considerable leeway to raise choice of law arguments requiring no further factual development

---

[20] Further, to the extent Plaintiffs try to argue that Defendants waived any choice of law argument, that waiver could apply only to the Named Plaintiffs prior to class certification, which would mean that Defendants were free to argue choice of law issues with regards to the class going forward. *See In re Brinker Data Incident Litig.*, No. 18-cv-686, 2020 WL 691848, at *3 n.5 (M.D. Fla. Jan. 27, 2020) ("At the motion to dismiss stage, the Court considers the allegations of the Named Plaintiffs."). Thus, any finding of waiver would not alter the class certification analysis.

towards the end of the proceedings." *McDonnell v. AMC Entm't Holdings Inc.*, No. 20-cv-5378, 2022 WL 3274166, at *5 (S.D.N.Y. Aug. 11, 2022).

Because Defendants have argued only that New York law applies pursuant to a valid choice of law provision, they have not consented to New York law or waived any argument against other law applying in the absence of that provision. And, if there is no governing choice of law provision, the various usury laws of the states of each borrower's domicile will have to be analyzed and applied. In such a circumstance, there is no common question for which a common answer can be provided. *See Hughes v. The Ester C Co.*, 317 F.R.D. 333, 352-53 (E.D.N.Y. 2016) (declining to certify nationwide class where "the laws of fifty states have 'material' differences which could 'mean the difference between success and failure'").

## VII.   Haymount and Clinton fail to meet the requirements for a Rule 23(b)(2) class

When presented with a motion for Rule 23(b)(2) class certification of claims seeking both injunctive relief and money damages, a court may allow (b)(2) certification if it finds that "(1) 'the positive weight or value [to plaintiffs] of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed,' and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy." *Robinson v. Metro-N. Commuter R.R. Co*., 267 F.3d 147, 164 (2d Cir. 2001) (citation omitted). Rule 23(b)(2) class certification is not intended to reach claims primarily for monetary recovery.

> This subdivision is intended to reach situations where a party has taken action . . . with respect to a class, and final relief of an injunctive nature . . . is appropriate . . . The subdivision does not extend to cases in which the appropriate final relief relates exclusively or *predominantly* to money damages.

Fed. R. Civ. P. 23(b)(2) advisory committee's note to the 1966 amendment (emphasis added). In this case, Plaintiffs primarily seek money damages—indeed, all of the four remaining causes of action seek money damages. *See* Dkt. 28 ¶¶ 262, 272, 307, 314.

Plaintiffs have not demonstrated that injunctive relief is predominant. Plaintiffs claim (at 34) that "Defendants brazenly continue to execute MCA agreements with merchants even after this Court ruled that those agreements may constitute usurious, illegal loans." Plaintiffs merely state (at 34) that "[a]n injunction would benefit the RICO class members as a whole, and would address Defendants' ongoing, illegal activities." Plaintiffs' proposed injunction is not limited to Defendants; instead, it also seeks to bind the absent class members from willingly contracting with counterparties of their choice. There is no basis for such a prohibition.

In addition, as discussed above, the Court will have to determine the specific economic reality of each transaction, which cannot be accomplished on a class-wide basis. "The Fifth, Seventh, and Eleventh Circuits have all held that certification under Rule 23(b)(2) is improper where an element of liability must be proven on an individualized basis." *Freeland v. AT & T Corp.,* 238 F.R.D. 130, 157 (S.D.N.Y. 2006).

## **CONCLUSION**

Defendants respectfully submit, for all the reasons described above, that the Court should deny Plaintiffs' Motion for Class Certification in its entirety.


Dated: October 24, 2022
     New York, N.Y.

*/s/ Velvel (Devin Freedman*
Velvel (Devin) Freedman
Edward Normand
Jordana Haviv
Richard Cipolla
Daniel M. Stone
**FREEDMAN NORMAND**
  **FRIEDLAND LLP**
99 Park Avenue, 19th Floor
New York, NY 10016
Tel: (646) 350-0527
Email: vel@fnf.law