# EXHIBIT 11

```
 1                   UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
     HAYMOUNT URGENT CARE PC;           )
 3   ROBERT A. CLINTON, JR.;            )
     INDIGO INSTALLATIONS, INC.;        )
 4   and CHRISTOPHER A. TURRENTINE,     )
     individually and on behalf of      )
 5   those similarly situated,          )
                                        )
 6           Plaintiffs,                )Case Number
                                        )1:22-cv-01245-JSR
 7   VS                                 )
                                        )
 8   GOFUND ADVANCE, LLC;               )
     FUNDING 123, LLC; MERCHANT         )
 9   CAPITAL, LLC; ALPHA RECOVER        )
     PARTNERS, LLC; YITZCHOK            )
10   ("ISAAC") WOLF; JOSEF BREZEL;      )
     JOSEPH KROEN; and                  )
11   YISROEL C. GETTER,                 )
                                        )
12           Defendants.

13           ********************************
                REMOTE VIDEOTAPED DEPOSITION OF
14                  ROBERT A. CLINTON, JR.
                     September 14, 2022
15           ********************************

16           ROBERT A. CLINTON, JR., produced as a

17      witness at the instance of the Defendants, was

18      duly sworn and deposed in the above-styled and

19      numbered cause on September 14, 2022, from

20      9:07 a.m. to 4:14 p.m. CST, stenographically

21      reported, pursuant to the Federal Rules of Civil

22      Procedure and the provisions stated on the record.

23
        Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
24                     Texas CSR 9306
                       California CSR 14407
25                     Illinois CSR 084.004659
```

Deposition of Robert A. Clinton, Jr.                Haymount Urgent Care PC, et al v. GoFund Advance, LLC, et al.

Page 10

1  A    Uh-huh.
2  Q    Great.
3       And as we discussed, if you need to
4  take a break, let me know, and as long as it's not
5  during a question -- an open question; do you
6  understand?
7  A    Sure.
8  Q    Okay.  Is there any reason you cannot give
9  your best testimony here today?
10 A    No, sir.
11 Q    All right.  Did you meet with Mr. Heskin
12 before this deposition to prepare for this
13 deposition?
14 A    Yes.
15 Q    How many times?
16 A    Several times via phone.
17 Q    Via phone.
18      How -- how long in the aggregate,
19 would you say, were those prep sessions for
20 today's deposition?
21 A    Just for the deposition or for the case in
22 general?
23 Q    Just for the deposition.
24 A    I don't know.  It might be, if you add
25 them all up, a couple hours.

Page 11

1  Q    Okay.
2  A    Just to talk about different things.
3  Q    And did you take any notes during those
4  prep sessions?
5  A    Not necessarily.  I didn't really -- I
6  didn't really -- I don't have any notes -- I mean,
7  I remembered he said to go look up certain things,
8  and so I did, and I got things together, but I
9  didn't really take notes to, like, follow during
10 the deposition.
11 Q    Got it.
12      I just saw you pick up a piece of
13 paper and put it in front of you.  What was that?
14 A    Yeah.  That was this (indicating).
15 Q    Got it.  Okay.
16 A    In case you say a question and I want to
17 make sure I have it, I was going to jot a little
18 note to make sure I answer correctly.  Is that
19 okay?
20 Q    Understood.  You can take notes if you
21 want.
22 A    Okay.
23 Q    Did you review any prior deposition
24 testimony from this case before today?
25 A    No.  I haven't seen any.

Page 12

1  Q    Okay.  Where are you located right now?
2  A    I am in 420 Owen Drive.  It's Haymount
3  Urgent Care office.
4  Q    Are you in your personal office?
5  A    Yes, sir.
6  Q    And there's no one in there with you?
7  A    Nobody's here.
8  Q    Are you aware that there were document
9  requests propounded on you and Haymount Urgent
10 Care?
11 A    Yes.
12 Q    Okay.  And have you produced all the
13 responsive documents to those requests, to your
14 knowledge?
15 A    Yeah, I've done my very best to get as
16 many documents as I could.  I'm sure there may be
17 documents that I have not found yet, but I've
18 certainly been trying.
19 Q    Are you still in the process of trying to
20 find documents?
21 A    I haven't been lately because I thought
22 I've produced all of them, but it's hard to know
23 when I do searches by various names and entities
24 and a lot of times those names and entities switch
25 or they're different, and so I'll find it -- you

Page 13

1  know, somebody might go by Ashley.  Then they go
2  be something else.  Then they go by, you know,
3  Rob.  But his name's not Rob.  You know, so then
4  I -- I try to find little things by different
5  people, and then I'll print those up.
6       MR. HESKIN:  Yeah.  And then,
7  Richard, just so you know, we're trying to
8  get his text messages.  We've produced
9  what we can already, but we're still in
10 the process of being able to get that in
11 producible form.  So --
12      MR. CIPOLLA:  Understood.  Thanks
13 for the clarification, Shane.
14      MR. HESKIN:  Yup.
15 BY MR. CIPOLLA:
16 Q    So what is your role in this case,
17 Dr. Clinton?
18 A    My role is I was, I guess, a plaintiff
19 that had a situation where I thought that I was
20 unjustly -- in an awkward position where I was
21 having a lot of money taken, and I filed a case
22 against them.
23 Q    Are you a class representative?
24 A    Yes, sir.
25 Q    Who is Charles Lunden?

Deposition of Robert A. Clinton, Jr.                         Haymount Urgent Care PC, et al v. GoFund Advance, LLC, et al.

Page 14

1   A    Charles Lunden?
2   Q    Yup.
3   A    I'm not sure all the names of everybody.
4   Q    L-u-n-d-e-n.  Have you heard that name
5   before?
6   A    I've heard a lot of names before, so I
7   don't recall everybody's name, to be honest with
8   you.  I hardly -- I barely remembered Shane's
9   name, and I talked to him a million times.
10  Q    Do you have any memory issues?
11  A    No.  Not yet.  Not that I'm aware of.
12  Q    Okay.  Who is David Almeida?
13  A    I do not know.
14  Q    Okay.  Who is James Bilsborrow?
15  A    I do not -- I'm not sure.
16  Q    Okay.  Who is Alex Corey?
17  A    I'm not sure.
18  Q    Have you read the amended complaint in
19  this matter?
20  A    Yeah.  I've -- I've read all the
21  documents.
22  Q    Okay.  When do you recall reading the
23  amended complaint?
24  A    When they first -- when they were coming
25  out.

Page 15

1   Q    Okay.  And do you recall roughly when the
2   suit was filed?
3   A    I don't know.  It's been several months.
4   I'm thinking it was in March, but, you know, I
5   could be wrong on the dates.  Everything kind of
6   happened really quickly in March.
7   Q    So when you say you read "all of the
8   documents," what do you mean by that?
9   A    I read through them all.  I opened them up
10  on my computer, and I read through them.
11  Q    Okay.  So you read all the documents
12  counsel has sent you; correct?
13  A    Correct.
14  Q    And you confirmed he sent you every file
15  in this case?
16  A    I don't know if every file.  He sent me
17  all the things that he filed before he filed them.
18  He said, "We're going to file this.  Does it look
19  good to you?"  And I read through things, and I
20  didn't see anything that stuck out as something I
21  wouldn't know.
22  Q    Yeah.  So what -- can you list the
23  documents you have when you say "all the
24  documents"?
25  A    What did you say?  Excuse me.

Page 16

1   Q    Can you -- you said "all the documents."
2   Can you list the documents you can recall reading?
3   A    I cannot list the documents.
4   Q    Okay.
5   A    There are various filings.  There are
6   various opinions.  Different orders.  There was
7   things about Shane Heskin, things about me --
8   Q    Okay.  Do you recall -- even if you can't
9   list --
10  A    -- things he wanted to produce.
11  Q    Sure.
12       If you can't list all of them, can you
13  recall any of them?
14  A    I just recalled some to you.
15  Q    Those ones?
16  A    Yes.
17  Q    Any others?
18  A    No.  I mean, there were things from -- you
19  know, all about Heskin.  There were things about
20  me.  There were things about the case in general
21  when it was filed, the opinion of the judge.
22  There's a lot of various small documents.  Some
23  are larger.
24  Q    So a few seconds ago, you said the suit
25  was filed sometime in February or March; correct?

Page 17

1   A    I -- well, because I'm thinking it was in
2   March because that's when everything started
3   happening.  It might have been after that.  You
4   know, things seemed to take a while.
5   Q    Why did you decide to file the suit?
6   A    I was advised that it probably wouldn't
7   stop unless I did.
8   Q    Okay.  Did anyone force you to file this
9   lawsuit?
10  A    Nobody forced me.
11       MR. CIPOLLA:  Can we pull up
12       document HAY-2606, James?
13       James, did you hear me?
14       THE VIDEOGRAPHER:  Oh, yes,
15       Counsel.  Sorry.  2606?
16       MR. CIPOLLA:  Correct.
17       THE VIDEOGRAPHER:  Okay.  I'm not
18       finding that.
19  BY MR. CIPOLLA:
20  Q    So you were advised to file, but it wasn't
21  your idea to file?
22  A    Well, I didn't know how to make things
23  stop, and so I didn't know what to do because I
24  was getting over-debited and it didn't seem like
25  people were being reasonable.

Deposition of Robert A. Clinton, Jr.                    Haymount Urgent Care PC, et al v. GoFund Advance, LLC, et al.

Page 22

1  supposed to be allowed where we could reopen the
2  portal prior to it being terminated, GoFund and
3  Alpha Recovery Partners did not inform the vendor
4  that we could do that.  So we gave them the
5  letter -- the opinion from the judge, and it was
6  like, "We have to have it from Alpha Recovery or
7  GoFund," and they refused to give it till the
8  portal was closed, so we could not file any of
9  those 8,000 claims and close.
10      And that was about 9 million-plus of
11 patient recovery, and we get about 17 percent of
12 that.  So it's -- you know, it's pretty
13 substantial.  About 1.5, $2 million, and three
14 times that is what I think the Court may allow,
15 but I don't know the exact details.
16 Q    Understood.
17      Do you understand that you claim
18 individual RICO damages of up to 14 million?
19 A    Yes, sir.
20 Q    Or approximately 14 million?
21 A    Yeah, I don't know what the exact numbers
22 are because I'm not an attorney and I don't know
23 what the Court allows.
24 Q    How many years would it take Haymount to
25 earn 14 million in profit?

Page 23

1  A    In profit or in gross revenues?
2  Q    In profit.
3  A    Well, it depends on how many MCAs we take.
4  Q    What do you mean by that?
5  A    We might not make any profit if we have
6  MCAs, because they might keep taking it out after
7  they're paid.  So I really -- it would be -- I
8  can't really -- you know, I don't want to guess at
9  how long it would take to make that.
10 Q    How many MCAs are you still paying off
11 right now?
12 A    There are several.  They've all halted or
13 gone down to about 50 to $100 per day.
14 Q    Do you know what the aggregate amount you
15 owe to those outstanding MCA agreements are?
16 A    I do not.  I can give an estimate, if you
17 like.
18 Q    When was the first MCA that Haymount
19 entered into?
20 A    I believe in 2018 I may have taken a small
21 one.
22 Q    Was Haymount open before that?
23 A    Yes, it was.
24 Q    Okay.  And what was the profit for
25 Haymount before entering its first MCA?

Page 24

1  A    It was not very much.  It was small
2  profits or break even.  It might be a slight loss.
3  Q    Okay.  So it would take a long time to
4  earn 14 million in profit for Haymount, if ever?
5  A    Theoretically, yes.
6  Q    And you understand you'd be entitled to
7  pursue that $14 million individually and are not
8  required to bringing a class action to pursue
9  that; correct?
10 A    Correct.
11      MR. CIPOLLA:  Okay.  James, now I
12   think 2602 -- 2606 should be up.  If you
13   could bring that up.
14   (Clinton Exhibit 1 marked.)
15 BY MR. CIPOLLA:
16 Q    Okay.  You were correct, Dr. Clinton.
17 World Global Fund.
18 A    Correct.
19 Q    So who is World Global Fund?
20 A    World Global Fund is another MCA.
21 Q    Okay.  Do you know what the terms of that
22 MCA were?
23 A    Basic terms?
24 Q    Yeah.
25 A    I recall some of the basic terms.

Page 25

1  Q    Okay.  Can you describe them to me?
2  A    Yeah.  It was a million dollars, and they
3  said they were going to do three, something like
4  that, with a payback.  We ended up not doing any
5  of the terms that it had there.
6  Q    What do you mean, "the terms that it had
7  there"?
8  A    You can probably -- they didn't fund the
9  full amount.
10 Q    Okay.  All right.  And are you familiar
11 with this email thread?
12 A    Well, yeah.  I wrote it.
13 Q    Okay.  And who is "Josh Funding"?
14 A    Josh is -- they all use different names.
15 I mean, it's -- you don't know who anybody is.  I
16 found out his name is Shia, but he goes by "Josh."
17 So we don't know.  This whole industry is filled
18 with people that go by other names.
19 Q    Okay.  And who is "Henry White"?
20 A    He is a broker.
21 Q    Okay.  And --
22 A    I believe that's his real name.
23 Q    And who is "David Gold"?
24 A    David Gold is another MCA type of person,
25 and I'm not sure how they're all related.

Page 26

1  Q     Okay.  Did Henry White broker the deal
2  for -- with World Global Fund?
3  A     Yes, sir.
4  Q     Have you ever spoken to these individuals
5  on the phone?
6  A     Yes.
7  Q     And on text?
8  A     Yes.
9  Q     Okay.  Why did -- do you see -- scratch
10 that.
11       Do you see here this paragraph that
12 says:  "I am not here to discuss this loan or the
13 collateral you took"?
14 A     Yes, I do.
15 Q     Can you read that paragraph for me
16 quickly?
17 A     Yes.  "I am not here to discuss this loan
18 or the collateral" --
19 Q     You don't have to read it out loud.  I
20 just want you to familiarize yourself with it.
21 A     Oh, I'm very familiar with it because I
22 wrote it.
23 Q     Okay.  Why did --
24 A     I wanted to show them that they -- sorry.
25 Q     Understood.

Page 27

1        Why did Global Fund demand you sue
2  GoFund?
3  A     Why did -- why did they demand it?
4  A     Yeah.
5  A     Or suggest it?
6  Q     Do you see the words -- you say:  "After
7  you" --
8  A     Yeah.
9  Q     -- "and David demanding we sue GoFund."
10 A     Correct.  Yeah, they -- they said that it
11 won't stop.  They said everybody's afraid of John
12 Braun and fearful for their families, and they --
13 a group of people came and asked -- and demanded
14 that I sue.  They said because of experiences
15 people have had in the community with him.
16 Q     Is this lawsuit against John Braun?
17 A     Well, he's kind of the brains behind the
18 group.  But I never knew if I spoke to him
19 personally or not because they all use different
20 names.  Sometimes I'd talk about John Braun to a
21 person going by Michael Wilson, and he'd respond
22 in the first person.  So I'd never know who it was
23 really.
24 Q     So you've spoken to John Braun?
25 A     I have no idea if I've spoken to John

Page 28

1  Braun.
2  Q     But do you know if John Braun's being sued
3  in this lawsuit?
4  A     He's not named.
5  Q     So you don't know the names of the other
6  defendants, but you do know John Braun's not being
7  sued?
8  A     Well, I know some of -- I didn't say I
9  didn't know the names of the other defendants.
10 You never -- I don't believe you asked the names
11 of the other defendants.  You asked several random
12 names that may or may not be attorneys in the
13 case, but I don't think they were defendants.
14 Q     Okay.
15 A     Am I correct or --
16 Q     I'm not sure.
17 A     Okay.
18       MR. HESKIN:  Well, I -- you asked
19    him what the defendants were, and he
20    named -- listed the plaintiffs.  So I
21    think he misunderstood the question.
22       THE WITNESS:  Oh, sorry.  Sorry.
23    Do you want me to list them, then, since
24    I --
25

Page 29

1  BY MR. CIPOLLA:
2  Q     No, no, that's okay.
3  A     -- got them confused?
4  Q     That's okay.
5       MR. HESKIN:  No.  I mean, listen,
6    if -- you know, he clearly misunderstood
7    the question.  And you asked him who the
8    defendants were, and he listed the
9    plaintiffs.
10      THE WITNESS:  Yeah.  Sorry.
11 BY MR. CIPOLLA:
12 Q     Sure.  Do you want to list the defendants
13 now?
14 A     Yeah.  The defendants would have been
15 GoFund; Funding 123; Merchant Capital; Josef
16 Brezel; Isaac Wolf, whatever his -- Yitzchok or
17 whatever.  I think Kroen is another, I believe.
18 Q     Yup.
19 A     I don't recall if there's anybody else.
20 Q     Okay.
21 A     Those are the ones on the top of my mind.
22 Q     So other than GoFund, did Josh and David
23 referenced in the email demand you name any other
24 defendants?
25 A     GoFund was the one that they were mainly

Case 1:22-cv-01245-JSR   Document 153-11   Filed 11/07/22   Page 7 of 21

Deposition of Robert A. Clinton, Jr.                     Haymount Urgent Care PC, et al v. GoFund Advance, LLC, et al.

Page 30

1  after, but they had said that they're all related,
2  like Merchant Capital, Funding 123, GoFund.
3  Because there was an issue -- one of the main
4  problems I had was I got really upset with Go- --
5  with World Global because Michael Wilson, who
6  represents GoFund, told me one day, "Hey, they're
7  going to double-debit you. World Global is going
8  to double-debit you. They're dirt bags."
9          And so I'm like, "They're not going to
10  double-debit me." Next thing I know, that same
11  day, they double-debit me.
12          I get ahold of GoF- -- them, and
13  they're like, "No, that is not us. That is them
14  trying to make it look like us. They changed the
15  name of the ACH. Get ahold of your bank."
16          So I got ahold of the bank, and
17  they're like, "Well, we can't tell you exactly
18  who, but it looks like possibly two different
19  groups, but we can't disclose that unless we had,"
20  you know -- I don't know -- something from
21  official.
22          So somebody was putting in another
23  debit the exact same as them with putting the same
24  name on the ACH and made it look as if they did a
25  double-debit, but it was going to two different

Page 31

1  entities, and I haven't gotten to the bottom of
2  that. That's more of a criminal case, I believe.
3  Q      Got it.
4  A      And that's when they said, "You got to
5  absolutely sue them because this won't stop."
6  Q      They demanded you sue them, in fact.
7  A      They suggested emphatically, yes.
8  Q      But here you agree it says --
9  A      I would consider it demand, yeah.
10  Q      Do you recall when they made that demand?
11  Was that over the phone?
12  A      Yes, over the phone.
13  Q      Do you recall when that was, roughly?
14  A      I don't recall the dates, no. It was
15  prior to being --
16  Q      What else do you recall about that
17  conversation?
18  A      That they -- they recommended an attorney.
19  Q      Did they recommend Shane in particular?
20  A      First they had somebody else, and the next
21  day they had Shane. They recommended two
22  different people.
23  Q      Who initiated that phone call?
24  A      They -- they did. They called me.
25  Q      But what was the reason they called you?

Page 32

1  A      They were worried that there would be no
2  money left for anybody else to collect and that it
3  wouldn't stop with the over-debiting and changing
4  names and things, and that they said that they
5  don't stop just with you asking them to stop.
6  Q      Okay. Did World Global Fund stop just
7  because you asked them to stop?
8  A      No. I'm not saying that they're good
9  people either or that they won't have the same
10  sort of situation a few months down the road.
11  Q      Do they know that?
12  A      I believe they know that there could be
13  some issues. There's -- there's clear reason for
14  me to believe that this was a loan and not an MCA.
15  We even said it was a loan with collateral, and
16  they took a watch as collateral. So I don't see
17  how -- more obvious it could get.
18  Q      It says here they "wired funds to Shane
19  Heskin" to bring the suit. Do you see that?
20  A      Okay. Yes.
21  Q      Okay. Do you know if they wired more
22  funds since then?
23  A      They have not. And they added that to my
24  bill with them.
25  Q      How often do you discuss this case with

Page 33

1  David and Josh?
2  A      I don't discuss the case with them.
3          Josh is --
4  Q      Do you know how much they wired?
5  A      I think $10,000.
6  Q      So do you see here where it says "I'm
7  trying to keep the business going after you and
8  David demanded we sue" --
9  A      Right.
10  Q      -- "demanding we sue"?
11  A      Yes.
12  Q      Before the lawsuit, GoFund did not declare
13  a default on you; correct?
14  A      Correct.
15  Q      Is it fair to say you sound upset by the
16  complications the lawsuit created?
17  A      I would say it's -- I was upset with the
18  UCC lien, and that's what caused the problems, and
19  that's what caused the lawsuit.
20  Q      The UCC liens caused the lawsuit?
21  A      Well, they didn't help anything.
22  Q      Do you know when the UCC liens went out?
23  A      They were in February. I --
24  Q      Sorry. I didn't --
25  A      I -- UCC liens were February. I believe

Page 46

1  A    Yes, sir.
2  Q    Do you know what the basis of the fraud
3  claim is?
4  A    Again, I'd have to defer to my attorney on
5  that. I explained how they would use different
6  names, entities would put them on -- on a contract
7  but would fund a different amount, and things like
8  that.
9  Q    Yeah. Mr. Heskin has a lot of experience
10 in the industry; right?
11 A    Correct, it's my understanding.
12 Q    You trust him in this case?
13 A    I do.
14 Q    You'd defer to his advice?
15 A    Yes, sir.
16 Q    Do you understand there's a breach of
17 contract claim in this case?
18 A    Yes, sir.
19 Q    Okay. Do you know the basis for that
20 breach of contract claim is?
21 A    It's my understanding that it was where
22 they would say they're going to fund a certain
23 dollar amount and then they would fund a portion
24 of that at the end.
25 Q    Do you understand there's a claim on the

Page 47

1  42 -- the US Code Section 1983 in this case?
2  A    I don't -- I can't say that I know exactly
3  what all those terms mean.
4  Q    Okay. Do you know that there's a claim in
5  this case regarding the Connecticut prejudgment
6  remedy statute?
7  A    I -- I do, and that -- I don't believe
8  that involves me. That involves the other person.
9  Q    So you haven't concerned yourself with
10 that part of the case?
11 A    No, not necessarily. I don't believe it
12 affects me.
13 Q    So we just discussed the RICO claims, the
14 declaratory relief claim, the fraud claim, the
15 breach of contract claim, and the Section 1983
16 case claim; correct?
17 A    That's my understanding, yes, sir.
18 Q    Okay. Do you know which of those claims
19 are brought on a class basis?
20 A    I believe I do not speak to two of them.
21 One part of it, I have to do -- I have to deal
22 with on the class, and the other gentleman is the
23 other two sections of that. I'm more with the --
24 like, the breach of contract and the -- that sort
25 of a thing.

Page 48

1  Q    Is the RICO claim brought on a class
2  basis?
3  A    And RICO. I believe so.
4  Q    Say it again?
5  A    Yeah, RICO.
6  Q    What about the fraud claim?
7  A    Fraud, yes, I believe so. Again, the
8  terms -- they escape me, but I just know the facts
9  of how I was involved.
10 Q    Do you know what a class action is?
11 A    Yes. It is my understanding it's a group
12 of -- that it represents an entire entity of
13 people or a group of people that are similarly
14 affected.
15 Q    Okay. And did Josh at World Global
16 Funding recommend to pursue this on a class action
17 basis?
18 A    He never mentioned anything about anything
19 like that. They just said to get ahold of Shane.
20 Q    Okay. Was it your idea to bring this on a
21 class basis?
22 A    I just talked about it and I said, you
23 know, I think it's a huge problem and that people
24 should be able to -- they should be held
25 accountable. And then dealing with -- discussing

Page 49

1  with Shane, he recommended that after we talked
2  about it for quite some time.
3  Q    And Shane represents you on matters beyond
4  just this specific case; right?
5  A    Like what sort of things would that
6  entail?
7  Q    He's CC'd on emails with, you know --
8  A    Yeah. I've CC'd him --
9  Q    -- base funding; right?
10 A    Yeah. I've CC'd him on emails in regards
11 to the MCA industry.
12 Q    With regard to the industry. Okay.
13     And, again, that's because you trust
14 him?
15 A    I trust him, yes, sir.
16 Q    Is he compensated separately for the --
17 that work?
18 A    I'm not sure how I would -- how it's
19 factored. I know he puts his time in, and I'm
20 billed.
21 Q    So you pay a bill to him?
22 A    I get billed by him, but I still have to
23 pay my large bill. It's -- I make payments when I
24 can.
25 Q    Do you know what happens to that bill if

Page 50

1  you lose this case?
2      A    I am responsible for it.
3      Q    How often do you communicate with Shane
4  about this case?
5      A    I'd say probably four to five times a
6  week.
7      Q    Are those by phone or email?
8      A    Typically phone.
9      Q    And who attends those calls?
10     A    The two of us.
11     Q    Do you know if a motion to dismiss was
12  filed in this case?
13     A    I believe that you filed a motion to
14  dismiss -- or not --
15     Q    Do you know --
16     A    -- necessarily you, but counsel that was
17  prior to you; is that -- is that correct?  Because
18  I don't think you were --
19     Q    Yes, counsel prior to us filed a motion to
20  dismiss.
21     A    Right.
22     Q    Do you know if the motion to certify the
23  class was filed in this case?
24     A    I believe so.
25     Q    Did you review a draft of that motion

Page 51

1  before it was filed --
2      A    I reviewed -- yeah.  I reviewed lots of
3  drafts.
4      Q    But you don't remember which specific
5  drafts?
6      A    Well, I don't know that I've been through
7  law school to know what exactly I was reading, but
8  I didn't see anything that stuck out that was --
9  that was wrong as far as what I knew.
10     Q    Earlier you said Shane was billing you for
11  this case; correct?
12     A    Yes, sir.
13     Q    Does that mean you're also being billed
14  for the costs in this case?
15     A    The costs?
16     Q    The filing fees.  You know, anything --
17  expert fees, anything that isn't Shane's, you
18  know, billable hour.
19     A    I have not looked really closely at the
20  invoice.  I'm sure it's whatever's standard.
21     Q    So you're not checking what the costs are
22  in this case?
23     A    They send me an invoice every month, and
24  I -- or weekly, I believe, and I glance at it and
25  I pray about it and I just keep working.

Page 52

1      Q    Okay.  Do you understand what the duties
2  of a class representative are?
3      A    My understanding is to be a representative
4  for the class.
5      Q    And what does that mean?
6      A    Just to understand some of the basics of
7  the class and to speak up on behalf of the class.
8      Q    Okay.  And do you understand that also
9  entails monitoring the costs of pursuing a case?
10     A    Yes, and -- yeah.  I believe that it's --
11  I'm not sure how it's worked out, but I don't know
12  if the class is -- it's considered different than
13  my part of that case.
14     Q    Okay.  So you said yes, you understood --
15  you have a duty to monitor costs; right?
16     A    Well, I understand, to the best of my
17  ability.
18     Q    Okay.  But you aren't monitoring costs
19  that closely?
20     A    Well, I do get an invoice from them, which
21  I look at.
22     Q    Do you know if any settlement offers were
23  made in this case?
24     A    I believe there was a walkaway settlement
25  offer after all the damage was done, which made it

Page 53

1  a little bit hard to take.  So it was not
2  accepted.
3      Q    Okay.  So do you know roughly how many MCA
4  agreements you had active in around February 2022?
5      A    Possibly ten.  I'm not sure exactly.
6  Maybe eight to ten.
7      Q    And do you know roughly how many of them
8  involved entities that are not defendants in this
9  case?
10     A    Maybe five to six.
11     Q    Okay.  And did they all know about each
12  other's MCA agreements?
13     A    They pretty much knew -- everybody knew
14  that there were other MCAs.
15     Q    Okay.  Do you know if they knew about all
16  the other MCAs?
17     A    I don't know if they knew about all of
18  them.  They knew about the majority of them.  They
19  all had access --
20     Q    Did they not --
21     A    They all had the bank records and they
22  went through them and they knew about them,
23  because they talked about them.
24     Q    Did you use -- scratch that.
25          Did you open up bank accounts around

Case 1:22-cv-01245-JSR   Document 153-11   Filed 11/07/22   Page 10 of 21

Deposition of Robert A. Clinton, Jr.                    Haymount Urgent Care PC, et al v. GoFund Advance, LLC, et al.

Page 54

1  December to February -- December 2021 to
2  February 2022 to receive MCA funds?
3    A    Yes, sir.
4    Q    And so were you using that to hide MCA
5  funds from other MCA entities?
6    A    Well, I did it as -- at their request by
7  the Merchant Capital and GoFund people, and
8  they -- also so that when they debited they
9  wouldn't take out from the other groups.
10   Q    Did any other MCA entity ask you to open
11  up bank accounts?
12   A    Yeah.  They've all said that they'd rather
13  not have it with the other MCA.
14   Q    Okay.
15   A    Because they don't want to be -- their
16  money to be taken.
17   Q    Okay.  So how many bank accounts were you
18  managing in February 2022 between yourself and
19  Haymount?
20   A    I believe there's four to five.
21   Q    Four to five?
22   A    Yeah.
23   Q    And were most of those -- scratch that.
24        How many of those MCA agreements were
25  daily debits?

Page 55

1    A    Most of them, if not all of them.  I think
2  they're all daily debits at the time.
3        MR. CIPOLLA:  I just -- I just saw
4     Shane disappear.  I want to be sure he
5     didn't drop off.  I want to make sure your
6     counsel is still listening.
7        Can someone tell me, is he still on
8     the Zoom, just muted?
9        THE VIDEOGRAPHER:  Yes, he's still
10    on the Zoom.
11       MR. CIPOLLA:  Okay.
12  BY MR. CIPOLLA:
13   Q    How were you managing keeping track of
14  four to five different bank accounts, daily debits
15  from ten different MCA agreements --
16   A    Yeah, I think it was actually closer to
17  seven bank accounts when I got -- when I think
18  about it.
19   Q    That's a lot of work to manage on a
20  day-to-day basis.
21   A    It is.  Certainly is, yes, sir.
22   Q    How are you managing it?
23   A    It was very difficult.
24   Q    Walk me through a day of making payments.
25   A    They would -- I was really concerned with

Page 56

1  treating my patients, to be honest with you, this
2  whole time.  That's when the omicron surge
3  happened, and so we were seeing up to
4  2,000 patients a day, and we had 175 employees.
5  So I was, to be honest with you, concerned with
6  meeting the needs of our community with testing,
7  and we had an infusion center for monoclonal
8  antibodies.  We're the only place around here
9  with, you know, 300,000 patients that potentially
10  come to us.
11        So I was doing that, and I was hoping
12  that we'd get the funding in from these insurance
13  companies to cover everything.  So they would take
14  their debits out of each account daily, and I
15  would have to move money around if it wasn't going
16  to make it.  But I was mainly concerned with
17  taking care of my patients during that time.
18   Q    Do you consider administering a COVID test
19  a treatment?
20   A    Administering a COVID test is not a
21  treatment.  It's a test.
22   Q    But you just said taking care of
23  patients --
24   A    Yes.  They are patients.  You have to talk
25  to each person.  You have to find out if they need

Page 57

1  a COVID test or if they need a flu test, if they
2  need a rapid strep test, if they need a chest
3  X-ray.  You know, we're not just a lab that's just
4  seeing people without any thought process like you
5  see in New York.  We're actually taking care of
6  our patients.  We send them over to our clinic to
7  get chest X-rays, we do a flu swab if they need
8  it, and then we also have an infusion center.  So
9  we would give monoclonal antibodies for people
10  that are positive that are at high risk and so
11  that they don't die.
12   Q    So were you personally seeing 2,000
13  patients a day?
14   A    No, I'm not seeing -- I can -- no one
15  person could ever see 2,000 patients a day.
16   Q    Okay.
17   A    We have a team of doctors, nurse
18  practitioners, and PAs that were all there.
19   Q    And how many -- how many employees do you
20  have now?
21   A    About 15.
22   Q    15.  That's a substantial difference.
23   A    Yeah, it is.
24   Q    So were those employees hired on a temp
25  basis?

Page 86

1  A    I do not know.  I don't --
2  Q    Are you making payments under it?
3  A    I made a payment, yes.  I believe that
4  it's okay, but I don't know because I'm not an
5  attorney.
6  Q    Shane advised you on that settlement;
7  correct?
8  A    I believe I ran it by him and he said it
9  sounds reasonable.  It sounds like they're being
10 reasonable.
11 Q    Do you have any reason to believe it's not
12 valid and enforceable?
13 A    I do not.
14     MR. CIPOLLA:  James, can we do
15     HAY-9757 now, which will be Exhibit 6, I
16     believe?
17     (Clinton Exhibit 6 marked.)
18 BY MR. CIPOLLA:
19 Q    Okay.  Do you recall this MCA agreement,
20 Dr. Clinton?
21 A    Yes, I do.  Yes, sir.
22 Q    And do you recall any negotiations about
23 this?
24 A    Not a lot of the negotiations.
25 Q    What do you recall?

Page 87

1  A    That it was the Isaacov brothers.  It was
2  a couple of them.  And I just don't remember -- I
3  don't recall the whole terms of it.
4  Q    Did you explain what you were going to use
5  the money for?
6  A    Yeah.  They knew -- at that point, I
7  guess, people all knew around the community that
8  we were using the money on omicron testing.
9  Q    And they knew a surge was happening?
10 A    Well, they knew the surge was happening,
11 correct.  It was all over New York City at the
12 time.
13 Q    Was North Carolina the same time, before,
14 or behind --
15 A    It was pretty much the same.  Maybe a week
16 later, but it was pretty much around the same
17 time.
18 Q    Okay.  I'll scroll down.
19     Do you recall the negotiation over
20 these terms?
21 A    Yeah.  Pretty much.
22 Q    Okay.
23 A    I recall it being -- I thought it was a
24 little bit more than 500,000, to be honest with
25 you.

Page 88

1  Q    You would discuss those numbers before
2  entering an agreement; correct?
3  A    Yeah.  I would discuss how much we were
4  going to get, but never -- nobody ever mentioned
5  anything about the purchase percentage.  Any of
6  the MCAs never even mentioned it, even in
7  discussions or funding calls.  They always said,
8  "This is how much it is.  This is how much it is a
9  day.  This is your total payback."  And that's the
10 only terms that we had ever discussed.
11 Q    But you knew they were determining -- but
12 you knew they had your bank information in order
13 to be doing this; correct?
14 A    Oh, yeah.  They had my bank information,
15 correct.
16 Q    And, again, they knew you were going
17 through an omicron surge; right?
18 A    Correct.
19 Q    Right.  And you were discussing the impact
20 of that on your business, or at least implying it?
21 A    Well, that's why I needed the money was
22 because we had to pay for all the supplies up
23 front.  We had to pay for all the lab consumables
24 and all the rapid tests and all those things that,
25 you know, when you have your own business.

Page 89

1  Q    When you say you needed it to pay for
2  those --
3  A    Correct.
4  Q    -- you were also increasing the testing
5  capacity; correct?
6  A    At this point, no.  Not in Janu- -- middle
7  of January.  We were already at the peak.
8  Q    Okay.  So what about the December one
9  before then?  You were increasing your capacity;
10 correct?
11 A    Yes.  That's when omicron was surging, so
12 we needed to increase capacity because we were
13 overflowing the waiting lines and the -- it was in
14 front of a hospital, so we were blocking the
15 entrance to the hospital and to a fire department.
16 Q    Did the fire department say you had to --
17 A    The fire department said we need more
18 places -- yeah, they said because we can't --
19 "You're going to block our trucks," so we had to
20 hire police officers to try to divert traffic, and
21 it was just a big nightmare, and there were no
22 other facilities around to test.  Nobody was
23 really testing here.  The hospital had stopped.
24 The health department had stopped.  They were
25 randomly doing it at a couple churches

Page 90

1  occasionally, like, twice a month.  It was really
2  pathetic here.  So nobody could get testing done.
3     Q     Did those sites also have overflow as
4  well?
5     A     No.  They weren't -- yeah, when they
6  opened, they would.  They would have problems.
7  There was one that opened in a random neighborhood
8  and they got shut down because they were blocking
9  all the streets in the neighborhood.
10          We're in an underserved area.  So it's
11 right outside of Fort Bragg, and it's very
12 underserved, and there's one hospital group that
13 tends to not really meet the needs of the
14 community as much as they probably could, and so
15 we were -- we were trying to do that.
16          MR. CIPOLLA:  Okay.  Can we close
17     this exhibit for now?
18 BY MR. CIPOLLA:
19    Q     So earlier do you remember we were
20 discussing the duties of a class representative?
21    A     Yes, sir.
22    Q     Okay.  Do you know what the requirements
23 are to bring a class action -- to certify a class?
24    A     I don't know all the requirements, no.
25 You know, I had a lot of documents that were sent

Page 91

1  to me and -- over the weekend to Monday,
2  Mr. Heskin sent me several documents, and I
3  briefly reviewed those over break, and I noticed
4  that that's where Billingsly [sic] and Almeida
5  were the other attorneys.  I had spoken several
6  times to Mr. Almeida; I just didn't recall his
7  name.  But I do not know exactly what all the
8  requirements are.
9     Q     When were those conversations with
10 Mr. Almeida?
11    A     They were prior to that.  The last few
12 weeks.
13    Q     Last few weeks?
14    A     Probably two weeks.
15    Q     How -- how long were those conversations?
16    A     Half hour to an hour.
17    Q     Okay.  So you said you don't know all the
18 requirements of class certification.  Do you know
19 any requirements?
20    A     No.  Just whatever -- I just presented my
21 situation to Mr. Heskin, and the attorneys have to
22 write all that.  I just -- trying to represent the
23 group as being the person affected and trying to
24 be a voice for the group.  So I'm trying to stay
25 apprised of the situation.  You know, I haven't

Page 92

1  ever taken any law classes.  My brother's a trial
2  lawyer, but I'm not.  And so he doesn't practice
3  medicine; I don't practice law, and we try to keep
4  it that way.  But I should understand more than I
5  do.
6     Q     Do you know the difference between a class
7  action and an individual action?
8     A     Well, a class action involves more people.
9  Individual is just me.
10    Q     And so why did you bring this as a class
11 action instead of an individual action?
12    A     Well, we talked about it for a while.  We
13 thought maybe I could bring it as an individual.
14 But it seemed like there were more people that are
15 being affected that don't have a voice, and we
16 thought this might be an opportunity to lend that
17 voice.
18    Q     Why don't they have a voice?
19    A     Because -- oftentimes it's because they
20 don't have financial resources to stand up and to
21 try to do that, or they're intimidated or
22 threatened and --
23    Q     How -- how much -- how much is your
24 individual claim worth again?
25    A     I don't know the entire damages, because

Page 93

1  it's whatever the Court will allow.  But I would
2  assume, you know, 15 to $30 million, but I don't
3  know what it is.
4     Q     That's a lot of money; right?
5     A     It is.
6     Q     Do you understand what bringing a case on
7  contingency means?
8     A     I don't understand what you said.
9     Q     Do you understand what bringing a case on
10 contingency means?
11    A     I do.
12          I do know what that definition would
13 be, that on contingency is you get paid if you
14 win; is that correct?  Contingent on me winning?
15 It's contingent on the outcome?
16    Q     Do you understand that you can enter into
17 agreements with attorneys that pay them out of any
18 recovery from a case?
19    A     Oh, yes.  I have -- I see that on -- when
20 I'm watching Jerry Springer and they have the
21 ambulance chasers.  They're typically on
22 contingency.  Yeah.  It's -- at a 40 percent, I
23 believe, something like that.  That's my basic
24 understanding of that.
25    Q     What's 40 percent of $10 million?

Case 1:22-cv-01245-JSR   Document 153-11   Filed 11/07/22   Page 13 of 21

Deposition of Robert A. Clinton, Jr.                    Haymount Urgent Care PC, et al v. GoFund Advance, LLC, et al.

Page 94

1    A    Of $10 million?
2    Q    Yeah.
3    A    Well, in med school, it would be
4  $4 million.  In -- I'm not sure what would be
5  here.
6    Q    So a 40 percent contingency would be
7  $4 million.  What about a 30 percent contingency?
8    A    It's $3 million.
9    Q    $3 million.
10   A    Yes, sir.
11   Q    Do you think a lawyer would want to bring
12 this case and recover $3 million?
13   A    I think a lawyer would, and -- but I did
14 not do it on contingency.  I mean, they're billing
15 me hourly because I didn't want to feel like there
16 was a financial incentive for them to bring in
17 false charges or increase, you know, damages that
18 aren't valid.
19   Q    So earlier, you know, a few amounts ago,
20 you said that other class members might not have
21 the financial resources to bring a case; right?
22   A    Correct.
23   Q    But they can bring a case on contingency;
24 right?  And pay their lawyers to cover it?
25   A    I'm sure they could.  I'm sure they could,

Page 95

1  yes.
2    Q    Okay.
3    A    And on an individual basis.  And I don't
4  know -- as far as being billed, I know I'm getting
5  billed for my individual part of this, but the
6  class is completely separate from my -- that part
7  as far as the billing is concerned.
8    Q    And do you know whether the RICO -- if
9  you're successful in the RICO claim, if that
10 entitles you to recover attorneys' fees?
11   A    I do not know, but I would assume that it
12 would.
13   Q    Okay.  And that would also lower the
14 financial burden to bring the suit; right?  If the
15 attorneys' fees are covered if you win?
16   A    Well, that seems to be the -- my
17 understanding of that math.
18   Q    Okay.  Do you know what the class
19 definition is in this case?
20   A    I do not know the class definition.  I
21 believe it's people that are affected by MCAs, but
22 I don't know verbatim what it is.
23   Q    Okay.  Do you know if there's multiple
24 classes in this lawsuit?
25   A    I know there's three different areas.  I

Page 96

1  don't know the exact way that they're separated.
2    Q    Are you aware that you have duties as a
3  class representative?
4    A    Yes, sir.
5    Q    And do you know what those duties are?
6    A    To stay apprised of the situation, to
7  understand the basics of things, and just to be,
8  like, a representative for the class.
9    Q    And do you understand the Court will have
10 to determine if you are a suitable class
11 representative?
12   A    I understand that.
13   Q    What do you want as the outcome for this
14 case?
15   A    The outcome?  I would like other people
16 not to be taken advantage of this way.  I don't
17 want people to be intimidated.  I think that an
18 agreement should be an agreement that's legal.  I
19 didn't understand all the laws prior to this.  I
20 didn't realize that there were caps on interest
21 rates and things like that, and I would like to
22 just recover my damages, whatever the Court will
23 allow, and for it not -- people not to be treated
24 like this in the future.
25        MR. CIPOLLA:  Has Dr. Clinton

Page 97

1  suddenly gone softer for anyone else?  Or
2  is that just me?
3        MR. HESKIN:  It looks like there
4  was a breakup in the video or the
5  connection.
6        THE WITNESS:  Oh, really?
7        MR. HESKIN:  Yeah, now you're fine.
8  It was just for a minute.
9        MR. CIPOLLA:  Okay.  Yeah.  Yeah.
10       THE WITNESS:  Oh, I wonder if
11 there's a speaker on here.  I must have --
12       MR. CIPOLLA:  You sound -- you
13 sound fine now.  We'll --
14       THE WITNESS:  I had a piece of
15 paper over my keyboard.  Sorry.  I can't
16 believe you said I was going soft.  You
17 sound like my wife.
18 BY MR. CIPOLLA:
19   Q    Do you know of any conflict between you
20 and the rest of the proposed class members?
21   A    I do not.
22   Q    Do you have any unsatisfied judgments or
23 court orders pending against you?
24   A    Not that I'm aware of.
25   Q    Are you aware of any other currently

Page 138

1  that."
2    Q    Do you have a written -- do your
3  employment agreements at Haymount have a vacation
4  built into it?
5    A    I don't know, to be honest with you.  I
6  think they may have vacation built into it.
7    Q    What about sick time?  Is that built into
8  it?
9    A    I think it's a PTO.  It's a paid time off
10  that they accrue each pay period.
11    Q    Do you recall if you've ever given an
12  employee more vacation time than they're
13  technically entitled to?
14    A    Oh, it happens very often.  They just
15  don't get paid when it's past the amount they're
16  entitled to.
17    Q    Do you know if the contract permits them
18  to take more time without pay?
19    A    Yeah.  It does.
20    Q    But -- that contract does?  You've read
21  that contract?
22    A    Well, I don't know.  I mean, I -- we have
23  a -- Tanya takes care of those things.  We have --
24  Engage is a company like ADP, but they do all of
25  the employment-type contracts.  I just know the

Page 139

1  basic terms.
2    Q    Do you see Section 2.4 here?
3    A    Yes.
4    Q    Can you read it for me?
5    A    "Use of Funds:  Merchant agrees that it
6  shall use the purchase price for business purposes
7  and not for personal, family, or household
8  purposes."
9    Q    Do you understand what this provision
10  means?
11    A    I do.
12    Q    Okay.  Did you have an understanding when
13  you entered into the MCA agreements if you were
14  allowed to use the MCA money for personal reasons?
15    A    I understood to use it for business
16  reasons.
17    Q    Okay.  Did you ever use MCA money for
18  personal reasons?
19    A    I did not use MCA money.
20    Q    So you never bought crypto with MCA money?
21    A    I bought crypto, but not with MCA money.
22    Q    So if we look through your records, we're
23  not going to find Day 1 you enter into a MCA
24  agreement, Day 2 you transfer that money to your
25  personal account, and then Day 3 you buy a bunch

Page 140

1  of crypto?
2    A    I don't know how we'll see it, because I
3  bought crypto here and there.  I don't know the
4  exact dates of everything.
5    Q    What do you mean, "here and there"?
6    A    I bought crypto -- I had it set up to buy
7  a small amount daily.  I would buy different bulk
8  amounts daily, different times.  So I don't know
9  the exact timing of everything.
10    Q    You were buying up to $5,000 a day of
11  crypto; correct?
12    A    Only if we had revenues coming in.
13    Q    Okay.  And -- but that's a small amount
14  daily?
15    A    No.  That's a larger amount daily.
16    Q    Do you still own that crypto?
17    A    No.  We -- we had to sell it to try to pay
18  our bills.  Our revenues the last few months have
19  been very low --
20    Q    When did you sell it?
21    A    I don't know.  It's -- the last few
22  months.  July, we only brought in $187,000.  So
23  we've sold it to stay in business.
24    Q    So you missed the peak, unfortunately, in
25  January, huh?

Page 141

1    A    Oh, yeah.  I was busy treating patients
2  during that time.
3    Q    Do you know when the crypto market started
4  to fall?
5    A    When it started to fall?
6    Q    Yeah.
7    A    No.  During the Christmastime, I don't
8  know.  It was -- I think it peaked around
9  November, possibly.
10    Q    You traded commodities in medical school;
11  correct?
12    A    I traded some commodities a little bit in
13  medical school.
14    Q    So --
15    A    As a hobby, like, on the side.
16    Q    How much were you trading in total?
17    A    Not a lot.  You know, a couple thousand
18  here and there.
19    Q    Did you take on debt to go to medical
20  school?
21    A    I did.  Not --
22    Q    It was a lot to you at the time.
23    A    What's that?
24    Q    That was a lot of money to you at the
25  time, a couple thousand --

Page 162

1  Q    Why do you think that's his real name?
2  A    That's what people refer to him as,
3  "Shia."
4  Q    What people?
5  A    Other people that he's friends with.
6  Q    Like who?
7  A    I don't know if it was Henry or David or
8  one of them.  They mentioned "Shia."  Or it might
9  have even been one of the other MCAs.  I don't
10 know if it was -- they talk about each other and
11 said "Shia."  I'm like, "I don't know Shia," and
12 like, "Well, maybe Josh.  Same guy."
13 Q    Okay.
14 A    So...
15        Is Shane still there?
16        MR. HESKIN:  I'm still here.  I
17 just had my video off.
18        THE WITNESS:  Okay.
19        MR. CIPOLLA:  All right.  I'll be
20 sure to save all the tough questions for
21 when we can't see him.
22 BY MR. CIPOLLA:
23 Q    Do you see here where Josh says:  "You
24 agreed to pay the only person that saved your
25 business from collapsing"?

Page 163

1  A    Oh, yeah.  I totally remember that, and
2  we've had some discussions, some candid, frank
3  discussions about his lunacy and some of his
4  reasoning skills.
5  Q    Tell me about those discussions.
6  A    Well, he seems to think since he told me
7  about GoFund that they're going to destroy my
8  business and it's going to collapse and they're
9  never going to stop funding.  He's like, "I saved
10 you because they would have destroyed you, and you
11 need to pay me first."  And I'm like, "That's not
12 the case.  That's not -- I mean, you're still an
13 MCA, and I still have to keep this business
14 afloat."  And he acts like I stabbed him in the
15 back.
16        And he thought that Richard Mille --
17 he refers to the collateral.  He thought it was
18 5- to $600,000 because he don't know watch values.
19 He probably saw it on MTV or "Cribs" or something
20 like that and thought that it was some baller
21 watch that the rappers wear, but it's not, that
22 model.
23        And -- I don't know.  He just -- he
24 kind of gets a little bit out of line mentally,
25 but I'm not sure that I can diagnose him from

Page 164

1  conversations, but he seems to get really, really
2  upset and animated.
3  Q    So you didn't represent to him that it was
4  worth 500 to $600 -- 500,000 to 600,000?
5  A    No.  No.
6  Q    Okay.
7  A    That was his writing --
8  Q    Do you see -- do you see here where it
9  says:  "Shane wanted me to be transparent with you
10 guys"?
11 A    Yeah, to tell him that money's tight and I
12 can't afford things.  That's being transparent,
13 that -- to tell him, "I can't pay you right now,
14 that I'm not getting the money in, so you need to,
15 you know, take lesser payments."
16 Q    Did he need to give you that advice
17 because otherwise you would have lied to them
18 about what you were doing?
19 A    No.  I think he just said, "Just be honest
20 with them," because they want to help me out.
21 That's what they said.
22        MR. CIPOLLA:  Okay.  Can we pull up
23 HAY-9770?
24        THE WITNESS:  I think the
25 transparency also was talking about all of

Page 165

1  our other bills that were coming due.
2        (Clinton Exhibit 11 marked.)
3  BY MR. CIPOLLA:
4  Q    Okay.  Do you recognize this document?
5  A    I do.  I sent it to you.
6        MR. CIPOLLA:  Okay.  What exhibit
7  are we on now, James?  Apologies.
8        THE VIDEOGRAPHER:  11.
9        MR. CIPOLLA:  11.
10 BY MR. CIPOLLA:
11 Q    Is this the Richard Mille watch --
12 A    It is.
13 Q    -- he referenced in the email?
14 A    Yeah.
15 Q    And the total of this purchase from
16 Christie's was 318,000; correct?
17 A    Correct.
18 Q    And do you see what the account address is
19 for this invoice?
20 A    Yes.
21 Q    So who bought these watches?
22 A    Haymount bought the watches with hopes
23 that they would increase in value, and that's why
24 Haymount gave the watch as collateral on a loan.
25 And then we would sell the watches at a profit,

Case 1:22-cv-01245-JSR   Document 153-11   Filed 11/07/22   Page 16 of 21

Deposition of Robert A. Clinton, Jr.                    Haymount Urgent Care PC, et al v. GoFund Advance, LLC, et al.

Page 166

1 was the goal.
2 Q    When did RAC -- sorry.  What's the name of
3 that --
4 A    RAC Investment Services.
5 Q    Yeah.  When did that --
6 A    That was --
7 Q    -- entity come into existence?
8 A    That was sometime in -- in the last few
9 months.
10 Q    Okay.
11 A    It might have been December as well.
12 Q    So Haymount bought the watches, not RAC?
13 A    Yeah.  So RAC Investment Services was --
14 it's designed to -- to do watch trading business,
15 but it wasn't in effect at the time yet.  And
16 that's why the money you'll see transfer from RAC
17 Investment is to Haymount when they received any
18 money when we did transfer --
19 Q    So --
20 A    -- watches.
21 Q    You -- you used Haymount's account to buy
22 money for RAC -- or to buy these watches for RAC?
23 A    It was for RAC, and then later we decided
24 we should do it under another entity for tax
25 purposes, but we kept it with RAC, and RAC sent

Page 167

1 the money right back to Haymount when it did
2 receive any money.  So it was on a ledger --
3 Q    So sometimes you used -- so sometimes you
4 used different entities for tax purposes even
5 though --
6 A    Well, it hasn't been --
7 Q    -- practicality -- can I finish my
8 question?
9 A    Yes, sir.  Yeah.
10 Q    So even though -- so sometimes you use
11 different entities for tax purposes even though
12 practically the business reason is it's going to
13 go under a different entity books; correct?
14 A    No.  This is -- there's been no taxes
15 filed with RAC Investment Services.  We were
16 trying to -- the watch market was trying to -- it
17 started to surge at that same time when crypto
18 was.  The Pateks and the Richard Milles and
19 Hublots and all those were surging a lot, so these
20 were at auction.  We thought we could get them
21 here cheap and sell them in January, February,
22 March at a bigger profit to make money for
23 Haymount and help pay down some of these other --
24 there's other expenses.  And that's why we did it.
25 Q    Is there a written contract between RAC

Page 168

1 and Haymount?
2 A    Yeah.  My accountant keeps a ledger and
3 has a -- it's like a line of credit agreement.
4 Q    But is there a written contract for the
5 transfer of those watches?
6 A    It's -- there is a contract that he has.
7 Do I need to find that?
8 Q    Well, who is that contract between?
9 A    Well, it's -- he keeps a ledger of it to
10 keep track of it.
11 Q    Do you know what a contract is,
12 Mr. Clinton?
13 A    It's a written agreement.  I mean, it's
14 nothing that --
15 Q    Is there a written agreement between
16 Haymount Urgent Care and the RAC entity for the
17 transfer of those watches?
18 A    Yeah, there is, with respect to this
19 transaction and any transaction if we were to have
20 any.
21 Q    And did you execute that contract?
22 A    Did I what?
23 Q    Did you sign that contract for both
24 entities?
25 A    Well, I just -- I just -- yeah, I did.  I

Page 169

1 just wrote it down so that we could keep track of
2 things.
3 Q    You wrote what down?
4 A    I wrote down what the premise was for it.
5 It wasn't a fancy multipage contract.  It was just
6 that they were transferring the watches to RAC,
7 and then the funds were back to Haymount.
8 Q    Do you understand what the term "corporate
9 formalities" are?
10 A    No.
11 Q    Okay.  Do you keep --
12 A    I try -- yeah.  To keep the books
13 separate.  Is that -- my understanding?
14 Q    What is your understanding of corporate
15 formalities?
16 A    Corporate formalities?
17 Q    Formalities, correct.
18 A    To keep things separate and to keep
19 accounting separate.  So if we know that if one
20 group is getting something, they're supposed to
21 keep track of it so they know that it's owed back
22 to the other group so that there's an accounting
23 for everything.
24 Q    Okay.  And do you -- do you follow that
25 practice of keeping personal assets and business

Page 170

1  assets separate?
2  A    Yeah.  We keep a ledger to keep track of
3  it so we know where it is and where it stands.
4  Q    Can you expound on that?  What do you
5  mean, you "keep a ledger"?
6  A    That the accountant has a ledger when --
7  so it's a tabulation of how much is owed to
8  which -- to which group.
9       Like when money was moved from
10 Haymount over to the personal business within
11 Wells Fargo, for example, we would move it so that
12 GoFund couldn't just take all the money there one
13 day, and then every day we're moving over the
14 amount that was owed.  Every day you'd see it come
15 back from -- from my personal account into this
16 one to cover all the daily draws.
17 Q    So --
18 A    And you see that -- it's more of a
19 protection mechanism so they can't -- but it would
20 be -- on our ledger, it would show it as a draw,
21 and then it has to be paid back.  It's almost like
22 a line of credit that's being paid back daily.
23 Q    So you keep -- you keep business funds in
24 your personal account?
25 A    Well, we don't usually.  We only did it

Page 171

1  because the MCAs were taking out more money than
2  they were entitled to.
3  Q    Okay.
4  A    So ideally, we would not do that.  But we
5  only did it for preservation of wealth -- of the
6  money that was in there.
7  Q    In December of 2021, how many MCA
8  agreements was Haymount Urgent Care entered into?
9  A    I don't know how many we had.  Maybe ten.
10 Q    Maybe ten.  Okay.
11 A    Yeah.
12 Q    $318,000 is a lot of money to spend on
13 watches, isn't it?
14 A    It is.
15 Q    Were you using MCA money to buy watches as
16 an investment for your side project of RAC?
17 A    No.  No.  It was -- because we had a
18 million dollars -- also 1.1 million came in in
19 December as well, and it was meant to make money
20 for Haymount, was the purpose of it.
21 Q    So your receivables in December cleared
22 all of your MCA obligations in December?
23 A    I don't know what they were.  I don't know
24 if they did.  Because a lot of those December
25 ones, they were near the end of December.  So they

Page 172

1  may have cleared them.
2  Q    Did you talk to anyone else at Haymount
3  before you spent $320,000 of its money on watches?
4  A    No.
5  Q    Do you see the invoice date was 12/20?
6  A    Uh-huh.  Yes.
7  Q    Do you know when you actually paid for
8  this?
9  A    No.
10 Q    Do you know when you received the watches?
11 A    The same day I paid for it.
12 Q    You received the watches the same day
13 you --
14 A    It was around --
15 Q    So when did you receive the watches?
16 A    It was around that time, the week before
17 Christmas.  So it must have been during that week
18 at some point.
19 Q    Okay.  So by -- by December 25th, you had
20 paid for the watches?
21 A    Right.  Before that, yes.
22 Q    Okay.
23 A    And you'll see that RAC Investments
24 transferred back much more than that back to
25 Haymount when we sold the watches.

Page 173

1       MR. CIPOLLA:  Let's go to -- can we
2  get -- James, can we go to GOFUND_7156?
3       (Clinton Exhibit 12 marked.)
4  BY MR. CIPOLLA:
5  Q    Do you recognize this document?
6  A    Yeah.
7  Q    Okay.  What's the date on it?
8  A    December 16th.
9  Q    And what's the amount you received?
10 A    I don't recall how much I received.
11 Q    Okay.  What's the purchase price on this
12 document?
13 A    Well, it says a million, but I don't think
14 I received a million.
15 Q    Do you know how much you received?
16 A    Maybe 900,000.
17 Q    Okay.
18 A    No.  Maybe 400,000.  I don't know.  I
19 don't recall, but I know it was less than that.
20 And I believe the form was green before, the
21 "GoFund Advance" was green.
22 Q    And you took these funds in order to pay
23 for supplies; correct?
24 A    Correct.
25 Q    That was why you were entering an MCA

Deposition of Robert A. Clinton, Jr.                    Haymount Urgent Care PC, et al v. GoFund Advance, LLC, et al.

Page 230

1   A    Well, there's a document that we keep
2   track of. But that's the only -- the only thing.
3   Q    Okay. What was that loan for?
4   A    Which one? This?
5   Q    The one between you and Haymount.
6   A    Oh, no. It's a -- it's like a line of
7   credit that would go back and forth. Like I lent
8   money to the business, and then the business would
9   pay it back, and it would go back and forth. Just
10  like more recently when we'd transfer the large
11  amounts, it was to put it there to preserve it so
12  that the MCAs wouldn't take from it, and then we'd
13  put it back every day.
14  Q    And in April 2021, were MCA companies
15  over-debiting your company?
16  A    There were still some MCA companies and we
17  don't know if they would over-debit or not.
18  Q    In April 2021, not 2022.
19  A    Yeah, there were still some MCAs. There
20  was one or two.
21  Q    And do you see on April 22nd --
22  A    Yes.
23  Q    -- you withdraw another 30,000?
24  A    Correct.
25  Q    Have you ever had dealings with Kharis

Page 231

1   Capital? I think we might have spoken about them
2   earlier.
3   A    Yes. Yeah, you showed me their -- you
4   showed me their contract.
5   Q    Did they -- yeah. What was your -- your
6   dealings with them like?
7   A    They seemed to be fine.
8   Q    Did they over-debit your account?
9   A    I don't recall it being over-debited. I
10  don't remember.
11  Q    Do you recall the date of that Kharis
12  Capital MCA?
13  A    I do not. I think there was more than
14  one.
15       MR. CIPOLLA: James, can you bring
16  back up HAY-9787? I think it's an
17  exhibit, but I'll admit I don't know the
18  exact number off the top of my head. And
19  can you put it side by side with this?
20       THE VIDEOGRAPHER: Sure. Just give
21  me one second.
22       THE WITNESS: April 15th, it said.
23       MR. HESKIN: Do you want to take --
24  is now a good time to take a break?
25       MR. CIPOLLA: Sure. Yeah. Now is

Page 232

1   a great time to take a break.
2        MR. HESKIN: Yeah. Why don't we --
3   we've been going for, like, an hour and a
4   half, I think.
5        THE VIDEOGRAPHER: Okay. Going off
6   the record at 3:13 p.m.
7   (Recess from 2:13 p.m. to 2:28 p.m. CST)
8        THE VIDEOGRAPHER: Going back on
9   the record at 3:28 p.m.
10  BY MR. CIPOLLA:
11  Q    So earlier you said Josh wired $10,000 to
12  Shane to pursue this case; correct?
13  A    Correct.
14  Q    Okay. Did you ask him to do that?
15  A    I mean, we said to get the money to Shane,
16  and so I said, "Yeah, you can wire it because I
17  don't have the extra money right now." And so he
18  did and added it to my bill.
19  Q    What do you mean, they added it to your
20  bill?
21  A    To the amount that I owed them.
22  Q    Do you know if Shane pressured them to
23  wire that money?
24  A    No.
25  Q    Did you pressure them to wire that money?

Page 233

1   A    No. I don't think anybody had to be
2   pressured to wire the money. They were just going
3   to extend another $10,000 of a loan to me, and
4   that's why they wired it.
5   Q    Did you discuss them adding it to your
6   bill before they wired it?
7   A    Yeah, because he said that he would send
8   it to Shane on my behalf. He never implied that
9   he was going to pay for -- ever implied he was
10  going to actually pay for it.
11  Q    Do you think that that contract with Josh
12  is -- was a loan?
13  A    I do.
14  Q    Okay. Do you think it's a problem that
15  he's paying your attorney to pursue these claims
16  when he has one of those agreements with you?
17  A    Well, yeah, I think that I had to pay him
18  back for it. But I think that all these MCAs are
19  a problem.
20  Q    Have you paid him back for it?
21  A    Yeah.
22  Q    Oh, you paid back Josh in full?
23  A    Yeah. I paid -- well, not the World
24  Global. I paid him back the 10,000, but I haven't
25  paid back their whole amount in full.

Page 234

1  Q    But you said you'd added it to the bill.
2  A    Yeah.  So it depends on how you account
3  for it.  I mean, he could say I still owe him
4  however many dollars it is.  I don't have it in
5  front of me.
6        MR. CIPOLLA:  Okay.  James, I think
7  earlier we were working on getting two
8  agreements up side by side -- or two
9  documents -- exhibits up side by side.
10  Not agreements.
11        I don't think it was Exhibit 21.
12  It's supposed to be HAY-3337.  It should
13  be an exhibit or two later than this.
14        THE VIDEOGRAPHER:  Okay.
15        MR. CIPOLLA:  On the right.
16        THE VIDEOGRAPHER:  Sorry about
17  that.
18  BY MR. CIPOLLA:
19  Q    Did -- does Josh consider the 10,000
20  payment to Shane cleared?
21  A    I have no idea what Josh thinks.
22  Q    So depending on how it's accounted for,
23  he's still fronting the costs to Shane for this
24  litigation?
25  A    Yeah, I would assume he knows that that's

Page 235

1  paid, but I don't -- it's hard to understand what
2  he thinks at any given moment.
3  Q    Have you asked him what he thinks?
4  A    No, not specifically about this.
5  Q    Have you put it in an email and asked him
6  to confirm what he thinks?
7  A    I have not.
8        MR. CIPOLLA:  All right.  Thank
9  you, James.
10  BY MR. CIPOLLA:
11  Q    All right.  Let's scroll back here.
12        Okay.
13  A    Yup.  All right.
14  Q    So here you see an agreement on the left
15  on April 15th; correct?
16  A    I sure do.
17  Q    And when would that have funded?
18  A    That would have funded two years before
19  the document you're showing me on the right.
20  Because this is 2019 on the document and 2021 on
21  the bank report, unless I'm missing something.
22        Correct?
23  Q    Yeah, yeah, yeah.  You're correct.
24  A    Thanks.
25  Q    This exhibit is the wrong one.

Page 236

1        You have so many of these MCA
2  agreements, it's hard to keep track.
3  A    I know.  That's what I'm saying.  I know.
4  It's hard to keep track.  Tell me about it.
5        MR. HESKIN:  I've seen worse.
6        MR. CIPOLLA:  I'll find that one in
7  a minute, and we'll come back to this.
8        James, can we close these both and
9  pull up HAY-001955?
10  BY MR. CIPOLLA:
11  Q    Do you know when your last crypto purchase
12  was, Dr. Clinton?
13  A    Excuse me?
14  Q    Do you know when your last crypto purchase
15  was, Dr. Clinton, roughly?
16  A    No.
17  Q    Did you buy any in 2022?
18  A    I may have bought a little bit in 2022.
19        THE VIDEOGRAPHER:  I'm sorry,
20  Mr. Cipolla.  What was the document again?
21        MR. CIPOLLA:  2415.  I think I just
22  uploaded it.
23        THE VIDEOGRAPHER:  Okay.  Got you.
24        (Clinton Exhibit 23 marked.)
25

Page 237

1  BY MR. CIPOLLA:
2  Q    Okay.
3        Okay.  Do you see this withdrawal on
4  April 4th to RAC Investment Services?
5  A    Yes.
6  Q    For $4,000?
7  A    Yes.
8  Q    That's the entity you control; correct?
9  A    Correct.
10        That was a deposit from them?  Yeah.
11  Q    Yeah.  It was --
12  A    That was a deposit from them.  Okay.
13  Q    It was a deposit.
14  A    Yeah.
15  Q    Sorry if I misstated that.  That was
16  definitely a deposit.
17  A    No, no.  I think you -- I think you did.
18  Q    Different banks' statements are slightly
19  different, so it takes me a second to --
20  A    Yeah.
21  Q    Okay.  Then you see here on April 7th you
22  withdraw 200,000 for R- -- RAC Investment
23  Services; correct?
24  A    Yes.
25  Q    And it says:  "Loan repayment."  Do you

```
 1                UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
    HAYMOUNT URGENT CARE PC;          )
 3  ROBERT A. CLINTON, JR.;           )
    INDIGO INSTALLATIONS, INC.;       )
 4  and CHRISTOPHER A. TURRENTINE,    )
    individually and on behalf of     )
 5  those similarly situated,         )
                                      )
 6          Plaintiffs,               )Case Number
                                      )1:22-cv-01245-JSR
 7  VS                                )
                                      )
 8  GOFUND ADVANCE, LLC;              )
    FUNDING 123, LLC; MERCHANT        )
 9  CAPITAL, LLC; ALPHA RECOVER       )
    PARTNERS, LLC; YITZCHOK           )
10  ("ISAAC") WOLF; JOSEF BREZEL;     )
    JOSEPH KROEN; and                 )
11  YISROEL C. GETTER,                )
                                      )
12          Defendants.

13


14                REPORTER'S CERTIFICATION
             REMOTE VIDEOTAPED DEPOSITION OF
15                ROBERT A. CLINTON, JR.
                   September 14, 2022
16

17          I, Rebecca A. Graziano, Certified Shorthand

18     Reporter in and for the States of Texas,

19     California, and Illinois, hereby certify to the

20     following:

21          That the witness, ROBERT A. CLINTON, JR.,

22     was duly sworn and that the transcript of the oral

23     deposition is a true record of the testimony given

24     by the witness;

25          I further certify that pursuant to FRCP Rule
```

1    30(f)(1) that the signature of the deponent:

2         ____ was requested by the deponent or a

3    party before the completion of the deposition and

4    returned within 30 days from date of receipt of

5    the transcript.  If returned, the attached Changes

6    and Signature Page contains any changes and the

7    reasons therefor.

8         ____ was not requested by the deponent or a

9    party before the completion of the deposition.

10        I further certify that I am neither attorney

11   nor counsel for, related to, nor employed by any

12   of the parties to the action in which this

13   testimony was taken.

14        Further, I am not a relative or employee of

15   any attorney of record in this cause, nor do I

16   have a financial interest in the action.

17

18                   Certified on September 19, 2022

19

20

21   _____

22   Rebecca A. Graziano, CSR, RMR, CRR
     Texas CSR 9306
     Expiration:  07/31/24
23   California CSR 14407
     Expiration:  09/30/22
24   Illinois CSR 084.004659
     Expiration:  05/31/23
25