# EXHIBIT 26

```
 1                UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
    HAYMOUNT URGENT CARE PC,      )
 3  ROBERT A. CLINTON, JR.,       )
    INDIGO INSTALLATIONS, INC.,   )
 4  and CHRISTOPHER A.            )
    TURRENTINE, individually and  )   No.
 5  on behalf of all those        )   1:22-cv-01245-JSR
    similarly situated,           )
 6                                )
                   Plaintiffs,    )
 7                                )
      vs.                         )
 8                                )
    GOFUND ADVANCE, LLC, FUNDING  )
 9  123, LLC, MERCHANT CAPITAL,   )
    LLC, ALPHA RECOVERY           )
10  PARTNERS, LLC, YITZCHOK       )
    ("ISAAC") WOLF, JOSEF         )
11  BREZEL, JOSEPH KROEN, and     )
    YISROEL C. GETTER,            )
12                                )
                   Defendants.    )
13
```

14           The discovery videotaped video

15    teleconference deposition of CHRISTOPHER A.

16    TURRENTINE, called by the Defendants, for

17    examination, pursuant to notice, taken remotely

18    before LAURA MUKAHIRN, CSR, RPR, CRR, within and

19    for the County of Cook and State of Illinois, on

20    September 15, 2022, scheduled to commence at

21    8:30 o'clock a.m.

22

23

24

25

Page 73

BY MS. HAVIV:
Q.  This is the December 2021 bank statement?
A.  Yes, ma'am.
Q.  If you look here, it says total deposits is approximately 133,000?
A.  Yes, ma'am.
Q.  Is that correct?
A.  Yes, ma'am.
Q.  What is the revenue, if we go down, is from Bargreen Elling.  What is that?
A.  Bargreen Ellingson, yes.  They're a kitchen equipment supplier also.
Q.  Is it accurate that most of this 133,000 is business revenue?
A.  Absolutely.
MS. HAVIV:  Can we pull up Exhibit 7, please?
      (Turrentine Deposition Exhibit
      No. 7 was remotely introduced
      and provided electronically to
      the reporter.)
BY MS. HAVIV:
Q.  This is the January 2022 bank statement; is that right?
A.  Yes, ma'am.

Page 74

Q.  The total deposits just under 50,000; is that right?
A.  Yes, ma'am.
Q.  49,797, right?
A.  Yes, ma'am.  Mm-hmm.
Q.  Most of those deposits are revenue; is that right?
A.  Yes, ma'am.
Q.  Do you recall what happened in January, why receivables were lower than in December?
A.  It's just the way we bill.
Q.  What do you mean by that?
A.  So depending on a project, sometimes we will do like progress payments, and then other ones we just wait until we're finished with the project.  And then so it'll make it look like that month has, you know, gotten -- that project may have been finished that month and it got bigger, bigger amount deposited.  So probably in January it was kind of just a start of some new projects, and there wasn't a whole lot of billing going on.
Q.  Did you expect it to get better in February?
A.  I'm not sure.  I don't recall at that

Page 75

time.
Q.  Can we pull up Exhibit 8, please?
      (Turrentine Deposition Exhibit
      No. 8 was remotely introduced
      and provided electronically to
      the reporter.)
MS. HAVIV:  Now I've lost it.  Here we go.
BY MS. HAVIV:
Q.  This is the February '22 bank statement?
A.  Mm-hmm.
Q.  Do you see on Page 1 that it says deposits of a little over $115,000?
A.  Yes.
Q.  That's revenue, correct?
A.  Yes.
Q.  Do you see the two incoming wires for $14,000 each on February 2nd and February 18 on this page of the exhibit which is the third page of Exhibit 8?
A.  Yes, ma'am.
Q.  Those are the wires from the defendants' GoFund, right?
A.  Correct.
Q.  And if we put those two wires aside,

Page 76

Indigo's revenue was 115 minus 28 which is approximately 87,000?
A.  Yes, ma'am.
Q.  So it seems like February was, in fact, better than January in terms of receivables; is that right?
A.  Correct.
Q.  So just to summarize, you agree that you had approximately $111,000 in revenue in November, $133,000 of revenue in December, $49,000 of revenue in January, and $87,000 of revenue in February, correct?
A.  Yes, ma'am.
Q.  Would you believe me if I said that averages out to about 95,000 a month?
A.  That sounds about right.
Q.  Over a month and a half, that would be almost $150,000 worth of revenue; is that right?
A.  One more time.  Sorry.
Q.  Over a month and a half with an average of 95,000 a month, that would be about $150,000 worth of revenue for the month --
A.  Correct.
Q.  And you provided your bank statements to GoFund, right?

Page 77

A. I believe I provided the last three months, correct.

Q. What were those last three months?

A. Let's see. So I got the loan in February, so it would have been January, December, November, yes.

MS. HAVIV: Can we pull up Exhibit 9, please?

(Turrentine Deposition Exhibit No. 9 was remotely introduced and provided electronically to the reporter.)

BY MS. HAVIV:

Q. Do you recognize this document?

A. Nothing more than what I've seen in -- no. I do not recognize that document.

Q. Is that your signature on the document?

A. No.

Q. That's not your DocuSign signature?

A. It doesn't appear, no. I don't recall this -- I don't even know what this is.

Q. Is the information on this accurate?

A. Let me see. Yes.

Q. But you don't recall filling this out?

A. Absolutely not. I don't recall who Seamless Capital is, no, do not.

Page 78

Q. Do you have a DocuSign account?

A. No, I do not.

Q. Have you ever signed documents by DocuSign?

A. Yes, I have.

Q. But you don't think that this is your signature?

A. No. I know it's not my signature.

Q. Is that your Social Security Number in the middle of the page?

A. Yes. And that would cause me great concern of how that's on there.

Q. Is that your federal tax -- or rather strike that.

Is this your birth date?

A. Yes.

Q. Is that your phone number?

A. Yes, it is.

Q. Do you see where the monthly revenue of Indigo Installations is listed as 100,000?

A. Yes.

Q. That's accurate, correct?

A. Let's see. This was done in February, so yes.

Q. This language about starting a new hub

Page 79

in Florida, is that something you've said before?

A. No.

Q. You never said that?

A. No. I don't even know what it means, to start a new hub in Florida means.

MS. HAVIV: You can take that one down.

BY MS. HAVIV:

Q. You said before that you were looking for a loan, right?

A. No, I did not.

Q. Can we pull up Exhibit 40 -- sorry. Hold on.

Do you agree that you were looking for financing?

A. No. In fact, I just told you a while ago that I was not looking for financing.

Q. Did you have a project to fund?

A. I mean that's -- that's a vague question for me, because I don't know what you're talking about. Did I have a project to fund?

Q. Did you have a project to fund on behalf of Indigo?

A. I'm going to have to say no, because I

Page 80

don't even know what that means.

MS. HAVIV: Can we pull up Exhibit 40, please?

(Turrentine Deposition Exhibit No. 10 was remotely introduced and provided electronically to the reporter.)

BY MS. HAVIV:

Q. Are you familiar with this document?

A. Yes.

Q. Did you draft it?

A. Yes.

Q. You drafted it yourself?

A. Oh, no, no. I'm sorry. No, I did not draft it.

Q. Did your attorney draft it for you?

A. The attorney drafted it based off of my conversation with him.

Q. Did you sign it?

A. Yes, ma'am.

Q. Did you sign it under penalty of perjury?

A. Yes, ma'am.

Q. Could you read the second sentence of Paragraph 7 for the record, please?

Page 81

A.  "Claiming to be named Ashley, offering to provide immediate financing.  Although I was not looking for a loan, I had a project to fund that would require Indigo to outlay 40,000, so I was receptive to what she had to offer."

Q.  Was that accurate at the time that you wrote it?

A.  Yes.

Q.  A moment ago I said did you have a project to fund on behalf of Indigo, and you said no.

A.  Right.  I was misunderstanding what you were asking.

Q.  How long after you made contact with the broker did it take for GoFund to fund you?

A.  Within days, a couple days at the most.

MS. HAVIV:  We can take this down.

BY MS. HAVIV:

Q.  Did you consult with an attorney before entering into the agreement with GoFund?

A.  No, ma'am.

Q.  Why not?

A.  Just didn't dawn on me to get an attorney to look it over.

Q.  You had a local attorney, right, named

Page 82

Steve that you worked with from time to time?

A.  Yes.

Q.  But you didn't think it made sense to call him before signing the contract?

A.  No.

Q.  Did you read the contract?

A.  For the most part, yes.

Q.  Did you read the whole thing?

A.  I read most of it, yes.

Q.  But not the whole thing?

A.  There's some legal warranty and things of that nature I didn't really go over.

Q.  So it's accurate that you did not read the whole contract, right?

A.  Correct.

MS. HAVIV:  Can we pull up Exhibit 30, please?

(Turrentine Deposition Exhibit No. 11 was remotely introduced and provided electronically to the reporter.)

BY MS. HAVIV:

Q.  Did you understand what fees were associated with the contract?

A.  No, I did not.

Page 83

Q.  You thought the deal with GoFund was that you would be funded $40,000, and in exchange you would sell GoFund $63,936 in receivables.  Is that accurate?

A.  No, that's not.

Q.  How is that inaccurate?

A.  I thought they were loaning me $40,000, and I had to pay back 63,000.

Q.  You were going to pay $2200 a day to approximate your revenue.  Is that accurate?

A.  I was going to -- I paid $2200 on this loan, yes.

Q.  If you're paying $2200 a day, how many days does that take to pay off $63,960?  And I could, if you're -- I could suggest what the answer is and represent what the answer is to you.

A.  Okay.

Q.  But I'm curious if you know the answer.

A.  I know what was presented to me as far as the total payout.  I didn't calculate the number of days.

Q.  I'm going to represent to you that $2200 a day for about 29 days equals 63,900, and --

Page 84

A.  Sounds right.

Q.  29 days is almost a month, right?

A.  Yes, ma'am.

Q.  But GoFund doesn't debit on the weekend, right?

A.  Correct.

Q.  So counting only business days, 29 days is about a month and a half, right?

A.  Approximately.

Q.  Earlier we established your monthly revenue was about $95,000 a month, right?

A.  Yes, ma'am, for that time period.

Q.  For the time period that we're talking about you getting a loan from GoFund -- Strike that.

For the time period that you were getting a financing agreement from GoFund?

A.  Correct.

Q.  If you make $95,000 in one month, do you know how much that comes out to in one and a half months?

A.  No idea.  I could calculate it real quick.

Q.  I'll represent to you that it's about $142,000.

Page 85

1    A.   Okay.
2    Q.   Do you know what percent of receivables
3  the $63,960 was supposed to make up?
4    A.   No idea.
5    Q.   Does looking at this document refresh
6  your recollection?
7    A.   Yes, ma'am.
8    Q.   Was the 63,960 supposed to make up
9  50 -- 40 -- excuse me.  Strike that.
10       Was the 63,960 supposed to make up 45
11 percent of receivables?
12   A.   I didn't even know what that meant, but
13 according to this, yes, 45 percent.
14   Q.   Do you know what 45 percent of $142,000
15 is?
16   A.   No idea.
17   Q.   And I represent to you that it's about
18 $64,000.
19   A.   Okay.
20   Q.   $64,000 pretty close to $63,960?
21   A.   Pretty close.
22   Q.   Do you know where the class action
23 waiver is in this agreement?
24   A.   No, I do not.
25   Q.   Did it matter to you?

Page 86

1    A.   I'm -- yeah, I guess it should have.
2  Again, I didn't go over this with a fine-tooth
3  comb.  I went over the conversations several
4  times with the broker, and I didn't even know
5  that that meant -- that's how much I was
6  supposed to be making, and I thought that was
7  what my percentage was on payback.
8    Q.   Do you recall reading the class action
9  waiver provision of the agreement before --
10   A.   I do not.
11   Q.   -- you signed it?  Let me go back to
12 something we were discussing before.  Do you
13 recall earlier that you said that you disputed
14 that you diverted funds from the company you
15 worked for into your own personal account in
16 connection with the wire fraud charge?
17   A.   I do.
18   Q.   But you told the Court that you
19 diverted funds, right?
20   A.   I did, yes.
21   Q.   And you did that on the advice of
22 counsel even though you didn't agree?
23   A.   Correct.
24   Q.   Will you say whatever your counsel
25 tells you to for a case?

Page 87

1    A.   No.  There was certain circumstances
2  that I had to follow along or it could have been
3  a lot worse.
4    Q.   I'm sorry.  I didn't understand that.
5  Will you say whatever your counsel tells you to
6  for a case?
7    A.   No.
8    Q.   But you did what your counsel told you
9  to in your wire fraud case?
10   A.   Correct.
11   MS. HAVIV:  James, can we pull up what's
12 called information on the exhibit, the platform?
13   THE VIDEOGRAPHER:  Is it titled felony
14 information?
15   MS. HAVIV:  Yes.
16   THE VIDEOGRAPHER:  Okay.
17        (Turrentine Deposition Exhibit
18         No. 12 was remotely introduced
19         and provided electronically to
20         the reporter.)
21 BY MS. HAVIV:
22   Q.   Do you recognize the caption in this
23 case?
24   A.   I do.
25   Q.   This was the felony information in your

Page 88

1  case?
2    A.   Yes, ma'am.
3    Q.   This is the charging document you pled
4  guilty to?
5    A.   Yes, ma'am.
6    Q.   You waived your right to the
7  indictment, right?
8    A.   Correct.
9    Q.   Do you see here that for the wire fraud
10 count, the government charged you with sending
11 an e-mail where you falsely informed the City of
12 Kosciusko account being closed without payment
13 and that no invoice to the city has ever been
14 sent?
15   A.   Correct.
16   Q.   And you pled guilty to that count?
17   A.   Yes.  That was --
18   Q.   Do you -- sorry.  What did you say?
19   A.   That was the wire fraud charge,
20 correct.
21   Q.   Do you dispute that you sent a false
22 e-mail?
23   A.   No, I do not.
24   MS. HAVIV:  Could you bring up, James, the
25 sentencing transcript, please?

Page 89

(Turrentine Deposition Exhibit
No. 13 was remotely introduced
and provided electronically to
the reporter.)
BY MS. HAVIV:
Q.   Did you address -- excuse me.  Strike
that.
Is this the sentencing transcript in
your criminal case?
A.   Appears to be, yes.
Q.   Did you address the Court at
sentencing?
A.   I did.
Q.   Do you see on Page 18 at the bottom
where it says:  I should not have tried to hide
payments?
A.   I do.
Q.   Did you try to hide payments?
A.   Yes.
Q.   Do you see on Page 19 where it says:  I
was wrong?
A.   Where at?  Sorry.
Q.   On Line 5.
A.   Yes.
Q.   Do you dispute that statement?

Page 90

A.   No.
Q.   You weren't being untruthful with the
Court to get a more favorable sentence?
A.   I'm not saying I was not truthful.  I
was saying that I told the Court what I needed
to tell the Court as far as how I felt about
being in that situation whatsoever.
Q.   You told the Court what they wanted to
hear?
A.   No.  No, I didn't tell the Court what
they wanted to hear.
Q.   Were you upset with your attorney after
you were sentenced?
A.   Yes.
Q.   Did you challenge your sentence?
A.   Yes.
Q.   Were you successful?
A.   No.
Q.   Do you recall your hearing where you
pled guilty?
A.   I do.
Q.   Do you recall admitting to diverting
funds to the Court?
A.   Yes.
Q.   But you dispute that you actually

Page 91

diverted any funds?
A.   Correct.
Q.   I'm fine to keep going.  I'm going to
move on to a new topic in just one second, but
we can talk about a lunch break.
One more question, sorry, Mr. Turrentine.
You were under oath during this sentencing
hearing?
A.   Yes, ma'am.
Q.   And you were under oath when you
admitted that you diverted funds?
A.   Yes, ma'am.
Q.   And you're under oath today?
A.   Yes, ma'am.
MS. HAVIV:  Okay.  I think we can go off the
record just to talk about timing and logistics,
if that works.
THE VIDEOGRAPHER:  Going off the record at
11:21 a.m. central.
(Short break taken.)
THE VIDEOGRAPHER:  Going back on the record
at 11:37 a.m. central.
MS. HAVIV:  Thank you.  Can we look at
Exhibit 8, please?
BY MS. HAVIV:

Page 92

Q.   What did you do with the funds you
received from GoFund?
A.   I don't know.
Q.   You said you had a project, right?
A.   Yes.
Q.   What was that project?
A.   I don't recall exactly what project it
was.
Q.   Didn't you sign a declaration where you
talked about the project on Monday?
A.   I didn't say what project it was, no.
Q.   But you talked about the project in the
declaration, right?
A.   Yeah.  That was the intent for the
funding, yes.
Q.   So on Monday you signed a declaration
that said:  I had a project to fund that would
require Indigo to outlay $40,000.  But today you
don't remember what that project was?
A.   I don't know the name of the project.
I've got probably 30 projects that go on at the
same time.  They're all over the place.  I don't
know exactly what project that was going to be
for or what I was going to use it for, but it
was for a project.

Deposition of Christopher A. Turrentine                    Haymount Urgent Care PC, et al v. GoFund Advance, LLC, et al.

Page 93

1  Q.  Was it in Florida?
2  A.  No.
3  Q.  Does this banking statement refresh
4 your recollection as to what the money was used
5 for?
6  A.  I can only see what some ACH deposits
7 are.  So I --
8  Q.  I can scroll down, if there's a portion
9 that would help you.  I can also turn this over
10 to you if that would be easier.
11  A.  I don't see anything on here that's --
12 because none of the charges are going to say
13 where they were at as far as what project we
14 were on and what we were doing.
15  Q.  You were funded on February 2nd, right?
16  A.  Yes.
17  Q.  And that's the same day you started
18 making payments?
19  A.  No, ma'am.
20  Q.  When did you start making payments?
21  A.  I think they take the payment out the
22 next day.
23  Q.  At some point you stopped permitting
24 defendants to debit your account, right?
25  A.  Yes, ma'am.

Page 94

1  Q.  That is, you stopped making payments to
2 GoFund, right?
3  A.  Correct.
4  Q.  Why did you stop making payments?
5  A.  Because I realized that I wasn't going
6 to get the full amount that they had told me I
7 was going to get.
8  Q.  What was that full amount?
9  A.  40,000.
10  Q.  When did you stop making payments?
11  A.  I don't know the exact date.  I'm sure
12 I could -- if I can get control of this, I can
13 probably see when it stopped.
14  MS. HAVIV:  Do you mind giving him control?
15  THE WITNESS:  Looks like the 25th is the last
16 payment.
17 BY MS. HAVIV:
18  Q.  Did you request the reconciliation
19 under the contract before stopping payments?
20  A.  No, I did not.
21  Q.  Did you request an adjustment to
22 remittance under Section 1.5 before stopping
23 payments?
24  A.  No.  I tried to reach GoFund after the
25 second deposit came in, which I think would have

Page 95

1 been on the 24th, somewhere in that area, and
2 then when they deposited the second 14,000,
3 another payment came out the next day.  And then
4 I talked to Steve, my attorney, and told him
5 what was going on and asked him what I should
6 do, and he said that I should get this -- I
7 should contact the bank and stop making the
8 payments until we get it figured out.
9  Q.  Did Steve look at the contract before
10 he provided that advice?
11  A.  No.  I just told him what was going on.
12  Q.  What was your understanding of what the
13 fees were going to be in connection with this
14 financing arrangement?
15  A.  Okay.  So it varied on two different
16 times.  When I first got the deposit, I had a
17 funding call.  And they had told me that I was
18 going to get $20,000 for the first tranche, and
19 then another second 20,000 for the second
20 tranche and that there was going -- they were
21 going to hold back $6,000 -- well, first of all,
22 they didn't tell me they were going to hold back
23 $6,000.  They put $14,000 in my account whenever
24 I called and asked them how come I only got 14
25 ,000?  I talked to the broker, and the broker

Page 96

1 told me that they were holding 6,000 to ensure
2 that I made my $2200 payments every day and that
3 to not miss my payments and then the -- after
4 ten payments of $2200, they would wire me the
5 other 20,000, and there would be no -- would not
6 be the second 6,000 being held out.  Never did
7 they discuss a fee arrangement or them taking
8 out -- anything out of the 6,000.  It was
9 basically, you know, they're -- we're going to
10 deposit 20,000 in your account, and then the
11 second time we deposit another 20,000 in there.
12 And they never discussed what a fee was until I
13 asked them how come 6,000 came out of the
14 account.
15  Q.  So did they call the $6,000 fees?
16  A.  No.  They said it was -- she told me
17 that it was just -- they were holding it so --
18 to make sure that I made the $2200 payments.
19  Q.  Did they say it was a temporary hold?
20  A.  Correct.
21  Q.  Can we go back to Exhibit 30, please?
22 When you signed this, did you understand that
23 there were going to be fees in connection with
24 the financing arrangement?
25  A.  No, actually, I didn't.

Page 97

Q.  Is that your signature?

A.  Yes.

Q.  Is that your signature on this page?

A.  Yes.

Q.  Can you see that it says Appendix A, the fee structure at the top of the page?

A.  Mm-hmm.

Q.  Did you read this before you signed it?

A.  I did not read this section.  The fee section that I had was blank.  I think if you keep going down --

Q.  What was blank?

A.  The fee structure.

Q.  But that's your signature over here, right?

A.  Yes.  But I think if you go to Page 12 --

Q.  I can go to Page 12 in a second, but you signed this page.  Is that accurate?

A.  Yes.

Q.  Are you suggesting that it did not look like this when you signed it?

A.  No.  I didn't even -- I didn't even realize that that was the fee structure at all whenever I was signing it.  Because I'm almost

Page 98

positive the last page said a fee structure, and it was completely blank.

Q.  Under A it says:  Underwriting fee minimum of $500.  Do you see that?

A.  Yes, ma'am.

Q.  And, again, your signature appears on this page?

A.  Yes.  As I just said a second ago, I -- when I signed this thing through DocuSign, I just went through the last page.  I'm almost 100 percent positive it said fee structure, and it was completely blank.  There was no fee structure.  There was no writing in it whatsoever.

Q.  This is the last page.  Is this what you're thinking of?

A.  No.

MS. HAVIV:  James, can we give him control of the document so he can find what he's looking for?

THE WITNESS:  Yeah.  I'm positive there was a blank fee structure that looked just like this, but it had no values in there whatsoever as far as the cost structures.

BY MS. HAVIV:

Page 99

Q.  But you signed this page, right?

A.  Yes.  Now, may I remind you of something?  This was the second document that I received from these guys.  The first one was a $40,000 complete package that they sent me, and the following morning when I was supposed to do my call, the broker told me that they had divided up into two payments, sent me another document like this right here, and I went through and did the -- she said all they did was change the values on them to split them up into two documents.  And this one here is -- I signed through the DocuSign also.  So I didn't go through this document, you know, tooth by tooth by trying to figure out what was being said in there, because I was just told that all they did was divide it into two different loans.

MS. HAVIV:  Can I have control of the document back, please?

BY MS. HAVIV:

Q.  Do you see this Provision 1.4, Reconciliation?

A.  Yes.

Q.  Have you read this provision before?

A.  I have not.

Page 100

Q.  So you didn't discuss this provision with GoFund?

A.  No.  I didn't discuss anything with GoFund on any kind of reconciliation.

Q.  Do you know whether this provision allows you to adjust your payments retroactively or not?

A.  I haven't read it, so I don't know.

Q.  Have you read Section 1.5?

A.  No.

Q.  So you don't know if you can request a lowering of the daily remittance under Section 1.5?

A.  Yeah.  I wouldn't have done that anyway.

Q.  Why not?

A.  It wasn't a problem with paying the payment.  It was a problem with them giving me $28,000 off of a $40,000 loan that I had to pay back 63,000.  Very misconceiving on how the presentation was presented when I was told the whole time I was getting $40,000, paying back 63,000, and getting only 28,000 and still having to pay back 63,000.  So to go back and adjust my $2200 payment was not the problem.

Page 157

Q.  Have you filed a lawsuit against RAM?
A.  No.
Q.  Do you know if Mr. Heskin has?
A.  Not by me he hasn't.
Q.  Do you know if he has by someone else?
A.  I have no idea.  Never asked him.
Q.  Have you filed taxes for the year 2021?
A.  I did -- for the company I did.  My personals hadn't been filed yet.  I got an extension.
Q.  How are the advances and payments under the RAM MCA agreement treated?
A.  As a loan.
Q.  Is it your understanding that RAM is a collection company for other merchant capital advance businesses?
A.  I understand that RAM will negotiate payoffs for MCA agreements.  At least that's my understanding.  I didn't really look into them a whole lot.  They contacted me, saw that I had a couple of loans out, and asked if I minded them setting up a payoff where I paid monthly instead of daily payments.  That's all I was looking for.
Q.  So what was the name of the company

Page 158

with whom you had the agreement if it wasn't with RAM?
A.  You mean the funding company?
Q.  Yes.
A.  Yeah.  I don't remember the names of them.  I discussed it the other day with Mr. Heskin, but I forgot what their names are.  It's -- I'm drawing a blank on their names.
Q.  Did you produce those agreements in this litigation?
A.  Yes, ma'am.
Q.  Did Indigo enter into another MCA agreement with Jett?
A.  No.
MS. HAVIV:  Could we pull up Exhibit 43, please.
          (Turrentine Deposition Exhibit
          No. 26 was remotely introduced
          and provided electronically to
          the reporter.)
BY MS. HAVIV:
Q.  Have you seen this document before?
A.  I've seen it.
Q.  Is this deal funded?
A.  No, ma'am.

Page 159

Q.  Why not?
A.  I believe it was that they -- I had discussed with them about an MCA agreement, and I didn't want to have to do any kind of MCA agreements, and they were saying that they could do it a different route, and then they sent me this agreement, and then they were going to try to set up a funding call.  And before they even said that, I told them I didn't -- I didn't want to get into an MCA agreement.  So they didn't fund it.  I told them I didn't want to get funded.  I did find it ironic that right after this one I did get contacted from KTK Capital, I think they were called, and they already had all my information.  So I'm not sure if these folks transferred it over to them or what the deal was, but shortly after that is whenever I got money from KTK Capital.
Q.  How did you get in contact with the people from Jett Funding?
A.  So I'll reiterate this again.  I would just, looking on my phone while we were on break, I literally get 10 to 15 calls a day, 15 texts a day, and at least 5 to 10 e-mails a day from these jokers like this.  It's constant.  I

Page 160

can't get out of it.
Q.  So to answer my question, you received a call from Jett Funding.  Is that what you're saying?
A.  What I'm saying is I don't know.  I don't know if it was a phone call, a text, an e-mail, they sent me a flyer.  I don't know.  It's -- I don't know.
Q.  They reached out to you, though?
A.  Yeah, yeah.
Q.  And you engaged with them, right?
A.  I have engaged with a couple of them where they state that they're not MCA funding sources.  Just about all of them say the same things.  These guys are crooks.  "We're not like that.  We're a direct lender," blah, blah, blah.  And then the next thing you know everybody has your information again, and you get called by everybody else in the MCA business.
Q.  So Jett reached out to you, and you had a phone conversation with them?
A.  That's what I was just telling you.  I don't know if it was a phone conversation, an e-mail, or a text, but they did reach out to me, and we had a conversation.  They sent me this

Page 161

1  e-mail, and then they produced this copy of this
2  agreement.  I sent it back to them, and they --
3  we never did any kind of funding whatsoever,
4  nothing.
5      Q.  They sent you this agreement, you
6  signed this agreement; is that correct?
7      A.  Yeah.  They sent me a DocuSign
8  agreement.
9      Q.  And that's your signature that appears
10 three times on the first page?
11     A.  It's what it looks like.  It's kind of
12 almost like the other one.
13     Q.  What's kind of almost like the other
14 one?
15     A.  That signature.
16     Q.  It's your signature, though, right?
17     A.  It is my signature.
18     Q.  You signed all these pages that you're
19 scrolling through now?
20     A.  Those are initials, and I -- appears
21 that this was signed, correct.
22     Q.  So to make sure I'm clear, they reached
23 out to you, you spoke with them on text or by
24 phone or by e-mail, they sent an agreement, and
25 you signed it.  Is that accurate?

Page 162

1      A.  Yes.  But signing this agreement does
2  not go into effect.  You have to have a -- what
3  they call a funding call, and then a bank, bank
4  preference or something like that.  They
5  basically will send this out to you and they say:
6  Hey, here's our -- here's our offer to you, sign
7  this agreement, and we'll get moving on with it.
8      Q.  Is your signature on this document
9  fraudulent in any way?
10     A.  I don't know.  I'm not saying it's
11 fraudulent or not.  I'm just saying it looks
12 awfully, awfully close to the other one that was
13 on that application or whatever that was.
14     Q.  Did you sign it or not?
15     A.  That appears to be my signature.  So
16 what I'm telling you is yeah, it looks like my
17 signature.
18     Q.  So this signature that appears here
19 which you've confirmed is your signature,
20 it's -- Withdrawn.
21         This agreement is similar to the
22 agreement with GoFund, right?
23     A.  Appears to be.
24     Q.  You signed this agreement after
25 bringing claims that the agreements with GoFund

Page 163

1  were void, correct?
2      A.  I signed an agreement with these guys
3  after I said that their agreement was void?
4      Q.  You signed this agreement with Jett
5  that we're looking at after bringing legal
6  claims that the agreements with GoFund were
7  void; is that right?
8      A.  When you mean that they were void, what
9  does that mean?
10     Q.  Do you argue that -- Withdrawn.  Do you
11 believe that the agreements with GoFund for
12 financing were enforceable?
13     A.  You're talking a legal term that I'm
14 not sure what you're asking me.
15     Q.  Do you understand what it means for a
16 contract to be enforceable?
17     A.  Yes.
18     Q.  Do you understand what it means for a
19 contract to be void?
20     A.  I'm assuming a voided contract means
21 that they -- that it's -- that it's -- there's
22 no -- that it's no longer enforceable.
23     Q.  Do you think that your financing
24 agreements with GoFund are enforceable?
25     A.  Legally I don't know if they are

Page 164

1  enforceable.  I don't think they should be.
2  And, again, like I said, if they would have just
3  paid the 40,000 like they said they was going to
4  get, then we wouldn't be in this position.
5  Legally, I don't know what the judge is going to
6  say whether or not they're legal or not.  That's
7  going to have to be something that the attorneys
8  and the judge figures out.
9      Q.  When you say if they would have just
10 paid the 40,000 like they said we wouldn't be in
11 this position.
12     A.  Mm-hmm.
13     Q.  Do you mean that you wouldn't have sued
14 if they had paid the 40,000?
15     A.  Well, look, I've gone through these
16 before.  I've gone through agreements, I've paid
17 them, everybody went on their way and did their
18 own thing.  I didn't get ripped off by the other
19 ones.  These guys ripped me off, and I called
20 them on it.  And, like I said, if they would
21 have just did what they said and paid the money
22 that they said they were going to pay instead of
23 stringing me along and saying they were going to
24 give me 6,000 at the end and another 20,000 and
25 then 14-, and they were going to give me another

Page 165

6-, we wouldn't be in this position.

Q.  Do you think GoFund did anything wrong besides not paying you the 40,000?

A.  Okay.  You're asking me my opinion, right?  You said do I think?

Q.  Yes.

A.  Okay.  My opinion is this:  GoFund, if they would have followed through with all they were supposed to do, we would have got to the point where they started doing things wrong, okay?  So they advanced me money or they gave me money and they said:  This is how much you're going to get, and you're going to pay this much off.  I started making my payments.  The original deposit was 14,000, I called them out on it, they said I was going to get another 6 to make it 20,000 after the ten payments.  Ten payments come along, nobody calls me for the next deposit; they wait two more days until I have to search -- I forgot to even mention the fact that they didn't even -- I had nobody's number, no telephone number, no e-mail, nothing to call about this account.  I had to go back to my AT&T account just to find a person to call to find out when I was going to get my other 20,000

Page 166

when I was told it was going to be deposited right in my account immediately after ten payments were made.  Okay?  So if they had just paid that, we'd never be in this position where they had to start trying to get, you know, freeze it -- I think it's totally -- they did something wrong when they froze my bank account.  That's ridiculous.  I think they totally did something wrong when they filed paperwork at the a court in Connecticut to tell my bank to freeze my account.  Those are all things that I feel that they did wrong.  That's my opinion.  I'm -- I think that's what they did wrong.  If they -- if they would have just paid the payments, we'd never be in this spot.  I would have paid out the contract just like I was going to, and we'd never be in this position.  That's my opinion.

Q.  Did you talk to Mr. Heskin before signing this agreement with Jett?

A.  I don't -- I don't recall if I did or not to be honest.  I don't think I did.

Q.  Sitting here today, do you know of any differences between the Jett agreement and the GoFund agreements that you signed?

A.  Had it -- honestly, I don't know, and I

Page 167

didn't go through it and even do a comparison or anything.  I didn't even -- I just got this thing just a couple days ago.  I didn't even know it even existed.

Q.  Do you have a copy of it in your files?

A.  Just from what I just got.

Q.  The one you received from the defendants?

A.  Mm-hmm.  Yes, ma'am.

Q.  You don't have a copy of this in your files though?

A.  Wait.  I did have this one, yes, I did.  I'm sorry.  I was thinking of the little -- the other little piece that you showed me at the beginning.  I did have this one.  This one I had in my account, I'm sorry, in my e-mail.

Q.  Did you produce it?

A.  I'm not sure, to be totally honest.  I went through and looked for everything that had to do with merchant capital agreements, and like I said, this, whenever I got this a couple days ago was the first I'd seen it.  So I had to go back and look and my attorney asked me to look for it again, and I was able to locate that one, but not the other one.

Page 168

Q.  Sorry.  Which one were you not able to locate?

A.  That sheet that you showed me, that -- some capital or something like that.

Q.  Seamless Capital?

A.  Yes.

Q.  Are you aware that your attorney has said that your signature on this document with Jett Funding is fraudulent?

A.  Yes.

Q.  Do you believe that to be true?

A.  I do.  I mean I -- it just seems like it is.

Q.  A couple moments ago I asked if you signed it, and you said yes.  Do you remember that?

A.  Yes.

Q.  So did you sign it, or is it fraudulent?

A.  No.  As I -- again, it looks to me like it's something that was copied, but it shows it as a DocuSign, and I discussed with Mr. Heskin about seeing if we could get something from DocuSign to show that that was a valid signature, because it looks like to me it's --

Deposition of Christopher A. Turrentine                    Haymount Urgent Care PC, et al v. GoFund Advance, LLC, et al.

Page 169

1  it's copied or something.
2      Q.  The copy that you have in your files of
3  this agreement with Jett, does it have your
4  signature on it?
5      A.  I don't remember if I even looked at
6  it.  I know I was discussing it with Mr. Heskin,
7  but I don't remember if I went back and looked
8  at it or not.
9      Q.  So you've seen this document, you have
10  what you think is an identical document in your
11  files as well.  They both appear to bear your
12  signature?
13     A.  Can -- I'm getting confused with so
14  many documents that we're going over right now.
15  I'm -- I have to go and look and see which one
16  we're talking about because, again, I'm starting
17  to get completely overwhelmed with documents
18  right now.
19     MR. HESKIN:  Why don't we take a break, have
20  Mr. Turrentine search his e-mails so that we can
21  have a clear record on this.
22     MS. HAVIV:  Why don't we keep going for a
23  little, and we can come back to this.
24  BY MS. HAVIV:
25     Q.  Did Indigo enter into any other MCA

Page 170

1  agreements besides the ones that we've discussed
2  with GoFund and Jett?
3      A.  The KTK one that we talked about
4  originally.
5      Q.  And what was the timing on that one?
6      A.  I don't remember the timing, to be
7  honest.
8      Q.  Do you know if it was before or after
9  you filed the lawsuit?
10     A.  Oh, after.
11     Q.  Have you produced a copy of that
12  agreement?
13     A.  Yes.
14     Q.  Was it similar to the agreement with
15  GoFund?
16     A.  No.  Actually -- you know what, I don't
17  think I even have a copy of the KTK one.  That
18  was the one that was supposed to be like a line
19  of credit, and I paid on it for ten days, and
20  then I paid it off.  I don't even -- I don't
21  have -- even have a document that had KTK on it.
22     Q.  What is Commercial Funding?
23     A.  Commercial Funding.  I don't recall.
24     MS. HAVIV:  Can we pull up Exhibit 27?
25     (Turrentine Deposition Exhibit

Page 171

1      No. 27 was remotely introduced
2      and provided electronically to
3      the reporter.)
4  BY MS. HAVIV:
5      Q.  If you look at Page 16, Commercial
6  Funding.  Do you see that?
7      A.  Commercial Funding?
8      Q.  It looks lake a creditor of Indigo
9  Warehouse.
10     A.  No idea.
11     Q.  Do you know what Fund Through is?
12     A.  Fund Through, if I'm not mistaken, is a
13  factoring company.
14     Q.  What about Green Capital Funding?
15     A.  I don't -- I don't recall who that is
16  either.  Is that something with Indigo
17  Warehouse?
18     Q.  Yeah.  You can look at Page 17.
19     A.  I don't know.  Looks like it is,
20  15,000.
21     Q.  What's a factoring company?
22     A.  Where you factor invoices.
23     Q.  What is EBF Holdings?
24     A.  No idea.  I'm sorry.
25     Q.  How many MCA agreements do you think

Page 172

1  you've negotiated in your professional career?
2      A.  I couldn't guess.  I don't know.
3      Q.  More than ten?
4      A.  No.
5      Q.  More than five?
6      A.  Possibly.  I don't know.
7      MS. HAVIV:  Maybe what we'll do with that
8  document, Shane, at the next break is you can
9  look for it and we can discuss it.  Does that
10  make sense?
11     MR. HESKIN:  Sure, sure.
12  BY MS. HAVIV:
13     Q.  Do you know what class certification
14  is?
15     A.  Class certification.  I mean can you --
16  what's it in reference to?  I mean --
17     Q.  In reference to the class action.
18     A.  Oh, oh, oh, okay.  I'm sorry.  Class
19  certification in my business means you're
20  certified in certain things.  So what was your
21  question again?  I'm sorry.
22     Q.  Do you understand what class
23  certification is in the context of a class
24  action?
25     A.  I know I've gone over it with

Page 245

A.  No, sir.

Q.  Okay.  And in that e-mail thread that you found in there, you're disclosing in there, are you not, that you're asking -- well, let me reword that.

You're asking whether or not they're related to GoFund, right?

A.  That's correct.

MS. HAVIV:  Objection to the form.

BY MR. HESKIN:

Q.  Did you ask whether or not -- in that e-mail did you ask whether or not they were related to GoFund?

A.  I did.

Q.  Okay.  And if you had known they were associated with GoFund, would you have taken it out?

A.  I would have not even had a communication with them.

Q.  Okay.  And so when you're communicating with this Mayo guy, you had no idea he was affiliated or associated with GoFund, did you?

MS. HAVIV:  Objection to the form.

THE WITNESS:  Not at all.

Page 246

BY MR. HESKIN:

Q.  Did you know that Mayo was conveying your personal information to GoFund during the pendency of this litigation?

A.  Absolutely not.

Q.  And had you known that he was giving that information to GoFund, would you have given him your bank authorization?

MS. HAVIV:  Objection to the form.

THE WITNESS:  I would definitely not.

BY MR. HESKIN:

Q.  Okay.  You testified earlier about having revenues of $100,000.  Do you recall that?

A.  Yes.

Q.  Okay.  And you were asked -- you were shown a handful of bank statements, I think it was three or four bank statements.  Do you recall that?

A.  Yes.

Q.  Okay.  And you were asked to trust the calculations that it averaged out to be about $95,000, right?

MS. HAVIV:  Objection to the form.

BY MR. HESKIN:

Page 247

Q.  Do you recall that?

A.  Yes.

Q.  Is your actual average revenues $100,000?

A.  No.

Q.  Okay.  What is your actual revenue?

A.  I mean like I said in my declaration, I mean we're -- if you take the whole year out, we're averaging 50-, 45-, 50,000 a month.

Q.  Okay.  Well, why would --

A.  You have to take into account some low months.  I mean like we saw already in January. It all depends.  Like this year it's -- of course it's a little bit better than it was the previous year.  But, you know, if you look at just general, the way that we bill, if we're waiting to bill until the final project, that's why you'll see like November and December there was some -- quote a bit of checks funded in there, because it was end of the project. January you didn't see as much because there wasn't as much billing going on because the project started back up.  So, you know, it could have got to February, could have got to March, March could have been a $30,000 month.  Just

Page 248

depends on the billing cycles.

Q.  Okay.  When you signed that affidavit or declaration representing that your average revenues were $55,000 per month, what was that based on?

A.  It was just my overall thought process of calculation of what we bill out normally.

Q.  Okay.  So your revenues would be about $600,000 a year.  Is that fair?

A.  That's correct.

Q.  Okay.  And then you were asked about Johnson Lancaster.  Do you recall that?

A.  I do.

Q.  Okay.  And how much business did you get from Johnson Lancaster in 2021?

A.  I think approximately 240,000.

Q.  Okay.  And what was your -- what are your margins?

A.  Our margins are pretty good.  They're running around -- off that 240, we probably profit 100-, 150, somewhere in there.

Q.  Okay.  And how much did you do from Johnson Lancaster in the first two months of 2022?

A.  I want to say it was about 35,000,

Page 249

1  somewhere in that area.
2    Q.  Okay.  And did you -- what did you --
3  did you have a projection of how much you would
4  have done for Johnson Lancaster in 2022?
5    A.  Well, I think we'd even done more, but
6  I mean just if we -- if we -- status quo, we
7  probably would have gotten 250,000 from them.
8    Q.  Okay.  And so you -- and how much would
9  you have made on that, just assume things didn't
10  go up, how much would you have made?
11    MS. HAVIV:  Objection.  Form.
12    THE WITNESS:  Yeah.  I would probably say a
13  little less because the cost of labor has gone
14  up a little more so maybe profit 100, 120,000,
15  somewhere in there.
16  BY MR. HESKIN:
17    Q.  Okay.  And this is September 15, 2022,
18  right?
19    A.  Yes, sir.
20    Q.  Have you gotten -- have you received a
21  bill [sic] from Johnson Lancaster since the
22  start of this litigation?
23    A.  No, sir.  I haven't had a call from
24  them or anything.
25    Q.  Okay.  Have you received a single bid

Page 250

1  from them since they received the UCC notice?
2    A.  No, sir.
3    Q.  Okay.  And based on your experience in
4  the industry, is -- what's the impact of
5  receiving an UCC notice like that?
6    A.  It's not --
7    MS. HAVIV:  Objection.  Form.
8    THE WITNESS:  Not good.  They -- it looks bad
9  on you as an installer.
10  BY MR. HESKIN:
11    Q.  Okay.  Do you have -- as you sit here
12  today, do you have a belief as to why Johnson
13  Lancaster hasn't provided you with any further
14  information?
15    MS. HAVIV:  Objection.  Form.
16    MR. HESKIN:  I'll withdraw it.  I think
17  that's all I needed to do.
18  BY MR. HESKIN:
19    Q.  Oh, so I do want to get this out.  So
20  can -- I want to give you an opportunity to
21  explain.  So you -- there were a couple things
22  that were brought out early on.  You pled guilty
23  to the wire fraud charges back in 2012, right?
24    A.  Correct.
25    MS. HAVIV:  Objection.  Form.

Page 251

1  BY MR. HESKIN:
2    Q.  Okay.  And you -- you were asked
3  directly whether or not you were funneling money
4  to yourself, right?
5    A.  Correct.
6    Q.  Okay.  And you claim that you didn't do
7  that; is that correct?
8    A.  Correct.
9    MS. HAVIV:  Objection.  Form.
10  BY MR. HESKIN:
11    Q.  Why do you -- why do you claim that you
12  were not guilty of that crime?
13    A.  Well, I was in a corporation before I
14  brought in my business partners.  They changed
15  the company to an LLC.  I was working with a
16  company called University of Southern Miss as --
17  by myself when we were -- when I was the sole
18  owner.  When we partnered up, we worked with
19  them for a couple more months, and they decided
20  to terminate our agreement.  I went on for about
21  another year of work with the University of
22  Southern Miss.  They asked me if I would come in
23  and do the work by myself outside of the
24  company.  The agreement allowed for outside work
25  to be performed by other companies as long as it

Page 252

1  didn't interfere with my relationship with the
2  company.  I did that work.  There was an invoice
3  sent to the City of Kosciusko that we were using
4  for -- my business partners wanted to cancel
5  Christmas, so no Christmas presents for any of
6  the employees because we were losing money.  And
7  I had negotiated with our office administrator
8  to send in the Kosciusko bill, and we were going
9  to use that money for Christmas.  And the
10  business partners got a call from City of
11  Kosciusko that I did that, so the company
12  launched an investigation.  They saw that the
13  University of Southern Miss -- that's where all
14  the money that they claimed was stolen was the
15  money that University of Southern Miss paid me.
16  I had, quite frankly, the roughest judge that
17  you could possibly find in the name of Judge
18  John McBride, and I -- nobody -- I couldn't get
19  around it.  I was going to get convicted of
20  something no matter what.  They tried me for
21  taxes.  They couldn't figure out anything on
22  taxes.  They convicted me of wire fraud because
23  of the Kosciusko e-mail that I sent to them.  I
24  served my time, I did my duty that I had to do,
25  and I've moved on from that.

Page 253

Q.  Okay.  And have you provided truthful answers to the best of your ability today?

A.  I have.

Q.  Okay.  And have you tried to be truthful and honest in this litigation to the best of your --

MS. HAVIV:  Objection to the form.

THE WITNESS:  Yes, I have.

BY MR. HESKIN:

Q.  Okay.  And as -- if the Court appoints you as a class representative, do you -- would -- do you agree to be truthful and honest?

MS. HAVIV:  Objection to the form.

THE WITNESS:  Absolutely.

BY MR. HESKIN:

Q.  Okay.  And then there was another -- there was another thing brought up about you were fired for using -- or at least they claim using your business card for personal expenses.  And you claim it was the other way around, right?

MS. HAVIV:  Objection to form.

THE WITNESS:  The business card that I had was issued to me under my Social Security number as the owner before we invited Karl Broberg to

Page 254

join the company.  I used that card.  They were supposed to provide us with a new card from the new bank.  They never did it.  The whole entire time -- a year passed by.  I continued to use that card for sales calls, for personal use.  I used it on other occasions.  The card is -- and as soon as the hearing is over with, they've already shut the company down.  So I'm not going to get anything out of my -- out of my case, which they've already been told they're going to lose.  But I got fired from my own company for a -- I want to say it was $41 charge for a medical procedure that I had done that I put on my American Express card that I obtained that I brought to the company for the partnership.

BY MR. HESKIN:

Q.  Okay.  And you said that you paid additional restitution since your release from probation, right, or supervised release?

A.  Yes, sir.

Q.  How much was paid in the house sale, if you know?

A.  It was -- I want to say it was 250,000.

Q.  Okay.  So that would -- based on my math, that would leave a balance of 300,000?

Page 255

A.  Well --

Q.  Approximately?

A.  I haven't gotten -- ever since they had told me to halt my payments, I have not gotten a statement from the U.S. Attorneys' Office.  So there has not been yet a -- shown what the total balance is left.

Q.  Okay.  Do you intend to pay that?

A.  Absolutely.

MS. HAVIV:  Objection.

BY MR. HESKIN:

Q.  Okay.  I think that -- let me just take my notes, but I think that's all the questions I had.  I'm not sure if anyone else has any follow-up, but I'll pass the witness.

Re-Examination

By Mr. Hugel

Q.  One quick follow-up about the house that Shane just asked you about.  That wasn't your house that was sold, right?

A.  It was the house that I had with my ex-wife.

Q.  It wasn't your house when it was sold, right?

A.  Correct.

Page 256

Q.  All right.  So your ex-wife's house was sold, and the government had put a lien on it because of your criminal conviction, right?

A.  Correct.

Q.  And that's the money that we're talking about?

A.  You -- did you ask me if that was what it was, or are you --

Q.  I'm just asking.  I'm trying to clarify so that --

A.  That was the --

Q.  The only restitution payment that was made since you completed your supervised release was the money that the government got from your ex-wife when you tried to sell her house?

A.  Correct.

Q.  Thank you.

Re-Examination

By Ms. Haviv

Q.  Just one question.  When did you get back from your vacation in Mexico?

A.  I don't remember.  I'm sorry.  I think it was March the 4th or 5th.

Q.  Before the settlement agreement with GoFund or after?

Page 257

1    A.  Oh, it was before.

2    THE VIDEOGRAPHER:  Is that everything for the

3  record?

4    MS. HAVIV:  That's everything.  Thanks.

5    THE VIDEOGRAPHER:  We are now off the record

6  at 4:42 p.m. central time.

7    MR. HESKIN:  We'll need one regular delivery.

8    MS. HAVIV:  Regular delivery is fine with us.

9  We'll let you know if that changes.

10         (Witness excused.)

11       * * * * * *

1    STATE OF ILLINOIS )
                        )  SS.
2    COUNTY OF COOK     )

3

4           I, LAURA MUKAHIRN, Certified

5    Shorthand Reporter and Notary Public in and for

6    the County of Cook, State of Illinois, do hereby

7    certify that on September 15, 2022, the

8    deposition of the witness, CHRISTOPHER A.

9    TURRENTINE, called by the Defendants, was taken

10   before me, reported stenographically, and was

11   thereafter reduced to typewriting under my

12   direction.

13          The said deposition was taken

14   remotely, and there were present counsel as

15   previously set forth.

16          The said witness, CHRISTOPHER A.

17   TURRENTINE, was first duly sworn to tell the

18   truth, the whole truth, and nothing but the

19   truth, and was then examined upon oral

20   interrogatories.

21          I further certify that the foregoing

22   is a true, accurate, and complete record of the

23   questions asked of and answers made by the said

24   witness, CHRISTOPHER A. TURRENTINE, at the time

25   and place hereinabove referred to.

1          The undersigned is not interested in

2     the within case, nor of kin or counsel to any of

3     the parties.

4          Witness my official signature in and

5     for the County of Cook, State of Illinois, on

6     this 27th day of September A.D., 2022.

7

8

9

10

11     _____

12     LAURA MUKAHIRN, CSR, RPR, CRR
       CSR NO. 084-003592

13

14

15

16

17

18

19

20

21

22

23

24

25