# EXHIBIT 30

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3                              No. 1:22-cv-01245-JSR

 4   ---------------------------------------------x

 5   HAYMOUNT URGENT CARE PC, ROBERT A. CLINTON,

 6   JR., INDIGO INSTALLATIONS, INC., and

 7   CHRISTOPHER A. TURRENTINE, individually,

 8   and on behalf of all those similarly situated,

 9          Plaintiffs

10   vs.

11   GOFUND ADVANCE, LLC, FUNDING 123, LLC,

12   MERCHANT CAPITAL LLC,

13   ALPHA RECOVERY PARTNERS, LLC,

14   YITZCHOK ("ISAAC") WOLF,

15   JOSEF BREZEL, JOSEPH KROEN, and

16   YISROEL C. GETTER,

17          Defendants

18   ---------------------------------------------x

19    REMOTE VIDEOTAPED DEPOSITION OF CHARLES C. LUNDEN

20         Thursday, September 22, 2022 10:19 a.m.

21                  Conducted Virtually

22   Reported by:

23   Janet McHugh, RMR, CRR, CLR

24   JOB NO. 15488
```

Page 216

1  A. My understanding is if the agreement,
2 as advertised, was in excess of 25 percent, then
3 it's a member of the class.
4  Q. Even if it was not harmed?
5  A. I don't know the answer to that
6 question.
7     MR. BILSBORROW: Object to form.
8  Q. You just stated that your understanding
9 is that if the agreement as advertised was in
10 excess of 25 percent, then it is a member of a
11 class.
12  We're looking at the class definition right
13 now. And I'm asking you whether or not an
14 individual who paid a single payment pursuant to
15 their agreement, and that on the face of the
16 agreement your calculation shows the interest
17 would be in excess of 25 percent, would your
18 understanding of the class definition include
19 that person?
20     MR. BILSBORROW: Form.
21  A. Again, my understanding of the class
22 definition is it may be that Window Select is a
23 member of the class with no damages.
24  Q. So your understanding -- as you

Page 217

1 understand the class, the class includes
2 individuals who are not harmed?
3     MR. BILSBORROW: Object to foundation.
4  A. Yes.
5  Q. To your understanding -- let me pose a
6 hypothetical for you and see if you believe that
7 this would fall into the class.
8  Imagine that a counterparty to an MCA
9 directed a third party to make a payment on their
10 behalf pursuant to the MCA agreement. Let's use
11 Indigo as a hypothetical. Let's say Indigo
12 directs one of their customers to make a payment
13 to GoFund pursuant to the MCA agreement on
14 Indigo's behalf. Do you follow that
15 hypothetical?
16  A. Yes.
17  Q. Would the customer that Indigo directed
18 to make a payment be a member of the class?
19  A. I don't know the answer to that
20 question.
21  Q. In your understanding?
22     MR. BILSBORROW: Foundation.
23  A. I don't know the answer to that
24 question. I don't know whether they're legally a

Page 218

1 member of the class or not.
2  Q. Yeah. I'm just asking you to read
3 paragraph 218 and tell me if, as you understand
4 it, in your opinion, would that hypothetical
5 customer of Indigo fall within the class.
6     MR. BILSBORROW: Foundation.
7  A. If Indigo never paid any money to the
8 merchant?
9  Q. It would be -- it would be Indigo
10 requesting that one of its customers make a
11 payment to the funder on its behalf.
12  A. Again, I don't know whether Indigo or
13 its customer would be a member of the class.
14  Q. You can't understand whether or not
15 Indigo or its customer in that situation would be
16 a member of the class, based on reading 218?
17  A. That's correct.
18     MR. STONE: Okay. No further
19 questions.
20     MR. BILSBORROW: Okay. Just give us a
21 couple of minutes. And I'm going to have a few
22 questions.
23     MR. STONE: Sure.
24     MR. GOSNELL: Sure. Do you want to

Page 219

1 come back at 3:50? Does that make sense?
2     MR. BILSBORROW: Yeah, that sounds
3 good.
4     THE VIDEOGRAPHER: Going off the record
5 at 3:44 p.m.
6     (A recess was taken.)
7     THE VIDEOGRAPHER: Going back on the
8 record at 3:49 p.m.
9     CROSS-EXAMINATION
10 BY MR. BILSBORROW:
11  Q. Good afternoon, Mr. Lunden. My name
12 James Bilsborrow. I represent the plaintiffs.
13 And I just have a few questions for you to
14 hopefully end out this day. Okay?
15  A. Okay.
16  Q. I want to ask you first about the
17 report that you provided in this case. And just
18 on a general level, what is the purpose of the
19 report that you produced in this particular case?
20  A. The purpose of the report is to
21 demonstrate that the damages for the class can be
22 measured using the formula in Exhibit A by
23 adjusting for the best available information as
24 to the amounts that were advanced to and from

Page 220

1  each merchant when it's produced and that that
2  information has not yet been produced.  But that
3  the formula set forth in the spreadsheet is the
4  right formula to use, making adjustments, when
5  appropriate, for the best available information
6  as to how much each merchant advanced and
7  received.
8      Q.  Why did you use in this report the
9  as-advertised amounts set forth in each MCA
10 agreement?
11     A.  Because at the time, it was the best
12 available information that I had.
13     Q.  So if actual repayment information is
14 obtained in discovery, can that information be
15 plugged into your Exhibit A to produce more
16 accurate damages information?
17     A.  Yes.  That would be a more meaningful
18 presentation of the economic harm.
19     Q.  And if one were to plug in actual
20 repayment information into your Exhibit A, would
21 the formula underlying Exhibit A change in any
22 way?
23     A.  No.  The outcome would change, but the
24 formula wouldn't change.

Page 221

1      Q.  Okay.  Now, you were asked some
2  questions by opposing counsel about a settlement
3  that Mr. Turrentine may have executed with one of
4  the defendants.  Do you recall that?
5      A.  I do.
6      Q.  Do you have any idea, from a legal
7  standpoint, what impact a settlement would --
8  from Mr. Turrentine would have on class claims?
9      A.  No.  I have no idea.
10     Q.  Do you know whether that settlement
11 that you were shown by opposing counsel, do you
12 know whether that settlement is legally valid?
13     A.  I don't know.
14     Q.  Do you have any idea what impact that
15 settlement has on this case at all?
16     A.  I don't know what impact that
17 settlement agreement has.
18     Q.  Mr. Lunden, you were also asked about
19 some of your prior testimony given in certain
20 cases.  Do you recall that?
21     A.  I do.
22     Q.  And just for the Court, how long have
23 you been testifying as an expert in litigation?
24     A.  For approximately 25 years.

Page 222

1      Q.  And over that 25-year period, how many
2  times have you been offered as an expert,
3  approximately?
4      A.  In excess 180 times.
5      Q.  Okay.  180 times.  Now, opposing
6  counsel focused on about four cases in which your
7  opinions were limited or excluded.  Do you
8  remember that?
9      A.  I do recall instances where my opinions
10 were found to be not persuasive.
11     Q.  And opposing counsel -- do you recall
12 that opposing counsel showed you about three or
13 four of those opinions during his examination?
14     A.  Yes.
15     Q.  He showed you three or four opinions
16 out of over 180 cases in which your opinion has
17 been offered in litigation as an expert; is that
18 correct?
19     A.  That's correct.
20     Q.  How -- approximately -- well, actually,
21 strike that.
22         Have Courts accepted -- in those 180 cases,
23 have Courts accepted your opinion as persuasive
24 and reliable as an expert?

Page 223

1      A.  Yes.
2      Q.  And do you know approximately how many
3  times a Court has accepted your opinion as
4  reliable and persuasive as an expert?
5      A.  It's been modified on one or two
6  occasions, but it's never been excluded.
7      Q.  Did opposing counsel ask you any
8  questions at all about any of the instances in
9  which Courts have accepted your expert opinions
10 as reliable?
11     A.  Not that I recall.
12     Q.  So did opposing counsel's questions
13 present a fair representation of your career as
14 an expert witness in the past 25 years?
15     A.  Not in my opinion.
16         MR. BILSBORROW:  That's all the
17 questions I have for you, Mr. Lunden.  Thank you
18 very much.
19         MR. GOSNELL:  I do have some follow-up
20 from what you just asked, Mr. Bilsborrow, if that
21 is okay.
22         MR. BILSBORROW:  Okay.  Okay.
23         MR. GOSNELL:  Daniel, do you have any?
24         MR. STONE:  No.  You can go.

Page 224

RECROSS-EXAMINATION
BY MR. GOSNELL:
Q. Okay. So Mr. Bilsborrow was just asking you some questions about whether a sample size of four cases where you were, you know, determined by a Court to have provided insufficient expert reports out of a total of 180, if that's a good representation of your work. Did I get that about right?
A. I believe so.
Q. And your work as a certified forensic examiner, you're often required to look at large data sets and things of that nature?
A. In instances of fraud examinations, yes.
Q. And in large data sets like that, if you find one or two instances of fraud, that's still fraud; right?
A. In instances of that type, yes. It would still be fraud.
Q. And is it your experience as a certified forensic examiner that oftentimes when you start to find one fraud or two frauds, that there's more out there?

Page 225

A. Again, in my experience as a certified fraud examiner, I would say that there are instances where the initial investigation reveals one or two and then that number grows.
Q. As the -- as you examine more and more cases; right?
A. Yes.
MR. GOSNELL: Okay. Nothing further.
MR. STONE: Nothing further for me.
MR. GOSNELL: Nor for me.
THE VIDEOGRAPHER: Okay. We are now off the record at 3:56 p.m.
COURT REPORTER: Could I just get the orders before you go? Did you want expedite on this?
MR. STONE: Yeah. I'll take expedited.
MR. GOSNELL: Not for myself. No. I don't know if we're going to get a copy at all.
MR. BILSBORROW: I think plaintiffs would like expedited.
COURT REPORTER: Okay. Did you want that as soon as possible expedite?
MR. BILSBORROW: What is the other option?

Page 226

COURT REPORTER: Well, anywhere between tomorrow and then to seven days out.
MR. BILSBORROW: I actually don't need it before seven days. So this time next week is fine.
MR. STONE: Yeah.
(Deposition concluded at 3:57 p.m.)

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

I, Janet M. McHugh, a Registered Merit Reporter and a Notary Public within and for the Commonwealth of Massachusetts do hereby certify:

THAT CHARLES LUNDEN, the witness whose testimony is hereinbefore set forth, was duly sworn by me and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter, to the best of my knowledge, skill and ability; that before completion of the deposition review of the transcript was not requested.

I further certify that I am not related to any parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of September, 2022.

*Janet McHugh*
JANET M. MCHUGH
Notary Public

My Commission Expires:
July 16, 2028