UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------

HAYMOUNT URGENT CARE PC et al.,

        Plaintiffs,

   -v-

GOFUND ADVANCE, LLC et al.,

        Defendants.

22-cv-1245 (JSR)

OPINION AND ORDER

---------------------------------

JED S. RAKOFF, U.S.D.J.:

    Plaintiffs Haymount Urgent Care PC ("Haymount")[1] and its principal Robert A. Clinton Jr. have moved to certify a class of all persons nationwide who since 2018 received funding from one or more of defendants pursuant to a "merchant cash advance" ("MCA") agreement with an effective interest rate exceeding 25%. See Pls. Mot. to Certify a Class, Dkt. 136; First Amended Complaint ("FAC") ¶ 218, Dkt. 28. The Court denied plaintiffs' motion by bottom-line order on 12/9/22. See Order, Dkt. 156. This Opinion sets forth the reasons for that Order.

    **I.  Factual and Procedural Background**

    The factual allegations underlying this dispute are laid out in detail in this Court's Opinion and Order denying in large part defendants' motion to dismiss. See Haymount Urgent Care PC v. GoFund

---

[1] All capitalized terms here used refer to the definitions set forth in this order, unless otherwise specified. Also, all internal quotation marks, alterations, omissions, emphases, and citations have been omitted from all cited sources.

1

Advance, LLC, No. 22-cv-1245, 2022 WL 2297768 (S.D.N.Y. June 27, 2022). As relevant here, plaintiff Haymount is a primary and urgent care facility in North Carolina owned by Dr. Clinton. Id. at *3. The individual and corporate defendants are in the merchant cash advance business. Id. at *1. That business, defendants assert, provides cash-starved small businesses such as Haymount (which received over $2.5 million in funding pursuant to several MCA agreements) with necessary cash by purchasing a share of those businesses' future revenues for a discount. Id. Plaintiffs characterize defendants' business differently, alleging that defendants employ high-pressure sales tactics to get small businesses to sign up for what are in effect very high-interest loans made in violation of applicable state laws setting maximum interest rates. Id.

Haymount and Dr. Clinton[2] commenced this suit in February 2022, alleging various claims including one under the Racketeer Influenced and Corrupt Organizations ("RICO") Act. After defendants moved to dismiss plaintiffs' complaint, this Court determined that plaintiffs plausibly alleged facts supporting the RICO claim under two separate theories. Haymount, 2022 WL 2297768, at *5-9. In support of one theory, plaintiffs alleged that the MCA agreements operated not as purchases of future revenues but as loans with interest rates more than twice as high as permitted under New York's anti-usury laws -- which, if

---

[2] Two other plaintiffs -- Indigo Installations, Inc. and its principal Christopher Turrentine -- have since voluntarily dismissed their claims. See Stipulation of Voluntary Dismissal, Dkt. 133.

2

that law were applicable, would render collection on them unlawful under RICO. Id. at *5; 18 U.S.C. § 1962(C). The Court also found that plaintiffs adequately alleged a pattern of federal wire fraud violations based on defendant GoFund Advance's alleged use of misleading names to evade blocks and withdraw funds from Haymount's bank account without authorization. Id. at *9.

Plaintiffs' first RICO theory -- that collection under the MCA agreements constituted the collection of unlawful debt -- turns necessarily on showing that the MCA agreements in fact constituted unlawful debt under some state's usury laws. Id. at *5; 18 U.S.C. § 1961(6). In their initial briefing on the subject, both plaintiffs and defendants assumed the relevant state's law was New York's, and after the Court ordered supplemental briefing on the choice-of-law question, defendants took the position that New York law applied by virtue of a New York choice-of-law provision included in each of the relevant MCA agreements, while plaintiffs did not dispute, for the purposes of the motion to dismiss, that New York law applied. See Defs. Supp. Mem. Supp. Mot. Dismiss at 2, Dkt. 82; Pls. Supp. Mem. Opp. Mot. Dismiss, Dkt. 83.

In its Opinion and Order denying in large part defendants' motion to dismiss, the Court therefore assumed, for purposes of the motion to dismiss, that that New York law applied to the question of whether the MCA agreements qualify as usurious, both because the parties had so agreed and because "[t]he MCA agreements at issue expressly choose that New York law will govern their terms." Haymount, 2022 WL 2297768,

at *5. This statement, however, was made in the context of a motion to dismiss.

But things became more complicated after defendants subsequently moved to strike the class allegations in plaintiffs' complaint, arguing that because of class action waiver clauses included in the MCA agreements, plaintiffs' case could not proceed as a class action. See Defs. Mem. Supp. Mot. Strike, Dkt. 104. The Court denied that motion, reasoning that if plaintiffs succeeded in showing that the MCA agreements would be considered usurious loans under New York law, then New York law would also treat them as totally void and unenforceable, including as to the class action waiver provisions. Haymount Urgent Care v. GoFund Advance, 2022 WL 6994507, at *3-6 (S.D.N.Y. Oct. 12, 2022). In their papers, defendants devoted a single paragraph to an argument that the Court should enforce the class action waiver provisions because it had already assumed, in deciding defendants' motion to dismiss, that the choice-of-law provision was enforceable. Mem. Supp. Mot. Strike at 7. The Court rejected this argument, noting that the parties had assumed at the pleading stage that New York law applied, that defendants had consented to its application as to the lead plaintiffs, and that "there [was] at least some basis to think" an independent choice-of-law analysis might result in the application of New York law in any event, given allegations that the defendants operated from New York. Haymount, 2022 WL 6994507, at *5. However, the Court noted that, in order to certify a class, plaintiffs would need to demonstrate that "that the questions of whether or not the MCA

4

agreements are void [and] whether the MCA agreements' class action waiver provisions can be enforced against them are capable of class-wide resolution." Id. at *6 n.3.

When plaintiffs moved for class certification, they argued that their first RICO theory -- that the defendants were engaged in the collection on usurious loans in violation of 18 U.S.C. § 1962(C) -- could be determined on a class-wide basis. Pls. Mem. Supp. Mot. Certification at 20-34, Dkt. 137. Plaintiffs did not make any argument for class certification based on their second RICO theory involving a pattern of alleged wire fraud or any other theory. Id. After hearing argument on plaintiffs' motion on 12/6/22, the Court denied plaintiffs' motion by bottom-line order on 12/26/22, with this Opinion to follow.

**II. Analysis**

A plaintiff seeking to certify a class must show that the proposed class complies with each of the requirements of Federal Rule of Civil Procedure 23(a) (numerosity, commonality, typicality, and adequacy) and at least one of the requirements of Rule 23(b) (that piecemeal litigation would create a risk of inconsistent verdicts, that the defendant has acted toward the class in a generally applicable way such that class-wide injunctive or declaratory relief would be appropriate, or that common questions of law or fact predominate over other questions). Fed. R. Civ. P. 23; see In re Initial Pub. Offerings Secs. Litig., 471 F.3d 24, 32-33 (2d Cir. 2006). As to Rule 23(a)(2)'s requirement of common legal or factual questions, "[w]hat matters to class certification . . . [is] the capacity of a class-wide proceeding

5

to generate common answers apt to drive the resolution of the litigation." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) (emphasis in the original). However, "even a single common question will do." Id. at 359.

As it turns out, plaintiffs cannot meet this commonality requirement. Although plaintiffs pose several putatively common questions as to which class litigation could supposedly furnish common answers, these questions all boil down to, are part of, or follow from a single question: do defendants' MCA agreements operate as unlawfully usurious loans?[3] As explained above, that question turns necessarily on state usury law. Haymount, 2022 WL 2297768, at *5; United States v. Moseley, 980 F.3d 9, 23 (2d Cir. 2020). Here, Haymount -- itself a North Carolina-based company -- seeks to certify a nationwide class of entities that have received funding from defendants pursuant to MCA agreements. See Defs. Mem. Supp. Certification. That necessarily raises the question of whether one or several states' usury laws applies to individual putative class members' claims.

---

[3] The specific putatively common questions that plaintiffs propose are: "(i) whether Defendants' form MCA Agreements constitute loans or the purchase of future (undefined or segregated) receivables; (ii) whether, if loans, the interest rate exceeds 50%; (iii) whether the form MCA Agreements are void ab initio; (iv) whether Plaintiffs and the Classes may recover any monies paid to the Enterprise; and (v) whether Defendants' conduct was willful or knowing." Pls. Mem. Supp. Certification at 24.

### A. The MCA Agreements' Choice-of-Law Provisions do not eliminate the need for an individualized choice-of-law analysis.

One reason why a single state's laws might apply would be if all the MCA agreements contained a single enforceable choice-of-law provision. And, indeed, the MCA agreements in this case each contain choice-of-law provisions selecting New York law. But, as this Court previously held in denying defendants' motion to strike, to the extent plaintiffs succeed in showing that the MCA agreements would be considered usurious under New York law, then New York law would also consider the MCA agreements totally void – arguably rendering not just their primary commercial terms but also such ancillary provisions as the class-action-waiver or choice-of-law provisions unenforceable. Haymount, 2022 WL 6994507, at *3. If, on the other hand, plaintiffs fail to demonstrate that the MCA agreements would be considered usurious loans under New York law, then there would be no reason not to enforce the class-action-waiver provision against them. Id. at *3, 6-7.

One might think that a decision on choice-of-law should precede any decision on the validity of the MCA agreements, such that, at the point a court decides whether the MCA agreements are void under a particular state's law, the decision as to choice of law should already been made. But where, as here, selection of a state's law in accordance with the contract's choice-of-law provision might invalidate the entire contract including the choice-of-law provision, it is hard to fully separate the choice-of-law question from the underlying legal

7

merits question, as enforcement of the choice-of-law provision might lead to its invalidity. Indeed, the Restatement of Conflict of Laws (which, as described below, New York follows in relevant part, Matter of Allstate Ins. Co. (Stolarz), 613 N.E.2d 936, 939-40 (N.Y. 1993)) avoids this problem by specifying that if parties "choose a law that would declare the contract invalid . . . the chosen law will not be applied by reason of the parties' choice." Restatement (Second) of Conflict of Laws § 187 cmt. e (Am. L. Inst. 1971, updated October 2022). In such circumstances, enforcing the choice-of-law provision "would defeat the expectations of the parties which it is the purpose of the present rule to protect" and therefore "[i]f the parties have chosen a law that would invalidate the contract, it can be assumed that they did so by mistake." Id.[4]

Indeed, during oral argument, plaintiffs' counsel explicitly disclaimed any argument that New York law applied by virtue of the MCA agreements' choice-of-law provisions, instead arguing that New York law applied under standard choice-of-law principles. But while this concession allows plaintiffs to argue that the MCA agreements (including their class-action-waiver provisions) are unenforceable under New York law, it creates a new and in fact insurmountable barrier to certifying the desired class: the apparent impossibility of

---

[4] Of course, the chosen forum's law might still apply -- and result in the contract's invalidation -- but this would follow from a standard choice-of-law analysis, and not from the contract's choice-of-law provision affirmatively selecting the law of a forum that would invalidate the contract. Id.

8

conducting a collective choice-of-law analysis as to all class members that would result in the application of a single state's usury laws.

### B. Individualized Choice-of-Law Analyses Preclude Class Certification.

To even determine which state's law applies to a particular MCA agreement, the Court would need to apply New York's center-of-gravity test to determine which state's interests are the most implicated by it. See United States v. Moseley, 980 F.3d 9, 23 (2d Cir. 2020) (applying New York's "center of gravity" test to determine which state's usury laws applied to a RICO prosecution brought based on the collection on unlawful debt in New York). Cf. Rogers v. Grimaldi, 875 F.2d. 994, 1002 (2d Cir. 1989) ("A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state."). New York's center-of-gravity test follows the Restatement of Conflict of Laws in looking to "five generally significant contacts in a contract case: the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." Allstate, 613 N.E.2d at 940; see also Restatement (Second) of Conflict of Laws § 188(2) (identifying the same factors).

Certain of these factors might support the application of New York law to all putative class members across the board. For instance, the putative lenders here are New York-based, and, while most of the "contracting" and "negotiation and performance" of the contracts likely occurred via interstate emails, texts, or phone calls, there

9

might be strong arguments that these contacts were in some sense directed toward New York. However, the Second Circuit in Moseley -- in which the borrowers were New York based, even while the lender was based in Missouri -- put particular emphasis on the "New York domiciles of many borrowers and the subject matter of the contract: loans and payments that affected the borrowers individually in New York in a direct way." Moseley, 980 F.3d at 23. This emphasis on the borrower's location makes particular sense, since borrowers may not even know from which state a lender is acting. Id. at 23-24. Further, since the point of the state anti-usury laws incorporated under RICO statute is to protect borrowers in the states that enacted such laws, the public policy interests of the state where the borrowers are located weighs especially strongly in favor of application of that state's usury laws. Id.; see also Kaneff v. Delaware Title Loans, Inc., 587 F.3d 616, 621–24 (3d Cir. 2009) (determining that Pennsylvania law applied to the question of whether a car loan made to a Pennsylvania consumer was usurious, notwithstanding a Delaware choice-of-law provision and the lender's location elsewhere, because of Pennsylvania's strong interest in protecting Pennsylvania consumers); In Turner v. Aldens, Inc., 433 A.2d 439, 443-45 (N.J. App. Div. 1981) (reasoning that New Jersey's anti-usury laws applied to loans made to New Jersey consumers notwithstanding the location of the lender). Indeed, if plaintiffs were right that the Court could categorically determine that New York applied to a nationwide class by virtue of the putative lenders' New York location, it is hard to see how New York borrowers would not

10

immediately lose the protection of New York's usury laws when they seek loans from out-of-state lenders.

In any event, while a center-of-gravity test might result in the application of New York law to some out-of-state putative borrowers -- perhaps including Haymount itself (as to which defendants at least arguably consented to the application of New York law), and perhaps those shown to be aware of defendants' New York location and/or those whose solicitation of funding could otherwise be said to have been somehow targeted toward New York -- plaintiffs offer no explanation for how this Court could categorically determine that New York law applies to all putative class members no matter where they are located, let alone how the Court could do so without conducting an individualized analysis.

This result should not surprise anyone, least of all plaintiffs, since, notwithstanding their repeated insistence that RICO actions based on state usury laws or similar actions are "well suited" for class treatment, Pls. Mem. at 19, each case actually cited by plaintiffs involves classes of borrowers based in one state. See Gibbs v. Stinson, No. 18-cv-676, 2021 WL 4812451, at *2, 21 (E.D. Va. Oct. 14, 2021) (certifying a class of Virginia borrowers in a RICO case based on the collection of loans alleged to be usurious under Virginia law); Williams v. Big Picture Loans, LLC, 339 F.R.D. 46, 53, 61-64 (E.D. Va. 2021) (same); Roper v. Consurve, Inc., 578 F.2d 1106, 1112 (5th Cir. 1978) (reversing district court's denial of class certification to a class of Mississippi borrowers based on usury claims

under Mississippi law); Bistro Exec., Inc. v. Reward Network, Inc., No. CV 04-4640 CBM, 2006 WL 6849825 (C.D. Cal. Jul. 19, 2006) (referring to an earlier decision in the same case to certify a class of California restaurants raising usury and other claims under California law). Similarly, while the criminal prosecution at issue in the Second Circuit's Moseley decision -- which set forth the standard for determining choice-of-law in RICO actions predicated on collection of debts rendered unlawful by state usury law -- involved illegal activities with respect to borrowers in multiple states, the alleged RICO violations were based solely on collection from New York borrowers. Moseley, 980 F.3d at 14.

This is not to say that the apparent need for an individualized choice-of-law analysis in this case precludes a showing of commonality in all RICO class actions. For one thing, many RICO claims do not turn on underlying state law that may vary class member to class member. As explained in this Court's Opinion and Order largely denying defendants' motion to dismiss, plaintiffs adequately alleged two RICO theories, and one of them -- a pattern of wire fraud consisting in defendant GoFund Advance's alleged unauthorized withdrawals from Haymount's bank account and misleading efforts to evade blocks to its use of those accounts -- did not turn on state law at all. Haymount, 2022 WL 2297768, at *9. In their class certification papers, however, plaintiffs have not contended (let alone demonstrated) that GoFund Advance or any other defendant systematically made unauthorized withdrawals from other putative class members' accounts. Alternatively

-- even with respect to a RICO theory based on the collection of debt rendered unlawful under state usury law -- choice-of-law analyses would not preclude commonality as to a putative class of borrowers from a <u>single</u> state. As discussed above, plaintiffs have cited multiple such cases. See <u>Gibbs</u>, 2021 WL 4812451, at *2, 21; <u>Williams</u>, 339 F.R.D. at 53, 61-64. In this action, however, North Carolina-based Haymount and Dr. Clinton obviously could not represent a class of borrowers based solely in New York. Nor have they made any showing that a class of North Carolina-based borrowers would be sufficiently numerous, or that there would be common legal or factual questions that would allow the common adjudication of such a class's claims.[5]

---

[5] Moreover, it is far from obvious that the question of whether the specific MCA agreements at issue in this case constitute usurious loans under New York or some other state's laws necessarily can be resolved on a class-wide basis even if only one state's law applied. Defendants make strong arguments that the agreements themselves, in light of their provisions for both prospective and retrospective reconciliation of the initially estimated remittance amounts to a business's actual revenues as they come in, do not on their face constitute unlawful loans, rather than bona fide purchases of future revenues. As such, the analysis as to whether such agreements constitute usurious loans under a particular state's laws would likely turn on a number of facts about how they operate in practice. <u>Haymount</u>, 2022 WL 2297768, at *6 (noting that "the outcomes" in New York cases in which similar agreements are alleged to be usurious loans "are strongly fact-bound and vary considerably.") So, even with respect to borrowers in a single state, a plaintiff arguing that the question of whether MCA agreements are usurious loans can be resolved on a class-wide basis would need to show that the issue either can be resolved by looking solely at the agreements themselves -- which is not at all clear here -- or that facts about how such agreements operate in practice can be shown on a class-wide basis (such as through evidence showing that the putative lenders routinely deny reconciliation requests as a matter of policy, notwithstanding reconciliation provisions in the agreements). Given the Court's determination that individualized choice-of-law questions preclude any showing of commonality in this

Of course, if underlying state usury laws substantially overlapped, the apparent impossibility of a class-wide choice-of-law determination might not matter. But state usury laws vary in important ways that might make identical MCA agreements unlawful loans under one state's laws and either not loans or not unlawful loans under another's. For instance, in North Carolina -- the state in which lead plaintiff Haymount is based -- the usury statute apparently does not apply to loans greater than $25,000. N.C. Gen. Stat. Ann. § 24-1.1(a). And other states do not apply their usury laws to corporate borrowers or else contain explicit safe harbors for receivables purchases such as the MCA agreements. See, e.g., Tex. Bus. & Comm. Code § 9.109(e); Express Working Cap., LLC v. Starving Students, Inc., 28 F. Supp. 3d 660, 670 (N.D. Tex. 2014).

As such, whether the MCA Agreement obtained by any specific putative class member in fact constitutes a "debt . . . incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State" law depends critically on which state's law applies. 18 U.S.C. § 1961(6). And, as discussed above, there is no way to answer this antecedent question in a common way across all putative class members. Cf. In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1018 (7th Cir. 2002) (Easterbrook, J.) ("Because

---

case, the Court need not resolve these other questions relating to commonality under Rule 23(a) or the predominance of common questions under Rule 23(b)(3), or the other grounds defendants raise as to why no class should be certified here.

14

these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); In re Digital Music Antitrust Litig., 321 F.R.D. 64, 99 (S.D.N.Y. 2017) ("Where proposed classes would implicate the laws of multiple states, the party seeking class certification must creditably demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles.").

As such, the single putatively common question raised by plaintiffs (albeit in multiple components or variations) -- whether the MCA agreements offered by defendants are unlawful debts under state usury laws -- necessarily turns on individualized choice-of-law analyses that will vary substantially state to state and putative class member to putative class member. Nor is there any way to narrow the proposed class to address this problem, since the lead plaintiffs are North Carolina-based and plaintiffs have made no showing that they can meet Rule 23's requirements with respect to a North Carolina-based class of borrowers or can adequately represent and are typical of a class of New York-based borrowers. For these reasons, plaintiffs have failed to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

### III. Conclusion

For the reasons stated above, the Court denies plaintiffs' motion to certify a class (Dkt. 136). The Clerk is directed to close the motion on the docket. As stated in the Court's 12/29/22 bottom-line order and pursuant to the parties' Case Management Plan, any summary

judgment motions will be due on 2/13/23, with opposing papers due 2/27/23, and reply papers due 3/6/23. A final pre-trial conference and argument on summary judgment motions will be held on 3/15/23 at 4:00 PM.

    SO ORDERED.

New York, NY
January 13, 2023

                                            JED S. RAKOFF, U.S.D.J.