**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAYMOUNT URGENT CARE PC and ROBERT A. CLINTON, JR., *individually and on behalf of all those similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISAAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, AND YISROEL C. GETTER,<br><br>Defendants. | Case No. 1:22-cv-01245-JSR |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

**WHITE AND WILLIAMS LLP**
Shane R. Heskin
Alex D. Corey
7 Times Square
New York, New York  10036
Tel:  (212) 244-9500
heskins@whiteandwilliams.com
coreya@whiteandwilliams.com

**WEITZ & LUXENBERG, P.C.**
James J. Bilsborrow
700 Broadway
New York, New York 10003
Tel: (212) 558-5500
jbilsborrow@weitzlux.com

**ALMEIDA LAW GROUP LLC**
David S. Almeida
849 W. Webster Avenue
Chicago, Illinois 60614
(312) 576-3024
david@almeidalawgroup.com

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ...........................................................................................1

BRIEF SUMMARY OF FACTS .......................................................................................4

I.       THE HAYMOUNT TRANSACTIONS ................................................................4

II.      THE RICO ENTERPRISE ...................................................................................5

III.     THE ENTERPRISE'S USE OF WIRE AND MAIL FRAUD ...............................6

     A.       The Enterprise Systematically Steals Small Amounts of Money From Merchants Using A Company Named "Monthly Fee." ..............................................6

     B.       The Enterprise Routinely Over-Debits Merchants Beyond The Purchased Amount and Filed a Knowingly False Affidavit Before This Court..............................8

     C.       The Enterprise Abuses ACH Processing Power By Intentionally Double-Debiting And Over-Debiting. ...........................................................................10

     D.       The Enterprise Fraudulently Induces Merchants Into MCAs Only To Underfund Immediately. ..................................................................................11

     E.       The Enterprise Extorts Merchants And Violates Due Process Through Fraudulent UCC Liens And Abuse Of The CT Prejudgment Statute .....................................12

     F.       The Enterprise Unlawfully Invokes The CT Prejudgment Statute By Incorporating In Connecticut Using Sham Offices.............................................................13

     G.       The Enterprise Freezes Merchants' Banks And Delays Providing Service Of The Writ Of Attachment For Weeks To Months While It Uses The Resulting Duress To Coerce The Merchant Into Unconscionable Settlements .................................15

     H.       The Writs Of Attachment Are Riddled With Fraud And The Enterprise Freezes Bank Accounts Of Merchants Who Never Defaulted...........................................18

LEGAL ARGUMENT...................................................................................................19

I.       PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST DEFENDANTS ON THE RACKETEERING RICO CLAIM.........................................19

     A.       The Individual Defendants Are Culpable Persons Under RICO. ..........................19

     B.       The Individual Defendants And Companies Constitute A RICO Enterprise. .......20

          i.       The Enterprise's common purpose was to fraudulently obtain money......20

          ii.      The Enterprise Members all have relationships among each other. ..........20

          iii.     Plaintiffs have established longevity. .......................................................21

     C.       Defendants Are Liable For Participating In A RICO Enterprise...........................22

II.      PLAINTIFFS HAVE ESTABLISHED A PATTERN OF RACKETEERING................23

      A.      The Enterprise Has And Will Continue To Engage In Mail Fraud. ....................23

      B.      The Enterprise Has And Will Continue To Commit Wire Fraud. .........................26

      C.      The Enterprise Has And Will Continue To Extort Merchants................................28

III.    HAYMOUNT HAS BEEN DAMAGED BY WIRE AND MAIL FRAUD ....................28

IV.    DEFENDANTS VIOLATE MERCHANTS' DUE PROCESS THROUGH ABUSE OF THE CT PREJUDGMENT STATUTE ...........................................................................31

V.    A PERMANENT INJUNCTION BARRING DEFENDANTS' USE OF ACH PROCESSING AND THE CT PREJUDGMENT STATUTE IS WARRANTED...........35

CONCLUSION..........................................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Avon Co. v. Fareva Morton Grove, Inc.*,
 22 Civ. 4724 (AKH), 2022 U.S. Dist. LEXIS 109904 (S.D.N.Y. June 21,
 2022) ................................................................................................................38

*Bankers Trust Co. v. Rhoades*,
 859 F.2d 1096 (2d Cir. 1988)............................................................................30

*Bd. of Regents v. Roth*,
 408 U.S. 564 (1972)...........................................................................................33

*Boddie v. Connecticut*,
 401 U.S. 371 (1971)...........................................................................................34

*Boyle v. U.S.*,
 556 U.S. 938 (2009)...........................................................................................21

*Cedric Kushner Promotions, Ltd. v. King*,
 533 U.S. 158 (2001)...........................................................................................21

*Center Cadillac v. Bank Lumi Trust Co.*,
 808 F. Supp. 213 (S.D.N.Y. 1992) ....................................................................28

*CFTC v. McDonnell*,
 332 F. Supp. 3d 641 (E.D.N.Y. 2018) ...............................................................37

*Ciambriello v. County of Nassau*,
 292 F.3d 307 (2d Cir. 2002)..............................................................................31

*Citibank v. Cotton*,
 CV92 0124559, 1992 Conn. Super. LEXIS 3210................................................36

*Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda*,
 07-CV-2410 (CS), 2010 U.S. Dist. LEXIS 164434 (S.D.N.Y. Sept. 3, 2010) ........33

*Connecticut v. Doehr*,
 501 U.S. 1 (1991)..............................................................................32, 33, 34, 35

*Crawford v. Franklin Credit Mgmt.*,
 758 F.3d 473 (2d Cir. 2014)..............................................................................24

*D.H. Overmyer Co., Inc. v. Frick Co.*
 405 U.S. 174 (1972)...........................................................................................34

*eBay Inc. v. MercEnchange, L.L.C.*,
  547 U.S. 388 (2006).................................................................................................35

*First Capital Asset Mgmt. v. Brickellbush, Inc.*,
  218 F.Supp. 2d 369 (S.D.N.Y. 2002)......................................................................31

*GMAT Legal Title Trust 2014-1 v. Catale*, 213 Conn. App. 674, 688-89 (Conn.
  App. Ct. 2022)...................................................................................................33, 34

*Gov't Emples. Ins. Co. v. Azu Ajudua*,
  15-CV-5199 (MKB), 2018 U.S. Dist. LEXIS 213930 (E.D.N.Y. Dec. 18,
  2018) ........................................................................................................................31

*Green v. Bauvi*,
  46 F.3d 189 (2d Cir. 1995)......................................................................................31

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989).................................................................................................23

*Haymount Urgent Care PC v. GoFund Advance, LLC*,
  2022 WL 2297768 (S.D.N.Y. June 27, 2022) ........................................................23

*Jordan v. Fox, Rothschild, O'Brien & Frankel*,
  20 F.3d 1250 (3d Cir. 1994).....................................................................................32

*McCahey v. L.P. Investors*,
  774 F.2d 543 (2d Cir. 1985).....................................................................................32

*Metromedia v. Fugazy*,
  983 F.2d 350 (2d Cir. 1992).....................................................................................24

*Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf
  LLP*,
  198 F. Supp. 3d 311 (S.D.N.Y. 2016)......................................................................35

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996)...................................................................................37

*SEC v. Manor Nursing Centers, Icn.*,
  458 F.2d 1082 (2d Cir. 1972)...................................................................................37

*Sedima, S.P.R.L. v. Imrex*,
  473 U.S. 479 (1985).................................................................................................21

*Semmes Motor, Inc. v. Ford Motor Co.*,
  429 F.2d 1197 (2d Cir. 1970)...................................................................................36

*Soundview Assocs. v. Town of Riverhead,*
   725 F. Supp. 2d 320 (E.D.N.Y. 2010) ...............................................................31

*Stochastic Decisions, Inc. v. DiDomenico,*
   995 F.2d 1158 (2d Cir. 1993)............................................................................30

*trueEx, LLC v. MarkitSERV Ltd.,*
   266 F. Supp. 3d 705 (S.D.N.Y. 2017)................................................................35

*U.S. v. Turkette,*
   452 U.S. 576 (1981) ..........................................................................................21

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.,*
   822 F.3d 650 (2d Cir. 2016)..............................................................................24

*United States v. Gatto,*
   986 F.3d 104 (2d Cir. 2021)..............................................................................26

*United States v. Travalino,*
   20-CV-00046-DC-DF, 2022 U.S. Dist. LEXIS 117474 (W.D. Tx. July 5,
   2022) .................................................................................................................38

*United States v. Young,*
   232 U.S. 155 (1914)..........................................................................................24

*Untied States v. Kahen,*
   CV 20-00474, 2020 U.S. Dist. LEXIS 61467 (E.D.N.Y. Jan. 28, 2020) ...............36

**STATUTES**

18 U.S.C. 1964(c) ....................................................................................................29

18 U.S.C.
   § 1341.................................................................................................................24
   § 1343.................................................................................................................24
   § 1961.................................................................................................................28
   § 1961(1)......................................................................................................24, 26
   § 1961(3).............................................................................................................21
   § 1961(4).............................................................................................................21
   § 1961(5).............................................................................................................24
   § 1962(c).............................................................................................................21
   § 1964(c).......................................................................................................30, 31

42 U.S.C. § 1983..............................................................................................1, 31, 35, 39

Conn. Gen. Stat.
  § 51-345(a)(1) ................................................................................................................33
  § 52-278c ......................................................................................................................19

Hobbs Act (18 U.S.C. § 1951) .............................................................................................28

Plaintiffs Haymount Urgent Care PC ("Haymount") and Robert A. Clinton, Jr. ("Dr. Clinton") submit this Memorandum in support of their Motion for Partial Summary Judgment on their First, Second and Sixth Causes of Action under 18 U.S.C. § 1962 and 42 U.S.C. § 1983 against Defendants Yitzchok ("Isaac") Wolf ("Wolf"), Josef Brezel ("Brezel"), Joseph Kroen ("Kroen") and Yisroel Getter ("Getter,") (the "Individual Defendants"), and Defendants GoFund Advance, LLC ("GoFund"), Funding 123, LLC ("Funding 123"), Merchant Capital LLC ("Merchant") and Alpha Recovery Partners, LLC ("Alpha") (the "Company Defendants").

## PRELIMINARY STATEMENT

Defendants operate a criminal RICO Enterprise out of Brooklyn, New York. Defendants lend money at criminally usurious intent rates to unsuspecting small businesses and their individual owners who are often struggling to survive. In order to obscure the criminal nature of the Enterprise, Defendants purport, on paper at least, to operate as legitimate factoring entities using standardized merchant cash advance agreements ("MCAs"). While the primary goal of the Enterprise is to extract criminally usurious interest, not to mention brutally unconscionable fees, the unlawful means used to achieve those illicit objectives are mail and wire fraud, as well as financial and physical extortion in violation of the Hobbs Act.

Among these predicate acts, the Enterprise intentionally over-collects, double-debits and manipulates ACH withdrawals to defraud. And, if a particular merchant grows wise to the fraud, the Enterprise simply deploys even more fraudulent devices to force their victims into submission by, among other things, sending out more than 500 UCC lien notices per year, which contain—by Defendants' own admission—pre-signed signatures of an attorney who has not reviewed the letters before her signature is affixed and sent by U.S. Mail. The Enterprise even goes so far as doctoring their processing name to evade a merchant's block on further debiting and to sabotage any further

financing. In short, the Enterprise's fraudulent devices ensure absolute repayment on their purported MCAs and routinely employs extortionate means through wire and mail fraud to ensure that they get paid—at all costs. Thus, regardless of whether the MCA is ultimately found to be a loan or not (which it is), the method and manner, in which the Enterprise collects upon their MCAs constitutes a pattern of racketeering activity through mail and wire fraud, as well as financial extortion under the Hobbs Act, subjecting them to RICO liability on that basis alone.

Among these fraudulent schemes and devices, the Enterprise created a separate company called "Monthly Fee," whose sole purpose is to make monthly withdrawals of $499 (or less) from countless merchants' bank accounts without notice or authorization. The Enterprise enlisted Monthly Fee to make withdrawals from Haymount both before and *after this Court enjoined* them from further ACH withdrawals in March 2022. Incredibly, since at least February 2021, the Enterprise has stolen more than $3,700,000 from small businesses through ACH debits intentionally designed to go unnoticed by couching those ACH debits as a "Monthly Fee."[1]

The Enterprise's use of wire and mail fraud is not limited to unlawful debiting of merchant's bank accounts, as the Enterprise has structured itself such that mail and wire fraud are a feature, not a bug of the organization. The deception begins with the fraudulent incorporation of GoFund, Funding 123 and Merchant in Connecticut so the Enterprise may unlawfully invoke and abuse Connecticut's Prejudgment Attachment Statute. The Enterprise registered each of these companies in 2021, despite every Defendant admitting at deposition that the Connecticut offices are shams created for the explicit purpose of gaining "leverage" over their victims. Through abuse

---

[1]     In reality, "Monthly Fee" is a company created by the Enterprise, which coincidentally was set up just one month after John Braun was released from federal prison. Defendants now admit, despite lying to Bloomberg News in February 2002, that Braun is, in fact, the mastermind behind the Enterprise's unlawful schemes.

of the Prejudgment Statute, the Enterprise has developed a system, whereby it freezes a merchant's bank accounts through hand delivery of writs of attachment to the Connecticut-branch of the out-of-state merchant's bank account and then uses the following days and weeks, while the merchant's operating accounts are frozen, to extract unlawful settlements, fleecing additional sums from merchants and attempting to immunize themselves from the very crimes committed to extract those settlements under duress.

Because these entities do not have genuine offices in Connecticut, they are prohibited from initiating lawsuits in Connecticut and invoking its Prejudgment Statute. Yet, over the past two years, the Enterprise has served many hundreds of writs of attachment on banks across the country, falsely representing that these entities are located in Connecticut, and falsely making the writs returnable to a Connecticut state court. This fraudulent practice has persisted for so long because 85-90% of all writs are never filed in court. Instead, the victims must capitulate to Defendants' demands under fear of financial ruin. And if the merchant has the audacity to hire an attorney, internal texts show that Defendants deploy their litigation war chest to "get out all guns, "wipe it out" and shoot: "To kill." Internal texts also show the Enterprise employs Mafia-style tactics by sending out thugs to collect, causing borrowers to run, while only showing concern about one collector, not because he crossed the line a "few times," but because he did so without "covering up his tracks." Extortion simply goes hand-in-hand with the Enterprise's loansharking.[2]

---

[2]    To make matters worse, the writs themselves contain numerous other falsehoods, ranging from **_admittedly forged affidavits of debt_** to doctored MCAs whereby Defendants insert a Prejudgment Statute waiver in an MCA where none previously existed. Even those authentically signed are fraudulent because the affiant (often Getter) testified that he has no personal knowledge of the MCA or the purported default described in the affidavits he signs for the Enterprise; he merely signs whatever Wolf, Kroen or Brezel tell him—including an **_admittedly false affidavit to this Court._** The problem with affiants lacking knowledge of the facts contained in these affidavits

-3-

In sum, the Enterprise is a scheme rife with fraud running up and down its operations. And, sadly, there have been virtually no consequences for this no-holds-bar criminality, which has made the Enterprise wealthy beyond measure at the expense of our nation's small businesses. For good measure, the Enterprise retains its illicit funds by admittedly failing to file taxes and hiding funds paid to the Enterprise members by wiring company funds to pay for personal items, such as cars, jewelry, helicopters and gambling. By this motion, the Court has an opportunity to hold the Enterprise accountable for these illicit acts by enjoining use of their two favorite tools: ACH processing and the CT Prejudgment Attachment Statute. The Enterprise has shown no regard for the law by flagrantly disobeying court orders, and outright stealing money from victims just days before the filing of summary judgment motions.  It needs to be stopped—now.

<u>**BRIEF SUMMARY OF FACTS**</u>

The foregoing illegal and reprehensible acts by the Enterprise are not hyperbole; rather, their insidious actions are evidenced by verifiable, indisputable facts:

## I.     THE HAYMOUNT TRANSACTIONS

Haymount is a VA-approved urgent care practice located in Fayetteville, North Carolina and is operated by Dr. Clinton. *See* SMF ¶ 133. Due to the COVID-19 pandemic, Haymount experienced a cash-flow crisis as it had to take expensive precautionary measures to protect patients and employees, such as protective gear and extensive testing. *Id.* ¶ 134. Unable to secure traditional financing, Haymount accepted Defendants' solicitations and, in August 2021, entered into a series of six transactions with the Enterprise. Robert Clinton Declaration ("Clinton Decl.") Exs. 1-6 (the "Haymount MCA Agreements").

---

of debt is not just limited to Getter, as Wolf, Kroen, Brezel and every other Enterprise witness admitted that they either never read the form MCAs or do not know how their terms work.

| MCA | Date | Advance | Daily | Payback | Term | % Rate |
|-----|------|---------|-------|---------|------|--------|
| Merchant | 8/25/2021 | $2,000,000 | $7,299 | $2,750,000 | 377 Days | 263% |
| GoFund | 8/26/2021 | $250,000 | $8,000 | $349,750 | 44 Days | 242% |
| GoFund | 9/27/2021 | $150,000 | $7,500 | $224,850 | 39 Days | 650% |
| GoFund | 12/16/2021 | $1,000,000 | $35,000 | $1,350,000 | 39 Days | 319% |
| Funding 123 | 12/27/2021 | $2,000,000 | $80,000 | $2,700,000 | 34 Days | 405% |
| GoFund | 1/20/2022 | $1,000,000 | $60,000 | $1,499,990 | 25 Days | 612% |

## II.    THE RICO ENTERPRISE

Defendants constitute a RICO Enterprise that is associated-in-fact through a closely held relationship with each member playing a defined role. The Individual Defendants are all friends and family of John Braun, whose schemes were exposed by Bloomberg News on February 10, 2022. SMF ¶¶ 6-8. GoFund, Funding 123 and Merchant are MCA companies whose sole purpose is to document, fund, and collect on the MCAs. Each is a subsidiary of Hartford Receivables, LLC, an entity owned on paper by Getter but controlled by Wolf (GoFund and Funding 123) and Brezel (Merchant). SMF ¶¶ 20-21, 47-48. Brezel also controls GSS Equity, LLC, through which he funds MCAs under various names, including GoFund, Funding 123, Merchant and Eleven Capital. Like Wolf, Brezel hides his ownership to evade personal liability. *Id.* ¶ 31-38 ("**I'm very cautious. I made a lot of changes internally to prevent problems. Like entity not being on my name…. the articles gave everyone a good warning.**"). Kroen owns Matrix Advance, LLC and Fundura Capital, LLC but funds MCAs through Hartford. *Id*. ¶ 39. On February 2021, just one month after Braun was released from prison, Brezel opened a series of bank accounts through Tailored Fund Cap, LLC. *Id.* ¶ 147. Brezel admitted the purpose of these accounts was to "FUND LOAN DEALS." One of these bank accounts was opened under the name "Monthly Fee." *Id*.

Alpha Recovery is purportedly a d/b/a of GSS, but bank records say it is also a d/b/a of Tailored Fund. *Id.* ¶ 91. Alpha is a collection arm of the Enterprise and sends UCC lien notices— including to Plaintiffs—at the direction of the Individual Defendants. *Id*. ¶¶ 91-98. Alpha uses pre-

signed form letters of an attorney who does not review them before they go out under her name. *Id*. ¶ 94. Rather, the Enterprise pays $2,500 per month for the use of her signature. *Id*.

Defendants operate out of Brooklyn and share office space, accounting systems, ACH processors, office staff, one bookkeeper, bank accounts, attorneys, investors and collection arms. *Id*. ¶ 100-06. The Individual Defendants all take advice from Braun. *Id*. ¶¶ 16-18. Braun taught Wolf and Brezel about the MCA industry since 2018, while he was operating his own loansharking enterprise, and they continued his legacy during his year in prison. *Id.* ¶ 7. Defendants, and Braun, use the same attorney for collecting upon their debts—Jared Alfin. *Id*. ¶ 70. (admitting that Braun is an agent of Defendants and that they all work together in asserting attorney-client privilege).

## III.   THE ENTERPRISE'S USE OF WIRE AND MAIL FRAUD

### A.   The Enterprise Systematically Steals Small Amounts of Money From Merchants Using A Company Named "Monthly Fee."

Each MCA requires the borrowing merchants to provide Defendants their bank account log-in information, under the pretext that this allows the Enterprise to perform underwriting. *Id*. ¶ 146. On or about February 19, 2021—one month after Braun's release from prison—Brezel created a bank account with Optimum Bank titled "TAILORED FUND CAP LLC DBA MONTHLY FEE" ("Monthly Fee"). *Id*. ¶ 147. According to the account documents, the purpose of wires for this account were to "FUND LOAN DEALS." *Id*. From March 2021 through August 2022, Monthly Fee received countless deposits, typically in the amount of $499 but also in far smaller, seemingly arbitrary amounts, of less than $10. *Id*. ¶ 148. These relatively small withdrawals accumulated more than $3,745,019 in total deposits. *Id.* ¶ 149. Those ill-gotten funds were immediately deployed back into the Enterprise. *Id*. ¶ 152.

After Defendants received the contents of these bank records, Defendants represented to this Court that they were cumulative and disproportionate to the needs of this case. (*see* 11/15/22 Order"). Specifically, Defendants represented that the internal business records already produced reflected all payments received by Defendants. But, as it turns out, not one of these "Monthly Fee" payments is reflected on any document produced by Defendants in this action. SMF ¶ 155.

The representations made to the Court were knowingly false. *Id*. ¶¶ 153-54. In addition to payments not reflected in any other document produced, the bank records identify numerous victims of the Monthly Fee fraud, including Haymount. Despite never doing business with Haymount, Monthly Fee withdrew $499 from at least September 2021 to September 2022, for a total of $6,487 in fraudulent ACH withdrawals. *Id*. ¶ 155. Since at least March 2021, Monthly Fee also regularly debited monthly withdrawals of $499 from numerous other merchants. *Id*. ¶ 159. This scam also violated this Court's March 21, 2022 Order, which prohibited GoFund from making further ACH withdrawals from Haymount's bank account. [DE 66]. Notwithstanding this Order, Plaintiffs' investigation to date has identified unauthorized withdrawals of $499 from Haymount's Bank of America business account from April 1, 2022 through September 1, 2022 totaling $3,493. SMF ¶ 155. Haymount incurred attorney's fees of $22,312.5 to discover the fraud. *Id*. ¶ 158.

Even after this fraud was brought to this Court's attention on February 6, 2023, Defendants continued to make fraudulent debits. ("2/6/23 Order"). Just three days later, on February 9, 2022, Defendants debited $499 under the name Monthly Fee from a retired police officer in Georgia—a former Chief of Police. *Id*. ¶ 165. The debits began on May 9, 2022, and continued through February 9, 2023, for a total of seven ACH debits in the amount of $3,493. *Id*. To trivialize Defendants' undisputed violation of this Court's injunctive order, they represented to this Court that the debit was a mere oversight. (2/6/23 Order.) Defendants also represented the debits on

Haymount stopped in October 2022, not because they previewed the bank records, but because Optimum Bank closed the accounts due to Haymount's subpoena. *Id.* ¶ 153. ***Even when Defendants confess, they lie to the Court***. The Optimum Bank account was closed on August 17, 2022—by Defendants. *Id.* ¶ 152 ("AUG 17 WITHDRAWAL TO CLOSE ACCOUNT"). That means Defendants opened a new account ***and started a new ACH debit from Haymount—after this Court's Order***. *Id.* ¶ 155 ("9/1/22 MONTHLY FEE…HAYMOUNT URGENT CARE.").

### B.    The Enterprise Routinely Over-Debits Merchants Beyond The Purchased Amount and Filed a Knowingly False Affidavit Before this Court.

When Plaintiffs moved to enjoin Defendants from further unlawful debits and freezing its bank accounts, Haymount contended that Funding 123 and GoFund over-collected. [DE 36-40, 57-65]. In opposition, Getter submitted an affidavit claiming he had personal knowledge of the Funding 123 transaction and attested under penalty of perjury that the parties agreed it would be funded in two parts, an initial advance of $900,000 and a second of $700,000. [DE 64] ¶ 7. Getter told this Court that $1,600,000 represented the $2,000,000 advanced amount minus ***$400,000*** in fees, and thus, Haymount only "overpaid by a mere $1,250." *Id.* ¶ 10. Defendants admit that their sworn representations to this Court were false. At deposition, Getter admitted that he had no knowledge of the Funding 123 transaction and that he merely signed the affidavit at Wolf's behest. SMF ¶ 170. Wolf and Kroen also admitted that the fees were ***$300,000***. *Id.* ¶ 171. Thus, it is undisputed that the Enterprise over-collected by at least $101,250 and ***lied to this Court***.

Lying about fees is commonplace. *Id.* ¶¶ 144, 166 ("Why did u put 22% fees on punjab u said 10%. These back and forth games are killing deal after deal for me.") ("ISOs very unhappy so I gotta deal with that too. They all saying u bait and switch and change the fees from agreement big headache… In the future don't say one thing and do another.…**Ur used to working with**

**criminals all day.  What u gonna do when they go to jail**…") ("I honestly don't think you guys know how sick and insane this is.") ("**These guys are going to jail**.").

This was not an isolated incident. On January 20, 2022, Clinton entered into another MCA with GoFund to secure the financing Funding 123 promised, but reneged on, not knowing that GoFund and Funding 123 were controlled by the very same persons who just defrauded him. Clinton Decl. ¶¶ 42-43. GoFund likewise pulled the same bait-and-switch, promising to fund $1,000,000, and then agreeing to fund only half ($400,000 less $100,000 in fees) after Haymount relied upon the funding and had no choice but to take the lesser amount. *Id*. ¶¶ 44-46. No change was made to the $60,000 daily payment and by February 4, 2022, Haymount had paid GoFund $540,000. Realizing he was paying to borrow is own money, Clinton told GoFund he did want the "second clip." *Id*. ¶¶ 47-48. GoFund funded anyway and made unauthorized withdrawals throughout February 2022. *Id*. ¶¶ 49-57. Even after Haymount's bank issued a stop order, the Enterprise attempted to circumvent it by altering the name on its ACH debit from "GoFund" to "GoFund b." *Id*. ¶ 57. Manipulating ACHs are a common tool of Defendants' schemes to defraud. *Id*. ¶ 123 ("Can I send a ACH credit showing FUNDING and not our name…Im at least going to try so it looks like more funding to hopefully kill other fu."), ¶ 123 ("Find a way somehow to screw over Wynwood/high bar/spin. It will be extra satisfaction for me.").

The Enterprise has similarly victimized countless other merchants through over-collecting, making unauthorized direct transfers, changing the name on the ACH debit to sabotage further funding, and double, triple and quadruple debiting. The Enterprise has even coined the acronym "SDD," which stands for same day debit. *Id*. ¶ 187. The Enterprise routinely debits a merchant's account even after the MCA has been paid in full. *Id*. ¶ 174.

The Enterprise even logs onto merchant bank accounts after they are in litigation. *Id*. ¶ 146 (Haymount) ("No I logged on." "Then he will know you have log in." "WE SHOULD GET STATEMENTS FROM ALL HIS ACCOUNTS FROM DAY ONE…SO SHANE CANT SAY THAT HIS BUSINESS TOOK A HIT"), (Indigo) ("OLD LOGIN STILL WORKS").

### C.   The Enterprise Abuses ACH Processing Power By Intentionally Double-Debiting And Over-Debiting.

The Enterprise ignores the terms of their MCAs and routinely takes as much money as possible through over-debiting the merchant's Designated Account. Double- and over-debiting is so ingrained in the Enterprise that the members proudly announce successful double-debits in internal emails. *Id*. ¶ X ("Double Debit Done"). Even when caught, the Enterprise persists in over-debiting, as was the case when Optimum Bank contacted the Enterprise on January 11, 2022 to explain "in this case it shows that you debit the client multiple times," to which the Enterprise responded "we have a signed agreement with this client, we cannot accept this time." *Id*. ¶ 186; *see also* ¶ 174 (text messages admitting to $75,000 in overcollection and sharing in profits), *Id*. (text from Braun) ("Wolf's asking me for 2k from the debits that cleared… because he told me to do extra debits that day."), *Id*. (debiting a merchant 6 times on same day); *Id*. ("Leave debits on. We should also turn on duplicate daily debit from other account"), *Id*. ("for florida nursing please double debit the next time we debit her account."), *Id*. ("3 SDD FROM OPD-FUNDURA DONE 4749.99 EACH), *Id*. ("2 EXTRA DEBITS DONE FOR A TOTAL OF 3"), *Id*. ("This is fucking ridiculous, debit both accounts on this deal.").

The Enterprise only stops when caught. *Id*. ("you have to shut the 35k Haymount payment, that deal is finished, you can not have a reason for shane to bother you."). And even then, it flouts court orders. *Id*. ¶¶ 146-66. The Enterprise knows double-debiting a merchant's account will sour

the relationship, but it prepares for this consequence by shuffling merchants among their various MCA entities in order to repeat the practice while the merchant remains unaware he or she is actually dealing with the same Enterprise. This happened with Haymount after it was shorted by Funding 123. Clinton Decl. ¶ 43. Haymount is one of many. SMF ¶ 115 ("24mil!!" "Maybe we can do it she has no fucking idea most of the balance is us." "Exactly!!"), ¶¶ 179-87 (shuffling from merchant from Bridge to Fundura after Wolf was caught double debiting and logging on to merchant's bank account and transferring money to the Enterprise), ¶¶ 115-20 (shuffling merchant among Bridge, Fundura, Powerball, and United after ransacking bank accounts with double debits, over debits, and extorting payments through UCCs), ¶ 146 (sharing bank login info and discussing scheme to obtain new loan with Brezel because "this bitch takes anything you give her.").

> ### D. The Enterprise Fraudulently Induces Merchants Into MCAs Only To Underfund Immediately.

While each MCA agreement issued by the Enterprise has a purported Purchase Price that promises the merchant a specific amount of funding, the Enterprise routinely reneges on the promised funding amount as soon as the merchant signs or is about to sign, with the false promise that the additional promised funding will be provided after a certain number of remittances are made.  Haymount went through this ordeal twice. First, was the December 27, 2021, Funding 123 deal, whereby Haymount was promised $2,000,000 in funding. Clinton Decl. Ex. 5. On the day of funding, Haymount was informed via text message that "they'll do 900K today net.  After 10 daily payments we'll release the second clip with positive payment history." Clinton Decl. Ex. 7. Second, was the January 20, 2021 GoFund deal, which provided for $1,000,000 in funding, *Id.*, Ex. 6, only for GoFund to renege and fund $400,000 (half minus fees) with promises of releasing

the "second clip" after several remittances. *Id*. ¶¶ 44-46. According to the Haymount MCAs, any changes to the terms were required to be made in writing signed by the funder. *Id*., Ex. 1-6 § 4.1.

Not so coincidentally, Braun—"consultant" to the Enterprise—was accused of this same conduct by the NYAG. SMF ¶ 9 (Braun and Richmond would "withhold funds from merchants' agreed-upon advances, calling the withheld amounts 'reserves,' and then keeping the money and failing to provide the 'reserved' amounts"). The Enterprise carries on this tactic. *Id*. ¶¶ 117-20 (offering Avantgarde an eight-month term on Fundura paper, then pulling it and offering far worse terms on Powerball paper just three weeks later); ¶ 206 (offering Indigo $40,000 only to fund $14,000, and then waiting until Indigo had paid pack $24,200 before funding the second clip); ¶ 233 (promising Maxon Construction $100,000 in funding but only netting $33,000, and then freezing accounts for more than $150,000, despite never giving the "second clip").

### E.    The Enterprise Extorts Merchants And Violates Due Process Through Fraudulent UCC Liens And Abuse Of The CT Prejudgment Statute

The Enterprise's collection practice is premised on extortion; as Alpha—the UCC collection arm of the Enterprise—said it best: "working on a on a settlement here. We still haven't frozen anything so leverage is pending." *Id*. ¶ 192. The Enterprise abuses the UCC lien in a variety of ways, but no more nefarious than its routine practice of issuing UCC liens against merchants who had never defaulted and were often victims of the Enterprise's overcollection. *See generally* Declaration of Jason Adelman ("Adelman") (describing how the Enterprise over-debited Avantgarde through three separate MCA deals and proceeded to file multiple UCC lien notices once Avantgarde discovered the theft); ¶¶ 179-83 (describing how Wolf's company Bridge doubled debited on two separate MCA deals and then filed a UCC lien against the merchant for blocking subsequent fraudulent wires); ¶¶ 184-85 (describing how Kroen, through Fundura,

-12-

double-debited merchant and then filed a UCC lien when merchant complained). Haymount experienced these same extortion tactics. Just four days *after Haymount filed this lawsuit*, Alpha served a UCC lien notice on United Healthcare Services, Inc. for $488,928.23. *Id*. ¶ 98.

Even worse, the Enterprise knowingly uses UCC lien letters to lock up personal accounts. *Id*. ¶ 96 ("We've been doing it this way for years, that's how we're able to lock up their personal square/PayPal accounts with UCC's").  Not only are the UCC lien notices filed against individuals, but the notices themselves are fraudulent because Alpha affixes its attorneys' signature on them without her reviewing the underlying facts and grounds for default. SMF ¶ 94. Alpha does not independently verify whether the merchant has breached the agreement either. *Id*. ¶ 97. Alpha processes over 500 UCC liens in this fashion every year since the Enterprise formed. *Id*. ¶ 93. As to Haymount alone, Alpha sent out at least a dozen UCC liens. *Id*. ¶ 98. As effective as Alpha has been in extorting settlements from merchants, it pales in comparison to the effectiveness of the Enterprise's abuse of the CT Prejudment Statute.

### F.    The Enterprise Unlawfully Invokes The CT Prejudment Statute By Incorporating In Connecticut Using Sham Offices

In June 2021, GoFund and Merchant were incorporated in Connecticut through Defendants' attorney, Jared Alfin ("Alfin") of Hassett & George P.C. ("H&G"), and in October 2021, the same was done for Funding 123. SMF ¶ 193. The certificates of organization originally identified Kroen as their sole member and listed each as having an office at "304 West Main Street, Suite 2, Avon, Connecticut," and a mailing address of 1757 58th Street, Brooklyn, New York. *Id*. ¶ 61. The Avon address has been described in press reports as "a rental mailbox in a strip mall." *Id*. ¶ 67. The decision to incorporate in Connecticut was for the express purpose of utilizing the CT Prejudment Statute. *Id*. ¶ 71.

On or about January 24, 2022, GoFund, Funding 123 and Merchant all submitted annual reports with the Connecticut Secretary of State which provided a new Connecticut office address of "500 West Putnam Avenue, Suite 400, Greenwich, CT" and changing their purported managing member from Kroen to Hartford Receivables ("Hartford"). Hartford is owned on paper by Getter but apparently controlled by Wolf. *Id*. ¶ 72. According to these annual reports, Getter authorized the change in ownership, which was effectuated by H&G. *Id*. ¶ 73. But Getter testified that he never authorized this filing, has never been to the so-called Connecticut office, has no employees in Connecticut, and has never paid rent at this office. *Id*. ¶ 74.

Getter's lack of familiarity with this purported Connecticut office is consistent among the Enterprise members. Brezel testified that he's never been to "the Connecticut office" and is unaware of anyone who has. *Id*. ¶ 78. Similarly, Wolf has never even been to Connecticut for business. *Id*. ¶ 80. Kroen testified he once visited the general area of the office to meet Alfin, but clarified they met at a coffee shop and not the actual office. *Id*. ¶ 76. He then testified that he stopped by the office, where he had never received mail, to see if there was mail. *Id*. ¶ 77.

Since GoFund, Merchant and Funding 123's purported incorporation in Connecticut, these companies have continued to file complaints against merchants in New York State Court, in which each attests to being a "Limited Liability Company organized and existing under the laws of the State of New York." *Id*. ¶ 81. Alpha has also issued UCC lien notices on behalf of GoFund since its purported incorporation in Connecticut and still lists solely New York addresses GoFund in these documents. *Id*. ¶ 82. Moreover, Alfin testified that he has prepared hundreds of writs of attachments on behalf of Defendants yet, without exception, every single accompanying affidavit of debt executed by an agent on behalf of either GoFund, Funding 123 or Merchant was signed in New York. *Id*. ¶ 88. The process server Defendants rely upon to serve the majority of their writs

of attachment also confirmed that she's never seen an affidavit of debt executed by an agent of GoFund, Funding 123 or Merchant executed in any location but New York. *Id*. ¶ 89.

Bloomberg News ran several stories on Defendants' usurious business practice, their use of a sham Connecticut office and their employment of Alfin to effectuate bank freezes using the CT Prejudgment Statute, one of which even quoted Alfin. *Id*. ¶ 19. Despite being put on notice of this sham, Alfin admitted that he has never been to this office to verify Defendants are indeed doing business in Connecticut. SMF ¶ 86. Notwithstanding this abject lack of diligence, Alfin continues to prepare, execute and serve writs of attachment that falsely represent they all are Connecticut businesses. *Id*. ¶ 87. When pressed for the basis of his belief that they conduct business in Connecticut, Alfin demurred and invoked the attorney-client privilege. *Id*. ¶ 90. The Enterprise has not filed taxes for these companies in Connecticut, although this probative value is humbled by the fact that the Enterprise does not pay taxes in New York either. *Id*. ¶ 79, 125-127.

**G.   The Enterprise Freezes Merchants' Banks And Delays Providing Service Of The Writ Of Attachment For Weeks To Months While It Uses The Resulting Duress To Coerce The Merchant Into Unconscionable Settlements**

From December 2020 to present, Defendants' use of the CT Prejudgment Statute has increased from just three or four times in December 2020 to over 50 a year by 2022. SMF ¶ 194. To serve these writs, Defendants primarily rely on a single process server, Connecticut Marshal Elizabeth Ostrowski ("Ostrowksi"), who Alfin describes as "reliable," despite admittedly rarely ever reviewing her affidavits or returns of service. *Id*. ¶ 197. Ostrowski's "reliable" system for serving writs involves immediate same-day hand service on the merchant's bank; since most merchants are located outside of Connecticut, she is able to freeze out-of-state bank accounts by serving a local branch of the merchant's national bank. *Id*. ¶¶ 198-205. Ostrowski then waits up to 12 days before the return date listed on the writ—which Alfin typically puts out 30 to 60 days from

the date the writ is prepared—to attempt service on the merchant and its owner, which she does by mailing a copy of the writ to the Connecticut Secretary of State for service on both an out-of-state entity and out-of-state individual. *Id*. ¶ 205.  Neither Alfin nor Ostrowski have bothered to research whether this standard practice they have developed is even lawful. *Id*. ¶ 201.

Nor does it trouble Alfin or Ostrowski that over twenty percent (20%) of the writs are returned ***unserved***. *Id*. ¶ 207. Alfin, for his part, admittedly does not review these returns and when pressed to answer who is responsible for any resulting due process violations—him or Ostrowski— he testified "I don't know. I haven't researched that issue." *Id*. ¶ 201. Alfin did confirm, however, that as to the 80% of merchants that do receive a copy of the writ of attachment—invariably days or weeks after their bank account had already been frozen due to the delay in service by mail versus hand service on the bank—there is nothing in the writs that would inform the merchant as to the docket number, for instance—if a merchant wanted to remove it to federal court. *Id*. ¶ 202. And that is because, as Alfin confirmed via testimony, that Defendants have not filed anything with the court and do not do so until six days before the return date. *Id*. ¶ 203. Defendants, however, rarely ever file anything with a court because 85-90% settle long before the return date selected by Alfin. *Id*. ¶ 209. These "settlement talks" are handled by Alfin or Defendants directly with unrepresented merchants, all while their accounts and business operations are paralyzed. *Id*. ¶ 210.

As a result of this scheme, a typical merchant will have their bank account frozen without warning and without receiving notice until days or weeks later—if at all—until Alfin or Defendants offer to unfreeze their accounts in exchange for an unconscionable settlement payment (often larger than the purported unpaid balance) and a mutual release of the merchant's claims against Defendants. Indeed, this is exactly what happened to Indigo Installations, Inc. ("Indigo"). On or about February 24, 2022, Defendants froze Indigo's bank account by serving a writ of

attachment on PNC Bank's branch in Connecticut. *Id*. ¶ 212. Indigo and Turrentine were never served a copy of this writ, as Ostrowski testified that she received a notice of non-service on May 3, 2022. *Id*. ¶ 213. When Turrentine contacted Alfin about the freeze, he was told that the account would be unfrozen in exchange for Indigo releasing the bank account's balance to Defendants. *Id*.

Turrentine was more fortunate than most in that he was able to retain counsel to represent him. *Id*. ¶ 214. Unfortunately, even retaining counsel did not prevent Defendants from continuing to abuse his rights. Alfin steadfastly refused to provide his counsel with the legal documents and excluded counsel from settlement discussions. *Id*. Like the other 85-90% of victims, Turrentine ultimately succumbed to Defendants' demands. *Id*. ¶ 216. In extorting this and many other settlements, Defendants falsely represented that they "filed a lawsuit." *Id*. ¶ 217. At least one other attorney whose client's bank accounts were frozen reported similar conduct, whereby Alfin refused to provide a copy of the writ used to freeze his client's account. *Id*. ¶ 211.

Indigo's story is just one of many: *Id* ¶ 220 (Office Pride, a minority owned small business, was promised $100,000, was advanced $30,000, had his bank account frozen after missing a payment, and was forced to refinance into a worse deal that he was later forced to payoff early due to UCC lien), ¶ 233 (Maxon Construction was advanced $33,000, and had its bank accounts frozen, never received a copy of writ, and had a default judgment entered against him for $139,633 despite two affidavits of service admitting he never received service).

Even worse, the Enterprise freezes bank accounts through ***admittedly forged affidavits*** of debt, which are sent via U.S. Mail. *Id*. ¶ 56 (admitting that MAG Insurance contained forged Debt Affidavit), ¶ 235 (Rockwood was promised $200,000 with a $299,800 payback, received $95,000 through a so-called "flex deal," and when he canceled the second portion because he did not want to pay to borrow his own money, his account was frozen, and was forced to pay a total of more

than $300,000. The affidavit of debt was forged. *Id*. ¶ 56), ¶ 56 (Getter admitting affidavit of debt to D Square was forgery); ¶ 56 (admitting affidavit of debt to Fitness 1440 was forgery).

### H.   The Writs Of Attachment Are Riddled With Fraud And The Enterprise Freezes Bank Accounts Of Merchants Who Never Defaulted.

The CT Prejudgment Statute requires every writ of attachment to contain "an affidavit sworn to by plaintiff or any competent affiant setting forth a statement of facts sufficient to show there is probable cause that a judgment in the amount of the prejudgment remedy sought[.]" (the "Debt Affidavit") Conn. Gen. Stat. § 52-278c. Defendants violate this statutory requirement.

First, Defendants serve writs of attachment that include forged Debt Affidavits. *Id*. ¶ 222. The Enterprise witnesses also admit having no personal knowledge of the particular MCA deal, the merchant's payment history, or the purported circumstances of default attested to in the Debt Affidavits. *Id*. ¶ 223. Moreover, Getter, Kroen, Wolf, Brezel and several other Enterprise members and decision-makers all testified that they never or hardly ever read their form MCA agreements, yet still readily hold merchants in default under these agreements, while disclaiming there are no known defenses. *Id*. ¶ 224. Alfin, in turn, passes the buck to his client, doing no investigation of his own. *Id*. ¶ 226. The Debt Affidavits are drafted by paralegals at H&G. Based on Alfin's application for $10,000 in attorneys' fees included with writs of attachment, H&G often prepares these Debt Affidavits without discussing the underlying matter with Defendants. *Id*. ¶ 225-26. In at least one instance, the Enterprise doctored an MCA to insert a CT Prejudgment Statute waiver, which previously never contained one, and then proceeded to freeze the merchant's account after under-funding the MCA agreement severely. *Id*. ¶ 236.

Second, Defendants target merchants with writs of attachment who are not even in default, and/or instances where Defendants breached the MCA first. Indigo, for instance, was promised

$40,000 in funding pursuant to a February 1, 2022 MCA with GoFund. [DE 129-1]. Shortly thereafter, GoFund reneged and made Indigo enter into a revised MCA also dated February 1, 2022, which revised the promised $40,000 in funding to a mere $20,000 while *increasing* the payback amount from $59,960 to $63,960. [DE 69-7]. GoFund breached this second MCA deal too by only funding $14,000 and withholding the additional $6,000 until Indigo made ten payments. *Id*. ¶ 206. Indigo is not alone. *Id*. ¶ 218 (defaulting Floortechs just one day after funding and filing forged affidavit), ¶ 220 (defaulting Office Pride even though it was under funded), ¶ 232 (defaulting LF Family for no reason at all), ¶ 233 (defaulting Maxon Construction one day after funding for purportedly "stacking."). So too would be Haymount—but for this Honorable Court.

## LEGAL ARGUMENT

### I.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST DEFENDANTS ON THE RACKETEERING RICO CLAIM.

Plaintiffs are entitled to summary judgment against the Individual Defendants because the undisputed facts establish each of the elements necessary to impose RICO liability:

(1)   The Individual Defendants are culpable persons;
(2)   There was a RICO Enterprise;
(3)   They conducted the Enterprise through a pattern of racketeering;
(4)   The Enterprise's activities affected interstate commerce:
(5)   The Enterprise's activities caused injury to the Plaintiffs.

*Sedima, S.P.R.L. v. Imrex,* 473 U.S. 479, 496 (1985).

### A.   The Individual Defendants Are Culpable Persons Under RICO.

A RICO claim requires a "person" who violated Section 1962(a), (b), or (c). 18 U.S.C. § 1962.  Section 1961(3) defines a "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).  Plainly, Wolf, Brezel, Kroen and Getter are persons under RICO.  *See, e.g., Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158,

163 (2001) (the sole shareholder of a corporation is a "person" who can be held liable for conducting the affairs of the corporation in violation of RICO).

**B.      The Individual Defendants And Companies Constitute A RICO Enterprise.**

Under RICO, it is "unlawful for any person any person employed by or associate with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pater of racketeering activity or collection of unlawful debt.  18 U.S.C. § 1962(c).  "Enterprise" is defined to include any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associate in fact although not a legal entity." 18 U.S.C. § 1961(4). Courts have defined an association-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *U.S. v. Turkette*, 452 U.S. 576, 583 (1981). A group does not require proof of a strict hierarchy but rather only: (i) "a purpose," (ii) "relationships among those associated with the enterprise," and (iii) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. U.S.*, 556 U.S. 938 (2009).

**i.      The Enterprise's common purpose was to fraudulently obtain money.**

The common purpose of the Enterprise is to steal and extort money through wire and mail fraud. This purpose is evident from the Enterprise's numerous instances of unauthorized double debiting and over collection, ACH fraud, fraudulent UCC liens, fraudulently and often forged writs of attachment, and its sham Connecticut "office," all so that the Enterprise can extract money from merchants, which is then distributed among the culpable persons.

**ii.      The Enterprise Members all have relationships among each other.**

The MCA corporate members of the Enterprise (GoFund, Funding 123, Merchant Capital, Bridge Funding, Skyfall Funding, Fundura Capital, Matrix Advance) enter into the agreements with merchants, fund the transactions, and conduct the daily ACH withdrawals (*Id.*, ¶¶ 20-24),

while Alpha Recovery acts as their collection arm. *Id.*, ¶¶ 91-98. These corporate entities share offices, expenses and bank accounts opened in their name or the name of any number of D/B/As used by these companies to transact business. *Id.*, ¶¶ 100-06. The members of these companies also share profits from the companies. *Id.*, ¶ 102. These companies share the same software system, MCA Suite, to track payments in and out of the companies and use the same bookkeeper to read their mail and handle the companies' accounting. *Id.*, ¶ 103. The corporate defendants have "relationships among" themselves to constitute an association-in-fact enterprise.

The Individual Defendants are similarly related to each other and the corporate members and each has a distinct role in the operation of the Enterprise. Wolf runs the day-to-day operations of the MCA companies and decides which deals get funded, which MCA company will fund which deals and who else may participate in any syndications of the deals. *Id.*, ¶¶ 20-30. He also decides when to grant reductions in daily payments and double debit merchant accounts. *Id.*, ¶ 21. Brezel supplies the money for the MCA companies to enter the deals and acts as the "enforcer" when necessary. *Id.*, ¶¶ 31-38. And Getter and Kroen act as the front men of the Enterprise. *Id.*, ¶¶ 39-63. Each of Gofund, Funding 123 and Merchant Capital were originally formed with Kroen as the managing and sole member of these companies. *Id.*, ¶ 68. Getter signs false affidavits on behalf of the MCA members in order to secure writs of attachments and freeze merchant accounts so that the Enterprise can then extort money from the merchants. *Id.*, ¶¶ 47-63.

### iii. Plaintiffs have established longevity.

This Court put it best in its June 27, 2022 Decision and Order:

> A party may establish open-ended continuity by alleging predicate
> acts occurring over a short period of time so long as there is a threat
> that such conduct will recur in the future. The threat that such illegal
> conduct will recur in the future exists when: (1) a specific threat of
> repetition exists, (2) the predicates are a regular way of conducting an

> ongoing legitimate business, or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." Rakoff & Goldstein, <u>RICO: Civil and Criminal Law and Strategy</u> § 1.04[2] (2021).

*Haymount Urgent Care PC v. GoFund Advance, LLC*, 2022 WL 2297768, * 28 (S.D.N.Y. June 27, 2022). "Here, ACH withdrawals are a regular means of collecting on the MCA agreements," "including the repeated attempts to debit Haymount's Bank of America account on at least five days spread over several weeks." *Id.* On this motion, Plaintiffs have proven undisputed facts establishing an open-ended continuity predicated on a pattern of wire and mail fraud activity, as well as financial extortion under the Hobbs Act. SMF ¶¶ 146-238.

The undisputed facts also establish the existence of a closed-end enterprise. "A party alleging a RICO violation may demonstrate continuity over a closed period by providing a series of related predicates extending over a substantial period of time." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989). The Second Circuit has repeatedly ruled that RICO violations spanning a two-year period is sufficiently substantial to constitute closed-ended continuity. *See, e.g.*, *Metromedia v. Fugazy,* 983 F.2d 350, 369 (2d Cir. 1992) (upholding RICO verdict in favor of plaintiff because the predicate acts in question spanned at least two years). Here, the evidence demonstrates that the Enterprise began over debiting merchant's accounts beginning at least early 2020, SMF ¶¶ 174-91, and hatching the fictitious "Monthly Fee" scheme as early as February 2021, *Id.* ¶¶ 146-66, which continues through today, plainly establishing the existence of a closed-ended enterprise.

### C.   Defendants Are Liable For Participating In A RICO Enterprise.

Defendants are liable as culpable persons under 18 U.S.C. § 1962(c) because they "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). "[T]he RICO defendant must have participated 'in the operation or

management of the enterprise.'" *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 224 (E.D.N.Y. 2014). This requires that "the defendant must have had 'some part in directing [the enterprise's] affairs.'" *First Cap. Asset Mgmt., Inc.*, 385 F.3d 159, 176 (2d Cir. 2004), and "has proven to be a relatively low hurdle for plaintiffs to clear." *Id*. The "word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise." *Id*. (quoting *Reves*, 507 U.S. at 179). Defendants are also liable under 18 U.S.C. § 1962(d) because defendants "agreed with others" to "further an endeavor which, if completed, would satisfy all of the elements of a substantive RICO offense." *United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012).

## II.   PLAINTIFFS HAVE ESTABLISHED A PATTERN OF RACKETEERING

"'Racketeering activity,' as defined by RICO, may consist of any number of criminal offenses, 18 U.S.C. § 1961(1), including mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343." *Crawford v. Franklin Credit Mgmt.*, 758 F.3d 473, 487 (2d Cir. 2014).  The pattern must consist of at least two related predicate acts, 18 U.S.C. § 1961(5), that are related occurring either over a "substantial period of time" or in the past with a "threat of future criminal conduct." *Crawford*, at 487. Plaintiffs have established innumerable predicate acts committed by the Enterprise over the past several years warranting summary judgment.

### A.   The Enterprise Has And Will Continue To Engage In Mail Fraud.

"The mail fraud statute, together with its lineal descendant, the wire fraud statute, has been characterized as the 'first line of defense' against virtually every new area of fraud to develop in the United States."  Jed S. Rakoff, *The Federal Mail Fraud Statute (Part 1)*, 18 Dup. L. Rev. 771, 772 (1980). The crime consists of two elements: (1) "a scheme devised or intended to be devised

to defraud, or for obtaining money or property by means of false pretenses," and (2) "for the purpose or executing such scheme or attempting to do so, the placing of any letter in any post office in the United States to be set or delivered by the Post Office Establishment." *Id*. at 817 (citing *United States v. Young*, 232 U.S. 155 (1914)); *see also*, *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016) (elements of wire and mail fraud: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme"). Here, Defendants have and will continue to commit wire fraud with every UCC lien and writ of attachment they send through the U.S. mails as these devices are used to defraud innocent merchants of money.

Virtually every UCC lien notice the Enterprise delivers through Alpha is fraudulent because, at a minimum, Alpha confirmed that the notices are prepared by non-attorneys who affixed Alpha's attorneys name and mail out the notices without the attorney's review. SMF ¶ 94. Neither the attorney nor even Alpha independently confirms that the merchant is actually in default. *Id*. ¶ 97. Alpha filed dozens of UCC liens against Haymount, including one on February 15, 2022 that fraudulently represented that Haymount owed $488,928,23 on the January 20, 2022 GoFund MCA Agreement, *Id*. ¶ 98, when GoFund had (a) admittedly breached this deal by splitting the funding into two halves without written modification of the Agreement; [DE 65] (Brezel's affidavit confirming the deal's funding was split); and (b) Haymount declining the second $400,000 installment after paying $540,000 back on the first $400,000 installment. Clinton Decl. ¶ 47. Alpha sends approximately 500 UCC lien notices on behalf of Defendants every year, SMF ¶ 93, showing ample past predicate acts and future acts to come.

The Enterprise has also utilized outside counsel to mail UCC lien notices to attack merchants whose only fault was to discover the Enterprise had been double-debiting their

accounts. The Enterprise's counsel, for instance, filed UCC lien notices by wire to the California Secretary of State on April 8, 2020, and June 28, 2021 on behalf of Bridge and UCF, respectively, when Avantgarde's accounting records and bank statements reflected that it was up-to-date on its remittances and had, in fact, been double debited on numerous occasions pursuant to each of these three separate MCA deals. Adelman Decl. ¶ 14, 28. The Enterprise's counsel filed UCC liens by wire on behalf of Bridge for Wolf and Fundura for Kreon on July 20 and 22, 2021, respectively, against BAT, Inc. and The Litigation Practice Group PC when these business partners noticed double- or triple-debiting on their accounts. SMF. ¶¶ 179-187.

Each time the Enterprise sends a writ of attachment pursuant to the CT Prejudgment Statute, it commits wire and mail fraud because therein, GoFund, Funding 123 or Merchant misrepresents that it has a legitimate office in Connecticut. SMF ¶ 87 (sample writs of attachment listing Connecticut addresses). Defendants admit that the Connecticut offices are shams, whereas all evidence, including testimony from all key Enterprise members, demonstrates the office is an empty vessel explicitly created to use the CT Prejudgment Statue. SMF ¶¶ 64-90. Each Enterprise member deposed testified that they have not and do not read their own MCA agreements, undercutting the veracity of each and every affidavit of debt contained in the writs. *Id.* ¶ 224. At the very least, evidence adduced demonstrates five *per se* fraudulent writs of attachment that were mailed by the Enterprise, including four writs that contained forged signatures on the affidavits of debt and one writ where the Enterprise doctored the original MCA signed by the merchant that was included with the writ to add in a CT Prejudgment Statute waiver. *Id.* ¶¶ 222, 236. Notably, forgery is its own predicate act. 18 U.S.C. § 1961(1).

**B.      The Enterprise Has And Will Continue To Commit Wire Fraud.**

Plaintiffs have established the Enterprise engages in wire fraud by (1) adopting a scheme to double-debit and over collect; (2) surreptitiously stealing money through ACH debits under the name Monthly Fee; and (3) use of interstate wires through ACH processing in making each of these withdrawals from the Enterprises location in New York to attack merchants' bank accounts across the U.S., including Haymount in North Carolina. *United States v. Gatto*, 986 F.3d 104, 113 (2d Cir. 2021) (elements of wire fraud).

For Haymount, Defendants already admitted to using wires to over-debit its account by at least $1,250, [Getter Decl. DE 64], but with this admission was another lie because Defendants subsequently produced underwriting records and testimony revealing that the fees on this deal were $300,000, not $400,000. SMF ¶¶ 132-33. Wolf testified that even this $300,000 figure is fraudulent as it was for extra "profit" with the post-facto justification of the Enterprise incurring legal fees in defending this action—to the extent that even makes sense. *Id*. ¶¶ 27-29. Haymount has also established that GoFund committed wire fraud by trying to circumvent Haymount's stop-withdrawal bank instructions by changing its processing name to "GoFund b." *Id.* ¶ 190.

There are simply too many instances of wire fraud over the past two plus years to include in a single motion, but in addition to the Haymount examples above, the Enterprise processed unauthorized double-debits or otherwise fraudulent and unauthorized debits from New York on Avantgarde's bank accounts located in California in the following dates and amounts: (i) August 5, 2020 ($20,982), (ii) August 21, 2020 ($6,944); (iii) August 26, 2020 ($6,944), (iv) September 3, 2020 ($6,944), (v) September 8, 2020 ($6,944), (vi) October 21, 2020 ($6,944), (vii) November 6, 2020 ($33,999), (viii) November 13, 2020 ($33,999), (ix) November 25, 2020 ($27,776), (x) November 30, 2020 ($33,999), (xi) December 4, 2020 ($33,999), (xii) December 15, 2020

-26-

($33,999) (xiii) December 22, 2020 ($33,999), (xiv) December 24, 2020 ($33,999). Adelman Decl. Exs. F & J. The Enterprise also made **fifty-two (52)** fraudulent wires on Avantgarde's account in the amount of $9,995, when the Bridge MCA agreement provided for daily remittances of $7,495. Adelman Decl Ex. B.

Similarly, the companies LPG, Bat and Vulcan, entered into MCAs with Bridge (through Wolf) and Fundura (through Kroen) resulting in the double-debits on: (a) May 21, 2021 (two wires of $45,000 each); (b) May 26, 2021 ($45,000); (c) May 28, 2021 ($15,000); (d) June 2, 2021 ($70,000); (e) June 8, 2021 ($70,000); (f) June 15, 2021 ($70,000); (g) July 20, 2021 ($22,500); (h) July 21 (two wires of $22,500 each); (i) July 22, 2021 ($22,500).  SMF ¶¶ 179-187.  In addition to these testimonials, there are numerous instances in Defendants' document production admitting to double-debiting and over-collecting using ACH wires. *Id.*, ¶ 174.

The Enterprise engages in far-reaching wire fraud through Monthly Fee's unauthorized withdrawals of $499 from countless merchants who trusted Defendants with their business and personal bank account access. To date, Plaintiffs have identified thirteen (13) unauthorized withdrawals of $499 from Haymount's Bank of America account by Brezel's Monthly Fee sham, including five ***after the injunction***. *Id.* ¶ 157. Based on investigations to date, which only began in February 2023, Monthly Fee made additional unauthorized withdrawals of $499 from other merchants. SMF ¶ 159. While the full scope of this wire fraud is still obscured, Monthly Fee's statements from March 2022 to August 2022 show total deposits of $3,745,019. *Id*. ¶ 149. Even days before this filing, and after they confessed to this Court about the scheme, the Enterprise continued to do it, this time, ***stealing from a former Chief of Police Officer***. *Id.*, ¶ 165.

### C.    The Enterprise Has And Will Continue To Extort Merchants.

Violation of the Hobbs Act (18 U.S.C. § 1951) is a predicate act. 18 U.S.C. § 1961. "The exploitation of fear of economic loss in order to obtain property to which the defendant is not entitled violates the Hobbs Act." *Center Cadillac v. Bank Lumi Trust Co.*, 808 F. Supp. 213, 231 (S.D.N.Y. 1992). The Enterprise routinely violates the Hobbs Act by exploiting merchants' fear of financial ruin by having its business and/or owner's personal bank accounts frozen for an indeterminate time to coerce the merchant into executing a mutual release coupled with extracting settlement demands that are unrelated to the purported unpaid balance on the MCA deal. For Haymount, this violation occurred in February 2022, when Alpha sent UCC lien notices demanding payment in the amount of $488,928.23, even though Haymount had filed a lawsuit before this Court. *Id.* ¶ 98. Haymount, in many ways, was lucky, because it retained counsel and enjoined the Enterprise from freezing its bank account by any means, including through their favorite tool, the CT Prejudgment Statute.  Many merchants have not been so lucky. *Id.* ¶ 218 (Floortechs), ¶ 232 (LF Family), ¶ 236 (Oil City), ¶ 219 (Metropolitan Security), ¶ 235 (Rockwood), ¶ 220 (Office Pride).

Each of the above pools of predicate acts are accomplished through interstate commerce as the Enterprise (i) serves the writs of attachment from a Connecticut process server to merchants across the United States; (ii) mails UCC liens from Alpha located in Brooklyn to merchants across the country, including Haymount in North Carolina; (iii) and processes interstate wires from Brooklyn for fraudulent ACH debits on bank accounts across the country. *Id.* ¶¶ 93-98, 146-166.

## III.    HAYMOUNT HAS BEEN DAMAGED BY WIRE AND MAIL FRAUD

Plaintiffs were damaged by Defendants RICO violations by (i) Defendants' fraudulent wires that over-collected on the December 27, 2021 Funding 123 deal in the amount of at least

$101,250; (ii) the unlawful withdrawals by Monthly Fee, which are at least $6,487, (iii) the $104,542 in legal fees Haymount incurred in applying for an injunction to retract the fraudulent UCC liens Defendants filed against Plaintiff and prevent Defendants' impending freeze on Haymount's business accounts; and (iv) $22,312.5 in attorney's fees to investigate and recover at least $3,493 in fraudulent ACH debits after this Court's injunction order. SMF ¶ 155.

By Defendants' admissions in affidavits filed with this Court and Wolf's own testimony, not to mention corroborating documents, Haymount was over-debited $101,250 on the Funding 123 MCA. SMF ¶ 170-71. Thus, at a minimum, Plaintiffs have established that Defendants are liable for RICO violations through a pattern of wire fraud, mail, fraud, and extortion. These damages are trebled under RICO. 18 U.S.C. 1964(c), resulting in damages of at least **$303,750**.

Nothing in the Haymount MCA Agreements allows Defendants to make monthly withdrawals of $499 from its business accounts. Clinton Decl., Exs. 1-6. Nevertheless, Defendants—through Brezel's company Monthly Fee—have made thirteen (13) unauthorized withdrawals of $499 each between September 2021 and September 22. *Id.* ¶ 260. At a minimum, Haymount has incurred $6,487 in damages through the Monthly Fee wire fraud, and $22,312.5 in fees for a total of $37,867, which trebled is **$86,398.50**.

It is well-settled that "legal fees may constitute RICO damages when they are proximately caused by a RICO violation." *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988) (allowing recovery of legal fees incurred in fighting defendants' RICO scheme). To stop further wire fraud, retract unlawful and fraudulent UCC lien notices, and to prevent Defendants from freezing its bank accounts through the CT Prejudgment Statute, Haymount moved this court successfully for a temporary restraining order and preliminary injunction. [DE 36 and 66]. This relief was absolutely

urgent because the fraudulent UCC Lien "blocked [Haymount's] ability to use the government portal to get unassured compensation, and that was over 8,000 claims that were stopped and [Haymount] could access . . . that was about 9 million-plus of patient recovery, and we get about 17 percent of that." *Id.* ¶ 259. Haymount incurred $104,542.50 in legal fees in connection with that application. *Id.* ¶ 258. This figure is also trebled, *Stochastic*, at 1167-68, raising it to **$313,627.50**.

Defendants' fraudulent UCC liens prevented Haymount from submitting reimbursement claims to HRSA for thousands of uninsured patients Haymount treated during the COVID-19 pandemic. *Id.* ¶ 263. Specifically, at least 8,460 claims totaling $9,723,105.44 were never submitted to HRSA because Defendants' UCC lien froze Haymount's access to HRSA's submission portal. *Id.* ¶ 264. Haymount typically recovers at least 17.4% of its claim amount submitted to HRSA, resulting in Defendants' freeze of Haymount's HRSA processing through fraudulent UCC lien letters causing at least $1,691,820.35 in additional damages to Haymount. *First Capital Asset Mgmt. v. Brickellbush, Inc.*, 218 F.Supp. 2d 369, 383 (S.D.N.Y. 2002) ("A 'RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence'") (citation omitted); 18 U.S.C. § 1964(c). Plaintiffs are entitled to treble damages of **$5,075,461.05**.

Thus, at a minimum, Plaintiffs established they have been damaged by Defendants' RICO violations in the amount of $5,779,237.05. A full evidentiary hearing will need to be held to determine Haymount's full damages as this figure does not account for the usurious debt collected. *Gov't Emples. Ins. Co. v. Azu Ajudua*, 15-CV-5199 (MKB), 2018 U.S. Dist. LEXIS 213930, *18 (E.D.N.Y. Dec. 18, 2018) (noting that, as Haymount has done, that RICO plaintiff must prove liability and damages, and that this Court may hold an evidentiary hearing to determine damages).

IV.    **DEFENDANTS VIOLATE MERCHANTS' DUE PROCESS THROUGH ABUSE OF THE CT PREJUDGMENT STATUTE**

To state a Section 1983 claim, Plaintiffs must demonstrate they possess a liberty or property interest protected by the United States Constitution or federal statutes, and a deprivation of that interest without due process. *Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002) (citing *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995)); *see also*, *Soundview Assocs. v. Town of Riverhead*, 725 F. Supp. 2d 320, 332 (E.D.N.Y. 2010) ("To prevail on a claim under § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law"). Bank accounts have long been established as "property interest" which "could not be deprived, even temporarily, without due process." *McCahey v. L.P. Investors*, 774 F.2d 543, 547 (2d Cir. 1985). Defendants are subject to Plaintiffs' 1983 claim because through use of the CT Prejudgment Statute they "enlist the compulsive powers of the state to seize property by executing on a judgment without pre-deprivation notice or hearing [and so Defendants] act[] under color of law." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1267 (3d Cir. 1994).

CT Prejudgment Statute has already been the subject of scrutiny by the Supreme Court for the potential to run afoul of the U.S. Constitution's Fourteenth Amendment right of due process. *Connecticut v. Doehr*, 501 U.S. 1 (1991). In *Doehr*, the Supreme Court ruled that the CT Prejudgment Statute's authorization of attachment of real estate "without prior notice or hearing, without a showing of extraordinary circumstances, and without a requirement that the person seeking the attachment post bond" violates the Due Process Clause of the Fourteenth Amendment. *Id.* at 4. The *Doehr* Court analyzed three factors: "first, consideration of the private interest that will be affected by the prejudgment measure; second, an examination of the risk of erroneous

-31-

deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third . . . the interest of the party seeking the prejudgment remedy, with, nonetheless due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections." *Id*. at 11. In *Doehr*, unlike here, there was no issue as to whether the underlying affidavit of merit that was used to attach the property was fraudulent or otherwise defective. *Id*. at 6-7. Following *Doehr*, Connecticut amended the CT Prejudgment Statute to require that a prejudgment remedy without a hearing to include "an affidavit averring facts sufficient to show that (1) probable cause exists that a judgment in an amount greater than or equal to the prejudgment remedy sought will be rendered in favor of the plaintiff and (2) exigent circumstances warrant immediate action because the defendant is about to remove from the state or fraudulently hide or transfer money or other property that could be used to satisfy that judgment." *GMAT Legal Title Trust 2014-1 v. Catale*, 213 Conn. App. 674, 688-89 (Conn. App. Ct. 2022) (citing Conn. Gen. Stat. § 52-278e).

Defendants' use of the CT Prejudgment Statute provides even less due process than the circumstances before the Supreme Court in *Doehr*. First and foremost, Defendants do not even have legitimate standing to invoke this Statute because they do not actually have an office in Connecticut. *Supra* Section III(D)(a). This is a significant issue because absent Defendants having a legitimate office in Connecticut, there is no Connecticut state court that would have jurisdiction to hear an out-of-state merchant's challenge to Defendants'—foreign New York companies— attachment of the merchant's out-of-state bank accounts. Conn. Gen. Stat. § 51-345(a)(1) (explaining that Connecticut actions where all parties reside out of state must be returnable to a judicial district where "(A) the injury occurred, (B) the transaction occurred, or (C) the property is located or lawfully attached"). Even if a Connecticut court could hear a merchant's challenge to

Defendants' use of the CT Prejudgment Statute—ignoring the economic difficulty of a merchant retaining a lawyer to represent the business while the business' account is frozen—Defendants confirmed 20% of the writs of attachment used to freeze a merchant's bank account are never served on the merchant. SMF ¶ 207. Thus, Defendants' abuse of the CT Prejudgment Statute raises even greater fundamental violations of the Fourteenth Amendment Due Process Clause than the facts in *Doehr* because of the additional concerns of lack of notice and lack of an opportunity for a hearing before *or after* attachment. *Bd. of Regents v. Roth*, 408 U.S. 564, 569-570 (1972) (ruling that the "right to some kind of prior hearing is paramount" under the Due Process Clause). *Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda*, 07-CV-2410 (CS), 2010 U.S. Dist. LEXIS 164434, *9-10 (S.D.N.Y. Sept. 3, 2010) (noting plaintiff would have a Section 1983 claim where plaintiffs lacked notice of the hearing and "never had access to a remedy in New York state courts"). What is more, discovery has confirmed this Court's prior concern that "defendants issue their writs without ever commencing actions in state court" [DE 86] at 27, because Alfin confirmed approximately 90% of the writs are never returned to Connecticut court because they settle before the return date and while the merchant's account is still frozen. SMF ¶ 195. This deprivation of any chance at a hearing while the merchants' property rights are trampled by Defendants violates the core of the Due Process Clause. *Boddie v. Connecticut*, 401 U.S. 371, 378-79 (1971) ("That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest"); *D.H. Overmyer Co., Inc. v. Frick Co.* 405 U.S. 174 (1972).

Defendants' use of the CT Prejudgment Statute also violates the Fourteenth Amendment's Due Process Clause because the writs Defendants use do not satisfy the probable cause or exigent circumstances requirements of Conn. Gen. Stat. § 52-278e, which was passed to rectify the

problems the *Doehr* Court found. *GMAT* at 688-89. First, the undisputed facts demonstrate that (a) the affidavits of debt that accompany Defendants' writs are prepared by paralegals and without discussion of the merits of the judgment with Defendants; (b) Defendants' affiants lack personal knowledge of the facts and potential defenses because they do not read their MCA agreements; (c) Getter regularly signs affidavits without personal knowledge based solely on others, like Wolf's, verbal instructions; (d) Defendants have included forged affidavits in at least four writs; and (e) Defendants have intentionally doctored an MCA agreement to fraudulently insert a CT Prejudgment Statute waiver that did not exist in the original agreement. SMF ¶¶ 221-238.

Second, the affidavits in the writs served by Defendants do not even include conclusory allegations to satisfy the requirement that there be exigent circumstances justifying the attachment, such as risk that the assets sought to be attached will be "fraudulently disposed of." *Compare* Conn. Gen. State. § 52-278e(a)(1)-(4) *with* Heskin Decl. Exs. 32-35 (writs used by Defendants to freeze bank accounts lacking any allegation of exigent circumstances). Third, just as in *Doehr*, the Defendants do not post any bond to protect merchants from the harm and risk of improper attachment.  Clinton Decl. Exs. 1-6 § 4.13 ("MERCHANT, ENDORSER AND GUARANTOR OF THIS AGREEMENT HEREBY WAIVE . . . ALL RIGHTS TO REQUEST THAT [DEFENDANT] POST A BOND").

Defendants' abuse of the CT Prejudgment Statute intentionally violates merchants' due process protections under the Fourteenth Amendment in an even more precarious way than what was already found to be prohibitive by the Supreme Court. Summary judgment is therefore warranted on Plaintiffs Sixth Cause of Action for violation of 42 U.S.C. § 1983.

-34-

## V.    A PERMANENT INJUNCTION BARRING DEFENDANTS' USE OF ACH PROCESSING AND THE CT PREJUDGMENT STATUTE IS WARRANTED

"[A] plaintiff seeking a permanent injunction . . . must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf LLP*, 198 F. Supp. 3d 311, 315 (S.D.N.Y. 2016) (Rakoff, J.) (citing *eBay Inc. v. MercEnchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

"It is well settled in this circuit that 'major disruption of a business can be as harmful as termination, and a 'threat to the continued existence of a business can constitute irreparable injury.'" *trueEx, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 726-27 (S.D.N.Y. 2017). As demonstrated in Section III(c) above, Defendants' abuse of the CT Prejudgment Statute at a minimum disrupts a merchant's ability to pay expenses, meet payroll and at times results in the complete closure of the business. Defendants' practice of double-debiting and over-collecting on merchants' accounts through likewise disrupts businesses by drawing down business accounts into the negative and causing merchants' banks to terminate relationships with the merchants, as was the case with Avantgarde. *Id.* ¶¶ 116-120.  Moreover, "permitting the Defendants to continue to participate in the alleged extensive wire fraud scheme would constitute irreparable harm" as a matter of law. *Untied States v. Kahen*, CV 20-00474, 2020 U.S. Dist. LEXIS 61467, *2 (E.D.N.Y. Jan. 28, 2020).  This element, therefore, weighs squarely in favor of enjoining Defendants' use of ACH processing and the CT Prejudgment Statute as they are the key tools of their scheme.

-35-

Merchants who fall victim to Defendants' scheme lack adequate remedies at law. While a merchant's account is frozen, even if the merchant is served a copy of the writ of attachment (which over 20% are not), Defendants intentionally withhold filing the writ with a Connecticut court while recognizing that doing so prevents the merchant from seeking judicial relief. SMF ¶ 192-204. Even a rare instance when the writ was returned, the merchant risks finding a Connecticut court being unable to hear his or her application because Connecticut courts have no jurisdiction over foreign limited liability companies (like GoFund, Funding 123 and Merchant) that do not maintain an office in Connecticut unless the tort was committed within the State. *Citibank v. Cotton*, CV92 0124559, 1992 Conn. Super. LEXIS 3210, *5 ("The venue statute in Connecticut . . . makes no provision for an action between two nonresident parties where neither the transaction nor the injury takes place in Connecticut, and where no property is located or attached in Connecticut"). Moreover, a merchant's business closing because it could not survive is a textbook example of monetary damages being inadequate. *Semmes Motor, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970).

The balance of the hardships can only weigh in one favor, Plaintiffs and all other merchants who fall victim to Defendants' scheme. If Defendants want to legitimately utilize the CT Prejudgment Statute, they only need to **actually use** an office in Connecticut (and pay taxes there) from which to conduct business. What is more, Defendants are not rendered helpless by taking this abused tool away; their MCA agreements contain 13 "protections," ranging from security interest in the merchants' assets to personal guarantees from the merchants' owners, that offer Defendants full recourse if a merchant legitimately defaulted. Clinton Decl. Exs. 1-6 § 1.13. Defendants can also still accept remittance payments under their MCA deals even without unilateral power to make the withdrawals themselves with no notice or authorization from the merchant. Plaintiffs and other

merchants, on the other hand, suffer extensive hardship by having their business and/or personal accounts frozen without warning and in many instances without ever receiving service of the writ. SMF ¶ 205-220. They also suffer hardship by losing all autonomy to their bank accounts and cannot trust Defendants not to over-debit or over-collect on MCA deals through unilateral and unauthorized ACH withdrawal processing. SMF ¶¶ 174-191.

To the extent Defendants complain loss of ACH processing privileges, they should be reminded that permanent injunctions are wholly appropriate where "there is a likelihood that, unless enjoined, the violations will continue." *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 725 (E.D.N.Y. 2018). In these papers alone there are nearly 100 instances of Defendants using ACH processing to commit wire fraud, and "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations." *SEC v. Manor Nursing Centers, Icn.*, 458 F.2d 1082, 1100 (2d Cir. 1972). Because Defendants' abuse of the ACH processing is "founded on systematic wrongdoing, rather than an isolated occurrence," a permanent injunction is fully warranted. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996).

Finally, public interest weighs exclusively in favor of a permanent injunction on both use of ACH processing and the CT Prejudgment statute. As this Court recognized from the outset, Haymount's "inability to continue as a going concern would also disserve the public interest, because it would eliminate a source of medical care to the people of Fayetteville, N.C." and particularly true "in light of the continuing COVID-19 pandemic." [DE 66] at 7. This reasoning is even more compelling now since Defendants' tactics were shown to target other health care provider businesses during the pandemic, including the senior care facilities run by Avantgarde. *Id.* ¶ 116. More generally, saving businesses and allowing them to continue serving their customers is a well-established public interest in favor of granting injunctions. *Avon Co. v. Fareva Morton*

*Grove, Inc.*, 22 Civ. 4724 (AKH), 2022 U.S. Dist. LEXIS 109904, at \*29 (S.D.N.Y. June 21, 2022). Similarly, preventing systematic wire fraud solidly weighs in favor of granting a permanent injunction. *United States v. Travalino*, 20-CV-00046-DC-DF, 2022 U.S. Dist. LEXIS 117474, \*39 (W.D. Tx. July 5, 2022). All factors weigh in favor of granting a permanent injunction banning Defendants from continuing to use ACH processing to debit merchants' account and continuing to use the CT Prejudgment Statute—which Defendants do not even have a lawful right to use anyway.

## **CONCLUSION**

The Enterprise's pattern of racketeering is motivated by greed, wrath, envy, and gluttony. It is not enough to charge 200% interest over a 60-day period, and unconscionable fees exceeding 30%. Instead, Defendants crave instant profits by devising schemes to manufacture defaults so they can quickly trounce on the full amounts to be repaid on the MCAs—even those where they have not even advanced the "second clip." In some of the most egregious examples, the Enterprise advanced a mere $33,000, immediately froze the merchant's bank accounts, and then levied those funds through a default judgment—that admits the merchant never received service.

And when a merchant has the temerity to hire an attorney, Defendants "get out the guns" and shoot "to kill" with their limitless war chest (built off the backs of small businesses). The Enterprise even goes so far as to log into merchant bank accounts, after litigation has ensued, to determine what other funders are being paid, and to download unauthorized bank statements in aid of litigation. And when they see other funders in the account, they devise schemes to intentionally sabotage the merchant's ability to obtain other funding by, among other things, doctoring the name of the ACH debit to deter other funders. All of this is motivated to fuel the Individual Defendants' lavish lifestyle of $10 million homes, watch collections worth many millions of dollars, fancy cars like Bentleys, and helicopter trips to gamble away the hard-earned money of small businesses.

And if a small business cannot pay to feed their lavish treasures, the Enterprise sends thugs who "cross the line" to collect—in person.

The abuse and pilfering of small business through wire fraud, mail fraud and extortion needs to stop. For these reasons and those proven on this motion, Plaintiffs respectfully ask this Court enter an order granting their Motion for Partial Summary Judgment on their First and Second Causes of Action for violation of RICO, 18 U.S.C. § 1962 and on their Sixth Cause of Action pursuant to 42 U.S.C. § 1983, as well as all such other relief as is equitable and just.

Plaintiffs also ask the Court to award damages in the amount of $5,779,237.05, which represents: (i) Defendants' fraudulent wires that over-collected on the December 27, 2021 Funding 123 deal in the amount of at least $101,250; (ii) the unlawful withdrawals by Monthly Fee, which are at least $6,487, (iii) the $104,542 in legal fees Haymount incurred in applying for an injunction to retract the fraudulent UCC liens Defendants filed against Plaintiff and prevent Defendants' impending freeze on Haymount's business accounts; and (iv) $22,312.5 in attorney's fees to investigate at least $2,994 in fraudulent ACH debits after this Court's injunction order, trebled.

February 13, 2023

Respectfully submitted,

WHITE AND WILLIAMS LLP

By: _____

Shane R. Heskin
Alex D. Corey
7 Times Square, STE 29
New York, NY 10036
(215) 864-7000
heskins@whiteandwilliams.com

-39-

**WEITZ &  LUXENBERG, P.C.**
James J. Bilsborrow
700 Broadway
New York, New York 10003
Tel: (212) 558-5500
jbilsborrow@weitzlux.com

**ALMEIDA LAW GROUP LLC**
David S. Almeida
849 W. Webster Avenue
Chicago, Illinois 60614
(312) 576-3024
david@almeidalawgroup.com

*Attorneys for Plaintiffs*

-40-