**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAYMOUNT URGENT CARE PC and ROBERT A. CLINTON, JR., *individually and on behalf of all those similarly situated*,<br><br>       Plaintiffs,<br><br>       v.<br><br>GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISAAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, AND YISROEL C. GETTER,<br><br>       Defendants. | Case No. 1:22-cv-01245-JSR |

**PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**WHITE AND WILLIAMS LLP**
Shane R. Heskin
Alex D. Corey
7 Times Square
New York, New York  10036
Tel:  (212) 244-9500
heskins@whiteandwilliams.com
coreya@whiteandwilliams.com

**WEITZ & LUXENBERG, P.C.**
James J. Bilsborrow
700 Broadway
New York, New York 10003
Tel: (212) 558-5500
jbilsborrow@weitzlux.com

**ALMEIDA LAW GROUP LLC**
David S. Almeida
849 W. Webster Avenue
Chicago, Illinois 60614
(312) 576-3024
david@almeidalawgroup.com

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ..........................................................................................2

I.    Defendants Intentionally Issue Usurious Loans ..................................................3

II.    Getter Was Directly Involved In The RICO Enterprise.......................................6

ARGUMENT ...........................................................................................................8

I.    NEW YORK LAW APPLIES .................................................................................8

II.    THE MCA AGREEMENTS ARE LOANS ............................................................11

    A.    The Totality Of The Circumstances Renders The MCA Agreements Loans..........................................................................................................12

    B.    The Reconciliation Provisions Are Shams. ........................................................13

    C.    Defendants Intended Their MCA Agreements To Have Finite Terms.................14

    D.    The Enterprise's Warranty That Remittances Are "Good Faith Estimates" Of The Merchant's Receivables Is Demonstrably False.......................................14

    E.    Haymount Retained Control Over Its Receivables And Assumed All Risk..........15

    F.    Defendants Had Full Resource Against Haymount Under Virtually Any And All Circumstances, Including—Indirectly—Haymount Declaring Bankruptcy...........................................................................................................17

III.    DEFENDANTS INTENTIONALLY COLLECTED UNLAWFUL DEBT....................21

IV.    DEFENDANTS FAIL TO REBUT PLAINTIFFS' WIRE FRAUD RICO CLAIMS ..........................................................................................................27

V.    DEFENDANTS' ATTACKS ON PLAINTIFFS' DAMAGES ARE MERITLESS.........30

    A.    *Fleetwood* Establishes The Measurement For RICO Unlawful Debt Damages..........................................................................................................30

    B.    Plaintiffs HRSA Damages Were Foreseeable And Therefore Are Recoverable.......................................................................................................31

    C.    Plaintiffs HRSA Damages Are Sufficiently Supported By The Record................32

VI.    GETTER'S MOTION IS CONTRADICTED BY HIS OWN AFFIDAVIT ...................35

CONCLUSION........................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*,
   11-CV-00726 (CBA) (RLM), 2014 U.S. Dist. LEXIS 200610 .............................................33

*A. Conner Gen. Contracting Inc. v. Rols Cap. Co.*,
   145 A.D.3d 452 (2d Dep't 1998) ............................................................................................11

*Adar Bays v. GeneSYS ID, Inc.*,
   37 N.Y.S.2d 320 (2021) .........................................................................................................12

*Am. Equities Grp. v. Ahava Dairy Prods. Corp.*,
   2004 WL 870260 (S.D.N.Y. Apr. 23, 2004) ..........................................................................10

*Am Exp. Travel Related Servs. Cov. v. Assih*,
   893 N.Y.S.2d 438 (Civ. Ct. Rich. Cty. 2009) .......................................................................10

*Brown v. Vrendengurh*,
   43 N.Y. 195 (1870) ................................................................................................................24

*Davis v. Richmond Capital Group*,
   194 A.D.3d 516 (1st Dep't 2021) .....................................................................................12, 15

*DeStaso v. Bottiglieri*,
   25 Misc.3d 1213(A) (Sup. Ct. 2009) ....................................................................................25

*Endico Potatoes, Inc. v. Git Grp./Factoring, Inc.*,
   67 F.3d 1063 (2d Cir. 1995) .............................................................................................12, 17

*Feivel Funding Assoc. v. Bender*,
   156 A.D.3d 416 (1st Dep't 2017) ..........................................................................................25

*Fleetwood Servs., LLC v. Ram Capital Funding, LLC*,
   10-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022),
   *Fleetwood v. Ram Capital Funding, LLC et al.* ....................................8, 9, 10, 11, 20, 30, 31

*Freitas v. Geddes Savings and Loan Ass'n*,
   63 N.Y.2d 254 (1984) ............................................................................................................21

*Funding Metrics v. NRO Boston, LLC*,
   64204/2016, 2019 N.Y. Misc. LEXIS 4878 (Sup. Ct. N.Y. Cnty., Aug. 28,
   2019) ......................................................................................................................................16

*Giannullo v. City of New York*,
   322 F.3d 139 (2d Cir. 2003) ..................................................................................................38

*Hammelburger v. Foursome Inn Corp.*,
    446 N.Y.S.2d 917 (1981) ..................................................................................................11

*Hi Bar Capital LLC v. Parkway Dental Servs., LLC*,
    533245/2021, 2022 N.Y. Misc. LEXIS 5814 (Sup. Ct. Kings Cnty. Aug. 25,
    2022) .........................................................................................................................19, 20

*In re O.P.M. Leasing, Inc.*,
    30 B.R. 642 (Bankr. S.D.N.Y. 1983) ................................................................................16

*Lateral Recovery, LLC v. Cap. Merch Servs.*,
    21-cv-9336 (LJL), 2022 U.S. Dist. LEXIS 181044 (S.D.N.Y. Sept. 30, 2022) ....................13

*Lateral Recovery LLC v. Queen Funding, LLC*,
    21-cv-9607-LGS, 2022 U.S. Dist. LEXIS 129032 (S.D.N.Y. July 20, 2022) ........................19

*LG Funding LLC v. Island Flavor LLC*,
    Index No. 606794/17, 2017 ..............................................................................................24

*LG Funding, LLC v. Untied Senior Props. of Olathe, LLC*,
    181 A.D.3d 664 (2d Dep't 2020) ......................................................................................12

*New Y-Capp v. Arch Cap. Funding, LLC*,
    18-cv-3223 (ALC), 2022 U.S. Dist. LEXIS 180309 (S.D.N.Y. Sept. 30, 2022)....................13

*O'Donovan v. Galinski*,
    62 A.D.3d 769 (2d Dep't 2009) ........................................................................................25

*People v. Richmond Capital, et. al.*,
    Supreme Court of the State of New York, County of New York, Index No. 22-
    cv-01245 ........................................................................................................................11

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*,
    37 N.Y.3d 591 (2021) (Wilson, J., dissenting) ..................................................................12

*Rahanian v. Ahdout*,
    258 A.D.2d 156 (1st Dep't 1999) ......................................................................................15

*Roopchand v. Mohammad*,
    154 A.D.3d 986 (2d Dep't 2017) ......................................................................................24

*Stransky v. DiPalma*,
    137 A.D.3d 1734 (4th Dep't 2016) ....................................................................................25

Superior Vending Servs. Inc. v. Workmen's Circle Home & Infirmary Found. for
    Aged, 49 N.Y.S.3d 714, 716 (2d Dep't 2017) ....................................................................33

*Tractebel Energy Mkts. V. AEP Power Mktg.*
    487 F.3d 89 (2d Cir. 2007)..............................................................................32

*United States v. Moseley,*
    980 F.3d 9 (2d Cir. 2020)...............................................................................11

*Vista Food Exch., Inc. v. Comercial De Alimentos Sachnes S de R L de C.V.,*
    No. 18-CV-8999 (RA), 2022 U.S. Dist. LEXIS 165382 (S.D.N.Y. 13, 2022).......................32

*Welsbach Elec. Corp. v. MasTec N. Am., Inc.,*
    7 N.Y.3d 624 (2006)......................................................................................10

*Zerman v. Ball,*
    735 F.3d 14 (2d Cir. 1984).............................................................................10

## STATUTES

11 U.S.C.
    § 362...........................................................................................................18
    § 541(a)......................................................................................................18

N.Y. Penal Code § 190.40 ..................................................................................22

RICO, 18 U.S.C. § 1964(c)...................................................................... *passim*

Plaintiffs Haymount Urgent Care PC ("Haymount") and Robert A. Clinton, Jr. ("Dr. Clinton") respectfully submit this Memorandum of Law in opposition to (i) Defendant Yisroel Getter's ("Getter") motion for summary judgment [DE 182] (the "Getter MSJ"); and (ii) Defendants' GoFund Advance, LLC ("GoFund"), Funding 123, LLC ("Funding 123"), Merchant Capital LLC ("Merchant"), Alpha Recovery Partners, LLC ("Alpha"), Yitzchok Wolf ("Wolf"), Yosef Brezel ("Brezel"), and Joseph Kroen ("Kroen" collectively "Defendants," including Getter, the "Enterprise") motion for partial summary judgment [DE 175] ("Defendants MSJ").

## PRELIMINARY STATEMENT

Twice, this Court has held that usurious intent is a question for the trier of fact. (DE 86 p. 19; DE 157 p. 13 n. 5). Defendants point to no evidence warranting a different outcome. Rather, the undisputed evidence establishes that Defendants do, in fact, operate a criminal RICO Enterprise out of Brooklyn, New York. To escape these inescapable facts, Defendants ignore the mountain of evidence establishing their culpability, and brazenly misstate the documentary evidence.

For instance, Defendants' two motions for summary judgment rest upon the implausible claim that Defendants did not know their MCA Agreements were usurious loans based on a purported split in caselaw. Tellingly, however, Defendants fail to submit a single declaration *from any Defendant* in support of this tale of convenience. Instead, Defendants rely exclusively upon the unsupported say-so of counsel. Perhaps that is because these naked assertions are directly contradicted by the documentary evidence showing that Defendants routinely describe their MCA Agreements as loans: (i) to their banks, (ii) in internal accounting and underwriting records, and (iii) when soliciting merchants. Usurious intent is also evident from the face of the MCA agreements, which yields interest rates far beyond 25% on every one of the over 4,000 MCAs produced. And to extract even more unlawful interest, Defendants intentionally under-fund and over-collect like they did with Haymount and countless others.

In addition to extracting usurious interest, Defendants ensure repayment absolutely through a myriad of extortionate means, such as their abuse of the Connecticut Prejudgment Attachment Statute, and the UCC. In the absence of any meritorious defense to these unlawful tactics, Defendants attack Plaintiffs' damages. A large component of Haymount's damages includes lost revenue caused by Defendants' blocking Haymount's access to the HRSA portal for submitting claims for treating uninsured COVID-19 patients. Defendants claim this was an unforeseeable consequence of their February 15, 2022 UCC Lien Notice to UnitedHealthcare. But this is contradicted by Defendants' contemporaneous internal communications confirming they hoped the UCC liens would "lock" Haymount out of the HRSA portal and the UCC Lien Notice itself instructed UnitedHealthcare to place a "hold" on Haymount's accounts receivable. Defendants also wrongly claim they had no idea UnitedHealtcare blocked Haymount's HRSA access despite acknowledging they received a March 1, 2022 letter from UnitedHealthcare stating it had placed a "restraint" on Haymount's access to its "medical claim payment system."

Getter's motion also relies on misrepresentations but of a much broader, grander and easily debunked variety. Getter argues he is entitled to summary judgment because there is no evidence, he claims, of his involvement in the Enterprise or the alleged transactions at issue. Getter's involvement in the Enterprise and his direct involvement in the transactions at issue has already been established by prior affidavits Getter submitted in this action, not to mention the fact that Getter is the legal owner of GoFund, Funding 123 and Merchant, the MCA companies that entered into the six MCA Agreements that are at issue in this action. Both motions should be denied.

**STATEMENT OF FACTS**

Rather than regurgitate the same facts twice, Plaintiffs incorporate (i) Plaintiffs' Rule 56.1 Statement of Material Facts in Support of Plaintiffs' Partial Motion for Summary Judgment, dated February 13, 2023 [DE 180] ("Pls. SMF"); (ii) the Declaration of Shane R. Heskin, dated February

18, 2023 [DE 171-73] ("Heskin Decl."); (iii) Plaintiffs' Responses to Getter's Rule 56.1 Statement of Material Facts, dated February 27, 2023 ("Pls-Getter SMF"); and (iv) Plaintiffs' Responses to Defendants' Rule 56.1 Statement of Material Facts, dated February 27, 2023 ("Pls-Defs SMF").

## I.    DEFENDANTS INTENTIONALLY ISSUE USURIOUS LOANS

Defendants' motions depend on the unsubstantiated claim that the Defendants did not know their conduct was illegal. *See* Defendants Memorandum of Law in Support of their MSJ [DE 176] ("Defs. MOL") at 14-18. Like Getter, Defendants do not offer a single affidavit for any witness to support their unsubstantiated contention that they believed they were acting lawful, and this is because there is a wealth of undisputed facts demonstrating that Defendants knowingly violated RICO through unlawful debt collection, wire and mail fraud, and extortion.

First, Defendants' professed innocent *mens rea* with respect to the MCA agreements being usurious loans does not save them from the dozens of predicate acts of wire fraud. Defendants set up an entire sham company called "Monthly Fee" to disguise a system whereby they fraudulent debit $499 from unsuspecting merchants' bank accounts every month, and even did so with respect to Haymount *after* this Court issued an injunction barring any further withdrawals. Pls. SMF ¶¶ 146-166. While Defendants MCA agreements all provide for, at most, single daily Remittances, *see* Clinton Decl. Exs. 1-6; Heskin Decl. Exs. 17-18, Defendants routinely process two or more debits from a single merchant's account in one day, sometimes as often as 6 times. *Id*. ¶ 174. Defendants continue to debit merchants' accounts even after terminating their MCA deals with the merchants through mutual releases. *Id*. ¶¶ 176-77. Defendants begin double-debiting merchants as soon as they gain access to their accounts, and while the merchants are making payments. *Id*. ¶¶ 180-188. If a merchant grows wise to these fraudulent wires and instructs its bank to block further withdrawals, Defendants change their processing name, such as changing GoFund to "GoFund b"

to get around Haymount's block. *Id.* ¶¶ 189-191. These fraudulent wires demonstrate Defendants' intent to ensure absolute repayment (if not more) on their MCA deals.

Second, when not misleading the Courts, Defendants routinely describe themselves as "direct lenders" in internal communications and when soliciting merchants. Heskin Decl. Exs. 47-48. When opening up the sham "Monthly Fee" company, Defendants disclosed that the purpose of the account was to "FUND LOAN DEALS," Pls. SMF ¶ 147, and Defendants included an MCA agreement with the Monthly Fee bank account application as an exemplar. Heskin Decl. Ex. 64. Even internal spreadsheets refer to them as loans. Heskin Declaration in Opposition to Defendants MSJs, dated February 27, 2023 ("Heskin Opp. Decl.") Ex. 2. When negotiating MCA deals with merchants, Defendants do not discuss the merchant's anticipated receivables or revenues; rather the focus is on how much funding the merchant will get, what the payback amount will be, and how long the merchant will have to repay. Pls. SMF ¶ 235; Heskin Decl. Ex. 55. Defendants further disregard the fiction that they purchase receivables by purchasing receivables from merchants who have tax liens and/or have already sold their receivables to other MCA companies. Heskin Decl. Exs. 44 and 53; Pls. SMF ¶ 135; *Compare* Heskin Decl. Ex. 20 [Wolf Tr.] 52:7-11 (testifying it is possible to purchase more than 100% of a merchant's receivables) *with id.* Ex. 21 [Brezel Tr.] 77:15-17 ("If we buy a receivable, we own it. Same way you can't sell a car to two people."). Defendants will accept payment on their MCA deals from any source of funding, even a merchant's "piggy bank" or personal account, rather than just from a merchant's receivables. Clinton Decl. ¶ 24; Heskin Decl. Ex. 21 [Brezel Tr.] at 58:13-59:10.

Third, Defendants treat their MCAs as absolutely repayable. Defendants admit they never perform reconciliations, and instead treat reconciliation request as an opportunity to have the merchant refinance. Heskin Decl. Ex. 21 [Brezel Tr.] at 60:11-62:3; 74:7-75:5, 125:3-125:20

(testifying on reconciliation that "I don't think I've ever done something exactly to the letter" of the MCA agreement); Ex. 27 [Kroen Tr.] at 89:14-21 ("Reconciliation, to my understanding, is where . . . you basically renegotiate the entire contract"). Notably, Defendants failed to produce a single document processing a reconciliation request. Heskin Decl. Ex. 52. Rather than offering reconciliation, Defendants offer discounts to merchants who are able to repay the Purchased Amount faster than anticipated. Heskin Decl. Ex. 57. What is more, Defendants' agreements with brokers provide that the broker's commission is clawed back if the merchant does not keep up with the intended payment term by making up missed payments. Heskin Decl. Ex. 106.

Fourth, Defendants do not hesitate to default merchants and use strong-armed collection tactics to ensure payment absolutely. Just two missed payments will place a merchant, such as Haymount, in default. Clinton Decl. Exs. 1-6 at Appendix A. Defendants also hold a merchant in default for having more than one MCA agreement even when the merchant disclosed that fact beforehand, *see generally* Declaration of Michael Maxon, dated February 10, 2023 [DE 170] ("Maxon Decl."), and despite Defendants routinely funding merchants who have pre-existing MCA deals. Heskin Decl. Ex. 27 [Kroen Tr.] at 13:21-14:17 (testifying that "most of the time" the Enterprise funds MCA deals with pre-existing MCA positions); Ex. 21 [Brezel Tr.] at 108:20-109:18 (testifying Defendants do not default merchants for having pre-existing MCA positions). Once in default, Defendants use Alpha and their attorneys to issue UCC liens and writs of attachment to freeze merchants' bank accounts, and then exact settlements under duress. Pls. SMF ¶¶ 192-238. If freezing merchants' accounts through abuse of prejudgment statutory remedies does not suffice, the Defendants will choose violence to force merchants to pay. *Id*. ¶¶ 239-242.

Fifth, Defendants' unsupported contention that they believed their MCA deals were lawful is belied by the fact that Defendants do not read their own agreements. Pls. SMF ¶ 30, 42, 53, 224.

Defendants also routinely underfund, while simultaneously requiring the merchant to continue to make the as-promised remittances to receive the remaining funding. *Id.* ¶¶ 230-235. This happened to Haymount twice, as Defendants acknowledged in sworn declarations filed with this Court. *See* [DEs 64-65]. Even without this intentional underfunding, or the fees assessed, a survey of the hundreds of MCA agreements produced by Defendants in this action has revealed that with only a couple of exceptions, every single MCA agreement has an effective interest rate of three to four figures, several times greater than New York's 25% cap.  Heskin Decl. Exs. 50-51.

Finally, in private communications among themselves, Defendants regularly acknowledge they are criminals who break the law and run the risk of landing in jail. Pls. SMF ¶ 144, 166. The Defendants consult daily with Braun, a convicted felon who has been charged by the NYAG and FTC for operating his own criminal RICO enterprise centered on collecting usurious debt. *Id.* ¶¶ 6-19. Since getting out of prison on January 20, 2021, by reportedly bribing former President Trump for a grant of clemency, Braun has played a major role in directing the affairs of the Enterprise.  *Id.* ¶¶ 16-19; Heskin Decl. Ex. 15.

## II.    GETTER WAS DIRECTLY INVOLVED IN THE RICO ENTERPRISE

Getter's motion rests on the fiction that there is no evidence linking Getter to the Enterprise and, more specifically, no evidence "that Getter played any role in any MCA obtained by Plaintiffs."  Getter's Memorandum of Law in Support of his MSJ [DE 183] ("Getter MOL") at 2. This fiction, unsupported by an affidavit from Getter, is easily debunked and is contradicted by Getter's prior sworn testimony and affidavits submitted with this Court.  *See* Pls-Getter SMF.  First and foremost, Getter is the legal owner of the MCA company Defendants GoFund, Funding 123 and Merchant. Pls. SMF ¶¶ 47-48, 72-73. GoFund, Funding 123 and Merchant each entered into at least one of the six MCA agreements with Haymount that are at issue in this litigation. *See* Declaration of Robert Clinton, dated February 7, 2023 [DE 162] ("Clinton Decl.") Exs. 1-6.

GoFund directed Alpha to issue dozens of UCC liens against Haymount, including the UCC lien that froze Haymount's access to HRSA's claim submission portal, resulting in millions of dollars' worth of claims never being submitted for reimbursement. Pls. SMF ¶¶ 98, 263-65.

Second, Getter has submitted multiple affidavits in this case wherein he attests to knowledge and involvement with Haymount, in particular, the December 27, 2021 MCA agreement between Haymount and Funding 123. *See* [DE 58 & 64]. In these affidavits, Getter admitted that Funding 123 over-debited Haymount by $1,250 on this deal. ¶ 10. This calculation, however, was based on what was now revealed to be fraudulent representations that the fees were $400,000, when, based on Defendants' internal underwriting documents and confirmed by Wolf's testimony, the fees were just $300,000, which represented additional "profits" for Defendants and have since been used to cover their legal fees incurred in this action. Pls. SMF ¶¶ 26-29, 171-173.

Third, Getter is instrumental to the Enterprise's collection practice as Defendants routinely rely on him to sign affidavits of debt that accompany writs of attachment used to freeze merchants' bank account. *Id.* ¶¶ 53-54. Getter signs affidavits of debt at the request of the other Defendants even when he lacks personal knowledge of the underlying deal or purported default. *Id.*

Fourth, Getter is a non-credible witness. In addition to the false testimony to this Court, Getter testified in his deposition that he left employment with Defendants in April 2022. *Id.* ¶ 57. This proved to be false as Getter continues to issue MCA agreements on behalf of the Enterprise, including issuing an MCA agreement under the label "United Fund USA" in July 2022 for Matrix Advance, LLC. *Id.* ¶¶ 58-63. Getter also knows convicted felon Jonathan Braun ("Braun") is one of his bosses within the Enterprise, Heskin Decl. Ex. 25 [Getter Tr.] at 36:13-38:2, 111:11-113:23; Pls. SMF ¶¶ 6-19. Yet Getter lied to Bloomberg News when they ran a story on Braun and the Enterprise and claimed he had no idea who Braun was. Heskin Decl. Ex. 4.

## ARGUMENT

### I.    NEW YORK LAW APPLIES

Defendants present a heads-I-win, tails-you-lose choice-of-law argument. Defendants posit that if Plaintiffs succeed in showing the MCA Agreements is usurious under New York law, then the Agreements are void, including the New York choice-of-law provision. *Id*. at 5. "With no controlling choice-of-law provision," Defendants argue that "New York's center-of-gravity test controls," which conveniently in Defendants' estimation, would mean that North Carolina law—and that state's absence of usury laws—applies thereby exonerating the Enterprise. *Id.* Not so.

First, Defendants' choice-of-law argument is riddled with inconsistent assumptions. If this Court were to determine the MCA Agreements to be void *ab initio* under New York law, it would not then suddenly swap its New York legal analysis with North Carolina law. Defendants' entire argument is premised on the illogical sequence whereby this Court would first apply New York laws to construe whether the transaction is a loan, and then North Carolina law to construe whether Defendants violated RICO in issuing debt already found to be usurious under New York law. The approach advocated by Defendants would turn the legal framework for choice-of-law analysis on its head and allow bad actors, such as Defendants here, to mix and match various state laws until the composite of their choosing renders them immune from liability. That is not the law.

Second, conclusory logic aside, there is no question that New York law applies because it is undisputed that Defendants operate out of New York. As this Court already recognized, an "independent choice-of-law analysis" would likely result in the "application of New York law . . . given allegations that the defendants operated from New York." [DE 157] at 4. Moreover, this exact issue has already been addressed and rejected by Judge Liman. *See Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, 10-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022) ("Although the answer is not free from doubt, it appears that the approach that is most

consistent with Second Circuit law is to treat usury claims as contractual for purposes of choice-of-law analysis and to give effect to the parties' choice of the law that they desire to apply to the enforceability of the interest provision of a contract as long as that law has a reasonable relationship to the transaction and/or the parties and is not against public policy.").

*Fleetwood* involved a Texas merchant that entered into an MCA with a Brooklyn-based MCA company Richmond Capital Group, *Id*. at *1-2, the same company Braun ran as part of a separate RICO enterprise that is presently the subject of lawsuits by the NYAG and FTC. Heskin Decl. Exs. 5-6. Like the Haymount MCA agreements, and all other MCA agreements issued by Defendants, the *Fleetwood* MCA contained a New York choice-of-law provision. *Id*. at *10-11. Like Defendants here, Fleetwood argued that only New York law applied to the contract interpretation, and that Texas state law would apply on the usury claims. *Id*. at *48 ("Plaintiff argues that the choice-of-law provision governs only the construction of the Fleetwood Agreement and no extra-contractual causes of action such as usury"). Judge Liman rejected Plaintiff's attempt to have both New York law and Texas law apply to its claims. Significantly, Judge Liman found that even disregarding the New York choice-of-law provision (which Defendants urge this Court to do), New York's center of gravity approach compelled New York law and, in so doing, denied the usury claim under Texas law. *Id*. at *52-62. "The center of gravity approach focuses on the place with 'the most significant contacts with the matter in dispute, looking to 'five generally significant contacts: the places of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the parties." *Fleetwood* at *51.

Here the undisputed facts are that Defendants: (1) are located in New York; (2) solicit the MCAs from New York, (3) execute the MCAs in New York; (4) perform in New York; (5) collect in New York; and (5) admit New York law applies through their own contract. Pls. SMF ¶¶ 16,

64-89. Moreover, the NYAG, the entity charged with enforcing New York's laws, has taken the position, under the exact same facts, that New York law applies. Pls. SMF ¶¶ 6-19; Heskin Decl. in Opp. to Defendants' MSJ, dated February 27, 2023 ("Heskin Opp. Decl.") Ex. 1. In short, the entirety of Defendants' RICO activities, predicate acts and collection of unlawful debt all are based out of New York, and this, coupled with New York's "fundamental" public policy interest in stamping out usury, means New York law applies even in the absence of the New York choice-of-law provision. *Am. Equities Grp. v. Ahava Dairy Prods. Corp.*, 2004 WL 870260, at *9 (S.D.N.Y. Apr. 23, 2004) (applying New York law "[b]ecause New York is the state with the most significant contacts to the parties in the context of the Agreement"); *Am Exp. Travel Related Servs. Cov. v. Assih*, 893 N.Y.S.2d 438, 447 (Civ. Ct. Rich. Cty. 2009) (concluding that "New York has the most significant contacts to the parties and New York law will apply to the Agreement in reference to whether or not the interest being charged is usurious"); *Fleetwood*, at 62.

Third, New York law applies because Defendants have chosen that law to govern their contracts. Clinton Decl. Exs. 1-6 § 4.5. "Under New York law, great deference is to be given a contract's designation of the law that is to govern disputes arising from the contract, and that designation is determinative if the state selected has sufficient contacts with the transaction." *Zerman v. Ball*, 735 F.3d 14, 20 (2d Cir. 1984). "If a claim fails within a contract's choice-of-law provision and the provision calls for New York law, New York law will generally be applied 'so long as the chosen law bears a reasonable relationship to the parties or the transaction.'" *Fleetwood*, at *49 (citing *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624 (2006)). The undisputed facts demonstrate that Defendants operate out of offices exclusively in Brooklyn, New York. Pls. SMF ¶¶ 16, 64-89; Pls-Defs SMF ¶ 3.  Defendants' operating out of New York coupled with their selection of the New York choice of law provision requires New York law being

applied to all of Plaintiffs claims.  *Fleetwood*, at 62; *A. Conner Gen. Contracting Inc. v. Rols Cap. Co.*, 145 A.D.3d 452, 454 (2d Dep't 1998) (New York usury law applies where entity is going business in New York); *United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020) ("New York law is unambiguous in the area of express choice of law provisions in a contract. Absent fraud or violation of public policy contractual selection of governing law is generally determinative so long as the State selected as sufficient contracts with the transaction").

Finally, Defendants are simply wrong that the choice-of-law provision is void ab initio. Although New York's highest court has held that a criminally usurious loan is unenforceable by the criminal usurer, the New York Court of Appeals has expressly held that the victim of usury does—in fact—possess the ability to bring an affirmative action against the criminal usurer. *See Hammelburger v. Foursome Inn Corp.*, 446 N.Y.S.2d 917, 923 (1981) ("The criminal usurer… remains subject also to civil liability for his criminal act… to the debtor from whom the usurer could have collected neither principal nor interest for the principal and interest which the debtor has been required to pay to the innocent assignee…").

## II.    THE MCA AGREEMENTS ARE LOANS

Although usurious intent is typically a question for the trier of fact, *see* DE 86 p. 19; DE 157 p. 13 n. 5, the undisputed record here establishes usurious intent:

- In communications with merchants, brokers and internally, Defendants referred to themselves as "direct lenders," their products as "loans" and their "loans" as having fixed daily payments. Heskin Decl. Exs. 47 and 48; Ex. 6; ¶¶ 11-16.[1]

---

[1] The allegations and evidence in this case are strikingly similar to the allegations and evidence presented in *People v. Richmond Capital, et. al.*, Supreme Court of the State of New York, County of New York, Index No. 22-cv-01245, wherein the NYAG, New York's highest regulatory enforcement agency, is pursuing claims against other MCA companies for, among other things, disguising the true nature of their agreements. *See, generally,* Petition attached as Exhibit 6 to the Heskin Decl.

- Defendants did not consider Haymount's actual "receivables" while plaining their transactions with Haymount and instead, underwrote and planned the transactions as loans. Heskin Decl. Ex. 6, ¶ 119,

- The Haymount transactions were subject to finite terms of repayment, which were indicated on the face of the MCA agreements and which Defendants commonly discussed internally and with merchants. Heskin Decl.  Exs. 47-48; Heskin Decl. Ex. 6, ¶¶ 115-116.

- The reconciliation provisions in the MCA Agreements were shams because they were at the complete whim of the Defendants and Defendants could not recall any instance in which a reconciliation was actually performed. Heskin Decl. Ex. 6, ¶ 111.

- The MCA Agreements stated that they would allow Haymount only a limited number of insufficient-funds events before the Defendants declared a default; Clinton Decl. Exs. 1-6 Appendix A (H) (definition of "Default Fee"); Heskin Decl. Ex. 6, ¶ 16.

- Defendants required that each Haymount transaction be secured and guaranteed even in the event of a merchant's business failure or bankruptcy. Heskin Decl. Ex. 6, ¶ 102.

At the very least, these facts demonstrate that a question of fact exists as to whether the MCA Agreements were loans, which precludes the entry of summary judgment.

### A.    The Totality Of The Circumstances Renders The MCA Agreements Loans.

The New York Court of Appeals has made clear that "[w]hen determining whether a transaction is a loan, substance—not form—controls." *Adar Bays v. GeneSYS ID, Inc.*, 37 N.Y.S.2d 320, 335 (2021); *see also*, *Endico Potatoes, Inc. v. Git Grp./Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir. 1995) (holding whether an assignment of accounts receivable is a loan "depends on the substance of the relationship" between the parties "and not simply the label attached to the transaction"). The hallmark of a loan is that the lender "is absolutely entitled to repayment under all circumstances," or put otherwise, the "principal sum is repayable absolutely." *LG Funding, LLC v. Untied Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666 (2d Dep't 2020). There can be no question that the terms and the facts in this case support such a conclusion. *See Id.* at 666 (looking at various factors to see if agreement was a loan); *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 37 N.Y.3d 591, 609 n. 2 (2021) (Wilson, J., dissenting); *Davis v.*

*Richmond Capital Group*, 194 A.D.3d 516, 517 (1st Dep't 2021); *New Y-Capp v. Arch Cap. Funding, LLC*, 18-cv-3223 (ALC), 2022 U.S. Dist. LEXIS 180309, *10-14 (S.D.N.Y. Sept. 30, 2022); *Lateral Recovery, LLC v. Cap. Merch Servs.*, 21-cv-9336 (LJL), 2022 U.S. Dist. LEXIS 181044, at *113-16 (S.D.N.Y. Sept. 30, 2022).

  **B.  The Reconciliation Provisions Are Shams.**

  The MCA Agreements each contain a sham reconciliation provision whereby Haymount was restricted to making one reconciliation request per month "within five (5) business days of the close of the calendar month" provided that it complied with any and all of Defendants' documentation request. Clinton Decl. Exs. 1-6 § 1.4. In denying Defendants' motion to dismiss, this Court recognized that these limitations could render the reconciliation provision useless if, for instance, Haymount experienced a "mid-month decline in revenues," while also giving Defendants pretext to deny reconciliation for purported lacking documentation. [DE 86] at 16-17.

  Discovery has confirmed that not only is the provision illusory, Defendants do not grant reconciliations under any circumstance as required by this provision. None of the Defendants or their agents deposed in this matter could recall an instance where they performed a reconciliation. Pls-Defs SMF ¶ 37. Rather, if a merchant requests reconciliation, to the extent the Enterprise does anything, it opts to renegotiate the entire deal. *Id*. Moreover, even though the Haymount MCA Agreements include a purported email address for handling reconciliation requests, Defendants failed to produce a single document from these accounts—or any others—reflecting them reconciling a merchant's payment. Heskin Decl. Ex. 52. Defendants do not even offer reconciliation or an adjustment to daily Remittances when the Defendants underfund the Purchase Price.  Clinton Decl. Ex. 7 (Funding 123 refusing to lower the $80,000 daily Remittance after only funding $900,000 of the promised $2,000,000 Purchase Price). There is simply no factual support

for Defendants ever offering reconciliation to any merchant whatsoever. Thus, at the very least, a question of fact exists regarding whether the reconciliation provisions are scams.

### C.      Defendants Intended Their MCA Agreements To Have Finite Terms.

As this Court previously noted, "[w]hile none of the MCA agreements have definite terms . . . the expected duration of the repayment period is readily calculable, since the merchant's total repayment amount due is known, as is the daily remittance amount." Ex. [DE 86] at 16 n. 5. Defendants perform this exact calculation and routinely describe their MCA agreements as having finite terms as a function of how many fixed daily or weekly Remittances before the Purchased Amount is paid off. Heskin Decl. Ex. 46 (sample underwriting reports for Defendants describing MCA deals as having fixed number of payments). When the Enterprise is negotiating the terms of an MCA agreement with a merchant, it does so by describing the agreement has having a finite number of days, weeks or payments, as was the case when negotiating with Haymount. Heskin Decl. Ex. 55. Finally, in light of the fact that the reconciliation provision is illusory, and that Defendants never perform reconciliation in any event, there is not even the theoretical possibility that the MCA agreement's term could be extended. Indeed, under the MCA Agreements, the merchant represents and warrants that he will use the Defendants' funds to "to maintain and grow Merchant's business," thereby demonstrating the Enterprise's expectation that payments will be made within the time determined by the daily payments. Heskin Decl. Ex. 16, ¶ 2.13. These undisputed facts establish that the Enterprise intentionally structures and treats their MCA Agreements as having definite terms.

### D.      The Enterprise's Warranty That Remittances Are "Good Faith Estimates" Of The Merchant's Receivables Is Demonstrably False

New York law holds that "the selection of daily payment rates that did not appear to represent a good faith estimate of receivables" weighs in favor of the MCA agreement being

construed as a loan. *Davis*, 194 A.D.3d at 517. Each Haymount MCA Agreement provides that the "Remittance is a good faith estimate of Purchased Percentage multiplied by revenues of Merchant." Clinton Decl. Ex. 1-6 at 1. A review of the MCA Agreements proves this falsity:

| MCA Company | Date | Remittance | Purchased Percent | Estimated Total Revenue |
|---|---|---|---|---|
| Merchant | 8/25/21 | $7,299 | 45% | $16,220/day |
| GoFund | 8/26/21 | $8,000 | 25% | $32,000/day |
| GoFund | 9/27/21 | $7,500 | 25% | $30,000/day |
| GoFund | 12/16/21 | $35,000 | 45% | $77,778/day |
| Funding 123 | 12/27/21 | $80,000 | 45% | $117,778/day |
| GoFund | 1/20/21 | $60,000 | 45% | $133,333/day |

Defendants' deposition testimony confirms that they have no documentation supporting their ever-changing estimate of Haymount's daily revenues. Heskin Decl. Ex. 21 [Brezel Tr.] at 227:6-19. Dr. Clinton has confirmed that when negotiating the Haymount MCA Agreements with Defendants, the daily Remittance amount was negotiated as part of the overall economic terms of the Agreements without any discussion about Haymount's actual receivables. Clinton Decl. ¶¶ 22-23; Heskin Decl. Ex. 55. Defendants' underwriting performed in connection with the Haymount MCA Agreements further **confirms that Haymount had <u>negative</u> net revenue of $1.5 million for the month of December 2021**, yet Defendants still funded—multiple times. Heskin Decl. Ex. 44 at GOFUND_000019975-79. Thus, all the evidence demonstrates that the Daily Payments were arbitrarily selected, further establishing that the Agreements are loans.

**E.    Haymount Retained Control Over Its Receivables And Assumed All Risk.**

In a true sale of receivables, "title and risk of loss pass to the buyer-retailer and the buyer is entitled to retain all proceeds of a subsequent sale[.]" *Rahanian v. Ahdout*, 258 A.D.2d 156, 158 (1st Dep't 1999). Accordingly, in instances where the seller retains the right to collect the proceeds of the allegedly purchased receivables, use the allegedly purchased receivables (or a portion thereof), or other indicia of ownership, courts have found the agreement did not constitute a sale.

*Funding Metrics v. NRO Boston, LLC*, 64204/2016, 2019 N.Y. Misc. LEXIS 4878, at *10 (Sup. Ct. N.Y. Cnty., Aug. 28, 2019) ("There is no competent evidence that QFC 'purchased' the NRO's receivables. The NROs retained ownership of the receivables, were required to collect them, bore all the risk of non-collection, gave QFC a guaranty on the money advanced that was absolutely repayable during a fixed time period with calculated interest that exceeds the legal rate"); *In re O.P.M Leasing, Inc.*, 30 B.R. 642, 648 (Bankr. S.D.N.Y. 1983).

None of the Haymount MCA Agreements "identify particular revenues or accounts that were supposedly purchased, so there is no transfer of 'risk of nonpayment by any specific customer. Moreover, the MCA agreements leave [Haymount] with the responsibility to collect revenues from all their accounts, and merchants may possess and use those revenues so long as the daily remittances are made." Heskin Ex. [DE 86] (internal citations omitted). This conclusion is unassailable as it comes from the terms of the Haymount MCA Agreements themselves. Clinton Decl. Exs. 1-6 at 1 ("[Lender] will debit the Remittance each business day from only one depositing bank account . . . into which **Merchant and Merchant's customers shall remit the Receipts from each Transaction**") (emphasis added).

This factor is undisputed. The Enterprise admits that a merchant can pay the Remittance using any source of funds, including the merchant's "piggybank if he wants to." Heskin Decl. Ex. 21 [Brezel Tr.] at 58:13-59:10. The Enterprise also purports to purchase receivables that are either (a) already been "purchased" pursuant to other pre-existing MCA Agreements; or (b) subject to tax liens. Heskin Decl. Exs. 44 and 53. Indeed, the underwriting performed by Defendants here revealed that Haymount's receivables were subject to tax liens and that Haymount had pre-existing MCA deals at the time Defendants funded—making it impossible for Defendants to purchase

anything at all. *Compare* Heskin Decl. Ex. 44 at GOFUND_000019975-79 *with Id.*, Ex. 21 [Brezel Tr.] 77:15-17 ("If we buy a receivable, we own it. Same way you can't sell a car to two people.").

Because Haymount was responsible for collecting its customer's receipts and placing them in the designated account so that the daily Remittance could be processed, it retained the risk of loss arising from a customer's non-payment. The risk remaining with Haymount is memorialized by the Agreements themselves: "Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by [Defendant] remains in the Account and will be held responsible for any fees incurred by [Defendant] resulting from a rejected ACH attempt or an Event of Default." Clinton Decl. Exs. 1-6 at 1. The failure of Haymount's account debtors to repay a purchased receivable has no consequence on the amount due from Haymount to Defendants. *Id*. Indeed, if Haymount's account debtors failed to pay, Haymount still had to pay the Defendants or be subject to default after just two missed payments. Clinton Decl. Exs. 1-6 Appendix A (H) (definition of "Default Fee"). The Haymount MCA Agreements operated as loans because Haymount "remain[ed] liable for the debt and bear[ed] the risk of non-payment by the account debtor, while [Defendants] only bear[ed] the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan." *Endico Potatoes*, 67 F.3d 1063, 1069 (2d Cir. 1995).

At bottom, both the terms of the Haymount MCA Agreements and Defendants' conduct demonstrate beyond dispute that Haymount retained full title to all of its receivables and that it was fully responsible, and consequently assumed all the risk, for ensuring it paid each Remittance regardless of where and how the money was generated. That is a loan as a matter of law.

**F.    Defendants Had Full Resource Against Haymount Under Virtually Any And All Circumstances, Including—Indirectly—Haymount Declaring Bankruptcy**

Defendants have argued that the MCA Agreements are not loans because Haymount's bankruptcy filing is not an event of default. Defs. MOL at 10.  As an initial matter, the absence of

bankruptcy as an event of default is "far from dispositive" as to whether the Haymount MCA Agreements are loans. [DE 86 at 15]. In any event, the MCA Agreements were structured such that the effects of Haymount declaring bankruptcy would trigger an Event of Default under Agreements, and the Events of Default were defined so broadly as to ensure Defendants would recover the full Purchased Amount under any and all circumstances.

In bankruptcy, the debtor's property becomes estate property (11 U.S.C. § 541(a)), the debtor must cease using its pre-petition accounts[2] and it can no longer maintain the balance in the Designated Account to make the Daily Payments, and the Enterprise would be blocked from collecting them (11 U.S.C. § 362) and Haymount would be barred from paying its pre-petition debt, all of which constitute defaults under the Agreements. Clinton Decl. Exs. 1-6 § 1.13(d) (allowing Defendants to declare default if Haymount "interrupts the operation of its business"); § 3.1(j) & (k) (Haymount changing or closing its designated account is an Event of Default); Appendix A (H) (definition of "Default Fee"). Thus, if Haymount were to file for bankruptcy, it would default under the terms of the Haymount MCA Agreements. *CMS*, at *82 (while a bankruptcy was not a default, merchant sufficiently pled MCA agreement was a loan where "language of agreements could be read to permit occurrence of some other act – such as the interruption of the merchant's business – not to be excused for protection under the Bankruptcy Code.")

Thus, the MCA Agreements operated in such a way that even bankruptcy would entitle Defendants to recourse for the full unpaid Purchased Amount, and this was just one of innumerable ways Defendants could pursue full recourse against Haymount. Indeed, the MCA Agreements defined Events of Default so broadly that a default with full recourse could occur under any

---

[2] *See* U.S. Trustee Guidelines. https://www.justice.gov/ust-regions-r02/file/region_2_operating_guidelines.pdf/download.  Among other things, a debtor must close all pre-petition books and records and bank accounts.

conceivable circumstance, including, but not limited to: (i) Haymount missing a single Remittance without giving 24-hour's notice;[3] (ii) Haymount breaching any single "term or covenant" in any one of the six Haymount MCA Agreements, which would trigger simultaneous default under all six; (iii) Haymount interrupting its business; (iv) Haymount makes any changes with its bank "in any way that is adverse or unacceptable to" Defendants; (v) Haymount fails to supply Defendants with "copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request[.]" Clinton Decl. Exs. 1-6 §§ 1.13 & 3.1

Finally, hidden in Appendix A in each of the Haymount MCA Agreements, is a provision within the listed Default Fee ($5,000 or up to 10% of the funded amount) **that Default is triggered by as little as two bounced Remittances**. Clinton Decl. Exs. 1-6 Appendix A (H). Courts have found this exact provision to weigh in favor of construing the MCA agreement as a loan. *See CMS*, 73-74 (ruling agreement to be like a loan where it provided for a default after just two missed payments); *Lateral Recovery LLC v. Queen Funding, LLC*, 21-cv-9607-LGS, 2022 U.S. Dist. LEXIS 129032, *16 (S.D.N.Y. July 20, 2022) (same); *Hi Bar Capital LLC v. Parkway Dental Servs., LLC*, 533245/2021, 2022 N.Y. Misc. LEXIS 5814, *13-14 (Sup. Ct. Kings Cnty. Aug. 25, 2022) (finding agreement like a loan where merchant was required to maintain sufficient funds in the designated account for the fixed daily payments and two missed payments triggered a default).

If any one of these non-exhaustive Events of Default occurred, Defendants had a slew of available remedies ensuring total recourse against Haymount and its owner Dr. Clinton, including, but not limited to: (i) making the "full uncollected Purchased Amount plus all fees (including reasonable attorney's fees)" immediately due; (ii) enforcing Dr. Clinton's personal guaranty; (iii)

---

[3] None of the MCA Agreements proscribe what happens if Haymount *does* give advance 24-hour notice that it will not have sufficient funds to satisfy the daily Remittance, but since reconciliation was illusory as described above, there is no relief from the obligation to pay each Remittance even if notice is given.

fling the pre-signed confession of judgment against Haymount; and (iv) enforcing their security interest in the collateral, which was defined broadly to include all of Haymount's present and future assets and revenue. *Id.* These recourses make the Haymount MCA Agreements the very definition of "absolutely repayable" and indicia of a loan; not the same of receivables. Indeed, this District has already ruled substantially similar MCA agreements issued by Braun—the guru on all things MCA for his cousins Wolf and Brezel and "consultant" to the Enterprise as a whole, SMF ¶¶ 6-19—were loans on summary judgment because:

> [T]here are virtually no circumstances where, if the accounts receivable would not be sufficient to pay the Purchased Amounts, Richmond would not be absolutely entitled to repayment of that amount by Fleetwood. 'Beyond the superficial hazard associated with a [merchant's] relatively meager chance of success, [Richmond] backed up the risk with [a] personal guarantee and a security interest in [Fleetwood's] property. Moreover, any default of the Agreements (including [Fleetwood's] closing or bankruptcy) would trigger payment.

*Fleetwood*, 2022 U.S. Dist. LEXIS 100837, at *42-43 (citations omitted).

Moreover, several of the Events of Default entitling Defendants to pursue full recourse against Haymount and Dr. Clinton (through the guaranty) have no bearing on Haymount failing to make payments and could be triggered by the arbitrary whims of Defendants, such as Defendants deeming a change between Haymount and its bank "unacceptable" or Defendants not being satisfied with Haymount's response to a request for card activity documentation. Clinton Decl. Exs. 1-6 § 1.13(b) & (f). Defendants' conduct further emphasizes they retained the unilateral discretion to invoke full recourse against Haymount—or any other merchant for that matter—by the fact that they routinely fund merchants knowing they have pre-existing MCA agreements, only to later invoke Section 3.1(i)'s anti-stacking provision. *Compare* Maxon Decl. ¶¶ 13-14 (describing how Defendants froze the merchant's account for stacking despite merchant disclosing his pre-existing MCA deals prior to signing the MCA deal) *with* Heskin Decl. Ex. 27 [Kroen Tr.]

at 13:21-14:17 (testifying that "most of the time" the Enterprise funds MCA deals with pre-existing MCA positions); Ex. 21 [Brezel Tr.] at 108:20-109:18 (testifying Defendants do not default merchants for having pre-existing MCA positions). The Events of Default, the contractual "protections" Defendants gave themselves for full recourse, and Defendants' conduct, all rendered the MCA Agreements absolutely repayable and remove all doubt that they are loans.

## III.    DEFENDANTS INTENTIONALLY COLLECTED UNLAWFUL DEBT

Defendants argue that they are entitled to summary judgment on Plaintiffs' RICO claims because "Plaintiffs cannot show any evidence that Defendants knew the MCA Agreements were usurious." Defs. MOL at 14. As an initial matter, even if true (which it is not), Defendants would not be entitled to summary judgment on Plaintiffs' RICO claims because these claims are also premised on Defendants' racketeering and predicate acts of mail fraud, wire fraud and extortion/Hobbs Act violations. Heskin Decl. Ex. 1 [Amended Complaint] ¶¶ 185-191, 241-256, 267; [DE 86] at 10 ("Court finds that the Complaint states claims for substantive and conspiratorial RICO violations, both predicated on the collection of unlawful debts and on a pattern of wire fraud involving allegedly manipulative use of ACH withdrawals"). As set forth in Plaintiffs' moving papers, there is overwhelming evidence of Defendants committing dozens if not hundreds of predicate acts of wire fraud, mail fraud, extortion and Hobbs Act violations, Pls. SMF ¶¶ 146-238, and for this reason alone, Defendants are not entitled to summary judgment on the RICO claims.

Incompleteness of Defendants' argument aside, the uncontested evidence demonstrates that Defendants did know they were issuing and collecting upon usurious loans. Under New York law, "if the note or bond shows a rate of interest higher than the statutory lawful rate, it would be immaterial whether the lender actually intended to violate the law. His intent would be conclusively presumed." *Freitas v. Geddes Savings and Loan Ass'n*, 63 N.Y.2d 254, 262 (1984). If Haymount made its daily Remittances in accordance with the stated terms of the MCA

Agreements, then Agreements all result in interest rates far exceeding New York's 25% cap, N.Y.

Penal Code § 190.40, as reflected in the chart below:

| MCA Issuer | Date | Purchase Price | Daily Remittance (Purchased %) | Purchased Amount | Term | Interest Rate[4] |
|---|---|---|---|---|---|---|
| Merchant | 8/25/2021 | $200,000 | $7,299 (45%) | $275,000 | 48 Days | 263% |
| GoFund | 8/26/2021 | $250,000 | $8,000 (25%) | $349,750 | 44 Days | 242% |
| GoFund | 9/27/2021 | $150,000 | $7,500 (25%) | $224,850 | 39 Days | 650% |
| GoFund | 12/16/2021 | $1,000,000 | $35,000 (45%) | $1,350,000 | 39 Days | 319% |
| Funding 123 | 12/27/2021 | $2,000,000 | $80,000 (45%) | $2,700,000 | 34 Days | 405% |
| GoFund | 1/20/2022 | $1,000,000 | $60,000 (45%) | $1,499,990 | 25 Days | 612% |

Clinton Decl. Exs. 1-6; Heskin Decl. Ex. 1 [Amended Complaint] ¶¶ 103-186

Based just on the face of the MCA Agreements, if Haymount made each Remittance as scheduled, it would be paying interest rates of 263% on the low end, and 612% on the high end, which is more than ten (10) and twenty-four (24) times New York's legal limit, respectively. The shockingly high interest rates on these MCA Agreements are not an anomaly. Plaintiffs' counsel have review more than 4,300 MCA agreements produced by Defendants in this action and calculated their actual interest rate assuming full funding of the Purchase Price and the merchant making each required Remittances. *See* Heskin Decl, Ex. 51. The results: all MCA agreements produced by Defendants yield an effective simple interest rate of at least twice New York's 25% cap, N.Y. Penal Law § 190.40, with agreements having an interest rate as high as 4,123%. *Id*. Thus, it is not credible for Defendants to contend—particularly without a single witness affidavit in support—that they lacked knowledge that they were issuing and collecting upon usurious loans when every one of their MCA agreements imposed usurious interest according to the disclosed terms and intended repayment schedule.

---

[4] This interest rate does not account for the fees the Enterprise assessed on the Purchase Price. If accounted, this would increase the interest rate.

Defendants' argument that they did not know or intend for their MCA agreements to be usurious loans rings even more hollow when considering that these agreements were deliberately made ***more*** usurious by Defendants' routine practice of underfunding the full promised Purchase Price while still expecting the full Purchased Amount repaid. Haymount went through this experience twice, and this is not disputed by Defendants. On December 27, 2021, Haymount entered into an MCA agreement with Funding 123 that provided for a $2,000,000 Purchase Price and a $2,700,000 Purchased Amount to be paid back through daily Remittances of $80,000. Clinton Decl. Ex. 5; [DE 64 (Getter Aff.)] ¶ 7. Rather than funding the full Purchase Price, Funding 123 merely funded $900,000 (after deducting for fees) with the promise that "after ten (10) daily payments, [it] it would fund a second payment of $700,000." [DE 64] ¶ 7; Clinton Decl. Ex. 7 (Defendants refusing to adjust Remittances on Funding 123 deal despite only funding $900,000). By changing the promised Purchase Price of $2,000,000 to $900,000 but leaving the Purchased Amount ($2,700,000) and daily Remittance ($80,000) the same, Defendants increased the effective interest rate on this Haymount-Funding 123 MCA deal from 405% to 1,521%.

Defendants also underfunded the January 20, 2021 MCA agreement with GoFund, wiring $400,000 on a $1,000,000 Purchase Price, with a $1,499,990 Purchased Amount paid back through daily Remittances of $60,000. Clinton Decl. Ex. 6; [DE 65 (Brezel Aff)] ¶¶ 16-17. This increased the effective interest rate from 612% to 4,105%. Numerous other merchants suffered the same fate. Pls. SMF ¶ 220, 231 (Office Pride entered into an MCA deal with Defendants promising $100,000 funding with a $149,990 Purchased Amount paid back through daily Remittances of $4,000, but was only funded $30,000); ¶ 232 (LF Family entered into an MCA agreement with Defendants promising $40,000, but instead received merely $26,000); ¶ 233 (Maxon Construction entered into an MCA deal with Defendants that was funded only $33,000 on a promised $100,000 Purchase

Price that had a $149,990 payback amount through daily remittances of $6,000); ¶ 234 (Rockwood agreed upon an MCA deal with Defendants with a $100,000 Purchase Price and $150,000 payback, but was subsequently duped into signing the MCA agreement that provided for $100,000 Purchase Price as a $299,800 Purchased Amount that was based on a separate Purchase Price offer of $200,000 that Rockwood rejected). Defendants intentional under-funding of MCAs that are already usurious based on their stated and intended terms is dispositive proof that they intended to collect upon unlawful debt. *Frietas*, at 261 ("Clear and convincing evidence, of an act unequivocally exacting a rate of interest in excess of that allowed by law, places a transaction within the plain intent of the usury statute"); *Roopchand v. Mohammad*, 154 A.D.3d 986, 988-89 (2d Dep't 2017) ("[W]here a loan agreement is usurious on its face, usurious intent will be implied and usury will be found as a matter of law").

Moreover, Defendants' usurious intent is not avoided simply because these outrageously high interest rates could be slightly lowered if reconciliation is provided. First, as discussed in Section III above, the reconciliation provisions were shams; they were intentionally made discretionary, Defendants failed to produce any evidence of them performing reconciliation, and Defendants admitted they do not follow the reconciliation provisions of their MCA agreements and instead will refinance the entire deal with the merchant. Pls-Defs SMF ¶ 37. Second, the mere theoretical possibility that reconciliations could, somehow, lower the effective interest rates on these usurious MCAs with interest rates of up to 4,000% to below 25% is insufficient as a matter of law to make the loans non-usurious. *See Brown v. Vrendengurh*, 43 N.Y. 195, 198 (1870) ("When a lender stipulates for a contingent benefit beyond the legal rate of interest, and has the right to demand the repayment of the principal sum with the legal rate of interest thereon, the contract is in violation of the statute prohibiting usury, and is void"); *LG Funding LLC v. Island*

*Flavor LLC*, Index No. 606794/17, 2017 NYLJ LEXIS 3426, *5 (Sup. Ct. Nov. 21, 2017) ("An initially usurious interest rate in an agreement is not saved by the potential that the rate might decrease below the twenty-five percent, (25 percent), criminal usury red line"); *DeStaso v. Bottiglieri*, 25 Misc.3d 1213(A), *8 (Sup. Ct. 2009) ("while a loan agreement may not be usurious on its face at the inception of the loan, there may be a usury problem if the rate of interest should exceed the usury ceiling during the term of the loan even though the lender would have no way of knowing whether this would eventually happen").

Defendants unsupported argument that they lacked usurious intent because they believed their MCA agreements were lawful is further undercut by a mountain of extrinsic evidence to the contrary. Under New York law, "it is well settled that parol evidence is admissible to show the illegal nature of a contract." *Stransky v. DiPalma*, 137 A.D.3d 1734, 1735 (4th Dep't 2016) (considering extrinsic evidence to determine whether agreement was usurious); see also, *Feivel Funding Assoc. v. Bender*, 156 A.D.3d 416, 418 (1st Dep't 2017) ("Contrary to plaintiff's argument that parol evidence cannot be used to raise an issue of fact as to whether a note legal on its face is usurious, usury may be established by extrinsic facts concerning the 'real character' of the transaction") (citing *O'Donovan v. Galinski*, 62 A.D.3d 769, 769 (2d Dep't 2009)).  Here, the extrinsic evidence deflates Defendants' arguments that their "actions were objectively reasonable in light of the law and wholly inconsistent with knowledge of illegality." Defs. MOL at 18.

First, Defendants refer to themselves and lenders and their MCAs as loans in private communications among themselves, conversations with merchants, and in documents shared with their bank. Heskin Opp. Decl. Ex. 2; Heskin Decl. Exs. 46-48, 64. They also acknowledge they are breaking the law and risk jail for their activities in internal communications. Pls. SMF ¶¶ 144, 166. Defendants even created an entire sham company called "Monthly Fee" whereby they

unlawfully withdraw $499 from merchant accounts, including Haymount's account in violation of this Court's injunction. Pls. SMF ¶¶ 146-189.

Second, Defendants admittedly to not treat their MCA agreements as a purchase of specific receivables. Defendants do not discuss a merchant's receivables while negotiating MCA deals. Pls. SMF ¶ 235; Heskin Decl. Ex. 55. Defendants issue MCA deals to merchants whose receivables are already encumbered, either by being already purchased by other MCA lenders or through tax liens, including Haymount. Heskin Decl. Exs. 44 and 53; Pls. SMF ¶ 135; Heskin Decl. Ex. 20 [Wolf Tr.] 52:7-11 (testifying it is possible to purchase more than 100% of a merchant's receivables). Defendants know and sometimes force merchants to pay off MCA deals using non-business-related money. Clinton Decl. ¶ 24; Heskin Decl. Ex. 21 [Brezel Tr.] at 58:13-59:10. Defendants view their MCA agreements as having fixed number of payments and admittedly disregard following the agreements' reconciliation provisions. Heskin Decl. Ex. 46; Ex. 21 [Brezel Tr.] at 60:11-62:3; 74:7-75:5, 125:3-125:20 (testifying on reconciliation that "I don't think I've ever done something exactly to the letter" of the MCA agreement).

Third, Defendants do everything in their power to ensure they are fully repaid the full Purchased Amount. Rather than ensuring that a merchant's daily remittances match their actual receivables, Defendants instead offer early pay discounts. Heskin Decl. Ex. 57. Defendants structure their broker agreements such that the brokers do not get any commission unless a significant number of remittances are tendered. Heskin Decl. Ex. 106. Defendants incorporated in Connecticut using sham offices for the explicit purpose of utilizing the CT Prejudgment Statute so it can freeze merchant's accounts to gain the upmost leverage in settlement discussions to ensure maximum recovery. Pls. SMF ¶¶ 64-90, 192-220. The Enterprise has explicitly acknowledged that freezing the merchant's accounts provides leverage for settlements. Heskin Decl. Ex. 49 at

GOFUND_00021543 (Alpha writing to the Enterprise in an email: "working on a settlement here. We still haven't frozen anything so leverage is pending").

Defendants' intentional collection of unlawful debt is established because (i) all MCA agreements are usurious on their face, often with interest rates 10 or more times higher than New York's limit; (ii) Defendants intentionally exacerbate the usurious interest by routinely under-funding the Purchase Price while leaving the term and payback amount unchanged; and (iii) all extrinsic evidence corroborates that Defendants know they are issuing loans and will do anything to collect on their, including wire fraud and violation merchants' due process rights.

## IV.    DEFENDANTS FAIL TO REBUT PLAINTIFFS' WIRE FRAUD RICO CLAIMS

As set forth above, Plaintiffs RICO claims are not just premised on the collection of unlawful debt, but also are premised on Defendants' racketeering and predicate acts of mail fraud, wire fraud and extortion/Hobbs Act violations.  Heskin Decl. Ex. 1 [Amended Complaint] ¶¶ 185-191, 241-256, 267; [DE 86] at 10. Defendants contend they are entitled to dismissal of these non-debt collection theories by self-servingly ignoring all alleged instances of fraud other than the specific example of GoFund changing its name to GoFund b in order to avoid Haymount's block. Defs. MOL. at 19-20. Even if Defendants were able to present a credible non-fraudulent explanation for the attempted GoFund b wire (which they have not), this does not address the other wire fraud acts Defendants committed against Haymount and other merchants, including Defendants admitted over-debiting of Haymount by Funding 123 and "Monthly Fee."

As Defendants acknowledge, on January 20, 2022, Haymount entered into an MCA Agreement with GoFund that provided for a $1,000,000 Purchase Price and a $1,499,990 Purchased Amount that would be paid back through daily Remittances of $60,000. Clinton Decl. Ex. 6; [DE 65 (Brezel Aff.)] ¶¶ 5-6. GoFund admittedly only funded $400,000 of this promised $1,000,000 Purchase Price, while still requiring Haymount to make the full $60,000 daily

Remittance. [DE 65] ¶ 16. As a result, by February 4, 2022, Haymount had paid $540,000 on the $400,000 advance in just a span of two-weeks, and GoFund had still refused to fund the second $400,000 installment on the MCA deal. Clinton Decl. ¶¶ 46-47. Rather than pay more of its own money for the privilege of borrowing its own money, Dr. Clinton informed GoFund it was terminating the deal and instructed GoFund not to wire the second installment and not make any further ACH withdrawals. *Id.* ¶ 48. GoFund ignored these instructions and continued to debit Haymount's Bank of America and Wells Fargo bank accounts in the amount of $60,000 on February 7-10, 2022, and February 14-17, 2022. *Id.* ¶¶ 49-54. On February 16, 2022, two days after this lawsuit began, GoFund made another $60,000 withdrawal from Haymount's Bank of America account, which prompted Haymount to instruct Bank of America to ban all further withdrawals by GoFund. *Id.* ¶ 55. After issuing this block order, Dr. Clinton received a notice from Bank of America that reflected an entity called "GoFund b" had attempted a $60,000 withdrawal on February 16, 2022, as reflected by the screenshot below, and "GoFund b" would attempt additional wires on February 18, 2022, and February 23, 2022. *Id.* ¶ 57.



Defendants argue that "there is definitive proof that the wire instruction did not use the false name 'Go Fund b,'" but this "definitive proof is quite lacking. Defs. MOL. at 19. Defendants sole "proof" is an email chain dated February 18, 2022, in which Brezel is purportedly shown making a wire from Haymount's account under the name GoFund. Pls-Defs SMF ¶ 52-54. This far from "definitive proof" that Defendants did not try to debit Haymount using "GoFund b"

because, even if true, this would only pertain the February 18, 2022 wire, not the February 16, 2022 and February 23, 2022 wires whereby "GoFund b" attempted to withdraw $60,000. Pls-Defs SMF ¶ 54. Moreover, Haymount's own bank records **do not** reflect any wire being made by "GoFund" on February 18, 2022 from either its Bank of America or Wells Fargo account, Clinton Decl. Exs. 8 and 9, rendering Defendants' February 18, 2022 email purporting to confirm a wire of dubious probative value. Defendants' contention that there was no "GoFund b" wire on February 18, 2022 is also called into question by other evidence Defendants advance, such as Brezel's uncorroborated claim that GoFund did attempt wires under the name "GoFund b," but that the "b" stood for batch (without further explanation as to why this would only appear on some wires). Pls-Defs SMF ¶ 58.

Notably, the same evidence Defendants offer to unpersuasively argue they did not attempt to fraudulently debit Haymount's account using "GoFund b" confirms the larger and more relevant claim that Defendants made unauthorized withdrawals from Haymount's account. Dr. Clinton terminated the GoFund deal on February 4, 2022, Clinton Decl. ¶ 48, and all Defendants "definitive proof" establishes is that Defendants at least attempted to make an unauthorized withdrawal on February 18, 2022. This is the second time Defendants have admitted to wrongfully debiting Haymount's account. With respect to the Haymount and Funding 123 MCA deal, Defendants already submitted an affidavit admitting to over-debiting Haymount by $1,250. [DE 64 (Getter Aff.)] ¶ 10. Discovery has revealed that this admitted $1,250 is actually an admission of at least $101,250 in over-debiting of Haymount's account because the true amount of fees on this deal was not the $400,000 Getter testified to, but actually only $300,000, which reflected the additional "profits" Defendants wanted on the deal. Pls. SMF ¶¶ 27-29, 171-173  Defendants do not even address the wire fraud with respect to the Funding 123 deal.

Defendants, therefore, have utterly failed to meet their burden to show they are entitled to dismissal of Plaintiffs' RICO claims based on wire fraud. All Defendants have succeeded in showing is that they **did** attempt at least one unlawful wire of $60,000 from Haymount's account on February 18, 2023, while offering no compelling explanation for the fraudulent wires under the name "GoFund b." Defendants do not, and cannot, offer any explanation for the wire fraud they've already admitted to with respect to the Funding 123 deal. Nor can Defendants offer explanations for the variety of other instances of wire fraud they committed in the form of the Monthly Fee withdrawals or fraud committed on merchants other than Plaintiffs. Pls. SMF ¶¶ 146-191. For these reasons, Plaintiffs' RICO claims for wire fraud must stand.

## V.    DEFENDANTS' ATTACKS ON PLAINTIFFS' DAMAGES ARE MERITLESS

Defendants advance two separate arguments with respect to Plaintiffs' damages: (1) damages for the unlawful debt collection RICO claims should be calculated as the interest charged above the lawful rate, Defs. MOL at 18-19; and (2) Plaintiffs' claimed damages stemming from lost sales are speculative and unsupported. Defs. MOL at 20-25. Notably, these arguments do not address several categories of Plaintiffs' damages, including damages for wire fraud and attorney's fees incurred in securing an injunction. *See* Pls. SMF ¶¶ 256-267. Plaintiffs will address herein these incomplete attacks on Plaintiffs' theory of damages.

### A.    *Fleetwood* Establishes The Measurement For RICO Unlawful Debt Damages

*Fleetwood v. Ram Capital Funding* involved a highly similar fact pattern where a Texas merchant entered into an MCA agreement with Braun's MCA Company containing a New York choice-of-law provision. 2022 U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022). The *Fleetwood* Court granted summary judgment on plaintiff's RICO claim for unlawful collection of debt finding that the MCA agreement issued by Braun—the cousin of Wolf and Brezel and who provides consultancy to this Enterprise's MCA business—to be a usurious loan. *Id.* at *73.

On August 17, 2022, the *Fleetwood* Court issued a subsequent ruling on the narrow issue of the extent of plaintiff's damages on its RICO claim for unlawful collection of debt. 20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 148032 (S.D.N.Y. Aug. 17, 2022) ("*Fleetwood II*"). The *Fleetwood II* Court provided a simple and uncontroversial formula for measuring RICO damages on an unlawful collection of debt claim: "the sum that was debited from [plaintiff's] account less the sum it was received and was able to enjoy. It is entitled to have that sum trebled under RICO, 18 U.S.C. § 1964(c)." *Fleetwood II*, at *22. While Defendants cite *Fleetwood II* as good and controlling authority, Defs. MOL. at 18-19, their greed gets the better of them in that they argue further that "the proper calculation is the actual amount that Plaintiffs paid above the allowed [interest] rate." Defs. MOL at 19. Defendants cite to no controlling New York authority for this proposition, and this District should not deviate from its recently set *stare decisis* in favor of foreign law chosen by Defendants because it merely lowers their exposure.

### B.    Plaintiffs HRSA Damages Were Foreseeable And Therefore Are Recoverable.

The undisputed facts demonstrate that on February 15, 2022, Alpha, acting on GoFund's behalf, sent a "UCC Lien Notice" to United Healthcare claiming Haymount to be in breach of the January 20, 2022 GoFund MCA Agreement and demanding $488,928.23 in payment from United Healthcare to satisfying Haymount's purported debt. Pls-Defs SMF ¶ 63. While Defendants claim this UCC Lien Notice was not intended on blocking Haymount from submitting claims to HRSA, the Notice itself instructed UnitedHealthcare to have "a hold on [Haymount's] accounts receivable." *Id*. ¶ 64. Internal emails from Alpha to Defendants concerning this very same UCC Lien Notice stated that its purpose was to "lock most if not all of these up." Heskin Decl. Ex. 49 at GOFUND_000020642. On March 1, 2022, Defendants received confirmation from United Healthcare that "a restraint has been placed on our medical claim payment system regarding the Tax Identification Number provided by your office for Haymount." Pls-Def SMF ¶ 67.

In light of these undisputed facts, there is no merit to Defendants' contention that United Healthcare's freeze on Haymount's HRSA submissions was the result of "unforeseeable and intervening causes (such as acts of third parties)." Defs. MOL at 21. Defendants asked United Healthcare to freeze Haymount's accounts, their contemporaneous communications confirmed this was their intent, and they accepted United Healthcare's confirmation that it had, in fact, frozen Haymount's account. Pls-Defs SMF ¶¶ 63-68. These facts satisfy the criteria for consequential damages based on the very case law Defendants rely upon in their motion papers. *Tractebel Energy Mkts. V. AEP Power Mktg.* 487 F.3d 89, 109 (2d Cir. 2007) ("In New York, a party is entitled to recover . . . lost profits only if . . . the damages have been caused by the breach [and] . . .it is established that the damages were fairly within the contemplation of the parties"); *Vista Food Exch., Inc. v. Comercial De Alimentos Sachnes S de R L de C.V.*, No. 18-CV-8999 (RA), 2022 U.S. Dist. LEXIS 165382, *23 (S.D.N.Y. 13, 2022) ("It is axiomatic that . . . the law awards damages for breach of contract to compensate for injury caused by the breach – injury which was foreseeable, i.e., reasonably within the contemplation of the parties, at the time the contract was entered into."). Plaintiffs' lost profits as a result of Defendants UCC Lien Notice to United Healthcare demanding it restrain Haymount's account is therefore a foreseeable consequence of Defendants' RICO violations and breach of the January 20, 2022 GoFund MCA Agreement.

### C.    Plaintiffs HRSA Damages Are Sufficiently Supported By The Record

Defendants also attack Plaintiffs HRSA damages for purportedly being "not substantiated" and "do not stand up to even the slightest scrutiny." Defs. MOL at 23-24. Notably, Defendants arguments here are comprised solely of immaterial attacks on the business records Haymount obtained from its billing vendor Bizmatics, which Plaintiffs produced to Defendants, while simultaneously accusing Plaintiffs of not citing any record evidence in support of its HRSA damages. *Id*. at 23; Pls-Defs SMF ¶¶ 62-86. Defendants do not even cite any relevant legal standard

for establishing lost profits, which "do[] not require absolute certainty" and "are often an approximation." *Superior Vending Servs. Inc. v. Workmen's Circle Home & Infirmary Found. for Aged*, 49 N.Y.S.3d 714, 716 (2d Dep't 2017).

Plaintiffs have adequately substantiated their HRSA damages to defeat Defendants' meritless attack. To calculate these damages, Haymount reviewed its regularly generated business records maintained by its vendor Bizmatics, which identified over 8,500 unpaid HRSA claims that had a value of more than $9.5 million. *See* Clinton Decl., ¶ 67. Plaintiffs synthesized this business record spreadsheet with additional unsubmitted HRSA claims and determined a final universe of 8,460 unpaid claims, with a total claim value of $9,723,105.44. *Id.*; *see also* [DE 162-10]. Plaintiffs then relied on business records of previously paid HRSA claims to determine the average recovery rate for Haymount's HRSA claims, which was 17.4%, to calculate the actual lost revenue, which is $1,691.820.35. Clinton Opp. Decl. [DE 193] ¶ 19; Ex. 2. This methodology is well recognized to substantiate lost profits. *Superior Vending*, at 716 ("The law does not require that they be determined with mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation"); *4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, 11-CV-00726 (CBA) (RLM), 2014 U.S. Dist. LEXIS 200610, at *22-23 ("'Established businesses have a record of past performance that may offer a reliable statistical basis for prediction' and a calculation of lost profit is not unduly speculative where lost profit calculations are properly based on that past performance") (citations omitted).

Given that Plaintiffs accumulated the data and calculated their lost profit HRSA damages in a manner entirely consistent with their legal burden of proof, it is unsurprising that Defendants' attacks on Plaintiffs' HRSA damages proof are immaterial and only seem significant due to their blinders. For instance, Defendants seem to suggest there is something nefarious about the fact that

approximately 6,321 of the claims reflected in the Bizmatics spreadsheet were submitted before February 25, 2022. Defs. MOL at 24. As an initial matter, to the extent Defendants are trying to suggest claims are included that were submitted before Defendants froze Plaintiffs' access to the HRSA portal, then the appropriate date would be February 15, 2022, when Alpha sent the UCC Lien Notice to United Healthcare. [DE 28-3]. In any event, the fact that thousands of claims were submitted to HRSA before February 15, 2022, is immaterial because HRSA had a backlog of unprocessed COVID-19 claims at the time Defendants froze the account. Clinton Opp. Decl. ¶¶ 25-26.  In fact, it would typically take HRSA 30 to 45 days to process Haymount's claims, and in that time, Haymount would see thousands of new patients every day.  *Id*. ¶¶ 9-10. The fact that there are claims submitted before February 15, 2022, does nothing to invalidate these damages.

Defendants also try to suggest Plaintiffs' HRSA damages are invalid merely because several thousands of claims on the Bizmatics spreadsheet, Clinton Opp. Dec. Ex. 1, "have a 'Date of Service' before January 1, 2022." Defs. MOL. at 24. Again, this fact is irrelevant and also expected given that Haymount was seeing thousands of new patients a day in the last few months of 2021 and the first few months of 2022. Clinton Opp. Decl. ¶ 28-29. Because Haymount was inundated with COVID patients, both insured and uninsured, its employees could not always promptly complete the cumbersome paperwork to submit with an HRSA claim immediately after treating the uninsured patient; other untreated patients were always the priority.  *Id*.  As a result, Haymount's unpaid HRSA claims that were pending at the time Defendants froze its access to the HRSA portal include many services that were provided months prior.  *Id*.

Finally, Defendants attack the Bizmatics spreadsheet because it has "29 claims for services rendered after March 22, 2022" and "59 claims that have an 'Assign Status' indicating Haymount was paid." Defs. MOL at 24. Again, this is immaterial because Plaintiffs did not simply assert a

claim for every HRSA claim that appeared in the Bizmatics spreadsheet, instead it removed those claims that were already paid or were serviced after the HRSA portal closed permanent on March 25, 2022. Clinton Opp. Decl. ¶¶ 30-31. This is why the Bizmatics spreadsheet lists 8,542 claims, whereas Plaintiffs are only seeking recovery for 8,460 HRSA claims. *Compare* Clinton Opp. Decl. Ex. 1 *with* [DE 162-10].

At bottom, Plaintiffs calculated and assessed their HRSA damages based on historical business records that were regularly maintained, just as Courts require from parties seeking to recover lost profits. Defendants have attempted to create controversy with respect to these figures where there is none by taking the underlying data out of context. because these HRSA damages were undoubtably foreseeable to Defendants when they froze Haymount's access to the HRSA portal, they are recoverable and Defendants' motion to dismiss these damages must be denied.

## VI.    GETTER'S MOTION IS CONTRADICTED BY HIS OWN AFFIDAVIT

Getter's entire argument for granting summary judgment in his favor can be distilled into a single simple theory:  I did not do anything, as evidenced by the fact that I include no evidence of me doing anything. *See generally* Getter SMF and Getter MOL. Both Getter's SMF and MOL rest entirely on a series of conclusory statements of his innocence, including (1) "There is no evidence that Getter played any role in any MCA obtained by Plaintiffs," (2) "There is no evidence Getter was involved in the issuance of any MCAs to Haymount," (3) There is no evidence that Getter was involved in the collection of payments for MCAs from Haymount," (4) "There is no evidence that Getter was involved in asset restraints against Haymount," (5) "Plaintiffs cannot establish that Getter engaged in any racketeering activity," (6) "Plaintiffs cannot establish that Getter had the requisite level of control o the enterprise affairs to establish liability," and (7) "There is no evidence showing that Getter was aware that the enterprise was collecting unlawful debt." Getter MOL at 3-8. Getter does not cite to any piece of evidence, not a document, affidavit or

deposition testimony, to support any of these conclusory and absolute statements, and that is because all evidence, including Getter's testimony, refutes these claims.

Getter's claim that he had no involvement or control over the Enterprise issuing the six MCAs is counterfactual. Getter is owner of Defendants GoFund, Funding 123 and Merchant. Pls. SMF ¶¶ 47-48, 72-73. GoFund, Funding 123, and Merchant are the counterparties to the six MCAs entered into between Plaintiffs and Defendants that are at the heart of this Action. Clinton Decl. Exs. 1-6; Heskin Decl. Ex. 1 [Amended Complaint] ¶¶ 103-186. Getter was also involved in collecting on these MCA Agreements because after Getter's company GoFund held Haymount to be in breach of the January 20, 2022 GoFund MCA Agreement, Alpha, acting on GoFund's behalf, sent UCC lien notices to dozens of Haymount's debtors and third-party payors, including United Healthcare, which administered the HRSA COVID-19 uninsured patient reimbursement portal. Pls. SMF ¶ 98; Heskin Decl. Ex. 10; Clinton Decl. ¶¶ 60-69. Getter's testimony confirmed that he plays a major role in the Enterprise's collection practice by volunteering to sign the affidavits of debt in writs of attachment used to freeze merchants' bank accounts. Pls. SMF ¶¶ 52-53.

Getter's instant claim that he had no involvement in the MCA Agreements at issue is also contradicted by his prior sworn statements. On March 21, 2022, Getter submitted an affidavit in opposition to Plaintiffs' order to show cause for a preliminary injunction. [DE 64]. Therein, Getter testified that "I am an authorized representative of Defendant Funding 123 . . . and . . . I am fully familiar with the facts and circumstances stated herein." *Id*. ¶ 1. Getter attached (a) the December 27, 2021 Funding 123 MCA Agreement with Haymount; (b) Funding 123's payment history for the MCA Agreement with Haymount; and (c) text messages between the Enterprise and Dr. Clinton and described the document as "business records . . . maintained under my supervision and control." *Id*. ¶ 2. Getter therein proceeded to describe the formation of the Funding 123 deal

and how Funding 123 reneged on the stated Purchase Price of $2,000,000 and instead funded merely $900,000. *Id*. ¶ 7. Getter also confirmed that Funding 123 over-debited Haymount by $1,250.[5] *Id*. ¶ 10. Consequently, Getter **was** involved issuing and managing the MCA deals between Defendants and Plaintiffs, and even had direct involvement in one of the deals Defendants breached by underfunding and made unauthorized over-withdrawals on.

Finally, Getter's proclamation of innocence through complete lack-of-involvement is simply not credible. Getter does not support these claims through a sworn statement, and thus these unsworn claims made by his attorney cannot trump his previous sworn affidavit filed with this Court that establishes his direct involvement. Neither Getter's SMF nor his MOL contain a single cite to any portion of the record—not a document, not an email, not an affidavit or declaration and not a single transcript—that substantiates a single portion of his arguments. Getter has already proven to make false statements concerning his and others involvement in the Enterprise as well. Getter, for example, knows and acknowledges that Braun has a leadership role within the Enterprise and works closely with other Defendants, yet when Bloomberg News ran a story on Defendants in February 2022 and spoke to Getter, he falsely claimed he had no idea who Braun was. Heskin Decl. Ex. 4; Pls-Getter SMF ¶ 11. Getter also testified that he ended his employment with Defendants in April 2022, but this was proven false as he has continued to work with Defendants in issuing writs of attachments against merchants allegedly in default as recently as July 2022. Pls. SMF ¶¶ 57-63.

"[W]here the movant 'fails to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, 'even if

---

[5] As set forth above and in Plaintiffs' moving papers, this figure is actually at least $101,250 because Defendants' underwriting records and Wolf's testimony confirmed that the fees were not $400,000 but actually $300,000, which represented additional profits for Defendants.  Pls. SMF ¶¶

no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 140-141 (2d Cir. 2003). Getter has utterly failed to fulfill his burden because he neither presents nor cites to a single piece of evidence to corroborate his claims, not even his own affidavit. Plaintiffs, while "not required to rebut an insufficient showing" has done so by citing to a variety of evidence, including Getter's own sworn statements, reflecting his direct involvement in the underlying claims and overall role in the Enterprise. For these reasons, his Motion must be denied in its entirety.

## CONCLUSION

For the reasons set forth above, neither Defendants nor Getter have satisfied their burden for their respective motions for summary judgment and Plaintiffs respectfully request that this Court deny the motions in their entirety.

March 6, 2023

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
Alex D. Corey
7 Times Square, STE 29
New York, NY 10036
(215) 864-7000
heskins@whiteandwilliams.com

**WEITZ & LUXENBERG, P.C.**
James J. Bilsborrow
700 Broadway
New York, New York 10003
Tel: (212) 558-5500
jbilsborrow@weitzlux.com

-38-

**ALMEIDA LAW GROUP LLC**
David S. Almeida
849 W. Webster Avenue
Chicago, Illinois 60614
(312) 576-3024
david@almeidalawgroup.com

*Attorneys for Plaintiffs*

-39-