**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HAYMOUNT URGENT CARE PC, and ROBERT A. CLINTON, JR., individually, and on behalf of all those similarly situated, | Case No. 1:22-cv-01245-JSR |
| Plaintiffs. | |
| v. | |
| GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISAAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, and YISROEL C. GETTER, | |
| Defendants. | |

**DEFENDANT GETTER'S RESPONSE AND COUNTERSTATEMENTS TO PLAINTIFFS' LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS**

Defendant Yisroel C. Getter respectfully submits these responses and objections to Plaintiffs' Local Civil Rule 56.1 Statement of Material Facts in Support of their Motion for Partial Summary Judgment ("Plaintiffs' 56.1 Statement").

**GENERAL RESPONSES AND OBJECTIONS**

Defendant Getter joins in the General Responses and Objections asserted in the Rule 56.1 Counterstatement filed by his co-defendants. He adopts those general responses and objections as if fully set forth and repeated herein.

1

**SPECIFIC RESPONSES AND OBJECTIONS TO PLAINTIFFS' 56.1 STATEMENT**

Getter specifically respond to Plaintiffs' Rule 56.1 Statement as follows:

**I.      Summary of the Action**

1.      Plaintiffs filed this action for breach of contract, RICO collection of unlawful debt, racketeering and conspiracy, and violations of their constitutional rights.

**RESPONSE / OBJECTION**  Getter does not dispute that Plaintiffs filed this action for breach of contract, RICO collection of unlawful debt, racketeering and conspiracy. Defendants dispute that Plaintiffs filed this action for violations of their constitutional rights.

Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement that they filed this action for violation of their constitutional rights.  The record demonstrates that Haymount and Clinton, the only Plaintiffs remaining in this action, did not assert any claims alleging violation of their constitutional rights.  Amended Complaint [Dkt. No. 28]

2.      The RICO Enterprise consists of Defendants, Jonathan Braun ("Braun") and other companies controlled by Defendants and Braun, including Bridge Funding Cap, LLC ("Bridge"), GSS Equity, Tailor Fund Cap, LLC, Hartford Receivables, LLC, and Alt Capital Source, LLC (the "Enterprise").

**RESPONSE / OBJECTION.** Disputed. The membership of the Enterprise is a legal question.

3.      The Enterprise, through the Individual Defendants and other co-conspirators, orchestrates a scheme to engage in mail and wire fraud and to collect upon unlawful debt by disguising criminally usurious loans as the purchase of future receivables.

**RESPONSE / OBJECTION.** Disputed. This is argumentative and a legal conclusion. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for this statement.

4.      To ensure absolute recovery of the unlawful debt, the Enterprise abuses of the Connecticut prejudgment attachment statute, Conn. Gen. Stat. § 52-278(f) (the "CT Prejudgment Statute") to freeze bank accounts without notice and to coerce merchants and their individual owners into signing releases through the pain of financial duress. *See generally* Declaration of Shane Heskin, dated February 13, 2023 ("Heskin Decl.") Ex. 1 [the Amended Complaint].

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs' citation to its own pleading does not count as admissible support for this statement. To the extent Paragraph 4 states conclusions of law or Plaintiffs' legal characterizations, and not statements of fact as required by Local Civil Rule 56.1, it should not be considered. Getter disputes the allegations, and to the extent Plaintiffs rely on pleadings, refer this Court to Defendants Answer. Dkt. No. 171, Heskin Decl. Ex. 2 (Amended Answer).

5.      On the Motion, Plaintiffs seek summary judgment on their claims for RICO racketeering and conspiracy and due process violations. Plaintiffs are not presently moving with respect to their RICO Claims for the collection of an unlawful debt.

**RESPONSE / OBJECTION.** Getter does not dispute that Plaintiffs are not presently moving with respect to their RICO Claims for the collection of an unlawful debt. Getter disputes that Plaintiffs are seeking summary judgment on the due process violations, because Plaintiffs have amended their notice of motion to withdraw their 42 U.S.C. § 1983 claim. Dkt. No. 189.

II.     The Enterprise's Culpable Persons and Corporate Members

      **a. Johnathan Braun is the Enterprise's Guru Who Taught The Enterprise How The MCA Industry Scam Works**

6.      Braun is an individual and convicted felon. On November 3, 2011, Braun pled guilty to conspiracy to import marijuana and money laundering, and on May 28, 2019, he was sentenced to a 10-year prison term. Heskin Decl. Ex. 6 [NYAG Petition] ¶ 31.

**RESPONSE / OBJECTION.** Undisputed.

7.      Braun is the cousin of Defendant Wolf and Defendant Brezel.  It was Braun who introduced Wolf and Brezel to the MCA industry sometime between 2016 and 2018.  Heskin Decl. Ex. 20 [Wolf Tr.] at 24:15-25:22; and Ex. 21 [Brezel Tr.] at 180:19-181:7.

**RESPONSE / OBJECTION.** Getter does not dispute that Wolf and Brezel are second cousins with Braun. Brezel Tr. at 180:21-181:1.

8.      As alleged by the New York Attorney General (the "NYAG") and the Federal Trade Commission ("FTC"), during the time Braun was introducing Wolf and Brezel to the MCA industry, Braun was a principal and de facto owner of Richmond Capital Group LLC ("Richmond"), which, like Defendants, was an MCA company alleged to be part of a scheme to deceive merchants. Heskin Decl. Ex. 6 [NYAG Petition] ¶ 30; Ex. 5 [FTC Complaint] ¶ 8.

**RESPONSE / OBJECTION.** Getter does not dispute that the NYAG and FTC have made allegations against Braun and  refer to the cited statements for their true and correct contents. To the extent Paragraph 8 states conclusions of law or Plaintiffs' legal characterizations, and not statements of fact as required by Local Civil Rule 56.1, it should not be considered. The FTC Complaint cited to support the statement in Paragraph 8 is inadmissible, in violation of Rule 56(e) and Local Rule 56.1(d), and thus should not be considered.

9.     Among other things, the NYAG and FTC alleged that Braun and Richmond: (i) issued thousands of usurious loans disguised as merchant cash advances (Heskin Decl. Ex. 6 ¶¶ 3, 10-11, 50, 64, Ex. 5 ¶¶ 13-14); (ii) regularly defrauded merchants by lending them smaller amounts than promised, charging excessive fees and withdrawing more from merchants' bank accounts than merchants agreed to pay (Heskin Decl. Ex. 6, ¶¶ 12, 76-77, Ex. 5, ¶ 15); (iii) fraudulently withheld amounts from merchants' agreed-upon advances as so-called "reserves" (Heskin Decl., Ex. 6, ¶ 75); (iv) abused New York's court system by filing confessions of judgments supported by false and misleading affidavits to procure fraudulent judgments against merchants (Heskin Decl. Ex. 6 ¶¶ 57, 94-97); and (v) threatening merchants who did not pay under their agreements with Richmond. Heskin Decl., Ex 5, ¶ 26.

**RESPONSE / OBJECTION.** Getter does not dispute that the NYAG and FTC have made allegations against Braun and refers to the cited statements for their true and correct contents. To the extent Paragraph 9 states conclusions of law or Plaintiffs' legal characterizations, and not statements of fact as required by Local Civil Rule 56.1, it should not be considered. The FTC Complaint cited to support the statement in Paragraph 9 is inadmissible, in violation of Rule 56(e) and Local Rule 56.1(d), and thus should not be considered.

10.     From at least April 2019, Braun has been intimately involved with Defendants' operations, as demonstrated by emails from April 5, 2019, in which Braun instructs one MCA company called "Mega Cap Funding," to send remittances to co-Defendant Brezel (a/k/a Yossi). Heskin Decl. Ex. 15 at GOFUND_000023594; *see also* Ex. 23 [Alfin Tr.] at 45:9-47:9 (Defendants' attorneys testifying that he understands Braun to be an agent of GoFund, Funding 123 and Merchant); *see also*, Heskin Decl. Ex. 15 at GOFOUND_000025191-202 (Braun, via his consulting company "Royal Consulting Services", sending a notice, dated November 5, 2019, to a

customer of a merchant purportedly in default under one of the Enterprise's MCA agreements directing the merchant's customer to remit payments directly to Braun's consulting company acting on behalf of the Enterprise); *id.* at GOFUND_000024777-783 (Braun contacting the law offices retained by a merchant and threaten the recipient, writing: "WE ARE UNWILLING TO RELEASE YOU. YOU'RE A LIAR AND THIEF, AND DEFRAUD [sic] US FINANCIAL AS WELL AS COMMITTED FORGERY. WE ARE NTO ALLOWING YOU TO DICTATE WHEN TO PAY US AND DO WHATEVER YOU'D LIKE…").

**RESPONSE / OBJECTION.** Getter does not dispute that Braun, in some capacities, was involved in the operation of MCA of entities identified as Defendants in this action. To the extent that the Plaintiffs use the terms "Defendants' operations" to imply that Getter controls or operates any of these entities, Getter disputes any such assertion and avers that it is un supported by the evidence cited by Plaintiffs.

11.     Braun's in-person participation in the Defendants' businesses came to a brief pause on or about January 2, 2020, when, after several delays, Braun finally surrendered to authorities and began serving his 10-year sentence. Heskin Decl. Ex. 7.

**RESPONSE / OBJECTION.** The exhibit cited to support the statement in Paragraph 11 is inadmissible, in violation of Rule 56(e) and Local Rule 56.1(d), and thus should not be considered.

### b.   President Trump Commutes Braun's Sentence

12.     On January 20, 2021, Braun's 10-year sentence suddenly and unexpectedly came to a swift end when former President of the United States Donald J. Trump issued an executive grant of clemency to Braun, which stated:

> **Jonathan Braun –** President Trump commuted the sentence of Jonathan Braun. Mr. Braun has served 5 years of a 10-year sentence for conspiracy to import marijuana and

commit money laundering.  Upon his release, Mr. Braun will seek employment to support his wife and children.

Heskin Decl. Ex. 19 [WH Press Release].

**RESPONSE / OBJECTION.** Getter does not dispute that Mr. Braun's sentence was commuted by executive action.

13.  Braun was released that same day, January 20, 2021. *Id.* Ex. 7

**RESPONSE / OBJECTION.** The cited exhibit does not support the statement in Paragraph 13.

14.  Since receiving clemency, Braun has resumed usurious lending by acting as a "consultant" for Defendants. Heskin Decl. Ex. 21 [Brezel Tr.] at 111:4-6 (Braun is a consultant for GoFund, Funding 123 and Merchant); Ex. 27 [Kroen Tr.] at 27:16-27:10.

**RESPONSE / OBJECTION.** The assertion that Braun resumed "usurious lending" is a legal conclusion. Getter does not dispute that Braun is a consultant for certain of the Defendant entities.

15.  During Braun's year in custody, Defendant Wolf maintained daily communications with Braun, and would visit him in jail every week. Heskin Decl. Ex. 20 [Wolf Tr.] at 27:22-34:18.

**RESPONSE / OBJECTION.** Disputed. Wolf testified that he presently talks to Braun "once a day," *see* Wolf Tr. at 27:22-24, and that he "*tried* to go every week to visit" Braun in jail, *see id.* at 34:15-18 (emphasis added).

16.  Since his release, Braun has visited Defendants' Brooklyn offices "almost every day." Heskin Decl. Ex. 20 [Wolf Tr.] at 36:4-11. Defendants confirmed that Braun works out of Defendants' Brooklyn offices. Ex. 27 [Kroen Tr.] at 61:6-10; see also Ex. 25 [Getter Tr.] at 46:2-47:8 (testifying Braun was in Defendants' New York office daily between April 2021 and April

2022 and was believed to be calling the shots). Defendants also confirmed that Braun provides them with leads for new business for the Defendants. Ex. 29 [Beityakov Tr.] at 28:15-29:8.

**RESPONSE / OBJECTION.** Getter does not dispute these statements.

17.     Defendants' document production confirms that Braun is a key decision-maker within the Enterprise, involved with (i) directing members of the Enterprise as to when to release funding to merchants, Heskin Decl. Ex. 15 at GOFUND_000020920-925; (ii) directing the Enterprise about debiting merchant's accounts, *id.* at GOFUND_000027078-095; (iii) directing the Enterprise on how to handle a merchant in default, *id.* at GOFUND_000027820-832 and GOFUND_000030923-929; and (iv) making decisions for the Enterprise on refinancing or refunding merchants' MCA Agreements. *Id.* at GOFUND_000031565-578, and 000018998-018; *see also* Ex. 40 [Wolf Interrogatory Responses] at 2 (identifying Braun as a witness with information concerning Defendants' MCA business).

**RESPONSE / OBJECTION.** Getter does not dispute this statement.

18.     The individual Defendants take advice and direction from Braun. Heskin Decl. Ex. 20 [Wolf Tr.] at 26:21-27:24, 36:4-7, 60:10-17.

**RESPONSE / OBJECTION.**  Getter does not dispute the statement to the extent that it asserts that he took advice and direction from Braun from April 2021 to April 2022.  There is no evidence in the record that Getter took advice or direction from Braun outside this period.

19.     Per Bloomberg News' reporting, this advice includes using the CT Prejudgment Statute in connection with loans issued by Defendants. *Id.* at 13 ("In more than 100 cases in a Connecticut Court, companies associated with Braun—including Matrix Advance, Bridge Funding Cap, and GoFund Advance-have used a legal procedure called prejudgment attachment").

**RESPONSE / OBJECTION.** The exhibit cited to support the statement in Paragraph 19 is inadmissible, in violation of Rule 56(e) and Local Rule 56.1(d), and thus should not be considered. The cited parenthetical does not support the assertion that Getter took advice from Braun concerning the use of CT Prejudgment Statute.

### c.   Defendant Wolf Is The Public Face Of The Enterprise

20.   Defendant Wolf is an individual who got involved in the MCA industry around 2016 or 2017 through a mentorship with Braun, his cousin, who he still talks to as an admitted "advisor" every day and copies Braun "on almost every deal for his advice." Heskin Decl. Ex. 20 [Wolf Tr.] at 24:15-28:3; 60:19-61:5.

**RESPONSE / OBJECTION.**   Getter does not dispute this statement.

21.   Although he hides his true ownership of Defendants GoFund and Funding 123 from the public and governmental authorities through Getter, Kroen and Hartford Receivables, LLC, Wolf is the true owner of each company, and exercises all major decision making over these entities, including who gets to fund the deals, which brokers to use, and which deals to fund. Heskin Decl. Ex. 21 [Brezel Tr.] at 26:15-34:12.

**RESPONSE / OBJECTION.**   Getter does not dispute that Wolf exercised all major decision making over GoFund and Funding 123.  Getter objects to that term "true owner" as vague and ambiguous.

22.   Wolf admittedly owns numerous other MCA companies, more than he could recall sitting for a deposition, including Bridge Fund Cap, LLC ("Bridge"), Chrome Capital Funding, LLC, Yes Capital Funding Group, LLC, and MapCap Advance, LLC. Heskin Decl. Ex. 20 [Wolf Tr.] at 28:19-32:1, 39:6-42:15.

**RESPONSE / OBJECTION.** The cited testimony supports the assertion that Wolf owns Chrome Capital Funding and Yes Capital Funding Group, LLC. Undisputed that Wolf owns the other entities listed in paragraph 22.

23.    Wolf "has authority to make decisions" concerning Bridge. Heskin Decl. Ex. 21 [Brezel Tr.] at 24:20-24.

**RESPONSE / OBJECTION.** Undisputed with clarification. Brezel testified that Wolf "has authority to make decisions as far as I know," concerning Bridge Funding Cap.

24.    The MCA companies owned by Wolf also do business under various D/B/As, more than he was able to recall, but these D/B/As include GoFund Advance, Skyfall Funding, Fundura Capital, Funding 123, Merchant Capital, Matrix Advance, Gel Funding, Eleven Capital, Cannon Advance and Bridge Funding. Heskin Decl. Ex. 20 [Wolf Tr.] at 129:2-133:15.

**RESPONSE / OBJECTION.** Undisputed with clarification. Wolf later testified that Gel Funding is no longer operational. *See* Wolf Tr. 149:12-17 (Q. "So is this a company that you own or control, Gel Funding? A. It was originally I had that entity, yeah.  Q. Okay. But you no longer own Gel Funding?  A. Gel Funding is not operational for the last, I'd say, two years.").

25.    As owner of these MCA companies, Wolf obtains copies of merchants' bank statements who are applying for loans but testified that he does not review these materials carefully. Heskin Decl. Ex. 20 [Wolf Tr.] at 46:20-47:4; 117:20-118:21; at 120:7-121:10 ("I don't read every single underwriting report"); at 151:16-152:23 ("Q. You don't always look at the merchant's bank statements when funding them? A. Actually most of the times not").

**RESPONSE / OBJECTION.** Undisputed.

26.    Wolf determines the amount of fees his MCA companies assess on the MCA agreements merchants enter into. For instance, Wolf confirmed he funded the $2 million MCA

agreement dated December 27, 2021, entered into between Haymount and Funding 123. Heskin Decl. Ex. 20 [Wolf Tr.] at 67:8-10; *see also* Clinton Decl. Ex. 5.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement that "Wolf determines the amount of fees his MCA companies assess on the MCA agreements merchants entered into" and the immediate next sentence, despite saying "for instance," does not address fees. As to the second assertion, undisputed with clarification. Wolf's "entity syndicated" the MCA agreement. Wolf Tr. 67:8-10.

27.     As reflected in the Enterprises internal correspondence, the "Total Fees" associated with this MCA agreement was $300,000. Heskin Decl. Ex. 42.

**RESPONSE / OBJECTION.** Disputed. Getter does not dispute that Heskin Decl. Ex. 42 purports to show an internal funding email showing total fees for $300,000, but dispute the fees were actually $300,000 for the reasons included in response to Plaintiffs' Rule 56.1 Statement ¶ 171.

28.     Wolf testified that these "Total Fees" did not represent contemporaneous fees, but are treated as contemporaneous legal fees. *Id.* Ex. 20 [Wolf Tr.] at 72:13-19.

**RESPONSE / OBJECTION.** Disputed. The cited testimony does not support the statement in Paragraph 28. Moreover, when asked whether it was his "testimony that this is intended to cover potential future legal fees," Wolf testified "No. I said deal-by-deal basis." *See* Wolf Tr. at 73:22-74:1.

29.     Wolf testified that this $300,000 fee associated with the Funding 123 MCA agreement with Haymount and others like it are "justified . . . because their client agreed and that's what we charge." Heskin Decl. Ex. 20 [Wolf Tr.] at 73:22-74:13.

**RESPONSE / OBJECTION.** Undisputed with clarification. The correct quote is, "To justify, is because their clients agreed and that's what we charge."

30.     In addition to not reading underwriting reports or bank statements, Wolf testified that he does not read his own MCA agreements and is generally averse to reading. Heskin Decl. Ex. 20 [Wolf Tr.] at at 127:11-129:15 (testifying he is generally illiterate and doesn't read every agreement) and 172:7-12 ("I don't read the contracts. I got it from my attorneys") and 244:21-245:8 ("I never read the agreement. I have an attorney who prepares agreements").

**RESPONSE / OBJECTION.** Disputed in part. Wolf did not testify that he is "illiterate." He stated," I don't read. I'm not a – I can't read a book . . . I have ADHD it's called." Wolf Tr. 127:15-16.

#### d.  Defendant Brezel Controls The Flow Of Funds Into the Enterprise

31.     Brezel also hides his ownership of Merchant Capital through Getter, Kroen and Hartford Receivables, LLC and GSS Equity. In substance, Brezel is the true owner of Merchant Capital and GSS Equity, and exercises all major decision making over them, including who gets to fund the deals, which brokers to use, and which deals to fund. Heskin Decl. Ex. 21 [Brezel Tr.] at 26:15-34:12; Ex. 129 at 16 ("I'm very cautious. I made a lot of changes internally to prevent problems. Like entity not being on my name…. the articles gave everyone a good warning."), Ex. 74 ("But trust me, leave it on MC docs. I can freeze that and it's a US bank account. …I have the money").

**RESPONSE / OBJECTION.** Getter does not dispute that Brezel exercises all major decision making over Merchant Capital and GSS Equity."  Getter objects that that term "true owner" is vague and ambiguous.

32.     Defendant Brezel is an individual and also acts as the liaison between the Corporate Defendants and Individual Defendants, on the one hand, and GSS Equity, on the other, which serves as the primary financier on the Enterprise's deals and covers expenses. Heskin Decl. Ex. 21 [Brezel Tr.] at 11:22-17:24.

**RESPONSE / OBJECTION.** The cited testimony does not support the statement in paragraph 32.

33.     Brezel is Wolf's and Braun's "first cousin once removed." Heskin Decl. Ex. 21 [Brezel Tr.] at 24:15-16, and 112:12-15. He consults with Braun "on a lot of business that I do" and pays Braun as a consultant through GSS Equity. *Id*. at 112:12-24.

**RESPONSE / OBJECTION.** Undisputed.

34.     Since May 2020, Brezel uses GSS Equity exclusively for issuing MCA agreements, which maintains "multiple d/b/as." Heskin Decl. Ex. 21 [Brezel Tr.] at 18:1-19:16 and 114:20-21 ("I run the MCA department of [GSS Equity], but I'm not the owner of the company").

**RESPONSE / OBJECTION.** Undisputed.

35.     Prior to May 2020, Brezel utilized his own companies for MCA deals, which were BBF Partners, Tailor Cap Fund, and Rely Services, which also utilized various D/B/As, including Forward Fund, Simply Fund, Green Fund, Second Chance, Business Funding, and Merchant Capital, which he operated by himself. *Id.* at 19:3-22:10.

**RESPONSE / OBJECTION.** Undisputed.

36.     Brezel's use of Merchant Capital to issue MCA agreements is as a d/b/a of GSS Equity, not the Defendant Merchant Capital. *Id.*  51:8-16. Brezel also issues MCA agreements under "GoFund" as a d/b/a of GSS Equity beginning in June or July of 2021.  *Id*. at 26:18-24; 51:21-52:1.

13

**RESPONSE / OBJECTION.** Undisputed with clarification. Brezel testified that GSS equity has been using GoFund as a d/b/a since "approximately June of 2021," not July.

37.     Brezel uses a program to change his telephone number in his dealings with merchants. Heskin Decl. Ex. 21 [Brezel Tr.] at 9:2-7.

**RESPONSE / OBJECTION.** Undisputed with clarification. Brezel testified: "Do I use a program to change my cell phone number? Yes, I've used that in the past."

38.     Brezel also acts as the enforcer for the Defendants. Heskin Decl. Ex 126, pp. 25-26 ("I had someone visit a merchant [] that owes us money. Mother fucker. He ran away. Im gonna collect here."), p., 33 ("I'm a bit worried about how he crossed the line a few times on collecting without covering up his tracks."), pg. 41 ("Asian. When you'll know what it took to get paid you would understand."); Ex. 115 ("There's a limit to how much I can just forgive and forget.").

**RESPONSE / OBJECTION.** Disputed. The term "enforcer" is vague and ambiguous. To the extent that Plaintiffs are asserting that Brezel acts as an enforcer for Getter, the cited evidence does not support this assertion and Getter disputes it.

**e.   Kroen Controls Various MCA Companies Within The Enterprise and Works With Wolf Managing Deals Issued by GoFund, Funding 123 and Merchant Capital**

39.     Kroen owns Matrix Advance and Fundura Capital and exercises full decision-making authority over these two MCA companies, which are D/B/As for Bridge. Heskin Decl. Ex. 21 [Brezel Tr.] at 37:1-38:2; Ex. 27 [Kroen Tr.] at 23:7-26:9.

**RESPONSE / OBJECTION.**  Getter does not dispute that Koran exercised full decision-making authority over Matrix and Fundura.  The cited evidence supports the assertion that Kroen owns Fundura Capital, not Matrix Advance. *See* Kroen Tr. 23:7-12.

40.     Kroen works directly with Wolf (who owns Bridge) and they share an office. Heskin Decl. Ex. 21 [Brezel Tr.] at 180:7-9; Ex. 27 [Kroen Tr.] at 60:13-62:8; 109:10-11 ("Wolf has authority across the board, I believe, on all my deals"). Kroen also involves Braun in his deals as a "consultant" and, prior to September 2022, would routinely copy Braun on emails.  Heskin Decl. Ex. 27 [Kroen Tr.] at 28:4-30:19.

**RESPONSE / OBJECTION.** Undisputed.

41.     Kroen uses made-up names in his business dealings with merchants. Heskin Decl. Ex. 27 [Kroen Tr.] at 6:13-7:9.

**RESPONSE / OBJECTION.** Undisputed with clarification Kroen "sometimes" uses made-up names in his business dealings with merchants. *See* Kroen Tr. at 6:13-7:10.

42.     Kroen claims to understand the terms of the Company Defendants' MCA agreements but admittedly has never ready one in full. Heskin Decl. Ex. 27 [Kroen Tr.] at 45:3-15.

**RESPONSE / OBJECTION.** Undisputed.

43.     Kroen does not understand the purpose of certain fees charged on MCA deals, like underwriting and bank fees, and as for other fees, he believes they are to obtain profit in addition to expenses, which are minimal. *Id*. at 79:2-83:2.

**RESPONSE / OBJECTION.** The cited testimony does not support the statement that expenses "are minimal."

44.     Kroen does not review the bank statements when performing underwriting. Heskin Decl. Ex. 27 [Kroen Tr.] at 159:8-162:9 ("I personally never reviewed bank statements").

**RESPONSE / OBJECTION.** Undisputed with clarification. Kroen also testified that "[He's] not the one that determined what the receivable is. [He's] not the one that determined what day the payment is. [He's] not the one that determined any of that." Kroen Tr. 161:13-15.

45.     Kroen does not know who actually performs the underwriting, what their qualifications are, or what their educational background is. *Id*. at 163:9-18.

**RESPONSE / OBJECTION.** Undisputed with clarification. Kroen testified that he "[doesn't] hire [the underwriters]; [he doesn't] fire them . . . [he doesn't] interview them either." Kroen tr. 163:12-13.

46.     Kroen managed the MCA agreement entered into between Funding 123 and Haymount. Heskin Decl. Ex. 21 [Brezel Tr.] at 190:1-10.

**RESPONSE / OBJECTION.** Undisputed with clarification. When asked if "this is a deal that's Isaac's. Right. And Joe Kroen," Brezel answered, "Okay. This is the Haymount deal. So he's managing the deal, yes. Okay."

> **f.   Defendant Getter Issues MCA Agreements Through A Company He Owns and Prepares Writs of Attachment to Freeze Bank Accounts On Behalf of the Enterprise**

47.     Defendant Getter is an individual and is the owner of Hartford Receivables, LLC ("Hartford"), Heskin Decl. Ex. 25 [Getter Tr.] at 25:16-25.

**RESPONSE / OBJECTION.** Undisputed.

48.     Hartford is the purported parent company of GoFund, Funding 123 and Merchant, but as described below, the legitimacy of this ownership registration is disputed.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for this statement.

49.      Getter uses made up names in dealing with merchants. Heskin Decl. Ex. 24 [Gold Tr.] at 61:30-62:5.

**RESPONSE / OBJECTION.** Getter denies that he uses made. up names in dealing with merchants, and avers that he often goes by the first name Sruly (which is his Hebrew nickname) socially and in business.  The cited testimony does not support the statement in paragraph 49.

50.      Getter also uses an application that disguises his true phone number when speaking with merchants. Heskin Decl. Ex. 25 [Getter Tr.] at 57:16-58:11.

**RESPONSE / OBJECTION.** The cited testimony does not support the statement in Paragraph 50. Getter denies this assertion.

51.      The Enterprise relies on Getter to assist with the preparation of writs of attachment, which are used to freeze merchant's bank accounts. Specifically, he signs the accompanying affidavits of debt without actually having personal knowledge. Heskin Decl. Ex. 25 [Getter Tr.] at 39:11-40:5 ("Q. Did they [Wolf, Brezel, Kroen] ever ask you to sign something that you didn't have personal knowledge about?  A.  I mean, I definitely have signed affidavits that's, you know, based off the same way I would trust the accounting system, the same way I would trust somebody else saying this, this, I'm not in the office today, can you sign this.  I've definitely done that.  Q. So you signed things based on personal knowledge that you didn't have personal knowledge about[?] A. I mean, personal knowledge, it's I think that's considered personal knowledge if somebody tells me that. That's personal knowledge").

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement "[t]he Enterprise relies on Getter to assist with the preparation of writs of attachment, which are used to freeze merchant's bank accounts." And Getter denies this.  Getter does not

dispute that while employed by Wolf, he signed affidavits of debt in connection with collection proceedings, although not in connection with and debt owned by Plaintiffs. The cited testimony does not support the parenthetical in paragraph 51.

52.     Getter admits that he was not personally involved in the December 27, 2021 Funding 123 and Haymount MCAs, Heskin Decl. Ex. 25 [Getter Tr.] at 54:12-57:16, but submitted an affidavit attesting to facts concerning that deal with this Court. Ex. 114 [Getter Decl. Dkt. No. 64].

**RESPONSE / OBJECTION.** Undisputed.

53.     Getter explained this was an example of when he "would have signed some affidavits when I was in the office for other people." Ex. 25 [Getter Tr.] at 54:12-57:16; 113:16-125:24 (Getter being shown the affidavit he submitted to this Court and walking back his statement therein that he "reviewed Funding 123's books and records as they pertain to this file" and admitting that he attested to whatever Wolf told him about the deal).

**RESPONSE / OBJECTION.** Undisputed.

54.     Getter prepares writs of attachment despite admittedly never having read an MCA agreement issued by the Company Defendants. Heskin Decl. Ex. 25 [Getter Tr.] at 36:13-38:2.

**RESPONSE / OBJECTION.** The cited testimony does not support the statement in paragraph 54. *See* Getter Tr. 36:13-38:2 and Getter disputes it.

55.     Getter disputes that he is the actual legal owner of GoFund, Funding 123 and Merchant, and testified that with respect to these entities "I have never given those contracts out, never created those contracts[.]" *Id.* at 142:9-19.

**RESPONSE / OBJECTION.** The cited testimony does not support the statement in paragraph 55. See Getter Tr. 142:9-19 (Getter testifying as to Sarah Beiyakov using the name "Ashley"). Getter disputes that he is legal owner of GoFund, Funding 123 or Merchant Capital.

56.     Getter testified that at least four writs of attachment prepared by the Enterprise's attorneys include an affidavit of debt that contain forgeries of his signature. Heskin Decl. Ex. 25 [Getter Tr.] at 143:5-184:12; *see also* Heskin Decl. Exs. 32-35 (forged affidavits Getter refers to).

**RESPONSE / OBJECTION.** Disputed. Getter never affirmatively testified that his signatures were actually forged, repeatedly stating "I'm not sure" or "I don't think so." And on one occasion, Getter did recognize his signature. See Getter 193:20-24 ("The witness has identified [exhibit] 15 as his signature and all of the rest that we've shown him are not his signature? A. I'm not sure. They don't seem to be." Documentary evidence indicates that Getter did sign at least one of the affidavits at issue. *See* GOFUND_000103856 (email in which Wolf asks Getter to sign); *see also* GOFUND_000103904 (email in which Getter responds to Wolf email with the signed attachment).

57.     On September 21, 2022, Getter testified that he left the Enterprise in April 2022. Heskin Decl. Ex. 25 [Getter Tr.] at 32:3-6.  This testimony was false.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement: "This testimony was false."

58.     On or about July 26, 2022, a merchant, LF Family LLC ("LF Family") entered into an MCA with "United Fund USA."  *See* Declaration of George Harbor ("Harbor Decl.") Ex. A.

**RESPONSE / OBJECTION.** Undisputed. This witness was never disclosed to Defendants and this document was not produced in discovery.

59. On or about September 16, 2022, United Fund USA issued a writ of attachment for LF Family's purported default, in which it revealed that United Fund USA is a d/b/a for Matrix Advance, LLC ("Matrix"). Harbor Decl. Ex. B.

**RESPONSE / OBJECTION.** Undisputed. This witness was never disclosed, and this document was not produced in discovery.

60. Getter testified he issues MCA agreements under "United Fund USA." He stated this was a d/b/a of "Skyline Funding Group," which he purportedly owns. Heskin Decl. Ex. 25 [Getter Tr.] at 62:12-63:13.

**RESPONSE / OBJECTION.** Undisputed.

61. Like Defendants GoFund, Funding 123, and Merchant Capital, Matrix filed to be incorporated in Connecticut in June 2021 and listed Kroen as the owner and gave a "Principal Office Address" of 304 West Main St, Suite 2, Avon, Connecticut, 06001," which was the same address originally given for GoFund, Funding 123 and Merchant when they incorporated in Connecticut. *Compare* Heskin Decl. Ex. 58 *with* Ex. 59. Wolf testified that he uses Matrix as a white label for funding MCA agreements. Heskin Decl. Ex. 20 [Wolf Tr.] at 130:7-15.

**RESPONSE / OBJECTION.** Undisputed as to the first statement of Paragraph 61. The second statement of paragraph 61 is undisputed with clarification. Wolf testified that Matrix is a d/b/a/ of MapCap. Wolf Tr. 130:7-15.

62. As part of the writ of attachment for LF Family, Getter signed an affidavit of debt in which he attested that he is an "account manager" of United Fund USA and that there is probable cause for a judgment to be entered against LF Family in the amount of $73,005, including "$20,000" in "anticipated legal fees/costs." Harbor Decl. Ex. B.

**RESPONSE / OBJECTION.** Undisputed. This witness was never disclosed, and this document was not produced in discovery.

63.     Five days before testifying that he had cut ties with the Enterprise, Getter signed an affidavit of debt on behalf of Matrix, a company owned by Kroen and controlled by the Enterprise, as part of a writ of attachment against a merchant that utilizes the CT Prejudgment Statute.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for this statement. Getter disputes that the referenced affidavit of debt was signed on behalf of a company owed by Kroen or controlled by the "Enterprise" and the cited evidence does not support his contention.

### g.  GoFund, Funding 123 and Merchant Capital Are Fictitious Connecticut Entities Created To Abuse The CT Prejudgment Statute

64.     The legal entities and Defendants GoFund, Funding 123, and Merchant Capital were incorporated in June 2021 (for GoFund and Merchant Capital) and October 2021 (for Funding 123). Heskin Decl. Ex. 21 [Brezel Tr.] at 46:14-51:4; Exs. 58 and 59.

**RESPONSE / OBJECTION.** Undisputed.

65.     Prior to the creating of these legal entities, both GoFund and Merchant Capital were D/B/As that were used by GSS Equity since 2019.  Ex. 21 [Brezel Tr.] at 160:4-161:1.

**RESPONSE / OBJECTION.** Undisputed with clarification. Brezel testified: "I don't know, but for my -- in GSS Equity, it could have been GSS Equity, a d/b/a. I don't remember when that was created . . . same with Merchant Capital." Brezel Tr. 160:18-21.

66.     The Certificates of Organization for GoFund, Funding 123 and Merchant Capital filed in 2021 all listed their principal office as 304 West Main Street, Suite 2, Avon, Connecticut 06001.  Heskin Decl. Ex. 58 and 59.

**RESPONSE / OBJECTION.** Undisputed.

67.     Bloomberg News reported on Defendants' use of this office for invoking the CT Prejudgment Statute and described it as "a rental mailbox in a strip mall in Avon, Conn[ecticut]." Heskin Decl. Ex. 3 at 6.

**RESPONSE / OBJECTION.** The exhibit cited to support the statement in Paragraph 6 is inadmissible, in violation of Rule 56(e) and Local Rule 56.1(d), and thus should not be considered.

68.     The Certificates of Organization further provided that Kroen was the manager or member for GoFund, Funding 123, and Merchant Capital, and gave a mailing address for each company as 1757 58th Street, Brooklyn, New York 11204.  Heskin Decl. Exs. 58 and 59.

**RESPONSE / OBJECTION.** Undisputed.

69.     These filings were made No. by Crystal Phelps, a paralegal with H&G. Ex. 25 [Getter Tr.] at 155:18-24.

**RESPONSE / OBJECTION.** Undisputed with clarification. Getter testified he is not sure who Crystal Phelps is. Getter Tr. 155:21-23.

70.     GoFund, Funding 123, and Merchant Capital each use Jared Alfin, Esq. ("Alfin") of Hassett & George, P.C. ("H&G"), Heskin Decl. Ex. 23 [Alfin Tr.] at 27:10-29:11, and Alfin also represents GSS Equity and Braun.  Ex. 21 [Brezel Tr.] at 115:19-22; Ex. 23 [Alfin Tr.] at 45:1-47:24.

**RESPONSE / OBJECTION.** Disputed. When asked if Alfin represents GSS Equity, Brezel testified: "Sometimes, yes. Actually, no. I don't think Jared represents -- sometimes yes. Sometimes deals, yes." Brezel Tr. 115:19-22. When asked if he represents Braun, Alfin testified: "*I don't represent personally*, but . . . for purposes of attorney-client privilege and things, it's my understanding that he's some kind of agent or underwriter or something for those companies, and

I've always treated him as if he was a client, so to speak; no different than Isaac and Joe and all those communications and so forth." Alfin Tr. 45:15-46:2 (emphasis added).

71.     Defendants Wolf, Getter and Kroen, with advice from Alfin, made the decision to incorporate GoFund, Funding 123, and Merchant in Connecticut for the explicit purpose of using the CT Prejudgment Statute.  Heskin Decl. Ex. 21 [Brezel Tr.] at 31:21-32:18 ("Connecticut was used because some Connecticut laws were favorable to some of the deals we funded."); Ex. 27 [Kroen Tr.] at 101:14-102:22.

**RESPONSE / OBJECTION.**  Disputed.  The evidence cited does not support the assertion that Getter made. the decision to incorporate GoFund, Funding 123 or Merchant in Connecticut or that it was done with advice Alfin.

72.     According to records with the Connecticut Secretary of State, on or about January 24, 2022, GoFund, Funding 123, and Merchant Capital each submitted annual reports with an updated business address of 500 West Putnam Avenue, Suite 400, Greenwich, Connecticut 06830. *See* Heskin Decl. Exs. 11-13.

**RESPONSE / OBJECTION.** Undisputed. Heskin Decl. Exs. 11-13 [Dkt. No. 171] were not produced in discovery.

73.     At this time, Kroen was replaced as the companies' principal with Hartford. *Id*. These changes were made by Crystal Phelps under the purported authorization of Getter, who owns Hartford.  *Id*; Ex. 25 [Getter Tr.] at 25:16-25.

**RESPONSE / OBJECTION.** Undisputed.

74.     Getter testified he had no idea any changes were made to these Defendants' registration status to list Hartford as their owner, and that he did not authorize this filing.  Heskin Decl. Ex. 25 at 154:2-160:3.

**RESPONSE / OBJECTION.** Undisputed.

75.     Getter testified that he had never been to the 500 West Putnam address listed as the business address for GoFund, Funding 123 and Merchant, and added that he does not have any employees working from this address and does not pay rent at this address. Heskin Decl. Ex. 25 at 161:4-162:18.

**RESPONSE / OBJECTION.** Undisputed.

76.     Kroen testified that he has been near the office maybe once to meet Alfin (H&G is based in Connecticut) but admitted that they actually met at a Starbucks next door rather than in the purported office.  Heskin Decl. Ex. 27 [Kroen Tr.] at 94:17-95:8.

**RESPONSE / OBJECTION.** The cited testimony does not support the statement in paragraph 76. See Kroen Tr. at 94:17-95:8 (Kroen testifying that he has been to the Connecticut office and where it is located).

77.     Kroen testified he did not know of any other employee of Defendants who had been to this office and confirmed that the companies do not even receive mail there.  *Id*. at 97:14-98:19.

**RESPONSE / OBJECTION.** Undisputed.

78.     Brezel likewise confirmed he has never been to GoFund, Funding 123 and Merchant Capital's purported Connecticut address and did not know anyone who has ever gone there.  Heskin Decl. Ex. 21 [Brezel Tr.] at 32:19-33:15.

**RESPONSE / OBJECTION.** Undisputed with clarification. Brezel was asked if anyone "operates out of Connecticut," not if anyone has simply gone there. Brezel Tr. 4-6.

79.     Brezel further testified that he has no knowledge of GoFund, Merchant Capital or Funding 123 ever paying taxes to the State of Connecticut.  *Id*. at 50:9-13.

**RESPONSE / OBJECTION.** Undisputed.

80.     Wolf also testified that he has never been to Connecticut for business.  Heskin Decl. Ex. 20 [Wolf Tr.] at 18:8-19:7.

**RESPONSE / OBJECTION.** Undisputed .

81.     Despite GoFund, Funding 123, and Merchant Capital all being incorporated in Connecticut between June and October 2021, since then, whenever these entities become involved in litigation against merchants using New York State Courts, they invariably admit in verified pleadings that they are New York companies. Heskin Decl. Ex. 9:

   a.  *GoFund Advance v. Clemmers Landscape, Inc. et al.*, 505723/2022, Verified Complaint [Dkt. No. 1] ¶ ("At all relevant times, Plaintiff was and is a Limited Liability Company organized and existing under the laws of the State of New York");

   b.  *GoFund Advance v. On Top Freight, Inc.*, 505529/2022, Verified Complaint [Dkt. No. 1] ¶ 1 ("At all relevant times, Plaintiff was and is a Limited Liability Company organized and existing under the laws of the State of New York");

   c.  *Funding 123 v. Maximum Precast, LLC, et al.*, 532493/2021, Verified Complaint [Dkt. No. 1] ¶ 1 ("At all relevant times, Plaintiff was and is a Limited Liability Company organized and existing under the laws of the State of New York");

   d.  *Funding 123 v. Edwards Hobbs Logistics, LLC, et al.*, 5352021/2022, Verified Complaint [Dkt. No. 1] ¶ 1 ("At all relevant times, Plaintiff was and is a Limited Liability Company organized and existing under the laws of the State of New York");

   e.  *Bridge Funding Cap LLC DBA Merchant Capital v. Scripts Wholesale Inc. et al.*, 532902/2021 [Dkt. No. 1] at ¶ 3 ("Plaintiff is a Company organized under the laws of the United States of America with its principal office at 5308 13th Ave., Brooklyn New York 11219").

**RESPONSE / OBJECTION.** Disputed. In the last example Plaintiffs cite to, it is clear from the caption that the refernced Merchant Capital is the d/b/a of another company. Further, like the Bridge Funding Cap LLC example, the Funders all share names with New York entities that have DBAs in their name. *See* Wolf Tr. 39:11-18 ("If it's a New York Company, it's mine . . . If it's [] New York Bridge Fund Cap, LLC, that's my company."); *see also id.* at 134:9 (noting there

is a "Bridge Funding for Connecticut"). For example, GoFund exists as a separate LLC, but it is also a d/b/a of MapCap Advance. *See* Wolf Tr. 28:21-29:4, 130:16-18.

82.     Alpha Recovery Partners—the collection arm of the Enterprise—has filed UCC liens on behalf of GoFund since its purported incorporation in Connecticut that continue to list GoFund as having a New York office. *See* Heskin Decl. Ex. 10.

**RESPONSE / OBJECTION.** Undisputed. Heskin Decl. Ex. 10 [Dkt. No. 171] was not produced in discovery.

83.     Defendants' business practices and use of the CT Prejudgment Statute earned them press coverage by Bloomberg News in February 2020. *See* Heskin Decl. Ex. 3. Per Bloomberg News' reporting, GoFund, Bridge, and Matrix Advance "are managed from an office in the Borough Park neighborhood of Brooklyn, overseen by Johnathan Braun, according to people with knowledge of the matter." *Id*.

**RESPONSE / OBJECTION.** The exhibit cited to support the statement in Paragraph 83 is inadmissible, in violation of Rule 56(e) and Local Rule 56.1(d), and thus should not be considered. Defendants do not dispute that the article was published.

84.     Alfin confirmed that each and every time he has met with Defendants, he does so in Brooklyn, New York. Heskin Decl. Ex. 23 [Alfin Tr.] at 42:7-43:1.

**RESPONSE / OBJECTION.** Undisputed with clarification. Alfin testified that he has met with certain Defendants once in 2021 and maybe once in 2022. Alfin Tr. 42:10-14.

85.     Nevertheless, Alfin followed Defendants' instructions to incorporate GoFund, Funding 123 and Merchant Capital in Connecticut notwithstanding the fact that neither he nor anyone at H&G had ever been to this purported Connecticut office. *Id*. at 59:21-61:4, and 76:8-78:21.

**RESPONSE / OBJECTION.** Getter disputes that he instructed Alfin to incorporate these entities.

86.     Even after reading Bloomberg News' allegations that this office is a sham, Alfin has still done nothing to investigate.  *Id*. at 65:2-16; and 79:21-80:2.

**RESPONSE / OBJECTION.** Undisputed.

87.     Alfin continues to sign Notices of *Ex Parte* Prejudgment Remedy pursuant to the CT Prejudgment Statute that claim GoFund, Funding 123, and/or Merchant Capital have an office in Connecticut. *Id*. 66:2-68:12; Heskin Decl. Exs. 32-35 (sample notices).

**RESPONSE / OBJECTION.** Undisputed.

88.     With each Notice of *Ex Parte* Prejudgment Remedy, there is an accompanying affidavit from Defendants. Alfin testified that he has not seen an affidavit executed by any agent of Defendants that was not signed in New York.  Heskin Decl. Ex. 23 [Alfin Tr.] at 71:18-74:8.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement "[w]ith each Notice of *Ex Parte* Prejudgment Remedy, there is an accompanying affidavit from Defendants." The second statement is undisputed with clarification. When asked if he is aware of any affidavit that was sworn anywhere else other than Brooklyn, Alfin testified: "There could be, but I don't remember." Alfin Tr. 73:16-22. And when asked if he is aware of any affidavits signed and executed in Connecticut, Alfin testified: "I can't recall anything off the top of my head right now." *Id.* at 74:5-11.

89.     Similarly, the process server Defendants use for a large portion of their writs of attachment could not recall a single instance where she saw an affidavit executed by an agent of GoFund outside of New York. Heskin Decl. Ex. 22 [Ostrowski Tr.] at 102:17-105:13.

**RESPONSE / OBJECTION.** Undisputed.

90.     Rather than identify facts for his belief that Defendants have Connecticut offices, Alfin demurred and claimed attorney-client privilege. Heskin Decl. Ex. 23 [Alfin Tr.] at 70:4-9.

**RESPONSE / OBJECTION.** Undisputed.

### g.  Alpha Recovery Partners LLC ("Alpha") Serves As The Enterprise's Collection Arm

91.     Alpha Recovery is a D/B/A of Enterprise member and funder GSS Equity that operates out of Brooklyn, New York.  Heskin Decl. Ex. 24 [Gold Tr.] at 22:16-20; 35:3-13.

**RESPONSE / OBJECTION.** Undisputed.

92.     Alpha does collection work for GoFund, Funding 123, Merchant Capital and Bridge, as well as other MCA companies.  Heskin Decl. Ex. 24 [Gold Tr.] at 23:5-18.

**RESPONSE / OBJECTION.** Undisputed with clarification. Gold testified: "We work with a variety of different clients, not just them. We have other clients as well in the MCA space." Gold. Tr. 23:16-18.

93.     In a typical month it issues 40 to 50 UCC lien notices, averaging 500 per year.  *Id.* at 16:10-17:14.

**RESPONSE / OBJECTION.** Disputed. When asked how many UCC letters are signed each month, Gold testified: "Varies month to month, but it just depends on the deal flow[.]" Gold Tr. 16:10-14. When asked how many UCC letter were signed *last month*, Gold testified that it was "40 to 50." *Id.* at 16:24-17:2.

94.     The UCC Notices Alpha serves are prepared by non-attorney personnel, and once a week the attorney Alpha uses comes to "oversee the notices," but Alpha already has her wet signature to apply on the UCC Notices.  Typically, Alpha just fills in the template its attorney gave

it and sends with her wet signature affixed without her review. The attorney is paid $2,500/month. Heskin Decl. Ex. 24 [Gold Tr.] at 10:15-11:10, 13:19-17:2, 20:24-22:6, 50:15-54:20.

**RESPONSE / OBJECTION.** Disputed. Gold testified that Florence, outside counsel that Alpha hired, comes in about once a week to oversee the notices, "to give a second pair of eyes, some due diligence[.]" When asked if those UCC notices have already gone out before Florence does this, Gold responded, "No." Gold testified that "[Florence is] aware of everything that's in the template as far as the language in there. It's just a matter of the information that's double-checked on our end through the due diligence process." Gold then confirmed that Florence gives them the template, Alpha enters the information, and then sends it out without Florence first reviewing it. But then "Florence comes in later in the week, and she'll just spot-check anything that's gone out under her name to make sure everything's in compliance[.]" Gold Tr. 20:24-22:6

95.     When Alpha serves a restraining notice on a merchant's bank, it performs Google searches to determine whether the merchant's bank has a branch in New York. Heskin Decl. Ex. 24 [Gold Tr.] at 108:3-109:5.

**RESPONSE / OBJECTION.** Undisputed.

96.     This method has resulted in instances where banks that do not have branches in New York nevertheless receive restraints from Alpha. *Id*. at 109:23-110:4. Alpha often also restrains the merchant owner's personal account along with the business account.  Heskin Decl. Ex. 126 at 47 ("We've been doing it this way for years, that's how we're able to lock up their personal square/PayPal accounts with UCC's").

**RESPONSE / OBJECTION.** Disputed. The cited testimony does not support the first statement in paragraph 96. When asked if he still sends a restraining notice when a bank does not have a branch located in New York, Gold testified: "No." As to the second assertion, Alpha is able

to place restraints on personal accounts because "merchant also personally guarantees on contract." Dkt. No. 173, Heskin Decl. Ex. 126 at GOFUND_000099949.

97.    Alpha does not independently verify whether the merchant has breached the agreement, or whether the agreement is usurious, before issuing restraints. Heskin Decl. Ex. 24 [Gold Tr.] at 120:18-122:16.

**RESPONSE / OBJECTION.** Disputed. The cited testimony does not support the assertion that "Alpha does not independently verify whether the merchant has breached the agreement . . . before issuing restraints Gold testified: "We're not sending out UCC 8 restraint notices based off of interest. We're sending them based off of receivables that were purchased in advance at a fixed price." Gold Tr. 121:4-10. When asked if he's okay with "knowingly participating in this enterprise," Gold responded: "First, this seems like an opinionated question as if you're asking me morally if this is okay, or if this is an opinion . . . This isn't an enterprise or anything of that regard where I -- we, Alpha Recovery, have a specific job to do UCC collections on the receivables, and that's our role, and that's it." *Id.* at 121:12-122:7.

98.    On Haymount alone, Alpha sent out at least a dozen UCC lien notices. Heskin Decl. Ex. 49 at GOFUND_000020642. This included a UCC lien notice sent to United Healthcare Services, Inc., on February 15, 2022—one day after this action started—purporting to reflect a balance of $488,928.23. Heskin Decl. Ex. 10.

**RESPONSE / OBJECTION.** Undisputed.

### III.    Braun, Wolf, Brezel, Kroen, Getter, GoFund, Funding 123, Merchant, Bridge, GSS Equity, and Alpha Form A Common Enterprise

99.    Since at least 2018 and continuing through the present, Wolf, Brezel, Kroen and Getter, while relying on the advice of Braun, have advanced funds to small businesses in North Carolina and throughout the United States pursuant to merchant cash advance agreements ("MCA

agreements") through the MCA companies GoFund, Funding 123, Merchant, Bridge, GSS Equity and various D/B/As of those entities, with Alpha serving as their designated collection agent. Heskin Decl. Ex. 20 [Wolf Tr.] at 24:15-25:22 (testifying he began working with Braun in the MCA industry in 2017; Ex. 21 [Brezel Tr.] at 180:19-181:7 (testifying he started working with Braun in the MCA industry in 2018).

**RESPONSE / OBJECTION.** Disputed.  The cited testimony does not support any portion of the fact alleged with respect to Getter.

### a. *Defendants Share Resources And Work Collectively To Advance The Enterprise's Goal of Collecting Unlawful Debt*

100.    The MCA Agreements are funded collectively for most deals from GSS Equity, which also handles the Enterprise's expenses such as rent. Heskin Decl. Ex. 21 [Brezel Tr.] at 15:14-16:18 ("They're responsible for all monies related to any deals, anything MCA. That's who pay the rent and that's why they would pay the Am Ex bill, as well"); 17:14-24 (GSS Equity funds all of Brezel's deals).

**RESPONSE / OBJECTION.** Undisputed.

101.    The Defendants shares expenses and bank accounts among the various MCA companies, both actual incorporated entities and their D/B/As. Heskin Decl. Ex. 21 [Brezel Tr.] at 11:22-12:24 (testifying that the phone bill is shared among company Defendants); Ex. 27 [Kroen Tr.] at 55:11-18 (testifying that Fundura Capital uses Bridge's bank account).

**RESPONSE / OBJECTION.** Disputed. The term "Defendants" and "expenses" are vague and ambiguous and gives no notice of who is alleged to share what expense. Getter further objects that the cited testimony does not support the assertion that "the phone bill is shared among company Defendants." Brezel testified the following as to the phone bill: "I don't know what company pays the phone bill and how it gets supplied—I don't know." Brezel Tr. 11:14-18. Getter

further objects that the testimony does not even establish that there is a single phone bill given the proliferation of mobile device. Brezel also testified that there is no common bank account among the defendant companies that's used to pay bills. *Id.* at 12:1-6.

102.    The Defendants also shares profits. Ex. 25 [Getter Tr.] at 26:21-27:1 (Getter testifying he shares profits with Wolf).

**RESPONSE / OBJECTION.** Disputed. The cited testimony does not support the assertion, as the full quote states: "Q. And why did Josef Kroen form [Hartford Receivables] on your behalf? A. For -- he told me there was some, he wanted to split up some of the filings in Connecticut." Getter Tr. 26:9-13.

103.    Defendants share use of the software system MCA Suite to track payments in and out of the Enterprise.  Heskin Decl. Ex. 66; Ex. 28 [Katz Tr.] at 189:1-98:24.

**RESPONSE / OBJECTION.** Disputed to the extent that Katz never testified that the "Defendants" share the MCA Suite. Katz only testified to what the MCA suite does and how he uses it.  Getter disputes the her shared any software with any other defendant other that during the period of his employment with Wolf from April 2021 to April 2022.

104.    Regardless of whether a deal is issued from Wolf, Brezel, Kroen or Getter's MCA companies, "[e]very deal would be run on [one] bank account. It could be four investors in the same deal, but it would still run from one bank account because it's impossible to do otherwise." Heskin Decl. Ex. 21 [Brezel Tr.] at 43:21-44:14.

**RESPONSE / OBJECTION.**  Getter disputes that he owned an MCA company while working for Wolf from April 2021 to April 2022, or that deals issued from the MCA he created after leaving Wolf were funded from an account used by any other defendant.

105.    The Defendants operates out of offices in Brooklyn, New York, one at 1276 50th Street, on at 1274, 49th Street, and the other at 622 McDonald Avenue.  Heskin Decl. Ex. 21 [Brezel Tr.] at 13:1-24.

**RESPONSE / OBJECTION.** Disputed. Getter disputes that he operated out of that address after April 2022..

106.    Wolf works out of the McDonald Avenue office, as did Braun.  Ex. 27 [Kroen Tr.] at 61:6-62:8; Ex. [Dkt. No. 28-3] (identifying Alpha and GoFund as sharing the 1274 49th Street Brooklyn address); Ex. 25 [Getter Tr.] at 27:7-28:6 (Getter testifying that he and Brezel worked out of the same office); Ex. 24 [Gold Tr.] at 34:8-36:9 (testifying that Alpha operates out of Brooklyn).

**RESPONSE / OBJECTION.** Undisputed with clarification. When asked if the McDonald office is the office that Braun goes to, Kroen testified, "I don't know if he currently goes there" but that "[h]e has been there." And when asked if Braun used to go on a daily basis, Kroen replied, "I don't know." Kroen Tr. 61:6-14. Disputed that the cited testimony does not support the assertion that "Getter testif[ied] that he and Brezel worked out of the same office." *See* Getter Tr. (Getter testifying about Hartford Receivables).

107.    The Defendants share "one bookkeeper . . . that handles MCA-related mail and does some checks and balances to make sure the accounts are properly, are run properly."  Heskin Decl. Ex. 21 [Brezel Tr.] 14:16-19; *see also* Ex. 24 [Gold Tr.] at 28:17-29:23 (Getter testifying that Brezel and Wolf maintained the books and records for Getter's MCA deals).

**RESPONSE / OBJECTION.** The use of "Defendants" is vague and ambiguous. Getter disputes that Brezel or Wolf maintained the books and records for MCA deals entered into by the company formed by Getter after leaving Wolf's employment in April 2022.

108.    While Defendants purport to maintain legal offices for their MCA companies, these emails are actually managed by the person who is running the deal, rather than a lawyer.  Heskin Decl. Ex. 27 [Kroen Tr.] at 156:4-10.

**RESPONSE / OBJECTION.** Disputed. When asked who's in the legal department at Funding 123, Kroen testified: "It depends who's running the deal. Usually, the person that's running the deal is the one that runs the deal until he needs -- you know, if he needs a lawyer's help or legal advice, that's when the lawyer comes in." Kroen Tr. 156:4-10. Defendants also object that in his testimony, Kroen is referring to Corporate Defendant Funding 123, not the Individual Defendants.

109.    GoFund does not have any employees.  Heskin Decl. Ex. 21 [Brezel Tr.] at 28:2-3.

**RESPONSE / OBJECTION.** Undisputed.

110.    Nor does Hartford, its purported parent company.  Ex. 25 [Getter Tr.] at 21:4-21.

**RESPONSE / OBJECTION.**  Undisputed, but the cited testimony does not support this assertion.

111.    The Defendants virtually never allows changes to the substantive terms of its MCA agreements. Heskin Decl. Ex. 21 [Brezel Tr.] at 54:17-56:14 (only being able to recall one instance in which an MCA agreement's terms were changed at the merchant's request, to include a Heter Iska provision).

**RESPONSE / OBJECTION.** Disputed. First, whether the substantive terms of an MCA agreement are changed "depend[s] on the deals," based on "legal advice or per merchants wanting to modify agreements." Brezel Tr. at 52:18-53:21; 55:10-14. Second, the cited testimony does not support the assertion with respect to Getter that "[t]he Defendants virtually never allow changes to the substantive terms of its MCA agreements."

112.     Similarly, MCA agreements issued by GoFund, Funding 123, and Merchant Capital all contain terms that function in the same way, regardless of which particular company issued the loan. *Id.* at 129:19-144:24 (testifying to similarities between GoFund, Funding 123, and Merchant MCA agreements).

**RESPONSE / OBJECTION.** Undisputed.

### b.   The Enterprise Works Together To Hide Their Criminal Activity

113.     Based on Defendants' productions, Wolf, Brezel, Kroen and Getter issue MCA agreements not only under GoFund, Funding 123, and Merchant Capital, but also utilize other actual companies and business names for issuing MCA agreements, including, but not limited to, Eleven Capital, Fundura Capital Group, Matrix Advance, Bridge Funding Cap LLC, Viking Capital, Map Cap, Harper Advance Services LLC, and United Fund USA. Heskin Decl. Ex. 18.

**RESPONSE / OBJECTION.** Disputed in part. Getter does not dispute that Defendants have produced MCA agreements bearing those names, but he dispute that production shows that he "utilized" MCA agreements with those names.

114.     The Defendants operate using so many legal entities with various D/B/As, that not they cannot keep track of them all. Heskin Decl. Ex. 20 [Wolf Tr.] at 130:7-131:15; Ex. 21 [Brezel Tr.] at 18:14-20:13; 26:15-28:3; 34:13-35:12; 38:2-43:6; 160:12-163:18; Ex. 27 [Kroen Tr.] at 24:5-26:9; 45:19-52:25; Ex. 25 [Getter Tr.] at 39:11-40:9; 62:18-68:24.

**RESPONSE / OBJECTION.**  Disputed.  Getter disputes that he operates so many legal entities that he cannot keep track of them all.  The cited testimony indicates only that Getter was not sure about the details of the various GoFund entities.  Getter Tr. 39:13-16.  There is no evidence cited that Getter operated any of the GoFund entities.

115.    Defendants hide behind these D/B/As so that merchants do not know who they are contracting with, and they exploit this ignorance for their pecuniary gain. Heskin Decl. Ex. 115 (24mil!!" "Maybe we can do it she has no fucking idea most of the balance is us." "Exactly!! Let's do it!"); Ex. 127 (documents produced by Defendants relating to BAT, Inc. ("BAT")); Ex. 128 (documents produced by Defendants relating to Avantgarde Senior Living ("Avantgarde")).

**RESPONSE / OBJECTION.** The use of "Defendants" is vague and ambiguous and does not identify the specific act or actor in question. Getter disputes the statement to the extent that relates to him and asserts that the  cited evidence does not support the statement with respect to him.

116.    For instance, one merchant, Avantgarde, after entering into and paying off several MCA agreements issued by Wolf under various trade names, was referred to Brezel by a broker, for additional funding.  *See* Declaration of Jason Adelman ("Adelman Decl.") ¶¶ 21-22.

**RESPONSE / OBJECTION.** This witness was never disclosed to Defendants and this document was not produced in discovery.

117.    Avantgarde was not aware that Brezel and Wolf worked together as one lending organization, and after entering into an MCA with Brezel through the label United Fund USA, Brezel began double debiting Avantgarde's account.  *Id*. ¶¶ 24-28.

**RESPONSE / OBJECTION.** The declaration cited in support of this statement, in turn, cites to bank statements and other documents, Dkt. No. 174, Adelman Decl. Exs. E, F, G, that do not show any "double, triple, [or] quadruple" debits. First, Exhibit E does not appear to contain the spreadsheet of remittance history as Adelman describes in his declaration, so there is no evidence he was making timely payments. Second, Exhibit G is supposed to contain "notices from Cathay Bank" of these over-debits, but simply contains emails from Adelman asking the bank not

to process debits. Further, Defendants object that Plaintiffs do not pincite the referenced material in Ex. F or G. Defendants also object that the cited declaration continuously refers to the withdrawals as "fraudulent" or "unauthorized," which are conclusions of law. *See id.* at ¶¶ 24, 26, 27.

118.   Brezel's double-debiting exacerbated Avantgarde's cash crisis, at which point Kroen introduced himself to Avantgarde promising to offer fair and reasonable financing to solve its woes. *Id.* ¶ 24.

**RESPONSE / OBJECTION.** The cited material does not support the statement in paragraph 118. Dkt. No. 174, Adelman Decl. at ¶ 24 ("As reflected in this spreadsheet, Avantgarde upheld its end of the bargain by ensuring the weekly remittance amount was in the designated account.

119.   Kroen and Avantgarde negotiated the terms of an MCA agreement that was acceptable to Avantgarde, only for Kroen to backout at the last minute. *Id.* ¶¶ 40-45.

**RESPONSE / OBJECTION.** Disputed. Adelman testified that Kroen explained that the agreement "was no longer valid." Adelman Tr. ¶ 42.

120.   Three weeks later, when Avantgarde's desperation was at its maximum, Kroen reconnected with Avantgarde and ultimately entered into an MCA agreement using the label Powerball Funding one materially worse terms than Kroen and Avantgarde had agreed upon three-weeks earlier. *Id.*

**RESPONSE / OBJECTION.** Whether the agreement had "materially worse terms" is a conclusion of law and not a statement of fact as required by Local Rule 56.1 and, therefore, no response is necessary.

121.    Regardless of the trade name on the MCA agreement, all of the MCA agreements share the following features with the Haymount MCA agreements: (i) Defendants purchase not just future receipts but also the merchant's contract rights or any other entitlements arising from merchant's customers; (ii) the remittance is warranted as a "good faith estimate" of the specified percentage of the merchant's receivables; (iii) the merchant must designate an account from which the remittance will be withdrawn until the Purchased Amount is met; (iv) a reconciliation provision that limits the number of times the merchant can make a request in a given month, which also requires documentation to be provided at Defendants' request; (v) protections against default that include enforcement of the security agreement, personal guaranty, and acceleration of the full Purchased Amount; (vi) events of default that include breach of any term or covenant of the agreement, failure to give 24-hours advance notice of insufficient funds for a remittance, and entering into any other MCA agreements with a third party; (vii) all amendments must be in writing signed by funder; (viii) a jury and class action waiver; (ix) a prejudgment remedy waiver (if 2021 or later); and (x) an appendix of fees given often as a range with a minimum and maximum tied to a certain percentage of the purchase price. *See generally* Heskin Decl. Ex. 18 at preamble and §§ 1.4, 1.13, 3.1, 4.1, 4.10, 4.11, and 4.13.

**RESPONSE / OBJECTION.** Undisputed with clarification. Although the reconciliation provision limits the number of times the merchant can make a request in a given month, Plaintiffs overlook the fact that under the adjustment to future remittances provision, a merchant can request such adjustment at any time and there is no limit on the number of times a merchant can make this request to adjust its payments.

122.    Absent from GoFund, Funding 123, and Merchant Capital's form MCA agreements are any contact information for these entities or their agents. *See* Clinton Decl. Exs. 1-6; Heskin

Decl. Ex. 17-18; Ex. 27 [Kroen Tr.] at 44:4-18 (confirming no telephone number appears on the MCA agreements); Ex. 25 [Getter Tr.] at 31:6-32:18 (Getter acknowledging a merchant would not be able to know when its dealing with an actual entity or a D/B/A based on an MCA agreement).

**RESPONSE / OBJECTION.** Disputed. First, all MCA agreements contain an email address. *See* [Dkt No.178, Cipolla Decl. Exs. 2-7 at §§ 1.4, 1.5]. Second, Kroen did testify that no phone numbers appear on the MCA agreements, "but when we speak to a merchant for funding call, we let them know that we're gonna be the point of contact, and, you know, when we reach out to them, if anything happens or – for any reason, if we reach out to them, they know who we are, so I believe they save our phone number." Kroen Tr. 44:5-11. Third, the cited testimony does not support the assertion that Getter acknowledged "a merchant would not be able to know when its dealing with an actual entity or a D/B/A based on an MCA agreement." *See* Getter 31:2-6 (Q: So Isaac Wolf would fund deals, he would fund them through Bridge Funding Cap, right? A: I believe so. I'm sure he sometimes used DBAs. I have no idea.").

123.    The Individual Defendants and their cohorts use fake made-up names for their interactions with merchants. Heskin Decl. Ex. 25 [Getter Tr.] at 142:11-22 (confirming that Sarah Beityakov uses multiple fake names); Ex. 21 [Brezel Tr.] at 7:5-15 (testifying to the "aliases" he uses in business); Ex. 20 [Wolf Tr.] at 8:4-9:9; Ex. 27 [Kroen Tr.] at 6:13-7:2; Ex. 113.  The Enterprise also processes wires using fake names or names of their competitors.  Heskin Decl. Ex. 122 at 6 ("Can I send a ACH credit showing FUNDING and not our name…Im at least going to try so it looks like more funding to hopefully kill other fu.") and ("Find a way somehow to screw over Wynwood/high bar/spin. It will be extra satisfaction for me.").

**RESPONSE / OBJECTION.**  Getter disputes that he used fake or made-up names in dealing with merchants.  The cited testimony does not supports this assertion.

124.    The Individual Defendants and those working with them use programs or applications that allow them to mask their true phone number when contacting merchants.  Heskin Decl. Ex. 21 [Brezel Tr.] at 9:11-10:8; Ex. 25 [Getter Tr.] at 70:24-71:18 (testifying he alters his number for "collection purposes"); Ex. 29 [Beityakov Tr.] at 22:17-24 (testifying he uses numerous phone numbers to communicate with merchants) and 40:17-42:23 (testifying she uses "burner" phones with merchants and applications to scramble the number she calls from).

**RESPONSE / OBJECTION.** Getter disputes that he masks his phone number when contacting merchants.  The cited testimony indicates that Getter occasionally uses a different phone number when trying to contact merchants collect debts (when they do not answer calls from his number).

### c.  *The Enterprise Works Together To Hide Their Criminal Activity*

125.    While GoFund opened in June 2021, it had not filed taxes ever according to Defendants' testimony. Heskin Decl. Ex. 21 [Brezel Tr.] at 45:24-46:21.

**RESPONSE / OBJECTION.** Undisputed.

126.    Neither Merchant Capital nor Funding 123, which also began operations in 2021, have filed any taxes.  Heskin Decl. Ex. 21 [Brezel Tr.] at 47:10-48:12.

**RESPONSE / OBJECTION.** Undisputed.

127.    This is true for both New York and Connecticut taxes.  Heskin Decl. Ex. 21 [Brezel Tr.] at 50:5-17.

**RESPONSE / OBJECTION.** Undisputed.

128.    On or about November 12, 2019, Yoel Getter, the brother of Defendant Getter, registered a New York company called Quick Capital Inc., which listed an address of 564 East 9th Street, Brooklyn, New York.  Heskin Decl. Ex. 68.

**RESPONSE / OBJECTION.** Undisputed.

129.    Quick Capital Inc.'s bank statements reflect that the Enterprise, including Brezel and Kroen uses this account for personal expenses, including shopping, gym memberships, and fine dining.  Ex. 67.

**RESPONSE / OBJECTION.** Disputed.  Getter disputes that the cited documents show any funds being used by him for personal purposes.

130.    Defendants also produced bank statements for other corporations, such as "Creative Faucets and More, Inc." they own that show similar use of corporate funds for personal enjoyment by Brezel and Getter.  Ex. 69.

**RESPONSE / OBJECTION.** Disputed.  Getter disputes that the cited documents show any funds being used by him for personal purposes.

131.    Defendants use the BBF Partners LLC bank account to pay for personal expenses, such as paying for Braun's Amex credit card, jewelry and travel.  Heskin Decl. Ex 94.

**RESPONSE / OBJECTION.** Disputed. The cited documents do not support the asserted fact with respect to Getter.

132.    Bridge, one of Wolf's MCA companies, purchased Enterprise member Sarah Beityakov a Mercedes through a direct wire from Bridge to the dealership in January 2022.  Heskin Decl. Ex. 29 [Beityakov Tr.] at 92:3-100:12, 200:23-203:7.  Ms. Beityakov testified that she does not use the vehicle for business purposes.  *Id*.

**RESPONSE / OBJECTION.**  Disputed that Bridge purchased the Mercedes. Beityakov testified that she paid for the Mercedes, but Bridge sent the wire for her as she's "never sent a wire before in [her] life." Beityakov Tr. 93:22-94:7. Moreover, Beityakov never testified that she does

not use the vehicle for business purposes. *Id.* at 203:2-3 (Q: Did you ever use the Mercedes for business? A: I don't know.").

## IV.     The Haymount MCA Agreements

133.    Plaintiff Haymount is a VA-approved urgent care practice located in Fayetteville, North Carolina, and is operated by Dr. Clinton as its sole owner.  Clinton Decl. ¶¶ 3-5.

**RESPONSE / OBJECTION.** Undisputed.

134.    As a result of the COVID-19 pandemic, Haymount's funds were drastically reduced as the facility had to take expensive precautionary measures to protect patients and employees, such as additional costs to provide testing, purchase personal protection equipment, and additional cleaning supplies.  Clinton Decl. ¶¶ 8-13.

**RESPONSE / OBJECTION.** Disputed. Haymount's profits grew drastically during the pandemic. Its revenues went from $695,000 in 202 to $10.38 million in 2021. *See* Dkt. No. 179, Def. Rule 56.1 Statement at ¶ 6.

135.    At the time, Haymount had an existing IRS tax lien.  *Id.* ¶ 15.

**RESPONSE / OBJECTION.** Undisputed.

136.    In the absence of traditional financing, Haymount was forced to turn to Defendants. Starting in or about August 2021, Haymount entered into transactions with the Company Defendants, the economic terms of which are reflected below:

| MCA Issuer | Date | Purchase Price | Daily Remittance (Purchased %) | Purchased Amount | Term | Interest Rate[1] |
|---|---|---|---|---|---|---|
| Merchant | 8/25/2021 | $2,000,000 | $7,299 (45%) | $2,750,000 | 377 Days | 263% |
| GoFund | 8/26/2021 | $250,000 | $8,000 (25%) | $349,750 | 44 Days | 242% |
| GoFund | 9/27/2021 | $150,000 | $7,500 (25%) | $224,850 | 39 Days | 650% |
| GoFund | 12/16/2021 | $1,000,000 | $35,000 (45%) | $1,350,000 | 39 Days | 319% |

---

[1] This interest rate does not account for the fees the Enterprise assessed on the Purchase Price.  If accounted, this would increase the interest rate.

| Funding 123 | 12/27/2021 | $2,000,000 | $80,000 (45%) | $2,700,000 | 34 Days | 405% |
| GoFund | 1/20/2022 | $1,000,000 | $60,000 (45%) | $1,499,990 | 25 Days | 612% |

Clinton Decl. Exs. 1-6; Heskin Decl. Ex. 1 [Amended Complaint] ¶¶ 103-186.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement that "In the absence of traditional financing, Haymount was forced to turn to Defendants." Undisputed as to the second assertion of paragraph 136, that Haymount entered into the transactions. Disputed with the legal conclusions reflected in the table (such as the "interest rate.").

137.    As part of the Haymount MCA agreements, Dr. Clinton also executed (i) a security agreement whereby Defendants were granted a security interest "Merchant's assets of any kind whatsoever"; (ii) a personal guaranty making Dr. Clinton liable for the Purchased Amount and other fees in the event of default; and (iii) an authorization agreement for direct deposit and direct payments. *See* Clinton Decl. Exs. 1-6

**RESPONSE / OBJECTION.** Disputed. The cited documents do support the assertion that Getter was granted a security interest by Plaintiffs.

138.    Each Haymount MCA contains identical terms. Clinton Decl. Exs. 1-6 at 1.

**RESPONSE / OBJECTION.** Undisputed with clarifications. Provisions relating to amounts of funding and fees and other details change deal to deal.

139.    Like the NYAG and the FTC, Plaintiffs allege the Haymount MCA agreements are usurious loans disguised as the purchase of Haymount's receivables. Heskin Decl. Ex 1 [Amended Complaint] ¶¶ 83-86, 103-186.

**RESPONSE / OBJECTION.** Undisputed with clarification. The cited exhibit does not support the assertion of paragraph 139.

140.    On June 27, 2022, this Court denied Defendants' motion to dismiss Plaintiffs' RICO claims finding, among other things, that Plaintiffs' had sufficiently pled facts establishing that the Haymount MCA agreements are loans [Dkt. No. 86 at *9-19] and, further, that Plaintiffs had sufficient pled facts establishing a pattern of racketeering. [Dkt. No. 86 at *20-22].

**RESPONSE / OBJECTION.** Disputed. The Court held: "Plaintiffs allege that two types of activities described in the Complaint amount to wire fraud: (i) the use of email to transmit agreements that misrepresent the nature of the fees they were charging, and (ii) the use of ACH withdrawals, including through use of misleading names, to extract unrecorded payments or payments after merchants blocked access to their accounts. For the reasons explained below, the Court concludes that only the second allegation adequately pleads a pattern of wire fraud sufficient to support a RICO claim." Dkt. No. 86 at 20.

141.    Defendants did not fund the Haymount MCA agreements in accordance with their terms.  For instance, whereas the December 27, 2021 Funding 123 MCA agreement provided for $2,000,000 in funding.  Clinton Decl. Ex. 5.  On December 27, 2021, the broker for this deal sent a text message to Dr. Clinton informing him that "they'll do 900K today net.  After 10 daily payments we'll release the second clip with positive payment history."  Clinton Decl. Ex. At 1.

**RESPONSE / OBJECTION.** Disputed in part. Rule 56©(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement that "Defendants did not fund the Haymount MCA agreements in accordance with their terms." Getter objects that the use of "Defendants" is vague and ambiguous. The cited documents do not support the asserted fact with respect to Getter.

142.    Defendants charged Haymount $80,000 in daily remittances after funding $900,000 of the promised $2,000,000, rather than utilizing a pro rata remittance in light of the split in

funding. Heskin Decl. Ex. 21 [Brezel Tr.] at 221:8-14. Dr. Clinton asked that this $80,000 be reduced in light of the split, but the Enterprise refused this request. Clinton Decl. Ex. 7.

**RESPONSE / OBJECTION.** Disputed.  The cited evidence does not support the asserted fact with respect to Getter..

143.    Defendants submitted an affidavit to this Court, in which Getter stated that "the parties agreed that Funding 123 would fund an initial payment of $900,000 and then, after ten (10) daily payments, would fund a second payment of $700,000." Heskin Decl. Ex. 114 ¶ 5.

**RESPONSE / OBJECTION.** Undisputed with clarification. The correct citation is Heskin Decl. Ex. 114 ¶ 7.

144.    Getter testified that the $2,000,000 Purchase Price for the Funding 123 MCA was reduced to $1,600,000 "less applicable fees of 20%, which were clearly and explicitly disclosed." Internal underwriting documents for this Funding 123 MCA however, provided that the "total fees" were $300,000.  Heskin Decl. Ex. 42.  This was not an isolated occurrence.  Heskin Decl. Ex. 30 at 13 ("Why did u put 22% fees on punjab u said 10%.  These back and forth games are killing deal after deal for me.") and 16 ("ISOs very unhappy so I gotta deal with that too. They all saying u bait and switch and change the fees from agreement big headache… In the future don't say one thing and do another….**Ur used to working with criminals all day.  What u gonna do when they go to jail**…").

**RESPONSE / OBJECTION.** Disputed in part. It is undisputed that certain internal underwriting documents stated that the total fees were $300,000, but Getter asserts that the proper amount of fees is disputed. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement that "Getter testified that the $2,000,000 Purchase Price for the Funding 123 MCA was reduced to

$1,600,000 'less applicable fees of 20%, which were clearly and explicitly disclosed.'" Getter objects that the statement, "This was not an isolated occurrence" is vague and ambiguous.

145.     Defendants never funded this $1,600,000 amount.  Heskin Decl. Ex. 21 [Brezel Tr.] at 219:23-24 ("Q. Did he get 1.6? A. No").

**RESPONSE / OBJECTION.** Disputed.  The cited evidence does not support the assertion that Getter had any obligation to fund any MCA with Plainff.  Getter does not dispute that Haymount never received the full $1,600,000 from the MCA agreement at issue. However, Haymount received $900,000. *See* Pl. Statement 142.

V.     **The Enterprise's Racketeering Activity**

  a.  **Unauthorized Monthly Fees (Wire Fraud)**

146.     Each MCA agreement requires the merchant to provide the Defendant Company's with their bank account log-in information. Heskin Decl. Ex. 21 [Brezel Tr.] at 119:14-21. Defendants often use these credentials to access merchants' bank statements without their permission.  Heskin Decl. Ex. 30 (Haymount) ("No I logged on." "Then he will know you have log in." "WE SHOULD GET STATEMENTS FROM ALL HIS ACCOUNTS FROM DAY ONE…SO SHANE CANT SAY THAT HIS BUSINESS TOOK A HIT") (Indigo) ("OLD LOGIN STILL WORKS"); Ex. 129 at 16 (Enterprise sharing bank login info and discussing scheme to obtain new loan with Brezel because "this bitch takes anything you give her.").

**RESPONSE / OBJECTION.** Disputed in part. Getter admits that the MCA Agreements require merchants to provide bank account information.  Getter disputes that he "often used [merchants] credentials to access merchants' bank statement without their permission and asserts that the cited evidence does not support this assertion.

147.    On or about February 19, 2021—one-month after Braun was released from prison through Trump's grant of clemency—Brezel opened an account at Optimum Bank in the name "TAILORED FUND CAP LLC DBA MONTHLY FEE" ("Monthly Fee"), which listed the purpose of the account as: "FUND LOAN DEALS".  Heskin Decl. Ex. 84.

**RESPONSE / OBJECTION.** Disputed in part. First, this document was not produced in discovery. Second, Plaintiffs do not pincite the referenced material in the 43-page Heskin Decl. Ex. 84 [Dkt. No. 172]. Third, the "purpose of the account" is "CASH MANAGEMENT." *Compare* Dkt. No. 172, Heskin Decl. Ex. 84 at p. 4 (listing "CASH MANAGEMENT" with Heskin Decl. at p. 6 (listing the purpose of the wires); *see also id.* at p. 4 (listing, as separate "business activities" both "invoice factoring" and "short term asset-backed lending"). Fourth, the document states that the account was opened by Giovanni Cumberbatch, not Brezel. *See id.* at p. 7.

148.    From March 2021 through August 2022, Monthly Fee received numerous deposits, typically in the amount of $499 but also in small amounts of less than $10. Heskin Decl. Ex. 85.

**RESPONSE / OBJECTION.** Undisputed. This document was not produced in discovery.

149.    The deposits added up to nearly $4 million:

| Month and Year | Total Deposits |
|---|---|
| March 2021 | $30,793 |
| April 2021 | $141,557 |
| May 2021 | $262,198 |
| June 2021 | $182,280 |
| July 2021 | $154,541 |
| August 2021 | $315,946 |
| September 2021 | $254,205 |
| October 2021 | $464,643 |
| November 2021 | $310,011 |
| December 2021 | $279,360 |
| January 2022 | $244,035 |
| February 2022 | $193,146 |
| March 2022 | $189,126 |
| April 2022 | $187,731 |
| May 2022 | $147,405 |

| June 2022 | Unproduced by Optimum Bank |
|---|---|
| July 2022 | $150,641 |
| August 2022 | $147,405 |
| September 2022 – Present | Unproduced by Optimum Bank |
| **Total:** | **$3,745,019** |

Heskin Decl. Ex. 85.

**RESPONSE / OBJECTION.** Disputed in part. First, this document was not produced in discovery. Second, Plaintiffs do not pincite the referenced material in the 187-page Heskin Decl. Ex. 85 [Dkt. No. 172]. The summary chart appears to summarize the "deposit amount" contained on the first page of each monthly statement. *See, e.g.*, Dkt. No. 172, Heskin Decl. Ex. 85 at 3, 9. However, several deposits are simply transfers from other businesses. *See, e.g., id.* at 9 ($5,000 transfer from another checking account); *id.* at 10 ($8,000 transfer from another checking account). The sum of all such transfers is $1,892,729.59 – more than half of the total deposits listed in the table above.

150.   Every month from at least September 2021 through August 2022, Monthly Fee debited Haymount's business accounts in the amount $499.  Heskin Decl. Ex. 87.

**RESPONSE / OBJECTION.** Disputed in part. First, Plaintiffs do not pincite the referenced material in the 227-page Heskin Decl. Ex. 87 [Dkt. No. 172]. Second, only "Part 1 of 3" of Exhibit 87, Dkt. No. 172-40, appears to pertain to Haymount and it only shows bank statements from a *single* Haymount "business account" at Bank of America from June 2021 through July 2021 and December 2021 through January 2022. Dkt. No. 172, Heskin Decl. Ex. 87 Part 1 at 2-10. The cited exhibit thus does not cover multiple "business accounts" or the entire period in question.

151.   In July 2022, Plaintiffs subpoenaed Optimum Bank.  Heskin Decl. Ex. 125

**RESPONSE / OBJECTION.** Undisputed. Plaintiffs do not pincite the referenced material in the 56-page Heskin Decl. Ex. 125 [Dkt. No. 173].

152.     The next month, August 2022, the Tailored Fund Optimum account was closed:

```
AUG 17  WITHDRAWAL TO CLOSE ACCOUNT          .OO          $        .OO
THE AVERAGE BALANCE FOR 0210022984   IN THIS STATEMENT PERIOD WAS  $    4007.39
```

Heskin Decl. Ex. 85.

**RESPONSE / OBJECTION.** Undisputed. Plaintiffs do not pincite the referenced material in the 187-page Heskin Decl. Ex. 85 [Dkt. No. 172].

153.     Defendants' counsel has represented that the Optimum account was closed as a result of Haymount's subpoena.  Heskin Decl. Ex. 125.

**RESPONSE / OBJECTION.** Undisputed with clarification. The quote is: "The debits stopped because Optimum shut the accounts down – apparently because of your subpoena." Email from February 5, 2023.

154.     Nonetheless, in September 2022, Monthly Fee deducted another $499 from Haymount's business accounts.  Clinton Decl. Exs. 9 and 11.

**RESPONSE / OBJECTION.** Disputed in part. First, Plaintiffs do not pincite the referenced material in the 73-page Clinton Decl. Ex. 9 or the *337-page* Clinton Decl. Ex. 11 [Dkt. No. 162].

155.     Between September 2021 and September 2022, Monthly Fee withdrew a total of $6,487 from Haymount's business accounts.  Clinton Decl. Exs. 9 and 11.  No payment records produced for Haymount or any other merchant reflected any of these $499 Monthly Fee withdrawals. *See* [Dkt. No. 64-3 & 65-2].

**RESPONSE / OBJECTION.** Disputed in part. Ex. 9 only refers to statements from January 2022 through February 2022, while Ex. 11 only refers to statements from September 2021 through October 2021..

156.     Nothing in any of the Haymount MCA agreements permitted the Company Defendants or any other entity from deducting a "monthly fee" from Haymount's accounts. Clinton Dec., Exs. 1-6.

**RESPONSE / OBJECTION.** Disputed. Appendix A for five of the six MCA Agreements permit a "monthly funding fee for duration of agreement terms or until balance is paid" in amounts ranging from $249 to $299. [Dkt No. 142, Exs. 1-6 at app. A]. On September 1, 2019—the date of the first $499 "Monthly Fee" debit—Haymount had two active MCA Agreements with the Funders. [Dkt No. 142, Exs. 1-2]. One permitted a monthly funding fee of $299, and the other a monthly funding fee of $249, for a total of $548. [Dkt. No. 142, Exs. 1-2 at app. A].

157.     Further, withdrawals of the Monthly Fee violated this Court's March 21, 2022 Order [Dkt. No. 66] which prohibited Go Fund from withdrawing funds from Haymount's accounts.

**RESPONSE / OBJECTION.** Undisputed.

158.     Haymount incurred $22,312.50 in legal fees uncovering the monthly fee withdrawals and Go Fund's violation of this Court's restraining order.  Heskin Decl. Ex. 127.

**RESPONSE / OBJECTION.** Plaintiffs do not pincite the referenced material in the 144-page exhibit Heskin Decl. Ex. 127 [Dkt. No. 173], and the cited materials, which appear to be a pleading from another action, do appear to contain any relevant information. Getter also objects that the assertion "Haymount incurred $22,312.50 in legal fees" is a legal conclusion. Getter disputes that Haymount "incurred" this legal cost. At his deposition, Dr. Clinton, in his personal

capacity and representative of Haymount, testified that he does not pay his bill regularly but rather "make[s] payments when I can." Clinton Tr. 49:21-24.

159.    Monthly Fee continues to withdraw "monthly fees" in the amount of $499 from other merchant's accounts.  *See* Declaration of Jerome Turner Junior date February 12, 2023 ("Turner Decl.", ¶¶ 25-27, Ex. D).

**RESPONSE / OBJECTION.** This witness was never disclosed to Defendants and this document was not produced in discovery. Getter also objects that the account referenced in paragraph 159 is closed by Plaintiffs' own contentions. *See* Plaintiffs' 56.1 Statement ¶ 152.

160.    Turner, a former police officer and Chief of Police in Georgia, had entered into an agreement with GoFund dated January 1, 2022, which permitted GoFund to charge a monthly management fee of $299, not $499.  Turner, Decl., Ex. A.

**RESPONSE / OBJECTION.** Undisputed with objections. This witness was never disclosed to Defendants and this document was not produced in discovery.

161.    Turner allegedly defaulted under the GoFund agreement and by letter agreement dated April 8, 2022, negotiated by and through Alpha Recovery, GoFund and Turner reached a settlement.  Turner Decl., Ex. C

**RESPONSE / OBJECTION.** Undisputed. This witness was never disclosed to Defendants and this document was not produced in discovery.

162.    Pursuant to the settlement, GoFund released any and all claims against Turner and his company, in exchange for $30,000, which was to be paid from a lumpsum payment of $14,000 and then weekly instalments of $2,666.66 starting April 18, 2022, until the settlement amount was paid in full.  Turner Decl. Ex. C.

**RESPONSE / OBJECTION.** Undisputed. This witness was never disclosed to Defendants and this document was not produced in discovery.

163.   The settlement agreement did not require the payment of a monthly fee.  Turner Decl. Ex C.

**RESPONSE / OBJECTION.** Undisputed. This witness was never disclosed to Defendants and this document was not produced in discovery.

164.   Turner maDkt. No. the required settlement payments and received a "zero balance" letter from GoFund dated May 27, 2022.  Turner Decl. Ex. B.

**RESPONSE / OBJECTION.** Undisputed. This witness was never disclosed to Defendants and this document was not produced in discovery.

165.   Notwithstanding the settlement agreement and zero balance letter, between May 9, 2022 and February 9, 2023, Monthly Fee conducted seven unauthorized withdrawals totaling $3,493.  Turner Decl. ¶¶ 27-28, Ex. D.

**RESPONSE / OBJECTION.** Undisputed. This witness was never disclosed to Defendants and this document was not produced in discovery.

166.   Defendants know their conduct is illegal.  Heskin Ex. 101 (Text message saying "He's acting like we are all going to prison tomorrow morning for 25 years."); Ex. 30 (fraud compilation) at 20 ("Ur used to working with criminals all day.  What u gonna do when they go to jail…"); Ex. 30 at 24-25 ("These guys are going to jail."); Ex. 129 at 22 ("I honestly don't think you guys know how sick and insane this is.").

**RESPONSE / OBJECTION.** Disputed. The cited evidence does not support this assertion with respect to Getter.

### b. Overcollection Haymount (Wire Fraud)

167.    When Plaintiffs moved to enjoin Defendants from further unlawful debits and freezing its bank accounts, Haymount contended that Funding 123 and GoFund over-collected. [Dkt. No. 36-40, 57-65].

**RESPONSE / OBJECTION.** Undisputed.

168.    In opposition, Getter submitted an Affidavit claiming he had personal knowledge of the Funding 123 transaction and attested under penalty of perjury that the parties agreed it would be funded in two parts, $900,000 and $700,000. [Dkt. No. 64] ¶ 7.

**RESPONSE / OBJECTION.** Disputed in part. Getter never claims to have personal knowledge and instead, the Affidavit states that "I have reviewed Funding 123's books and records as they pertain to this file and am fully familiar with such." [Dkt No. 64] ¶ 2. Getter does not dispute that his Affidavit says the funding would be done in two parts, $900,000 and $700,000.

169.    Getter also affirmed that $1,600,000 represented the $2,000,000 advanced amount minus $400,000 in fees, and thus, Haymount only "overpaid by a mere $1,250." *Id*. ¶ 10.

**RESPONSE / OBJECTION.** Undisputed.

170.    At deposition, Getter admitted that he had no knowledge of the Funding 123 transaction and that he merely signed the affidavit at Wolf's behest. Heskin Decl. Ex. 25 [Getter Tr.] at 54:12-57:16 and 113:16-125:24.

**RESPONSE / OBJECTION.** Disputed. The cited evidence does not show that Getter testified that "he had no knowledge of the Funding 123 transactions."  It shows that he testified that he did not participate in that deal [Getter Tr. 57:1] but that he obtained information about it from Wolf.  Getter Tr. 114:14-115:8.

171.    Further, Wolf and Kroen also admitted that the fees were only $300,000.  Heskin

Decl. Ex. 20 [Wolf Tr.] at 73:22-74:13 and Ex. 27 [Kroen Tr.] at 37:2-4.

**RESPONSE / OBJECTION.** Disputed. Dr. Clinton himself stated in support of his summary judgment motion that the second funding tranche should have been $700,000 (Clinton Decl. in Support of Summary Judgment ¶ 33), which would make the net fees $400,000 given that the initial funding amount was $900,000 and the purchase amount was $2,000,000. *I.e.*, $2,000,000 minus $900,000 minus $700,000 nets $400,000 in fees. Brezel, the appointed Rule 30(b)(6) witness for Funding 123, testified that the $300,000 in fees "could be a typo" and that "it's possible and quite frequent, surprisingly, that the numbers are off." Heskin Decl. Ex. 21, Brezel Tr. 191:12-19. Kroen agreed it "should have been $300,000" but agreed there was never a communication to Plaintiff memorializing it. Finally, Getter testified that he has seen documents indicating that the net funding for the deal was both $1.6 million and $1.7 million. Getter Tr. 54:17-23. In sum, the proper amount of fees is disputed.

172.   Internal underwriting documents for this Funding 123 MCA agreement also confirm that the "total fees" were $300,000. Heskin Decl. Ex. 42.

**RESPONSE / OBJECTION.** Disputed. *See* Defendants' response to paragraph 171.

173.   Thus, by Defendants' own admission (and internal business records), Funding 123 over-collected by at least $101,250.

**RESPONSE / OBJECTION.** Disputed. First, Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for this statement. Second, how much Funding 123 "over-collected" assumes that there was an overcollection and is a conclusion of law that goes to the core of Plaintiffs' claim and the disputes in paragraphs 171 and 172.

   **c.   Other Example of Overcollection (Wire Fraud)**

174.     The Defendants regularly double-debit and over-collect upon MCA agreements with merchants. Heskin Decl. Ex 72 (text messages admitting to $75,000 in overcollection sharing of proceeds); Heskin Decl. Ex. 53 at GOFUND_000025376-77; Ex. 109, Ex. 31 at 10 ("2 EXTRA DEBITS DONE FOR A TOTAL OF 3"); Ex. 31 at 143 ("This is fucking ridiculous, debit both accounts on this deal."); Ex. 31 at 154 (debiting a merchant 6 times on same day); Ex. 31 at 157 ("Leave debits on. We should also turn on duplicate daily debit from other account") Ex. 31 and 157 ((3 SDD FROM OPD-FUNDURA DONE 4749.99 EACH"); Ex. 31 at 216 ("you have to shutthe 35k Haymount payment, that deal is finished, you can not have a reason for shane to bother you."); Ex. 31 at 224 ("Wolf's asking me for 2k from the debits that cleared… because he told me to do extra debits that day."); Heskin Decl. Ex. 74 ("For florida nursing please double debit the next time we debit her account."); Heskin Decl. Ex. 53 at GOFUND_000025376 ("Isaac Sku" reporting to Braun and others that "Double Debit Done").

**RESPONSE / OBJECTION.** Disputed. None of the cited evidence supports the assertion that Getter double-debited or over collected on an MCA agreement.

### (i).  Office Pride

175.     Office Pride Commercial Cleaning Services ("Office Pride") entered into two MCA agreements with Skyfall Funding which is a D/B/A used by Wolf.  *See* Declaration of Armando Ascencion ("Ascencion Decl.") ¶ 6; Heskin Decl. Ex. 20 [Wolf Tr.] at 133:14-15.

**RESPONSE / OBJECTION.** Disputed in part.  "D/B/A used by Wolf" is ambiguous. Wolf testified that "I have a D/B/A of Skyfall also." Dkt. No. 171, Heskin Decl. Ex. 20 at 133:15.

176.     Thereafter, pursuant to the amount demanded in a payoff letter issued by Skyfall, Office Pride's SBA lender paid Skyfall $189,875 to satisfy Office Pride's obligations and obtain a release of a UCC lien granted to Skyfall by Office Pride.  Ascension Decl. ¶¶ 23-24.

**RESPONSE / OBJECTION.** Undisputed.

177.    Even after Skyfall received the payoff letter amount from the SBA lender, it continued to debit $2,500 from Office Pride's business account for the following two weeks, resulting in an overcollection of more than $20,000.  *Id.* at ¶ 24.

**RESPONSE / OBJECTION.**  Getter adopts the response and objections asserted by his co-defendants in response to this assertion.

178.    In addition, in calculating the payoff amount, Skyfall failed to account for $20,000 in payments collected by Skyfall after Office Pride allegedly default on the initial agreement. *Id.* at ¶ 15.  As result, Skyfall collected at least $40,000 more than it was entitled to collect from Office Pride.

**RESPONSE / OBJECTION.** Getter adopts the response and objections asserted by his co-defendants in response to this assertion .

### (ii).   BAT, Inc. and The Litigation Practice Group

179.    Small business owners Daniel March ("March") and Tony Diab ("Diab") are partners who operate several companies, including, The Litigation Practice Group, P.C. ("LPG"), Bat, Inc. ("Bat"), and Vulcan Consulting Group, LLC ("Vulcan"). Heskin Decl., Ex. 127.

**RESPONSE / OBJECTION.** Disputed. First, Plaintiffs do not pincite the referenced material in the 124-page Heskin Decl. Ex. 127 [Dkt. No. 173]. Second, this witness was never disclosed to Defendants and these documents were not produced in discovery.

180.    In May 2021, Wolf solicited March into entering an MCA deal with Bridge with daily Remittances of $45,000.  Heskin Decl., Ex. 127 [Dkt. No. 173].  Between May 17, 2021, and May 28, 2021, Bridge double or triple-debited the companies' accounts on four separate instances, for a total of over-debit of $150,000.  *Id.*

**RESPONSE / OBJECTION.** Disputed. First, Plaintiffs do not pincite the referenced material in the 124-page Heskin Decl. Ex. 127 [Dkt. No. 173]. Second, this witness was never disclosed to Defendants and these documents were not produced in discovery.

181.    Bridge then required the companies to refinance the deal, and under the refinanced agreement, the companies would make daily remittances of $70,000. *Id.* Once again, Bridge immediately began double-debiting and took an extra $70,000 debit on June 2, 2021, June 8, 2021, and June 15, 2021, for a total of $210,000 over-debits. *Id.*

**RESPONSE / OBJECTION.** Disputed. First, Plaintiffs do not pincite the referenced material in the 124-page Heskin Decl. Ex. 127 [Dkt. No. 173]. Second, this witness was never disclosed to Defendants and these documents were not produced in discovery.

182.    On June 18, 2021, Wolf admittedly used the companies' password information to log into Vulcan's Bank of America Account and transfer $70,000 into Vulcan's Chase bank account from where Bridge was executing its daily ACH withdrawals. *Id.*

**RESPONSE / OBJECTION.** Disputed. First, Plaintiffs do not pincite the referenced material in the 124-page Heskin Decl. Ex. 127 [Dkt. No. 173]. Second, this witness was never disclosed to Defendants and these documents were not produced in discovery.

183.    When March and Diab demanded reimbursement for the overdraws, Wolf had his attorney secure an order of attachment and freeze the companies' bank accounts. March and Diab were ultimately forced under financial duress into a $849,240 settlement payment and mutual release to have the restraints removed. *Id.*

**RESPONSE / OBJECTION.** Disputed. First, Plaintiffs do not pincite the referenced material in the 124-page Heskin Decl. Ex. 127 [Dkt. No. 173]. Second, this witness was never disclosed to Defendants and these documents were not produced in discovery.

184.    Thereafter, Diab was solicited by Kroen to enter into an MCA agreement with Fundura Capital Group ("Fundura"). *Id.* at 000050978-991.

**RESPONSE / OBJECTION.** Disputed. Assuming "000050978" refers to GOFUND_000050978, which is the July 14, 2021, Purchase and Sale of Future Receivables Agreement between Fundura and Bat, such exhibit does not support the statement in paragraph 184 relating to who solicited Diab.

185.    Immediately after entering into the Fundura deal, Fundura proceeded to double and triple debit the companies' account each day between July 20 and 22, 2021, for a total over-debiting of $90,000. *Id.* The companies were never reimbursed for these over-debits; instead Fundura directed Wolf's attorneys to issue a UCC lien notice to the companies' credit card processor, thereby freezing payments. *Id.*

**RESPONSE / OBJECTION.** Disputed. First, Defendants assume the "*id.*" cites refer back to Ex. 127, and not the MCA Agreement at GOFUND_000050978. If so, Plaintiffs do not pincite the referenced material in the 124-page Heskin Decl. Ex. 127 [Dkt. No. 173]. Second, this witness was never disclosed to Defendants and these documents were not produced in discovery. Third, Getter disputes that the cited material supports the statement, as the relevant pleading appears to assert that the merchant voluntarily wired money "to avoid Fundura claiming that Defendants defaulted" and the alleged overpayment totaled $67,500. [Verified Counterclaims paragraphs 122-124]

186.    Even when caught, the Defendants persist in over-debiting, as was the case when Optimum Bank emailed on January 11, 2022 to explain with respect to recent ACH processing "in this case it shows that you debit the client multiple times," to which the response was "we have a signed agreement with this client, we cannot accept this time." Heskin Decl. Ex. 61.

**RESPONSE / OBJECTION.** Disputed. The cited evidence does not support the assertion with respect to Getter.

187.    The decision to double-debit or multi-debit a merchant is made consciously through written authorization among the Individual Defendants, and these double-debits or more can begin as soon as the Defendants have access to merchant's account.  Heskin Decl. Exs. 95 and 98 (**Braun** stating in a text that "**Wolf** is asking me for 2k from the debits that cleared ($4k) on 12/31 **because he told me** to **do extra debits that day**") (emphasis added); Ex. 102 (April 28, 2020 text from Wolf to Brezel, instructing Brezel to "Do double [f]or tomorrow [p]ayment[.]  Say it was sdd"); Ex. 76 (Wolf confirming a double-debit in a January 14, 2022 email).

**RESPONSE / OBJECTION.**  Disputed. The cited evidence does not support the assertion with respect to Getter.

188.    The purpose and intent behind double-debiting is to completely loot every account the merchant gave the Defendants access to, as Kroen demonstrates succinctly in a September 10, 2021 email to Wolf and others:

---

Message

| | |
|---|---|
| From: | Joseph FunduraCapital [jk@funduracap.com] |
| Sent: | 9/10/2021 11:51:35 AM |
| To: | Accounting BFC [accounting@bridgefundingcap.com] |
| CC: | Isaac Wolf [isaac@bridgefundingcap.com]; Issac Sku [issac.s@bridgefundingcap.com]; Jason Peterson [Jason@bridgefundingcap.com] |
| Subject: | Re: FUNDED 30K - FACTORY ARTWEAR INCORPORATED |
| Attachments: | image.png; image.png; image.png |

The guy is on lowered payments  so he'll bounce naturally  - he doesn't get enough  money ever to be able to send a wire and to make his account positive.  **we should leave debits on.**
We should  also turn on a duplicate daily debit from his other account -3367528589
BROOKLANDS  PARTNERS  LLC - same routing  number  - starting  with  a sdd - I don't have a vc but the statement  is in the funding  email and the account  in on the ach form.
I believe  that he has prince funding  in that account.

---

Heskin Decl. Ex. 97.

**RESPONSE / OBJECTION.** Disputed. The cited evidence does not support the assertion with respect to Getter.

189.    For instance, between February 7, 2022, and February 23, 2022—immediately before and after this lawsuit was filed, GoFund attempted a series of unauthorized ACH withdrawals from several of Haymount's accounts, and took $60,000.  Clinton Decl. ¶¶ 49-57.

**RESPONSE / OBJECTION.** Disputed. Haymount owed a balance of $488,928.23 to GoFund. See Dkt. No. 171, Heskin Decl. Ex. 10. Defendants also dispute that the ACH withdrawals were "unauthorized" and further object that such an assertion is a conclusion of law.

190.    Even after Haymount instructed its bank to stop accepting ACH withdrawals from GoFund, GoFund attempted to circumvent this by doctoring its ACH withdrawal account name from GoFund to "GoFund b" and making attempted withdrawals on February 16, 18, and 23, 2022, all **after** this lawsuit had started.  *Id*. ¶ 57.

**RESPONSE / OBJECTION.** Disputed that GoFund "attempted to circumvent this by doctoring its ACH withdrawal account name from GoFund to 'GoFund b.'" Defendants refer the Court to the statement and evidence at Dkt. No. 179, Defendants' Rule 56.1 Statement at ¶¶ 51-58. Furthermore, Plaintiffs have produced other evidence in this case in this case confirming that the "b" in "GoFund b" is simply a remnant of how banks process debits. *See* Dkt. No. 169-4, Turner Decl. Ex. D at 1 (showing batches of "b080223004" and "b060123005"); Dkt. No. 168-5, Furat Decl. Ex. D at 4 (showing a batch of "b030223003").

191.    The Defendants correspond with one another before agreeing to deploy ACH withdrawals under disguised name.  Heskin Decl. Ex. 112 (text massage asking if funding should be under disguised name to mislead others)

**RESPONSE / OBJECTION.** Disputed. The cited evidence does not support the assertion with respect to Getter.

## VI.    Defendants Abuse The CT Prejudgment Statute to Deprive Merchants Of Due Process By Freezing Bank Accounts Without Serving Notices On Merchant

192.    The Enterprise utilizes its collection arm Alpha and its attorney Alfin to freeze merchant's bank accounts who are purportedly in default to increase leverage in settlement discussions with said merchant. *See, e.g.*, Heskin Decl. Ex. 49 at GOFUND_000021543 (Alpha writing to the Enterprise in an email: "working on a on a settlement here.  We still haven't frozen anything so leverage is pending").

**RESPONSE / OBJECTION.** Disputed. Defendant Brezel, as the 30(b)(6) representative for Go Fund, Funding 123, and Merchant Capital, has repeatedly explained how having to default entities and freeze accounts only *lowers* the chance of collection. *See* Brezel Tr. 110:20-21 ("Because once a deal defaults, you have lesser odds on collecting."); *id*. at 116:14-15 ("It gives you lesser odds to collect on deals if you" default like that"); *id*. at 116:20-22 ("Even if it froze doesn't mean you get it. A deal wouldn't fund just to do that. It doesn't make sense to me."). The term "Enterprise" is vague and ambiguous.

193.    In June 2021 GoFund and Merchant Capital were registered as Connecticut businesses with the Connecticut Secretary of State, followed by Funding 123 doing the same in October 2021.  Heskin Decl. Ex. 58.  Shortly thereafter, the Defendants modified their MCA agreements to include a CT Prejudgment Statute waiver provision. Ex. 21 [Brezel Tr.] at 170:6-10.

**RESPONSE / OBJECTION.** Disputed.  The cited evidence does not support the assertion with respect to Getter.

194.    Since then, the Defendants "routinely" uses the CT Prejudgment Statute as a collection tactic, which the Defendants understand from their attorney Alfin is the "best" method of collection.  Heskin Decl. Ex. 21 [Brezel Tr.] at 167:7-169:9. Defendants' use of the CT Prejudgment Statute has steadily increased since 2020, as their attorney testified that he handled three or four writs of attachment for Defendants in 2020, between 30 and 50 in 2021, and 50 by September 2022.  Ex. 24 [Alfin Tr.] at 51:9-51:24.

**RESPONSE / OBJECTION.** Disputed. The cited evidence does not support the assertion with respect to Getter.

195.    The vast majority of these writs of attachment are never brought before a court. Alfin estimates that approximately eighty-five to ninety percent (85-90%) of the writs of attachments he issues on behalf of Defendants never get returned to court.  Heskin Decl. Ex. 24 [Alfin Tr.] at 53:11-23.

**RESPONSE / OBJECTION.** Undisputed with clarification. Alfin testified that in 2022 "10 percent or maybe 15" percent get returned to court. *See* Alfin Tr. at 53:11-18.

196.    To effectuate the service of the writs of attachment made pursuant to the CT Prejudgment Statute, defendants primarily rely on a single process server, Connecticut Marshal Elizabeth Ostrowski ("Ostrowski"), who Defendants' attorney describes as "reliable."  Heskin Decl. Ex. 24 [Alfin Tr.] at 101:2-101:24.

**RESPONSE / OBJECTION.** Disputed. The cited evidence does not support the assertion with respect to Getter.

197.    Ostrowski is so "reliable" that Alfin does not regularly review her affidavits or returns of service, nor does he instruct her on how to serve them.  *Id*. Tr. 102:2-14.

**RESPONSE / OBJECTION.** Undisputed with a clarification. Alfin testified when asked about reviewing Ostrowski's affidavits or returns of service as follows: "I can't say that I do as a practice. I mean, I know that there's a return. I skim through it. I'm not gonna tell you that I read all of her affidavits. I don't." Alfin Tr. 102:4-7.

198.    For serving a writ of attachment on a non-Connecticut resident, Ostrowski testified that in "Connecticut, nonresidents are served through the secretary of state . . . I would serve the Connecticut Secretary of State, and then do a certified mailing to the nonresident defendant." Heskin Decl. Ex. 22 [Ostrowski Tr.] at 16:22-17:3. Ostrowski confirmed she follows this approach whether or not the non-resident is a corporation or an individual. *Id*. at 27:17-28:2.

**RESPONSE / OBJECTION.** Undisputed as to first sentence of paragraph 198. As to the second sentence, Ostrowski responded that "If it is a nonresident individual, they are served under the long-arm statute" when asked if "[she] can serve any individual outside of Connecticut by simply serving the Secretary of Connecticut even though they've got no relationship or connection to Connecticut whatsoever[.]" Ostrowski Tr. at 16:22-17:3.

199.    Ostrowski qualifies this approach by admitting that she "may be mistaken, I haven't read the [relevant] statute in a long time." Heskin Decl. Ex. 22 [Ostrowski Tr.] at 18:14-21. Ostrowski admits that she hasn't investigated whether her approach is legally compliant, but she "believe[s] what [she is] doing is proper." *Id.* at 22:24-23:1.

**RESPONSE / OBJECTION.** The cited testimony does not support the statement that "Ostrowski admits that she hasn't investigated whether her approach is legally compliant, but she 'believe[s] what [she is] doing is proper.'"

200.    Ostrowski believes her obligations as to whether the intended recipient of the writs of attachment she serves on behalf of Defendants received due process is extinguished once she

affects service in the above-described manner.  *Id.* at 23:23-24:5 ("[O]nce I serve the document, they get returned to plaintiff's attorney, who then returns them to court.  I have no knowledge of whether they are – I don't make a service and then go online to the judicial to confirm that matters have been returned to court for any of my clients").

**RESPONSE / OBJECTION.** Disputed to the extent that the cited testimony makes no mention of Ostrowski's "obligations."

201.    Alfin knows that Ostrowski effectuates service in the above-described manner, but has not bothered to research whether this approach is lawful.  Heskin Decl. Ex. 24 [Alfin Tr.] at 167:3-5.  When asked "who's ultimately responsible for the due process violations" that may result from Marshal Ostrowski failing to property serve merchants, Alfin testified that the "answer is I don't know.  I haven't researched that issue." *Id.* at 104:3-18 and 106:1-6.

**RESPONSE / OBJECTION.** Disputed. The first referenced testimony refers to whether Alfin has researched whether leaving a notice of attachment with the secretary of state is proper service. Second, Alfin did not admit that there are any due process violations. The complete testimony is: "And if the marshal doesn't do their job like you've just explained happens all the time, then who's ultimately responsible for the due process violations that result from that? Is the marshal responsible, or are you responsible as the one who signed that writ?" to which Alfin replied: I think you're asking me a legal opinion. The answer is I don't know. I haven't researched that issue, but in my practice, you know, I draft the complaint, and I give it to the marshal, and the marshal serves it. If I come to find out that it didn't get served, I'd call the marshal up, and I'd probably -- probably say, okay, it's got to get served[.]" Alfin Tr. 104:3-18.

202.    The writs of attachment used by Defendants do not contain any information about the underlying lawsuit such that the recipient would understand how to appear in court to contest the restraint on the bank account.  Heskin Decl. Ex. 24 [Alfin Tr.] at 116:12-118:6.

**RESPONSE / OBJECTION.** Disputed. Alfin testified: "I believe the box on the first page has a section that they can check off that discusses this. I don't have the form in front of me, but I think there's a box there that talks about it." Alfin then directs Heskin to section 3 of Exhibit No. 5 and confirms that is where they're supposed to go. Alfin Tr. 116:12-117:15.

203.    Alfin explained that the writ of attachment will not be brought before a court unless he makes the filing, which is done six days before the return date.  *Id.* at 121:11-17.  Typically, Alfin selects a return date of 30 days for writs of attachment, but Ostrowski testified that this return date can be extended up to two months.  *Id.* at 82:10-83:15. Consequently, based on Defendants' practice, a bank account can be frozen for months before an action is every actually brought before the court.  *Id.* at 168:1-14 (testifying that he typically picks a return date six weeks out).

**RESPONSE / OBJECTION.** Disputed as to the second sentence of paragraph 203. Ostrowski testified that the longest she has seen a return date with respect to Defendants and Alfin is "usually around a month." Ostrowski Tr. 83:4-12.

204.    One entity that Ostrowski and Alfin ensure does receive a copy of the writ of attachment promptly is the merchant's bank.  Ostrowski's practice is to personally **hand serve** a local branch of the bank used by the merchant who purportedly defaulted, which results in an immediate freeze on that merchant's account with the bank.  Heskin Decl. Ex. 22 [Ostrowski Tr.] at 61:23-63:5. She may then wait up to 12 days before the return date to effect service on the actual merchant, which is done by serving the Connecticut Secretary of State and certified mailing.  *Id.* at 16:20-17:11; 67:4-75:6; 77:13-79:10; 80:12-81:13. Ostrowski has not researched and has no

idea whether it is legally permissible to effectuate a bank freeze on an out-of-state resident's bank account by serving a branch of the merchant's bank in the state of Connecticut. *Id*. at 85:5-88:10.

**RESPONSE / OBJECTION.** Disputed. Ostrowski testified that "By statute, it has to be served 12 days prior to the return date" and that she does not have a staff and needs time to prepare the papers to serve the defendants after serving the banks. Ostrowski Tr. 66:10-11, 67:10-12, 68:13-14, 69:8-9. And she did not always take the full 12 days; for example, she took 8 days to serve Turrentine. *Id*. at 79:4-6. Ostrowski testified that she tries to serve as promptly as she can. *Id*. at 80:23; see also 95:9-10 ("Generally, they are served quicker than 12 days"). Moreover, when asked if she can serve an individual through the secretary of state, Ostrowski replied: "5259(b) is service of a nonresident individual." *Id*. at 89:9-13.

205.    Indigo Installations Inc. ("Indigo") and its owner Christopher Turrentine ("Turrentine") fell victim to the above practice.  On February 24, 2022, Defendants froze Indigo's bank account through a writ of attachment.  Heskin Decl. Ex. 24 [Alfin Tr.] at 117:3-122:13.

**RESPONSE / OBJECTION.**   Getter disputes the characterization that Indigo and Turrentine "fell victim to the above practice." and that the cited evidence supports the assertion with respect to Getter.

206.    The writ of attachment was never served on Indigo or Turrentine, Heskin Decl. Ex. 22 [Ostrowski Tr.] at 90:6-91:23, **and an action was never filed**, but Turrentine's bank account for his business Indigo was frozen for more than **64 days** until Indigo was cash-strapped and forced to settle. All this occurred after Indigo was promised $40,000, and was only funded $14,000, with the caveat that the full funding would not be provided unless and until Indigo made $24,200 in payments.

66

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statements: (1) "an action was never filed, but Turrentine's bank account for his business Indigo was frozen for more than 64 days until Indigo was cash-strapped and forced to settle"; (2) "All this occurred after Indigo was promised $40,000, and was only funded $14,000, with the caveat that the full funding would not be provided unless and until Indigo made $24,200 in payments." Defendants further object that whether Indigo was served is a legal conclusion. That said, Indigo was eventually served. *See* HASSETT_002562 (showing that Ostrowski received a green card for certified mail on June 24, 2022, addressed to Indigo's same address that was on the returned unopened envelope); *see also* HASSETT_002560.

207.    Like Indigo and Turrentine, approximately 20% of the defendant-merchants subject to the writs of attachment Ostrowski serves on the merchants' banks never get a copy of the writ themselves. Heskin Decl. Ex. 22 [Ostrowksi Tr.] at 90:6-91:23.

**RESPONSE / OBJECTION.** Disputed. Ostrowski did not testify that 20% of the defendants "never get a copy of the writ themselves." She testified that the percentage of getting returned envelopes is 20%.

208.    For the 80% of merchants that do eventually receive service of a writ of attachment from Defendants after their bank account is frozen, there is still no readily available means for them to challenge the restrain in court because, as **Alfin concedes, so long as the writ of attachment remains unfiled with the court,** there is no pending lawsuit for the merchant to appear in.  Heskin Decl. Ex. 24 [Alfin Tr.] at 117:24-122:24; 132:15-21.

**RESPONSE / OBJECTION.** Alfin testified that he's required to return the writ back to the court 6 days before the return date that's on the complaint. Alfin Tr. 121:7-21. Further disputed

as merchants have challenged this process, showing it is possible. *See Tryfacta, Inc. v. GoFund Advance, LLC*, FSTCV226055351S, Dkt. No. 20 (Conn. Super. Ct. Mar. 2, 2022) (case in which a merchant represented by counsel tried, and failed, to obtain preliminary injunction to challenge this process).

209.   Most of these merchants never have their day in court because approximately 85 to 90% of all writs of attachment Alfin issues on behalf of Defendants are never returned back to court because "[m]ost of these cases settle well before the return date."  Heskin Decl. Ex. 24 [Alfin Tr.] at 122:14-123:7.

**RESPONSE / OBJECTION.** Disputed as to the statement that "[m]ost of these merchants never have their day in court." The cited testimony does not support the assertion that "[m]ost of these merchants never have their day in court[.]"

210.   These settlements are negotiated directly with the unrepresented merchant while both his or her business and/or personal bank accounts are frozen.  *Id*. at 127:15-129:7.

**RESPONSE / OBJECTION.** Disputed. The cited testimony does not support the assertion that settlements are negotiated with business and personal bank accounts frozen. For example, Turrentine testified that he had another bank account that was not frozen which had substantial money in it. *See* Turrentine Tr. 112:2-4, 122:19-24.

211.   Even in the rare scenario a merchant is able to obtain counsel, Defendants deny merchant's access to the unserved writs. For instance, in a matter before the District of Connecticut entitled *Evexia Holdings, Inc. v. Quick Funding Group, LLC*, counsel for plaintiff—a merchant who had his bank account frozen by Alfin—filed an affirmation stating that Alfin refused to provide him with a copy of the restraining paperwork, necessitating the emergency relief described therein.  Heskin Decl. Ex. 36.

**RESPONSE / OBJECTION.** Disputed.  The cited evidence does not support the assertion with respect to Getter.  Also, Quick Funding Group, LLC is not alleged to be part of the Enterprise.

212.    Indigo and Turrentine were similarly victimized.  When Defendants froze Indigo's PNC Bank bank account on or about February 24, 2022, Turrentine was on vacation in Mexico with his wife, leaving him and his wife stranded in a foreign country without access to funds.

**RESPONSE / OBJECTION.** Disputed. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statements in Paragraph 212. In addition, Turrentine never testified that he and his wife were left "stranded in a foreign country without access to funds." *See* Turrentine Tr. 41:21-42:9, 109:23-110:14, 256:20-257:1.

213.    As confirmed by Ostrowski, Indigo never received service of the writ used by Alfin and Defendants to freeze its bank account.  Heskin Decl. Ex. 22 [Ostrowki Tr.] at 90:6-91:23. When Turrentine was finally able to contact Alfin, he demanded payment of Indigo's entire account balance in exchange for unfreezing the account.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement "[w]hen Turrentine was finally able to contact Alfin, he demanded payment of Indigo's entire account balance in exchange for unfreezing the account

214.    Turrentine was able to make it back to America by March 3, 2022, at which point he retained White and Williams LLP to represent him and Indigo against Defendants in the settlement discussions that Alfin had started with Turrentine by March 3, 2022.  Turrentine informed GoFund in subsequent discussions that he had retained White and Williams to handle his dispute over the bank freeze.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statements in Paragraph 214.

215.   Notwithstanding Turrentine retaining White and Williams as counsel, Alfin and Defendants still proceeded to negotiate and coerce Turrentine into an unconscionable settlement in communications that precluded White and Williams.  Even when White and Williams contacted Alfin demanding to see copies of the writ of attachment and proposed settlement, Alfin refused and claimed—without actual basis—that White and Williams was not Indigo or Turrentine's counsel.  Heskin Decl. Ex. 24 [Alfin Tr.] at 144:13-150:23.

**RESPONSE / OBJECTION.**  Disputed. The cited evidence does not support the assertion with respect to Getter or the asserted facts in general..

216.   Deprived of counsel and with his bank account still frozen, Turrentine felt he had no choice but to sign an unconscionable settlement agreement prepared by Alfin whereby he had to release funds to Defendants to have his bank account unfrozen.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement in Paragraph 216.

217.   Many other merchants who entered into MCA Agreements with Defendants fell victim to this same abuse of the CT Prejudgment Statute.  As part of this abuse, Alfin regularly misrepresents to merchants and third parties that an active lawsuit has been filed when, in fact, no such lawsuit exists.  Heskin Decl. Exs. 88-93 (copies of settlement agreements entered into between the Enterprise and merchants representing lawsuits were filed, along with searches for

GoFund, Funding 123 and Merchant on Connecticut's Superior Court search finding no such lawsuits).

**RESPONSE / OBJECTION.** Disputed. Plaintiffs do not cite any support for the statement that "[m]any other merchants who entered into MCA Agreements with Defendants fell victim to this same abuse of the CT Prejudgment Statute.".

218.    Floortechs, LLC, a commercial flooring service provider based in Virginia, for instance, entered into an MCA Agreement with an entity called "Skyfall Funding"[2] on March 30, 2022. *See* Declaration of Brandy Perez ("Perez Decl.") ¶¶ 2-7. The next day, despite Floortechs making the first daily remittance, Defendants froze Floortechs' bank account and immediately demanded $152,000 (well above the Floortechs' MCA agreement's purchase amount) without bothering to serve the merchant with a writ of attachment. *Id.* ¶¶ 10-12. Floortechs was forced to enter into a settlement agreement whereby Defendants obtained $152,181.35 in exchange for a mutual release and Defendants unfreezing Floortechs' bank account, all without ever having received a copy of the writ of attachment from Defendants or H&G. *Id.* ¶¶ 12-22.

**RESPONSE / OBJECTION.** The term "Defendants" is vague and ambiguous and does not describe who did what. The cited evidence does not support the asserted facts with respect to Getter. Whether there was service, and whether Floortechs was "forced" to enter a settlement agreement are legal conclusions. Getter does not dispute that Floortechs' account was frozen.

219.    Metropolitan Security Associates ("Metro"), a professional security guard provider based in Georgia, had a similar experience. On January 6, 2022, Metro entered into an MCA with GoFund. Declaration of Jerome Turner, Jr. ("Turner Decl.") *Id.* ¶ 5. During Metro's second week of making daily payments, it experienced difficulties collecting invoices from its customers, but

---

[2] Kroen confirmed that Skyfall is a d/b/a used by Defendants. Heskin Decl. Ex. 27 [Kroen Tr.] at 118:10- 14; *see also*, Ex. 28 [Katz Tr.] at 69:8-24.

instead of offering Metro a reconciliation or pause, GoFund froze not only Metro's designated account per the MCA agreement, but several other of Metro's business accounts, all without serving a copy of the writ of attachment on Metro.  *Id*. ¶¶ 6-14.  GoFund would only unfreeze Metro's accounts if the merchant agreed to pay it $14,000 and enter into a mutual release, which Metro was forced to do in order to save its business on May 27, 2022.  *Id*. ¶¶ 15-16.

      **RESPONSE / OBJECTION.** This witness was never disclosed to Defendants and this document was not produced in discovery.  Getter objects that the assertion the writ of attachment was not served is a legal conclusion. Lastly, disputed because Kings County Supreme Court issued a default judgment against Metro after service. *See GoFund Advance v. Metropolitan Security Associates, Inc*., NYECF Index No. 505528/2022, Dkt. 6.

      220.    Office Pride Commercial Cleaning Services ("Office Pride"), a franchise offering commercial cleaning services in Indiana, also fell victim to this conduct.  On May 13, 2022, Office Pride entered into an MCA agreement with Skyfall Funding, but instead of the $100,000 funding that was promised, Skyfall Funding only advanced Office Pride approximately $30,000. Ascencion Decl.  ¶ 6.  Despite funding less than half the contractual amount, Skyfall Funding still required Office Pride to repay $149,990 through daily payments of $4,000.  *Id*. ¶¶ 6-8.  When Office Pride failed to keep up with these daily payments—unsurprising considering the $4,000 daily payments was contemplated with $100,000 in funding as opposed to $30,000—Defendants froze Office Pride's bank account for its purported default without ever serving a copy of the writ on Office Pride.  *Id*. ¶¶ 10-13.  Defendants agreed to unfreeze this account, but only if Office Pride entered into an even more onerous MCA agreement, which Office Pride did because it had no alternatives while its bank account was frozen and the writ of attachment never having been served on it.  *Id*. ¶¶ 14-16.  Office Pride likely would have defaulted under this second MCA agreement, but in this

instance, when Defendants learned Office Pride had been accepted for an SBA loan, Defendants duped the SBA into paying Defendants $189,875 in exchange for Defendants lifting their UCC liens on Office Pride. *Id*. ¶¶ 20-25.

**RESPONSE / OBJECTION.** This document was not produced in discovery. Getter disputes that the cited evidence supports the asserted facts with respect to Getter. Getter adopts the responses and objections to these assertions submitted by his co-defendants.

## VII.    The Writs of Attachments Defendants Use To Freeze Merchants' Bank Accounts Are Knowingly Riddled with Fraud

221.    Under the CT Prejudgment Statute, every writ of attachment must be accompanied by, among other things, "an affidavit sworn to by plaintiff or any competent affiant setting forth a statement of facts sufficient to show there is probable cause that a judgment in the amount of the prejudgment remedy sought[.]" (hereafter the "Debt Affidavit") Conn. Gen. Stat. § 52-278c.

**RESPONSE / OBJECTION.** Paragraph 221 does not set forth a statement of fact, as required by Local Rule 56.1(a), and so no response is necessary. Getter refers to the Connecticut Prejudgment Statute for its true and correct content.

222.    Defendants have served writs of attachment that included Debt Affidavits with forged signatures. Heskin Decl. Ex. 25 [Getter Tr.] at 170:1-178:20; 185:21-194:2; and 202:7-203:2 (Getter being shown four Debt Affidavits he purportedly signed, attached to Heskin Decl. as Exs. 32 to 35, and testifying his signature was forged).

**RESPONSE / OBJECTION.** Disputed. Getter never affirmatively testified that his signatures were actually forged, repeatedly stating "I'm not sure" or "I don't think so." And on one occasion, Getter did recognize his signature. See Getter 193:20-24 ("The witness has identified [exhibit] 15 as his signature and all of the rest that we've shown him are not his signature? A. I'm not sure. They don't seem to be." Documentary evidence indicates that Getter did sign one of the

an affidavit at issue. *See* GOFUND_000103856 (email in which Wolf asks Getter to sign); *see also* GOFUND_000103904 (email in which Getter responds to Wolf's email with the signed attachment).

223.    Defendants use individuals with no personal or general knowledge of the underlying deals to sign Debt Affidavits used in writs of attachment.  Heskin Decl. Ex. 25 [Getter Tr.] at 39:11-46:10; 93:22-98:21.

**RESPONSE / OBJECTION.** Disputed. The cited evidence does not support the assertion with respect to Getter.

224.    Moreover, Defendants admittedly do not even read their own MCA agreements that are attached to the Debt Affidavits.  Heskin Decl. Ex. 25 [Getter Tr.] 33:8-15 (admitting he never has read an MCA agreement) and at 39:11-50:15 (testifying that he signs Debt Affidavits at the instruction of other Defendants without independent verification); Ex. 27 [Kroen Tr. 45:4-14] (testifying that he never reads his MCA agreements fully); Ex. 20 [Wolf Tr.] at 127:11-129:15 (testifying he is generally illiterate and doesn't read every agreement) and 172:7-12 ("I don't read the contracts.  I got it from my attorneys") and 244:21-245:8 ("I never read the agreement.  I have an attorney who prepares agreements"); Ex. 21 [Brezel Tr.] at 133:4-10 ("I'm not familiar with every single change that happens to the contracts"); Ex. 28 [Katz Tr.] at 15:23-16:20 (testifying she "skimmed through" MCA agreements "when I started to do MCA") and 39:3-39:24 (testifying he's unaware if a merchant may pause payment because he's not read agreements); Ex. 29 [Beityakov Tr.] at 103:6-104:14 (testifying she only looked through Defendants' MCA contracts prior to this lawsuit when she started working, and only once since).

**RESPONSE / OBJECTION.** Disputed. First, the use of the term "Defendants" is vague and ambiguous. Second, the cited testimony does not support the assertion that Getter admitted he

never reads MCA agreements fully. Second, Wolf did not testify that he is "illiterate." He stated," I don't read. I'm not a – I can't read a book . . . I have ADHD it's called." Wolf Tr. 127:15-16. Third, Brezel's full statement is as follows: "I'm not familiar with every single change that happens to the contracts. Some things are minor, some things are major. If a question arises that pertains to it, I would either read it and understand it or ask my lawyer and have him explain it to me. Brezel Tr. 133:5-10. Fourth, Katz's complete testimony is as follows: "So I looked at things that pertain to what I should know. So I did look through them . . . but I remember when I started to do MCA, I did read them . . . I believe I read through most of [the provision]. Like a lot of law things that I skimmed through, but what was more pertaining to me was . . . I read reconciliation, about defaults, mostly those kind of things, the day-to-day work." Katz Tr. 16:6-20. As to the purported testimony that Katz is "unaware if a merchant may pause payment because he's not read agreements," the actual testimony is: "Like, I didn't read everything, every line, so I don't know if it does say it or not." *Id.* at 39:17-19. Lastly, Katz never testified that he has only looked at the MCA contracts "once" since after the lawsuit was filed.

225. Paralegals at H&G often are the ones that actually draft the Debt Affidavits. Heskin Decl. Ex. 24 [Alfin Tr.] 89:7-90:8. The writs of attachment and Debt Affidavits are at time prepared without H&G even having discussed the matter with the Defendants. Ex. 37 (writ of attachment including application for attorneys' fees broken down by task reflecting no communications with Defendants). H&G often receives instructions to file writs of attachments from Defendants from an individual who is not the signatory on the Debt Affidavit. Ex. 24 [Alfin Tr.] at 58:14-17.

**RESPONSE / OBJECTION.** Disputed. Alfin testified that Donna Pare, a paralegal at H&G, "*sometimes*" drafts the prejudgment remedy applications, "but usually it's the lawyers that do it." Alfin Tr. 89:7-12 (emphasis added). Alfin also testified that "the lawyers always review the

[prejudgment remedy application] before is goes out" and that "[t]he paralegal doesn't send out a document without a lawyer looking at everything." *Id.* at 89:14-21. Moreover, Ex. 37 does not support the assertion that "[t]he writs of attachment and Debt Affidavits are at time prepared without H&G even having discussed the matter with the Defendants." Lastly, when asked if the person signing the affidavits of debt are the same individuals instructing him to file a lawsuit, Alfin responded, "Not always." Alfin Tr. 58:14-17.

226.    H&G often submits its own affidavit of attorney's fees with the writs of attachments they prepare, even though Alfin testified that he charges these fees without first charging them to his clients, as he is paid on contingency.  Heskin Decl. Ex. 24 [Alfin Tr.] at 84:1-86:13.

**RESPONSE / OBJECTION.** Disputed. Alfin testified that he wasn't sure if he had billed that client in that particular case and that "*generally* it's a contingency." Alfin Tr. 84:13-85:7. (emphasis added).

227.    When GoFund, Funding 123, and Merchant enter into settlements with merchants who had their accounts frozen, the agreements routinely represent in the settlement documents that a complaint was filed with a court in Connecticut.  Heskin Decl. Ex. 93.  Likewise, when Alfin reports the settlements on behalf of Defendants to merchants' banks to have the accounts unfrozen, he represents there was an actual litigation filed. Ex. 88.

**RESPONSE / OBJECTION.** Disputed.  Plaintiffs do not pincite the referenced material in the 150-page Heskin Decl. Ex. 93 [Dkt. No. 173] or the 163-page Heskin Decl. Ex. 88 [Dkt. No. 172]. Getter further object that the cited material does not support the contention that there is a representation that "a complaint was filed," as the language differs agreement to agreement. For example, settlements use language like "GFA has commenced a lawsuit." *See, e.g.*, Ex. 93 pt. 2 at 5. For those settlements, Defendants also object that whether, under the mechanics of the

prejudgment remedy statute, it is accurate to say that a party "has commenced a lawsuit" is a legal conclusion. Similarly, for the reports to banks, the letter uses language "This is to inform you that the above captioned matter has been settled privately" but makes no representations about whether a suit was filed. *See, e.g.,* HASSETT_002681.

228.    Searches for parties named "GoFund", "Funding 123", "Merchant Capital", and "Bridge Funding Cap" in Connecticut's database for litigations in Superior Court, however, do not reflect any such litigations having actually been filed.  Heskin Decl. Exs. 89-92.

**RESPONSE / OBJECTION.** Disputed to the extent that paragraph 228 implies that those entities have no cases in Connecticut at all, because they do. *See, e.g.*, Dkt. No. 176, Def. Motion for SJ at 17 n. 11.

229.    Defendants also use writs of attachment to freeze bank accounts belonging to merchants who are not in default.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement in Paragraph 229.

230.    As discussed in Section V above, Floortechs entered into an MCA agreement with Defendants for $100,000, yet was only funded $35,000.  Perez Decl. ¶ 9.  Despite Defendants' own documented and acknowledged breach of this promise in communications with Floortechs in the days to follow, Defendants went ahead and froze Floortechs' bank account while it was in compliance with making daily remittances.  *Id.* ¶¶ 9-11.  Defendants even continued to withdraw the daily remittances from Floortechs' frozen account, all while failing to serve a copy of the writ of attachment on Floortechs.  *Id.* ¶¶ 12-17.

**RESPONSE / OBJECTION.** Disputes.  The cited evidence does not support he asserted facts  with respect to Getter.

231.    Office Pride was similarly short-changed by Defendants in violation of the MCA agreement, whereby Office Pride was promised to receive $50,000, but instead only received $30,000. Ascencion Decl. *Id*. ¶ 7.  Defendants intentionally withheld the full funding amount while promising its release if Office Pride made  several daily remittances of $4,000.  *Id*. Notwithstanding Defendants' own obvious breach, Defendants nevertheless froze Office Pride's bank account using the CT Prejudgment Statute and used the resulting duress to coerce Office Pride into executing an even more onerous MCA agreement.   *Id*. ¶¶ 11-25.

**RESPONSE / OBJECTION.** Disputed.  The cited evidence does not support the facts asserted with respect to Getter.

232.    LF Family, LLC, a catering company based in California, was another innocent merchant whose business account was wrongly frozen by Defendants.  LF Family entered into an MCA agreement with Defendant Getter through a company entitled United Fund USA that provided LF Family would receive $40,000 in funding.  *See* Declaration of Benjamin George Harbor Jr. ("Harbor Decl.") ¶ 5.  LF Family did not receive $40,000, however, it only received $26,000, which Getter claimed was a mistake that Defendants would fix. *Id*. ¶¶ 8-9.  Rather than fix the mistake, Defendants ultimately froze LF Family's business account in early August 2022 and did not serve a copy of the writ of attachment on LF Family until sometime in October 2022. *Id*. ¶¶ 12-17.  This account remains frozen presently because LF Family refused Defendants' settlement demand of payment of $37,000 in exchange for unfreezing LF Family's account.  *Id*.

**RESPONSE / OBJECTION.**  This witness was never disclosed to Defendants and this document was not produced in discovery. Getter disputes these factual assertions as they are

unsupported by the cited evidence.  The MCA agreement indicates that various fees will be subtracted from the funding amount and payment received by LF Family is consistent with the contract. Ex. A to Harbor Decl. at p. 8.  The garnishment documents submitted as exhibits to the Harbor Declaration are each dated September 16, 2022, indicating that could not have been used to freeze LF's account in August 2022, and that the account could not have been restrained by Getter until sometime in late September.  [Harbor Decl., Ex. B].  The same documents also indicate that $53,000 of the $65,000 that Harbor owed under its MCA agreement was still due and owing in September 2022, meaning that Harbor stopped making payments almost immediately after receiving funding, and after receiving $26,000 it has paid only $12,000 under the agreement. Getter disputes that characterization of LF as "an innocent merchant whose business account was wrongfully frozen." Is supported by the cited evidence.

233.    Continuing this pattern, Maxon Construction, Inc. ("Maxon"), a subcontractor based in California, had the unfortunate luck of entering into an MCA agreement with Bridge Funding Cap LLC ("Bridge")[3] on June 1, 2022.  *See* Declaration of Michael Maxon ("Maxon Decl.") *Id*. ¶ 7.  Pursuant to the funding call with Bridge, Maxon expected to enter into a deal for $100,000 in funding and would pay back $149,990 through daily remittances of $6,000.  *Id*.  When the contract arrived, however, it was only promised the amount of $50,000.  *Id*. ¶ 8. Maxon's owner contacted the broker before signing the MCA agreement, and the broker assured Maxon that the second installment of $50,000 would be made after Maxon had made remittances, which was memorialized in text.  Maxon Decl. Ex. B.  Maxon only received approximately $33,000 ($6,200 of which was immediately withdrawn that same day) of the promised $50,000, Maxon Decl. ¶ 12, resulting in an effective interest rate of 3,545.4%.

---

[3] As reflected in court filings and Defendants' testimony cited above, Bridge is another MCA company owned and controlled by Defendants.

**RESPONSE / OBJECTION.** This witness was never disclosed to Defendants and this document was not produced in discovery. Getter disputes he owns or controls Bridge Funding Cap LLC and disputes that the cited evidence supports any of the asserted facts with respect to Getter.

234.    Maxon never got this second installment because within two days Bridge had frozen its bank account for the alleged reason of having other MCA agreements, even though Bridge knew it was not Maxon's only MCA position prior to offering the funding. *Id*. ¶¶ 13-14. Maxon never received service of the papers and the business closed immediately after Bridge froze its account as it could not process payroll. *Id*. ¶¶ 15-17. Significantly, Brezel testified on behalf of the Enterprise that it does not default merchants solely for having multiple MCA positions because it is so common in the industry. Heskin Decl. Ex. 21 [Brezel Tr.] at 108:20-110:21.

**RESPONSE / OBJECTION.** Disputed. The evidence cites in support of these assertions does not establish any facts with respect to Getter. Getter adopts the responses and objects submitted by his co-defendants with respect to these statements.

235.    On January 12, 2022, Sarah Bietyakov, using the fake name Ashley, solicited Ken Rockwood ("Rockwood"), a small business owner via text message offering him an MCA deal for receivables. Heskin Decl. Ex. 81. After some negotiation on the terms—again with no discussion of receivables—Rockwood agreed to $100,000 in funding, with a $150,000 payback, and rejected the $200,000 offer with a $300,000 payback. *Id*. On January 17, 2022, Rockwood entered into an MCA agreement with Funding 123 for his company Kenrock Enterprises, LLC ("Kenrock"), with reflected $100,000 Purchase Price, but also had a $299,800 Purchased Amount which was based on Beityakov's original $200,000 Purchase Price offer that Rockwood rejected. Heskin Decl. Ex. 82. Kenrock was funded $95,000 and Rockwood contacted Beityakov on February 22, 2022 to confirm that he had paid in full. Ex. 81. Beityakov confirmed Rockwood had paid $150,000, but

said he owed an additional $120,000.  *Id.*  Rockwood was surprised because he only agreed to the $100,000/$150,000 deal.  *Id.*  Notwithstanding Rockwood fully complying with the terms he accepted, on or about March 2, 2022, Funding 123 froze Kenrock's account through a writ of attachment using the CT Prejudgment Statute.  Ex. 80.  Kenrock's account was only unfrozen after it entered into a mutual release and paid Funding 123 an additional $149,128.85.  Ex. 83.

**RESPONSE / OBJECTION.** This witness was never disclosed to Defendants and this document was not produced in discovery. Getter adopts the responses and objects submitted by hjis co-defendants with respect to these statements

236.    Defendants have also included fraudulent MCA agreements in their writs of attachments and filings with courts.  For instance, Oil City Tractors, Inc. ("Oil City"), a lawn and garden retailer based in Beaumont, Texas, entered into an MCA agreement with a funder purportedly named Tailored Fund Cap LLC ("Tailored"). *See* Declaration of Eulice Alvey ("Alvey Decl.") ¶ 6.  Pursuant to the terms of this MCA agreement, Oil City was to receive $554,401.57, and repay $848,234.40 through daily remittances of $8,999.  *Id.* ¶¶ 6-8.  Significantly, the MCA agreement Oil City entered into with Tailored did not contain the requisite CT Prejudgment Statute waiver like so many other MCA agreements.  Alvey Decl. Ex. A.  However, when Oil City could not keep up paying these daily remittances due to receiving far below than the promised $554,401.57 funding and difficulty collecting on its own receivables, its bank account was frozen. *Id.* ¶¶ 15-16.  When Oil City ultimately received a copy of the writ of attachment used to freeze its bank account, it discovered that the freeze was affected by Defendant Merchant, and the MCA agreement included therein was **doctored** to replaced Tailored with Merchant **with the only other difference being the insertion of a CT Prejudgment Statute waiver**.  *Compare* Alvey Decl. Ex. A with Ex. C.  Text messages produced in this case demonstrate that Brezel authorized the

doctoring of Oil City's MCA deal for the explicit purpose of freezing his accounts and to exert settlement leverage.  Heskin Decl. Exs. 74-75.  Oil City would ultimately have to enter into a series of settlements with Merchant before its bank account was finally unfrozen.  Alvey Decl. ¶ 22.

**RESPONSE / OBJECTION.** Disputed. Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted be supported by evidence in the record, and Plaintiffs do not cite any support for the first sentence in paragraph 236. This witness was never disclosed to Defendants and this document was not produced in discovery. In addition, the signature page bears a different document control number on the bottom left than the prior pages of the declaration. The cited evidence does not support the asserted facts with respect to Getter.

237.    Haymount had similar experiences. On or about December 27, 2021, Haymount entered into an MCA agreement with Funding 123 which provided for $2,000,000 in funding in exchange for Haymount paying back $2,700,000 through daily remittances of $80,000.  Clinton Decl. Ex. 5.  Haymount did not receive $2 million, nor anything close; rather it received only $900,000.  Clinton Decl. ¶ 32.  Funding 123 did not adjust the daily remittance to reflect that less-than-half the funding amount that was contractually promised had been funded; it kept making daily remittances of $80,000, which ultimately resulted in Haymount paying well more than $1,350,000 (i.e., half the Purchased Amount) on this Funding 123 MCA agreement.  *Id*. ¶¶ 33-41.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted be supported by evidence in the record, and Plaintiffs do not cite any support for the statement that "Haymount had similar experiences."

238.    Defendants do not dispute that they only funded Haymount with $900,000 pursuant to this clearly contemplated $2 million MCA agreement.  Heskin Decl. Ex. 20 [Wolf Tr.] at 75:11-76:11 (Wolf testifying that Haymount only received $900,000 under the deal and that the total was

"supposed to be 1.7 [million]"); Ex. 114 ¶ 8.

**RESPONSE / OBJECTION.** Disputed.  The cited evidence does not support the asserted facts with respect to Gettter.  To the extent that Plaintiffs are implying the MCA agreement ever called for funding $2 million net without any fees, Getter disputes this that based on the text of the agreement.

**VIII.   The Enterprise Uses Violate To Collect**

239.   Text messages produced by Defendants indicate the use of threats of violence and actual violence as part of the Enterprise's collection practices.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement in Paragraph 239.

240.   For instance, on October 21, 2021, Brezel texted Braun and an individual named "Yitzhock Weiss" the following:

> **(347) 446-0445@s.whatsapp.net YB** 06:03:23 PM
>
> I had someone visit a merchant (PRESTIGE AMERICA) that owes us money
>
> **(347) 446-0445@s.whatsapp.net YB** 06:03:45 PM
>
> Mother fucker
>
> **(347) 446-0445@s.whatsapp.net YB** 06:03:58 PM
>
> He ran away
>
> **(347) 446-0445@s.whatsapp.net YB** 06:05:45 PM
>
> Im gonna collect here

Heskin Decl. Ex. 99.

**RESPONSE / OBJECTION.** Undisputed as to what the text messages say but Getter

dispute that they relate to him or reflect that anyone used violence.

241.    Yitzchok Weis responded with his own tale of collection abuses:

> **(917) 635-0472@s.whatsapp.net Yitzchok Weiss** 10:45:33 PM
>
> BTW I'm impressed Sammy got YILNIK to pay off
>
> Man I remember ge used to scream at that guy 24/7
>
> Months ago / always

**RESPONSE / OBJECTION.** Undisputed as to what the text messages say but Getter

disputes they relate to him or that they indicate violence was ever used.

242.    Later in the text exchange, Brezel added ominously:

> **(347) 446-0445@s.whatsapp.net YB** 09:10:25 PM
>
> Also, I spoke to Rosenberg business for a little.
> I don't think he's a funder.
> He's a good collector
> Actually, he can probably be a great one.
> But also, I'm a bit worried about how he crossed the line a few time on collecting without covering his tracks.
> It's a problem in my opinion.

Heskin Decl. Ex. 99.

**RESPONSE / OBJECTION.** Undisputed as to what the text messages say but Getter

disputes that it relates to him or that it reflects that Defendants ever used any means of violence.

### IX.    Defendants' RICO Violations Are Ongoing and Defendants Continue to Collect Usurious Debt, Commit Wire Fraud, and Extortion Since Discovery Closed

243.    Discovery was closed in this action on September 28, 2022.  *See* [Dkt. No. 100].

**RESPONSE / OBJECTION.** Undisputed.

84

244.    Defendants' RICO Enterprise has continued to victimize merchants.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statement in Paragraph 244.

245.    For instance, Defendants froze LF Family's business account in August 2022, which remains frozen as Defendants try to extort settlement and a mutual release. Harbor Decl. ¶¶ 12-17. LF Family did not even receive a copy of the writ of attachment until October 2022. *Id*.

**RESPONSE / OBJECTION.**  Disputed.  The evidence cited contradicts the asserted facts. The garnishment documents submitted as exhibits to the Harbor Declaration are each dated September 16, 2022, indicating that could not have been used to freeze LF's account in August 2022, and that the account could not have been restrained by Getter until sometime in late September.  [Harbor Decl., Ex. B].  The same documents also indicate that $53,000 of the $65,000 that Harbor owed under its MCA agreement was still due and owing in September 2022, meaning that Harbor stopped making payments almost immediately after receiving funding, and after receiving $26,000 it has paid only $12,000 under the agreement. Getter disputes the characterization of his attempt to lawfully collect this contractual debt as "extortion."

246.    Speed Weedy Madera, LLC ("Speedy") entered into an MCA agreement with Jett Funding ("Jett") on February 2, 2023. Declaration of Furat Alsaigh ("Alsaigh Decl.") ¶ 15.

**RESPONSE / OBJECTION.** The assertion that "Defendants try to extort settlement and a mutual release" is a conclusion of law and not a statement of fact as required by Local Rule 56.1 and, therefore, no response is necessary. Getter also object that this witness was never disclosed to Defendants and this document was not produced in discovery.

247.    Defendants' productions confirm that they operate Jett and do so out of the

Enterprise's shared office at 1508 13th Avenue, Suite 324, Brooklyn, New York.  Heskin Decl.

Exs. 105-106

 **RESPONSE / OBJECTION.** Disputed. Jett's address is listed as 5308 13th Avenue, Suite

#324 Brooklyn, NY 11219. *See* GOFUND_000056856.  Getter disputes that the cited evidence

supports the assertion that he operates Jett.

 248. The Jett MCA deal called for Speedy receiving $60,000 in funding, but Speedy

actually received $0.  Alsaigh Decl. ¶¶ 15-16.

 **RESPONSE / OBJECTION.** Getter adopts the response and objection submitted by his

co-defendants for these assertions.

 249. Nevertheless, Jett went ahead and withdrew a remittance of $4,500. *Id.,* Ex. C. Jett

admitted to Speedy that it took the $4,500 without providing any funding, claiming it was a

justifiable penalty for Jett's false accusation that Speedy was not being honest about its bank

account statement. *Id*. ¶¶ 22-24.

 **RESPONSE / OBJECTION.** Getter adopts the response and objection submitted by his

co-defendants for these assertions.

 250. As a result of this wire fraud and theft, Speedy instructed its bank to block further

debits from Jett, and Jett has attempted a second unlawful wire attempt on February 6, 2023, all

while admittingly not funding a penny of the agreement it has with Speedy. *Id*. ¶¶ 28-30.

 **RESPONSE / OBJECTION.** Getter adopts the response and objection submitted by his

co-defendants for these assertions.

 251. Defendants have not returned the $4,500 they took from Speedy and Speedy is

presently monitoring its bank account for additional fraudulent wire attempts by Jett. *Id*.

**RESPONSE / OBJECTION.** Getter adopts the response and objection submitted by his co-defendants for these assertions.

252.     In June 2022, Bridge, using Alfin, froze Maxon's business account on the purported basis that it was in default for entering into another MCA, even though these were disclosed to Bridge before Maxon signed the MCA with Bridge.  Maxon Decl. ¶¶ 13-15

**RESPONSE / OBJECTION.** Getter adopts the response and objection submitted by his co-defendants for these assertions.

253.     Maxon was never served a copy by Bridge or Alfin of the writ they used to freeze its account.  *Id*. ¶ 17.  On or about July 11, 2022, Bridge filed an action against Maxon in Connecticut Superior Court entitled *Bridge Funding Cap, LLC v. Maxon Construction Inc. et al.*, FST-CV22-6057371-S (Connecticut, Superior Court).

**RESPONSE / OBJECTION.** Getter adopts the response and objection submitted by his co-defendants for these assertions.

254.     According to supplemental returns filed on August 11, 2022, neither Maxon nor its owner received service of the complaint in this lawsuit.  Heskin Decl. Exs. 119 and 120.

**RESPONSE / OBJECTION.** Getter adopts the response and objection submitted by his co-defendants for these assertions.

255.     Nevertheless, on or about February 6, 2023, Alfin secured a default judgment against Maxon in the amount of $139,663.71.  Dkt. No. 173,  Heskin Decl. Ex. 121.

**RESPONSE / OBJECTION.** Getter adopts the response and objection submitted by his co-defendants for these assertions.

**X.     Plaintiffs Were Injured By Defendants' RICO violations**

256.     On March 11, 2022, Plaintiffs moved by order to show cause for a temporary

restraining order and preliminary injunction to restrain Defendants from (i) continuing to debit unauthorized monetary amounts from the Plaintiffs' bank accounts; (ii) freezing Plaintiffs' bank accounts and health insurance accounts, assets and receivables; and (iii) to direct Defendants to withdraw and retract any and all UCC Lien Letters sent to third parties. *See* Heskin Decl. Ex. 62.

**RESPONSE / OBJECTION.** Undisputed.

257.    After this motion was fully brief, on or about March 21, 2022, this Court granted Plaintiffs' injunction.

**RESPONSE / OBJECTION.** Undisputed.

258.    Plaintiffs incurred $104,542 in legal fees in connection with making and fully briefing their application for a temporary restraining order and preliminary injunction.  Heskin Decl. Ex. 77.

**RESPONSE / OBJECTION.** Disputed. *See* Getters response to paragraph 158.

259.    This relief was urgent because Alpha's UCC lien notice letters "blocked [Haymount's] ability to use the government portal to get unassured compensation, and that was over 8,000 claims that were stopped and [Haymount] could access . . . that was about 9 million-plus of patient recovery, and we get about 17 percent of that."  Heskin Decl. Ex. 118 [Clinton Tr.] 21:14-22:15.

**RESPONSE / OBJECTION.** Disputed in part. It is undisputed that the lien notice letters blocked Haymount's ability to use the Government portal. It is disputed whether that caused the implied non-payment of claims, which is a legal conclusion turning on proximate cause addressed in Defendants' summary judgment briefing. *See* Dkt. No. 176, Def. Mot. For SJ at 20-23; *see also* Dkt. No. 179, Def. Rule 56.1 Statement at ¶¶ 62-67.

260.    Based on investigations that began in February 2023, Monthly Fee has made at least

thirteen (13) unauthorized withdrawals of $499 from Haymount's Bank of America account, one at the beginning of each month, over the span of September 2021, through September 2022, for a total withdrawal of $6,487.  Clinton Decl. Exs. 9 and 11.

**RESPONSE / OBJECTION.** Getter disputes that the investigations began in February 2023. Plaintiffs have always had access to their own bank records and retained counsel who examined and used the bank records in filings in this matter as early as March 11, 2022, when it moved for a temporary restraining Order. *See* Dkt. No. 38. In addition, whether each withdrawal was unauthorized is a legal conclusion.

261.    Defendant Getter testified that based on Defendants' own payment records and a purported $400,000 fee, Haymount was over-debited in the amount of $1,250 on the December 27, 2021 Funding 123 MCA deal with Haymount.  Heskin Decl. Ex. 114 ¶ 10.

**RESPONSE / OBJECTION.** Undisputed.

262.    As established above in Paragraphs 132-33, both Wolf's testimony and Defendants' own underwriting file reveal that the actual fees on the Funding 123 deal were $300,000, not $400,000.  Thus, based on Defendants' own sworn statements and documentation, Haymount was over-debited at least $101,250 on the Funding 123 MCA deal.

**RESPONSE / OBJECTION.** Disputed for the reasons set forth in response to paragraphs 132-33.

263.    As set forth in the accompanying Declaration of Dr. Robert Clinton, as a direct result of Defendants' issuing UCC lien letters pursuant to Haymount's purported breach of the January 20, 2022 GoFund MCA deal, Haymount's access to the Health Resources and Services Administration's ("HRSA") claim submission portal was frozen.  Clinton Decl. ¶¶ 60-69.

**RESPONSE / OBJECTION.** Disputed for the reasons set forth in response to paragraph 259.

264.    Without access to the HRSA portal, Haymount was unable to submit at least 8,460 claims relating to health services provided to uninsured patients during the COVID-19 pandemic, which had a total value of $9,723,105.44.  Clinton Decl. Ex. 10.

**RESPONSE / OBJECTION.** Disputed for the reasons set forth in response to paragraph 259.

265.    Historically, Haymount recovers at least 17.4% of its total claims submitted to HRSA for reimbursement treating uninsured patients.  Based on this ratio, Haymount suffered consequential damages stemming from Defendants' RICO violations in the amount of $1,691,820.35.

**RESPONSE / OBJECTION.** Rule 56(c)(1)(A) and Local Rule 56.1(d) require the fact asserted to be supported by evidence in the record, and Plaintiffs do not cite any support for the statements in Paragraph 265.

266.    The total of (i) the over-debiting of Haymount's account on the Funding 123 MCA deal (at least $101,250); (ii) the fraudulent debiting of Monthly Fee ($6,487); (iii) the legal fees incurred to get an injunction to prevent further harm from Defendants' RICO violations ($104,542); and (iv) the consequential damages from Haymount being unable to submit claims to HRSA due to Defendants' UCC lien letters freezing its access ($1,691,820.35) is $1,904,099.85.

**RESPONSE / OBJECTION.** Getter disputes any implication that that Plaintiffs are entitled to this amount but do not dispute the math

267.    Tripling this $1,904,099.85 figure, pursuant to 18 U.S.C. § 1964(c), yields a total damage amount of at least $5,712,299.55.

**RESPONSE / OBJECTION.** Getter disputes any implication that that Plaintiffs are entitled to this amount but do not dispute the math.

Dated: New York, New York
      March 6, 2023

                                        CLAYMAN ROSENBERG
                                        KIRSHNER & LINDER LLP
                                        *Attorneys for Defendant*
                                          *Yisroel C. Getter*

                                        Paul S. Hugel (PH4749)
                                        Wayne Gosnell (WG2422)
                                        305 Madison Ave – Ste 650
                                        New York, New York 10165
                                        hugel@clayro.com
                                        gosnell@clayro.com