UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAYMOUNT URGENT CARE PC, and ROBERT A. CLINTON, JR., individually, and on behalf of all those similarly situated,<br><br>Plaintiffs.<br><br>v.<br><br>GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISAAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, and YISROEL C. GETTER,<br><br>Defendants. | Case No. 1:22-cv-01245-JSR |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................2

I.   PLAINTIFFS NEVER ADDRESS THE CENTER-OF-GRAVITY TEST,
     WHICH WOULD REQUIRE NORTH CAROLINA LAW TO APPLY ..........................2

II.  THE MCA AGREEMENTS ARE NOT USURIOUS .......................................................3

III. IF THE MCA AGREEMENTS ARE USURIOUS, AND NEW YORK LAW
     APPLIES, PLAINTIFFS HAVE NO EVIDENCE THAT DEFENDANTS
     KNEW THEIR CONDUCT WAS ILLEGAL .................................................................6

IV.  PLAINTIFFS OVERSTATE THE MEASUREMENT OF DAMAGES
     FOR USURY ..................................................................................................................9

V.   PLAINTIFFS' LOST PROFIT DAMAGES WERE NOT FORESEEABLE.....................9

VI.  PLAINTIFFS' BELATED REHABILITATION OF LOST PROFITS IS
     INSUFFICIENT ............................................................................................................10

CONCLUSION .............................................................................................................11

# TABLE OF AUTHORITIES

**Cases**

*Bonifacio v. Ocean Network Express (N. Am.), Inc.*,
 2023 WL 2330428 (S.D.N.Y. Mar. 2, 2023) .................................................................................8

*Colonial Funding Network, Inc. for TVT Cap., LLC v. Epazz, Inc.*,
 252 F. Supp. 3d 274 (S.D.N.Y. 2017) ........................................................................................5

*Elonis v. United States*,
 575 U.S. 723 (2015) ....................................................................................................................6

*Empire Merchants, LLC v. Reliable Churchill LLP*,
 902 F.3d 132 (2d Cir. 2018) ........................................................................................................9

*Endico Potatoes, Inc. v. CIT Grp.*,
 67 F.3d 1063 (2d Cir. 1995) ........................................................................................................7

*Fleetwood Services, LLC v. Ram Cap. Funding, LLC*,
 2022 WL 1997207 (S.D.N.Y. June 6, 2022) ...............................................................................3

*Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*,
 2022 WL 3536128 (S.D.N.Y. Aug. 17, 2022) .............................................................................9

*Freitas v. Geddes Sav. and Loan Ass'n*,
 63 N.Y.2d 254 (1984) .................................................................................................................6

*Funding Metrics v. NRO Boston, LLC*,
 64204/2016, 2019 N.Y. Misc. LEXIS 4878 (Sup. Ct. Aug. 28, 2019) ........................................6

*Haymount Urgent Care PC v. GoFund Advance*, LLC,
 2023 WL 185499 (S.D.N.Y. Jan. 13, 2023) ................................................................................2

*In re Platinum-Beechwood Litig.*,
 2020 WL 1932608 (S.D.N.Y. Apr. 21, 2020) .............................................................................8

*Principis Cap., LLC v. I Do, Inc.*,
 160 N.Y.S.3d 325 (2d Dep't 2022) .............................................................................................5

*Ruan v. United States*,
 142 S. Ct. 2370 (2022) ................................................................................................................6

*Safeco Ins. Co. of Am. v. Burr*,
 551 U.S. 47 (2007) ......................................................................................................................7

*Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*,
 993 F. Supp. 2d 379 (S.D.N.Y. 2014) .......................................................................................10

*Taberna Cap. Mgmt., LLC v. Dunmore*,
  2009 WL 2850685 (S.D.N.Y. Sept. 2, 2009) ...............................................................................8

*Tesla Wall Sys., LLC v. Related Cos, L.P.*,
  2018 WL 4360777 (S.D.N.Y. Aug. 15, 2018) .............................................................................2

*United States v. Grote*,
  961 F.3d 105 (2d Cir. 2020) ....................................................................................................6, 7

*United States v. Moseley*,
  980 F.3d 9 (2d Cir. 2020) ........................................................................................................3, 6

*Womack v. Cap. Stack, LLC*,
  2019 WL 4142740 (S.D.N.Y. Aug. 30, 2019) .............................................................................5

**Other Authorities**

Restatement (Second) of Conflict of Laws § 187 cmt. e................................................................2

## INTRODUCTION

Plaintiffs' unlawful debt RICO claim fails as a matter of law because the MCA Agreements have strong, merchant-friendly provisions that Haymount never tried to invoke and thus cannot contest. Plaintiffs' main flaw in opposition is that they rely on irrelevant evidence relating to third-party merchants, ignoring their own experiences as well as the caselaw on MCA agreements. The facts are that *no* court has found an agreement like the ones here to be usurious, and Haymount *never* requested a reconciliation or adjustment to remittance. Plaintiffs' complaints about Defendants' other alleged bad acts—which arguments are baseless and based on irrelevance evidence under Rule 404—do not change the duties under the MCA Agreements *here* between *these* parties. And Plaintiffs' claims would fail even if they could contest these agreements.

First, if the MCA Agreements are usurious, then as this Court has explained, the choice-of-law provision is invalid and the Court must perform a center-of-gravity analysis. Plaintiffs ignore that holding, address none of the relevant facts, and perform none of that analysis.

Second, Plaintiffs cannot—and do not even try to—show scienter. Citing irrelevant state court law that has nothing to do with RICO, Plaintiffs wrongly argue that it is "immaterial whether the [defendant] actually intended to violate the law." They also argue that various other alleged misconduct related to third parties show scienter, even though issues like whether merchants receive proper service under the Connecticut prejudgment remedy statute has nothing to do with the whether the terms of the MCA Agreements make it "absolutely repayable" or not.

The Court should also grant summary judgment on the single RICO racketeering claim and fraud claim that survived the motion to dismiss: that GoFund changed its name to circumvent a bank block. Plaintiffs' mere say-so that it happened does not suffice on summary judgment.

**ARGUMENT**

I. **PLAINTIFFS NEVER ADDRESS THE CENTER-OF-GRAVITY TEST, WHICH WOULD REQUIRE NORTH CAROLINA LAW TO APPLY**

Defendants have explained why, under the center-of-gravity test that applies, *Haymount Urgent Care PC v. GoFund Advance*, LLC, 2023 WL 185499, at *3-4 (S.D.N.Y. Jan. 13, 2023) ("Class Cert. Order"), North Carolina law would apply if the choice-of-law provision is invalid. DE 176 ("Def. Mot.") at 5. Even after exceeding the applicable page limits,[1] Plaintiffs never address that test, why the factors such as Plaintiffs' and the receivables' location in North Carolina are not dispositive, or the case law Defendants cite on these points. DE 195 ("Pl. Opp.") at 5-7.[2]

Instead, Plaintiffs rely on *Fleetwood Services, LLC v. Ram Cap. Funding, LLC*, (S.D.N.Y. June 6, 2022), but misunderstand it. This Court has held that the New York choice-of-law provision cannot require the application of law that invalidates the MCA Agreements, and thus requires this Court to perform an independent center-of-gravity analysis. Class Cert. Order at *3 (citing *Restatement (Second) of Conflict of Laws* § 187 cmt. e). *Fleetwood* did not address that portion of § 187 or what happens when the chosen law invalidates a contract. And *Fleetwood* did not engage in a conflicts-of-law analysis to determine the applicable law. Instead, it enforced the New York choice-of-law provision after analyzing whether New York had a "reasonable relationship" to the

---

[1] Via email from the law clerk, the Court permitted "either party to take up to 40 pages in their opening papers. If either party exceeds the ordinary 25-page limit in their opening papers, the other side may use up to 40 pages in their answering papers." Defendants kept their opening papers to 25 pages, yet Plaintiffs submitted a 38-page opposition, with the majority addressing the non-Getter Defendants. Plaintiffs went on to file a 20-page reply brief, DE 203, violating the 10-page limit. Finally, Plaintiffs' opposition briefing repeatedly cites evidence and asserts (contested) facts without citing a Rule 56.1 statement, violating this Court's Individual Rule 2(e),

[2] For the reasons previously explained, DE 146 at 38 n.20, Defendants have not consented to New York law or waived any arguments on it. *See also Tesla Wall Sys., LLC v. Related Cos, L.P.*, 2018 WL 4360777, at *2 (S.D.N.Y. Aug. 15, 2018) (Rakoff, J.) (choice-of-law determination is not "waived until a late stage in litigation").

transaction given the choice-of-law provision. 2022 WL 1997207, at *15. The court admitted this approach was "not completely settled" and relied on *United States v. Moseley*, which addressed whether a non-New York choice-of-law provision would be enforceable as to "*New York borrowers*." 980 F.3d 9, 20 (2d Cir. 2020) (emphasis added). In sum, Plaintiffs are simply wrong when they state (at 9) that Judge Liman "disregard[ed]" the choice-of-law provision and found the "center-of-gravity approach compelled New York law."

Plaintiffs further argue that applying North Carolina law is "illogical," the choice-of-law provision is not void, and Defendants "agreed" to apply New York law. Pl. Opp. at 8, 10-11. These arguments ignore[3] this Court's two prior holdings (on the motion to strike and class certification) addressing why this conflicts-of-law analysis is required. Plaintiffs point out that the NYAG has argued (in a short footnote, *see* DE 194-1 at 10 n.3) that New York law applies, but that limited analysis is not binding on this Court. In addition, Plaintiffs invoke New York's public policy by citing cases (at 11) where *all* the parties were in New York, but as Defendants have already explained, and Plaintiffs never refuted, New York's public policy concerns do not apply to sophisticated corporate out-of-state entities like Haymount. Def. Mot. at 7.

In conclusion, if the MCA Agreements are invalid for usury, the Court would have to undertake a center-of-gravity analysis that would point to the application of North Carolina law, under which Plaintiffs have no claim. Plaintiffs cannot win.

## II. THE MCA AGREEMENTS ARE NOT USURIOUS

Plaintiffs' unlawful debt RICO claim, as they concede, depends on whether the agreements were "absolutely repayable." Pl. Opp. at 12. In making that determination, courts consider various

---

[3] Except for when Plaintiffs mischaracterize this Court as "recognizing" that the choice-of-law analysis "would likely" result in applying New York law, when this Court actually said that "might" result. *Compare* Pl. Opp. at 8 *with* Class Cert. Order at *2

factors, emphasizing certain ones more than others. Def. Mot. at 8, 11. Because the most important factors favor Defendants, Plaintiffs repeatedly use terms like "sham" and "illusory" to describe MCA provisions without (i) engaging with Haymount's actual experiences of never invoking its rights, (ii) addressing the plethora of contrary caselaw, or (iii) explaining why a court would not enforce the relevant provisions that shift the payment obligations.

Starting with the most important factor, the MCA Agreements are not absolutely repayable in part because of the provisions concerning reconciliation (¶ 1.4) and adjustment to remittance (¶ 1.5). Def. Mot. at 8-9, 12-13. In the face of these mandatory provisions, Plaintiffs first argue that the reconciliation provision is a sham because it can only be invoked once a month. Pl. Opp. at 13. This is an unpersuasive strawman. There is a separate adjustment to remittance right that can be invoked at any time. Def. Mot at 8-9. Plaintiffs never substantively address this right. Courts routinely find provisions less robust than these mandatory and effective. *See* DE 178-1 (summarizing New York cases addressing these factors). Plaintiffs address none of these cases.

Plaintiffs next argue that the provision is a sham because there is no evidence that the Funders performed reconciliations. Pl. Opp. at 13. This is irrelevant, and factually untrue. Def. Reply SOF ¶ 37. The argument also rings hollow for Haymount, because it never requested a reconciliation and thus cannot complain about a hypothetical invocation. Def. Mot. at 13 (collecting cases). With no response to this precedent, Plaintiffs shift the burden and blame Defendants for never proactively *offering* a reconciliation to Haymount, even though no such duty exists in the MCA Agreements. And Plaintiffs' repeated arguments that the provision is a sham ignore the relevant tests of what actually makes a provision illusory. Plaintiffs have never tried to show that the provisions contain an "insubstantial" promise such that no court would not or could not enforce them. *See* Def. Mot. at 12-13.

4

On the next factor, Plaintiffs argue (at 14) that the MCA Agreements have "finite terms," but ignore (i) the operation of the reconciliation provisions that can change the amount; (ii) provisions that let merchants miss payments without triggering any default; and (iii) evidence of lowered payments. *See* Pl. Opp. at 10; *see also* DE 198, Def. Resp. SOF ¶ 188.

Plaintiffs further argue that the Defendants have recourse in bankruptcy, inventing "conceivable circumstance[s]" (at 19) that list ways Defendants could hypothetically breach an implied covenant of good faith and fair dealing to collect in a bankruptcy. There are two flaws with this argument. First, it redefines what courts consider "recourse" in evaluating this factor and depends on a chain of hypothetical ways a Funder could *try* to circumvent a bankruptcy. Courts consider whether the contracts identify bankruptcy as an event of default or make the guarantor personally responsible if the merchant goes bankrupt. *See, e.g.*, *Principis Cap., LLC v. I Do, Inc.*, 160 N.Y.S.3d 325, 327 (2d Dep't 2022). No such provisions exist here, and in fact the agreements state: "Merchant going bankrupt or going out of business, or experiencing a slowdown in business . . . does not constitute a breach of this Agreement." *Compare with Womack v. Cap. Stack, LLC*, 2019 WL 4142740, at *6 (S.D.N.Y. Aug. 30, 2019) (citing similar language and finding "no recourse" in bankruptcy). Second, this argument proves too much. No contractual language, however strong, would hinder a funder that was committed to breaching its obligations. But that breach would not give the funder *legal* recourse. This factor is not dispositive, moreover, as courts have found agreements non-usurious that (1) list filing for bankruptcy as an event of default and (2) require the guarantor to pay money a merchant does not as a result of bankruptcy. *Colonial Funding Network, Inc. for TVT Cap., LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 287 (S.D.N.Y. 2017).

Plaintiffs also focus at length on the Secondary Factor of who services the receivables, even though that factor has nothing to do with the relevant transfer of risk. *See* Def. Mot. at 11.

Rather than address the caselaw discussing the import of this factor, Plaintiffs cherry-pick one MCA case short on analysis, *Funding Metrics v. NRO Boston, LLC*, 64204/2016, 2019 N.Y. Misc. LEXIS 4878, at *10 (Sup. Ct. Aug. 28, 2019), and otherwise cite two irrelevant cases about (i) consignments and sale or return agreements and (ii) whether an assignment of payments included a reservation of rights in those payments. None of these cases are persuasive.

Plaintiffs also argue, focusing on another Secondary Factor, that the daily remittances are not good-faith estimates of receivables. Ironically, this is the one argument Plaintiffs do not cite Defendants' interactions with third parties, though that is understandable given former plaintiffs' Indigo admissions that the daily payments essentially matched its receivables. DE 198, Def. Res. ¶ 35. In any event, Defendants have conceded that this factor remains in dispute,[4] but based on the weight of the other factors and a merchants' ability to reconcile, it should weigh little against a finding that the MCA Agreements are not usurious.

### III. IF THE MCA AGREEMENTS ARE USURIOUS, AND NEW YORK LAW APPLIES, PLAINTIFFS HAVE NO EVIDENCE THAT DEFENDANTS KNEW THEIR CONDUCT WAS ILLEGAL

RICO has a scienter requirement that requires proof the defendant had a "culpable mental state." *Ruan v. United States*, 142 S. Ct. 2370, 2376-77 (2022); *see Elonis v. United States*, 575 U.S. 723, 737 (2015). Any attempt to impose RICO liability that "does not require awareness of the illegality of the rate" is invalid under *Elonis* and other Supreme Court authority. *United States v. Grote*, 961 F.3d 105, 120-21 (2d Cir. 2020); *Moseley*, 980 F.3d at 19.

Plaintiffs disregard these authorities and instead (at 21) relies on New York state court cases, such as *Freitas v. Geddes Sav. and Loan Ass'n*, 63 N.Y.2d 254, 262 (1984), for the

---

[4] Though factual disputes remain on this issue, Plaintiffs' alleged negative net profit in December 2021 is irrelevant to calculating what receivables a funder could purchase.

proposition that it is "immaterial whether the [defendant] actually intended to violate the law." But the Second Circuit has specifically cited *Freitas* as an example of a situation where RICO liability could not be imposed for a violation of New York usury law because of the disconnect between the knowledge required under state law versus RICO. *Grote*, 961 F.3d at 118 n.4.

Plaintiffs also do not dispute that, as shown in Defendants' opening brief (at 16), "the state of the law on factoring agreements when Plaintiff executed the relevant MCA Agreements, was that similar contracts (indeed contracts with far fewer risk-assuming provisions), were overwhelmingly considered valid, legal, and non-usurious [and]the Funders' own contracts had been enforced by numerous courts." *See also* DE 178-1 Cipolla Decl. Ex. 1. Accordingly, no reasonable jury could find that Defendants acted with the requisite scienter. *See, e.g.*, *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007) (no scienter where "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation").

As for Plaintiffs' alleged "mountain of evidence" that Defendants knew that the MCA agreements were illegal, it is more a house of cards. One category of "evidence" is simply facts about an *Endico Potatoes* factor that, as explained, does not address the "transfer of risk" issue. *Compare* Def. Mot at 11 *with* Pl. Opp. at 26 (arguing that Defendants do not "treat their MCA agreements as a purchase of specific receivables"). For another category, Plaintiffs (at 25) broadly cite pages of exhibits to argue that "Defendants refer to themselves [as] lenders and their MCA as loans in private,"[5] but then almost exclusively cite the communications of *third* parties (including merchants). *See* Def. Reply SOF ¶ 40. Plaintiffs make the same mistake when citing exclusively

---

[5] Using the term "lender" colloquially a handful of times across thousands of emails is not a smoking gun. Even courts constantly refer to "lenders" in the context of factoring agreements. *E.g.*, *Endico Potatoes, Inc. v. CIT Grp.*, 67 F.3d 1063, 1069 (2d Cir. 1995) ("Where the lender has purchased the accounts receivable . . . the lender and not the borrower bears the risk . . . .").

third-party communications to claim *Defendants* "acknowledge they are breaking the law." Pl. Opp. at 25; DE 198, Def. Res. ¶ 166. Similarly, Plaintiffs make several (baseless) arguments about Defendants' enforcement techniques which are irrelevant to the agreement. For example, the Funders' alleged failure to properly serve merchants in Connecticut proceedings would still be illegal under Plaintiffs' theory regardless of the "interest rate" charged. The two are unrelated.

## IV. PLAINTIFFS' CLAIMS BASED ON MAIL FRAUD, WIRE FRAUD, AND THE HOBBS ACT DO NOT DEFEAT SUMMARY JUDGMENT

Plaintiffs argue (at 27) that their claims based on "Defendants' racketeering and predicate acts of mail fraud, wire fraud and extortion/Hobbs Act violations" survive Defendants' motion, including because Defendants purportedly chose not to address them. Plaintiffs are wrong.

*First*, Plaintiffs may not assert new claims and theories of recovery in opposition to a motion for summary judgment. *See Bonifacio v. Ocean Network Express (N. Am.), Inc.*, 2023 WL 2330428, at *4 (S.D.N.Y. Mar. 2, 2023) (collecting authority). Plaintiffs' arguments and purported evidence about Funding 123's and Monthly Fee's supposed over-debiting of Haymount, and the supposed fraud that Defendants have committed on third-party merchants, theories that Plaintiffs never pled. Indeed, the terms "mail fraud" and "Hobbs Act" do not even appear in the pleading. *See, e.g.*, *Taberna Cap. Mgmt., LLC v. Dunmore*, 2009 WL 2850685, at *3 (S.D.N.Y. Sept. 2, 2009) (Rakoff, J.) (refusing to consider claim for aiding and abetting in opposition to summary judgment where "the Complaint nowhere includes the words 'aiding and abetting' nor suggests such a theory"). This is why Defendants did not address these issues in their opening papers. Accordingly, those claims and that evidence are not properly before the Court. *See, e.g.*, *In re Platinum-Beechwood Litig.*, 2020 WL 1932608, at *11 n.20 (S.D.N.Y. Apr. 21, 2020) (Rakoff, J.) ("plaintiffs are barred from relying on conduct that should have been alleged in the SAC" in opposition to summary judgment).

8

*Second*, as shown in both Defendants' opening brief and the opposition to Plaintiffs' motion for summary judgment, Plaintiffs' reliance on the bulk of these supposed predicate acts fails as a matter of law because the conduct with which they take issue sounds in contract, not fraud. *See* Ds. SJ Opp. Mem. at 20-31. That is, Funding 123's alleged over-debiting of Haymount's account, Alpha Recovery's alleged sending of a "fraudulent" UCC lien, and third-party Monthly Fee's debiting $6,487 are disputes over contract rights, not instances of either mail or wire fraud. In critical respects the conduct of which Plaintiffs complain is simply not "fraud." *See id*.

*Third*, Plaintiffs' efforts to label as "fraud" GoFund's alleged evasion of Bank of America's block on the bank account also fail as a matter of law. Plaintiffs do not and cannot rebut that (1) Haymount's own bank statement shows the money was credited to "Go Fund," not "Go Fund b," (2) the contemporaneous wire instructions that were circulated internally and that led to the successful debit despite the "block" shows "Go Fund" and not "Go Fund B,", and (3) Brezel's unrebutted testimony that the "b" refers to "batch." DE 179, Def. SOF ¶¶ 53-54, 57-58; DE 199 at 19.

## IV. PLAINTIFFS OVERSTATE THE MEASUREMENT OF DAMAGES FOR USURY

Plaintiffs argue (at 31) that this Court should follow *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 WL 3536128 (S.D.N.Y. Aug. 17, 2022). But *Fleetwood* raises that damages should be reduced by the time-value of money. *See id*, at *3 n.3. Defendants' measure does this.

## V. PLAINTIFFS' LOST PROFIT DAMAGES WERE NOT FORESEEABLE

Plaintiffs' lost profits were not foreseeable because they depended on both (i) UnitedHealthCare blocking Haymount's access to the payment portal and (ii) the COVID insurance fund suddenly running out of money on one weeks' notice. Those intervening causes break the causal chain, Def. Mot. at 21, especially for RICO claims which do not go past the "first step" in causation. *Empire Merchants, LLC v. Reliable Churchill LLP*, 902 F.3d 132, 141 (2d Cir. 2018).

Plaintiffs' arguments fail because they never address the second intervening act. As for the first intervening act, Plaintiffs argue (at 31-32) it was foreseeable that UnitedHealthCare would freeze access to Haymount's payment portal in response to Alpha Recovery's notice. But that is not what the UCC notice requests, and Plaintiffs never dispute that such a freeze thwarts Defendants' interests for collecting payment. *See* Def. Mot at 22. The freeze that Defendants desired and Plaintiffs now highlight relate to freezing *assets*—not Haymount's ability to collect payment.

## VI. PLAINTIFFS' BELATED REHABILITATION OF LOST PROFITS IS INSUFFICIENT

Plaintiffs bear the burden to establish damages. *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 398–99 (S.D.N.Y. 2014). But their calculation prepared by a non-expert does not even come close to "approximating" lost profits. Def. Mot. at 25. For example, Plaintiffs claim (at 35) that their analysis "removed those [88] claims [from the Bizmatics spreadsheet] that were already paid or were serviced after the HRSA portal closed." The Bizmatics spreadsheet contained 8,458 HRSA claims,[6] so one would expect at least 88 to come off that total. But Plaintiffs seeks payment for 8,460 claims—*two more than even exist*. Even with the benefit of Defendants' arguments, Plaintiffs have not addressed:

- Whether the vast majority of claims that were submitted before the block were not paid *because* of the block, contrary to the evidence in discovery; Def. Reply SOF ¶ 83,

- Why the global 17.4% payment rate applied to this subset of claims which includes most claims that were clearly submitted and rejected at least once; or

- When the Government ran out of money and thus if claims submitted on February 25, or March 1 even would have been paid, *see* Def. Mot. at 23.

At bottom, Dr. Clinton is simply asserting damages for all unpaid HRSA claims, whatever

---

[6] Plaintiffs maintain that the spreadsheet contains 8,542 rows of HRSA claims, but that is an error based on the total number of claims and ignores non-HRSA claims. *See* Def. Reply SOF ¶ 81.

the reason. DE 193, Clinton Decl. ¶ 18. That is not permitted. Plaintiffs cannot meet their burden for lost profits based on what they produced.

## CONCLUSION

Defendants respectfully request, for the foregoing reasons as well as the reasons in the Memorandum in Support of Defendants' Motion for Summary Judgment, that this Court grant summary judgment in their favor on Plaintiffs' RICO and fraud claims.

Dated: March 13, 2023  
       New York, New York

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman
Edward Normand
Jordana Haviv
Richard Cipolla
**FREEDMAN NORMAND**
 **FRIEDLAND LLP**
99 Park Avenue, 19th Floor
New York, NY 10016
Tel: (646) 350-0527
Email: vel@fnf.law