UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| HAYMOUNT URGENT CARE PC et ano, <br><br>            Plaintiffs, <br><br>    -v- <br><br> GOFUND ADVANCE, LLC et al., <br><br>            Defendants. |

22-cv-1245 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

On February 13, 2023, defendants GoFund Advance, LLC, Funding 123, LLC, Merchant Capital, LLC, Alpha Recovery Partners, LLC, Yitzchok Wolf, Yosef Brezel, and Joseph Kroen[1] moved for partial summary judgment on Plaintiffs' RICO claims and associated fraud claims. See Defs. Mot. for Partial Summ. J. ("Defs. Mot."), Dkt. No. 175; Defs. Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Defs. Mem."), Dkt. No. 176. Co-defendant Yisroel Getter also separately filed a motion for summary judgment on Plaintiffs' RICO claims and breach of contract claim. Getter Mot. for Summ. J. ("Getter Mot."), Dkt. No. 182; Getter Mem. of Law in Supp. of Mot. for Summ. J. ("Getter Mem."), Dkt. No.

---

[1] On March 24, 2023, Plaintiffs voluntarily dismissed their claims, without prejudice, against Joseph Kroen. See Joint Stipulation of Voluntary Dismissal, Dkt No. 211.

183.[2] After full briefing and consideration, the Court, for the reasons discussed below, grants summary judgment to defendants on those claims.

## I.   Factual and Procedural Background

The facts underlying this dispute are laid out in detail in this Court's previous Opinion and Order denying in large part defendants' motion to dismiss. See Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F. Supp. 3d 237 (S.D.N.Y. 2022).[3] As relevant here, Haymount is a primary and urgent care facility in North Carolina owned by Dr. Clinton. Id. at 243. Haymount entered six "merchant cash advance" ("MCA") agreements with defendants GoFund Advance, Funding 123, and Merchant Capital to fund its operations during a period of economic strain on its business. Id. The parties dispute whether these MCA agreements are usurious loans or purchases of receivables.

Plaintiffs originally asserted six causes of action: (1) a RICO claim premised on the collection of unlawful debts and a pattern of wire fraud; (2) a racketeering conspiracy claim, premised on the same underlying conduct as the substantive RICO claim; (3) a claim seeking a declaratory judgment that the MCA agreements and a settlement

---

[2] The two plaintiffs, Haymount Urgent Care P.C. and Dr. Robert A. Clinton (collectively "Plaintiffs") initially filed their motion for partial summary judgment, but subsequently withdrew that motion and requested that their papers be treated as an opposition to defendants' motions and as support for their second amended complaint. See Pls. Mot. to Amend the Compl., Dkt. No. 209. That request is granted.

[3] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

agreement were void; (4) a common law fraud claim for charging excessive fees and extracting unauthorized debits using a misleading name to evade a block on Plaintiffs' bank account; (5) a breach of contract claim for over-debiting Plaintiffs' bank accounts; and (6) a Section 1983 claim for violating due process by abusing Connecticut's pre-judgment attachment statute. First Amended Complaint ("FAC"), ¶¶ 225-333, Dkt. No. 28.

At the motion to dismiss stage, the Court permitted the RICO, racketeering conspiracy, breach of contract, and Section 1983 claims to proceed forward; dismissed the declaratory relief claim except for the claim for declaratory relief against GoFund Advance related to the settlement agreement; and dismissed the common law fraud claim except as against GoFund Advance related to extracting unauthorized debits using a misleading name to evade a block on Plaintiffs' bank account. Haymount, 609 F. Supp. 3d at 241, 245-58. At the class certification stage, the Court then denied Plaintiffs' motion to certify a class premised on their first RICO theory -- that the MCA agreements are usurious loans -- finding that the commonality requirement could not be met because of the presence of individualized choice-of-law issues. See Haymount Urgent Care PC v. GoFund Advance, LLC, 22-cv-1245, 2023 WL 185499 (S.D.N.Y. Jan. 13, 2023).

All defendants then moved for partial summary judgment on Plaintiffs' RICO and associated fraud claims, and Getter also moved for summary judgment on Plaintiffs' breach of contract claim. See Defs. Mot.; Defs. Mem.; Getter Mot.; Getter Mem. After summary judgment

briefing and oral argument concluded, Plaintiffs filed a proposed second amended complaint ("SAC"). See Heskin Decl., Ex. A, Dkt. No. 210-1. The SAC removes the declaratory relief and Section 1983 claims in full and amends the RICO and associated fraud claims to add an additional theory of wire fraud based on defendants' debiting a "monthly fee" from plaintiffs' and others' accounts.

## II.   Legal Standard

The Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "The moving party bears the burden to demonstrate the absence of any genuine issues of material fact." New York v. Mountain Tobacco Co., 942 F.3d 536, 541 (2d Cir. 2019). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). In making its determination on summary judgment, the Court "view[s] the evidence in the light most favorable to the party opposing summary judgment, draw[s] all reasonable inferences in favor of that party, and eschew[s] credibility assessments." Mountain Tobacco Co., 942 F.3d at 541.

## III. Discussion

### A. RICO Claim Based on the Collection of "Unlawful Debts"

Plaintiffs alleged in the FAC that defendants committed a RICO violation by "illegally operating an enterprise that loans money to

4

small businesses at criminally usurious interest rates." <u>Haymount</u>, 609 F. Supp. 3d at 245. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debts." 18 U.S.C. § 1962(c). The statute specifically defines "unlawful debt" to mean:

> [A] debt (A) . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6). Because "RICO's definition of unlawful debt invokes state as well as federal laws related to usury to provide substance to the concept of unlawfulness, the first question is what state's law applies to the transactions at issue." <u>Haymount</u>, 609 F. Supp. 3d at 246 (cleaned up). <u>See also</u> <u>United States v. Moseley</u>, 980 F.3d 9, 18 (2d Cir. 2020).

Defendants argue they are entitled to summary judgment on this theory of RICO liability for two reasons. First, if Plaintiffs are correct that New York law would consider the MCA agreements usurious loans, the agreements would then be void and thus the agreements' choice-of-law provisions selecting New York law would also be void. That would then require the Court to apply a center-of-gravity test to determine which state's law applies. Under that test, defendants argue, North Carolina's usury law should govern, but North Carolina's

law does not apply to loans (like the MCA agreements) that are greater than $25,000. Defs. Mem. at 1, 5-7. Second, defendants argue that they are entitled to summary judgment because the MCA agreements are not usurious loans a matter of law. Id. at 7-14. For the reasons discussed below, the Court finds that defendants' choice-of-law argument is a sufficient basis for granting summary judgment without reaching whether there are fact issues pertaining to the characterization of the MCA agreements as loans or purchases of receivables.

### 1. The MCA agreements' choice-of-law provision does not apply.

At the motion to dismiss stage, the parties initially assumed that New York's usury laws applied to plaintiff's RICO claim. In particular, defendants contended that this was the case by virtue of a New York choice-of-law provision included in all the relevant agreements stating that "[t]his Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regards to any applicable principles of conflicts of law." See Defs. Supp. Mem. of Law in Supp. of Partial Mot. to Dismiss at 2-3, Dkt. No. 82; Clinton Decl., Ex. 1, 8/25/21 MCA Agreement, Dkt. No. 162-1, § 4.5; Ex. 2, 8/26/21 MCA Agreement, Dkt. No. 162-2, § 4.5; Ex. 3, 9/27/21 MCA Agreement, Dkt. No. 162-3, § 4.5; Ex. 4, 12/16/21 MCA Agreement, Dkt. No. 162-4, § 4.5; Ex. 5, 12/27/21 MCA Agreement, Dkt. No. 162-5, § 4.5; Ex. 6, 1/20/22 MCA Agreement, Dkt. 162-6, § 4.5. Given this choice-of-law provision and the apparent agreement of the parties that New York law should govern, the Court assumed, for

purposes of the motion to dismiss, that New York law applied to the question of whether the MCA agreements are usurious loans. See Haymount, 609 F. Supp. 3d at 246.

However, at the class certification stage, defendants argued -- and the Court agreed -- that the choice-of-law provision would not apply if New York law would consider the MCA agreements usurious. Specifically, the Court held:

> [T]he MCA agreements in this case each contain choice-of-law provisions selecting New York law. But, as this Court previously held in denying defendants' motion to strike, to the extent plaintiffs succeed in showing that the MCA agreements would be considered usurious under New York law, then New York law would also consider the MCA agreements totally void -- arguably rendering not just their primary commercial terms but also such ancillary provisions as the class-action-waiver or choice-of-law provisions unenforceable. . . .

> One might think that a decision on choice-of-law should precede any decision on the validity of the MCA agreements, such that, at the point a court decides whether the MCA agreements are void under a particular state's law, the decision as to choice of law should already [have] been made. But where, as here, selection of a state's law in accordance with the contract's choice-of-law provision might invalidate the entire contract including the choice-of-law provision, it is hard to fully separate the choice-of-law question from the underlying legal merits question, as enforcement of the choice-of-law provision might lead to its invalidity. Indeed, the Restatement of Conflict of Laws (which, as described below, New York follows in relevant part, Matter of Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 597 N.Y.S.3d 904, 613 N.E.2d 936, 939-40 (1993)) avoids this problem by specifying that if parties "choose a law that would declare the contract invalid . . . the chosen law will not be applied by reason of the parties' choice." Restatement (Second) of Conflicts of Law § 187 cmt. e (Am. L. Inst. 1971, updated October 2022). In such circumstances, enforcing the choice-of-law provision "would defeat the expectations of the parties which it is the purpose of the present rule to protect" and therefore "[i]f parties have chosen a law that would invalidate the contract, it can be assumed that they did so by mistake." Id.

<u>Haymount</u>, 2023 WL 185499, at *3. <u>See</u> Restatement (Second) of Conflict of Laws § 203 (Am. L. Inst. 1971, updated May 2023) (discussing the general choice-of-law rules in usury cases and making clear that the presumption is in favor of selecting the law of a forum that would tend to either sustain the contract or invalidate it to the least extent, so long as that forum has a sufficient connection with the subject transaction).

The bottom line is that if Plaintiffs succeed in showing that the MCA agreements are usurious under New York law, then New York law should not apply by virtue of the agreements' choice-of-law provision and should instead only apply if an independent choice-of-law analysis would result in its application. Indeed, Plaintiffs conceded at much at oral argument on the motion to certify a class (although they have attempted to retreat from that position in their summary judgment briefing and at oral argument):

> Court: "If you contend, as I thought you did, that the agreements are void under New York law, then how can you rely on the agreement's choice of law provision?"

> Plaintiffs' counsel: "Yes Judge. ***We're not, is the simple answer.***"

12/6/22 Hr'g Tr. at 19:9-13, Dkt. No. 187 (emphasis added).

Plaintiffs back away from this representation in their current briefing, instead seeming to contend that the choice-of-law provision should apply even if New York law would invalidate the contracts.[4] In

---

[4] Plaintiffs similarly tried to walk back this position at oral argument, contending their prior admission was a misstatement of the law. <u>See</u> 3/16/23 Hr'g Tr. at 12:4-5. The Court disagrees, finding Plaintiffs' original position to be correct.

support, they cite Judge Liman's opinion in <u>Fleetwood Services, LLC</u> <u>v. Ram Capital Funding LLC</u>, 20-cv-5120, 2022 WL 1997207 (S.D.N.Y. June 6, 2022), which also considered choice-of-law issues in the context of MCA agreements and held that it could not decide as a matter of law that a choice-of-law provision selecting New York law did not apply to a usury claim. <u>Id.</u> at *8, *14-*18. But in <u>Fleetwood</u>, the law of the other potential state with substantial contacts to the forum was at least as likely or more likely to have resulted in the contract's invalidation; indeed, the putative borrowers had brought affirmative usury claims under Texas law, <u>see id.</u> at *18, *20, so there was no reason not to apply the choice-of-law provision on the theory that the selected law would result in the contract's invalidation where the other plausible forum's law would not. Judge Liman decided that because usury law sounds primarily in contract, rather than tort, there is no prima facie reason that a usury claim would not be subject to a choice of law provision. <u>See id.</u> at *16-*18. But his opinion did not address the situation presented here, where the chosen forum's law would invalidate the contract and the forum whose law would otherwise apply would not invalidate the contract.

Accordingly, the Court concludes the MCA agreements' choice-of-law provision does not apply in this case.

### 2. Applying New York's Center of Gravity Test, North Carolina Law Applies.

Given that the choice-of-law provision does not apply, New York's "center-of-gravity" test, which looks to which forum has the greatest

contacts with the forum, would govern the choice-of-law analysis. Haymount, 2023 WL 185499, at *3-*4. Five specific contacts are relevant: "the place[s] of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." Moseley, 980 F.3d at 23 (quoting Matter of Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 227 (1993)); see also Restatement (Second) of Conflicts § 188 (enumerating the same factors).

The Court, drawing on the Second Circuit's decision in Moseley, previously held that the borrower's domicile and the subject matter of the funding agreement deserve "particular emphasis." This holding is premised on the theory that states have an especially strong interest in protecting in-state borrowers no matter where a lender is located, especially since borrowers often may not even be aware of a lender's location. Haymount, 2023 WL 185499, at *4. Here, it is undisputed that Dr. Clinton and Haymount are based in North Carolina. See Pls. Resp. to Defs. Rule 56.1 Statement, ¶¶ 1-2, Dkt. No. 192. Thus, the MCA agreements should either be understood as purchasing a share of Haymount's North Carolina-based receivables or else as constituting a loan used in support of Haymount's North Carolina-based operations. That Haymount's underlying business and the accounts underlying the putative revenue purchase are based in North Carolina deserves particular weight. Phillips Credit Corp. v. Regent Health Grp., Inc., 953 F. Supp. 482, 504 (S.D.N.Y. 1997) ("Regarding the location of the subject matter of the contract, the location of the collateral that secures a contract for the repayment of money typically

determines the location of the subject matter of the contract."); Moseley, 980 F.3d at 22-23 (declining to apply a choice-of-law clause and instead applying New York law to loans made to New York-based borrowers).

While these two most important factors -- the location of the borrower and the subject of the contract -- clearly favor application of North Carolina law, the other factors are fairly neutral. The "place of negotiation" has no strong contact to either forum, since the agreements were negotiated over phone or email. Defs. Rule 56.1 Statement, ¶ 28, Dkt. No. 179; Pls. Resp. to Defs. Rule 56.1 Statement, ¶ 28; Restatement (Second) of Conflict of Laws § 188 cmt. e ("This contact is of less importance when there is no one single place of negotiation and agreement[.]"). "The place of performance" cuts at most equally in favor of New York and North Carolina; defendants appear to have funded the transfers from their New York locations, but Haymount and Dr. Clinton obviously received the funds in North Carolina. There is also an argument the place of performance is Connecticut, as the precise corporate entities that funded the MCA agreements -- GoFund Advance, Merchant Capital, and Funding 123 -- are incorporated there. Defs. Rule 56.1 Statement, ¶ 3; Pls. Resp. to Defs. Rule 56.1 Statement, ¶ 3. The only tie cutting clearly in favor of New York, the domicile of various defendants, see FAC, ¶¶ 48-51, is of questionable relevance, given the Court's previous analysis at the class certification stage and the Second Circuit's analysis in Moseley about the relatively greater importance of the location of the

borrower than the lender in cases alleging usury. <u>Haymount</u>, 2023 WL
185499, at *4; <u>Moseley</u>, 980 F.3d at 23-24. The Court therefore
concludes there is no genuine dispute that North Carolina has greater
contacts to the relevant transactions and its law should apply.

Under North Carolina law, the transactions at issue here would
not be considered unlawful even if they are loans. North Carolina's
usury statute does not apply to loans greater than $25,000. N.C. Gen.
Stat. Ann. § 24-1.1(a). Each of the MCA agreements received by Haymount
is for an amount greater than $25,000. <u>See</u> Clinton Decl., Ex. 1-6;
Defs. Rule 56.1 Statement, ¶¶ 21-26; Pls. Resp. to Defs. Rule 56.1
Statement, ¶¶ 21-26; Pls. Rule 56.1 Statement, ¶ 136, Dkt. No. 180.
Plaintiffs have not made any argument as to why this statute would not
apply and bar their claim, assuming North Carolina law applies. Because
the MCA agreements are not unlawful debts under North Carolina law,
the Court grants defendants summary judgment on the RICO claims, to
the extent premised on the MCA agreements being unlawful debts under
RICO.

### B. Plaintiffs' Remaining RICO Theories

#### 1. Alleged wire fraud based on evading bank blocks through the use of misleading names

Plaintiffs' second theory of RICO liability is a pattern of wire
fraud, in which defendants allegedly used misleading names to evade
blocks placed on their access to Plaintiffs' bank accounts in order
to continue making unauthorized withdrawals. <u>Haymount</u>, 609 F. Supp.
3d at 250-51. Specifically, plaintiffs alleged that on February 16,

2022, February 18, 2022, and February 23, 2022, "GoFund attempted to bypass [a] block from debiting Plaintiff's account by fraudulently debiting $60,000 from the Plaintiff's bank account under the name 'GoFund b' as opposed to 'GoFund.'" FAC, ¶ 186. In denying the motion to dismiss, the Court held that these allegations were "barely" sufficient to plausibly give rise to the inference that defendants had (1) engaged in "at least two predicate acts of racketeering occurring within a ten-year period[,] (2) that these predicate acts are related to each other[,] and (3) that these predicate acts amount to or pose a threat of continuing criminal activity." Haymount, 609 F. Supp. 3d at 250-51.

Defendants now move for summary judgment on this theory of RICO liability because there is no evidence of GoFund Advance using a misleading name to bypass a bank block. See Defs. Mot. at 19-20. The Court agrees. As noted above, in the FAC, Plaintiffs alleged that "[o]n February 16, 2022, February 18, 2022, and February 23, 2022, GoFund attempted to bypass [a] block from debiting Plaintiff's account by fraudulently debiting $60,000 from the Plaintiff's bank account under the name 'GoFund b' as opposed to 'GoFund.'" FAC, ¶ 186. But the only wire instructions in evidence showing a transfer or attempted debt on any of these days shows the "payee" as "GoFund," not as "GoFund b." Defs. Rule 56.1 Statement, ¶ 54; Cipolla Decl., Ex. 21 at GOFUND_000020955, Dkt. No. 185. The routing and account number on the relevant bank account labeled "GoFund," not "GoFund b," match to the account that Plaintiffs contend was misleadingly labeled "GoFund b."

Defs. Rule 56.1 Statement, ¶ 56. Moreover, defendants have offered an explanation for the "b" appearing in a single screenshot that plaintiffs have produced as standing for "batch." Defs. Rule 56.1 Statement, ¶ 58; Brezel Aff., Ex. 73, ¶ 23, Dkt. No. 172.

Plaintiffs dispute defendants' contention that the "b" stands for batch, but Plaintiffs have not come forward with any affirmative evidence that any account named "Go Fund b" -- separate from the ordinary account just named "Go Fund" -- was ever used to evade any block placed on GoFund's withdrawals, and so have failed to create any issue of material fact as to this issue. The Court accordingly grants summary judgment to defendants on this theory of RICO liability.

### 2. Alleged wire fraud based on defendants' debiting a "monthly fee" from plaintiffs' and others' accounts

After the Court heard oral argument on summary judgment, Plaintiffs moved to amend their complaint to add an additional theory of wire fraud that was raised, for the first time, in their motion for summary judgment.[5] Plaintiffs contend defendants engaged in a pattern

---

[5] Plaintiffs also raised other theories of wire fraud, mail fraud, and Hobbs Act extortion for the first time in their motion for summary judgment; however, seeing as Plaintiffs did not seek to amend the complaint to include these theories and Plaintiffs withdrew their motion for summary judgment, they are waived, and the Court need not address them. Moreover, even if these theories were not waived, they would fail independently. With respect to the over-debiting of fees (that are not related to the "Monthly Fee" issue discussed below) or the underfunding of cash advances, the Court has already held that these "complaints sound in breach of contract, not fraud." Haymount, 609 F. Supp. 3d at 250. Similarly, Plaintiffs' argument that they were fraudulently induced into entering the MCA Agreements based on alleged differences in amounts of charged fees or funding received sounds in contract, as it is, at bottom, a complaint that defendants were overcharged fees and then delivered

of wire fraud based on debits from Plaintiffs' and other merchants' bank accounts by having a company owned by defendants, called "Monthly Fee," withdraw $499 from Plaintiffs' account on a monthly basis.[6] The SAC alleges "Monthly Fee" debited $499 from Haymount's Bank of America accounts every month for a year (from September 2021 to September 2022), for a total of $6,487.00, and that these debits happened even after the Court issued an injunction enjoining further withdrawals from Plaintiffs' bank account. SAC, ¶¶ 29-31, 189-93, 195.

The more specific allegations in the SAC are as follows: defendants used "Monthly Fee" to "disguise[] the nature and source of certain ACH debits" to "defraud merchants" and make debits that would "go unnoticed and undetected by merchants." SAC, ¶¶ 288-90. Defendants solicited bank account information "to perform due diligence" but then shared it with "'Monthly Fee' so it can begin making unauthorized withdrawals above-and-beyond any fees disclosed in the MCA

---

less than the promised fund amount. See id. Finally, to the extent Plaintiffs argue they can survive summary judgment on a RICO theory based on some combination of Hobbs Act violations, mail fraud, and wire fraud that involved the issuance of unlawful liens and writs of attachment, as best the Court can tell from Plaintiffs' opaque briefing, these actions either also involved alleged overcharging that sounds in contract or involve defendants' actions with respect to entirely different persons or businesses than Plaintiffs. See Pls. Mem. of Law in Supp. of Mot. for Partial Summ. J. at 23-28, Dkt. No. 181.

[6] The SAC makes numerous allegations that defendants deducted these monthly fees from other merchants' accounts. See SAC, ¶¶ 34, 199-207. Except as arguably bearing on the issue of "pattern," those allegations are irrelevant. This has not been certified as a class action, and those other merchants are not parties to this lawsuit.

Agreements," that "exceeded any disclosed monthly fee (if any) in the MCA Agreements themselves." Id. ¶¶ 291-92, 297. But "[n]othing in any of the Haymount MCA agreements permitted the Company Defendants or any other entity from deducting a 'monthly fee' from Haymount's accounts," Haymount "did not authorize these debits," and "Haymount did not know the Monthly Fee debits were in any way, shape or form associated with Defendants, and did not authorize these debits." Id. ¶¶ 194, 196-97, 293. Finally, the MCA Agreements only permitted "the funder" to access Haymount's bank account and provided "no notice . . . that Defendants intended to share [Haymount's] bank account log in information with third parties, such as 'Monthly Fee.'" Id. ¶ 294.

Assuming arguendo that the SAC has been properly filed and accepted, the threshold issue the Court must resolve is whether these allegations have adequately pled a RICO claim premised on a pattern of wire fraud. Wire fraud has three elements that "must be pled with particularity" -- (1) "a scheme to defraud" (which requires "proof of a material misrepresentation") (2) "to get money or property" (3) "furthered by the use of interstate mail or wires." Williams v. Affinion Grp., LLC, 889 F.3d 116, 124 (2d Cir. 2018). To satisfy Fed. R. Civ. P. 9(b), "[t]he complaint must detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." Id. And beyond that, "[t]he alleged predicate acts of mail and wire fraud merit particular scrutiny lest the courts allow the RICO statute to federalize garden-variety state common law claims."

Bigsby v. Barclays Cap. Real Est., Inc., 170 F. Supp. 3d 568, 575 (S.D.N.Y. 2016). See also Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 489 (2d Cir. 2014).

Under this standard, the SAC does not adequately plead a RICO claim premised on the debiting of a monthly fee. As detailed above, many of the allegations are conclusory and not pled with adequate specificity. The SAC does not specify any actual misstatements that were made or when they are made, nor does it explain how the use of "Monthly Fee" was fraudulent, other than to make conclusory allegations that it was created with "the intent to defraud" and make "unnoticed and undetected" withdrawals. Given that this is a second amended complaint, these defects are telling, and support dismissal of the claim.

Furthermore, even if this theory of wire fraud were alleged with the required specificity, at best, it sounds in contract, not fraud. At bottom, Plaintiffs are alleging that the contract did not authorize debits of this "Monthly Fee" in their account by a third-party, and that these fees exceeded the fees in the MCA Agreements. But, as discussed further below, the MCA agreements themselves contemplate the charging of monthly fees, so any complaint that plaintiffs were over-charged or improperly charged would suffer from the same flaw as the over-debiting theory of wire fraud that the Court previously dismissed. "A breach of contract, without more, does not amount to actionable wire fraud." N.Y. State Cath. Health Plan, Inc. v. Acad. O & P Assocs., 312 F.R.D. 278, 299 (E.D.N.Y. 2015). That is why at the motion to

dismiss stage, the Court concluded that Plaintiffs failed to state a claim for wire fraud supporting a RICO claim (or any fraud) based on defendants' allegedly charging "exorbitant fees," since "the MCA agreements disclose the amounts of these fees," and disclosed fees, even if "exorbitant," do not amount to wire fraud. Haymount, 609 F. Supp. 3d at 250. The Court continued that "[t]o the extent that plaintiffs allege that no services were actually performed in exchange for these fees, or that the work performed materially differed from the descriptions in the fee schedule, plaintiffs' complaints sound in breach of contract, not fraud." Id. So too here. To the extent Plaintiffs are complaining the fees charged are above those disclosed in the MCA Agreements or that another entity, other than the one specified in the contract, withdrew the fees, that sounds in contract, not fraud.

Nor can the allegation that defendants continue to make the debits after an injunction was issued change this calculus. Although making the debits was unauthorized post-injunction, that does not sound in fraud as there is no allegation defendants made any misstatements, modified the debits, or changed the name of the debits post-injunction to evade the Court's order. The SAC solely alleges the same type of debits for the same purpose were made pre- and post-injunction. The Court accordingly concludes that the SAC fails to adequate allege a RICO claim premised on this theory of wire fraud.

Further still, even if the Court were to analyze this theory as it was presented at the summary judgment stage, the undisputed facts

support the same conclusion that this claim sounds in contract.[7] There is no evidence or even contention that defendants changed the name on the account to "Monthly Fee" to evade bank blocks. Further, Appendix A to five of the six MCA Agreements explicitly disclosed that plaintiffs would be charged a monthly "management fee" "for the duration of [the] agreement." See Clinton Decl., Ex. 1 at App. A; Ex. 2 at App. A; Ex. 3 at App. A; Ex. 4 at App. A; Ex. 6 at App. A. True, those appendices disclosed a $299 and $249 monthly fee, so it is possible that plaintiffs were overcharged. However, "disclosed fees pursuant to a contract [do not] amount[] to wire fraud" and to the extent plaintiffs were overcharged, that complaint "sound[s] in breach of contract, not fraud." Haymount, 609 F. Supp. 3d at 250.

As Plaintiffs have expressly disavowed any need for further discovery on the "Monthly Fee" issue, see Pls. Mot. to Amend the Compl. at 2, the Court finds that even to the extent the SAC arguably pleads a RICO claim premised on this theory of wire fraud (it does not), defendants are still entitled to summary judgment on this theory.

---

[7] As for the withdrawals after the injunction was issued, on summary judgment defendants contended this was an honest mistake, and as soon as they were discovered, all the money was returned. See Defs. Resp. and Counterstatement to Pls. Rule 56.1 Statement of Material Facts, ¶¶ 23-24, Dkt. No. 198. Plaintiffs provided no evidence to dispute this story. There is thus still no dispute of fact (or basis) for finding the continued debiting after the injunction was fraudulent. At most, it would be a contempt of court issue.

## IV.  RICO Conspiracy

Defendants are similarly entitled to summary judgment on Plaintiffs' RICO conspiracy claim. The RICO conspiracy claim is predicated on defendants agreeing to commit substantive RICO violations, that is, committing wire fraud and collecting on unlawful debts. FAC, ¶¶ 264-67 ("Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of the Enterprise to violate 18 U.S.C. § 1962(c) as describe[d] above, in violation of 18 U.S.C. § 1962(d)."); See also SAC, ¶¶ 276-79. Because the Court finds that defendant is entitled to summary judgment on the substantive RICO claims, there can be no dispute of material fact about whether defendants conspired to commit those same underlying RICO violations. See, e.g., First Cap. Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004); Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 245 (2d Cir. 1999).

## V.  Fraud

Defendants are also entitled to summary judgment on plaintiffs' fraud claims. The theories underlying plaintiffs' fraud claim are the same theories underlying its wire fraud claims. See SAC, ¶¶ 287-98 (describing plaintiffs' two theories of wire fraud as the basis for the fraud claim). However, as described above, Plaintiffs' theory that defendants used a misleading name to evade bank blocks cannot survive summary judgment; therefore, a fraud claim premised on that same theory similarly cannot survive summary judgment. Furthermore, the Plaintiffs' theory that defendants committed wire fraud by deducting

a "Monthly Fee" cannot survive summary judgment because it sounds in contract; therefore, similarly, plaintiffs' fraud claim premised on the same theory and allegations cannot survive summary judgment because it too must sound in contract. See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (allegations sounding in contract cannot support a fraud claim unless plaintiff can show one of three conditions is met).

## VI.   Breach of Contract

Getter separately moved for summary judgment on the breach of contract claim because he is not a party to any of the MCA Agreements. See Clinton Decl., Exs. 1-6; Getter 56.1 Statement of Material Facts, ¶ 14, Dkt. No. 184 ("Getter was not a party to any of the MCA Agreement[s] entered into by Plaintiffs that are the subject of this Action."). Plaintiffs seemingly dispute Getter's assertion of fact. Plaintiffs contend "it is immaterial that Getter is not a direct party to the MCA Agreements subject to this Action with respect to Plaintiffs' RICO claims" because Getter owns the LLCs that entered into the MCA Agreements and Getter is a culpable person and member of the enterprise under RICO. See Pls. Resp. to Getter's Rule 56.1 Statement, ¶ 14, Dkt. No. 191. Plaintiffs' argument misses the mark.

A non-party to a contract between an individual and an LLC cannot be sued for breach of contract merely because the non-party is a member of the LLC unless the prerequisites for corporate veil piercing are

satisfied.[8] N.C. Gen. Stat. Ann. § 57D-3-30 ("A person who is an interest owner, manager, or other company official is not liable for the obligations of the LLC solely by reason of being an interest owner, manager, or other company official."); <u>Cummings v. Carroll</u>, 270 N.C. App. 204, 228 (2020) (if an individual "did not contract in his individual capacity with Plaintiffs, he cannot be held individually liable for any breach of the Contract"), <u>aff'd in part, rev'd in part</u>, 379 N.C. 347 (2021); <u>S. Shores Realty Servs., Inc. v. Miller</u>, 251 N.C. App. 571, 584 (2017) (Despite the general rule codified in N.C. Gen.

---

[8] This principle of law would hold even if, for some reason, New York or Connecticut law would have applied under the choice-of-law analysis. See <u>Paguirigan v. Prompt Nursing Emp. Agency LLC</u>, 286 F. Supp. 3d 430, 440-41 (E.D.N.Y. 2017) ("[N]on-parties to a contract are not bound to it. However, New York law allows a plaintiff to pierce the corporate veil and sue a non-party for breach of contract when the non-party is an alter ego of one or more signatories."); <u>State v. C&J Enter., LLC</u>, 116 N.Y.S.3d 430, 432-33 (3d Dep't 2020) ("Under Limited Liability Company Law § 609, a member of a limited liability company is generally not liable for the contractual obligations of the company."); Conn. Gen. Stat. Ann. § 34-251a(a) ("A debt, obligation or other liability of a limited liability company is solely the debt, obligation or other liability of the company. A member of manager is not personally liable . . . for a debt, obligation or other liability of the company solely by reason of being or acting as a member or manager."); <u>Bruno v. Whipple</u>, 138 Conn. App. 496, 509-10 (2012) (affirming grant of summary judgment on breach of contract to an individual that was not identified as a party to a contract between plaintiff and an LLC); <u>FCM Grp., Inc. v. Miller</u>, 300 Conn. 774, 797 (2011) ("only parties to contracts are liable for their breach"); <u>Avant Cap. Partners, LLC v. Strathmore Dev. Co. Mich., LLC</u>, No. 3:12-cv-1194, 2013 WL 5435083, at *12 (D. Conn. Sept. 30, 2013) ("While it is axiomatic that only parties to a contract can be liable for breach of that contract, other non-party entities may be liable for the acts and omissions of the defendant corporation if they are considered the alter ego of that corporation or if the corporate veil is pierced."); <u>Strum v. Harb Dev., LLC</u>, 298 Conn. 124, 131 n.7 (2010) ("the identity and instrumentality rules for piercing the corporate veil" are the same for corporations and LLCs).

Stat. Ann. § 57D-3-30, North Carolina "appellate courts have generally upheld the imposition of personal liability upon an individual manager of an LLC under the same circumstances that support piercing the corporate veil.").

Plaintiffs do not dispute that Getter is not a party to the contract and put forward no argument that corporate veil piercing is appropriate in this case. Plaintiffs only argument is that it is immaterial for the RICO claim that Getter is a non-party to the contract. That may be true, but it certainly is material to the breach of contract claim. As there is no dispute of material fact between the parties that Getter is not a party to the MCA Agreements, Getter is entitled to summary judgment on the breach of contract claim.

### VII. Conclusion

For the foregoing reasons, the Court hereby grants partial summary judgment to all defendants, dismissing plaintiffs' RICO claims and fraud claims. The Court also grants partial summary judgment to Getter, dismissing the breach of contract claim against him.

The parties must jointly call Chambers by no later than August 31, 2023 to set a trial date for the remaining claim.

SO ORDERED.

New York, NY
August 28, 2023

JED S. RAKOFF, U.S.D.J.