**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAYMOUNT URGENT CARE PC and ROBERT A. CLINTON, JR., *individually and on behalf of all those similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISSAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, AND YISROEL C. GETTER,<br><br>Defendants. | Civil Action No.   1:22-cv-01245-JSR |

**PLAINTIFF HAYMOUNT URGENT CARE PC'S**
<u>**PROPOSED FINDINGS OF FACT**</u>

**WHITE AND WILLIAMS LLP**
Shane R. Heskin
Justin E. Proper
Alex D. Corey
7 Times Square, STE 29
New York, NY 10039
Tel: (215) 864-7000
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

I.     PROCEDURAL HISTORY......................................................................................1

II.    DEFENDANTS CONSPIRED TO ENGAGE IN A FRAUDULENT SCHEME ............6

     A.     The Enterprise..................................................................................................6

     B.     Purpose of the Enterprise.................................................................................6

     C.     Structure of the Enterprise. ..............................................................................6

     D.     The Enterprise's Operation of the Corporate Defendants.......................................7

     E.     The Racketeering Conspiracy. .........................................................................14

     F.     The Manner and Means of the Enterprise............................................................15

           i.     Wire and Mail Fraud ....................................................................15

           ii.     Corruption of an Official Proceeding ...........................................15

           iii.     Conspiracy to a Corrupt a Civil Proceeding .................................16

           iv.     Witness Tampering ......................................................................16

           v.     Forgery .......................................................................................16

           vi.     Perjury........................................................................................16

           vii.     Use of extortionate means to collect an extension of credit. ....................18

           viii.     Tax evasion. ................................................................................18

           ix.     The use of sham MCA agreements to disguise the Enterprise's loans. ..........................................................................................18

     G.     The Enterprise has Affected Interstate Commerce. .............................................22

     H.     Haymount has been Injured in its Business or Property.........................................22

           i.     Haymount has been injured by being charged excess fees. .......................22

           ii.     Haymount has been injured by overcollection...........................................24

           iii.     Haymount has been injured by underfunding. ...........................................25

           iv.     Damages using the contract interest rate. ..................................................26

           v.     Damages using North Carolina default rate of 8%. ...................................30

           vi.     Damages using material breach. ................................................................31

           vii.     Haymount has been injured by the UCC Lien Letters.............................31

           viii.     Haymount is entitled to prejudgment interest............................................33

Haymount Urgent Care PC ("Haymount") submits its Proposed Findings of Facts in support of its claims against GoFund Advance LLC ("GoFund"), Funding 123, LLC ("Funding 123"), Merchant Capital LLC ("Merchant Capital,") (the "Corporate Defendants"), Yitzchakov Wolf ("Wolf"), and Josef Brezel ("Brezel") (collectively, the "Individual Defendants").

## I.   PROCEDURAL HISTORY

1.      On February 14, 2022, Haymount filed this action, asserting that several related merchant cash advance ("MCA") companies are controlled and manipulated by Defendants Wolf and Brezel to carry out a fraudulent scheme to collect upon unlawful debts and otherwise fraudulently obtain funds from Plaintiff and hundreds of other similarly situated victims through the use of their sham MCA agreements ("MCAs" or "MCA Agreements").  [DE 1, ¶ 1].

2.      Plaintiff alleged that Defendants operate out of New York but abuse an apparent loophole under Connecticut procedural law to collect upon their unlawful debts. [DE 1, ¶¶ 6-19].

3.      Throughout its complaint, Plaintiff alleged that Defendants had no actual operations in Connecticut and that the various corporate aliases used by Defendants were shams designed to abuse the Connecticut loophole and disguise the members of an associated-in-fact criminal RICO Enterprise led by Jonathan Braun, a former drug trafficker who had his federal prison sentence commuted by former President Trump. [*Id.*].

4.      Defendants Brezel and Wolf are first cousins of Braun and are alleged to control the purse strings of the RICO Enterprise. [DE 1, ¶ 20].

5.      In addition to using sham shell companies purportedly located in Connecticut, Plaintiff alleged that Defendants employed the very same fraudulent practices used by Braun in the complaints filed by the Federal Trade Commission and the New York State Attorney General on June 6, 2020. [DE 1, ¶ 21-28].

6.      Specifically, Plaintiff alleged that Defendants intentionally (1) charged exorbitant and unconscionable fees that were not actually related to expenses incurred by Defendants; (2) over-collected the amounts permitted under the contracts; and (3) underfunded the amounts promised under the contract through bait-and-switch tactics.  [*Id.*].

7.      On March 10, 2022, Haymount filed an Amended Complaint alleging that Defendants sent UCC Lien Letters to all of Haymount's health insurance providers, which had the effect of completely shutting down its ability to input and process COVID-19 related claims. [DE 1, ¶ 28].

8.      On March 11, 2022, Haymount filed an Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, seeking to enjoin Defendants from collecting on its predatory loans, and directing them to immediately retract the UCC Lien Letters. [DE 1, ¶ 36]

9.      On March 16, 2022, rather than voluntarily retract those UCC Lien Letters, Defendants opposed the Order to Show Cause. [DE 57-60].

10.     In support of their opposition to the Order to Show Cause, the Corporate Defendants submitted affidavits signed by Defendant Brezel [DE 59-60], Mechie Gross [DE 57], and Yisroel Getter [DE 58].

11.     In each of those affidavits, the affiants represented to this Court that each (1) was an authorized representative of the Corporate Defendants; (2) reviewed the business records maintained during the regular course of the Corporate Defendants' business; and (3) was attaching true and correct business records maintained by the Corporate Defendants located in Connecticut.

12.     On March 17, 2022, this Court held an emergency hearing wherein Defendants refused to retract their UCC Lien Letters, despite admitting that they could not point to any

provision in the January 20, 2022, MCA Agreement permitting Defendants to advance Haymount only half the amount promised.

13.     On March 21, 2022, this Court granted the Order to Show Cause, enjoining Defendants from collecting upon the receivables purportedly sold to Haymount, and directing Defendants to immediately retract the UCC Lien Letters it sent to any third party. [DE 66].

14.     On March 31, 2022, Defendants filed a motion to dismiss the RICO claims. Notably, Defendants *did not* move to dismiss the breach of contract claims asserted against all Defendants, including against the Individual Defendants. [DE 68].

15.     In support, Defendants submitted the Affidavit of Josef Brezel, once again, representing to this Court that Brezel (1) was an authorized representative of the Corporate Defendants; (2) reviewed the business records maintained during the regular course of the Corporate Defendants' business; and (3) was attaching true and correct business records maintained by the Corporate Defendants located in Connecticut.  Brezel attached a true and correct copy of each of the six MCA Agreements undergirding the Amended Complaint. Each of those MCA Agreements contained a provision allowing Defendants to use Connecticut's prejudgment attachment statute in the event that Defendants declare a default. [DE 69].

16.     In its supporting Memorandum of Law, Defendants also represented to this Court that the Corporate Defendants "are engaged in the receivables financing business" and "contracted to purchase, at a discount, a percentage of the future receivables of Haymount up to a certain sum." [DE 68, pg. 1].

17.     Defendants also moved to dismiss the RICO claims based on wire fraud, alleging that the claims sounded in breach of contract.

18.     The Court denied Defendants' motion to dismiss the RICO claims but granted Defendants' motion to dismiss the wire fraud claims arising from overcollection and the overcharging of fees, holding those claims sounded in contract, not fraud. [DE 86].

19.     On July 11, 2022, Defendant GoFund Advance, LLC ("GFA") filed a counterclaim against Haymount alleging that GFA and Haymount entered into the January 2022 MCA Agreement at issue in the Amended Complaint. [DE 90, pgs. 14-15].

20.     On July 25, 2022, Defendants filed an Amended Answer. [DE 102].

21.     In neither Defendants' Original Answer nor its Amended Answer did Defendants raise the affirmative defense that Haymount's claims for consequential damages are prohibited by the limitation of damages provision contained in the six MCA Agreements.

22.     On February 14, 2023, Defendants filed a motion for partial summary judgment on the RICO and fraud claims.  Notably, again, Defendants *did not* move for summary judgment on the breach of contract claims asserted against the Individual Defendants. [DE 175].

23.     In support of their motion for partial summary judgment, Defendants filed a Rule 56.1 Statement representing to this Court that "GFA, Funding 123, and Marchant Capital are companies that are incorporated in Connecticut engaged in the merchant cash advance ("MCA") business." [DE 179, ¶ 2].

24.     In support of its motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment, Defendants represented to this Court that any overcollection practices engaged in by Defendants was "accidental" and not intentional. [DE, 199, pg. 23].

25.     Also, in support of its motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment, Defendants filed an affidavit by Defendant Wolf, admitting to his personal knowledge of various other MCA contracts entered into with other merchants. [DE 200].

26.     On August 28, 2023, relying on the representations and affidavit submitted by Defendants, this Court granted Defendants' motion for summary judgment on the RICO and fraud claims. [DE 216].

27.     On October 30, 2023, the Court set all remaining claims for trial on February 12, 2024. [Minute Entry dated October 30, 2023].

28.     On February 5, 2024, just one week prior to trial, the Individual Defendants filed a motion in limine seeking, in effect, to dismiss the breach of contract claims against the Individual Defendants on the basis that no piercing of the corporate veil claim had been alleged in the Amended Complaint pursuant to Fed.R.Civ.P. 12(b). [DE 228].

29.     On February 12, 2024, the Court denied the Individual Defendants' motion in limine on several grounds, including but not limited to: (1) the motion was untimely under Fed.R.Civ.P. 12(c); (2) the motion was brought in violation of the Court's Individual Rules requiring a premotion conference call with the Court; (3) the motion lacked substantive merit because Haymount's piercing the corporate veil theory was adequately pled; (4) the Individual Defendants' motion was additionally untimely given that the Court expressly recognized and addressed Haymount's corporate veil theory of personal liability in its August 28, 2023 summary judgment decision with respect to the Individual Defendant Yisroel Getter; and (5) even if the Individual Defendants' motion did have merit (which it did not), Fed.R.Civ.P. 15(b)(1) permits a plaintiff to amend the pleadings at any time to conform with the evidence, even during or after trial. [Day 1 Tr., pgs. 12-18].

30.     A five-day bench trial on all remaining issues ensued between February 12, 2024, and February 20, 2024.

## II.    DEFENDANTS CONSPIRED TO ENGAGE IN A FRAUDULENT SCHEME

### A.    The Enterprise.

31.    Brezel and Wolf are individual persons with their own separate legal existence.

32.    Jonathan Braun is an individual person with his own separate legal existence.

33.    Jared Alfin is an individual with his own separate legal existence.

34.    The Corporate Defendants are sham corporate alter egos of Brezel and Wolf.

35.    Matrix Advance LLC, BBF Partners, Tailored Fund Cap, LLC, MapCap Advance LLC (d/b/a Alt Capital Source, Eleven Capital, Cannon Advance, Viking Capital, and Funding 123, LLC), Fundura Capital Group, LLC, Bridge Funding Cap LLC (d/b/a Skyfall Funding), Hartford Receivables, GSS Equity, and Alpha Recovery Partners are sham corporate alter egos of Brezel and Wolf (the "Other Corporate Entities"). [Day 1 Tr., pgs. 12-18]; [P. 293, 296]

36.    The Corporate Defendants, the Other Corporate Entities, Brezel, Wolf, Braun and Alfin constitute an Enterprise under 18 U.S.C. 1961(4), that is a group of individuals and entities associated in fact.  The Enterprise is engaged in, and its activities affected, interstate and foreign commerce. The Enterprise constitutes an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

### B.    Purpose of the Enterprise.

37.    The common purpose of the Enterprise is to collect upon its predatory loans and funnel the proceeds of those loans to its members, through sham shell companies that permit it to abuse the Connecticut prejudgment statute by extortionate means and to hide the identity of the Enterprise members through perjury, corruption of civil proceedings, and witness tampering.

### C.    Structure of the Enterprise.

38.    Brezel and Wolf fund the loans and control the books and records of the Enterprise. [Day 1 Tr., pgs. 20-26, 28-33; Day 2 Tr., pgs. 158-59, 161 (describing chain of command), 184,

194-198, 201 (admitting that real entity funding Haymount was Bridge and that Wolf owned

Bridge), 202 (admitting that Wolf owned offices and provided infrastructure), 224-28 (admitting

Wolf controlled funding and was boss), 279-87, 285 (admitting that Wolf shared profits with

Brezel through GSS Equity), 288 (WOLF: "A hundred percent. I can explain it.  I understand it

better than anyone who sat in this chair"); 289-300; Day 3 Tr., pgs. 311, 359-367; Day 4 Tr., pgs.

392-401; Day 5 Tr., pgs. 490-492; P. Ex., 32, 51, 52, 59, 93, 124, 131, 159, 235, 236, 246].

39.     Alfin advises the Enterprise on its fraudulent structure. [Alfin Dep. Tr., pgs. 29-37,

62-65; Day 1 Tr., pgs. 7-12, 20-26, 47-48, 55-59, 65-70].

40.     Braun advises the Enterprise on its fraudulent schemes. [Alfin Dep. Tr., pgs. 45,

47-49, 176-177; Day 1 Tr., pgs. 18-30, 76-80, 83-87, 93-94, 99-101; Day 2 Tr., pgs. 158-59; P.

Ex., 32, 36 ("we need our money back"), 42 ("we may fund again"), 44, 47, 63, 78, 93, 88, 196].

41.     The Corporate Defendants are empty vessels used to paper the Enterprise's loans

and hide the identity of the Enterprise members. [Day 1 Tr., pgs. 12-18].

**D.     The Enterprise's Operation of the Corporate Defendants.**

42.     Wolf and Brezel have final decision-making authority over all aspects of the

Enterprise, including the fraudulent schemes used here. [Day 1 Tr., pgs. 20-26, 28-32]; [Day 2 Tr.,

pg. 180 ("I was told to by Mr. Wolf and was not given much of a choice).]

43.     In September 2019, the New York Legislature banned confessions of judgments,

which took away the MCA industry's weapon of choice to freeze out-of-state bank accounts.

44.     At some point in mid-to-late 2000, an Enterprise associate, Joseph Kroen, noticed

that a merchant had its bank account frozen by an attorney named Jared Alfin out of Connecticut.

[Day 1 Tr., pg. 8].

45.     At the time, Kroen was a funder for the Enterprise and worked directly under its

control. [*Id.*, pgs. 5-8]

46.     Kroen contacted Mr. Alfin to get more information on how one could freeze an out-of-state merchant's bank account from Connecticut.  [*Id.*, pgs. 7-11].

47.     After Alfin explained the process, Kroen discussed the use of this Connecticut statute with Wolf, obtained a copy of the Enterprise's form MCA Agreement and sent it to Alfin for revision to permit the Enterprise's use of the Connecticut Prejudgment Attachment Statute to collect on its loans.  [*Id.*, 11-12].

48.     Mr. Alfin revised the form MCA Agreements to include 4.13 as provided below:

> 4.13   **Prejudgment Remedy Waiver.** EACH AND EVERY MERCHANT, ENDORSER, GUARANTOR AND SURETY OF THIS AGREEMENT, AND EACH OTHER PERSON OR ENTITY WHO MAY BECOME LIABLE FOR ALL OR ANY PART OF THIS OBLIGATION, HEREBY ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTIONS 52-278a TO 52-278m, INCLUSIVE, OR BY OTHER APPLICABLE LAW EACH AND EVERY MERCHANT, ENDORSER AND GUARANTOR OF THIS AGREEMENT HEREBY WAIVE (A) ALL RIGHTS TO NOTICE AND PRIOR COURT HEARING OR COURT ORDER IN CONNECTION WITH ANY AND ALL PREJUDGMENT REMEDIES TO WHICH FCG HEREOF MAY BECOME ENTITLED BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENTAND (B) ALL RIGHTS TO REQUEST THAT FCG HEREOF POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT SAID MERCHANTS, ENDORSER OR GUARANTOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY THE HOLDER HEREOF BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT OR SECURITY AGREEMENT SECURING THIS AGREEMENT.

49.      At the time, the Corporate Defendants had no legal existence of any kind.  Not one of the Corporate Defendants was even incorporated in any state.  [*Id.*].

50.     Despite having no legal existence whatsoever, the Enterprise used the Connecticut Prejudgment Attachment to freeze out-of-state bank accounts of their borrowers. [*Id.,* pgs. 52-55; P. Ex., 212, 214].

51.     At the time, the Enterprise conducted no business in Connecticut and maintained no office in Connecticut. [Day 1 Tr., pgs. 9, 55-56; Day 2 Tr., pgs. 268-279; Day 3 Tr., pgs. 383-87; Day 4 Tr., pgs. 391-394; Day 5 Tr., pgs. 488-490; P., Ex. 210].

52.     Nevertheless, on February 10, 2021, Alfin filed a complaint in the Superior Court of Connecticut representing that a non-existent entity had an office in Avon, Connecticut. [Day 1 Tr., pgs. 52-55; P. Ex., 212].

53.     Alfin claimed at his deposition that he never investigated whether the Individual Defendants or their alter egos maintained a legitimate office in Connecticut and merely relied upon the representations of his clients. [Alfin Dep. Tr., pgs. 62-65, 68-70].

54.     Alfin admitted that he never met with the Individual Defendants in Connecticut, never visited their so-called Connecticut offices, and that the only time he actually met with the Individual Defendants was at their office in Brooklyn, New York. [*Id.*, pgs. 71-73].

55.     Alfin also admitted that he knew that all of the affidavits of debt he received from the Individual Defendants were executed out of Brooklyn, NY and that he never received an affidavit of debt executed out of Connecticut.  [*Id.*, pgs. 74-77].

56.     The evidence adduced at trial established conclusively that Alfin's sworn deposition testimony was not truthful.

57.     Rather, the indisputable evidence adduced at trial proves that Alfin knew that the Individual Defendants or their alter egos did not have a legitimate Connecticut office and conspired with them to create sham Connecticut corporations for the sole purpose of abusing the Connecticut Prejudgment Attachment Statute and to disguise their personal liability.

58.     Among other things, Alfin instructed the Individual Defendants to open a sham mailbox in Avon, Connecticut so that he would have a Connecticut address to falsely represent to the courts of Connecticut that the Individual Defendants or their alter egos maintained an office in Connecticut.  [Day 1 Tr., pgs. 60-62, 64-65].

59.     On June 10, 2020, the New York Attorney General and the Federal Trade Commission filed suit against Jonathan Braun and his related MCA companies, alleging various fraudulent and deceptive practices in connection with his illegal loansharking enterprise.

60.     At his deposition, Alfin admitted that Braun was his client and that he was an authorized representative of the Corporate Defendants and that he and the Individual Defendants all work together.  [Alfin Dep. Tr., pgs. 45-49].

61.     Immediately after the filing of these state and federal regulatory complaints, Alfin instructed the Individual Defendants that they needed to incorporate the Corporate Defendants and file a Certificate of Incorporation with the Connecticut Secretary of State. [Day 1 Tr., pgs. 20-26]

62.     As a direct result, the Individual Defendants filed Certificates of Incorporation for each of the Corporate Defendants on June 21, 2021.  [*Id.*; P. Ex., 210]

63.     To disguise their true ownership and control of these sham entities, the Individual Defendants' listed Joseph Kroen as the owner of the Corporate Defendants. [*Id.*].

64.     Despite naming Kroen as the owner of the Corporate Defendants, the Individual Defendants paid Alfin's fees, negotiated the terms and conditions of their retainer agreement with Alfin, exercised sole decision-making authority over the Corporate Defendants, and funded and collected upon all of the MCAs issued under the Corporate Defendants' names.  [*Id.*, pgs. 20-26, 28-33, 37, 40-44, 47-49; P. Ex. 149, 218, 293, 296, 297].

65.     Wolf admitted that he funded and participated in 5 of the 6 MCA Agreements with Haymount either as a syndicator on Brezel's platform or as a direct funder on his own platform, and that nobody knows the details of these MCAs better than he.[1] [Day 3 Tr., pgs. 311-316, 339-342, 345-347].

---

[1] Wolf funded MCAs 1, 4, 5 and 6 on his platform, and syndicated in MCA 3 on Brezel's platform. Wolf was the sole funder on MCA 1. [P. Ex., 124, 293; Day 1 Tr., pgs., 143-150; Day 2 Tr., pgs. 263-273, 282-300; Day 3 Tr., pgs. 320-322].

66.     Brezel also admitted that he funded and participated in 5 of the 6 MCAs either as a syndicator on Wolf's platform or as a direct funder on his own platform.[2]  [Day 3 Tr., pgs. 359-370; Day 4 Tr., pgs. 404-411].

67.     In December 2021, Bloomberg News contacted Kroen and others working for the Enterprise about their relationship with Braun and abuse of the Connecticut prejudgment attachment statute. [Day 1 Tr., pgs. 26-30, P. Ex., 17].

68.     As a result of Bloomberg's investigation, Kroen informed Wolf that he no longer wanted the Corporate Defendants in his name and demanded that his name be taken off the Certificate of Incorporation for all of the Corporate Defendants.  [*Id.*, pgs. 30-31].

69.     In response to this demand, Wolf and Alfin negotiated a new retainer agreement authorizing Alfin to represent all of the Individual Defendants' alter egos:  GoFund Advance, LLC, Matrix Advance, LLC, Bridge Funding Cap, LLC, Simpli Fund, LLC, Funding 123, LLC, EMET Group, LLC, ABC MCA Holdings, LLC, Newline Advance, LLC, Chrome Capital, LLC, Fundura Capital Group, Merchant Capital, Infusion Capital Group and United Fund USA. [*Id.;* P. Ex., 296].

70.     In the January 2, 2022, cover e-mail, Alfin admits: "Since Joe is currently the member for the CT LLC's, I have him signing on behalf of the LLC's. *See* P. Ex., 296.  In the same cover e-mail, Alfin admits that, despite Joe being the on-paper owner of the LLC's, Alfin directly discussed and negotiated the terms of the retainer agreement with Wolf.  [*Id.*].

71.     In addition, Alfin instructed the Individual Defendants that they had to rent an actual office space as a direct result of the Bloomberg investigation. [Day 1 Tr., pgs. 26-30, 62-65; P. Ex., 16].

---

[2] Brezel funded MCA 2 and 3 on his platform and syndicated in MCAs 4-6 on Wolf's platform. Brezel had a 50% syndication on MCA's 4 and 6, and a 45% syndication on MCA 5.  Brezel was the sole funder on MCA 2. [P. 124; Day 1 Tr., pgs. 140-146; Day 2 Tr., pgs. 284-285; Day 3 Tr., pgs. 320-322, 357-375].

72.     Alfin thereafter filed a Change of Business Address for the Corporate Defendants on January 18, 2022, and January 19, 2022. [P. Ex., 189, 190].

73.     At the Individual Defendants' direction, Kroen then instructed Alfin to change the ownership name on the Corporate Defendants to Hartford Receivables. [P. Ex., 293].

74.     On January 24, 2022, Alfin instructed his paralegal, Crystal Phelps, to file change of ownership forms with the Secretary of State of Connecticut without ever speaking to Yisroel Getter, an associate of the Enterprise, and without obtaining his written authorization to file the certificate. [Day 1 Tr., pgs., 65-68; P. Ex., 28-30].

75.     The change in ownership forms remove Kroen and replace him with Hartford Receivables, LLC.  Getter was listed as the sole owner of Hartford Receivables. [*Id.*].

76.     In filing these certificates without obtaining Getter's authorization, Alfin caused his paralegal to file documents certifying "under penalties of false statement that all of the information set forth on this document is true."  [*Id.*].

77.     The filing of these certificates was fraudulent in numerous ways. First, it was filed without authorization from the person supposedly certifying its truthfulness. Second, it was fraudulent because Alfin knew that the Corporate Defendants had no legitimate office in the State of Connecticut. Third, Alfin knew that the Individual Defendants were the true owners in interest, and were actually located in Brooklyn, New York. Fourth, Alfin knew that the Corporate Defendants were complete and utter shams that had no offices, employees, or business records within the State of Connecticut. [Day 1 Tr., pgs. 55-56, 68-70; Day 2 Tr., pgs. 267-68]

78.     The fraudulent nature of this corporate gamesmanship is evidenced even further by the Initial Resolutions and Operating Agreement created for Hartford Receivables. [P. Ex., 294].

79.     The initial resolutions are signed by a stranger, Morgan Noble, and the Operating

Agreement and accompanying LLC Membership Certificate is blank and unexecuted.  [*Id.*].

80.     Hartford Receivables, like the Corporate Defendants it supposedly owned, had no

offices, employees, assets or bank accounts and it paid no taxes.  [Day 1 Tr., pgs. 126-129; Day 2

Tr., pgs. 162-166, 168-169, 192-195].

81.     The purpose of the sham Corporate Defendants is unrefuted. The Individual

Defendants admit that they formed the Corporate Defendants in Connecticut in order to use its

prejudgment attachment statute.  [Day 2 Tr., pgs. 267, 278-280; Day 3 Tr., pgs. 354-355; Day 4

Tr., pgs. 399-400, 409; Day 5 Tr., pg. 481].

82.     In addition to admitting this purpose at trial, Brezel also admitted this fraudulent

purpose through private text messages. [P. Ex., 225]:

> **(347) 446-0445@s.whatsapp.net YB** 03:00:14 PM
>
> I dont mind
> But trust me, leave it on MC docs

> **(347) 446-0445@s.whatsapp.net YB** 03:03:10 PM
>
> I can freeze with that and its a US bank account

83.     Brezel also admitted in personal text messages that this sham corporate structure

was created to avoid "problems" like Braun. [P. Ex., 215]:

> **(347) 446-0445@s.whatsapp.net YB** 09:48:23 PM
>
> I'm very cautious
> I made a lot of changes internally to prevent problems.
> Like entity not being on my name....

84.     The corporate merry-go-round continues.

85.     On July 8, 2022, during the pendency of this litigation and after a fallout with Getter (who was represented by independent counsel throughout), Brezel and Getter switched ownership of GoFund, Funding 123 or Merchant Capital to Hartford Receivables, Co. [P. Ex., 184].

86.     On April 23, 2023, while the summary judgment motions were pending before this Court, the Individual Defendants effectively dismantled any Connecticut corporate existence for the Corporate Defendants by filing a notice of Agent Resignation. *See* CT Gen. Stat. § 34-243n(a) ("Each limited liability company and each registered foreign limited liability company shall designate and maintain a registered agent in this state."). [P. Ex., 181-82].

87.     Instead, the Individual Defendants created a new corporate shell company to run their loansharking scheme through Putnam Receivables. [Day 1 Tr., pgs. 74-76; P. Ex., 291].

88.     Although Wolf is listed as the actual owner of this company, Wolf still ensured that his identity could not be found by registering the corporate owner in Delaware, which does not identify the names of the LLC members. [*Id.*].

89.     Based on the overwhelming, uncontradicted evidence adduced at trial, the Court concludes that the Corporate Defendants are sham companies with no legal or actual corporate existence, and that they are nothing more than the alter egos of the Individual Defendants.

**E.      The Racketeering Conspiracy.**

90.     From at least 2021 through the present, in the Eastern District of New York and elsewhere, Brezel and Wolf, together with Braun, Alfin and others, each being a person employed by and associated with the Enterprise, unlawfully and knowingly combined, conspired, confederated, and agreed with each other and with others to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1) and 1961(5), which pattern of racketeering activity consisted of multiple acts indictable under: 18 U.S.C. § 1512

(witness tampering and obstruction of justice); 18 U.S.C. § 371 (conspiracy to obstruct justice); 18 U.S.C. § 894 (use of extortionate means to collect on an extension of credit); 18 U.S.C. § 1623 (perjury); 18 U.S.C. § 1961(1) (forgery); and 18 U.S.C. § 1343 (wire fraud).

### F.     The Manner and Means of the Enterprise.

#### i.      Wire and Mail Fraud

91.     The Enterprise violated 18 U.S.C. § 1343 by, among other things, misrepresenting that the Corporate Defendants are located in Connecticut and engage in the merchant cash advance industry when they are not even shell companies but rather artifices to hide the identity of the Enterprise members. [P. Ex., 28, 29, 30, 181, 182, 184, 189, 190, 191, 210].

92.     The fraudulent scheme allows the Enterprise to collect on its loans through use of ACH and wires. [Day 1 Tr., pgs. 55-57].

93.     The Enterprise violated 18 U.S.C. § 1343 by using sham form agreements that are in true substance absolutely repayable loans. This fraudulent scheme allows the Enterprise to collect upon its predatory loans in states that have strong public policies against usury, including within its home state of New York. [P. Ex., 1-6].

94.     The Enterprise also violated 18 U.S.C. § 1341 by sending UCC Lien Letters to each of Haymount's health insurer providers by misrepresenting the address of the Corporate Defendants, and by attaching a UCC Lien that related to an MCA Agreement that had been fully repaid many months before the letter was sent. [P. Ex., 27, 35, 78, 130, 153].

#### ii.      Corruption of an Official Proceeding

95.     The Enterprise violated 18 U.S.C. § 1512 by causing the Affidavits of Yisroel Getter, Josef Brezel and Mechie Gross to be filed with this Court on March 16, 2022, [DE 57- 60, 64-65], and the Affidavit of Josef Brezel on March 31, 2022 [DE 69]. The Individual Defendants further violated 18 U.S.C. § 1512 when they filed a 56.1 Statement on February 13, 2023,

representing the Corporate Defendants "are companies that are incorporated in Connecticut engaged in the Merchant Cash Advance ("MCA") business. [DE 179, ¶ 3].

### iii.    Conspiracy to a Corrupt a Civil Proceeding

96.     The Enterprise violated 18 U.S.C. § 1512 by conspiring to cause the Affidavits of Yisroel Getter, Josef Brezel and Mechie Gross to be filed with this Court on March 16, 2022, [DE 57-58, 60], and the Affidavit of Josef Brezel on March 31, 2022 [DE 69]. The Individual Defendants further violated 18 U.S.C. § 1512 when they filed a 56.1 Statement on February 13, 2023, representing the Corporate Defendants "are companies that are incorporated in Connecticut engaged in the Merchant Cash Advance ("MCA") business. [179, ¶ 3].

### iv.    Witness Tampering

97.     The Enterprise violated 18 U.S.C. § 1512 by corruptly influencing Yisroel Getter to submit a knowingly false affidavit before this Court. [DE 58; P. Ex., 167, 299; Day 2 Tr., pg. 279; Day 3 Tr., pgs. 304-306; Day 4 Tr., pgs. 465-477, Day 5 Tr., pgs. 489-492].

### v.    Forgery

98.     The Enterprise violated 18 U.S.C. § 1961(1) by submitting multiple forged affidavits with the Superior Court of Connecticut. [Day 2 Tr., pgs. 172-179; P. Ex., 98, 231].

### vi.    Perjury

99.     The Enterprise violated 18 U.S.C. § 1623 by providing knowingly false testimony to this Court at trial.

100.     Brezel and Wolf each committed perjury by testifying that the Haymount MCAs were not papered through the Corporate Defendants. *Compare* [Day 3 Tr., pg. 340; Day 4 Tr., pgs. 406-409; Day 5 Tr., pgs. 480-481]; *with* [P. Ex., 1-6, § 4.13 (CT Prejudgment Attachment Remedy); D. Ex., 57-58, 60, 69, 179, ¶ 3 (representing the Corporate Defendants "are companies that are incorporated in Connecticut engaged in the Merchant Cash Advance ("MCA") business,"

that the Corporate Defendants entered into the Haymount MCAs, and that the affiants were attaching true and correct records of the Corporate Defendants relating to the Haymount MCAs that they reviewed.)].

101.    Brezel also committed perjury by testifying that he was not an authorized representative of the Corporate Defendants. *Compare* [Day 4 Tr., pgs. 413-419] *with* [P. Ex., 246 (containing admitted signatures by Brezel on settlement agreements); D. Ex., 69 (admitting that he was an authorized representative of the Corporate Defendants)].

102.    Wolf further committed perjury by representing to this Court that he was not involved with the knowingly false Getter Affidavit that was submitted to the Court. *Compare* [Day 3 Tr., pgs. 304-306 (denying that he coerced Getter into signing a knowingly false affidavit and suggesting instead that it was Kroen who coerced Getter into signing it)] *with* [Day 4 Tr., pgs. 465-477 (attorneys for Defendants admitting under oath that Wolf provided all of the information and Wolf and Brezel were the direct points of contact); P. Ex., 299 (corroborating Getter's testimony that the affidavit was sent to him by Wolf's secretary and that he was directed to sign it)].

103.    Brezel also committed perjury when he testified that he violated this Court's injunctive order by accident. [Day 4 Tr., pgs. 371-378, 465-477; Day 5 Tr., pgs. 480-486]. On cross examination, Brezel was confronted with his own bank statements showing that his Optimum bank account was closed on August 17, 2022. In response, Brezel admitted that he then continued to violate this Court's injunctive order because he saw the bank closure coming due to Haymount's subpoena and purposely continued the debits from another one of his personal bank accounts. [*Id.*, pgs. 371-376; P. Ex., 236, at pg. 187 (showing account closed on 8/17/2022), 12, at pg. 326 (showing $499 Monthly Fee debit on 9/1/2022)].

### vii.   Use of extortionate means to collect an extension of credit.

104.   The Enterprise uses numerous extortionate methods to collect upon its loans. Here, the Enterprise used UCC Lien letters that it knew would shut down Haymount's business with the intent to extort a settlement our of Haymount through financial duress. [P. Ex., 27, 25, 78, 130, 153]. As a direct result of this extortion attempt, Haymount was required to obtain emergency relief from this Court, which was granted. [DE 36, 66]. The Enterprise also abuses the CT Prejudgment Attachment Statute to freeze bank accounts and extort settlements under financial duress from its merchants. [P. Ex., 246 (sample settlements obtained through Alfin); Day 1 Tr., pg. 24 ("The Court:  So it gave you a further weapon in those situations?  Kroen:  Correct, a form of security.")].

### viii.   Tax evasion.

105.   The Enterprise violated 26 U.S.C. § 7201 by using the Corporate Defendants to collect upon its MCA loans and funnel the proceeds to the Individual Defendants without filing a tax return. [Day 1 Tr., pg. 25; Day 2 Tr., pg. 164; P. Ex., 246; D. Exs., 4, 6, 8, 10, 12, 14].

### ix.   The use of sham MCA agreements to disguise the Enterprise's loans.

106.   The Individual Defendants operate a predatory, loansharking enterprise out of Brooklyn, New York through their ownership and control of the Enterprise. [Day 1 Tr., pgs. 140-150].

107.   In order to accomplish their loansharking scheme, the Enterprise uses sham form agreements that purport to purchase a percentage of a merchant's receivables. [P. Ex., 1-6].

108.   **MCA #1:**  On August 25, 2021, Haymount entered into an MCA Agreement stating Merchant Capital purchased 45% of its future receivables for a Purchase Price of $200,000 and a Purchased Amount of $275,000 to be paid at $7,299 each business day.  Haymount was advanced $160,000 on August 25, 2021, through two separate payments of $80,000 on August 30, 2021, and

September 15, 2021. Haymount paid $275,000 between August 31, 2021, and November 1, 2021. [DE 232 (Consent Order)].

109.    **MCA #2**:  On August 26, 2021, Haymount entered into an MCA Agreement stating GoFund purchased 25% of its future receivables for a Purchase Price of $250,000 and a Purchased Amount of $349,750 to be paid at $8,000 each business day. Haymount was advanced $200,000 through two separate payments of $100,000 on August 30, 2021, and September 15, 2021. Haymount paid $352,000 between August 31, 201, and October 28, 2021. [*Id.*].

110.    **MCA #3**: On September 27, 2021, Haymount entered into an MCA Agreement stating GoFund purchased 25% of its future receivables for a Purchase Price of $150,000 and a Purchased Amount of $224,850 to be paid at $7,500 per business day.  Haymount was advanced $120,000 through two separate payments of $60,000 on September 27, 2021, and October 13, 2021. Haymount paid $225,000 between September 28, 2021, and November 8, 2021.  [*Id.*].

111.    **MCA #4**: On December 16, 2021, Haymount entered into an MCA Agreement stating GoFund purchased 45% of its future receivables for a Purchase Price of $1,000,000 and a Purchased Amount of $1,350,000 to be paid at $35,000 per business day. Haymount was advanced $900,000 on December 16, 2021. Haymount paid $1,400,071.77 between December 17, 2021, and February 10, 2022. [*Id.*].

112.    **MCA #5**: On December 27, 2021, Haymount entered into an MCA Agreement stating Funding 123 purchased 45% of Haymount's future receivables for a Purchase Price of $2,000,000 and a Purchased Amount of $2,700,000 to be paid at $80,000 per business day. Haymount was advanced $900,000 on December 27, 2021. Haymount paid $1,520,000 between December 28, 2021, and January 21, 2022. [*Id.*].

113.   **MCA #6**: On January 20, 2022, Haymount entered into an MCA Agreement stating GoFund purchased 45% of its future receivables for a Purchase Price of $1,000,000 and a Purchased Amount of $1,499,990 to be paid at $60,000 per business day.  Haymount was advanced $800,000 through two separate payments of $400,000 on January 20, 2022, and February 7, 2022. Haymount paid $1,020,000 between January 20, 2022, and February 11, 2022. [*Id.*].

114.   In reality, the agreements are nothing more than disguised loans.

115.   The characterization of these transactions is helpful to determine the measure of damages.  If the transactions are loans, then it follows that the measure of damages is tied to the parties' expectation of the time value of money at the time of contracting or the default interest rate applicable under applicable North Carolina law.

116.   The form agreements used by the Individual Defendants disguise the loan amount by calling it a "Purchase Price" and disguise the interest charged by calling it a "Purchase Amount."  The term of the loan is readily ascertainable from the face of the agreement by simply dividing the "Purchase Amount" by the "Daily Remittance Amount."   [P. Ex., 32, 59]. The effective interest rate on the face of these agreements is unconscionable.

117.   The Individual Defendants admitted at trial that the transactions were loans and were absolutely repayable. Wolf admitted that missing payments due to insufficient funds constitutes an event of default, triggering their right to accelerate the debt and exercise their security rights and personal guarantee, and Kroen admitted the forms were loans. [Day 3 Tr., pgs. 316-320; Day 1 Tr., pg. 97 (Court: "After you had set up those Connecticut companies, was this basically the form that was used for all your, all the loans made by you and your associates?  Kroen: Yes.")].

118.    In addition, the record establishes that even when Haymount missed a payment due to insufficient funds, the Individual Defendants demanded an immediate wire. [P. Ex., 47, 53, 123].

119.    In fact, the record shows that the Individual Defendants routinely over-debited despite the lack of funds, and even had a $200 side bet among themselves that Haymount would transfer money in to cover the over debit. [P. Ex., 159].

120.    Most significantly, an event of default triggers the Individual Defendants' right to use the Connecticut Prejudgment Attachment Statute to freeze a merchant's out-of-state bank accounts.  It also triggers the Individual Defendants' right to freeze a merchant's out-of-state accounts receivables through the use of UCC Lien Letters. [Day 1 Tr., pg. 24 ("The Court:  So it gave you a further weapon in those situations?  Kroen:  Correct, a form of security.")].

121.    Although the Individual Defendants testified that they had purchased a percentage of Haymount's receivables, this testimony was false under basic principles of mathematics.

122.    In the Consent Order agreed upon by the parties and entered by the Court, the Individual Defendants entered into three separate MCAs with Haymount on December 17, 2021, December 27, 2021 and January 20, 2022. Each purported to purchase 45% of Haymount's receivables. [DE 232]. It is mathematically impossible to purchase 135% of a merchant's receivables.  In addition, at the time of these purported purchases of receivables, the Individual Defendants knew that Haymount had numerous other MCA agreements, which also purported to purchase a percentage of Haymount's receivables. [P. Ex., 32 ("current advances debiting over 2.5M/month), 59 ("current advances debiting approx. 963k/month), 107]. Obviously, the Individual Defendants knew they could not purchase what has already been sold to others.

123.    In fact, knowing that Haymount had numerous other MCAs, the Individual Defendants required Haymount to open a side account to pay back the MCA Agreements.  This account was not an account where Haymount received its receivables.  Rather, it was an account used exclusively to fund and repay the Individual Defendants' loans. [Day 4 Tr., at 439-441; P. Ex., 9 (side account), 47 ("this is just a side account")].

124.    Based on the evidence adduced at trial and a review of the agreements on their face, the Court finds that each of the MCA Agreements are in substance absolutely repayable loans.

### G.    The Enterprise has Affected Interstate Commerce.

125.    The Enterprise uses interstate wires and emails to carry on its goals.  Here, the six MCA Agreements were all transmitted by email from the Individual Defendants located in New York and signed electronically through electronic mail by Haymount located in North Carolina. [P. Ex., 1-6]. In addition, each of the six MCA Agreements was funded and collected upon via interstate ACH transactions involving bank accounts located in New York and North Carolina. [*Id.*; P. Ex., 9-10, 12]. The fraudulent scheme also consisted of a conspiracy with the Individual Defendants located in New York and an attorney located in Connecticut. [P. Ex., 296]. This fraudulent scheme was designed to and did in fact cause numerous out-of-state bank accounts to be frozen. [P. Ex., 246].

### H.    Haymount has been Injured in its Business or Property.

####       i.    Haymount has been injured by being charged excess fees.

126.    On MCA 1, the parties stipulated that Haymount was charged $40,000 in fees.

127.    On MCA 2, the parties stipulated that Haymount was charged $50,000 in fees.

128.    On MCA 3, the parties stipulated that Haymount was charged $30,000 in fees.

129.    On MCA 4, the parties stipulated that Haymount was charged $100,000 in fees.

130.    On MCA 5, the parties stipulated that Haymount was charged $100,000 in fees.

131.   On MCA 6, the parties stipulated that Haymount was charged $200,000 in fees.

132.   Appendix A provides that the Individual Defendants may charge a "Minimum of $500 or up to 12% of the purchase price for underwriting and related expenses" and a Minimum of $500 or up to 10% of the purchase price to cover cost of Origination and ACH/Setup.

133.   Haymount has established that the actual fees and expenses incurred by the Individual Defendants was less than $500 for all of the MCAs.

134.   Specifically, Haymount has submitted the Enterprise's own syndication sheet for the last three MCA agreements.  The loan amounts on those last three were between $1 million and $2 million each.  The first three loan amount were less than $250,000 each.

135.   According to the Enterprise's own internal records, the total fees and expenses incurred for the last three loans were no more than $304 on any one of the loans:

| FEES & EXP |
| --- |
| $4,315.28 |
| $1,165.50 |
| $1,818.78 |
| $ - |
| $277.00 |
| $250.00 |
| $250.00 |
| $304.00 |
| $250.00 |

136.   The Individual Defendants have put forth no evidence to rebut Haymount's evidence showing the actual fees and expenses were any more than a few hundred dollars per loan.

137.   Rather, the only testimony by the Individual Defendants was provided by Wolf, and he described the fees charged as general overhead expenses and overall portfolio risk management. [Day 2 Tr., pgs. 270-272]. Even if the Court were to give any credence to Wolf's

testimony (which it does not), the testimony is an admission that the fees were not costs related to ACH, underwriting or origination.

138.    Furthermore, the Individual Defendants admitted that the underwriting was conducted by Braun, and that Braun did so for free (as incredible as that sounds, it is an admission by the Individual Defendants from which they cannot now retreat). [Day 2 Tr., pgs. 258-261, 296; Day 3 Tr., pgs. 311-313, 382-384].

139.    Accordingly, the Court finds that the Individual Defendants overcharged Haymount the following for excess fees:

| MCA 1 | $39,000 |
|-------|---------|
| MCA 2 | $49,000 |
| MCA 3 | $29,000 |
| MCA 4 | $99,000 |
| MCA 5 | $99,000 |
| MCA 6 | $199,000 |
| **TOTAL** | **$514,000** |

**ii.    Haymount has been injured by overcollection.**

140.    On MCA 1, the payback amount was $275,000.  The Individual Defendants' own records show that they over-collected by $31,558. [D. Ex., 6]. This amount, however, was refunded in two increments on October 28, 2021, and November 1, 2021. Haymount is not claiming overcollection on this loan.

141.    On MCA 2, the payback amount was $349,750.  The Individual Defendants' own records show that they over-collected by $2,250. [D. Ex., 8].

142.    On MCA 3, the payback amount was $224,850.  The Individual Defendants' own records show that they over-collected by $150. [D. Ex., 8].

143.    On MCA 4, the payback amount was $1,350,000.  The Individual Defendants' own records show that they over-collected by $50,071. [D. Ex., 10].

144.     On MCA 5, the payback amount was $2,700,000.  It is undisputed, however, that the Individual Defendants advanced only $900,000.  The Individual Defendants claim that the actual amount funded was $1,125,000 based on convoluted ex post facto math contained in the Yisroel Getter affidavit submitted to this Court on March 16, 2022.

145.     The Court concludes that the affidavit was fraudulent and was submitted at the direction of the Individual Defendants.  Nor does the Court give any credence to Wolf's testimony before this Court that internal records squarely refuting the representations made to this Court were mere internal errors that went uncorrected. [P. Ex., 270 (noting an internal refund of $170,000)].

146.     The Court finds that both the affidavit submitted to this Court and the Wolf testimony provided to the Court at trial were false.

147.     Accordingly, the Court finds that the payback amount on MCA 5 was $1,350,000 (exactly half the payback amount in light of advancing only half the amount required), and thus, the Individual Defendants' over-collected on MCA 5 in the amount of $170,000.

148.     The Court finds that the total amount over-collected is:

| | |
|---|---|
| MCA 2 | $2,250 |
| MCA 3 | $150 |
| MCA 4 | $50,077 |
| MCA 5 | $170,000 |
| **TOTAL** | **$222,477** |

**iii.     Haymount has been injured by underfunding.**

149.     The first measure of damages would be to recharacterize the MCA Agreements as loans and use the interest rate agreed upon the parties as the measure of damages. A second measure of damages would be to use the North Carolina default statutory rate for breach of contract, which is 8%. A third measure of damages would be to exclude all interest based on the Individual Defendant's material breach by not funding the amount promised.

150.     Notably, this third measure of damages could be used even if the Court did not recharacterize the transactions as loans.  If the transactions were true sales (which they were not), the Individual Defendants were never entitled to the Purchase Amount because they failed to pay the Purchase Price.  Clearly, the Individual Defendants cannot get the benefit of a discounted Purchase Price it never paid.  Nor can the Individual Defendants use Haymount's own money to pay the Purchase Price, which is exactly what happened in effect.

151.     For the sake of choosing the most appropriate measure of damages, the Court has calculated the measure of damages under each of these approaches below.

### iv.     Damages using the contract interest rate.

152.     On MCA 1, the Purchase Price was $200,000 and the Purchased Amount was $275,000.  The Daily Remittance was $7,299.  Haymount was advanced $160,000 on August 25, 2021, through two separate payments of $80,000 on August 30, 2021, and September 15, 2021. Haymount paid $275,000 between August 31, 2021, and November 1, 2021.

153.     On MCA 2, the Purchase Price was $250,000 and the Purchased Amount was $349,750.  The Daily Remittance was $8,000. Haymount was advanced $200,000 through two separate payments of $100,000 on August 30, 2021, and September 15, 2021. Haymount paid a total of $352,000 between August 31, 201, and October 28, 2021.

154.     On MCA 3, 2021, the Purchase Price was $150,000 and the Purchased Amount was $224,850.  The Daily Remittance was $7,500.  Haymount was advanced $120,000 through two separate payments of $60,000 on September 27, 2021, and October 13, 2021. Haymount paid a total of $225,000 between September 28, 2021, and November 8, 2021.

155.     On MCA 5, the Purchase Price was $2,000,000 and the Purchased Amount was $2,700,000.  The Daily Remittance was $80,000. Haymount was advanced $900,000 on December 27, 2021. Haymount repaid $1,520,000 between December 28, 2021, and January 21, 2022.

156.     On MCA 6, the Purchase Price was $1,000,000 and the Purchased Amount was $1,499,990.  The Daily Remittance was $60,000.  Haymount was advanced $800,000 through two separate payments of $400,000 on January 20, 2022, and February 7, 2022.  Haymount paid $1,020,000 between January 20, 2022, and February 11, 2022.

157.     The interest rates on each of the MCA Agreements is readily discernable based on the face of the agreements.  The principal amount is the Purchase Price.  The interest charged is determined by subtracting the Purchase Price from the Purchase Amount.  The term is determined by dividing the Purchase Amount by the Daily Remittance Amount.  The interest rate is determined by dividing the interest charged by the principal, multiplying that amount by 365 days, and then dividing that amount by the number of days of the term.

158.     Using this formula, the interest rate on the MCAs is as follows:

| MCA 1 | 364% |
|-------|------|
| MCA 2 | 466% |
| MCA 3 | 607% |
| MCA 5 | 379% |
| MCA 6 | 729% |

159.     In five of the six MCA loans, the Individual Defendants only advanced half the amount required by contract, and then only advanced the second half once Haymount had already repaid the first advance. The Court would not allow any interest to be charged on the second advances because it would have the effect of Haymount having to pay the Individual Defendants interest to borrow Haymount's own money. This abhorrent practice of "flexing" or "shorting" has resulted in two recent judgments against Braun and his MCA companies by both the New York Attorney General and the Federal Trade Commission.

160.     The practice was found to be a deceptive and unfair practice under Section 5(a) of the Federal Trade Commission Act. *See FTC v. Braun*, 2024 U.S. Dist. LEXIS 20535, *31

(S.D.N.Y. Feb. 6, 2024) ("The evidence thus shows that Mr. Braun violated the GLB Act 942 times (by over-collecting on 396 deals and underfunding 546 deals)").

161.    The practice was also found to be a fraudulent practice under New York Executive Law § 63(12). *See People v. Richmond Capital Group LLC*, 2023 N.Y. Misc. LEXIS 5511, *9 (N.Y. Sup. Ct. Sept. 15, 2023) ("There are no issues of fact that the Predatory Lenders engaged in fraudulent and illicit conduct in violation of New York State law. …In addition, the amount actually funded to the Borrowers was not the full amount that was 'purchased.' It was also false that there would be a daily sweep of the pledged accounts based on an estimated percentage of collected receivables — the so-called 'Specified Percentage.'"); *see also People v. Richmond Capital Group LLC*, 2024 N.Y. Misc. LEXIS 609, *4 (N.Y. Sup. Ct. Feb. 6, 2024) (entering record setting $77 million judgment against Braun and his co-conspirators).

162.    Notably, the New York Attorney General also obtained an injunction against the Corporate Defendants here. *See* NYCEF, Index No. 451368/2020 [D. Ex., 797] (emphasis added):

> ORDERED that, pending a final determination of the Amended Petition, Mr. Braun, his agents, employees, or any other person under his control are enjoined from (i) participating in the business of advertising, marketing, soliciting, brokering, consulting, offering, or servicing merchant cash advances, purchases of receivables, factoring, loans, or any other type of business financing (collectively, hereinafter Business Funding), including by receiving compensation or other financial benefit from or participating in the operation and/or management of **Merchant Capital LLC**, Matrix Advance LLC, **GoFund Advance LLC**, BBF Partners, **Tailored Fund Cap, LLC**, MapCap Advance LLC (d/b/a Go Fund Advance, LLC, **Alt Capital Source**, Eleven Capital, Cannon Advance, Viking Capital, and *Funding 123, LLC*), Fundura Capital Group, LLC, Bridge Funding Cap LLC (d/b/a Skyfall Funding), **Hartford Receivables, GSS Equity, and Alpha Recovery Partners** and (ii) collecting on or attempting to collect or assigning the right to collect on or debiting, attempting to debit or causing to be debited the bank accounts of any business or person pursuant to a Business Funding agreement.

163.    These are public filings to which the Court takes judicial notice.

164.    On MCA 1, Haymount had use of $81,000 over 61 days.[3] The annual interest amount is $294,840 or $808 per day. The total interest permitted was $49,288, and the total interest charged was $75,000.  Haymount's damages for underfunding on MCA 1 is $25,712.

165.    On MCA 2, Haymount had use of 101,000 over 58 days.  The annual interest amount is $470,660 and $1,289 per day.  The total interest permitted was $74,789, and the total interest charged was $99,750.  Haymount's damages for underfunding on MCA 2 is thus $24,961.

166.    On MCA 3, Haymount had use of $61,000 over 41 days.  The annual interest amount is $370,270 and $1,014 per day.  The total interest permitted was $41,591, and the total interest charged was $75,000.  Haymount's damages for underfunding on MCA 3 is $25,712.

167.    On MCA 5, Haymount had use of $901,000 over 24 days. The annual interest amount is $3,414,790 and $9,356 per day.  The total interest permitted was $224,534, and the total interest charged was $350,000. Haymount's damages for underfunding on MCA 5 is $125,466.

168.    On MCA 6, Haymount had use of $401,000 over 18 days. The annual interest amount is $2,923,290 and $8,009 per day.  The total interest permitted was $144,162. The total principal and interest permitted is thus $944,162. Haymount repaid $1,020,000.  Haymount's damages for underfunding on MCA 6 is $75,338.

169.    The total damages under this measure of damages is as follows:

| MCA 1 | $25,712 |
| MCA 2 | $24,961 |
| MCA 3 | $25,712 |
| MCA 5 | $125,266 |
| MCA 6 | $75,338 |
| **Total** | **$276,989** |

---

[3] The total amount includes the $1,000 in fees permitted under the contract.

### v.   Damages using North Carolina default rate of 8%.

170.   On MCA 1, Haymount had use of $81,000 over 61 days.  The annual interest amount is $6,480 and $17.75 per day.  The total interest permitted was $1,083, and the total interest charged was $75,000.  Haymount's damages for underfunding on MCA 1 is thus $73,917.

171.   On MCA 2, Haymount had use of 101,000 over 58 days.  The annual interest amount is $8,080 and $22.14 per day.  The total interest permitted was $1,283, and the total interest charged was $99,750.  Haymount's damages for underfunding on MCA 2 is thus $98,467.

172.   On MCA 3, Haymount had use of $61,000 over 41 days.  The annual interest amount is $4,880 and $13.37 per day.  The total interest permitted was $548, and the total interest charged was $75,000. Haymount's damages for underfunding on MCA 3 is $74,452.

173.   On MCA 5, Haymount had use of $901,000 over 24 days, inclusive of permitted fees of $1,000.  The annual interest amount is $72,080 and $197.48 per day. The total interest permitted was $4,739, and the total interest charged was $350,000. Haymount's damages for underfunding on MCA 5 is $345,261.

174.   On MCA 6, Haymount had use of $401,000 over 18 days. The annual interest amount is $32,080 and $87.89 per day.  The total interest permitted was $1,582 and the total interest charged was $499,990.  Haymount paid $20,000 over the amount permitted, and thus, Haymount's damages would be $18,418.

175.   The total damages under this measure of damages are as follows:

| | |
|---|---|
| MCA 1 | $73,917 |
| MCA 2 | $98,476 |
| MCA 3 | $44,452 |
| MCA 5 | $345,261 |
| MCA 6 | $18,418 |
| **Total** | **$580,524** |

### vi. Damages using material breach.

176. The measure of damages using material breach is far simpler. It is the Purchase Amount minus the Purchase Price.

177. The damages under this method are as follows:

| MCA 1 | $75,000 |
|-------|---------|
| MCA 2 | $99,750 |
| MCA 3 | $74,850 |
| MCA 5 | $350,000 |
| MCA 6 | $20,000 |
| **Total** | **$619,600** |

178. After considering each measure of damages, the Court concludes that using material breach as the measure of damages is most consistent with North Carolina law.

### vii. Haymount has been injured by the UCC Lien Letters.

179. On February 7, 2022, Haymount instructed the Individual Defendants to cease debiting its account and placed a block on its account. [Day 4 Tr., pgs. 442-444].

180. Despite instructing Defendants to cease debiting its account, Defendants continued debiting Haymount's account through at least February 11, 2022. [DE 232 (Consent Order)].

181. Defendants filed this action on February 14, 2022. [DE 1]. In response, the Individual Defendants asked their lawyer in Connecticut to freeze Haymount's bank accounts. But Braun advised that Alfin could not freeze bank accounts if there was a preexisting lawsuit:

On Tue, Feb 15, 2022 at 3:01 PM Underwriting | Alt Capital Source <uw@altcapitalsource.com> wrote: jared says he cant file for us , cause it would be dismissed, based on law suit. serving based on receivables, isnt the same thing correct?

182. Unable to abuse the Connecticut prejudgment attachment statute, the Individual Defendants used Brezel's alter ego Alpha Recovery to send UCC lien letters that resulted in Haymount's access to the Health Resources and Services Administration's ("HRSA") claim submission portal being frozen. [P. Ex., 27, 25, 78, 130, 153].

183.     The address on the letter and UCC Filings for GoFund was:



184.     And the date of the UCC filing attached to the letter was August 30, 2021, meaning it could not have been the UCC associated with MCA 6. [P. Ex., 27]. Rather, it had to be the UCC filed in connection with MCA 2, which was fully repaid at the time. [P. Ex., 42 ("UCC Terminated")].

185.     The UCC liens served by the Individual Defendants had a variety of negative effects on Haymount's ability to submit claims and receive payment from the government for patients who were treated by Haymount and did not provide insurance information or were uninsured. [Day 4 Tr., pgs. 450-463].

186.     When an individual without insurance receives treatment from Haymount, Haymount in turn submits the patient's pertinent information to HRSA, which was a government program that reimbursed health care providers who offered COVID-19 testing and treatment to patients without insurance. [Day 4 Tr., pgs. 451].

187.     Typically, Haymount would submit insured patient information to HRSA's portal, which verifies that the patient is uninsured, and once that verification is made, Haymount can submit a claim to HRSA for processing and reimbursement.  [*Id.*, pgs. 451-452].

188.     Based on Haymount's historical recovery for claims submitted through HRSA, it at a minimum can expect to recover 18% of the total value of those claims. [*Id.*, pgs. 460-462].

189.     In 2020, Haymount submitted 2,528 claims totaling $1,167,402.  Haymount was paid $341,068 for an average of 29%. [*Id.*, pg. 462].

190.    In 2021, Haymount submitted 24,799 claims totaling $27,486,931.  Haymount was paid $5,192,684 for an average of 19%. [*Id.*].

191.    In 2022, Haymount submitted 13,267 claims totaling $17,103,659.  Haymount was paid $3,034,179 for an average of 18%. [*Id.*].

192.    As a direct result of the UCC liens, Haymount was frozen out of the HRSA portal and could no longer submit claims. [P. Ex., 130, 153 ("we locked up HRSA"); Day 4 Tr., pgs. 450-452]. The intentional freeze resulted in Haymount being unable to submit a total of 8,460 claims to the HRSA portal, which represented thousands of manhours, testing, exams and other services and expenses Haymount incurred in caring for the uninsured during the COVID-19 pandemic.

193.    Defendants' freeze of Haymount's ability to submit claims to the HRSA portal was not lifted until March 25, 2022, after the HRSA portal permanently closed. [Day 4 Tr., pgs. 457-458].

194.    Haymount submitted a spreadsheet containing its HRSA business records at trial, which showed $9,822,942.72 in submitted claims and $9,783,232.72 unreimbursed claims. [P. Ex., 286, 287; Day 4 Tr., pgs. 452-456]. After deducting for the 29 claims submitted after March 22, 2022, the total is $9,723,105.44. [P. Ex., 286].

195.    Using the lowest of the three-year averages of 18%, Haymount suffered damages of $1,750,159.

### viii.    Haymount is entitled to prejudgment interest.

196.    N.C. Gen. Stat. § 24-5(a) provides:

> In an action for breach of contract, except an action on a penal bond, the amount awarded on the contract bears interest from the date of breach. The fact finder in an action for breach of contract shall distinguish the principal from the interest in the award, and the judgment shall provide that the principal amount bears interest until the judgment is satisfied.

-33-

197. As calculated above, the contract rates range from 364% to 729%.

198. For simplicity's sake, Haymount is only seeking prejudgment interest from February 7, 2022, the date in which Haymount made its last payment.

199. The prejudgment interest shall be calculated by the clerk from February 7, 2022, to the date of entry of this Decision and Order.

200. The prejudgment interest calculations are as follows:

| MCA# | Interest Rate | MCA Damages | Per Day |
|------|---------------|-------------|---------|
| MCA 1 | 364% | $114,000 | $1,137 |
| MCA 2 | 466% | $151,000 | $1,927 |
| MCA 3 | 607% | $104,000 | $1,730 |
| MCA 4 | 332% | $149,077 | $1,356 |
| MCA 5 | 379% | $619,000 | $6,427 |
| MCA 6 | 729% | $219,000 | $4,374 |
| **Total** | | **$1,356,077** | |

201. The HRSA prejudgment interest rate relates to MCA 6, which had an interest rate of 729%. The annual prejudgment interest amount is $34,955 per day. Notably, this number pales in comparison to the daily amount the Individual Defendants were taking from Haymount. From December 27 through January 20, 2022, the Individual Defendants took ***$115,000 per day***. And on January 20, 2022, and January 21, 2022, the Individual Defendants debited ***$175,000 per day***. [D. Ex., 10, 12, 14].

Dated:  March 7, 2024

Respectfully Submitted,

**WHITE AND WILLIAMS LLP**
Shane R. Heskin

Justin E. Proper
Alex D. Corey
7 Times Square, STE 29
New York, NY 10039
Tel: (215) 864-7000

Attorneys for Plaintiffs