**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAYMOUNT URGENT CARE PC and ROBERT A. CLINTON, JR., *individually and on behalf of all those similarly situated*,<br><br>    Plaintiffs,<br><br>  v.<br><br>GOFUND ADVANCE, LLC, FUNDING 123, LLC, MERCHANT CAPITAL LLC, ALPHA RECOVERY PARTNERS, LLC, YITZCHOK ("ISSAC") WOLF, JOSEF BREZEL, JOSEPH KROEN, AND YISROEL C. GETTER,<br><br>    Defendants. | Civil Action No.   1:22-cv-01245-JSR |

**PLAINTIFF HAYMOUNT URGENT CARE PC'S**
**<u>PROPOSED CONCLUSIONS OF LAW</u>**

**WHITE AND WILLIAMS LLP**
Shane R. Heskin
Justin E. Proper
Alex D. Corey
7 Times Square, STE 29
New York, NY 10039
Tel: (215) 864-7000
*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

I.    SUMMARY OF FINDINGS OF FACT AND CONCLUSIONS OF LAW.......................1

II.    PROPOSED CONCLUSIONS OF LAW ..................................................................3

    A.    Haymount is only required to pay actual fees incurred. ................................3

    B.    Defendants' material breach excused the obligation to pay any interest.................4

    C.    The limitations of damages provision has been waived and is unenforceable. .......5

    D.    Haymount is entitled to prejudgment interest at the contract rates.........................6

    E.    Haymount has proven all elements to pierce the corporate veil. .............................7

III.    HAYMOUNT MAY AMEND ITS PLEADINGS TO CONFORM WITH THE
EVIDENCED AT TRIAL UNDER RULE 15(b)(1) ....................................................10

    A.    Standard. ................................................................................................10

    B.    Haymount has proven all elements of a RICO claim. ..........................................13

        i.    The Individual Defendants Are Culpable Persons Under RICO. .............13

        ii.    The Individual Defendants, Braun, And The Corporate Defendants
Constitute A RICO Enterprise. ..................................................................13

            a.    The Enterprise's common purpose was to collect upon its
predatory loans through sham shell companies and use of
interstate wires. ..............................................................................13

            b.    The Enterprise Members all have relationships among each
other. ...............................................................................................14

            c.    Haymount has established longevity. .............................................15

        iii.    The Individual Defendants participated in a RICO Enterprise.................15

        iv.    The Enterprise engaged in a pattern of racketeering. ...............................15

        v.    The Enterprise has and will continue to engage in Racketeering. .............16

        vi.    The Enterprise has and will continue to commit wire fraud.....................17

        vii.    Haymount has been damaged by wire and mail fraud..............................17

    C.    The MCAs are loans as a matter of law..............................................................18

        i.    The MCAs are loans in substance and in form. .........................................18

        ii.    The reconciliation provision is a sham. .....................................................19

        iii.    The Enterprise intended the MCAs to have finite terms............................19

        iv.    The Enterprise's warrant that remittances are "Good Faith
Estimates" of the merchant's receivables is demonstrably false. ..............20

        v.    Haymount retained control over its receivables and assumed all
risk........................................................................................................20

        vi.    The MCAs provided full recourse under virtually any and all
circumstances, including bankruptcy..........................................................22

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Ada Liss Grp. v. Sara Lee Corp.*,
No. 06CV610, 2010 U.S. Dist. LEXIS 59691 (M.D.N.C. Apr. 28, 2010) .............................25

*Adar Bays v. GeneSYS ID, Inc.*,
37 N.Y.S.2d 320 (2021) ..................................................................................................15

*Angelo Tomasso, Inc. v. Armor Const. & Paving Inc.*,
447 A.2d 406 (Conn. 1982) ............................................................................................12

*ARP Films, Inc. v. Marvel Entm't Grp., Inc.*,
952 F.2d 643 (2d Cir. 1991) ...........................................................................................23

*Beck v. City of Durham*,
154 N.C. App. 221, 573 S.E.2d 183 (N.C. Ct. App. 2002) ...............................................25

*Blue Ridge Pub. Safety, Inc. v. Ashe*,
712 F.Supp.2d 440 (W.D.N.C. 2010) ...............................................................................25

*Boyle v. U.S.*,
556 U.S. 938 (2009) .........................................................................................................6

*Burns v. Imagine Films Entm't, Inc.*,
198 F.R.D. 593 (W.D.N.Y. 2000) .....................................................................................24

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) .........................................................................................................6

*Courtland Steet Recovery Corp. v. Bonderman*,
96 N.E.3d 191 (N.Y. 2018) ......................................................................................11, 12

*Crawford v. Franklin Credit Mgmt.*,
758 F.3d 473 (2d Cir. 2014) ..........................................................................................8, 9

*Crystal Springs Capital Inc. v. Big Thicket Coin, LLC*,
220 A.D.3d 745 (2d Dep't 2023) ....................................................................................15

*Davis v. Richmond Capital Group*,
194 A.D.3d 516 (1st Dep't 2021) ...............................................................................15, 17

*Delo v. Paul Taylor Dance Found., Inc.*,
2023 U.S. Dist. LEXIS 133712 (S.D.N.Y Aug. 1, 2023) ....................................................4

*DePetris v. Traina,*
211 A.D.3d 939 (N.Y.S.2d 2022) ......................................................................13

*E. Market St. Square, Inc. v. TyCorp Pizza IV, Inc.,*
625 S.E.2d 191 (N.C. App. 2006) ....................................................................15

*Endico Potatoes, Inc. v. Git Grp./Factoring, Inc.,*
67 F.3d 1063 (2d Cir. 1995).......................................................................15, 19

*First Capital Asset Mgmt. v. Brickellbush, Inc.,*
218 F.Supp. 2d 369 (S.D.N.Y. 2002)...............................................................11

*Funding Metrics v. NRO Boston, LLC,*
64204/2016, 2019 N.Y. Misc. LEXIS 4878 (Sup. Ct. N.Y. Cnty., Aug. 28,
2019) ..................................................................................................................18

*Glenn v. Wagner,*
329 S.E.2d 326 (N.C. 1985).......................................................................12, 14

*Green v. Freedman,*
749 S.E.2d 262 (N.C. 2013)..............................................................................13

*Hall v. Sinclair Refining Co.,*
242 N.C. 707, 89 S.E.2d 396 (1955)................................................................24

*Haymount Urgent Care PC v. GoFund Advance, LLC,*
2022 WL 2297768 (S.D.N.Y. June 27, 2022) ...............................................7, 8

*Hi Bar Capital LLC v. Parkway Dental Servs., LLC,*
533245/2021, 2022 N.Y. Misc. LEXIS 5814 (Sup. Ct. Kings Cnty. Aug. 25,
2022) ..................................................................................................................21

*Hillburn by Hillburn v. Maher,*
795 F.2d 252 (2d Cir. 1986)................................................................................4

*In re O.P.M Leasing, Inc.,*
30 B.R. 642 (Bankr. S.D.N.Y. 1983)..........................................................18, 19

*Jafari v. Wally Findlay Galleries,*
741 F. Supp. 64 (S.D.N.Y. 1990) .....................................................................23

*Knapp Shoes v. Sylvania Shoe Manufacturing Corp.,*
15 F.3d 1222 (1st Cir. 1994).............................................................................24

*Lake Mary Ltd. P'ship v. Johnston,*
145 N.C. App. 525, 551 S.E.2d 546 (2001)......................................................23

*Lateral Recovery, LLC v. Cap. Merch Servs.*,
  21-cv-9336 (LJL), 2022 U.S. Dist. LEXIS 181044 (S.D.N.Y. Sept. 30, 2022) .....................15

*Lateral Recovery LLC v. Funderz.Net, LLC*,
  2024 U.S. Dist. LEXIS 10134 (S.D.N.Y. Jan. 19, 2024)..........................................................15

*Lateral Recovery LLC v. Queen Funding, LLC*,
  21-cv-9607-LGS, 2022 U.S. Dist. LEXIS 129032 (S.D.N.Y. July 20, 2022).........................21

*LG Funding, LLC v. Untied Senior Props. of Olathe, LLC*,
  181 A.D.3d 664 (2d Dep't 2020) ..............................................................................................15

*McCree v. City of New York*,
  2023 U.S. Dist. LEXIS 22038 (E.D.N.Y. Feb. 8, 2023)...........................................................5

*Meeker v. McLaughlin*,
  2019 U.S. Dist. LEXIS 55086 (S.D.N.Y. March 31, 2019) ......................................................5

*Morris v. Department of Taxation*,
  623 N.E.2d 1157 (N.Y. 1993)..........................................................................................11, 14

*Naples v. Keystone Bldv. And Development Corp.*,
  990 A.2d 326 (Conn. 2010) ......................................................................................................13

*New Y-Capp v. Arch Cap. Funding, LLC*,
  18-cv-3223, 2022 U.S. Dist. LEXIS 180309 (S.D.N.Y. Sept. 30, 2022) ...............................15

*Parks v. N.C. Dep't of Pub. Safety*,
  No. 5:13-CV-74-BR, 2014 U.S. Dist. LEXIS 944, 2014 WL 32064 (E.D.N.C.
  Jan. 6, 2014)..............................................................................................................................25

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*,
  37 N.Y.3d 591 (2021) (Wilson, J., dissenting) .......................................................................15

*Provectus Biopharmaceuticals, Inc. v. RSM US LLP*,
  2018 NCBC LEXIS 101 (N.C. Super. Ct. Sept. 28, 2018)......................................................24

*Rahanian v. Ahdout*,
  258 A.D.2d 156 (1st Dep't 1999) .............................................................................................17

*Richmond v. Indalex Inc.*,
  308 F.Supp.2d 648 (M.D. N.C. 2004) ......................................................................................13

*Sedima, S.P.R.L. v. Imrex*,
  473 U.S. 479 (1985)....................................................................................................................5

*Settlers Edge Holding Co., LLC v. RES-NC Settlers Edge, LLC*,
  250 N.C. App. 645 (2016) ........................................................................................................23

*Simon v. United States*,
    891 F.2d 1154 (5th Cir. 1990) ................................................................24

*Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*,
    17 F. Supp. 3d 207 (E.D.N.Y. 2014) ........................................................8

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*,
    41 F.3d 1570 (2d Cir. 1994)....................................................................24

*U.S. v. Turkette*,
    452 U.S. 576 (1981)..................................................................................6

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
    822 F.3d 650 (2d Cir. 2016)......................................................................9

*United States v. Cain*,
    671 F.3d 271 (2d Cir. 2012)......................................................................8

*United States v. Gatto*,
    986 F.3d 104 (2d Cir. 2021)....................................................................10

*United States v. Young*,
    232 U.S. 155 (1914)..................................................................................9

*Williams v. Habul*,
    219 N.C. App. 281, 724 S.E.2d 104 (2012)............................................23

**STATUTES**

11 U.S.C.
    § 362........................................................................................................20
    § 541(a)..................................................................................................20

18 U.S.C.
    § 1341........................................................................................................8
    § 1343........................................................................................................8
    § 1961(1)..............................................................................................8, 10
    § 1961(3)....................................................................................................5
    § 1961(4)....................................................................................................6
    § 1961(5)....................................................................................................8
    § 1962........................................................................................................5
    § 1962(c)................................................................................................6, 8
    § 1962(d)....................................................................................................8
    § 1964(c)............................................................................................2, 4, 11

N.C. Gen. Stat. § 24-5(a) ............................................................................24

*North Carolina Corporate Law*, § 2-21 ......................................................12

## OTHER AUTHORITIES

17A Am. Jur. 2d Contracts § 685 (2012) ........................................................23

18 Am.Jur.2d, *Corporations* § 15 (1965) ....................................................12

5 Charles A. Wright et al., Federal Practice & Procedure §1278 (3d ed. 2016)............................24

Fed.R.Civ.P. 15(b)(1).........................................................................1, 4

Federal Rule 8(c).............................................................................24

Rule 15(b) .....................................................................................4

Rule 15(b)(2)...................................................................................5

U.S. Trustee Guidelines. https://www.justice.gov/ust-regions-
    r02/file/region_2_operating_guidelines.pdf/download.........................20

Haymount Urgent Care PC ("Haymount") submits its Proposed Conclusions of Law in support of its claims against GoFund Advance LLC ("GoFund"), Funding 123, LLC ("Funding 123"), Merchant Capital LLC ("Merchant Capital,") (the "Corporate Defendants"), Yitzchakov Wolf ("Wolf"), and Josef Brezel ("Brezel") (collectively, the "Individual Defendants").

## I.     SUMMARY OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

From day one of this action, Haymount has asserted that the Corporate Defendants were sham entities controlled and manipulated by the Individual Defendants as part of a criminal RICO Enterprise. The elements required to prove that the Individual Defendants controlled the affairs of the RICO Enterprise are the same as those required to pierce the corporate veil. At trial, Haymount established all elements required to pierce the corporate veil and hold the Individual Defendants personally liable. Specifically, the Court finds that the Individual Defendants have conspired with each other, and others, to perpetrate a fraudulent scheme designed to abuse the Connecticut prejudgment attachment statute and to disguise their control over the affairs of the Corporate Defendants. Notably, the scheme used here is similar in purpose to a recent RICO grand jury indictment, employing similar predicate acts, such as wire fraud, tax evasion, collection of an extension of credit through extortion, and corruption of justice through witness tampering and perjury. *See* Par Funding Principals Charged in a RICO Indictment in Addition to Pending Charges of Securities Fraud, Extortion, Tax Crimes, Perjury, and Obstruction, Feb. 27, 2024.

The Court further finds that Haymount has proven damages based on the Individual Defendants' breach of contract. Contrary to the Individual Defendants' repeated representations to this Court that its overcollection tactics were "accidental," the evidence at trial established that the Individual Defendants had a pattern and practice of overcollection by intentionally setting up its ACH debits without a stop date. This practice of overcollection was so intentional that the Individual Defendants included this overcollection in their syndications. This overcollection was

identified as a "backend fee" and identified on the syndication sheet as "BEF." In fact, the Individual Defendants over-collected on three of the five MCA loans. Notably, the Individual Defendants over-collected on the first MCA loan by $31,558 and only refunded the money because they were caught by Haymount.  The amount over-collected is $222, 247.

Haymount is also entitled to damages for the overcharging of fees. Appendix A of the MCA loans permitted fees of $1,000 or up to 22% for costs relating to underwriting, ACH setup and/or origination. Haymount has established the actual costs incurred was no more than a few hundred dollars for each of the MCA loans.  The amount of fees overcharged is $514,000.

Haymount is further entitled to damages for intentional underfunding.  Each of the MCA loans contains a provision prohibiting any modification unless it is in writing *and signed by the Corporate Defendants.* Despite this plain language, the Individual Defendants repeatedly underfunded Haymount by either attempting to change the terms on a funding call or through a subsequent modification—*not signed by the Corporate Defendants*. The Individual Defendants therefore intentionally breached five of the six MCA Agreements by not funding the full amount required by contract. Due to this material breach, Haymount had no obligation to pay any interest. Haymount's damages for underfunding is $619,600.

The Court also finds that Haymount is entitled to breach of contract damages as a result of the UCC Lien Letter sent to Haymount's health insurance providers, which prevented Haymount from submitting approximately $9,723,105 in unreimbursed claims. The Individual Defendants knew their conduct would cause the damages sustained because Haymount filed an Order to Show Cause concerning these specific damages. Rather than retract the letters, the Individual Defendants opposed the emergency relief sought. As held by the Court in granting its preliminary injunction, the Individual Defendants had no good-faith basis to send the UCC Letters based on their material

breach by underfunding.  Haymount put on uncontested evidence that its historical reimbursement rate is no less than 18%. Haymount is thus entitled to damages of $1,750,159.

Haymount is also entitled to prejudgment interest.  Under North Carolina law, prejudgment interest is based on the interest rate specified in the contract. The interest rate is readily calculated based on the face of the MCA Agreements. These interest rates range from 364% to 729%. Haymount is thus entitled to prejudgment interest at the agreed interest rates of the parties from February 7, 2022, to the date of this Order.

Finally, the Court again rejects the Individual Defendants' objection to the corporate veil piercing evidence introduced by Haymount at trial. This evidence overlaps with the RICO claims previously asserted in this action, and thus, if the Court were to entertain the objections that the Individual Defendants continue to assert, despite this Court's warning, Rule 15(b)(1) allows Haymount to amend its pleadings to conform to the evidence. If the Court were to permit Haymount to do so in response to this continued objection, Haymount has proven all elements of a RICO claim, and thus, would be entitled to treble damages and attorney's fees.

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Haymount is only required to pay actual fees incurred.

Each of the MCA Agreements allows the Individual Defendants to charge a "Minimum of $500 or up to 12% of the purchase price for underwriting and related expenses" and a Minimum of $500 or up to 10% of the purchase price to cover cost of Origination and ACH/Setup. [Proposed Findings of Fact ("PFF"), ¶ 132]. Under North Carolina law, a reasonableness standard is read into contracts, whereas here, one party has discretion to affect the rights of the other. *See MCI Constructors, Inc. v. City of Greensboro*, 125 Fed. Appx. 471, 477 (4th Cir. 2005) ("[T]he general rule in North Carolina, where a contract confers on one party a discretionary power affecting the

-3-

rights of the other party, is that such a contract is not illusory so long as its interpretation is exercised in an objectively reasonable manner based upon good faith and fair play.").

Extrinsic evidence of the actual amount incurred for these fees is permissible no matter the standard. If the contract terms are read as written, only *actual* costs may be charged. And even if a reasonableness standard is read into the contract, extrinsic evidence would still be permitted to determine whether the fees charged are "reasonably" related to the fees charged. Here, Haymount has established that the actual costs incurred is no more than a few hundred dollars for each of the MCA Agreements. [PFF, ¶¶ 133, 135]. Accordingly, the Individual Defendants were permitted to charge no more than $1,000 per contract in fees.

### B.    Defendants' material breach excused the obligation to pay any interest.

Haymount does not have to pay any interest or factor rate due to the Individual Defendants' material breach by funding only half the amount promised:

> A party may not insist upon the performance of a contract or a provision of it where that party is personally guilty of a material or substantial breach of that contract or provision. The other party's duty to perform is excused by a material failure to perform contractual obligations or a material breach. Therefore, in the case of bilateral contracts, if either party commits a material breach of the contract, the other party should be excused from the obligation to perform further. Such a breach amounts to the nonoccurrence of a constructive condition of the exchange and justifies injured party's suspension of performance and the termination of the contract.

17A Am. Jur. 2d Contracts § 685 (2012); *see also Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. App. 525, 537, 551 S.E.2d 546, 555 (2001) ("The general rule governing bilateral contracts requires that if either party to the contract commits a material breach of the contract, the other party should be excused from the obligation to perform further[.]"); *Williams v. Habul*, 219 N.C. App. 281, 293, 724 S.E.2d 104, 112 (2012) (same); *Settlers Edge Holding Co., LLC v. RES-NC Settlers Edge, LLC*, 250 N.C. App. 645, 659 (2016) (recognizing debtor's claim that "repudiation

is a material breach which excuses them from any performance whatsoever under the loan contract and thus requires dismissal of defendant's counterclaim for breach of contract."); *ARP Films, Inc. v. Marvel Entm't Grp., Inc*., 952 F.2d 643, 649 (2d Cir. 1991) ("Failure to tender payment is generally deemed a material breach of a contract."); *Jafari v. Wally Findlay Galleries*, 741 F. Supp. 64, 67 (S.D.N.Y. 1990) ("The failure to tender payment is a material breach of a contract.").

Here, the material breach is highlighted by the outrageously high interest rates charged, ranging from 364% to 729%. Clearly, Haymount was in desperate need of cash if it was willing to pay these predatory interest rates and it did not get the benefit of its bargain when it was funded only half the amount desperately needed. This material breach is underscored even further by looking at the financial impact of funding only half.  The net effect is that Haymount ended up paying to borrow its own money. The loan terms here required rapid repayment, including payment on the same day of funding, resulting in Haymount paying back the first advance with interest in a matter of weeks. The Individual Defendants would then take the money Haymount just paid back and loan it back to Haymount, and then charge Haymount more interest for the privilege of borrowing back its own money. This practice is outrageous and merits excusing the payment of any interest or factor rate, regardless of how the transaction is characterized.

### C.    The limitations of damages provision has been waived and is unenforceable.

A limitation of damages clause is an affirmative defense that must be pled in the answer. *See Burns v. Imagine Films Entm't, Inc*., 198 F.R.D. 593, 602 (W.D.N.Y. 2000) (citing *Knapp Shoes v. Sylvania Shoe Manufacturing Corp*., 15 F.3d 1222, 1226 (1st Cir. 1994); *Simon v. United States*, 891 F.2d 1154, 1157 (5th Cir. 1990).  The Individual Defendants did not raise limitation of damages as an affirmative defense in their answer.  [DE 102].

It is therefore waived. *See Travellers Int'l, A.G. v. Trans World Airlines, Inc*., 41 F.3d 1570, 1580 (2d Cir. 1994) ("The general rule in federal courts is that a failure to plead an affirmative

defense results in a waiver."); 5 Charles A. Wright et al., Federal Practice & Procedure §1278 (3d ed. 2016) ("[A] failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case."). Nor did the Individual Defendants raise this defense in the pretrial Consent Order. [DE. 232].

But even if the defense was not waived (which it is), the defense does not apply to intentional breaches. *See Provectus Biopharmaceuticals, Inc. v. RSM US LLP*, 2018 NCBC LEXIS 101, *33 (N.C. Super. Ct. Sept. 28, 2018) ("North Carolina case law supports the proposition that parties may contractually limit their risks associated with possible claims for ordinary negligence, *see Hall v. Sinclair Refining Co*., 242 N.C. 707, 709, 89 S.E.2d 396, 397 (1955), but does not provide the same basis for enforcing contractual protections against liability for intentional wrongdoing, *see Ada Liss Grp. v. Sara Lee Corp*., No. 06CV610, 2010 U.S. Dist. LEXIS 59691, at *26-27 (M.D.N.C. Apr. 28, 2010) (noting that no North Carolina decision supports "enforcement of exculpatory clauses for intentional wrongdoing").

The breach of contract here is an intentional tort. *See Parks v. N.C. Dep't of Pub. Safety*, No. 5:13-CV-74-BR, 2014 U.S. Dist. LEXIS 944, 2014 WL 32064, at *5 (E.D.N.C. Jan. 6, 2014) (concluding plaintiff's claim for tortious interference with contractual or prospective business relations was an intentional tort) (citing *Blue Ridge Pub. Safety, Inc. v. Ashe*, 712 F.Supp.2d 440, 447-48 (W.D.N.C. 2010) (under North Carolina law, tortious interference with contract and tortious interference with prospective economic advantage are intentional torts); *Beck v. City of Durham*, 154 N.C. App. 221, 573 S.E.2d 183, 190 (N.C. Ct. App. 2002) (same)).

### D.    Haymount is entitled to prejudgment interest at the contract rates.

N.C. Gen. Stat. § 24-5(a) "authorizes awards of interest on damages resulting from breach of contract from the date of the breach at the rate of interest provided in the contract, or at the legal rate if the parties have not agreed on their own rate. When interest is not made payable on the face

of the instrument, payment of interest will be imposed by law in the nature of damages for the retention of the principal of the debt." *Craftique, Inc. v. Stevens & Co.*, 321 N.C. 564, 568 (1988) (citing *Security National Bank v. Travelers' Ins. Co.*, 209 N.C. 17, 182 S.E. 702 (1935)).

The interest rates on each of the MCA Agreements is readily discernable on their face. The principal amount is the Purchase Price. The interest charged is determined by subtracting the Purchase Price from the Purchase Amount. The term is determined by dividing the Purchase Amount by the Daily Remittance Amount. The interest rate is determined by dividing the interest charged by the principal, multiplying that amount by 365 days, and then dividing that amount by the number of days of the term. This formula results in the following interest rates: (MCA 1=364%), (MCA 2=466%), (MCA 3=607%), (MCA 4=332%), (MCA 5=379%), (MCA 6 =729%). [PFF, ¶ 200]. Haymount is only seeking prejudgment interest from February 7, 2022, the date in which Haymount made its last payment.

### E.  Haymount has proven all elements to pierce the corporate veil.

It is "well recognized" that courts may disregard the corporate form when "the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Courtland Steet Recovery Corp. v. Bonderman*, 96 N.E.3d 191, 203 (N.Y. 2018); *Glenn v. Wagner*, 329 S.E.2d 326, 330 (N.C. 1985) (citing 18 Am.Jur.2d, *Corporations* § 15 (1965)); *Angelo Tomasso, Inc. v. Armor Const. & Paving Inc.*, 447 A.2d 406, 412 (Conn. 1982). To that end, the purpose of the instrumentality rule is:

> [T]o place the burden of the loss upon the party who should be responsible. Focus is upon reality, not form, upon the operation of the corporation, and upon the defendant's relationship to that operation. It is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of facts which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the corporate entity attacked had 'no separate mind, will or existence of its own' and was therefore the 'mere instrumentality or tool' of the dominant corporation.

*Glenn*, 329 S.E.2d at 332; *see also* Russell M. Robinson, II, *Robinson on North Carolina Corporate Law*, § 2-21, at 2.08 (rev. 7th ed. 2006) (emphasizing that the critical consideration is "whether corporateness has been *achieved* and, if so, whether it should be *recognized* for purposes of the matter at issue").  As such, "a plaintiff seeking to pierce the corporate veil must show that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Courtland St. Recovery Corp.*, 96 N.E.3d at 203.

While there is no "exhaustive checklist" of conditions that must be met before disregarding the corporate entity under the instrumentality rule, courts in New York, Connecticut, and North Carolina consider the following factors relevant in deciding whether a corporation is so dominated by its shareholder that the they "abused the privilege of doing business in the corporate form": (1) the absence of corporate formalities; (2) inadequate capitalization; (3) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations are treated as independent profit centers; (8) whether the corporation in question had property that was used by other of the corporations as if it were its own; (9) complete domination and control of the corporation so that it has no independent authority; (10) excessive fragmentation of a single enterprise into separate corporations; (11) non-payment of dividends; (12) non-functioning of other officers or directors; (13) the names of defendant companies are used interchangeably; and (14) the "absence of corporate records." *DePetris v. Traina*, 211 A.D.3d 939, 941, (N.Y.S.2d 2022); *See Green v. Freedman*, 749 S.E.2d 262, 270-71 (N.C. 2013); *Naples v. Keystone Bldv. And Development Corp.*, 990 A.2d 326, 339 (Conn. 2010); *Richmond v. Indalex Inc.*, 308 F.Supp.2d 648, 656 (M.D. N.C. 2004).

The Corporate Defendants had no office, employees, assets, or bank accounts, and were "100 percent" owned by another company, Hartford Receivables, LLC, which also had no office, employees, or assets. [PFF, ¶¶ 51, 58, 73, 77, 80]. Hartford Receivables was created by Kroen on behalf of Getter at the direction of Individual Defendants to "split up some of the filings in Connecticut." *Id.*, ¶¶ 81-83. Just days after its creation, Mr. Kroen transferred 100% ownership of the Corporate Defendants to Mr. Getters' company to shield Individual Defendants from liability. *Id.*, ¶¶ 75, 85. Neither Kroen nor Getter have ever paid rent for the alleged office. *Id.*, ¶ 80. Both admit the Corporate Defendants never paid taxes and had no bank accounts. *Id.*

Every witness admitted that the Individual Defendants controlled the Corporate Defendants, including Wolf himself, who admitted that nobody knows the accounting on the MCAs better than him. *Id.*, ¶ 65. Further, while Mr. Brezel testified that Alpha Recovery was not a real company, New York public records show that it is a d/b/a of "GSS Equity." *Id.*, ¶ 182. The overwhelming documentary and witness evidence at trial firmly establishes that Brezel controls GSS Equity to fund his loansharking enterprise as a mere pass through and that he in fact exercises all decision-making authority over the loans he funds through GSS Equity. *Id.*, ¶¶ 15, 38, 42, 66. This conclusion is buttressed by his private texts explaining: "I made a lot of changes internally to prevent problems. Like entity not being on my name . . . the [Bloomberg] articles gave everyone a good warning." *Id.*, ¶ 83. Numerous other "accomplices" identify GSS Equity as "Brezel's book." *Id.*, ¶ 70, 81, 85.

While the Individual Defendants controlled the finances, practices, and operations of Company Defendants to satisfy the first element of the instrumentality test, it gets worse because the Corporate Defendants literally do not even exist on-paper anymore. On April 23, 2023, while the summary judgment motions were pending before this Court, even the "on-paper" Connecticut

corporate existence was effectively dissolved when their agent filed a Notice of Resignation. *Id.*, ¶ 86; *see also* CT Gen. Stat. § 34-243n(a) ("Each limited liability company and each registered foreign limited liability company shall designate and maintain a registered agent in this state.").

After sufficient control is established, Haymount must show "a wrongful or unjust act toward plaintiff." *Morris*, 623 N.E.2d at 1161. This includes a "violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiffs' legal rights. *Glenn*, 329 S.E.2d at 330. "[P]erformance under a contract" is a sufficient "positive legal duty, the violation of which is a clear 'wrong' done to plaintiffs." *E. Market St. Square, Inc. v. TyCorp Pizza IV, Inc.*, 625 S.E.2d 191, 199 (N.C. App. 2006). Haymount was injured through numerous breaches of contract by the Individual Defendants. [PFF., ¶¶ 149, 179-195].

## III. HAYMOUNT MAY AMEND ITS PLEADINGS TO CONFORM WITH THE EVIDENCED AT TRIAL UNDER RULE 15(b)(1)

### A. Standard.

It is black letter law that a plaintiff is permitted to amend its pleadings to conform to the evidence—even during or after trial. *See* Fed.R.Civ.P. 15(b)(1); *Hillburn by Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir. 1986) (observing that, under Rule 15(b), "(1) a motion to amend the pleadings to conform them to the evidence may be made at any time; (2) if the motion is made during trial, either in response to an objection to evidence concerning issues not raised by the pleadings or without such an objection, it may be granted if the party against whom the amendment is offered will not be prejudiced by the amendment, and it should be granted in the absence of prejudice if the interests of justice so require").

Here, the Individual Defendants were put on notice of the RICO claims and were not otherwise prejudiced. Haymount pled RICO claims from day one, and as demonstrated by the evidence adduced at trial, the elements required to pierce the corporate veil are overlapping. *See*

*New York State Elec. & Gas Corp. v. Secretary of Labor*, 88 F.3d 98, 105 (2d Cir. 1996) ("Relevant to this analysis is whether the unpleaded claim involves the same material facts as the pleaded claims."); *Delo v. Paul Taylor Dance Found., Inc.*, 2023 U.S. Dist. LEXIS 133712, *14 (S.D.N.Y Aug. 1, 2023) ("[W]hen evaluating the viability of a complaint, courts focus on the substance of the factual allegations and not how the causes of action are labeled."); *Meeker v. McLaughlin*, 2019 U.S. Dist. LEXIS 55086, at *15 (S.D.N.Y. March 31, 2019) ("Accordingly, the Court will permit the parties to develop this theory of liability and, if appropriate, permit Plaintiffs to conform their pleading to the evidence before trial").

The Court may also treat the claim as pled under Rule 15(b)(2); *McCree v. City of New York*, 2023 U.S. Dist. LEXIS 22038, *4-5 (E.D.N.Y. Feb. 8, 2023) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.") (citing Fed. R. Civ. P. 15(b)(2)).

Here, the Court placed the Individual Defendants on notice of the RICO claim during its questioning of the very first witness at trial. [PFF, ¶¶ 31-41]. The Individual Defendants were also put on notice that their predicate acts in violation of 18 U.S.C. § 18 U.S.C. § 1512(c)(2) and 2 (obstruction of justice) and 18 U.S.C. § 1512(a)(2)(A),(B)(i) and 2 (tampering with a witness) were at issue when the Court conducted an evidentiary hearing on these knowingly false statements during trial. The Individual Defendants violated 18 U.S.C. § 1512 by causing the Affidavits of Getter, Brezel and Gross to be filed with this Court on March 16, 2022, [DE 57, 58, 60], and the Brezel Affidavit on March 31, 2022 [DE 69].  The Individual Defendants further violated 18 U.S.C. § 1512 when they filed a 56.1 Statement on February 13, 2023, representing the Corporate

-11-

Defendants "are companies that are incorporated in Connecticut engaged in the Merchant Cash Advance ("MCA") business. [DE 179, ¶ 3]. In addition, Haymount placed the Individual Defendants on notice that the elements were the same on day one of the first witness. [PFF, ¶¶ 31-41 (citing *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 163 (2001)), 50-58, 61-64].

In addition, during trial, the Individual Defendants repeatedly violated 18 U.S.C. § 1512 and 18 U.S.C. § 1623 by testifying falsely that the MCA loans were issued by New York entities, not the Corporate Defendants. [PFF, ¶¶ 86-89, 125]. This testimony was knowingly false and was intended to obstruct a civil proceeding. Wolf also gave knowingly false testimony before this Court when he disclaimed involvement with the fraudulent Getter affidavit submitted to this Court. *Id.*, ¶ 97. As a direct result, the Court was required to conduct an evidentiary hearing whereby Wolf's attorneys were called to testify and submit documentary evidence proving the falsity of Wolf's sworn testimony before this Court. *Id.*, ¶¶ 97, 102. This evidence also established that Brezel was part of this conspiracy to corrupt this civil proceeding. *Id.*, ¶ 103.

In short, even if Fed.R.Civ.P. 15(b)(1) did not expressly permit the Court to conform the pleadings to the evidence adduced at trial (which it does), the Court could still conform the pleadings based on its inherent powers to prevent injustice and promote the search for truth. *See Grace v. Rosenstock*, 228 F.3d 40, 51 (2d Cir. 2000) ("Provided a district court has jurisdiction over a case, it possesses 'inherent power' to reconsider interlocutory orders 'when it is consonant with justice to do so.'") (quoting *United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir. 1982)); *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail Rigging, LLC*, 2015 U.S. Dist. LEXIS 15909, 2015 WL 545565, at *2 (S.D.N.Y. Feb. 9, 2015) ("[A] district court also possesses the inherent authority to sua sponte reconsider its own interlocutory orders before they become final.").

**B.      Haymount has proven all elements of a RICO claim.**

Haymount has proven each of the elements necessary to impose RICO liability. *See Sedima, S.P.R.L. v. Imrex,* 473 U.S. 479, 496 (1985).

### i.      The Individual Defendants Are Culpable Persons Under RICO.

A RICO claim requires a "person" who violated Section 1962(a), (b), or (c). 18 U.S.C. § 1962. Section 1961(3) defines a "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Plainly, Wolf, Brezel, Braun, and Alfin are persons under RICO. *See, e.g., Cedric Kushner,* 533 U.S. at 163.

### ii.     The Individual Defendants, Braun, And The Corporate Defendants Constitute A RICO Enterprise.

It is "unlawful for any person any person employed by or associate with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pater of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c). "Enterprise" is defined to include any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associate in fact although not a legal entity." 18 U.S.C. § 1961(4). Courts have defined an association-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *U.S. v. Turkette*, 452 U.S. 576, 583 (1981). A group does not require proof of a strict hierarchy but rather only: (i) "a purpose," (ii) "relationships among those associated with the enterprise," and (iii) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. U.S.*, 556 U.S. 938 (2009).

### a.      The Enterprise's common purpose was to collect upon its predatory loans through sham shell companies and use of interstate wires.

The common purpose of the Enterprise is to collect upon its predatory loans through sham shell companies that permit it to abuse the Connecticut prejudgment statute by extortionate means

-13-

and hide the identity of the Enterprise members through perjury, corruption of civil proceedings, and witness tampering.  [PFF, ¶¶ 37, 91-124].

> **b.      The Enterprise Members all have relationships among each other.**

The Corporate Defendants enter into the agreements with merchants, fund the transactions, and conduct the daily ACH withdrawals [*Id.*, ¶¶ 16, 34-34, 37], while Alpha Recovery acts as their collection arm. *Id.*, ¶¶ 35, 182. These corporate entities share offices, expenses and bank accounts opened in their name or the name of any number of d/b/a's used by these companies to transact business. *Id.*, ¶ 51. The members of these companies also share profits from the companies. *Id.*, ¶¶ 65-66.  The companies share the same bookkeeper and accounting systems. *Id.*, ¶¶ 38, 65.  The Corporate Defendants have "relationships among" themselves constituting an association-in-fact enterprise.

The Individual Defendants are similarly related to each other and the Corporate Defendants and each has a distinct role in the operation of the Enterprise.  The Individual Defendants run the day-to-day operations of the Corporate Defendants and decide which deals get funded, which MCA company will fund which deals and who else may participate in any syndications of the deals. *Id.*, ¶¶ 11, 38, 42, 64-66. They also decide when to double debit and over-collect on merchant accounts. *Id.*, ¶¶ 24-25, 119.  The Individual Defendants also supply the money for the MCA companies to enter the deals and acts as the "enforcer" when necessary. *Id.*, ¶¶ 38, 42, 64-66. Braun is the mastermind of the operation and advises the Enterprise members on all aspects of the fraudulent scheme. *Id.*, ¶ 40. Jared Alfin is the Enterprise's attorney, and he advises the Enterprise on how to abuse the Connecticut prejudgment attachment statute and how to hide the Enterprise members' identities from the public. *Id.*, ¶ 39.

### c.      Haymount has established longevity.

"A party may establish open-ended continuity by alleging predicate acts occurring over a short period of time so long as there is a threat that such conduct will recur in the future. The threat that such illegal conduct will recur in the future exists when: (1) a specific threat of repetition exists, (2) the predicates are a regular way of conducting an ongoing legitimate business, or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." Rakoff & Goldstein, RICO: Civil and Criminal Law and Strategy § 1.04[2] (2021). Here, ACH withdrawals are a regular means of collecting on the MCA agreements. [PFF, ¶¶ 92, 125].

### iii.      The Individual Defendants participated in a RICO Enterprise.

The Individual Defendants are liable as culpable persons under 18 U.S.C. § 1962(c) because they "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). "[T]he RICO defendant must have participated 'in the operation or management of the enterprise.'" *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 224 (E.D.N.Y. 2014). This requires that "the defendant must have had 'some part in directing [the enterprise's] affairs.'" *First Cap. Asset Mgmt., Inc.*, 385 F.3d 159, 176 (2d Cir. 2004), and "has proven to be a relatively low hurdle for plaintiffs to clear." *Id*. Defendants are also liable under 18 U.S.C. § 1962(d) because defendants "agreed with others" to "further an endeavor which, if completed, would satisfy all of the elements of a substantive RICO offense." *United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012). [PFF., ¶ 90].

### iv.      The Enterprise engaged in a pattern of racketeering.

"'Racketeering activity' may consist of any number of criminal offenses, 18 U.S.C. § 1961(1), including mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343." *Crawford v. Franklin Credit Mgmt*., 758 F.3d 473, 487 (2d Cir. 2014).  The pattern

must consist of at least two related predicate acts, 18 U.S.C. § 1961(5), that are related occurring either over a "substantial period of time" or in the past with a "threat of future criminal conduct." *Id.* at 487. Haymount has proven multiple predicate acts, which include: 18 U.S.C. § 1512 (witness tampering and obstruction of justice); 18 U.S.C. § 371 (conspiracy to obstruct justice); 18 U.S.C. § 894 (use of extortionate means to collect on an extension of credit); 18 U.S.C. § 1623 (perjury); 18 U.S.C. § 1961(1) (forgery); 18 U.S.C. § 1341 (mail fraud); and 18 U.S.C. § 1343 (wire fraud).

<h4 style="text-align:center">v.      The Enterprise has and will continue to engage in Racketeering.</h4>

"The mail fraud statute, together with its lineal descendant, the wire fraud statute, has been characterized as the 'first line of defense' against virtually every new area of fraud to develop in the United States."  Jed S. Rakoff, *The Federal Mail Fraud Statute (Part 1)*, 18 Dup. L. Rev. 771, 772 (1980). The crime consists of two elements: (1) "a scheme devised or intended to be devised to defraud, or for obtaining money or property by means of false pretenses," and (2) "for the purpose or executing such scheme or attempting to do so, the placing of any letter in any post office in the United States to be set or delivered by the Post Office Establishment." *Id*. at 817 (citing *United States v. Young*, 232 U.S. 155 (1914)); *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016) (same). Here, the Enterprise has and will continue to commit wire fraud with every UCC lien and writ of attachment they send through the U.S. mails as these devices are used to fleece innocent merchants of money.

Every UCC lien notice the Enterprise delivers through Alpha is fraudulent because, at a minimum, the address attributed to the Corporate Defendants is fraudulent. In addition, Alpha filed dozens of UCC liens against Haymount, including one on February 15, 2022 that fraudulently represented that Haymount owed $488,928,23 on the January 20, 2022 GoFund MCA Agreement [PFF, ¶ 94], when GoFund had (a) admittedly breached this deal by splitting the funding into two halves without written modification of the Agreement; [DE 65] (Brezel's affidavit confirming the

deal's funding was split); and (b) Haymount declining the second $400,000 installment after paying $540,000 back on the first $400,000 installment. [PFF, ¶ 113].

Each time the Enterprise makes an ACH debit or sends a writ of attachment pursuant to the CT Prejudgment Statute, it commits wire and mail fraud because therein, the Corporate Defendants misrepresent that they have legitimate offices in Connecticut. *Id.*, ¶ 98 (sample writs of attachment listing Connecticut addresses). The Individual Defendants admit that the Connecticut offices are shams, whereas all evidence, including testimony from all key Enterprise members, demonstrates the office is an empty vessel explicitly created to use the CT Prejudgment Statue. *Id.*, ¶¶ 51, 58, 77. At the very least, evidence adduced at trial demonstrates multiple *per se* fraudulent writs of attachment that were mailed by the Enterprise, including two writs that contained forged signatures on the affidavits of debt. *Id.*, ¶ 98. Notably, forgery is its own predicate act. 18 U.S.C. § 1961(1).

### vi.    The Enterprise has and will continue to commit wire fraud.

Plaintiffs have established the Enterprise engages in wire fraud by using interstate wires through ACH processing in making each of these withdrawals from the Enterprises location in New York to attack merchants' bank accounts across the U.S., including Haymount in North Carolina. *United States v. Gatto*, 986 F.3d 104, 113 (2d Cir. 2021) (elements of wire fraud). The Individual Defendants used wires to over-debit Haymount's account and submitted multiple knowingly false affidavits to this Court related to these debits and transactions. [PFF, ¶¶ 102, 103].

### vii.    Haymount has been damaged by wire and mail fraud.

Haymount was damaged by wires that over-collected and the fraudulent UCC Letters. Thus, at a minimum, Haymount has established that the Individual Defendants are liable through a pattern of wire and mail fraud in the amount of $3,066,930. *Id.*, ¶¶ 91-94, 140-147; *First Capital Asset Mgmt. v. Brickellbush, Inc.*, 218 F.Supp. 2d 369, 383 (S.D.N.Y. 2002) ("A 'RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of

responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence'") (citation omitted); 18 U.S.C. § 1964(c).

### C.     The MCAs are loans as a matter of law.

For all of the reasons stated by the New York Attorney General in *The People of New York v. Yellowstone, et al*, March 5, 2024, the MCAs here are loans.

### i.     The MCAs are loans in substance and in form.

"When determining whether a transaction is a loan, substance—not form—controls." *Adar Bays v. GeneSYS ID, Inc.*, 37 N.Y.S.2d 320, 335 (2021); *Endico Potatoes, Inc. v. Git Grp./Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir. 1995) (holding whether an assignment of accounts receivable is a loan "depends on the substance of the relationship" between the parties "and not simply the label attached to the transaction"). The hallmark of a loan is that the lender "is absolutely entitled to repayment under all circumstances," or put otherwise, the "principal sum is repayable absolutely." *LG Funding, LLC v. Untied Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 666 (2d Dep't 2020).  There can be no question that the terms and the facts in this case support such a conclusion. *See id.* at 666 (looking at various factors to see if agreement was a loan); *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 37 N.Y.3d 591, 609 n. 2 (2021) (Wilson, J., dissenting); *Crystal Springs Capital Inc. v. Big Thicket Coin, LLC*, 220 A.D.3d 745 (2d Dep't 2023); *Davis v. Richmond Capital Group*, 194 A.D.3d 516, 517 (1st Dep't 2021); *Lateral Recovery LLC v. Funderz.Net, LLC*, 2024 U.S. Dist. LEXIS 10134 (S.D.N.Y. Jan. 19, 2024); *New Y-Capp v. Arch Cap. Funding, LLC*, 18-cv-3223, 2022 U.S. Dist. LEXIS 180309, *10-14 (S.D.N.Y. Sept. 30, 2022); *Lateral Recovery, LLC v. Cap. Merch Servs.*, 21-cv-9336 (LJL), 2022 U.S. Dist. LEXIS 181044, at *113-16 (S.D.N.Y. Sept. 30, 2022).

-18-

### ii.   The reconciliation provision is a sham.

The MCAs each contain a sham reconciliation provision whereby Haymount was restricted to making one reconciliation request per month "within five (5) business days of the close of the calendar month" provided that it complied with any and all of Defendants' documentation request. [P. Ex., 1-6 § 1.4]. In denying Defendants' motion to dismiss, this Court recognized that these limitations could render the reconciliation provision useless if, for instance, Haymount experienced a "mid-month decline in revenues," while also giving Defendants pretext to deny reconciliation for purported lacking documentation. [D. Ex., 86 at 16-17]. The evidence at trial established that the Individual Defendants treated the agreements as absolutely repayable loans regardless of whether Haymount had receivables. In fact, the Individual Defendants intentionally over-debited when they knew Haymount was short on funds and even bet $200 that Haymount would wire in funds from a personal account to cover their debits. [P. Ex., 159].

### iii.   The Enterprise intended the MCAs to have finite terms.

As this Court previously noted, "[w]hile none of the MCA agreements have definite terms . . . the expected duration of the repayment period is readily calculable, since the merchant's total repayment amount due is known, as is the daily remittance amount." [D. Ex., 86 at 16 n. 5]. Defendants perform this exact calculation and routinely describe their MCA agreements as having finite terms as a function of how many fixed daily or weekly Remittances before the Purchased Amount is paid off. [P. Ex., 63 (underwriting reports describing MCA deals as having fixed number of payments)]. When the Enterprise is negotiating the terms of an MCA agreement with a merchant, it does so by describing the agreement has having a finite number of days, weeks or payments, as was the case when negotiating with Haymount. [PFF, ¶ 116]. Finally, whenever Haymount missed a payment due to insufficient funds, Defendants demanded wires from whatever source. Indeed, under the MCA Agreements, the merchant represents and warrants that he will use

the Defendants' funds to "to maintain and grow Merchant's business," thereby demonstrating the Enterprise's expectation that payments will be made within the time determined by the daily payments. [P. Ex., 1-6, ¶ 2.13]. These undisputed facts establish that the Enterprise intentionally structures and treats their MCA Agreements as having definite terms.

### iv.   The Enterprise's warrant that remittances are "Good Faith Estimates" of the merchant's receivables is demonstrably false.

"[D]aily payment rates that did not appear to represent a good faith estimate of receivables" weighs in favor of the MCAs being construed as a loan. *Davis*, 194 A.D.3d at 517. Each MCA provides that the "Remittance is a good faith estimate of Purchased Percentage multiplied by revenues of Merchant." [P. Ex., 1-6 at 1]. A review of the MCAs proves this falsity:

| MCA Company | Date | Remittance | Purchased Percent | Estimated Total Revenue |
|---|---|---|---|---|
| Merchant | 8/25/21 | $7,299 | 45% | $16,220/day |
| GoFund | 8/26/21 | $8,000 | 25% | $32,000/day |
| GoFund | 9/27/21 | $7,500 | 25% | $30,000/day |
| GoFund | 12/16/21 | $35,000 | 45% | $77,778/day |
| Funding 123 | 12/27/21 | $80,000 | 45% | $117,778/day |
| GoFund | 1/20/21 | $60,000 | 45% | $133,333/day |

Defendants' underwriting performed in connection with the MCA loans further **confirms that Haymount had <u>negative</u> net revenue of $1.5 million for the month of December 2021**, yet Defendants still funded—multiple times. [P. Ex., 32, 59]. Thus, all the evidence demonstrates that the Daily Payments were arbitrarily selected, further establishing that the MCAs are loans.

### v.   Haymount retained control over its receivables and assumed all risk.

In a true sale of receivables, "title and risk of loss pass to the buyer-retailer and the buyer is entitled to retain all proceeds of a subsequent sale[.]" *Rahanian v. Ahdout*, 258 A.D.2d 156, 158 (1st Dep't 1999). Accordingly, in instances where the seller retains the right to collect the proceeds of the allegedly purchased receivables, use the allegedly purchased receivables (or a portion thereof), or other indicia of ownership, courts have found the agreement did not constitute a sale.

*Funding Metrics v. NRO Boston, LLC*, 64204/2016, 2019 N.Y. Misc. LEXIS 4878, at *10 (Sup. Ct. N.Y. Cnty., Aug. 28, 2019) ("There is no competent evidence that QFC 'purchased' the NRO's receivables. The NROs retained ownership of the receivables, were required to collect them, bore all the risk of non-collection, gave QFC a guaranty on the money advanced that was absolutely repayable during a fixed time period with calculated interest that exceeds the legal rate"); *In re O.P.M Leasing, Inc.*, 30 B.R. 642, 648 (Bankr. S.D.N.Y. 1983).

None of the MCAs "identify particular revenues or accounts that were supposedly purchased, so there is no transfer of 'risk of nonpayment by any specific customer. Moreover, the MCA agreements leave [Haymount] with the responsibility to collect revenues from all their accounts, and merchants may possess and use those revenues so long as the daily remittances are made." [DE 86] (internal citations omitted). This conclusion is unassailable as it comes from the terms of the Haymount MCA Agreements themselves.  [P. Ex., 1-6 ("[Lender] will debit the Remittance each business day from only one depositing bank account . . . into which **Merchant and Merchant's customers shall remit the Receipts from each Transaction**") (emphasis added)].

The Enterprise also purports to purchase receivables that are either (a) already been "purchased" pursuant to other pre-existing MCA Agreements; or (b) subject to tax liens. [P. Ex., 1-6]. Indeed, the underwriting performed here revealed that Haymount's receivables were subject to tax liens and that Haymount had pre-existing MCA deals at the time Defendants funded— making it impossible for Defendants to purchase anything at all. [PFF, ¶¶ 122-123].

Because Haymount was responsible for collecting its customer's receipts and placing them in the designated account so that the daily Remittance could be processed, it retained the risk of loss arising from a customer's non-payment. The risk remaining with Haymount is memorialized

-21-

by the Agreements themselves: "Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by [Defendant] remains in the Account and will be held responsible for any fees incurred by [Defendant] resulting from a rejected ACH attempt or an Event of Default." [P. Ex., 1-6 at 1] The failure of Haymount's account debtors to repay a purchased receivable has no consequence on the amount due from Haymount to Defendants. *Id.* Indeed, if Haymount's account debtors failed to pay, Haymount still had to pay the Defendants or be subject to default after just two missed payments. *Id.*, Appendix A (H) (definition of "Default Fee"). The MCAs operated as loans because Haymount "remain[ed] liable for the debt and bear[ed] the risk of non-payment by the account debtor, while [Defendants] only bear[ed] the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan." *Endico Potatoes*, 67 F.3d 1063, 1069 (2d Cir. 1995).

At bottom, both the terms of the MCAs and Defendants' conduct demonstrate beyond doubt that Haymount retained full title to all of its receivables and that it was fully responsible, and consequently assumed all the risk, for ensuring it paid each Remittance regardless of where and how the money was generated. That is a loan as a matter of law.

### vi.   The MCAs provided full recourse under virtually any and all circumstances, including bankruptcy.

The absence of bankruptcy as an event of default is "far from dispositive" as to whether the MCAs are loans. [DE 86 at 15]. In any event, the MCAs were structured such that the effects of Haymount declaring bankruptcy would trigger an Event of Default under Agreements, and the Events of Default were defined so broadly as to ensure the Individual Defendants would recover the full Purchased Amount under any and all circumstances.

In bankruptcy, the debtor's property becomes estate property (11 U.S.C. § 541(a)), the debtor must cease using its pre-petition accounts[1] and it can no longer maintain the balance in the Designated Account to make the Daily Payments, and the Enterprise would be blocked from collecting them (11 U.S.C. § 362) and Haymount would be barred from paying its pre-petition debt, all of which constitute defaults under the Agreements. [P. Ex. 1-6 § 1.13(d) (allowing Defendants to declare default if Haymount "interrupts the operation of its business"); § 3.1(j) & (k) (Haymount changing or closing its designated account is an Event of Default); Appendix A (H) (definition of "Default Fee")]. Thus, if Haymount were to file for bankruptcy, it would default under the terms of the MCAs. *CMS*, at \*82 (while a bankruptcy was not a default, merchant sufficiently pled MCA agreement was a loan where "language of agreements could be read to permit occurrence of some other act – such as the interruption of the merchant's business – not to be excused for protection under the Bankruptcy Code.")

Thus, the MCAs operated in such a way that even bankruptcy would entitle Defendants to recourse for the full unpaid Purchased Amount, and this was just one of innumerable ways Defendants could pursue full recourse against Haymount. Indeed, the MCA Agreements defined Events of Default so broadly that a default with full recourse could occur under any conceivable circumstance, including, but not limited to: (i) Haymount missing a single Remittance without giving 24-hour's notice;[2] (ii) Haymount breaching any single "term or covenant" in any one of the six Haymount MCA Agreements, which would trigger simultaneous default under all six; (iii) Haymount interrupting its business; (iv) Haymount makes any changes with its bank "in any way

---

[1] *See* U.S. Trustee Guidelines. https://www.justice.gov/ust-regions-r02/file/region_2_operating_guidelines.pdf/download.  Among other things, a debtor must close all pre-petition books and records and bank accounts.
[2] None of the MCAs proscribe what happens if Haymount *does* give advance 24-hour notice that it will not have sufficient funds to satisfy the daily Remittance, but since reconciliation was illusory as described above, there is no relief from the obligation to pay each Remittance even if notice is given.

that is adverse or unacceptable to" Defendants; (v) Haymount fails to supply Defendants with "copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request[.]" [P. Ex., 1-6 §§ 1.13 & 3.1]

Finally, hidden in Appendix A in each of the Haymount MCA Agreements, is a provision within the listed Default Fee ($5,000 or up to 10% of the funded amount) **that Default is triggered by as little as two bounced Remittances**. [P. Ex., 1-6 Appendix A (H)] Courts have found this exact provision to weigh in favor of construing the MCA agreement as a loan. *See CMS*, 73-74 (ruling agreement to be like a loan where it provided for a default after just two missed payments); *Lateral Recovery LLC v. Queen Funding, LLC*, 21-cv-9607-LGS, 2022 U.S. Dist. LEXIS 129032, *16 (S.D.N.Y. July 20, 2022) (same); *Hi Bar Capital LLC v. Parkway Dental Servs., LLC*, 533245/2021, 2022 N.Y. Misc. LEXIS 5814, *13-14 (Sup. Ct.  Kings Cnty. Aug. 25, 2022) (finding agreement like a loan where merchant was required to maintain sufficient funds in the designated account for the fixed daily payments and two missed payments triggered a default).

If any one of these non-exhaustive Events of Default occurred, Defendants had a slew of available remedies ensuring total recourse against Haymount and its owner Dr. Clinton, including, but not limited to: (i) making the "full uncollected Purchased Amount plus all fees (including reasonable attorney's fees)" immediately due; (ii) enforcing Dr. Clinton's personal guaranty; (iii) fling the pre-signed confession of judgment against Haymount; and (iv) enforcing their security interest in the collateral, which was defined broadly to include all of Haymount's present and future assets and revenue. *Id.* These recourses make the MCAs the very definition of "absolutely repayable" and indicia of a loan; not the same of receivables. Indeed, this District has already ruled substantially similar MCAs issued by Braun—the guru on all things MCA for his cousins Wolf and Brezel and "consultant" to the Enterprise as a whole—were loans because:

> [T]here are virtually no circumstances where, if the accounts receivable would not be sufficient to pay the Purchased Amounts, Richmond would not be absolutely entitled to repayment of that amount by Fleetwood. 'Beyond the superficial hazard associated with a [merchant's] relatively meager chance of success, [Richmond] backed up the risk with [a] personal guarantee and a security interest in [Fleetwood's] property.  Moreover, any default of the Agreements (including [Fleetwood's] closing or bankruptcy) would trigger payment.

*Fleetwood*, 2022 U.S. Dist. LEXIS 100837, at *42-43 (citations omitted).

Moreover, several of the Events of Default entitling Defendants to pursue full recourse against Haymount and Dr. Clinton (through the guaranty) have no bearing on Haymount failing to make payments and could be triggered by the arbitrary whims of Defendants, such as Defendants deeming a change between Haymount and its bank "unacceptable" or Defendants not being satisfied with Haymount's response to a request for card activity documentation. [P. Ex., 1-6 § 1.13(b) & (f)] Defendants' conduct further emphasizes they retained the unilateral discretion to invoke full recourse against Haymount—or any other merchant for that matter—by the fact that they routinely fund merchants knowing they have pre-existing MCA agreements. The Events of Default, the contractual "protections" Defendants gave themselves for full recourse, and Defendants' conduct, all rendered the MCA Agreements absolutely repayable and remove all doubt that they are loans.

Dated:  March 7, 2024

Respectfully Submitted,

*[signature]*

**WHITE AND WILLIAMS LLP**
Shane R. Heskin
Justin E. Proper
Alex D. Corey
7 Times Square, STE 29
New York, NY 10039
Tel: (215) 864-7000

Attorneys for Plaintiffs