UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ HAYMOUNT URGENT CARE PC et ano,      │
│                                      │
│           Plaintiffs,                │
│                                      │
│      -v-                             │
│                                      │
│ GOFUND ADVANCE, LLC et al.,          │
│                                      │
│           Defendants.                │
│                                      │
│                                      │
└─────────────────────────────────────┘
```

22-cv-1245 (JSR)

FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND FINAL JUDGMENT

JED S. RAKOFF, U.S.D.J.

Plaintiffs Haymount Urgent Care P.C. ("Haymount") and Dr. Robert A. Clinton sued defendants GoFund Advance, LLC ("GoFund"), Funding 123, LLC ("Funding 123"), Merchant Capital, LLC ("Merchant Capital"), Alpha Recovery Partners, LLC ("Alpha Recovery"), Yitzchok Wolf, Yosef Brezel, Joseph Kroen, and Yisroel Getter for engaging in debt-collection practices that allegedly violated state and federal law. At the start of this case, plaintiff was asserting six claims against the defendants: (1) a RICO claim premised on the collection of unlawful debts and a pattern of wire fraud; (2) a racketeering conspiracy claim, premised on the same underlying conduct as the substantive RICO claim; (3) a claim seeking a declaratory judgment that a settlement agreement and the merchant cash advance ("MCA") agreements plaintiffs entered into were void; (4) a common law fraud claim for charging excessive fees and extracting unauthorized debits using a misleading name to evade a block on plaintiffs' bank account; (5) a breach of contract claim for underfunding and over-collecting on the MCA agreements; and

(6) a Section 1983 claim for violating due process by abusing Connecticut's pre-judgment attachment statute. See First Am. Compl. ("FAC"), ¶¶ 225-333, ECF No. 28. At the motion to dismiss stage, the Court permitted the RICO, racketeering conspiracy, breach of contract, and Section 1983 claims to move forward; however, the Court dismissed the declaratory relief claim (except as against GoFund related to a settlement agreement) and the common law fraud claim (except as against GoFund relating to the extraction of unauthorized debits using a misleading name to evade a block on plaintiffs' bank account). See 6/27/22 Op. and Order, ECF No. 86.

Then, on summary judgment, the Court entered judgment in favor of defendants on all but the breach of contract claim, which the Court permitted to proceed against all the defendants except for Mr. Getter. See 8/28/23 Op. and Order, ECF No. 216. However, because plaintiffs voluntarily dismissed their claims against Mr. Kroen, the only defendants remaining on the breach of contract claim after summary judgment were Mr. Wolf, Mr. Brezel, Alpha Recovery, GoFund, Funding 123, and Merchant Capital. See Joint Stipulation of Voluntary Dismissal, ECF No. 211. And, as the parties agreed at the start of trial, the only plaintiff on this remaining claim was Haymount. See Joint Pretrial Consent Order, at 1, ECF No. 238.

Accordingly, by the time of trial, only one claim remained for the Court to adjudicate: whether the remaining defendants are liable to Haymount for breaching the six MCA agreements entered into between

Haymount and the corporate defendants (GoFund, Merchant Capital, and Funding 123). <u>See</u> Joint Pretrial Consent Order, at 1-2. Based upon the evidence presented at the bench trial, plaintiff asserts that defendants breached the MCA agreements by: (1) underfunding the agreements through the device of charging excessive fees, as well as by funding the agreements in two tranches; (2) collecting more from plaintiff than defendants were owed under the contracts; and (3) filing an improper UCC lien that resulted in a freeze being placed on Haymount's HRSA account. Plaintiff asserts that not only are the corporate defendants, who are the parties to the MCA agreements, liable for these breaches but also that the individual defendants, Mr. Wolf and Mr. Brezel, are alter egos of the corporate defendants and thus liable for these breaches. For the reasons explained below, the Court finds that GoFund, Funding 123, and Mr. Wolf are liable for breach of contract, but no one else.

I.    <u>Findings of Fact</u>

Based on the exhibits, the trial testimony, and the Court's assessment of the trial witnesses' demeanor and credibility, the Court makes the following factual findings:

**A. <u>Background on the Parties</u>**

1. Haymount is an urgent care facility located in Fayetteville, North Carolina that is owned by Dr. Clinton. Tr. 427:7-11, 429:2-4.[1]

---

[1] Hereinafter, "Tr." refers to the trial transcript.

When the COVID-19 pandemic hit, Haymount needed quick cash to meet the increased demand for testing and monoclonal antibody treatments, so Dr. Clinton entered into six MCA agreements (one with Merchant Capital, one with Funding 123, and four with GoFund), which are at the center of this case. Tr. 428:21-429:1, 430:6-432:10. See Pl. Ex. 1; Pl. Ex. 2; Pl. Ex. 3; Pl. Ex. 4; Pl. Ex. 5; Pl. Ex. 6. Generally speaking, an MCA agreement is a contract whereby a business sells its future receivables to a funder in exchange for immediate cash and then the business pays back a specified amount to the funder over a set period of time. See Tr. 4:22-5:1.

2. Mr. Wolf, one of the two individual defendants remaining in this case, is the owner and sole member of Bridge Funding Capital, LLC ("Bridge Funding"). Tr. 47:24-25, 147:5-21, 198:19-21, 199:2-4, 257:15-23.

3. Mr. Brezel, the other individual defendant remaining in this case, manages and serves as the sole member of Tailored Fund. Tr. 342:16-20, 369:2-4. Mr. Brezel also manages GSS Equity; however, he does not invest his own money or have an equity stake in the company. Tr. 342:16-20, 359:17-360:4.

4. Mr. Brezel and Mr. Wolf worked in separate offices in the same building. Tr. 194:14-195:5.

5. GoFund, Merchant Capital, and Funding 123 are LLCs that were incorporated in Connecticut and are the contracting

counterparties to the MCA agreements at issue in this lawsuit.[2] See Tr. 24:6-9; Pl. Ex. 1; Pl. Ex. 2; Pl. Ex. 3; Pl. Ex. 4; Pl. Ex. 5; Pl. Ex. 6. How those entities came to be incorporated in Connecticut and were used with respect to the six MCA agreements at issue here is a key aspect of this case.

6. Mr. Kroen went to work for Mr. Wolf at Bridge Funding in June of 2020. Tr. 5:12-25, 6:25-7:4, 47:24-25, 143:19-21, 147:5-21, 198:16-21, 199:2-4, 257:15-23. At the end of 2020, Mr. Kroen learned about a Connecticut pre-judgment attachment statute,[3] and eventually, Mr. Wolf and Mr. Kroen decided they wanted to use this statute and thus incorporated it into the MCA agreements they used to fund MCA deals. Tr. 7:25-11:22.

7. To fully accomplish their goal of making use of this Connecticut statute, Mr. Kroen, in June of 2021, spoke with an attorney in Connecticut, Jared Alfin, Esq., about formally incorporating entities in Connecticut. See Tr. 8:12-15, 20:8-10. Subsequently, in June or July of 2021, GoFund, Merchant Capital, and Funding 123 were incorporated in Connecticut so that defendants could utilize Connecticut's pre-judgment attachment statute to collect on debts in MCA deals that went sour. Tr. 24:6-24, 267:8-17, 275:15-18, 282:19-21. When Mr. Kroen formed these entities, he

---

[2] The Court refers to these defendants collectively as the "corporate defendants" or the "Connecticut entities."

[3] The specific statutory provisions that defendants sought to make use of are codified in Section 52-278. See Conn. Gen. Stat. § 52-278 et. seq.

put them in his name, listing himself as the sole member, because Mr. Wolf refused to have the entities put under his name; however, it was Mr. Wolf who provided the funding to set up the entities. Tr. 25:1-2, 25:19-26:5, 55:18-25, 57:1-2, 58:20-59:1, 61:8-17, 266:25-267:7, 267:17-23; Pl. Ex. 210; Pl. Ex. 296.

8. Despite incorporating the entities in Connecticut, at no point in time did GoFund, Merchant Capital, or Funding 123 have any meaningful or practical connection to Connecticut. Pl. Ex. 210, Tr. 56:1-5, 57:3-59:1, 60:13-61:3.[4] Nor for that matter did Mr. Kroen actually own the entities, have bank accounts for the entities in his name, file taxes for those entities, or hire any employees for those entities. Tr. 25:3-15, 33:3-5.[5]

9. Instead, Mr. Wolf and his first cousin, Jonathan Braun, made most of the decisions regarding whether and how the Connecticut pseudo-entities would fund deals and how the Connecticut entities would be nominally used to conduct their business. Tr. 26:10-14, 197:1-5; see also Tr. 401:4-9 (Mr. Brezel testifying that Mr. Wolf controlled the Connecticut entities), 491:4-24 (Mr. Wolf testifying that he "was authorized to make decisions on behalf of

---

[4] For example, when both GoFund Advance and Funding 123 filed lawsuits, their address was listed as 5308 13th Avenue Suite 324, Brooklyn, NY 11219, although this was just another office at which no one actually worked. Pl. Ex. 22; Pl. Ex. 24; Tr. 80:2-81:23.

[5] In fact, while working for Mr. Wolf, Mr. Kroen funded most of his MCA deals through a different company, GoFund R. Capital, but the money to fund those deals still came from Mr. Wolf's bank accounts. Tr. 6:8-24.

the" Connecticut entities). And the Connecticut entities received funding from the bank accounts of Bridge Funding, the New York entity owned by Mr. Wolf, which had d/b/a/s that "match[ed] the names of the Connecticut entities." Tr. 33:6-12, 230:9-231:2; Pl. Ex. 51.

10.     However, after a Bloomberg reporter contacted Mr. Kroen about the Connecticut entities, the on-paper ownership and address of the Connecticut entities was changed. See Tr. 26:15-27:25, 29:12-31:2. First, Mr. Kroen changed the address for all three entities from a P.O. box in Connecticut to an actual office address (500 West Putnam Avenue) in Connecticut, and Bridge Funding paid the rent for that new office space. Tr. 60:3-12, 62:3-15, 63:19-64:4, 64:13-16, 65:7-25; Pl. Ex. 189; Pl. Ex. 190; Pl. Ex. 29. Despite this change of address, there were still no employees nor business transacted in Connecticut. Tr. 64:5-65:6, 119:23-120:19. Next, Mr. Kroen spoke with Mr. Wolf about removing Mr. Kroen's name from the Connecticut entities, and Mr. Wolf instructed Mr. Kroen to put the entities in someone else's name. Tr. 27:23-29:25, 30:19-25. Thereafter, Mr. Getter, who also worked at Bridge Funding, was substituted in Mr. Kroen's place by making Hartford Receivables LLC the new member for the Connecticut entities and making Mr. Getter the sole manager of Hartford Receivables LLC. Tr. 30:5-10, 31:1-20, 66:1-25, 67:23-69:13,

156:18-157:8, 159:14-24, 161:1-19, 169:21-170:1; Pl. Ex. 28; Pl. Ex. 30; Pl. Ex. 293; Pl. Ex. 294.[6]

11.    Despite this purported change in ownership, it was Mr. Wolf and Mr. Braun who continued to control the Connecticut entities, as Mr. Getter had no ability to make any decisions for the Connecticut entities and did not even know Hartford Receivables LLC owned the Connecticut entities. Tr. 158:19-159:13, 176:24-177:22. In fact, Mr. Getter used United Fund, LLC, instead of the Connecticut entities, for most of his deals, and documents for the Connecticut entities were filed without his permission, including annual reports and writs of garnishment that purport to contain Mr. Getter's signature. Tr. 157:9-158:18, 166:23-169:3, 172:21-178:12; see also Pl. Ex. 28; Pl. Ex. 98; Pl. Ex. 231.[7]

12.    In essence, the three Connecticut entities that contracted with Haymount were "shell corporations" that were used as Mr.

---

[6] Mr. Getter had no role in forming Hartford Receivables LLC and was only informed after the fact that this entity had been formed under his name. See Tr. 159:14-161:19, 166:7-20. And while Mr. Getter worked at Bridge Funding, he had no authority to make decisions for Hartford Receivables LLC. Hartford Receivables LLC functioned as a shell corporation (it had no bank accounts, it did not file tax returns, it had no revenue, it had no office, and it had no employees). See Tr. 164:19-165:6, 170:2-15.

[7] Mr. Brezel's control and role with the respect to the Connecticut entities still remains unclear. However, Mr. Brezel did sign settlement agreements on behalf of the Connecticut entities on a few occasions, despite testifying that he could not remember being an authorized signatory for those entities. See Tr. 413:4-420:11. He also admitted that he did not pay or receive any money from the Connecticut entities in connection with the MCA agreements at issue here. Tr. 410:10-17, 412:25-413:3.

Braun and Mr. Wolf pleased. Tr. 25:16-18, 193:9-15, 197:1-5, 275:19-20. Thus, although the Connecticut entities were the named contracting party on all six MCA agreements that Haymount entered into, the Connecticut entities did nothing in connection with the four MCA agreements in which Mr. Wolf was involved.[8] Instead, Bridge Funding performed all the accounting, ACH setup, and collections on those four deals, with Mr. Wolf essentially admitting on the stand that he "controlled" the four MCA deals he was involved in. See Tr. 283:8-285:19, 307:1-13.[9]

### B. **General Structure of the Six MCA Agreements**

13.    The MCA agreements at issue here followed a set structure. In each contract, the Purchase Price was "the amount" of money that defendants were supposed to give upfront to Haymount; the Purchased Percent was the percentage of Haymount's receivables that defendants purchased; and the Purchased Amount was "[t]he amount of receivables" that defendants were "entitled to" receive as repayment. Tr. 96:6-21, 239:22-240:17.

14.    Although each of the MCA agreements at issue here specified a Purchase Price that was to be advanced as one upfront lump sum to Haymount, in practice defendants often sent the Purchase Price

---

[8] As further explained below, Mr. Wolf was involved in the first, fourth, fifth, and sixth contracts that Haymount signed.

[9] Mr. Getter was not involved in the MCA agreements entered into between the Connecticut entities and Haymount. See Tr. 149:3-12, 164:23-25, 191:17-20, 196:1-4.

in two tranches. This was called a "flex" deal. Defendants "flexed" the deal if certain information was discovered during the log-in, which was a "bank verification" that was completed before a deal was funded to determine if the merchant was actually qualified to receive the Purchase Price specified in the contract. See Tr. 218:2-5, 219:24-220:2, 233:18-234:6, 235:3-9. As explained more fully below, for some of the contracts there was a written addendum reflecting the deal was flexed, and for other contracts the deal was flexed without a written addendum. However, regardless of whether there was a written addendum or not, Dr. Clinton understood that flexing was the standard practice. See Tr. 535:15-536:9.

15.   Beyond the fact that each MCA agreement had the same financial structure, the six MCA agreements also had largely identical contractual provisions. Cf. Tr. 97:19-23. As relevant here, each of the six MCA agreements contained a limitation of liability provision, a no-oral-modification provision, an integration clause, and a pre-judgment remedy provision. Specifically, Section 1.9 of the contracts provided that the funder (i.e., the named corporate defendant on the deal) would not be liable to Haymount "for any claims asserted by [Haymount] under any legal theory of lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages." Pl. Ex. 1, § 1.9; Pl. Ex. 2, § 1.9; Pl. Ex. 3, § 1.9; Pl. Ex. 4, § 1.9; Pl. Ex. 5, § 1.9; Pl.

Ex. 6, § 1.9. Second, Section 4.1 stated that "[n]o modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by [the funder]." Pl. Ex. 1, § 4.1; Pl. Ex. 2, § 4.1; Pl. Ex. 3, § 4.1; Pl. Ex. 4, § 4.1; Pl. Ex. 5, § 4.1; Pl. Ex. 6, § 4.1. Third, Section 4.9 provided that, "[t]his Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between [Haymount] and [the funder] and supersede all prior agreements and understandings relating to the subject matter hereof." Pl. Ex. 1, § 4.9; Pl. Ex. 2, § 4.9; Pl. Ex. 3, § 4.9; Pl. Ex. 4, § 4.9; Pl. Ex. 5, § 4.9; Pl. Ex. 6, § 4.9. Fourth and finally, Section 4.13 permitted the funder to use Connecticut's pre-judgment attachment statute in the event Haymount defaulted. Pl. Ex. 1, § 4.13; Pl. Ex. 2, § 4.13; Pl. Ex. 3, § 4.13; Pl. Ex. 4, § 4.13; Pl. Ex. 5, § 4.13; Pl. Ex. 6, § 4.13; see also Tr. 97:2-14.

16.    In addition, each contract had an appendix that disclosed three types of fees that the funder was entitled to charge. First, each contract permitted the funder to charge an underwriting fee, which was supposed "to cover underwriting expenses." Pl. Ex. 1, App. A; Pl. Ex. 2, App. A; Pl. Ex. 3, App. A; Pl. Ex. 4, App. A; Pl. Ex. 5, App. A; Pl. Ex. 6, App. A; see also Tr. 98:24-25. Second, each contract permitted the funder to charge an origination fee, which "usually cover[ed]" costs associated with the broker. Pl. Ex. 1, App. A; Pl. Ex. 2, App. A.; Pl. Ex. 3,

App. A; Pl. Ex. 4, App. A; Pl. Ex. 5, App. A; Pl. Ex. 6, App. A;
see also Tr. 98:25-99:1. The contracts further specified that the
origination and underwriting fees would be deducted upfront from
the Purchase Price that was advanced to Haymount. See Pl. Ex. 1,
at 8; Pl. Ex. 2, at 9; Pl. Ex. 3, at 9; Pl. Ex. 4, at 9; Pl. Ex.
5, at 9l Pl. Ex. 6, at 9. Third and finally, each contract
permitted the funder to charge a default fee. Pl. Ex. 1, App. A;
Pl. Ex. 2, App. A; Pl. Ex. 3, App. A; Pl. Ex. 4, App. A; Pl. Ex.
5, App. A; Pl. Ex. 6, App. A.

17.     For each deal, there would be a funding call. During those
funding calls, Dr. Clinton would try to negotiate the fees that
he would be charged. Dr. Clinton was always charged the amount of
fees that was disclosed on the funding call, and he knew those
fees would be deducted upfront from the Purchase Price that was
advanced to Haymount. Tr. 516:20-517:15, 520:5-17.

18.     Although the total fee amount that the funder could charge
varied between the six agreements, the percentage of the Purchase
Price that the funder could charge in fees was the same across
all the agreements: the underwriting fee could be up to 12% of
the Purchase Price and the origination fee could be up to 10% of
the Purchase Price. Pl. Ex. 1, App. A; Pl. Ex. 2, App. A; Pl. Ex.
3, App. A; Pl. Ex. 4, App. A; Pl. Ex. 5, App. A; Pl. Ex. 6, App.
A. In practice, defendants would usually charge the maximum of
22% in upfront fees, although, as further explained below,
defendants never charged Haymount more than 20% in fees on any of

the deals. See Tr. 270:12-272:25. While the inference is strong that defendants' practice of usually charging the maximum of 22% in upfront fees, as well as the actual charges imposed on Haymount, was highly suspicious, if not outright fraudulent, and was part of defendants' taking unfair advantage of their borrowers' desperate circumstances, this is a breach of contract case where plaintiff bears the burden of proof. Here, even after extensive pre-trial discovery, plaintiff offered no testimony or documentary evidence showing the actual expenses that defendants incurred in connection with the MCA agreements at issue in this case. See Tr. 248:14-23, 249:19-250:3, 253:2-12, 271:1-272:25, 541:23-25.[10]

19.     Although Haymount entered into each of the MCA agreements at issue here with only one named counterparty, it is standard practice in the MCA industry to have multiple entities syndicated into a deal, whereby an entity (other than the one listed as the contractual counterparty) becomes "part of the deal" and "partake[s] . . . in the upside and the downside" of the deal. Tr. 122:18-25; Pl. Ex. 1; Pl. Ex. 2; Pl. Ex. 3; Pl. Ex. 4; Pl. Ex. 5; Pl. Ex. 6; see also Tr. 141:3-6. Syndication is used to

---

[10] Plaintiff attempted to show the actual fees incurred with an internal spreadsheet that reflected information about the fourth, fifth, and sixth contracts at issue here. See Pl. Ex. 131. But no witness was able to testify as to what the numbers meant, and Mr. Kroen testified that this spreadsheet did not reflect the fees and expenses that "were incurred with respect" to the fourth, fifth, and sixth MCA agreements. See Tr. 117:21-23, 424:9-425:4.

spread the risk of a deal going sour. See Tr. 425:13-21. As detailed below, many of the MCA agreements at issue here were syndicated.

### C. **MCA Agreement 1**

20.    Haymount entered into the first MCA agreement (hereinafter referred to as "MCA Agreement 1") with Merchant Capital on August 25, 2021. See Pl. Ex. 1. Pursuant to this agreement, "Merchant Capital purchased 45% of Haymount's future receivables for a Purchase Price of $200,000 and a Purchased Amount of $275,000." Joint Pretrial Consent Order, at 5. See also Pl. Ex. 1, at 1. Haymount was required to repay the Purchased Amount in a daily increment of "$7,299 each business day." Joint Pretrial Consent Order, at 5.

21.    In terms of fees, Merchant Capital was entitled to charge: (1) an underwriting fee of a "[m]inimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses"; and (2) an origination fee of a "[m]inimum of $500.00 or up to 10% of the purchase price to cover cost of Origination and ACHSetup"; and (3) a default fee of "$5,000.00 or up to 10% of the funded amount (if a merchant changes bank accounts or switches to another credit-card processor without [Merchant Capital's] consent, or commits another default pursuant to the Agreement) or bounces more than 2 debits of the Account." Pl. Ex. 1, App. A.

22.     "Haymount was advanced $160,000 on August 25, 2021, through
two separate payments of $80,000 on August 30, 2021 and September
15, 2021." Joint Pretrial Consent Order, at 5. The deal was
"flexed" into two tranches pursuant to a written addendum, which
was signed by Dr. Clinton on Haymount's behalf. See Def. Ex. 23;
Tr. 232:15-233:17, 234:7-22, 235:10-16, 535:4-11. The written
addendum, however, was not signed by Merchant Capital. See Def.
Ex. 23.

23.     Although Dr. Clinton attempted to negotiate the fees on this
deal, he was told the underwriting fees and related expenses would
be higher than $500 because of his history. Tr. 441:25-442:13,
516:20-517:15. Ultimately, Haymount was charged $40,000 in fees,
with $20,000 in fees deducted upfront from each tranche. See Pl.
Ex. 196. The fees charged were thus 20% of the Purchase Price.

24.     Nominally, the contracting party was Merchant Capital.
However, in practice, Bridge Funding handled and funded this deal,
with Mr. Wolf controlling the funds and advances. See Pl. Ex.
124; Tr. 226:19-21, 228:6-13, 262:6-13, 263:21-25, 265:16-266:8.

25.     Ultimately, "Haymount paid $275,000 between August 31, 2021,
and November 1, 2021." Joint Pretrial Consent Order, at 5.
Accordingly, Haymount is not claiming that it was over-charged on
this agreement. See Def. Ex. 4 (reflecting a refund to Haymount);
Pl. Ex. 120 (reflecting that Haymount was owed $31,558); Tr.
308:21-310:5, 314:21-315:18, 443:9-444:7. Again, this is not to

gainsay defendants' overbearing practices; but the issue before
the Court is whether plaintiff has proved breach of contract.

### D. **MCA Agreement 2**

26.    Haymount entered into the second MCA Agreement (hereinafter
referred to as "MCA Agreement 2") with GoFund on August 26, 2021.
See Pl. Ex. 2. Pursuant to this agreement, GoFund "purchased 25%
of Haymount's future receivables for a Purchase Price of $250,000
and a Purchased Amount of $349,750." Joint Pretrial Consent Order,
at 5. See also Pl. Ex. 2, at 1. Haymount was required to repay
the Purchased Amount in a daily increment of "$8,000 each business
day." Joint Pretrial Consent Order, at 5.

27.    In terms of fees, GoFund was entitled to charge: (1) an
underwriting fee of a "[m]inimum of $500.00 or up to 12% of the
purchase price for underwriting and related expenses"; (2) an
origination fee of a "[m]inimum of $500.00 or up to 10% of the
purchase price to cover cost of Origination and ACHSetup"; and
(3) a default fee of "$5,000.00 or up to 20% of the funded amount
(if a merchant changes bank accounts or switches to another credit
card processor without [GoFund's] consent, or commits another
default pursuant to the Agreement) or bounces more than 2 debits
of the Account." Pl. Ex. 2, App. A.

28.    "Haymount was advanced $200,000 through two separate
payments of $100,000 on August 30, 2021, and September 15, 2021."
Joint Pretrial Consent Order, at 5. The deal was flexed into two

tranches pursuant to a written addendum, which was signed by Dr. Clinton on behalf of Haymount. See Def. Ex. 24. GoFund, however, did not sign the written addendum. Id. In total, Haymount was charged $50,000 in upfront fees. See Def. Ex. 24; Joint Pretrial Consent Order, at 5. The fees charged were thus 20% of the Purchase Price.

29.     Nominally, the contracting party was GoFund, but Mr. Brezel testified that in actuality, GSS Equity was the contracting party, with GoFund just acting as a d/b/a of GSS Equity. See Tr. 373:17-375:6. Accordingly, GSS Equity funded the deal, and GSS Equity and Tailored Fund provided management services in connection with this deal. See Tr. 361:1-362:9, 405:3-5.[11] Mr. Wolf was not involved with this deal. Tr. 264:3-7, 311:5-9.

30.     Ultimately, "Haymount paid a total of $352,000 between August 31, 2021, and October 28, 2021." Joint Pretrial Consent Order, at 5. Accordingly, GoFund over-collected $2,250 on MCA Agreement 2. Cf. Def. Ex. 6.[12]

---

[11] The Court completely discounts Mr. Brezel's attempt to walk back his previous admission that he was involved in MCA Agreement 2, as that attempt at backtracking was plainly self-serving and not credible. See Tr. 365:9-19.

[12] It is true that Dr. Clinton's trial testimony established that Haymount initially "bounced" several payments in the course of repaying this deal. Tr. 537:20-23. However, for the first time in its post-trial findings of fact, defendants contend that Defendants' Exhibit 6 shows that defendants were entitled to and did in fact charge Haymount $150 for these bounced payments. See Def. Ex. 6; Def. Proposed Findings of Fact, ¶ 55. However, defendants point to no witness testimony indicating that this is a correct interpretation of Defendants' Exhibit 6, nor for that matter do defendants point to any evidence showing

17

### E. **MCA Agreement 3**

31.     Haymount entered into the third MCA Agreement (hereinafter referred to as "MCA Agreement 3") on September 27, 2021, with GoFund. <u>See</u> Pl. Ex. 3. Pursuant to this agreement, GoFund "purchased 25% of Haymount's future receivables for a Purchase Price of $150,000 and a Purchased Amount of $224,850." Joint Pretrial Consent Order, at 5; <u>see also</u> Pl. Ex. 3, at 1. Haymount was required to repay the Purchased Amount in a daily increment of "$7,500 each business day." Joint Pretrial Consent Order, at 5.

32.     On this deal, GoFund was entitled to charge: (1) an underwriting fee of a "[m]inimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses"; (2) an origination fee of a "[m]inimum of $500.00 or up to 10% of the purchase price to cover cost of Origination and ACHSetup"; and (3) a default fee of "$5,000.00 or up to 20% of the funded amount (if a merchant changes bank accounts or switches to another credit card processor without [GoFund's] consent, or commits another default pursuant to the Agreement) or bounces more than 2 debits of the Account." Pl. Ex. 3, App. A.

---

that, in fact, four payments were bounced (beyond Dr. Clinton's vague testimony). Accordingly, the Court finds that defendants have not established that they were entitled to charge $150 for bounced payments.

33.     "Haymount  was  advanced  $120,000  through  two  separate payments of $60,000 on September 27, 2021, and October 13, 2021," meaning that Haymount was charged $30,000 in upfront fees (i.e., 20% of the Purchase Price). See Joint Pretrial Consent Order, at 5. Although there was no signed addendum reflecting that this deal would be flexed, Dr. Clinton understood that flexing was the standard practice and accepted that this deal would be flexed. See Tr. 535:15-536:9.

34.     Like MCA Agreement 2, nominally, the contracting party was GoFund, but Mr. Brezel testified that again, in actuality, GSS Equity was the contracting party, with GoFund just acting as a d/b/a of GSS Equity. See Tr. 373:17-375:6, 406:1-12. Accordingly, GSS Equity funded the deal, and GSS Equity and Tailored Fund provided management services in connection with this deal. See Tr. 361:1-362:9, 365:1-366:8, 405:3-5, 407:23-408:1. Mr. Wolf was not involved with this deal. Tr. 264:10-19.

35.     "Haymount paid a total of $225,000 between September 28, 2021, and November 8, 2021." Joint Pretrial Consent Order, at 5. Haymount was accordingly overcharged $150. Cf. Def. Ex. 8.[13]

---

[13] Defendants once again urge the Court to find they were entitled to charge $150 for four bounced payments. See Def. Proposed Findings of Fact, ¶ 56; Def. Ex. 8. However, defendants point to no witness testimony showing that four debits did not clear on this deal or explaining that Defendants' Exhibit 8 shows that four debits did not clear. Accordingly, the Court declines defendants' invitation to find that defendants were entitled to charge $150 for bounced payments.

F. **MCA Agreement 4**

36.    Haymount entered into the fourth MCA Agreement (hereinafter referred to as "MCA Agreement 4") on December 16, 2021, with GoFund. See Pl. Ex. 4. Pursuant to this agreement, GoFund "purchased 45% of Haymount's future receivables for a Purchase Price of $1,000,000 and a Purchased Amount of $1,350,000." Joint Pretrial Consent Order, at 5-6; see also Pl. Ex. 4, at 1. Haymount was required to repay the Purchased Amount in a daily increment of "$35,000 each business day." Joint Pretrial Consent Order, at 6.

37.    On this deal, GoFund was entitled to charge: (1) an underwriting fee of a "[m]inimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses"; (2) an origination fee of a "[m]inimum of $500.00 or up to 10% of the purchase price to cover cost of Origination and ACH Setup"; and (3) a default fee of "$5,000.00 or up to 20% of the funded amount (if a merchant changes bank accounts or switches to another credit card processor without [GoFund's] consent, or commits another default pursuant to the Agreement) or bounces more than 2 debits of the Account." Pl. Ex. 4, App. A.

38.    "Haymount was advanced $900,000 on December 16, 2021." Joint Pretrial Consent Order, at 6. Haymount was accordingly charged $100,000 in upfront fees, which was 10% of the Purchase Price.

See Tr. 350:22-25; Pl. Ex. 131 (reflecting a $100,000 bank fee was charged).[14]

39.    Mr. Wolf handled this deal, but GSS Equity (Mr. Brezel's company) was a 50% syndicate in the deal. See Tr. 118:2-13, 264:20-24, 265:20-266:8, 339:13-15 (Mr. Wolf testimony confirming that GSS Equity syndicated this deal), 359:11-16 (Mr. Brezel testimony confirming that GSS Equity syndicated this deal); Pl. Ex. 131.

40.    "Haymount paid a total of $1,400,071.77 between December 17, 2021, and February 10, 2022." Joint Pretrial Consent Order, at 6. Accordingly, GoFund over-collected $50,071.77 on this deal. See Tr. 293:8-22 (Mr. Wolf: "Internal means that we had a different deal and we transfer sometimes payments of a different deal into this deal."); Pl. Ex. 270 (reflecting an internal transfer of $50,000); Def. Ex. 10 (reflecting an overpayment of $50,071.77 on MCA Agreement 4); Pl. Ex. 131 (reflecting a backend fee of $50,071.77 was charged).[15] The Court notes that Mr. Wolf

---

[14] Plaintiff's Exhibit 131 also reflects that unspecified fees and expenses of $250 were incurred in connection with this deal. Pl. Ex. 131; Tr. 117:1-25.

[15] The Court discredits Mr. Wolf's contrary testimony about what the internal transfers in Plaintiff's Exhibit 270 reflect, based on the Court's assessment of Mr. Wolf's dubious demeanor on the stand. See Tr. 294:8-295:22. The Court also completely discredits Mr. Wolf's testimony that he was entitled to charge $50,071.77 as a default fee. Given not only Mr. Wolf's doubtful demeanor on the stand, but also Mr. Wolf's inability to recall what exactly happened, the lack of substantiating documentary evidence, and the fact that the amount charged does not match the amount that GoFund could charge for a default fee under the contract, the Court finds that this claim is a

essentially admitted there was an over-collection on this agreement, when he testified that he applied an over-collection on MCA Agreement 4 to cover a shortfall on the sixth MCA agreement that Haymount entered with GoFund (hereinafter referred to as "MCA Agreement 6"). See Tr. 333:10-335:10.

### G. MCA Agreement 5

41.     Haymount entered into the fifth MCA Agreement (hereinafter referred to as "MCA Agreement 5") on December 27, 2021, with Funding 123. See Pl. Ex. 5. Pursuant to this agreement, Funding 123 "purchased 45% of Haymount's future receivables for a Purchase Price of $2,000,000 and a Purchased Amount of $2,700,000." Joint Pretrial Consent Order, at 6; see also Pl. Ex. 5, at 1. Haymount was required to repay the Purchased Amount in a daily increment of "$80,000 each business day." Joint Pretrial Consent Order, at 6.

42.     On this deal, Funding 123 was entitled to charge: (1) an underwriting fee of a "[m]inimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses"; (2) an origination fee of a "[m]inimum of $500.00 or up to 10% of the purchase price to cover cost of Origination and ACH Setup"; and (3) a default fee of "$25,000.00 or up to 20% of the funded amount

---

total fabrication. See Tr. 317:7-321:11, 351:4-7. Mr. Wolf's claim this was a proper default fee is further undermined by the fact that Dr. Clinton testified that he was never informed that he was in default. Tr. 442:25-443:5.

(if a merchant changes bank accounts or switches to another credit card processor without [Funding 123's] consent, or commits another default pursuant to the Agreement) or bounces more than 2 debits of the Account." Pl. Ex. 5, App. A.

43.     Although the contracting party was nominally Funding 123, Bridge Funding actually ran and funded the deal, with Mr. Wolf controlling those funds and advances. See Tr. 199:12-201:25, 226:19-21, 228:6-13, 264:25-265:7, 265:20-266:8.

44.     This deal was flexed into two tranches after negotiations between defendants and Dr. Clinton. On this deal, the issue of flexing came up because the log-in revealed that Dr. Clinton was taking "multiple other positions in hidden bank accounts" and "was buying crypto [and] watches." Tr. 217:6-218:10, 322:21-323:3, 329:14-18. According to Sarah Beityakov (an independent contractor at Bridge Funding), Dr. Clinton was informed via text message that the deal was going to be flexed. See Tr. 198:5-15, 221:13-22. Dr. Clinton also discussed the flexing of the deal with Mr. Kroen on the funding call. See Tr. 34:1-13, 35:20-36:1. Specifically, on that call, Mr. Kroen told Dr. Clinton that he would be advanced the Purchase Price in two tranches of $800,000 (reflecting that $400,000 or 20% in fees was being charged); however, Dr. Clinton insisted he needed at least $900,000 with the first tranche. Tr. 36:3-8, 85:1-11. Ultimately, Mr. Wolf or Mr. Braun approved sending $900,000 in the first tranche, and Mr. Kroen informed Dr. Clinton that he would be advanced $900,000

initially and then receive a second tranche later. Tr. 36:8-37:11, 85:13-86:1, 250:4-10, Tr. 323:3-9; see also Pl. Ex. 167, Ex. B.[16] Although there was no signed, written addendum reflecting this modification to the contract, when Haymount "was advanced $900,000 on December 27, 2021," Dr. Clinton accepted that amount on behalf of Haymount. See Tr. 221:24-25, 251:2-11, 254:8-12; Joint Pretrial Consent Order, at 6.[17] Accordingly, $100,000 in upfront fees were charged on the first tranche.[18]

45.     However, Haymount was never advanced the second tranche. Even after trial, the exact reason why still remains unclear. Some of the evidence indicates that the second tranche was not advanced because Haymount "missed payments" and "took several other positions." Pl. Ex. 44; Tr. 215:15-21. Other evidence indicates that Haymount did not want the second tranche after it was offered. See Tr. 210:9-23, 215:22-216:1, 224:4-7. Still other

---

[16] As compensation for performing the funding call, Mr. Kroen was "syndicated into the deal," allowing Mr. Kroen to receive 5% of the profits earned from MCA Agreement 5. Tr. 37:12-21, 38:9-15, 39:11-15, 91:11-25; Pl. Ex. 107. In addition, GSS Equity had 45% syndication in the deal, and Bridge Funding had 50% syndication in the deal. Pl. Ex. 107; Pl. Ex. 131; Tr. 92:1-19, 339:13-15, 359:11-16. This meant that GSS Equity, Mr. Kroen's entity, and Bridge Funding were all sharing in the profits of MCA Agreement 5, which would include any fees and over-collections. Tr. 93:5-17.

[17] Despite the deal being flexed, Haymount still paid the $80,000 daily remittance amount, as that payment was not a function of the funded amount but rather was a function of Haymount's revenue. See Tr. 328:6-329:16, 330:7-17, 351:23-352:18.

[18] An internal spreadsheet also reflects that $304 in unspecified fees and expenses were incurred on this deal. Pl. Ex. 131; Tr. 117:1-25.

evidence indicates that Ms. Beityakov sent emails urging that the second tranche should be advanced, which casts doubt on whether there was a valid reason to withhold the second tranche. See Pl. Ex. 52; Pl. Ex. 53; Tr. 223:18-224:24. However, because Haymount does not advance a breach claim based on the failure to fund the second tranche of this agreement, the Court need not resolve the exact reason this money was never advanced.

46.     Ultimately, "Haymount repaid $1,520,000 between December 28, 2021, and January 21, 2022." Joint Pretrial Consent Order, at 6.[19] See Def. Ex. 12; Tr. 331:19-21. Defendants thus over-collected $170,000.[20] See Pl. Ex. 270 (reflecting an internal transfer of $170,000);[21] Pl. Ex. 123 (Mr. Wolf instructing Mr. Kroen to get a

---

[19] Defendants urges the Court to find there were six bounced payments on this deal. See Def. Proposed Findings of Fact, ¶ 58; Def. Ex. 12. Once again, however, defendants have cited to no witness testimony indicating that this is the proper interpretation of Defendants' Exhibit 12. The Court accordingly declines to adopt this proposed finding of fact.

[20] The Court arrived at this amount in the following manner. Originally, defendants were supposed to pay Haymount $2 million (net of fees) and Haymount was supposed to repay $2,700,000. See Pl. Ex. 5, at 1; Joint Pretrial Consent Order, at 6. However, defendants ultimately only advanced half of the purchase price net of fees ($900,000), so the Court finds that plaintiff's repayment obligation should also be cut in half, to total $1,350,000. Because Haymount ultimately paid $1,520,000, defendants over-collected $170,000. The Court further notes that it rejects the calculations set forth in defendants' proposed findings of fact because there is no evidence to show how or why defendants recalculated plaintiff's repayment obligation to be $1,518,750. See Def. Proposed Findings of Fact, ¶ 58.

[21] The Court completely discredits Mr. Wolf's contrary testimony about what the internal transfers in Plaintiff's Exhibit 270 reflect based on the Court's assessment of Mr. Wolf's demeanor on the stand and other circumstances previously noted. See Tr. 294:8-295:22.

wire after Mr. Kroen informed Mr. Wolf that Haymount had repaid more than the $1,350,000 that was owed for the first tranche of the deal); Tr. 293:8-22 (Mr. Wolf: "Internal means that we had a different deal and we transfer sometimes payments of a different deal into this deal."); Tr. 444:9-445:4. The Court notes that Mr. Wolf essentially admitted he over-collected on this deal, testifying that he applied an over-collection on MCA Agreement 5 to cover a shortfall on MCA Agreement 6. See Tr. 333:10-335:10.

### H. **MCA Agreement 6**

47.     Haymount entered into the sixth and final MCA Agreement, MCA Agreement 6, on January 20, 2022, with GoFund. See Pl. Ex. 6. Pursuant to this agreement, GoFund "purchased 45% of Haymount's future receivables for a Purchase Price of $1,000,000 and a Purchased Amount of $1,499,990." Joint Pretrial Consent Order, at 6; see also Pl. Ex. 6, at 1. Haymount was required to repay the Purchased Amount in a daily increment of "$60,000 each business day." Joint Pretrial Consent Order, at 6.

48.     On this deal, GoFund was entitled to charge: (1) an underwriting fee of a "[m]inimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses"; (2) an origination fee of a "[m]inimum of $500.00 or up to 10% of the purchase price to cover cost of Origination and ACH Setup"; and (3) a default fee of "$5,000.00 or up to 20% of the funded amount (if a merchant changes bank accounts or switches to another credit

card processor without [GoFund's] consent, or commits another default pursuant to the Agreement) or bounces more than 2 debits of the Account." Pl. Ex. 6, App. A.

49.    Haymount was advanced $800,000 through two separate payments of $400,000 on January 20, 2022, and February 7, 2022. Joint Pretrial Consent Order, at 6.[22] Although there was no written addendum reflecting that this deal would be flexed, Dr. Clinton understood that flexing was standard practice and ultimately accepted that this deal would be flexed. Tr. 535:15-536:9. Haymount was thus charged $200,000 in upfront fees (i.e., 20% of the Purchase Price). Cf. Pl. Ex. 131.[23]

50.    This was one of Mr. Wolf's deals, but the funding for this deal came from both GSS Equity, which was 50% syndicate on this deal, and Bridge Funding. See Pl. Ex. 32; Pl. Ex. 35; Pl. Ex. 131; Tr. 107:6-108:20, 110:14-22, 265:8-13, 265:20-266:8, 339:13-15, 359:11-16.

51.    Ultimately, "Haymount paid $1,020,000 between January 20, 2022, and February 11, 2022." Joint Pretrial Consent Order, at 6; see also Def. Ex. 14; Tr. 524:5-15. During the course of repaying

---

[22] The Court discounts Dr. Clinton's testimony that he did not want the second tranche of $400,000 based on the fact that Dr. Clinton accepted the second tranche and never returned it. See Tr. 528:16-529:13.

[23] This internal spreadsheet also reflects that $250 in unspecified fees and expenses were incurred in connection with this deal. Pl. Ex. 131; Tr. 117:1-118:1.

this deal, seven of Haymount's payments bounced,[24] and ultimately, Haymount paid $479,990 less than what it owed under the contract. Tr. 524:12-15, 528:14-16.

52.     Because of the shortfall in Haymount's payments on this deal, on February 15, 2022, Mr. Brezel instructed that a UCC restraint be sent out. See Pl. Ex. 78; Pl. Ex. 35; Tr. 109:1-111:14. Dan Gold of Alpha Recovery, which was "[Mr.] Brezel's collection company," then confirmed receipt of Mr. Brezel's request. Pl. Ex. 35; Tr. 111:7-11. A few hours later, Mr. Gold sent an email to Mr. Brezel and Mr. Wolf, among others, confirming that UCC restraints would be sent out to a number of insurance companies. Pl. Ex. 130; Pl. Ex. 153; Tr. 112:7-18. Mr. Wolf approved the UCC notice being sent to all those insurance companies. See Tr. 348:5-22.

53.     One particular UCC lien is most relevant here. On February 15, 2022, a UCC lien was sent to United Healthcare, which stated that Haymount was in default on MCA Agreement 6 in the amount of $488,928.23 and directed United Healthcare to send "all funds owed by [United Healthcare] on behalf of [Haymount], or collected by [United Healthcare] on behalf of [Haymount]" to GoFund "until the amount of $488928.23.00 accrues." Pl. Ex. 27; Tr. 112:19-23. The entity to which this UCC lien was sent "controlled HRSA, which

---

[24] As the numerous bounced payments reflect, Dr. Clinton was in very difficult economic circumstances at this time, which, of course, defendants were happy to take advantage of. Nevertheless, the issue here is not the equities but whether there was a breach of contract.

was a portal used to treat and pay for all the uninsured people
that were being treated for COVID by the government." Tr. 450:22-
451:9. Thus, as a result of this UCC lien, on or about February
24, 2022, Haymount's HRSA account was frozen, which prevented
Haymount from submitting claims for the medical treatment it gave
to uninsured patients. Tr. 451:15-19, 457:1-13.

54.    On March 19, 2022, Dr. Clinton found out that the HRSA
program would be ending on March 22, 2022, and testified that he
had no idea the HRSA program would be ending in advance of that
announcement. Tr. 457:14-16, 546:22-24. Unfortunately, an
injunction from this Court, which would have lifted the freeze on
Haymount's HRSA account, was not received in time to unfreeze
Haymount's account before the HRSA program ended. Tr. 457:20-
458:15. Because the HRSA program ended before Haymount's account
was unfrozen, Haymount was unable to submit and process 8,460
claims. Tr. 451:19-452:16, 456:13-22; see also Pl. Ex. 286.

## II.    Conclusions of Law

Plaintiff Haymount asserts it has proven that the corporate
defendants breached all six MCA agreements, and that the individual
defendants should be held liable for those breaches under an alter ego
theory of liability. Plaintiff also attempts to resurrect its already
dismissed RICO claim, based on the evidence presented at trial. For
the reasons discussed below, the Court declines plaintiff's invitation

to resurrect its previously dismissed RICO claim, but finds GoFund, Funding 123, and Mr. Wolf liable for breach of contract.

## A. **RICO Claim**

The Court starts with plaintiff's attempt to resurrect the already dismissed RICO claim.[25] Federal Rule of Civil Procedure 15 permits "a motion to amend the pleadings to conform them to the evidence" at trial to "be made at any time." Hillburn v. Maher, 795 F.2d 252, 264 (2d Cir. 1986).[26] However, when "the motion is made after trial, and the issues have not been tried with the express or implied consent of the parties, the motion may [only] be granted if the party against whom the amendment is offered will not be prejudiced by the amendment and should be granted in the absence of such prejudice if the interests of justice so require." Id. Plaintiff cannot meet that standard.

To start, it is obvious to the Court that the resurrected RICO claim was not tried with defendants' express or implied consent. That is because: (1) the Court already entered judgment for the defendants

---

[25] To the extent this a thinly veiled attempt to have the Court reconsider its summary judgment decision, the Court declines to do so. The appropriate procedural mechanism would have been a motion for reconsideration, which was never filed and which would now be untimely. Nor has plaintiff shown why it would be appropriate for the Court to exercise its inherent powers to reconsider its dismissal of the RICO claim. Cf. Chartis Seguros Mex., S.A. v. HLI Rail Rigging, LLC, No. 1:11-cv-3238, 2015 WL 545565, at *2 (S.D.N.Y. Feb. 9, 2015) ("Sua sponte reconsideration is appropriate where there is a need to correct a clear error or prevent manifest injustice, there is an intervening change in the applicable law, or new evidence is available.").

[26] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

on the RICO claim at summary judgment; (2) the joint pretrial consent order stated that the <u>only</u> claim remaining to be decided at trial was plaintiff's breach of contract claim; and (3) the issue of whether the evidence presented at trial supported the already dismissed RICO claim was never once raised by plaintiff's counsel at trial. <u>See</u> 8/28/23 Op. and Order, at 23 ("[T]he Court hereby grants partial summary judgment to all defendants, dismissing plaintiffs' RICO claims and fraud claims."); Joint Pretrial Consent Order, at 1. It is equally obvious to the Court that defendants would be unduly prejudiced if plaintiff were permitted to re-raise the RICO claim, as defendants had no opportunity at trial to rebut plaintiff's purported evidence of a RICO violation. <u>See</u> <u>Gussack Realty Co. v. Xerox Corp.</u>, 224 F.3d 85, 94 (2d Cir. 2000); <u>Browning Debenture Holders' Comm. v. DASA Corp.</u>, 560 F.2d 1078, 1086 (2d Cir. 1977). The Court accordingly denies plaintiff's motion to amend the pleadings to reallege a RICO claim and reconfirms its prior ruling that the RICO claim is dismissed from the case.[27]

---

[27] The Court further notes that it is entirely unclear why plaintiff devoted an entire section of its proposed conclusions of law to establishing that the MCA agreements are loans, given that the Court has already ruled that even if these transactions were loans, they are not unlawful under North Carolina's very permissive laws. <u>See</u> Pl. Proposed Conclusions of Law, at 18-25, ECF No. 255. 8/28/23 <u>Op.</u> and Order, at 12. To the extent this is part and parcel of Haymount's attempts to resurrect the already dismissed RICO claim, it is not properly before the Court. To the extent plaintiff believes it bears on plaintiff's claim that the contracts were breached by underfunding, the Court finds that it is irrelevant, as that aspect of plaintiff's breach claim fails for reasons independent of whether MCA agreements should be recharacterized as loans.

## B. **Breach of Contract**

The Court now turns to plaintiff's breach of contract claim. Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract." Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 276 (N.C. 2019). Here, there is no dispute that the six MCA agreements at issue are valid contracts. The only dispute between the parties is whether those MCA agreements were breached, and if so, what the appropriate measure of damages is.

### i. **Excessive Fees**

Plaintiff asserts that defendants breached the MCA agreements by charging excessive upfront fees. For the reasons explained below, the Court finds that plaintiff has failed to prove that defendants breached the MCA agreements in this manner.

All six MCA agreements permitted defendants to charge up to 12% of the Purchase Price for underwriting costs and up to 10% of the Purchase Price for origination costs, which means defendants could charge a maximum of up to 22% of the Purchase Price in upfront fees. The evidence at trial established that defendants never charged more than 22% of the Purchase Price in upfront fees and always charged the amount that was disclosed to Dr. Clinton on the funding call. Thus, plaintiff presses the remaining avenue for challenging the fees it was charged: that defendants breached the MCA agreements by charging more

32

than the actual fees they incurred.[28] While, as previously noted, the Court, in recognition of defendants' overbearing practices, harbors some suspicion that the defendants in fact charged origination and underwriting fees beyond the actual fees incurred, plaintiff, who bears the burden of proof, has wholly failed to prove what defendants' actual fees were, let alone the amount of any supposed overcharging.

Despite full pre-trial discovery, plaintiff entered no documentary evidence about the actual fees incurred on MCA Agreement 1, MCA Agreement 2, and MCA Agreement 3. Plaintiff, however, attempted to show the actual fees incurred on MCA Agreement 4, MCA Agreement 5, and MCA Agreement 6 with an internal spreadsheet. See Pl. Ex. 131. But that spreadsheet does not show what plaintiff thinks it does. Plaintiff urges the Court to infer that the actual fees defendants incurred are reflected in the column labeled "Fees & Exp," which shows that $250 was incurred in connection with MCA Agreement 4, $304 was incurred in connection with MCA Agreement 5, and $250 was incurred in connection with MCA Agreement 6. Id. But no witness testified that was the correct interpretation of the spreadsheet. Worse yet, Mr. Kroen even pushed back against interpreting the spreadsheet in that manner. Nor as a matter of first principles does it makes sense to interpret the spreadsheet in that way. First, the MCA agreements specify that at

---

[28] To the extent plaintiff is also asking the Court to interpret the contract to only permit defendants to charge reasonable origination and underwriting fees, plaintiff would still not prevail because it also put forward no evidence showing what origination and underwriting fees would be reasonable for defendants to charge in connection with the six MCA agreements.

least $1,000 is always charged for underwriting and origination fees, which is higher than the amounts listed in the spreadsheet. Second, the spreadsheet appears to list the fees that plaintiff was actually charged in a column labeled "bank fee." See id. (listing $100,000 for MCA Agreement 4, $300,000 on MCA Agreement 5, and $200,000 on MCA Agreement 6).[29] Thus, absent on-point witness testimony, the Court declines plaintiff's invitation to interpret the spreadsheet in such a counterintuitive manner.

Compounding the lack of documentary evidence is the fact that plaintiff also failed to elicit any witness testimony establishing the actual fees that defendants incurred. The closest plaintiff came was Mr. Wolf's testimony that defendants' practice was to charge the maximum of 22% in upfront fees. See Tr. 270:12-272:25.[30] But that testimony cannot, standing alone, prove that defendants charged more

---

[29] For MCA Agreement 5, plaintiff was actually charged less in fees ($100,000) but the Court finds that the spreadsheet likely reflects the total fees that would have been charged if plaintiff was sent the second tranche of funding.

[30] Plaintiff attempts to rely on testimony from Mr. Wolf and Mr. Brezel that Mr. Braun was not paid for the underwriting services he rendered in connection with these agreements to impugn the amount in fees that defendants charged. See Pl. Proposed Findings of Fact, ¶ 138, ECF No. 254. However, the Court intentionally omitted that proposed fact from its factual findings. Based on the Court's assessment of these witnesses' demeanor and credibility, the Court concludes that those witnesses were lying about paying Mr. Braun to avoid being implicated in Mr. Braun's egregious wrongdoing in other cases. See, e.g., FTC v. RCG Advances, LLC, No. 20-cv-4432, 2023 WL 6281138 (S.D.N.Y. Sept. 27, 2023); FTC v. Braun, No. 20-cv-4432, 2024 WL 449288 (S.D.N.Y. Feb. 6, 2024); People v. Richmond Capital Grp. LLC, 2023 N.Y. Misc. LEXIS 5511 (N.Y. Sup. Ct. Sept. 15, 2023).

than their actual fees. Indeed, defendants never charged the full 22% in upfront fees on any of the contracts at issue here. Moreover, Dr. Clinton, as he testified, was fully aware of these fees and even tried to negotiate some of these charges. Finally, and most importantly, plaintiff has not put forward any affirmative evidence showing that defendants' actual expenses were less than what Dr. Clinton was charged. Accordingly, plaintiff has not shown that defendants breached the contract by charging excessive fees. Plaintiff is therefore not entitled to recover damages for any of the fees that defendants charged.

### ii. Over-collecting

Plaintiff also asserts that defendants breached four of the MCA Agreements (agreements 2, 3, 4, and 5) by over-collecting more than they were contractually owed.[31] Here, the Court agrees. The evidence conclusively established that defendants over-collected $2,250 on MCA Agreement 2, $150 on MCA Agreement 3, $50,071.77 on MCA Agreement 4, and $170,000 on MCA Agreement 5. Because the contracts explicitly specified the amount that defendants were entitled to receive from plaintiff (i.e., the Purchased Amount), this is a clear breach of the contracts.

Defendants attempt to avoid the consequences of this clear breach with two arguments, neither of which has merit. First, defendants argue

---

[31] Plaintiff does not claim that defendants over-collected on MCA Agreement 1 or MCA Agreement 6. See Pl. Proposed Findings of Fact, ¶ 148.

that because they charged less than the contractual maximum in upfront fees on MCA Agreements 2, 3, and 4, they should now be able to offset the over-collections by retroactively charging the contractual maximum. That argument is frivolous. The evidence established that the contracts permitted defendants to deduct <u>up to</u> 22% in upfront fees from the Purchase Price. But here, defendants chose to only deduct 20% in upfront fees from the Purchase Price on MCA Agreements 2 and 3 and deduct 10% in upfront fees from the Purchase Price on MCA Agreement 4, which are also the amounts that were disclosed to Dr. Clinton during the funding call. Defendants have pointed to nothing in the MCA agreements that would permit them, after the fact, to increase the amount of upfront fees that Haymount owes. The reason defendants have pointed to nothing is because there is <u>no</u> contractual basis for their position. The Court accordingly rejects this argument.

Second, defendants argue they are entitled to offset the over-collections on MCA Agreements 2, 3, 4, and 5 by the $479,990 that plaintiff allegedly owes GoFund on MCA Agreement 6.[32] The Court again disagrees. North Carolina law, which here governs, treats offset (which is essentially a request for a setoff) as an affirmative defense. <u>See</u> <u>Lunsford v. Cemex, Inc.</u>, 733 F. Supp. 2d 652, 658 (M.D.N.C. July 28, 2010) (crediting a party's argument that "the claim to offset unemployment benefits is an affirmative defense and thus cannot be

---

[32] The Court presumes that defendants chose this route because they waived their counterclaim for breach of contract. <u>See</u> Joint Pretrial Consent Order, at 2 n.1 ("Defendants do not assert any counterclaims.").

considered in calculating the amount in controversy"); SCBT v. Rimes, 237 N.C. App. 399 (N.C. Ct. App. 2014) ("An offset under N.C. Gen. Stat. § 45-21.36 is an affirmative defense."); Mikels v. Unique Tool & Mfg. Co., No. 5:06CV32, 2007 WL 4284727, at *25 (W.D.N.C. Dec. 3, 2007) (indicating that offset is an affirmative defense); Asilonu v. Asilonu, 550 F. Supp. 3d 282, 294 (M.D.N.C. 2021) (same); Drapkin v. Mjali, 441 F. Supp. 3d 145, 157 (M.D.N.C. 2020) (equating the affirmative defenses of offset and setoff); Durham v. SMI Industries Corp., 882 F.2d 881, 883 (4th Cir. 1989) ("Setoff, however, is an affirmative defense which must be pled and proven by the party asserting it."); McGinity v. USAA Fed. Savings Bank, No. 5:19-cv-560, 2020 WL 1867386, at *2 (E.D.N.C. Apr. 14, 2020) (same). However, defendants never pled offset or setoff as an affirmative defense in their answer or amended answer. See Answer, ECF No. 90; Am. Answer, ECF No. 102. Defendants accordingly waived any argument they are entitled to an offset. See Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1580 (2d Cir. 1994) ("The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver.").[33]

---

[33] The Court notes, moreover, that it would have also barred defendants' claim for an offset under the doctrine of unclean hands if that doctrine was applicable to requests for monetary relief. See Drapkin, 441 F. Supp. 3d at 156 ("Under North Carolina law, the defense of unclean hands is applicable only when the plaintiff seeks an equitable remedy. Claims for monetary relief, therefore, are not properly addressed through the affirmative defense of unclean hands.").

In sum, Haymount proved that GoFund breached MCA Agreements 2, 3, and 4 and Funding 123 breached MCA Agreement 5. Haymount is thus entitled to recover $52,471.77 from GoFund and $170,000.00 from Funding 123 for over-collections.

### iii. **Funding the Purchase Price in Two Tranches**

For the first time in its post-trial briefing, plaintiff asserts that it is entitled to a "refund" of some or all of the "interest"[34] it paid on MCA Agreements 1, 2, 3, 5, and 6 because defendants underfunded those agreements by advancing the Purchase Price in two tranches, contrary to the terms of those agreements. The Court disagrees.[35]

Plaintiff's position suffers from two fatal flaws. First, plaintiff waived this aspect of its breach claim by failing to include it in the joint pretrial consent order. In the section of the joint pretrial consent order entitled "Joint Overview of the Case," plaintiff described its breach claim in the following manner: "Haymount alleges claims arising from breach of contract for: (i) over-collecting sums above the specified 'Purchased Amount' in certain MCA Agreements; (ii)

---

[34] The Court takes no position on whether defendants were charging interest. The Court is merely using the terminology that plaintiff used in describing this aspect of its claim.

[35] MCA Agreement 4 was not funded in two tranches and thus plaintiff is not seeking the return of the "interest" it paid on that agreement. The Court further notes that plaintiff does not claim that defendants' failure to advance the second tranche of funding, under MCA Agreement 5, was itself a breach. The Court accordingly does not address that issue.

assessing unearned fees for each of the six MCA Agreements; and (iii) breaching the terms of certain MCA Agreements by providing only a portion of the promised principal, while simultaneously not reducing the daily remittance amount contained in the MCA Agreement." Joint Pretrial Consent Order, at 1. Thus, the theory of underfunding presented in this section of the joint pretrial consent order is not the same theory of underfunding that the plaintiff presses now, after trial, as a purported failure to reduce the daily remittance rate is different in kind than a claim that plaintiff is entitled to the return of all or some of the "interest" that it allegedly paid.

Worse yet, in the section of the joint pretrial consent order entitled "Particularized Description of Each Party's Claims," plaintiff asserted that it is seeking $1,106,471 in damages based on the following three breaches: "[(i)] failing to provide the original amount of funding promised, [(ii)] over collecting more than what was agreed upon through the use of ACH debiting, and [(iii)] charging 'sham' fees that were not incurred as stated in the MCA Agreements." Id. at 2-3. But then when plaintiff specified the nature of those damages in the later order, plaintiff asserted that it was seeking $397,471 in compensatory damages for over-collections, $509,000 in compensatory damages for fee overcharges, and $167,723.04 in prejudgment interest. Id. at 25-26. Notably, plaintiff does not assert it is seeking damages, equal to some or all of the "interest" that it paid (ranging from $276,989 to $619,000), for underfunding caused by defendants' funding five of the MCA agreements in two tranches.

The glaring omission of this breach theory from the joint pretrial consent order is a problem for plaintiff. The undersigned's individual rules explicitly state that the parties must submit a pretrial consent order that includes both "[a] particularized description of each party's remaining claims, counterclaims, cross-claims, or third-party claims (failure to specify which will be deemed a waiver)" and "[a] particularized statement of the injunctive relief, declaratory relief, and/or damages claimed (including amounts) for each claim, counterclaim, cross-claim, or third-party claim." See Individual Rules of Practice Hon. Jed S. Rakoff, § 4(b)(ii), (v). By failing to include this aspect of their claim in the joint pretrial consent order, plaintiff has waived, or at the very least forfeited, its right to seek these damages. See Kontrick v. Ryan, 540 U.S. 443, 458 n.13 (2004) ("[F]orfeiture is the failure to make the timely assertion of a right[,]" while "waiver is the intentional relinquishment or abandonment of a known right."). The Court therefore finds that this aspect of plaintiff's breach claim is not properly preserved and that it need not be addressed on the merits.

Moreover, even assuming arguendo that plaintiff properly preserved this aspect of its breaching claim (which it did not), plaintiff's argument also fails on the merits. Plaintiff's position presupposes that defendants' decision to fund MCA Agreements 1, 2, 3, 5, and 6 in two tranches breached those contracts. The record belies that assertion. The evidence established that the contracts were

modified to permit defendants to send the Purchase Price in two tranches.

"It is well established under [North Carolina] law that: The provisions of a written contract may be modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract have been modified or waived, even though the instrument involved provides that only written modifications shall be binding." Son-Shine Grading, Inc. v. ADC Const. Co., 68 N.C. App. 417, 422 (N.C. Ct. App. 1984); accord Hodgson Const., Inc. v. Howard, 187 N.C. App. 408, 414 (N.C. Ct. App. 2007). Here, plaintiff's conduct reasonably led defendants to believe the contracts had been modified to permit the Purchase Price to be advanced in two tranches.

For the first two contracts, plaintiff signed a written addendum permitting those deals to be flexed and then accepted the money in two tranches. There is no evidence that plaintiff tried to return the money it was advanced. Thus, even though the written addendums were not signed by Merchant Capital or GoFund (as was required for the addendums to be binding under the no-oral modification clause in the contracts), plaintiff's course of conduct reasonably and justly led defendants to believe the contracts had been modified to permit sending the Purchase Price in two tranches.

The same goes for MCA Agreements 3, 5, and 6. For these agreements, even though there was no written addendum, Dr. Clinton knew flexing was the standard practice, accepted that these deals would

be flexed, and never appears to have attempted to return any of the funding he received because the deals were flexed. See Tr. 535:15-536:9. Furthermore, for MCA Agreement 5, Dr. Clinton directly negotiated how the deal would be flexed and ultimately accepted the deal only after he succeeded in getting more funding in the first tranche. In light of this evidence, coupled with the fact that Dr. Clinton signed written addendums permitting flexing on the first two deals, defendants justly and reasonably concluded that MCA Agreements 3, 5, and 6 had been modified to permit flexing.

Plaintiff attempts to resist this conclusion by arguing that the rule in Son-Shine Grading is inapplicable because it is premised on detrimental reliance and equity. See Pl. Reply Proposed Conclusions of Law and Fact, at 6. But plaintiff cites to no portion of that decision that actually supports that position, and, regardless, here there was detrimental reliance -- defendants advanced the Purchase Price in two tranches based upon plaintiff's conduct and continued acceptance of the funds. Plaintiff cannot avoid the clear implications of a settled rule of law by invoking a free-floating notion of equity.[36]

---

[36] Plaintiff also appears to assert that there was no modification because plaintiff did not know defendants were involved in each of the agreements. See Pl. Reply Proposed Conclusions of Law and Fact, at 1. But plaintiff cites no legal support for that proposition, and regardless, it also does not help plaintiff. The basis for finding there was a modification is based upon defendants' reliance on plaintiff's conduct.

In conclusion, the Court finds that plaintiff is not entitled to recover any damages for underfunding.[37]

### iv. **UCC Lien**

Plaintiff also seeks $1,750,159 in consequential damages. Plaintiff's theory is that the UCC lien that Alpha Recovery sent to United Healthcare breached MCA Agreement 6 and thus it is entitled to damages for the insurance claims it was never able to submit because the UCC lien kept Haymount's HRSA account frozen until the federal government ended the HRSA program. Accordingly, to prevail on this aspect of its breach claim, plaintiff must prove: (1) sending the UCC lien breached MCA Agreement 6; (2) the limitation of liability provision in the contract was waived; and (3) its consequential damages were caused by defendants' breach, are sufficiently definite, and were foreseeable. Even assuming arguendo that plaintiff proved that sending the UCC lien breached MCA Agreement 6 and that defendants waived the limitation of liability provision in the contract, plaintiff would still not be entitled to these consequential damages because they were not foreseeable.

"It is well established that, to recover special or consequential damages in a contract action, plaintiff must prove that these damages were in fact caused by the breach, that the amount of such damages can

---

[37] The Court also notes that it is not at all clear that plaintiff was actually damaged by this underfunding and even if plaintiff was damaged, that plaintiff's calculations appropriately measure its damages.

be proved with a reasonable degree of certainty, and that the damages were within the contemplation of the parties at the time they contracted." <u>Chris v. Epstein</u>, 113 N.C. App. 751, 756 (N.C. Ct. App. 1994). "In other words, the injured party may recover all of the damages which were *foreseeable* at the time of the contract as a probable result of the breach either because they were a *natural* result or because they were a *contemplated* result of breach." <u>Id.</u>

Here, Haymount is seeking to recover consequential damages for insurance claims it was unable to submit because the HRSA program ended before the Court's order could lift the freeze on Haymount's HRSA account. The problem for plaintiff is that while it was foreseeable to defendants that sending the UCC lien would freeze plaintiff's HRSA account, it was <u>not</u> foreseeable that the federal government would end the HRSA program, resulting in plaintiff being permanently unable to receive any reimbursement for its unsubmitted insurance claims. Dr. Clinton himself admitted on the stand that he had no idea the HRSA program was going to permanently end in advance of the federal government's announcement on March 19, 2022. Tr. 546:22-24. It is therefore clear to the Court that it was not foreseeable to defendants, at the time of entering the contract, that sending the UCC lien would lead to plaintiff being permanently unable to submit its HRSA claims for reimbursement.

Plaintiff's argument to the contrary appears to misunderstand the foreseeability analysis. Plaintiff asserts that "[t]he Individual Defendants knew their conduct would cause the damages sustained because

Haymount filed an Order to Show Cause concerning these specific damages," and "[r]ather than retract the letters, the Individual Defendants opposed the emergency relief sought." Pl. Proposed Conclusions of Law, at 2; see also Pl. Reply Proposed Conclusions of Law and Fact. That is not relevant. The foreseeability analysis requires the Court to determine what was reasonably foreseeable at the time of contracting, not to inquire about what defendants knew based on information that they later learned. See Crescent Univ. City Venture, LLC v. AP Alt., Inc., No. 15 CVS 14745, 2019 WL 3765313, at *18 (N.C. Super. Aug. 8, 2019) ("Consequential damages . . . are those damages which might have been within the contemplation of the parties at the time the contract was made."); Banc of Am. Merch. Servs., LLC v. Arby's Rest. Grp., Inc., No. 20 CVS 426, 2021 WL 2695474, at *11 (N.C. Super. June 30, 2021) (similar). And regardless, plaintiff's argument fails on its own terms. The memorandum that plaintiff submitted in support of the order to show cause, which contains lengthy discussions of the irreparable harm that the UCC lien would cause plaintiff, nowhere mentions that the HRSA portal will close and result in plaintiff being permanently barred from submitting its HRSA claims for reimbursement. See Pl. Mem. of Law in Supp. of Order to Show Cause for Temporary Restraining Order and Preliminary Injunction, at 3-7, 12-14, 20, ECF No. 39. Plaintiff's argument is therefore without merit.

In sum, the Court concludes that plaintiff is not entitled to recover any consequential damages.

### v. Alter Ego Liability

Finally, plaintiff asserts that Mr. Brezel and Mr. Wolf should be held responsible for the corporate defendant's contractual breaches. As the Court previously explained in its summary judgment opinion, a non-party to a contract between an individual and LLC cannot be sued for breach of contract, based on the actions of the LLC, unless the prerequisites for corporate veil piercing are satisfied. N.C. Gen. Stat. Ann. § 57D-3-30; Cummings v. Carroll, 270 N.C. App. 204, 228 (N.C. Ct. App. 2020), aff'd in part, rev'd in part, 379 N.C. 347 (N.C. 2021); S. Shores Realty Servs., Inc. v. Miller, 251 N.C. App. 571, 584 (N.C. Ct. App. 2017). Accordingly, the Court must determine whether it can pierce the corporate veil to hold Mr. Wolf and Mr. Brezel, both non-parties to the MCA agreements, liable for the corporate defendants' breaches.

To determine whether to pierce the corporate veil, the Court must apply the law of the state where the LLCs are incorporated. In re Digit. Music Antitrust Litig., 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011); see also Tayyib Bosque, Corp. v. Emily Realty, LLC, 813 F. App'x 628, 630 (2d Cir. 2020); Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995); Sweeney, Cohn, Stahl & Vaccaro v. Kane, 773 N.Y.S.2d 420, 423 (N.Y. App. Div. 2d Dep't 2004).[38] Because the corporate

---

[38] The same result would obtain, if for some reason, the choice-of-law rules of Connecticut or North Carolina applied to this question. See In re American Ambulette & Ambulance Serv., Inc., 560 B.R. 256, 269-70 (Bankr. E.D.N.C. 2016); Dassault Falcon Jet Corp. v. Oberflex, Inc., 909 F. Supp. 345, 348-49 (M.D.N.C. 1995); Herrmann Int'l, Inc. v.

defendants are incorporated in Connecticut, the Court will apply Connecticut law.

The Connecticut "Supreme Court has endorsed two tests: the instrumentality test and the identity test" to determine whether piercing the corporate veil is appropriate. KLM Indus., Inc. v. Tylutki, 75 Conn. App. 27, 32 (Conn. App. Ct. 2003). If either test is satisfied, the corporate veil may be pierced. In re Carrano, 530 B.R. 540, 556 (Bankr. D. Conn. 2015). However, regardless of which test is used, "the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetrate fraud or promote injustice." McKay v. Longman, 332 Conn. 394, 444 (Conn. 2019).

Here, plaintiff argues that the corporate veil can be pierced under the instrumentality test. See Pl. Proposed Conclusions of Law, at 7-10. Under the instrumentality rule, a plaintiff must prove: "(1) [c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant

Hermann Int'l Europe, No. 1:17-cv-00073, 2021 WL 861712, at *5 (W.D.N.C. Mar. 8, 2021); Al Hamra Trading, Est. v. Diamondback Tactical, LLP, No. 1:12-cv-00373, 2014 WL 5023488, at *9 (W.D.N.C. Oct. 8, 2024); Graduation Sols, LLC v. Acadima, LLC, No. 3:17-CV-01342, 2018 WL 3637479, at *5 (D. Conn. July 31, 2018).

to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of the plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." Naples v. Keystone Bldg. & Dev. Corp., 295 Conn. 214, 232 (Conn. 2010).

Under the first element of this rule, "the primary question is whether an entity is completely dominated by another." Chapco, Inc. v. Woodway USA, Inc., 282 F. Supp. 3d 472, 481 (D. Conn. 2017). Courts will accordingly consider the following factors in determining whether the requisite level of control has been exercised: "(1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." Naples, 295 Conn. at 233. These factors, however, are "non-exclusive." Chapco, 282 F. Supp. 3d at 481. That is because there is "[n]o hard and fast rule . . . as to the conditions under which the entity may be disregarded . . . as they vary according to the circumstances of each

48

case." <u>Pasco Common Condo. Ass'n v. Benson</u>, 192 Conn. App. 479, 520
(Conn. Ct. App. 2019).

Here, plaintiff has proven that Mr. Wolf exercised the requisite
level of control over the corporate defendants (GoFund and Funding
123) with respect to MCA Agreements 4 and 5.[39] Defendants' concession
"that corporate formalities were not fully followed" is an
understatement. Def. Post-Trial Proposed Findings of Fact and
Conclusions of Law, ¶ 22. The evidence conclusively established that
the Connecticut entities were mere shells set up by Mr. Kroen and Mr.
Wolf to take advantage of Connecticut's pre-judgment attachment
statute. The Connecticut entities had no offices, no employees, and no
independent bank accounts. The entities also never transacted any
business in Connecticut or filed any taxes. In short, the Connecticut
entities had absolutely no connection to Connecticut and effectively
existed on paper only.

Furthermore, even though Mr. Kroen and Mr. Getter were at
different points in time the on-paper owners of the Connecticut
entities, it was Mr. Wolf who was calling the shots. Mr. Wolf paid to
set up the entities, continued to fund the entities through his company
Bridge Funding (including paying rent on an office in Connecticut that

---

[39] Because plaintiff is not claiming any over-collections with respect
to MCA deals 1 and 6, the fact that Mr. Wolf controlled those
transactions is not directly relevant here. It is therefore also not
directly relevant whether Mr. Wolf controlled Merchant Capital, which
was only a party to MCA Agreement 1. However, because Mr. Wolf treated
all the Connecticut entities in the same manner, the Court necessarily
is addressing Mr. Wolf's control over Merchant Capital as part and
parcel of Mr. Wolf's control over all the Connecticut entities.

the entities never actually used), and made decisions about how and when the Connecticut entities funded MCA deals. Further to the point, Mr. Wolf admitted that he controlled the first, fourth, fifth, and sixth MCA deals, and that the Connecticut entities did <u>nothing</u> in connection with those deals. Therefore, even though Mr. Wolf was not the on-paper owner or even a named director of the Connecticut entities, he still exercised the requisite level of domination and control over the Connecticut entities with respect to MCA Agreement 4 and 5 to satisfy the first element of the instrumentality rule. <u>See Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc.</u>, 187 Conn. 544, 556-57 (Conn. 1982) (Although the Court should consider "stock ownership" and whether the individual is "an officer or director of the pierced corporation, . . . [i]t is clear that the key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs.").

However, the evidence established that Mr. Brezel ran the second and third MCA deals without much if any involvement from Mr. Wolf. Accordingly, the Court concludes that Mr. Wolf did not exercise the requisite level of control over MCA Agreements 2 and 3 for the imposition of personal liability for the over-collections on those transactions to be proper. <u>See in re Carrano</u>, 530 B.R. 540, 556 (Bankr. D. Conn. 2015) (emphasizing that the first element is whether "complete domination and control" has been exercised "*in respect to the transaction attacked*"); <u>Angelo</u>, 187 Conn. at 559 ("The fact that the

corporate veil could be disregarded for some purposes does not mean that it must be disregarded for all purposes.").

Plaintiff, however, has not at all proven that Mr. Brezel exercised the requisite level of control over the Connecticut entities to satisfy the first element of the instrumentality rule. Plaintiff put forward no evidence that Mr. Brezel controlled the Connecticut entities in any respect, let alone with respect to the transactions at issue here. The only evidence of Mr. Brezel's involvement with the Connecticut entities is that he contracted, in GoFund's name, on his two deals, received profits on some of Mr. Wolf's deals as a syndicate, and on a few occasions signed settlement agreements on behalf of the Connecticut entities. That evidence is plainly insufficient to show control and domination.

The fact that Mr. Brezel signed settlement agreements on behalf of the Connecticut entities does not show that he controlled those entities. At most, it shows that he was an authorized representative of the entities. Furthermore, receiving profits as a syndicate member on some of Mr. Wolf's deals does not equate to Mr. Brezel actually controlling the Connecticut entities. Finally, for the second and third MCA agreements, the evidence established that GoFund was nominally the contracting party, but that GSS Equity and Tailored Fund ran those transactions; but no evidence established that GSS Equity and Tailored Fund exercised actual control and domination over GoFund with respect to those transactions, rather than merely using the name of GoFund as a front and then conducting the transaction through an entirely

51

different entity.[40] Accordingly, plaintiff cannot pierce the corporate veil to hold Mr. Brezel responsible for any of the over-collections.

Now turning to the second element, plaintiff has proven that Mr. Wolf used his control over the Connecticut entities to perpetrate a fraud or wrongdoing against plaintiff. See Pasco Common, 192 Conn. App at 523 (explaining that this element focuses on whether the individual "improperly used his control over the . . . corporate form to accomplish . . . misconduct."). Defendants are right to point out that ordinarily breach of contract standing alone is insufficient to prove this element. See Campisano v. Nardi, 212 Conn. 282, 293-94 (Conn. 1989). However, a breach of contract coupled with a showing that a "the corporation was formed for an improper purpose," such as forming a corporation "to shelter [oneself] from personal obligations incurred prior to the formation or the corporation" or "to commit or to avoid liability for any personal wrongful act," is sufficient to satisfy the second element. Id. Here, plaintiff has made that showing.

The Connecticut entities were plainly formed for an improper purpose: to fraudulently take advantage of Connecticut's pre-judgment attachment statute, even though the entities and the transactions never had any connection to Connecticut. Furthermore, the evidence showed that Mr. Wolf intentionally structured the Connecticut entities so as to obfuscate his control over the entities and thus implicitly to avoid

---

[40] It is thus irrelevant that Mr. Brezel may have controlled GSS Equity and Tailored Fund, as plaintiff cannot pierce the corporate veil to go from GoFund to GSS Equity or Tailored Fund.

liability for any wrongful act done under the name of the Connecticut entities. Specifically, the evidence established that Mr. Wolf funded and controlled the Connecticut entities but ensured that the Connecticut entities were always in someone else's name, first Mr. Kroen's and then Mr. Getter's. Mr. Wolf then used his control over those entities to run MCA deals 4 and 5 and overcharge plaintiff in contravention of the terms of those agreements. And if the Court does not permit corporate veil piercing, plaintiff will likely never recover a dime because the Connecticut entities never existed beyond merely being names on a piece of paper. Cf. Naples, 295 Conn. at 236 (faulting a plaintiff for failing to show that not piercing the corporate veil "would perpetrate a fraud or other injustice, such as by wrongfully denying them compensation for the damages occasioned by the contractual and warranty breaches"). Because the evidence established that Mr. Wolf used his control over the Connecticut entities to breach the contracts with plaintiff and that these entities were formed for a fraudulent purpose and structured so as to obfuscate Mr. Wolf's role in any wrongdoing, the Court finds the second element is satisfied.

Finally, the third element is easily satisfied. The evidence established that Mr. Wolf controlled the fourth and fifth MCA deals and thus he controlled whether or not Haymount was over-charged. Accordingly, Mr. Wolf's exercise of control over the Connecticut entities was the proximate cause of plaintiff's monetary harm. See Naples, 295 Conn. at 232 ("the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of"). It

follows that the Court will pierce the corporate veil and hold Mr. Wolf responsible for $50,071.77 that plaintiff was over-charged by GoFund on MCA Agreement 4 and for $170,000 that plaintiff was over-charged by Funding 123 on MCA Agreement 5.

## III. Conclusion

For the foregoing reasons, the Court finds plaintiff is entitled to $170,000 against Funding 123 and $52,471.77 from GoFund, with Mr. Wolf also being jointly and severally liable to plaintiff for $170,000 owed by Funding 123 and $50,071.77 owed by GoFund. Plaintiff is also entitled to prejudgment interest, to be calculated by the Clerk of Court, of 8% per annum beginning on February 7, 2022.[41]

---

[41] N.C. Gen. Stat. § 24-5(a) provides that "[i]n an action for breach of contract . . . the amount awarded on the contract bears interest from the date of breach." Here, plaintiff has conceded that date is February 7, 2022. See Pl. Proposed Conclusions of Law, at 7. The statute further specifies that "[i]f the parties have agreed in the contract that the contract rate shall apply after judgment, then interest on an award in a contract action shall be at the contract rate after judgment; otherwise it shall be at the legal rate." N.C. Gen. Stat. § 24-5(a). Accordingly, the Court may award pre-judgment interest "at the contract rate, or the legal rate if the parties have not agreed upon an interest rate." Cleveland Constr., Inc. v. Ellis-Don Constr. Inc., 210 N.C. App. 522, 536 (N.C. Ct. App. 2011). Here, there is no interest rate specified in the relevant MCA agreements. See Pl. Ex. 2, at 1 ("there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected"); Pl. Ex 3, at 1 (same); Pl. Ex. 4, at 1 (same); Pl. Ex. 5, at 1 (same). Plaintiff attempts to avoid this fact by arguing that the interest rate "is readily discernable on the[] face" of the agreements and then calculates what the interest rate would be using a mathematical formula. See Pl. Proposed Conclusions of Law, at 7; Pl. Reply Conclusions of Law and Fact, at 9. However, plaintiff cites no cases that support manufacturing an interest rate when the contract itself specifies there is no interest rate. Cf. Craftique, Inc. v. Stevens & Co., Inc., 321 N.C. 564, 568 (N.C. 1988) (noting the difference between a contract that "had an agreed interest rate in

54

The Clerk of Court is respectfully directed to make the indicated calculation, enter final judgment, and close the case.

SO ORDERED.

Dated:    New York, NY

          June 26, 2024                    JED S. RAKOFF, U.S.D.J.

---

[the] contract" and a contract that "did not"). That is likely because there are no cases supporting such an approach, as plaintiff's ex-post calculations cannot change that the contract never specifies an interest rate and thus the parties never contractually agreed to an interest rate. Cf. Hardy-Latham v. Wellons, 415 F.2d 674, 679 (4th Cir. 1968) ("[A]bsent an agreement between the parties, [the legal rate of interest] is the rate due on money owed under a contract."); Coston v. Coston, 109 N.C. App. 306, 308 (N.C. Ct. App. 1993) (noting that the North Carolina Supreme Court has "stated: In the absence of an agreement, the injured party is entitled to interest at the legal rate. Implicit in this statement is the idea that if the parties do have an agreement concerning interest, that agreement will control."); Silicon Knights, Inc. v. Epic Games, Inc., 917 F. Supp. 2d 503, 526 (E.D.N.C. 2012) (applying a contractual interest rate explicitly specified in the contract); Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co., 129 N.C. App. 525, 529 (N.C. Ct. App. 1998) ("Interest is to be assessed at the legal rate of 8 percent, unless the parties have provided otherwise by agreement, in which event the agreement shall prevail."). Accordingly, the Court uses the legal rate of interest in North Carolina, which is 8% per annum. See N.C. Gen. Stat. § 24-1.